ORIGINAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

UNITED STATES OF AMERICA,

-against-

RUDY KURNIAWAN,

                  Defendant.

------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:        35
DATE FILED: 1/17/13
```

**OPINION AND ORDER**

12 Cr 376  (RMB)

102821

**Background**

       This Opinion and Order respectfully denies the motion of Rudy Kurniawan ("Defendant"

or "Kurniawan"), dated October 12, 2012 (as supplemented), to suppress evidence seized from

his home at 9638 East Naomi Avenue, Arcadia, California on March 8, 2012. The items seized

included, but were not limited to the following: electronic media (laptop computers and memory

stick), catalogues, tasting notes, wine bottles, foil, labels, corks. See Transcript of Proceedings,

dated Jan. 17, 2013 ("1/17/13 Tr.").

       The parties have stipulated that an evidentiary hearing in this matter is not required. (See

Letter from Jason P. Hernandez to Hon. Richard M. Berman, dated Dec. 7, 2012, ("Mr. Proctor

and I have conferred and we believe that an evidentiary hearing in connection with the

defendant's motion to suppress evidence is unnecessary because there are no material facts in

dispute. We believe that the motion can be decided based on the materials already submitted to

the Court.")). The Court did hear helpful oral argument of counsel on December 12, 2012. See

Transcript of Proceedings dated Dec. 12, 2012 ("12/12/12 Tr.").

       Based upon the record of these proceedings, the Court finds that United States Magistrate

Judge Michael R. Wilner, Central District of California, had probable cause to issue a warrant to

search Kurniawan's home on March 8, 2012 ("Search Warrant") – even if one assumes,

arguendo, that certain of the information presented in support of the Search Warrant should be

"excised" or disregarded.[1]

## Choice of Law

Preliminarily, the Court concludes that there was probable cause to search Kurniawan's

home on March 8, 2012, under either Ninth Circuit or Second Circuit jurisprudence, based upon

the following: **(i)** allegations set forth in the criminal Complaint, dated March 5, 2012

("Complaint"), which included sworn statements of Federal Bureau of Investigation (FBI)

Special Agent James P. Wynne, ("Special Agent Wynne" or "Agent Wynne") and (portions of)

the affidavit, dated March 8, 2012, of FBI Special Agent Olivier Farache ("Special Agent

Farache" or "Agent Farache"); **(ii)** "plain view" items observed by law enforcement at the time

of Kurniawan's arrest from the vantage point of the "threshold" of Defendant's front door

---

[1]Defense counsel argues that law enforcement was not entitled to conduct a "protective
sweep" of Defendant's home because "this arrest did not occur inside." (Def. Mem. of Law in
Supp. of Its Mot. to Suppress Evidence dated Oct. 12, 2012 ("Def. Mem.") at 3.) "[O]nly a
suspicionless search of a small area immediately adjoining the arrest site and - not the entire
home" would have been authorized; and "the search [should have been] cursory - only for other
dangerous people - and last only long enough to ensure the agents' safety while effectuating the
arrest." (Id.) Although the Court does not need to resolve the protective sweep issue (because it
finds probable cause existed even without the "fruits" of the protective sweep), if it did, it would
likely find that law enforcement agents were authorized to conduct at least a limited protective
sweep of Defendant's home, the protective sweep of a certain "locked room" perhaps being
problematic.

See, e.g., United States v. Lemus, 582 F.3d 958, 960 (9th Cir. 2009) ("Because the area
in which the police officers discovered the incriminating evidence immediately adjoined the
place of arrest, the officers were justified in conducting a search of that area without either
probable cause or reasonable suspicion, and anything in plain view that they discovered in the
course of that search could be seized without violating the Fourth Amendment."); see also
United States v. Oguns, 921 F.2d 442, 446 (2d Cir. 1990).

2

(particularly the crates and bottles of wine described by Agent Farache in his affidavit); and **(iii)**
the experience of law enforcement officers involved in this case. "The Supreme Court has
explained that probable cause is a fluid concept - turning on the assessment of probabilities in
particular factual contexts - not readily, or even usefully, reduced to a neat set of legal rules. . .
