**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA          :

                                               12 Cr 376

                        :

        Plaintiff,          **DEFENDANT'S OPPOSITION**
                                 **TO THE GOVERNMENT'S**
                                 **MOTION IN LIMINE**

       -against-          :
                        :

RUDY KURNIAWAN          :
                        :
        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


### Introduction

**The Government's Motion in Limine has three separate components.  Defendant**
**will address each in the order raised by the Government.**

I.      **Evidence and argument that Fine Art Capital, LLC was fully protected at all**
        **times and was able to recoup the full value of its loan by selling the artwork**
        **Mr. Kurniawan's pledged to secure the loan is highly relevant to the charge**
        **of wire fraud.**

Count Two of the Government's Superseding Indictment, charges Mr. Kurniawan

with one count of wire fraud.  In support of this charge, the Government alleges that Mr.

Kurniawan "devised and implemented a scheme to fraudulently obtain a $3 million[1] loan

from a New York financing company located in Manhattan, New York ("the Finance

Company") [Herein after "Fine Art"] that specialized in extending loans that are secured

by valuable collectibles, such as art and wine."  (Superseding Indictment ("Indictment")

---

[1] Only $2.5 Million was actually disbursed.  The balance of the loan was held by the Fine Art to service interest.

p. 12 ¶ 17).  Specifically, the Government alleges that Mr. Kurniawan defrauded Fine Art by making material misrepresentations and omissions on his loan application.

However, the evidence will show that Mr. Kurniawan answered the loan application questions to the best of his ability with no intent to deceive.  Moreover, to secure the loan, Mr. Kurniawan pledged 25 works of art as collateral.  This collection had value far in excess of the loan.  The total fair market value of the art work pledged as collateral, as determined by the lender, was $6,868,000, thus, the loan to collateral ratio was 43.6%.[2]  (Exhibit A.)  The collection of artwork was placed under the control of the Fine Art such that Fine Art was completely protected at all times.  When loan became due the negotiations between Mr. Kurniawan and Fine Art regarding recasting the loan broke down, Fine Art sold a number of the pieces pursuant to the parties' agreement. Fine Art was able to recoup the total value of its loan through the sale of a portion of the artwork and in fact remitted over $500,000 received through the sale, to another creditor with Mr. Kurniawan's consent.

The Government now seeks in its motion *in limine* to exclude this important evidence and prevent the jury from learning that Fine Art was made whole by the sale of the artwork.  This evidence is directly relevant to the charge of wire fraud and must not be excluded because it is highly probative of what Mr. Kurniawan's intent was at the time he applied for and obtained the loan from Fine Art.

In *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987), the defendants appealed a judgment of conviction on fifteen counts of mail fraud and wire fraud entered after a jury trial.  The *Starr* Court reversed the conviction and dismissed the indictment finding that there was insufficient evidence to support the conviction.  The *Starr* Court explained,

---

[2] In other words, the value of the collateral was 229% greater than the amount of the loan.

"[a]n essential element of the government's proof in a mail fraud prosecution or a wire fraud prosecution is proof of a 'scheme or artifice to defraud'." *Id.* (citing 18 U.S.C. §§1341, 1343). "Critical to a showing of a scheme to defraud is proof that defendants possessed a fraudulent intent. However, the government is not required to prove that an intended victim was actually defrauded to establish a violation by the defendants." *Id.*

The *Starr* Court emphasized that although "the government is not required to prove actual injury, it must, at a minimum, prove that defendants *contemplated* some actual harm or injury to their victims. *Only a showing of intended harm will satisfy the element of fraudulent intent*." *Id.* (First emphasis in original; second emphasis added.)

The *Starr* Court found that while the government's indictment contained a detailed description of the defendants' alleged scheme to defraud its customers, "[t]he record, however, show[ed] little else. Specifically, the evidence d[id] not identify what harm, if any, the [defendants] intended to inflict on their customers." *Id.* at 98. Therefore, the government failed to adequately support a charge for mail fraud and wire fraud. **"Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim**." *Id.* (Emphasis added).

In *United States v. Regent Office Supply Co., Inc.*, 421 F.2d 1174 (2d Cir. 1970) the defendants were convicted of mail fraud based on allegations that they had made false representations to its customers in connection with the sale of its merchandise. The *Regent* case makes clear that in the context of mail fraud and wire fraud, deceitfulness and a scheme to defraud must not be confused.

> "Since only a 'scheme to defraud' and not actual fraud is
> required for conviction, we have said that it is not essential

that the Government allege or prove that purchasers were in fact defrauded. **But this does not mean that the government can escape the burden of showing that some actual harm or injury was contemplated by the schemer.** Proof that someone was actually defrauded is unnecessary simply because the critical element in a scheme to defraud is fraudulent intent, and therefore the accused need not have succeeded in his scheme to be guilty of the crime. **But the purpose of the scheme must be to injure, which doubtless may be inferred when the scheme has such effect as a necessary result of carrying it out.**

*Id.* at 1180-81. (Emphasis added).