The task of the issuing magistrate  is simply to make a practical, common-sense decision
whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair
probability that contraband or evidence of a crime will be found in a particular place." United
States v. Falso, 544 F.3d 110, 117 (2d Cir. 2008). "The affidavit supporting the search warrant
established probable cause even after we excise evidence gathered from [Defendant's] post-
arrest search and the protective sweep." United States v. Thomas, 266 F. App'x 532, 534 (9th
Cir. 2008) (citations omitted).  "The experience and expertise of the officers involved in the
investigation and arrest may be considered in determining probable cause." United States v.
Santos, 892 F.2d 1387, 1392 (9th Cir. 1989), cert. denied, 498 U.S. 825 (1990).

 Although this issue need not be resolved conclusively at this time, the Court also
determines that the law enforcement agents who conducted the search of Kurniawan's home on
March 8, 2012 were entitled in good faith to rely upon Judge Wilner's Search Warrant and to
seize the items described in the warrant. See United States v. Johns, 948 F.2d 599, 601 (9th Cir.
1991) ("[N]o suppression was required because the officers who conducted the search relied on
the validity of the warrant in good faith.")

**Analysis**

 Probable cause exists to issue a search warrant where, as here, "under the totality of
circumstances, there is a fair probability that contraband or evidence of a crime will be found in
a particular location." United States v. Clark, 31 F.3d 831, 834 (9th Cir. 1994) (citation

3

omitted). "When a magistrate judge issues a search warrant for a residence, he must find a reasonable nexus between the contraband sought and the residence. . . . In making this determination, a magistrate judge need only find that it would be reasonable to seek the evidence there." United States v. Chavez-Miranda, 306 F.3d 973, 978 (9th Cir. 2002), cert. denied, 537 U.S. 1217 (2003) (citation omitted); see also United States v. Falso, 544 F.3d 110, 117 (2d Cir. 2008).

"Our duty on review, therefore, is simply to ensure that the district court had a substantial basis for . . . concluding that probable cause existed." Falso, 544 F.3d at 117.

**Factors Giving Rise to Probable Cause**

**(1) Complaint**

The Complaint, as noted, was sworn to by Special Agent Wynne and it alleged that the Defendant had committed the following offenses: 1) wire fraud - scheme to defraud a finance company; 2) wire fraud - scheme to defraud the finance company and a New York auction house; 3) wire fraud - attempt to sell "encumbered" wines at an international auction house; 4) mail fraud - attempt to sell counterfeit Domaine Ponsot wines; and 5) mail fraud - scheme to defraud by selling encumbered wines at a London Auction and attempt to sell counterfeit Domaine de la Romanee-Conti (DRC) wines. (See Complaint, 12 Mag. 606 ¶¶ 1-5.).

The Complaint also described alleged fraudulent activities engaged in by Defendant during the period June 2007 through February 2012.[2] (See Complaint, 12 Mag. 606 ¶¶ 1-5

---

[2]"A search warrant is not stale where "there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises." United States v. Gann, 732 F.2d 714, 722 (9th Cir. 1984)(internal citations and quotations omitted). "Where ongoing criminal conduct such as a narcotics conspiracy is suspected, the passage of time between the last described act and the presentation of the application becomes less significant." United States v. Clark, No. 05 cr 6041, 2006 WL 3150986, *3, (W.D.N.Y.

4

("Kurniawan consigned for sale at the New York Auction House [June 2007], approximately 84 bottles of wine purportedly from Domaine Ponsot that Kurniawan knew were counterfeit . . ." and "Kurniawan attempted to sell through the auction [February 2012] at least 78 bottles of wine purporting to be from Domaine de la Romanee-Conti estimated to sell for approximately $736,500 that Kurniawan knew were counterfeit. . . .").)

The Complaint also alleged that Defendant received at his home shipments of empty bottles of rare and expensive wines from 2004 to 2006. (See Complaint, 12 Mag. 606 ¶ 55b ("Following the tastings at the Restaurant, Kurniawan asked the Sommelier to send the empty bottles to Kurniawan's home address in California. In or about 2004, Kurniawan received approximately five packages containing numerous empty bottles of fine and rare wine from the Sommelier via Federal Express. In or about 2005, Kurniawan received approximately six packages containing empty bottles of fine and rare wine from the Sommelier via Federal Express. And, in or about 2006, Kurniawan received approximately seven packages containing empty bottles of fine and rare wine from the Sommelier via Federal Express. ").)