The *Regent* Court was quick to state that it did not condone deceitful business practices and finds "white lies repugnant to standards of business morality." *Id.* at 1179. Nevertheless, the *Regent* Court stated, "the facts as stipulated in the case before us do not, in our view, constitute a scheme to defraud or to obtain money by false pretenses punishable under section 1341." *Id.*   In reversing the defendant's conviction, the *Regent* Court determined: "[t]he government has offered no direct proof that any customer was actually defrauded by the defendant's selling campaign.  Instead it offers a stipulation which shows that false representations were made, and that they were made by defendants' agents with knowledge of their falsehood." *Id.* at 1181.   However, the government failed to establish that the defendants contemplated harm to its customers.

The *Regent* Court acknowledged "that a wrong has been suffered when a man is deprived of his chance to bargain 'with the facts before him' where the absent facts are facts material to the bargain he is induced thereby to enter." *Id.* at 1182. (Citing *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932).  Nevertheless, the *Regent* Court held that nothing "supports the conclusion that no definable harm need be contemplated by the accused to find him guilty of mail fraud." *Id.* at 1181.

Citing such cases as *Starr* and *Regent*, the Court in *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) reaffirmed that "deceit must be coupled with a contemplated harm to the victim" and that "misrepresentations amounting only to deceit are insufficient to maintain a mail or wire fraud prosecution." In *D'Amato*, the Court reversed a defendant's conviction for mail fraud. It was alleged that he concealed relevant information from those in control of a corporate fund thereby depriving them of the ability to make fully informed economic decisions. Describing this as a "right to control theory", the *D'Amato* Court agreed that withholding or inaccurate reporting of information that could impact on economic decisions can provide a basis for a mail fraud prosecution. *Id.* However, "a person charged with mail fraud under the right to control theory must intend to injure the person or entity misled." *Id.*

In the instant matter, the Government relies heavily on *United States v. Rossomando*, 144 F. 3d 197 (2d Cir. 1998) for the proposition that, it is not a defense to a charge of mail fraud or wire fraud that a person, in good faith, believes that, despite his or her misrepresentations or deceitfulness, no actual harm will come to the deceived person or entity. In *Rossomando*, the defendant admitted that he lied to a Pension Fund regarding his income and that he knew he was not entitled to the monies in excess of the cap. *Id.* at 203. However, the defendant argued that he did not intend to deprive the Pension Fund of monies because he believed that his income nonetheless fell well below the cap. *Id.*

It is true that the Court in *Rossomando* stated, "no amount of honest belief on the part of the defendant that the scheme would not ultimately result in a financial loss to the [victim] will excuse fraudulent actions or false representations by him to obtain money."

*Id.* at 201.   However, what the Government here conveniently ignores, is that the *Rossomando* Court made a critical observation regarding the intent required to support a charge of mail fraud or wire fraud.

The *Rossomando* Court held it vital that courts must be clear when "it states that, on the one hand, the defendant must have intended to harm his victim, but on the other hand, it is no defense that he believed "no ultimate harm" would result from his scheme." *Id.* at 202.  Specifically, the *Rossomando* Court explained:

> "[T]he essence of [the defendant's]defense was not that he thought the [the victim] would not "ultimately" lose money, but that he thought it was *never* going to lose money because his income was well below the level at which the false information he provided would become relevant. In the absence of a sufficiently clear referent for the court's "no ultimate harm" instruction, there is a substantial risk that the jury could have been confused into believing that the government was not required to prove that [the defendant] intended to harm the Pension Fund. Simply put, the jury could well have been persuaded by [the defendant's] defense that he did not intend to harm the Pension Fund, but still have believed that it should convict because "[n]o amount of honest belief on the part of the defendant that the scheme would not ultimately result in a financial loss to the … Pension Fund will excuse fraudulent actions or false representations by him to obtain money."
> *Id.* (Emphasis in original).

The *Rossomando* Court concluded "that the court's initial charge posed a genuine risk of confusing the jury into believing that it would be proper to convict [the defendant] of mail fraud without finding that he contemplated harm to the Pension Fund."  *Id.* 200.

Here, in order to support a charge of wire fraud, the Government must establish that Mr. Kurniawan not only made material misrepresentations and omissions to Fine Art for the purpose of obtaining money, but that he *also* contemplated harm to Fine Art.  The fact that Mr. Kurniawan pledged 25 valuable works of art worth $6,868,000 as collateral

to secure the $3 million loan from Fine Art, security far more valuable than the amount of the loan itself, is extremely relevant in this respect.

"Evidence is relevant if: **(a)** it has any tendency to make a fact more or less probable than it would be without the evidence; and **(b)** the fact is of consequence in determining the action." Fed. R. Evid. 401.  Therefore, evidence of the value of the pledged artwork and the full satisfaction of the Fine Art loan from that collateral is relevant evidence that Mr. Kurniawan had no intention to injure, harm or deprive Fine Art of its money.

Similar to the defendant in *Rossomando*, Mr. Kurniawan does not argue that he believed Fine Art would not "ultimately" lose money, rather that he knew Fine Art would "never" lose money because the loan was at all times secured by more than sufficient collateral.