Special Agent Wynne averred in the Complaint, among other things, the following:

• that he had been a Special Agent with the FBI since 1983. In connection with his assignment to the Major Theft Squad, he specialized in investigations concerning art, antique, and other collectible theft and fraud, and had participated in other investigations concerning financial crimes, mail fraud, wire fraud, and money laundering. (Complaint, 12 Mag. 606 ¶ 7.);

• that in or about May and November 2007, an unnamed California wine collector bought what was purported to be fine and rare wines from Kurniawan for approximately $2.2

Nov. 1, 2006)

million. In or about late 2007 or early 2008, the California wine collector hosted a dinner party. Wine service for the dinner party was provided by professionals from the wine department of an unnamed major auction house. During the course of the evening, the California wine collector was informed by the wine professionals that they had tasted the wines being offered that night and that two of the bottles were, in their judgment, counterfeit. Both bottles were supplied by Kurniawan. (Id. at ¶ 22c.);

● that in or about 2008, a California wine collector decided to sell approximately 500 bottles of wine from his collection. Some of those 500 bottles were wines that the California collector purchased from Kurniawan. The wines were not accepted for consignment by the auction house because the auction house found too many discrepancies related to the bottles and labels, leading the auction house to conclude that the wines could "not be represented at auction to be what the label on the bottle purported the wine in the bottle to be." (Id. at ¶ 22d.);

● that Agent Wynne learned about wine counterfeiting techniques from interviewing experts in the field of rare and fine wine and from reading articles in the wine press regarding wine counterfeiting techniques. One technique involved the acquiring of an authentic, empty bottle of rare and expensive wine. The counterfeiter then fills the empty bottle with a wine that is less expensive than the wine that would be in an authentic bottle. Another technique is to use a laser printer to print labels for rare and expensive wines and to affix the counterfeit labels to a less expensive bottle of wine that has been stripped of its labels. (Id. at ¶ 54.);

● that from at least in or about 2004 up to and including at least in or about May 2008, Kurniawan and others participated in several late-night, private tastings at an unnamed restaurant in New York where they consumed scores of fine and rare wines, such as DRC. Following the tastings at the restaurant, Kurniawan asked the sommelier to send the empty bottles to

6

Kurniawan's home address in California.  In or about 2005, Kurniawan received approximately

six packages containing empty bottles of fine and rare wine from the sommelier via Federal

Express at his home.  And in or about 2006, Kurniawan received approximately seven packages

containing empty bottles of fine and rare wine from the sommelier via Federal Express at his

home address.  (Id. at ¶ 55a,b.);

● that from in or about late April 2007, Kurniawan supplied bottles of wine to another

unnamed wine collector purporting to be from Domaine de la Romanee-Conti for a dinner event

in New York City.  After the dinner, on or about May 1, 2007, Kurniawan sent the wine collector

an email asking him (the wine collector) to send Kurniawan the empty bottles of DRC from the

dinner and any unopened bottles.  On or about May 30, 2007, the wine collector informed

Kurniawan via email that the empty bottles had been shipped to Kurniawan's home address in

California via Federal Express.  (Id. at ¶ 57.);

● that Agent Wynne had reviewed records of Kurniawan's purchases from art supply

stores and an office supply business and learned from those sources that Kurniawan purchased

supplies which could have been used to create counterfeit wine labels and affix them to bottles.

In or about 2006, Kurniawan purchased at least three different kinds of glue.  In or about 2006,

Kurniawan purchased approximately thirteen packages of "warm white Ingres drawing paper".