It is almost nonsensical to believe that Mr. Kurniawan would turn over property worth over twice the amount of the loan if he intended to harm Fine Art.  On the contrary, Mr. Kurniawan provided Fine Art with a means by which it could easily recoup its money should he default.  Indeed, Fine Art was able to sell the artwork and recoup its funds in full. The only person who was damaged as a result of his failure to pay the loan was Mr. Kurniawan because it triggered a fire sale of his valuable pledged assets and the jury needs to know this fact.

The evidence and argument that Mr. Kurniawan pledged collateral to secure the Fine Art loan is relevant and important evidence on the issue of intent.  That Fine Art was made able to sell that artwork, even under circumstances that produce less than optimal prices and still recoup over $500,000 more than the full amount of its loan is evidence of

the value of the collateral.  Together they are direct evidence of whether Mr. Kurniawan contemplated injury or harm to the Finance Company.  This evidence must not be excluded.

While the Government alleges that shortly after obtaining the Fine Art loan, Mr. Kurniawan double-pledged 18 of the 25 works of art to Acker, Merrall & Condit ("Acker Merrall"), the Superseding Indictment contains no charges relating to Acker Merrall.[3]  In fact, it is of no consequence whether Mr. Kurniawan later pledged, to Acker Merrall, the same artwork he pledged to Fine Art.  Fine Art's security interest was first in priority to any security interest issued to Acker Merrall.  What does matter is that, at all times, Fine Art was fully secured, its collateral unencumbered and its loan was fully satisfied by the sale of the pledged artwork.  Because any issues pertaining to the Acker Merrall loan are not charged in the Superseding Indictment it is not relevant to any issue regarding the Fine Art loan.

It is an essential aspect of the facts of the case and directly relevant to intent for the jury to hear evidence of all aspects of the financial transaction between Mr. Kurniawan and Fine Art, including the security pledged and the arrangements made for security of that property, and that the value of that property was always more than sufficient to satisfy the loan as evidenced by the amounts received on the sale of the property.

---

[3] The Government's original Indictment did contain such a charge, but it was not included in the Superseding Indictment.  Defendant's motion in limine further addresses this issue.

**II.     General evidence of Mr. Kurniawan's indebtedness is inadmissible for the purpose of establishing motive of the offense charge in Count One and evidence of material misrepresentations in Count Two.**

**A.     Evidence of financial status is normally inadmissible to prove theft or fraud.**

In addressing the admissibility of a defendant's financial status, the Court in *Davis v. United States*, 409 F.2d 453, 458 (D.C. Cir. 1969) cautioned against any "inference rested solely on the general (and impermissible) assumption that those who are not well-off cannot live within a budget and that they crave money and will commit crime to obtain it." *Id.* at 457.

The Second Circuit in *United States v. Mullings*, 364 F.2d 173, 175 (2d Cir. 1966) stated that "[a]lthough a lack of money is admissible to show a possible motive for some crimes", the evidence must do more than create a speculative chain of inferences. Accordingly, the *Mullings* Court found that the trial court erred when it admitted evidence against a defendant, that in effect, "only shows that he might have lacked money and therefore might have had a motive to commit the crime – from which the judge inferred that he did so.  We think this is too remote; the need for money being speculative the motivation can be no better."  *Id.*

The Court in *Vitek v. State*, 295 Md. 35 (1982), citing *Mullings,* provides an instructive discussion on the admissibility of a defendant's financial status.

> "'The motive for a theft offense seldom requires explanation. The motive is so pervasive that its proving will establish little more than the defendant's typicality; such proof increases but little the likelihood that this defendant is guilty of the charged offense. If poor and rich share a common and obvious motive, then why prove poverty?'" *Id.* at 41. (Citing *People v. Henderson,* 80 Mich.App. 447, 454, (1978)) (Footnotes omitted).

The *Vitek* Court refused "to assume that wealth exerts a greater attraction on the poor than on the rich.  To do so would effectively establish a two-tiered standard of justice and demolish *pro tanto* the presumption of innocence.  Our system of justice and its constitutional guarantees are simply too fragile to permit this type of unfounded character assassination."  *Id.* at 41.  (Citation removed).

The *Vitek* Court held "that in order for such evidence to be admissible, there must be something more than a 'general suspicion' that because a person is poor, he is going to commit a crime."  *Id.*

> "The real test of admissibility of evidence in a criminal case is 'the connection of the fact proved with the offense charged, as evidence which has a natural tendency to establish the fact at issue.' [O]ur predecessors stated it to be 'an elementary rule that evidence, to be admissible, must be relevant to the issues and must tend either to establish or disprove them.' Evidence which is thus not probative of the proposition at which it is directed is deemed 'irrelevant.'
> *Id.* at 40. (Citing *Dorsey v. State*, 276 Md. 638, 668-69 (1976).