On or about December 15, 2007, Kurniawan purchased five inkpads in various colors.  The

inkpads are typically used to supply ink to rubber stamps.  (Id. at ¶ 58.); and

● that Agent Wynne spoke to another FBI Special Agent who interviewed a resident of

California who consigned wine for sale at the London Auction and learned that the consignor

knew Defendant for approximately 15 years.  In or about November 2011, Defendant asked the

consignor to consign some of Defendant's wine at a London Auction under the consignor's name

7

which, in or about December 2011, the consignor agreed to do. The consignor and Defendant

agreed that the consignor would be paid a fixed percentage of a previously determined advance

on the consignment and a different fixed percentage on the results of the auction. "Kurniawan

personally delivered the wines he wanted consigned at the London Auction to the Consignor's

home . . . On or about February 6, 2012, after the wines had been collected from the consignor's

home, the consignor asked Kurniawan via email for provenance information for the Burgundy

wines. . . At least twelve lots of purported DRC wine from Kurniawan's cellar – consisting of 78

bottles estimated to sell for approximately $736,500 – were withdrawn just prior to the auction

because of several anomalies with various aspects of the labels on the bottles that would not be

found on genuine DRC bottles. " (Id. at ¶ 47.) In addition to the withdrawn DRC wines,

"Kurniawan used the consignor to consign other wines from Kurniawan's cellar that were

withdrawn prior to the London Auction. For example, . . . Burgundy wine from Domaine Comte

Georges de Vogue, estimated to sell for approximately $153,250, were withdrawn at the request

of Domaine Comte Georges de Vogue." (Id.)

### (2) Affidavit of Special Agent Olivier Farache

Special Agent Farache averred in his affidavit that:

● he has been an agent with the FBI for approximately 5 years. He has a law degree

from the University of Michigan Law School and practiced law in New York and Los Angeles

for approximately 7 years. (Agent Farache Search Affidavit at ¶ 1.);

● his statements were based on his observations, his review of other agents' notes,

information provided by other agents and/or officers who participated in the arrest of Rudy

Kurniawan, and information the FBI obtained during the course of the investigation of

Kurniawan and others. (Id. at ¶ 2.);

• Magistrate Judge Ronald Ellis, S.D.N.Y., signed the criminal Complaint against Kurniawan on March 5, 2012, charging Kurniawan with three counts of wire fraud and two counts of mail fraud. Judge Ellis also issued a warrant, on March 5, 2012, for Kurniawan's arrest based upon the Complaint. (Id. at ¶ 5; Complaint, 12 Mag. 606 ¶¶ 4-5.);[3]

• he knew "based on [his] involvement in this case and [his] discussions with various FBI agents and others, that, since the publicity surrounding the sale of the counterfeit Domaine Ponsot bottles (as outlined in the Complaint), Kurniawan has spent an inordinate amount of time holed up in [his home], from which it is believed that he communicates with others concerning his wine business via e-mail, cell-phone, and text messages." (Agent Farache Search Affidavit ¶ 20.);

• "during the course of the investigation, the FBI applied for a search warrant of Kurniawan's "hotmail" e-mail and obtained thousands of e-mails demonstrating that Kurniawan carried out his wine business and aspects of his wine fraud scheme through the use of his e-mail address and thus over the internet. In addition . . . evidence gathered during the investigation has shown that Kurniawan has spent significant amounts of time over the last past months conducting business out of his home - and out of the public eye. This evidence includes Kurniawan's almost total absence from the wine storage and retail shop that he owns and helps operate in the Los Angeles area." (Id. at ¶ 21g.);

**Items in Plain View**

Agent Farache also averred that from "just inside the threshold of the SUBJECT' s [Kurniawan's] RESIDENCE's front door, [he] saw wine bottles and a wooden crate containing

---

[3]Agent Farache included in the Search Warrant application a copy of the Complaint as well as the arrest warrant for Kurniawan. (Agent Farache Search Affidavit at ¶ 5.)