Accordingly, the *Vitek* Court determined that evidence of a defendant's financial status may be admissible when it establishes that the defendant had a "desperate" need for money immediately before the charged offense occurred.  *Id.* at 44.   By way of example, the *Vitek* Court cited *People v. Jackson*, 77 Mich.App. 392 (1977).   The *Jackson* Court stated:

> "We are opposed to a general rule or rationale that poor people are more likely to be criminals or that they are more likely to commit crimes which involve thefts of money. But we believe that, where a theft offense is involved, the prosecutor may prove a motive by showing that the defendant whether poor or relatively affluent was acutely short of money immediately before the offense occurred."
> *Id.* at 400-01.

Here, the Government seeks to admit evidence that Mr. Kurniawan was unable to meet his financial obligations. In broad and general terms, the Government contends that evidence of Mr. Kurniawan's debt proves "that [he] lied on his application for a loan from Fine Art Capital, as charged in Count Two of the indictment, by, among other things, failing to disclose the full extent of her personal debt." (Gov. Motion In Limine pg. 9). The Government also, and again in broad and general terms, "requests that the Court permit it to argue that evidence of defendant's indebtedness (in the amount of millions of dollars) is also evidence of the defendant's motive to sell counterfeit wines, and charged in Count One." *Id.* However, evidence of Mr. Kurniawan's general financial status is inadmissible.

## B.   Evidence of Mr. Kurniawan's debt is inadmissible to support the charge contained in Count One.

With respect to Count One, evidence of Mr. Kurniawan's debt will merely create speculative inferences, which rests solely on the general and impermissible assumption that those who cannot live within a budget crave money and will commit a crime to obtain it. If this evidence is admitted, the Government will ask the jury to make such impermissible inferences.

The Government does not seek to establish that Mr. Kurniawan was "desperate" for money or submit evidence of Mr. Kurniawan's financial need immediately prior to the charged offense. Rather, the Government suggests that Mr. Kurniawan's general indebtedness is evidence of his motive to commit the alleged offense. This is not relevant as such general evidence fails to provide the necessary nexus between the fact proved with the offense charged.

While the Government does not contend that Mr. Kurniawan was "poor" in the usual sense of the word, the effect is the same; because of Mr. Kurniawan's financial status and his level of debt he was driven to commit a crime in an effort to obtain money.

As the *Vitek* Court explains, the desire for money does not exert a greater attraction on the poor than on the rich.  Indeed, the attraction is equal; poor and rich share a common and obvious motive.  Therefore, general evidence that a defendant, rich or poor, lacks the means necessary to meet his financial obligations is prejudicial.  "The motive for a theft offense seldom requires explanation.  The motive is so pervasive that its proving will establish little more than the defendant's typicality; such proof increases but little the likelihood that this defendant is guilty of the charged offense."  *Vitek*, 295 Md. at 41. In the absence of direct evidence tending to establish that Mr. Kurniawan was desperate for money immediately prior to the occurrence of the charged offense, evidence of Mr. Kurniawan's finances does no more than create speculative, remote and impermissible inferences.

**C.      Evidence of Mr. Kurniawan's debt is inadmissible to support the charge contained in Count Two.**

The Government contends that Mr. Kurniawan failed to disclose the full extent of his personal debt on his loan application to Fine Art and seeks to submit evidence of his indebtedness in support of that claim.  However, the Government has not established that Mr. Kurniawan was in financial distress at the time he applied to Fine Art.  Indeed, at the time Mr. Kurniawan applied for the $3 million loan from Fine Art, he pledged $6,868,000 worth of collateral to secure the loan.  That property could have been sold for much in excess of the $2.5 Million Mr. Kurniawan actually received from the loan.

Therefore, it would appear that the Government seeks to do no more than submit general evidence regarding Mr. Kurniawan's debt, wholly lacking in any relevant connection to his application to Fine Art. As discussed above, such evidence will likely cause conjecture and speculation.

Moreover, a jury may be inflamed by knowledge of Mr. Kurniawan's debt. Evidence of indebtedness in the millions of dollars may cause the jury to believe that Mr. Kurniawan's conduct reached a level of inexcusable greed thereby prejudicing the jury against him.

## III.   Mr. Collins should not be excluded as an Expert Witness

On October 16, 2013, the Government disclosed its anticipated use of two expert witnesses. While the disclosure letter provided some information relating to the anticipated testimony of Mr. Egan it also stated that "[w]e will provide you a written summary of Mr. Egan's anticipated expert testimony when he has finished his examination." (Government Expert Disclosure letter page 1) Exactly what was to be examined was not disclosed other than Mr. Egan would be testifying that in his opinion Mr. Kurniawan was "making counterfeit wine in his home and that many of the counterfeit wines that Mr. Kurniawan sold, including the bottles identified in the Superseding Indictment, are counterfeit." *Id.* The letter went on to identify a number of reports that had been prepared by Mr. Egan in 2008 each of which discussed a large number of wines. Allan Frischman was also identified as a potential expert, but other than his CV no information was provided as to any testimony that he might be called upon to present. The Government then went on to request reciprocal expert discovery.