wine bottles. The wooden crate was labeled 'Joseph Drouhin' which [he] kn[e]w from [his] investigation in this case is a producer of wines from Burgundy, France. " (Id. at ¶ 18.)[4]

The Defense states with respect to the above quoted portion of paragraph 18 that "that testimony should be excised from the Farache Affidavit because it was acquired in violation of the Fourth Amendment" and that "[s]tripped of that tainted evidence - and without the ability to rely on the 'good faith' exception - the search warrant affidavit fails to provide a reasonable nexus between Mr. Kurniawan's alleged criminal activity and his home, and therefore lacks the necessary probable cause to justify the search of his home." (Def. Mem. at i.)[5] The Government responds persuasively that "[e]ven if portions of the broader protective sweep were unlawful, there is sufficient untainted evidence to support the warrant. The detailed account of Kurniawan's counterfeiting activities in the complaint, which already connected his home to evidence of wine counterfeiting, when combined with just a brief description of the materials

_____

[4]The Court is relying for purposes of its probable cause analysis upon this (just quoted) "plain view" description, and not upon observations of other items in Kurniawan's home made by law enforcement contained in the Farache affidavit. Nor is the Court here relying upon a photo taken by law enforcement at or about the time of Kurniawan's arrest depicting crates and bottles of wine stacked approximately fifteen feet high in plain view of the threshold of Kurniawan's door. (See Decl. of Jason P. Hernandez, dated Nov. 6, 2012 ("Hernandez Declaration"), Ex. C.) The photo is attached hereto. The reason for this is that Agent Farache's above quoted remarks - - and not the photo - - were presented to Magistrate Judge Wilner. See United States v. Frazier, 423 F.3d 526, 531 (6th Cir. 2005) ("[R]eview of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit.")(citation omitted.)); and United States v. Lawson, 2011 WL 839394, *20 (D. Alaska 2011) ("The sufficiency of a search warrant is in the first instance determined on the basis of the information before the issuing judge.") At the same time, the photo is germane to the "good faith" discussion beginning at p. 12 infra.

[5]The Defense proposes not to excise that portion of paragraph 18 which states: "During the morning hours of March 8, 2012, I and other agents from the FBI executed a warrant for Kurniawan's arrest at the SUBJECT RESIDENCE. Kurniawan answered the front door to the SUBJECT RESIDENCE and was taken into custody." (Agent Farache Search Affidavit at ¶ 18.)

piled up against Kurniawan's front door, establish probable cause to uphold the warrant."
(Mem. Of Law of the U.S.A. in Opp'n to Def.'s Mot. To Suppress Evid., dated Nov. 6, 2012
("Opposition") at 13.)

The Court finds that the wine bottles and wooden crate containing wine bottles
referenced by Agent Farache (see pp. 9-10 supra) were in plain view on March 8, 2012. "The
'plain view' exception to the Fourth Amendment warrant requirement permits a law enforcement
officer to seize what clearly is incriminating evidence or contraband when it is discovered in a
place where the officer has a right to be." Washington v. Chrisman, 455 U.S. 1, 5-6 (1982). "It
is of no legal significance whether the officer was in the room, on the threshold, or in the
hallway, since he had a right to be in any of these places as an incident of a valid arrest." Id. at
8. From the vantage point of Defendant's open front door, law enforcement in this case could –
and did – observe in plain view wine bottles and wooden crates containing wine bottles and they
could and did also observe that one wooden crate was crate labeled "Joseph Drouhin". See
Agent Farache Search Affidavit at ¶ 18; United States v. Disla, 805 F.2d 1340, 1346 (9th Cir.
1986) ("We have stated that the primary requisite for the application of the plain view doctrine is
that the police officer has a right to be where he is when he sees the evidence.") (internal citation
and quotations omitted).

In sum, a search warrant "may be upheld even where it contains tainted and untainted
facts as long as the untainted portions contain a sufficient showing of probable cause to render
the warrant valid." United States v. Driver, 776 F.2d 807, 812 (9th Cir. 1985). See also,
Laaman v. United States, 973 F.2d 107, 115 (2d Cir. 1992); United States v. Reed, 15 F.3d 928,
933 (9th Cir. 1994). And, there was more than ample information provided by law enforcement
to Magistrate Judge Wilner in support of the Search Warrant for Kurniawan's home. The

11

magistrate judge had probable cause to find that there was a fair probability that contraband or evidence of a crime would be found in the Defendant's home. See United States v. Clark, No. 05 cr 6041, 2006 WL 3150986, *2-3, (W.D.N.Y. Nov. 1, 2006). "Determinations by magistrates and judges who issue warrants are accorded great deference." United States v. Jakobetz, 955 F.2d. 786, 803 (2d Cir. 1992) (internal quotation marks omitted).   See also United States v. Salas, 879 F.2d 530, 539 (9th Cir. 1989).