13

On October 28, the Defense disclosed the identity of its expert witness relating to the rare wine market and authenticity of such wines, Mr. Collins.   In fairness to the Government very little was disclosed about his anticipated testimony other than that his testimony would be dependent upon the testimony given by the Government's witnesses.

A second letter was sent a few days later providing further information about Mr. Collins and his background.  We advised at that time that further information could be provided after Mr. Collins had a chance to review the reports provided by the Government from Mr. Egan, although there was no disclosure in the government's notice of how whether the 2008 reports would have any relationship to Mr. Egan's testimony in this case.  We do not know what further examination Mr. Egan is conducting or what will be in his report when it has been finished and provided.

The Government seeks to bar Defense Expert C. Robert Collins from testifying in the trial of this matter, arguing that: 1) the defense has failed to comply with FRCP 16 (b)(1)(C); 2) that pursuant to Fed. R. Evid 702 the proposed expert is not qualified to testify as an expert on wine authentication or wine auctions; alternatively the Government argues that Mr. Collins testimony would not be sufficiently reliable under Rule 702; 3) that Mr. Collins' testimony could potentially violate Rule 703 by disclosing otherwise inadmissible evidence to the jury; and 4) that Mr. Collins' testimony is potentially excludable pursuant to Rule 403 because its probative value may be outweighed by unfair prejudice.  Finally, the Government requests that the Court order a Daubert hearing if the Government's request to bar Mr. Collins' testimony is denied.

As discussed below, each of these alleged defects is either without merit or has been substantially cured through a supplemental disclosure provided by the Defense on November 8, 2013. (Exhibit B hereto).

**A. Mr. Collins' testimony should be permitted because the Defense has adequately disclosed the Bases and Reasons for Collin's Opinion and Qualifications thus satisfying Fed. R. Crim.P.16(b)(1)(C).**

The Government posits an essentially "straw dog" argument by parsing a portion of a single sentence from the last paragraph of defense counsel's letter dated October 28, 2013.  The entire paragraph makes clear that this is only an expectation of counsel as to what Mr. Collins' testimony might be but that said testimony would be dependent upon receipt and review of the government's expert reports.  Defense counsel further clarified the defense position on this issue by way of its letters of November 1, 2013 and in more detail on November 8, 2013, effectively mooting this argument.

The government complains on page 18 of their brief that the defense has violated FRCP 16(b)(1)(C) because defense "counsel has not adequately disclosed the 'bases and reasons' for Collins opinion that "Mr. Kurniawan did not counterfeit wines."  As stated above, this quoted snippet from defense counsel's November 1st letter was clarified in the November 8th letter on page 3 as follows: "To the extent that Mr. Egan, or some other government witness, testifies at trial that specific bottles alleged to have been sold, or placed for sale, by Mr. Kurniawan were counterfeit, Mr. Collins may testify that some, if not all, of such bottles are completely consistent with prior counterfeits of those same wines that he has seen prior to Mr. Kurniawan's appearance on the scene, and may thus be from sources other than Mr. Kurniawan.  Accordingly, Mr. Collins has not formed any opinion as to whether Mr. Kurniawan did, in fact, counterfeit any wine, but rather, that

based upon general availability of counterfeit bottles of the same wine Mr. Kurniawan may not have been the counterfeiter.  You will note that our original disclosure did not say that Mr. Collins had rendered an opinion that Mr. Kurniawan did not counterfeit wine, but rather he had opinions that 'supported the position' that he may have not done so."

Thus rather than "violat[ing] the heart of Rule 16 (b)(1)(C)" the defense has squarely met the burden of disclosure encompassed in the Rule such that there is no risk of "surprise from unexpected expert testimony".  The defense letter of November 8th more than adequately sets forth Mr. Collins' expected testimony, the basis therefore, and more than sufficiently gives notice so that the Government may have "a fair opportunity to test the merit of the expert's testimony through focused cross examination."  Once received, the Defense fully intends to provide Mr. Collins' report to the Government.  As noted in the Defense's prior letters to the Government, the Defense is still awaiting the Government's expert's reports having to date only being supplied with reports that are over 5 years old.  The bases for Mr. Collins' opinion have been clearly set forth in Defense counsel's letter disclosure of November 8th.  Therefore, the information necessary to satisfy the Rule, as delineated in the advisory committee's note cited by the Government on page 19 of their brief, has been provided to the Government.

The Government also puts forth a second reason why it feels that the Defense has not met its burden under FRCP 16 (b)(1)(C) and that pertains to an alleged non-disclosure of Mr. Collins' qualifications.  Once again, said information was fully set forth in the October 28th letter enclosing Mr. Collins' extensive resume and further supplemented by the defense disclosure of November 8th, wherein counsel wrote:

"Mr. Collins created a corporation, C. Robert Collins Wine Consulting in 1978.  In 1980, he dropped the use of the corporation but continued to provide wine consulting, but as an individual.[4]  He has continued to provide consulting services through the present.  He has attended most major wine auctions around the world over the last 35 years including London, New York, and Hong Kong."