### Good Faith Reliance Upon the Search Warrant

In light of the above finding that there was probable cause to issue the Search Warrant, it is not necessary to reach the issue of good faith reliance by law enforcement upon the Search Warrant. But, assuming, arguendo, that it were necessary to decide this issue, the Court would likely conclude, under both Ninth Circuit and Second Circuit law, that the search was undertaken in good faith. "We conclude that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." United States v. Leon, 468 U.S. 897, 922 (1984).

"As the Ninth Circuit has explained when applying the good faith exception, if a search warrant is issued partially on the basis of evidence obtained from an unlawful search, the search conducted pursuant to that warrant is valid 'only if the legally obtained evidence, standing alone, was sufficient to establish probable cause.'" United States v. Broadhurst, No. 3:11-cr-00121 - MO-1, 2012 WL 5985615, at *8 (Nov. 28, 2012 D.Oregon), citing United States v. Wanless, 882 F.2d 1459, 1467 (9th Cir. 1989). "Under the good faith exception . . . evidence will not be suppressed if the officer's reliance on the magistrate's probable cause determination and on the technical sufficiency of the warrant he issues, was objectively reasonable and the magistrate was

12

not misled by statements made with reckless disregard for the truth." United States v. Palma, No. 08 cr 565, 2008 WL 5273746, at *1,*7 (N.D.Cal. Dec. 19, 2008) (internal citations and quotations omitted). See also People v. Camarella, 54 Cal.3d 592, 606-607 (1991) ("Under these circumstances, we conclude [the affiant] acted reasonably when he took this affidavit to a judicial officer for determination. His subsequent reliance on the warrant that was issued was thus objectively reasonable under Leon, and suppression of the evidence is not required." (Internal citations and quotations omitted); United States v. Clark, 638 F.3d 89, 100 (2d Cir. 2011).

There are four circumstances in which the good-faith exception does not apply, none of which is present in the instant case: (1) "where the issuing [judge] has been knowingly misled; (2) where the issuing [judge] wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient . . . that reliance upon it is unreasonable." United States v. Falso, 544 F.3d 110, 125 (2d Cir. 2008) (internal quotation marks omitted). See also United States v. Leon, 468 U.S. 897, 923 (1984).

The Court notes that there are several factors, in particular, which would help to support a finding of good faith here: (i) Prior to the search of Kurniawan's home, law enforcement consulted with personnel from the United States Attorney's Office. See Declaration of Special Agent Farache at 3 ¶ 6 ("After placing Kurniawan in the custody of the Marshal's Service at the Courthouse, I was in communication with personnel from the United States Attorney's Office with respect to the arrest of Kurniawan and the items of apparent evidence observed in plain view during the security sweep. I later worked with Assistant United States Attorneys from the Southern District of New York and the Central District of California in preparing an affidavit in

13

support of a search warrant.") See Ortiz v. Van Auken, 887 F.2d 1366 (9th Cir. 1989); United States v. Fama, 758 F.2d 834, 837 (2d Cir. 1985); (ii) law enforcement believed the protective sweep was lawful. See Declaration of Special Agent Farache at ¶ 7 ("At all relevant times, including when I applied for the search warrant, I believed that the protective sweep of the Premises was lawful. In addition, I had no reason to believe then, nor do I now, that the search warrant issued by Magistrate Judge Wilner was invalid for any reason."); and (iii) law enforcement observed a substantial aggregation of wine crates and wine bottles stacked in the foyer immediately adjacent to Kurniawan's front door and they captured this aggregation in the photo attached hereto.

Based on the foregoing, the motion to suppress is denied.

Dated: New York, New York
January 17, 2013

RICHARD M. BERMAN, U.S.D.J.

Case 1:12-cr-00376-RMB   Document 25-4   Filed 11/06/12   Page 1 of 1

12 cr 376



12 cr
376