"He has extensive experience with the issue of altered, fake, and counterfeit wines because, as a consultant for wine buyers, he would represent buyers at auctions and private sales and conduct verification of product BEFORE it was purchased.  During the 1970's and 1980's he provided such services to Draper and Esquin ("D&E") including frequent authentication and purchase of rare Burgundy and Bordeaux wines.  Mr. Collins was sent to wine auctions and inspected large cellars to authenticate potential purchases.  Mr. Collins and Steve Gilbertson were the authenticators for the sale of the Dr. Lucia collection, documented in a special D&E catalog September 1985.  This sale is considered by many the largest and finest American collection ever sold."

"In the course of the last 35 years Mr. Collins has seen many suspicious, altered, and downright false bottles that purport to be rare and or desirable wines offered in catalogues and auctions."

"Additionally Mr. Collins was responsible, with Rene Rondeau, for all of the tastings at the Vintners Club of San Francisco, the premier wine club in the nation. This entailed bi-weekly tastings of virtually every available rare wine in San Francisco at the time.  Some consider this era as the golden age of availability of fine Bordeaux and Burgundy wine in the United States.  These tastings are documented in volumes 1 and 2 of Vintners Club that were compiled in book form in 1979."
(Exhibit B, pp. 1 and 2.)

Based on the foregoing, the Government cannot now seriously maintain that they have not been adequately informed, pursuant to Rule 16, of Mr. Collins' qualifications.

The Government now knows that Mr. Collins has been involved in wine authentication

---

[4] The Government seemed to make a point out of the abandonment of the corporate structure.

since 1978; that  he studied the wines of Burgundy with internationally recognized wine expert Paul Bouchard; that he worked for and catalogued wines for Draper and Esquin (D & E); that as part of his duties with  D & E he inspected and authenticated wines for purchase and sale; that together with Steve Gilbertson, he authenticated and assembled one of the largest and finest American collections ever sold  (the Dr. Lucia collection, which was documented in a special D & E catalogue in September 1985); that for over 35 years he has attended auctions of fine wines all over the world including New York, London, and Hong Kong.  Finally, the Government is now aware of the fact that since 2009 Mr. Collins has been a private consultant for clients in Russia, China, and the United States providing consulting services such as authentication, purchasing, and appraisal of fine wines.  Certainly this background and history establishes Mr. Collins as an expert in fine and rare wines including authentication.

At present the Government has not shared with the defense the final reports of the Governments proposed experts.  The Government has tendered reports by Mr. Egan written in 2008.  The government has never made clear in any written disclosure which of the wines, if any, discussed in those reports would be the subject of Mr. Egan's testimony.  Rather it was only after Court Tuesday, November 12, 2013 that counsel for the Government verbally confirmed that only the wines specifically identified in the Superseding Indictment would be the wines at issue in this matter and the subject of their expert testimony.  Considering that the Defense only received this information this week it is peculiar that the Defense is accused of "hold[ing back disclosure for strategic reasons".

In the unreported case of *United States v. Mavashev,* No. 08-CR-902 (DKI)(MDG) 2010 WL 670083 (EDNY Feb 23, 2010) the Court determined that since the Government had provided the summary of their expert witnesses testimony and requested reciprocal disclosure the defense was ordered to provide the requested information. Recognizing the need for the defense to work closer to trial the court in *United States v. Jasper,* No. 00 CR 825 (PKL), 2003 WL 223212 at *5 (SDNY Jan. 31, 2003) ordered the defendant to produce a written summary of proposed expert testimony one week before trial. The government now has as detailed a description of Mr. Collins anticipated testimony as the defense can provide in the absence of the government's experts' final reports. If there were defects in the earlier disclosure of Mr. Collins as an expert witness those defects were fully cured by the November 8, 2013 disclosure.

**B.  Mr. Collins is clearly qualified to Testify as an Expert in Wine authentication and Wine Auctions pursuant to Rule 702.**

The Government begins their Rule 702 attack on Mr. Collins qualifications by stating that "according to Mr. Collins resume very few of those years have been spent authenticating wine" This is curious position to take because Mr. Collins resume recites that he began authenticating wine in 1978 and thereafter formed several wine related companies, including a company he founded in 1993 and ran for 16 years called "old vine imports". Must one be so literal as to require clarification that old vine imports was oriented on older vintage wines and that orientation would require one to be well versed in wine authentication, provenance and the like? If someone actively involved in such commerce since 1978 is not now, some 35 years later, qualified to testify as an expert in such field, query then who could be so qualified?

The Government questions who the various clients for whom Mr. Collins has performed private consulting services are, stating that they are "unknown".  Although, Mr. Collins has learned that the Government has already contacted a number of people with whom he has worked.  Once again, this alleged deficiency was cured by counsel's November 8th letter wherein it was stated on page 2 "we anticipate that several clients are or will be willing to be interviewed about Mr. Collins' expertise.  A client who has agreed is Mr. _____.  He can be reached at _____."  (Redacted).  Thus not only have clients indicated a willingness to testify, if necessary, about Mr. Collins expertise but the defense has gone so far as to provide the telephone number of one such client.

Similarly, the Government makes much hay about the perceived lack of documentary evidence such as reports or other writings by Mr. Collins available for their inspections.  The Government has been apprised of the fact that Mr. Collins has been a consultant on the subject of wine for the San Francisco Examiner and a contributing writer to Wine World Magazine.  Annexed to Defense counsels' letter dated November 1, 2013 is a narrative description of the various writings attributed to Mr. Collins, including his writings on behalf of the Vintners club of San Francisco, a precursor to the newsletters later popularized by Robert Parker and others, as well as other volumes of materials collected at the Sonoma State wine library.  That Mr. Collins does not have copies to provide or a specific bibliography does not undercut his expertise.

The Government further maintains that Mr. Collins is unqualified to testify on the subject of wine auctions although it candidly concedes, "Collins has surely attended many auctions".  Apparently, the Government feels that one must need to run an auction

or work for an auction house in order to be an "expert" on wine auctions. According to the Government, attending auctions and inspecting wines for potential purchase at said auctions, worldwide, for over 35 years, as part of one's business of representing buyers of fine wines does not qualify one as an expert in such commerce. Surely, Rule 702 does not set such an unreachable bar for one to qualify as an expert in such commercial matters.

The Government implicitly acknowledges that Mr. Collins' years of experience in this area has permitted him to acquire a great deal of knowledge in the area that would be relevant to the formation of his opinions. Mr. Collins has over 35 years experience buying and selling fine wines, attending auctions, authenticating wines for purchase by clients, representing such buyers at auctions and in private sales of fine wines, validating wines before they were purchased. The wealth of experience Mr. Collins brings to the subject before the Court more than qualifies him as an expert whose testimony should be permitted to be presented to the jury. None of the subject matter of Collins opinions is beyond his scope of expertise. He is not rendering an opinion extrinsic to or only tangentially related to his field of expertise. This Court, in fulfilling its "gate keeping" function, should examine Mr. Collins experience and find him eminently qualified to render his opinions

**C. Collins Testimony is Reliable**.

As discussed above, Mr. Collins has been actively involved in the authentication of rare and collectable wines on behalf of his clients for over 35 years. His methodology for determining the authenticity of a wine as disclosed in the November 8 letter is essentially the same as that used by the Government's witnesses.

"His determination of authenticity is based upon provenance when available. He will testify that the reluctance of the wine purchasing market to insist on provenance and the allowance of 'secret sources' has greatly contributed to the proliferation of false product in the market."

"When provenance is not available sampling is sometimes possible. Obviously this is a destructive testing, but when larger lots are available random selection of bottles for testing can help provide verification."

"In performing his services Mr. Collins examines all aspects of the bottle for consistency with what it claims to be, including the date, varietal, and source. This includes, but is not limited to: 1) the size, shape, color and other features of the bottle itself; 2) the label, including its composition, placement, and attachment to the bottle, and characteristics and color, and any other indicia of actual age; 3) the capsule including its appropriateness for the bottle and any signs of tampering; 4) If visible, the cork, including its length and any branding; and 5) the appearance of the liquid in the bottle including the fill, color, and sediment. In the end he will recommend to his clients that they purchase or refrain from the purchase of wines and suggest likely value based upon his experience and what he has seen during his examination. Clearly, Mr. Collin's approach to authentication is similar to and consistent with most experts in the field, including those identified by you."
(Exhibit B, p. 2)

As stated above this methodology is essentially the same as that utilized by the Government's experts as described in Mr. Egan's 5 year old reports. Defense counsel's November 8 disclosure fully addresses all of the Government's objections as delineated at pages 25-26 of their brief. Rather than resting on the mere *ipse dixit* of the expert as the Government implies, Mr. Collins opinion derives from the above detailed professional methodology and experience and accordingly has a "traceable, analytical

basis in fact." *Primavera Familienstiftung v. Askin* 130 F.Supp 450, 522 (S.D.N.Y.)

(quoting *Bragdon v. Abbott*, 524 U.S. 624, 653 (1998)

Fed. R. Evid. Rule 702 provides:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Mr. Collins has substantial relevant knowledge, skill, and experience derived from his 35 plus years in the business of wine consulting. His testimony will certainly "assist the trier of fact to understand the evidence." He most assuredly is a "witness qualified by knowledge, skill, experience, and training" and therefore should be permitted to "testify thereto in the form of an opinion or otherwise."

Fed. R. Evid. Rule 702 further provides that such testimony is permissible if:

> "(b) The testimony is based upon sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the witness has applied the principles and methods reliably to the facts of the case."

Notwithstanding the Government's assertion to the contrary, Mr. Collins proffered testimony meets all of these criteria. Rather than presenting a "complete mystery" the November 8th defense disclosure sets forth the facts upon which Mr. Collins will form his opinion, his methodology in examination of the evidence, which, as aforesaid is exactly the same as the Government's witness, and thus accordingly, the reliability of said methodology is established. Simply put, what is sufficient for the Government's witness must also be sufficient for the Defense.

While he may not have prepared written reports that can be provided, he was actively involved in the authentication of rare and collectable wines on behalf of his

customers.  His methodology for determining the authenticity of a wine (as disclosed above) is essentially the same as that used by the Government's witnesses.

To the extent that the Government puts on expert testimony about any specific bottle of wine alleged to have been sold by, or at the direction of, Mr. Kurniawan (something that now seems likely), Mr. Collins may be called to comment on the expert's evaluation.  He may agree, agree in part, or disagree entirely with what Mr. Egan (or Mr. Frischman) have to say.  Until we know what they are going to say, it is hard to speculate as to Mr. Collins' testimony.

During Mr. Collins' many years of experience, he has become well versed in the culture of fine wine auctions and collecting.  He has identified products as suspect and clearly counterfeit.  He is familiar with the extent of counterfeit product in the market and in collections.  He is familiar with domains and vintages that are commonly counterfeited and common earmarks that appear and have appeared in such efforts over the last three decades.

The United States Supreme Court counsels that Rule 702 is to receive a liberal application in favor of the allowance of testimony.  In the end, admissibility turns on reliability and relevancy.  See *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 592(1993).  "[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Id.*

Clearly, Mr. Collins testimony is relevant.  Mr. Collins has substantial knowledge relating to the counterfeit wine market over the last 35 years.  This knowledge includes, although it is not limited to wines from Burgundy and Bordeaux.  The government would have the jury believe not only that Mr. Kurniawan may have sold wines that were

24

counterfeit, but that he is the only logical source for those bottles.  The general availability of false, altered and counterfeit wines in the wine market is relevant to whether Mr. Kurniawan is the source of any bottle deemed false.

The preferred test of the expert's testimony comes with the function of the advocacy system itself and the ability of opposing counsel to examine the witness before the jury. The Government will have the opportunity to cross-examine Mr. Collins; that is the proper place to test his testimony.

> "In this regard respondent seems to us to be overly pessimistic about the capabilities of the jury and of the adversary system generally. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."
> *Daubert* at 596

### D.  Mr. Collins testimony will not violate rule 703.

The Government next attempts to argue that Mr. "Collins testimony would likely violate Rule 703".  This entire argument is based upon a false supposition by the Government concerning Mr. Collins alleged interaction with Mr. Kurniawan.  The government well knows that Defendant is incarcerated, the Government monitors all his communications, and thus is fully aware of the fact that Mr. Collins has not discussed the case with Mr. Kurniawan.   The defense has no intention of attempting to introduce inadmissible evidence through Mr. Collins.  Accordingly this objection is moot.

### E.  Mr. Collins testimony should not be precluded pursuant to Rule 403.

The Government correctly states that pursuant to Fed R. Evid. Rule 403 that relevant evidence can still be excluded "if its probative value is substantially outweighed by unfair prejudice".   Unfortunately we are left to wonder what prejudice the

Government is concerned with.  Apparently, the Government would like to do away with the presentation of defense evidence with its invitation to the Court to "exercise its gate keeping function and preclude Collins from offering testimony that might cause the jury to give credence to an *untenable defense theory that is bereft of any bases in fact or reality*." (emphasis added)   The government has alleged "confusion" regarding Mr. Collins and his testimony was obviated through the aforementioned November 8 disclosure.  There is no prejudice to the Government whatsoever as any deficiency perceived by the Government can by fully explored by them through vigorous cross-examination.

Certainly, the Government is not suggesting that only their facts and reality are acceptable and that any evidence or testimony to the contrary should be inadmissible.

Mr. Collins has the proper background to testify as an expert.  Clearly, as set forth by Rule 702 he has "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" and his testimony should be allowed.

## Conclusion

Evidence and argument that Fine Art Capital's loan to Mr. Kurniawan was at all times fully secured by collateral worth 229% more than the value of the loan and that Fine Art Capital easily recouped the full value of its loan through the sale of a portion of the collateral is highly probative of what Mr. Kurniawan's intent was at the time he applied for and obtained this loan from Fine Art Capital.  This critical evidence must not be excluded.  It establishes that at no time did Mr. Kurniawan contemplate harm or injury to Fine Art Capital, which is a necessary element for the crime of wire fraud.

Evidence of Mr. Kurniawan's general indebtedness will create an impermissible inference that because he was unable to meet his financial obligations he was driven to

commit the alleged offenses. For evidence of Mr. Kurniawan's financial status to be admissible there must be something more than a general suspicion that because he carried debt, he committed a crime.

Lastly, Mr. Collins possesses the necessary specialized knowledge will assist any trier of fact in understanding the evidence or to determine a fact in issue.  Mr. Collins' testimony should be allowed pursuant to Rule 702.


    __/s/ Jerome H. Mooney _____
    Jerome H. Mooney
    Weston Garrou & Mooney
    12121 Wilshire Boulevard, #525
    Los Angeles, CA 90025
    Tel.: (310) 442-0072; Fax: (310) 442-0899
    Email:  jerrym@mooneylaw.com

*K:\0-ATTYS\JHM\Clients\Kurniawan\U.S. v. Kurniawan\Response to Government's Motion in Limine.docx*