DC5JKUR1                          Hearing

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                               12 Cr. 376 RMB

5   RUDY KURNIAWAN,

6               Defendant.

7   ------------------------------x

8

9                                           December 5, 2013
                                            2:10 p.m.
10

11

12  Before:

13                  HON. RICHARD M. BERMAN,

14                                          District Judge

15

16                      APPEARANCES

17  PREET BHARARA,
         United States Attorney for the
18       Southern District of New York
    JASON HERNANDEZ,
19  JOSEPH FACCIPONTI,
         Assistant United States Attorneys
20

21  JEROME MOONEY,
    VINCENT S. VERDIRAMO,
22       Attorneys for defendant Kurniawan

23  Also Present:
         JAMES WYNNE, Special Agent FBI
24

25

DC5JKUR1                              Hearing

1           (In open court)

2           (Case called)

3           THE COURT:  How are you all?  Please be seated.

4           So the purpose of today's proceeding is what is called

5    a Daubert hearing with respect to the proposed expert witness

6    that the defense is seeking to call.  Just a few housekeeping

7    matters before we get to that first witness.

8           So, number one, about jury selection, we have decided

9    to do the jury selection in Courtroom 26 A, so we should easily

10   be able to do that in the first day.  It is a bigger courtroom

11   and I think we might need it.  Then as soon as we have our

12   jury, we'll come back down here and conduct the trial in this

13   courtroom.  This is 12 D.

14          So, two, I got a letter from the defense, an

15   application on December 3.  I don't mean to be picky, but we

16   said no more applications, and so here comes an application!

17          MR. MOONEY:  I apologize.  They told us we had to do

18   that.

19          THE COURT:  You do.  This is not a penalty.  I don't

20   use Court Connect.  The application, even if it were timely, so

21   to speak -- and I am not penalizing you for being late -- would

22   be denied.  If you need or want realtime transcription, confer

23   with the Court Reporters, and they'll enable your computers so

24   that you can have that.  That is the way we do realtime

25   transcription.

DC5JKUR1                          Hearing

 1             MR. MOONEY:  That won't give us any internet

 2    connection.

 3             THE COURT:  No.  We don't do internet connection, not

 4    just for you.  That is my practice, we don't do internet

 5    connection.

 6             MR. MOONEY:  Okay, your Honor.  We are additionally

 7    requesting, of course, the electronic access.

 8             THE COURT:  I'll get to that in a moment.

 9             The other question is was there an open issue with

10    respect to forensics, the examinations, or is that between the

11    two of you and working out or worked out, meaning the

12    evaluations you each had?

13             MR. MOONEY:  Yes, that is worked out, your Honor.  We

14    are not planning on putting anybody on in the trial on that

15    issue.

16             THE COURT:  Okay.  Your application is for a cell

17    phone and a computer to bring into the courtroom?

18             MR. MOONEY:  That's correct.  We each would like to

19    have our cell phones and also have a computer.

20             THE COURT:  So that application is granted, but you

21    have to submit an order.  There is a form order I have to sign.

22    Otherwise, they'll confiscate it as you try to come in.

23             MR. MOONEY:  I understand.  We'll get that in

24    tomorrow.

25             THE COURT:  Okay.  Then you want an application with

DC5JKUR1                        Hearing

1   respect to the clothes for Mr. Kurniawan.  By the way, it is

2   Kurniawan or Kurniawan?  Are we saying different things?

3             THE DEFENDANT:  Kurniawan.

4             MR. MOONEY:  Kurniawan.

5             THE COURT:  Kurniawan?  Did I say it right?

6             THE DEFENDANT:  Yes, your Honor.

7             THE COURT:  So that application will, of course, be

8   granted, but you need to get me today an order because the BOP

9   requires that I sign an order, then you have to take it to the

10  Marshals, or I am not exactly sure what.

11            MR. MOONEY:  We have to deliver a signed order with

12  the clothes to the Marshals tomorrow.

13            THE COURT:  You have to get me the order today and

14  I'll sign it.  It is a busy day tomorrow.

15            MR. MOONEY:  We can fax that over, your Honor?

16            THE COURT:  Yes.  So actually that would have to be

17  like in the next hour or two or three.  Let's start the hearing

18  and then we'll see where we are.

19            MR. MOONEY:  Yes.

20            THE COURT:  I think that's it as far as my list.  Do

21  you have any other issues or housekeeping?

22            MR. MOONEY:  Not for us, your Honor.

23            MR. HERNANDEZ:  We had raised whether the defense

24  wanted a jury trial on forfeiture in the event of a conviction.

25  We have spoken to defense counsel.  They don't want one.

DC5JKUR1                        Hearing

1           I would just appreciate confirmation on the record so

2    that we know that we don't have to prepare for that if that is

3    the case.

4           MR. MOONEY:  That's correct, your Honor.

5           THE COURT:  There are two more little housekeeping

6    matters.

7           So I am going to give you each lists of names and

8    entities.  We are actually going to hand these out to the jury

9    because they're pretty long instead of my reading all of them.

10   I may read them, but I would like the jury, on the voir dire,

11   to have these names, go over them.  You have to make sure that

12   they are accurate and that if there is any more identification

13   information to be supplied, that we have that right away.

14          Then I have received and incorporated useful questions

15   from both sides and also description of the case for the voir

16   dire.  I want to go over the description of the case just to

17   make sure that I've got it the way that you're each comfortable

18   with it, just that paragraph, and I will read it to you.  It is

19   actually quite short.  So when we get to the section of the

20   voir dire called "outline of the case," I will say the

21   following:

22          As I mentioned, this is a criminal case.  It is

23   entitled United States versus Rudy Kurniawan.  The defendant

24   has been charged in a two-count indictment in which it is

25   alleged that, Count 1, in or about 2004 up to and including in

1    or about February 2012, the defendant Rudy Kurniawan committed

2    mail fraud by using the mails or interstate carriers in a

3    scheme to create, sell and attempt to sell very expensive

4    counterfeit wines.

5          Count 2, from on or about November 28, 2007 up to and

6    including on or about May 2, 2008, the defendant Rudy Kurniawan

7    committed wire fraud by using telephone and/or interstate wires

8    in a scheme to defraud Fine Art Capital by making false

9    representations to Fine Art Capital when applying for a $3

10   million loan.

11         That is mostly for the government.  Was it 3 million?

12   Did I get that right?

13         MR. MOONEY:  Yes.

14         MR. HERNANDEZ:  That's right.

15         THE COURT:  Is that okay for the government's

16   description of the case?

17         MR. HERNANDEZ:  Yes.

18         THE COURT:  Here is the paragraph more for the

19   defense, the next paragraph.

20         The defendant Rudy Kurniawan denies the charges

21   against him.  With regard to the counterfeit wine charge, Mr.

22   Kurniawan alleges that he was part of the Exclusive World of

23   Fine Wine -- that I took from the defense submission -- and had

24   one of the finest palates in the world.  That also comes from

25   the defense submission.  In this world, he became a scapegoat

DC5JKUR1                        Hearing

 1  for shortcomings and dealings of others in a world of rare and

 2  expensive wines.

 3          With regard to the scheme to defraud Fine Art Capital,

 4  Mr. Kurniawan alleges he provided capital for the $3 million

 5  loan and was forthright and answered to the questions posed in

 6  the Fine Art Capital loan application.

 7          MR. VERDIRAMO:  I believe the word you said was,

 8  "capital."  I believe you meant to say, "collateral."

 9          THE COURT:  You're right.

10          MR. VERDIRAMO:  Thank you, Judge.

11          THE COURT:  Otherwise okay?

12          MR. VERDIRAMO:  Yes, your Honor.

13          MR. MOONEY:  Yes.

14          THE COURT:  So all right.  I think that is the

15  housekeeping.  So let's see here, the proponent of the expert

16  testimony has the burden of establishing by a preponderance of

17  the evidence that the admissibility requirements of Rule 702

18  are satisfied.  The Court, the District Court, is the ultimate

19  gatekeeper.  So I guess that means that, Mr. Mooney, you call

20  your first witness.

21          MR. MOONEY:  Thank your Honor.  We would call Mr. C.

22  Robert Collins.

23          MR. VERDIRAMO:  Before we begin, we were notified

24  moments ago the prosecution may present a rebuttal witness, a

25  Mr. Stein, who I believe is in the courtroom.  We move for

DC5JKUR1                          Hearing

1    sequester at this point.

2            THE COURT:  That is to say, you're asking Mr. Stein to

3    leave the courtroom?

4            MR. VERDIRAMO:  That's correct.

5            THE COURT:  That is fair request if he is here.

6            MR. HERNANDEZ:  He is not here.  We actually told him

7    not to enter.  I am glad he followed instructions.

8            MR. VERDIRAMO:  Thank you.

9    CORNELIUS ROBERT COLLINS,

10        called as a witness by the Defendant,

11        having been duly sworn, testified as follows:

12   DIRECT EXAMINATION

13   BY MR. MOONEY:

14   Q.  Mr. Collins, how are you employed?  What do you do for a

15   living?

16   A.  I have, at the moment I have some property investments and

17   I do wine consultation work for private clients.

18   Q.  How long have you been involved in the wine consultation?

19   A.  Well, I had a wine consultation company that I started in

20   1978, and I was involved starting in 1976 with Draper & Esquin.

21           THE COURT:  How long is the question?  How long have

22   you been involved in wine consultation?

23           THE WITNESS:  35 years.

24   BY MR. MOONEY:

25   Q.  How did you first become involved in wine sales and

DC5JKUR1                         Collins - direct

1    purchase?

2    A.  Well, I first took a job in 1974 with Ernie's Wine

3    Warehouse.

4    Q.  What is Ernie's Wine Warehouse?

5    A.  It was a large retail wine chain.  They had 78 stores and

6    one large wine --

7              THE COURT:  Where was that?

8              THE WITNESS:  In San Francisco.

9    BY MR. MOONEY:

10   Q.  What was your initial position with Ernie's Wine?

11   A.  My initial position was a clerk.

12   Q.  Were you ultimately upgraded from that to a different

13   position?

14   A.  Yeah, I was promoted three months later to be head wine

15   buyer for Ernie's Wine Warehouse.

16   Q.  What kind of wines did Ernie's Wine warehouse purchase?

17   A.  Well, they purchased a lot of different wines.  At the time

18   I was first employed, they purchased a large quantity of

19   imported bordeaux wines because those wines were being dumped

20   due to the Cruz.

21             THE COURT:  Being what, dumped?  Did you say?

22             THE WITNESS:  Yeah, there was a large scandal in

23   bordeaux just preceding this period of time around a firm

24   called Cruz, and that just basically led to a crash in the

25   bordeaux wine business at the time.

DC5JKUR1                        Collins - direct

1           There were large quantities of bordeaux wines that

2    were in various importers in the United States that were being

3    sold at distressed prices.

4    BY MR. MOONEY:

5    Q.  Was Ernie's in a cash-long position at that point?

6    A.  Ernie's & Esquin had seen this coming because he had sold

7    all of his wine stocks in all of his stores, so we were in a

8    position where he had a lot of disposable cash and no inventory

9    to sell off.

10   Q.  As the head wine buyer, were you responsible then for

11   assisting in the purchase and collection of this large volume

12   of bordeaux wines?

13   A.  Yes, I was assisting.  I actually made most of the

14   decisions for these purchases.

15   Q.  Did you start to become more familiar with the bordeaux

16   wines during that period of time?

17   A.  Absolutely.

18   Q.  Did you subsequently leave Ernie's and go to a different

19   company?

20   A.  Yes.

21   Q.  What company was that you went to?

22   A.  I went to work for a company called Drapier, which was the

23   forerunner of Draper & Esquin.

24   Q.  How long were you with Drapier?

25   A.  I was there for three months.

DC5JKUR1                          Collins - direct

1    Q.  When you left Drapier, did you leave them and take a trip

2    to Europe?

3    A.  Yes, that is when I took my trip to Europe for wine

4    education purposes.

5    Q.  How long were you in Europe on that trip?

6    A.  Over three months.

7               THE COURT:  This would be what year?

8               THE WITNESS:  This is in 1976, sir.

9               THE COURT:  When?

10              THE WITNESS:  1976.

11              THE COURT:  '76?

12              THE WITNESS:  Yes.

13   BY MR. MOONEY:

14   Q.  What regions of Europe did you go to during that period of

15   time?

16   A.  Well, we started out in London with the auction markets and

17   then we traveled to Bordeaux twice, Burgundy twice and Germany

18   twice.

19   Q.  During this trip were you just traveling on your own or did

20   you have letters of introduction?

21   A.  No.  I was furnished with letters of introduction from a

22   lot of major importers for the chateaus where we had sold the

23   wines before at Ernie's, and I was also traveling with a fellow

24   named David Terrier, who also had letters of introduction and

25   between the two things, that was how we introduced ourselves to

DC5JKUR1                        Collins - direct

1   the various chateaus.

2   Q.  Did that allow you to be received and to interact with the

3   chateaus?

4   A.  Yes.

5   Q.  Did you spend time in Burgundy?

6   A.  Yes.

7   Q.  Did spend time in Bordeaux?

8   A.  Yes.

9   Q.  During the time that you were in Burgundy and Bordeaux did

10  you have an opportunity to go to many of the vinyards?

11  A.  Yes.

12  Q.  Did you have an opportunity to meet the people that were

13  connected with the operations of those vinyards?

14  A.  Yes.

15  Q.  Did you have an opportunity to stay with some of them?

16  A.  Yes.

17  Q.  You've looked at some of the wines that are involved in

18  this case.  Did you have an opportunity to go to any of the

19  vinyards that relate to things that you've seen in connection

20  with this case?

21  A.  Yeah, we took most directly the Domaine de la

22  Romanee-Conti.

23  Q.  What was your connection with that?

24  A.  My traveling companion, Dave Terrier, had gone to school

25  with Pam de Vaillaine, which is --

DC5JKUR1                          Collins - direct

1        THE COURT:  Slow down and spell some of these names so

2   he can get it correctly.

3        THE WITNESS:  Sorry.  De Vaillaine, like it is on the

4   wine labels, D E V A I L L A I N E.

5   Q.  It will be under D, small D E?

6   A.  Right.

7   Q.  Small D E?

8   A.  Yes, it is a small D E, capital V.

9   Q.  So you stayed at the chateau?

10  A.  Actually, we stayed at private residence in Boucheron, a

11  small town south of the chateau where the de Vaillaine is.

12  Q.  During the period of time you were in Burgundy and

13  Bordeaux, did you have the opportunity to taste wines at the

14  various chateaus?

15  A.  Yes.

16  Q.  Did you have a chance to look at the processes that were

17  followed by the various chateaus?

18  A.  Yes.

19  Q.  Did you have an opportunity to inspect and look at their

20  labeling and bottles?

21  A.  Yes.

22  Q.  Did that include just the current vintages they were

23  putting out, or did you have an opportunity to look at the

24  older vintages, older materials that had been maintained?

25  A.  We looked at the older vintages.

DC5JKUR1                          Collins – direct

1   Q.  After you returned from –– by the way, did you keep notes

2   of your trip?

3   A.  Yes, I did.

4   Q.  Do you still have those notes?

5   A.  Yes, it is this book here.

6   Q.  That is the black notebook?

7   A.  That's correct.

8   Q.  Those are detailed tasting notes and notes of where you

9   were, the travel you made during that period of time?

10  A.  Yes, they are.

11  Q.  Those were contemporaneously created?

12  A.  They were created at the moment.  There are stains of wine

13  on some of the notes.

14  Q.  After you returned from your trip to Europe and this

15  education process, where did you go to work?

16  A.  When I returned from Europe, I went back to work for what

17  was at the tight time becoming Draper & Esquin, E S Q U I N,

18  and that is D R A P E R.

19          THE COURT:  That was after this three-month period; is

20  that right?

21          THE WITNESS:  Sorry.

22          THE COURT:  That was after this three-month period

23  abroad?

24          THE WITNESS:  Correct, that was for the fall and

25  Christmas Season.

DC5JKUR1                    Collins - direct

1    BY MR. MOONEY:

2    Q.  Draper & Esquin was the company that had evolved from the

3    other company that you worked for before you had gone to

4    Europe?

5    A.  Precisely.  The person I was traveling with actually had

6    entertained the notion to buy the company Esquin, and while we

7    were in Europe, Jerry Draper actually purchased the company

8    from Ken Kew.

9              THE COURT:  From?

10             THE WITNESS:  Ken Kew, K E W, who was the current

11   owner of Esquin, and the company became Draper & Esquin.

12   BY MR. MOONEY:

13   Q.  What were your duties at Draper & Esquin?

14   A.  My duties were many-fold.  I was in charge of the wine

15   buying for Draper & Esquin.  I had a hundred percent of the

16   auction wines that were bought at that time, and there was

17   another fellow named Rene Rondeau, R O N D E A U, the two of us

18   shared the responsibilities for all of the purchases in Europe.

19   Q.  What was the business of Draper & Esquin?

20   A.  Draper & Esquin was at that time a relatively unusual

21   license in that it --

22             THE COURT:  Unusual?

23             THE WITNESS:  Unusual license in that it had an import

24   license and it had a retail license.  So the business of Draper

25   & Esquin was to import wines that they would then sell on their

DC5JKUR1                     Collins – direct

1   own retail store.

2              THE COURT:  And they were located in?

3              THE WITNESS:  They were on 655 Sutter in San

4   Francisco.

5   BY MR. MOONEY:

6   Q.  In connection with your work at Draper & Esquin, did you

7   also have connection with a wine club?

8   A.  Yes, in the same building there was a wine club called

9   Vintners Club of San Francisco.  It it was founded by Jerry

10  Draper, and they were considered the foremost wine tasting club

11  in the United States at the time.

12             I was a cellar master of the Vintners Club between '76

13  and 1978.  I conducted well over 60 percent of the tastings

14  that the club did.

15  Q.  What kind of wines would be tasted at the Vintners Club?

16  A.  We virtually attempted to taste everything that was

17  available in the San Francisco market.  We, of course,

18  categorized these.  There were many people at the time that

19  belonged to the Vintners Club of San Francisco that were wine

20  owners and wine makers from Napa Valley.

21             So we devoted 50 percent of the tastings to domestic

22  wines and 50 percent to imported wines.

23  Q.  As the cellar master, were you responsible for approving

24  the wines that would be made available at the tasting?

25  A.  Yes.

DC5JKUR1                    Collins - direct

1    Q.  Was one of the things that you would look at whether the

2    wines appeared to be correct or authentic?

3    A.  Yes.

4         THE COURT:  Sorry, could you repeat that question?  I

5    missed it.

6         MR. MOONEY:  Yes, whether he looked at, one of the

7    things he looked at was whether or not the wines were correct

8    and authentic.

9         THE COURT:  Did you then ask him another -- or you

10   were about to ask a follow-up?

11        MR. MOONEY:  The follow-up.

12        THE COURT:  You answered, "yes" to that?

13        THE WITNESS:  Yes.

14   BY MR. MOONEY:

15   Q.  As a buyer for Draper & Esquin, were you also looking at

16   whether or not the product that was being purchased was

17   correct?

18   A.  Yes.

19   Q.  You put us, I think, in '76 to '78 at this point in time.

20        Was there a problem in the market at that point with

21   regards to counterfeit wines?

22   A.  There was a beginning of a problem.  It doesn't look like a

23   problem compared to today, but we were the only company that

24   actually would send employees -- myself -- to London to bid in

25   auctions for wine that we would then resell in the retail

1    store.

2             We did this as a process of authentication for these

3    wines because there was numerous wines that we wouldn't have

4    normally accepted as proper products for selling, and we had a

5    limited amount of money compared to everybody else, and so we

6    were trying to spend it wisely.

7    Q.   Did you start at that point in time suggesting that wine,

8    certain bottles not be purchased because they appeared to be

9    questionable?

10   A.   Precisely.

11   Q.   While you were at Draper & Esquin, did Draper & Esquin

12   produce catalogs of the wines they did have available?

13   A.   Yes.

14   Q.   Have you brought any of those catalogs with you today?

15   A.   I brought a couple of catalogs with me today, yes.

16   Q.   Would you tell us which ones you brought.

17   A.   There is a Christmas catalog from autumn of 1977, and there

18   is a Christmas catalog from 1978.

19   Q.   Were you involved in the creation of those catalogs?

20   A.   Yes.

21   Q.   Did those catalogs accurately represent the nature of the

22   wines that were available through Draper & Esquin?

23   A.   Yes, although I think they were a broader, there were a

24   broader representation than that.  We also created lots of

25   articles that had to do with wine areas in a general sense and

DC5JKUR1                          Collins - direct

 1   not just specifically with wines that we were selling.

 2   Q.  Do those catalogs include wines from Burgundy?

 3   A.  Yes.

 4   Q.  Do they include wines from Bordeaux?

 5   A.  Yes.

 6   Q.  Do they include any discussions of the wines from those

 7   areas?

 8   A.  Yes.

 9   Q.  Were you involved in the creation of that product?

10   A.  Yes.

11           THE COURT:  When you say the "product," you mean the

12   catalog?

13           MR. MOONEY:  Catalogs, I am sorry, yes, not the wines.

14   BY MR. MOONEY:

15   Q.  You weren't ever a wine-maker, right?

16   A.  Not professionally.

17   Q.  But in the 1978 catalog --

18   A.  Yes.

19   Q.  -- does it also include tasting notes from some of the

20   Vintners Club?

21   A.  Yeah.  The 1978 catalog includes a note from the directors

22   dinner, an annual directors dinner, and the 1978 edition, the

23   wines that were selected for this tasting were twelve vintages

24   of the Domaine de la Romanee-Conti, Romanee-Conti vineyard.

25   Q.  Were Domaine Romanee-Conti wines available for purchase

DC5JKUR1                          Collins - direct

1   from Draper & Esquin?

2   A.  Yes.

3   Q.  And those wines would have been wines that you approved the

4   purchase of?

5   A.  Yes.

6   Q.  Where any Domaine Ponsot wines available?

7   A.  We didn't handle Domaine Ponsot.  There was another

8   importer in the San Francisco area, Current lynch Wine

9   Selections, who was the primary importer of this domaine, and

10  we felt that our domaines were adequately took care of our

11  needs.

12  Q.  Did you handle other wines that came from both the Burgundy

13  and Bordeaux region?

14  A.  Yes.

15  Q.  Did there come a time when your relationship with Draper &

16  Esquin changed from that of employee to something else?

17  A.  In 1978, after I returned from one of the trips, I set up a

18  consultation firm, C. Robert Collins Wine Consultation, in San

19  Francisco, and at this time I didn't directly collect a salary

20  from Draper & Esquin.  I still worked closely with Jerry Draper

21  and was with other people in Draper & Esquin, but I had other

22  independent clients besides the regional store.

23  Q.  Would you categorize yourself as an independent contractor

24  at that point?

25  A.  Yes.

DC5JKUR1                          Collins - direct

1   Q.  Would you still go out and make wine purchases or at least

2   authentications for when you purchased for Draper & Esquin for

3   that period?

4   A.  Yeah, I acted as an agent for Tiffany's in San Francisco

5   and for the Gettys to supply wines for Draper & Esquin and --

6           THE COURT:  Did you say the Gettys?

7           THE WITNESS:  Yes, the family.

8           THE COURT:  G E T T Y?

9           THE WITNESS:  That's correct.

10  BY MR. MOONEY:

11  Q.  After you became an independent contractor, did you start

12  providing wine authentication and purchase and purchase advice

13  to people other than Draper & Esquin?

14  A.  Yes.

15  Q.  Did you continue to go to wine auctions around the world?

16  A.  Yes, but not as often as I had in prior years.

17  Q.  Over the period of time that you've been --

18          THE COURT:  Excuse me.  Could I understand, you say

19  not as much as the period in that time?

20          THE WITNESS:  Not as often, yes.

21          THE COURT:  So I am not sure.  You went to Europe in

22  1976, right?

23          THE WITNESS:  Yes.

24          THE COURT:  And now you became a consultant when?

25          THE WITNESS:  In 1978.

DC5JKUR1                          Collins - direct

1          THE COURT:  How many times in-between '76 and '78 had

2     you gone to wine auctions around the world, if any?

3          THE WITNESS:  Six.

4          THE COURT:  Between '76 and '78?

5          THE WITNESS:  Yeah, approximately three a year.

6     BY MR. MOONEY:

7     Q.  How many auctions totally do you think you've attended on

8     behalf of the clients in your 35 years of work?

9     A.  300.

10    Q.  Was all of the authentication work that you did in

11    connection with auctions or did you also represent clients with

12    respect to private purchases that were being made?

13    A.  No.  We represented clients for private purchases also.

14    Q.  Do you remember a rather large collection called the Lucia

15    Collection that became available for sale?

16    A.  Yes.

17    Q.  Were you involved in the authentication of that cellar for

18    purchase?

19    A.  I was.

20          (Continued on next page)

21

22

23

24

25

Dc5dkur2                           Collins - direct

1   BY MR. MOONEY:

2   Q.  Who were you representing with regards to that purchase?

3   A.  Connoisseur Wine Imports.

4   Q.  And was there anybody else that was attempting to make the

5   purchase of that collection?

6   A.  Yes.  The Draper & Esquin.

7   Q.  Were you representing Draper & Esquin with regards to that

8   purchase?

9   A.  No.

10  Q.  Was there somebody else that was doing authentication on

11  behalf of Draper & Esquin?

12  A.  Yes.

13  Q.  Who was that?

14  A.  His name was Steve Gilbertson.  He was a gentleman I hired

15  in 1977.

16          THE COURT:  Gilbertson?

17          THE WITNESS:  Yes.

18  Q.  You hired him to work at Draper & Esquin?

19  A.  Yes.

20  Q.  But he wasn't working for you in 1985 for the Lucia

21  collection?

22  A.  No.  We were friendly competitors at the time.

23  Q.  Did you work together on the authentication?

24  A.  No.

25  Q.  When did you work together on the authentication?

Dc5dkur2                          Collins - direct

1   A.  Well, the Hurst and the Lucia's cellar were playing

2   Connoisseur Wine Imports off against Draper & Esquin to see

3   which one could get the biggest price.

4   Q.  Who ended up winning the bid?

5   A.  Jerry Draper did.

6   Q.  So your client didn't get the wine?

7   A.  No.  My clients just owned The Chronicle.

8          THE COURT:  Just owned the newspaper?

9          THE WITNESS:  Yes.

10  BY MR. MOONEY:

11  Q.  But you were involved and did do the authentication for

12  your client?

13  A.  Yes.

14  Q.  Did you find any significant problems with that collection?

15  A.  We didn't find any authentication problems in terms of

16  whether the wines were legitimate.  It was a kind of cellar we

17  always hoped for because there was complete documentation of

18  purchase records on all of these wines over what had been a

19  very long 30 or 40 years.  We did have some issues with proper

20  storage.  So there was a --

21         THE COURT:  Issues with what?

22         THE WITNESS:  Proper storage.  Unfortunately, certain

23  cases of wine had been stacked on their sides instead of

24  upright and, consequently, you had spoiled bottles.  So part of

25  this was to examine large quantities of the expensive wines in

Dc5dkur2                        Collins - direct

 1  order to ascertain the value.

 2          THE COURT:  And what exactly did you do to

 3  authenticate those wines?

 4          MR. MOONEY:  I was just about to ask you to go through

 5  his process, your Honor.

 6          THE COURT:  I'm sorry.

 7          MR. MOONEY:  As long as you want to set the historic

 8  stage.

 9  Q.  One more question before we go there.

10          THE COURT:  Yes.

11  A.  Sure.

12  Q.  Did you just stop after 1985, or did you continue to do

13  this authentication on behalf --

14  A.  I continued to do it.  Actually, shortly after the Lucia

15  cellar, Jerry Draper hired me back from Connoisseur Wine

16  Imports and thus ended the battle between the two companies.

17  Q.  Now, walk us through -- first of all, when you are looking

18  at a bottle of wine, you are looking to authenticate it is one

19  of the things, is that correct?

20  A.  Yes.

21  Q.  To see if it is what it purports to be?

22  A.  Yes.

23  Q.  Then you are also inspecting the wine with regard to its

24  viability and whether it has been perhaps ruined by something

25  that happened?

Dc5dkur2                      Collins - direct

```
 1   A.  Yes.
 2   Q.  OK.  So would you tell us now what you do, how you go about
 3   doing an authentication and verification of the viability of a
 4   bottle of wine?
 5   A.  Sure.
 6           THE COURT:  Actually, would it be OK if he described
 7   what he did in that 1985 project, as a live example?
 8           MR. MOONEY:  Yes.
 9   Q.  Why don't you tell us what you did at the Lucia, at the
10   collection?
11   A.  Well, sure.  One of the key items in that cellar was if
12   there was --
13           THE COURT:  In that what, cellar's list?
14           THE WITNESS:  In the cellar itself was an authentic
15   case of 1945 Romanee-Conti Romanee-Conti.  This was in an
16   original carton.
17           THE COURT:  I don't mean to be dense, but when you say
18   cellar, do you mean seller or cellar?
19           THE WITNESS:  Cellar like a physical --
20           THE COURT:  Downstairs.
21           THE WITNESS:  Go downstairs and here's the wine.
22           THE COURT:  OK.  So you found problems in the cellar
23   are you saying?
24           THE WITNESS:  Yes.  The problem simply was there was
25   so much wine the cases had been -- unfortunately had been
```

Dc5dkur2                    Collins – direct

1    stacked for long periods of time where you would have six

2    bottles facing down, in which case the corks would stay wet --

3              THE COURT:  The corks would what?

4              THE WITNESS:  The corks would stay wet and the wine

5    would stay -- would be sound, and then you would have bottles

6    that had faced upright for years and they would show the signs

7    of ullage.

8              THE COURT:  The signs of?

9              THE WITNESS:  Ullage of the wine.

10   Q.  What does ullage mean?

11             THE COURT:  How do you spell that, first?

12             THE WITNESS:  U-l-l-a-g-e.

13             THE COURT:  And that means what?

14             THE WITNESS:  That is the level of the wine from the

15   cork to the wine itself.

16   BY MR. MOONEY:

17   Q.  Yes.  And when wines are packed in a case, are they

18   traditionally interlaced so that they go back and forth in

19   different directions?

20   A.  That is correct.

21   Q.  So when you stand the case -- and the case is meant to lay

22   on its side so that everything, there is liquid against all of

23   the corks, is that correct?

24   A.  That is correct.

25   Q.  If you stand it up on its end, half of it is going to have

Dc5dkur2                        Collins - direct

```
 1    no liquid against the cork; is that what you are telling us?
 2    A.  Yes.
 3    Q.  Why is it important to have liquid against the cork?
 4    A.  Well, because that is the seal.  If the cork is allowed to
 5    dry out from the inside, then the wine will go bad.
 6    Q.  So that was one of the problems that you found?
 7    A.  That was one specific problem in this cellar, yes.
 8    Q.  That is not an authentication problem, that is a viability
 9    problem?
10    A.  That's correct.  There is sort of a procedure that you go
11    through for authentication that I think is somewhat similar in
12    a lot of cases.
13           So when I am looking at a bottle of wine, here's the
14    bottle of wine.  You take a look at the bottle of wine.  The
15    first thing I am looking at is I am looking at the label
16    because this is telling me what the wine purports to be.
17           THE COURT:  So you start either for viability or for
18    authentication with the label; is that what you are saying?
19           THE WITNESS:  The first thing I look at is the overall
20    visual of the bottle.
21           But the first thing that I focus on, I kind of do -- I
22    have an order of events that I kind of do this in where I try
23    to repeat the same -- the same method each time, because then
24    when it becomes years later and I am looking at something else,
25    you know, that I'm not forgetting something, that I am doing
```

Dc5dkur2                          Collins - direct

1  all of the things in order.

2          THE COURT:  OK.

3          THE WITNESS:  So for me the first order of events is I

4  look at the label.  What I'm looking at on the label, I say,

5  OK, it is identifying what this is supposed to be as a wine.

6          I am looking at the condition of the label.  We're

7  usually talking about this on older wines and rare wines.

8  There is a relatively short list of wines that we are

9  continually doing these kind of authentications for.  I look at

10  the paper quality versus what the vintage is, that I think they

11  are -- I look for deterioration around the label edges.  I look

12  for the way that the label is cut, whether the label -- whether

13  the label appears to be stamp-cut or whether it appears to be

14  cut out with scissors.

15          I'm looking at -- to go in a case of the 1945 Domaine

16  de la Romanee-Conti, there is three inks on this label so you

17  look at each one of the inks individually.  In the case of

18  these domain wines you also have a serial number.  So we are

19  looking, and I copy down the serial number.  And I am looking

20  for -- there is a lot of times you look for auxiliary

21  identification marks.  There is -- in burgundy there is a

22  printer that is used frequently by the domains.  They have a

23  small stamp on the right.  So these --

24          THE COURT:  They have a small stamp?

25          THE WITNESS:  Yes.  They have their name in very, very

1  small letters, about 2-point letters, that are down on the

2  right-hand corner of the label.

3          THE COURT:  They would be the names of?

4          THE WITNESS:  The name of the printer.

5  A.  After I've done that and after what I've done through

6  Draper & Esquin is I take a photograph of the front of the

7  bottle and --

8  Q.  Why do you take a photograph?

9  A.  Well, because when I am going through this after the fact

10 with the notes, there may be something that I can't remember

11 for sure that I can identify with the photograph.  And, also,

12 it provides an identification process for me to corroborate

13 some notes.  And so --

14 Q.  After you take the photograph, what next then?

15 A.  Pardon?

16 Q.  What next happens?  You have taken the photograph.  Where

17 do you go next?

18 A.  OK.  Then I proceed to the -- I proceed up the bottle.  The

19 next thing I look at is ullage.  That is the distance between

20 the cork and the wine.  I usually --

21         THE COURT:  So you now have the bottle in an upright?

22         THE WITNESS:  Yes.  That's right.

23         And you are looking at the ullage for a couple of

24 reasons.  One is that you look at this to see if it seems to

25 correspond with the age of the wine.  A bottle of wine that's

Dc5dkur2                        Collins - direct

1    been aging for 40 or 50 years is going to have a decreased

2    level because of certain -- there is a certain amount of

3    natural evaporation that happens.

4                THE COURT:  You mean more space between the cork and

5    the top of the wine?

6                THE WITNESS:  Precisely.  Precisely.

7                You also have, from that period, place, you have an

8    opportunity to look at the glass of the bottle from the top

9    part.  So I like to -- I look around that because I can see

10   light through it.  I'm looking for bottle identifications,

11   seams, and that's the manner in which the bottle has been put

12   together.

13   Q.  What do seams tell you?

14   A.  Well, the seams will tell me a lot of times what era -- in

15   a very wide sense, what era the bottle of wine would come from.

16   Q.  The bottles were made in different ways at different times?

17   A.  Pardon?

18   Q.  The bottles have been made in different ways at different

19   times?

20   A.  Exactly.

21   Q.  I'm sorry.  Go on.

22   A.  On older bottles of wine, I look for air imperfections and

23   so forth, which are signs of hand-blown bottles, which were

24   used frequently prior to World War II.

25                And then I take the bottle and I tilt it back

Dc5dkur2                          Collins - direct

1    slightly.  I use a light to shine up to the cork from

2    underneath.  This affords me a look at the cork if the wine

3    hasn't been -- if the capsule hasn't been taken off or

4    otherwise changed.

5            THE COURT:  I am sorry.  You are shining a lot on the

6    bottle now?

7            THE WITNESS:  Yes.  Through the neck of the bottle to

8    the bottom of the cork.

9            THE COURT:  OK.  And to do --

10           THE WITNESS:  One of the things I look for there is

11   color, because if the bottle has been -- if the wine has been

12   in the bottle for a very long time, that cork will be a

13   darker -- a dark color.  If you are seeing a cork that is light

14   colored and it is an old bottle of wine, then that usually

15   indicates at some point it has been recorked or that it in some

16   other ways has been changed.

17           Then at the same time after that I look down and you

18   can see the color of the wine through the top of the neck.

19   Usually this is the easiest place to check the color.

20           Again, you are checking the color in kind of an

21   overall sense.  If it is an old bottle of wine you are

22   expecting it not to be bright red, for example, and you are

23   also able to look for what I call mare's tail, which is a

24   sediment --

25           THE COURT:  Spell it.

Dc5dkur2                          Collins - direct

1          THE WITNESS:  M-a-r-e-s, mare's tail, which is like a

2     sediment that forms along the back of a bottle after it is laid

3     down for a long period of time, and you can see a little bit of

4     what the sediment is.

5          From there I shift my light down to the punt of the

6     bottle.

7     Q.   What is the punt?

8     A.   The punt is the indentation at the bottom of the bottle.

9     And the -- I'm looking -- I'm trying to look through the edge.

10    I look again for color but, more importantly, I look for stone

11    sediment.

12         THE COURT:  I'm sorry.  You look for what?

13         THE WITNESS:  Sediment.  Again, an older bottle of

14    wine -- particularly older bottles of wine, there wasn't a lot

15    of filtration that was done in those days so you usually see

16    significant deposits down there if the bottle of wine is old.

17         At that point then you turn the bottle onto its back.

18    I examine the bottom of the bottle.  There I'm looking at, you

19    know, I'm looking for a shape.  Again, there is real deep punt

20    bottles that come out of the era between World War I and World

21    War II and go into the '40s that have a certain shape.

22         There is also codes on the bottom of the bottles from

23    manufacturers.  And when those are available --

24         THE COURT:  What?

25         THE WITNESS:  I'm sorry?

Dc5dkur2                          Collins - direct

1              THE COURT:  I didn't hear what you just said.

2              THE WITNESS:  Oh, on bottles since World War II, a lot

3    of the manufacturers had put a bottle code into their glass

4    when they manufacture the bottle.  So I look for that for a

5    couple of reasons.  Particularly if I am looking at more than

6    one bottle from a particular wine, I look at that to see if

7    it's consistent.  And in some cases you can actually look at

8    the code and ascertain, you know, whether it came from a

9    specific winery.

10             This happens more with California wines because the

11   California manufacturers for years actually vintage dated their

12   glass.  So you knew that you had -- if you had a 1978 wine, it

13   would be put in a 1979 bottle, this kind of thing.  And the

14   burgundies and the bordeaux's it is much less consistent.  But

15   nonetheless, all of those are more checklist, you know, there

16   are more things on this list.

17             After that we're looking general shape of the bottle.

18   We are back to the -- we come back out and take another view.

19             And then we proceed to the opening, which we've got a

20   capsule and a cork, and we look at the markings on the capsule.

21   Sometimes I measure this -- if it seems unusual, in the case of

22   some wines where you are really trying to make sure that they

23   are authentic, you peel back the tin of the capsule.  You look

24   at the markings that are on -- that are visible or not visible

25   on the cork.  And in general you examine the capsule for signs

Dc5dkur2                           Collins – direct

1    that it's been adulterated in any way.

2         There is numerous ways this could happen.  One is the

3    wine has been recorked at some point because the wine is

4    getting too old and the cork is giving out.  Some properties

5    will recork wines, actually, before they sell older wines.

6         But most of the earlier recorkings that we saw from

7    the '70s, a frequent method of authenticating the cork on those

8    was is they took the old cork and they wrapped it in a twine

9    and they actually embossed the twine over the top of the

10   bottle.  This is the ideal situation because you have the old

11   cork as well as the new cork if you look at it.  But in a less

12   than ideal situation, you are trying to examine as much as you

13   can this cork without taking it out of the bottle to give you

14   signs of -- you know, to give signs of authenticity.

15        THE COURT:  I'm sorry.  To take it out of the bottle

16   in order to get signs of authenticity?

17        THE WITNESS:  Yes.  The issue is a lot easier with

18   bordeaux wines, where there have been frequent cork brandings

19   for a long period of time and so that you will have an

20   identification on the cork of a chateau and a vintage, and this

21   is what you are hoping to see.

22        In burgundies it is a lot more complicated because

23   there is a long period of time where people just used a generic

24   cork.  This is partially because the burgundies don't have one

25   chateau but they have a lot of different properties.  So they

Dc5dkur2                    Collins - direct

1   would either have a blank cork or the frequent ones that I have

2   seen are corks that are branded mise en bouteille au chateau.

3   It  means bottled at the domain or bottled at the property.

4           THE COURT:  OK.  By the way, when you start, do you

5   take a bottle at random out of a case, or is there a test

6   bottle, so to speak?

7           THE WITNESS:  It depends on the carton.  You know, if

8   we are looking at original cartons -- let's say we are opening

9   it up and it looks like it hasn't been opened before or the

10  wine hasn't been disturbed from the original carton, then you

11  have multiple examples here, and so you use one at the top.

12  But also you can -- you could go down to the second level and

13  take another bottle to just see if it conforms with the first

14  bottle.  Unfortunately, solid cases of things, when they are 50

15  or 60 years old, are rare, and so most of these, they are

16  individually done as here's the bottle, here's second bottle.

17  You look at them on a case-by-case basis.

18          THE COURT:  Did you ever open the bottle?  I guess you

19  can't do that, right?

20          THE WITNESS:  Actually, there was a lot of bottles

21  opened in the old days.

22          THE COURT:  You do what?

23          THE WITNESS:  It wasn't just because we drank a lot.

24  It was based on -- the auction houses back in the '70s used to

25  put on these kind of tastings, the ones that I attended a lot

Dc5dkur2                          Collins - direct

1    of times were for trade, and you had an opportunity to taste

2    all sorts of things, which gave you a big leg up on how good

3    this particular sale was going to be, this particular cellar.

4             THE COURT:  How did you know what you were tasting?

5             THE WITNESS:  How did I know what I was tasting?

6             THE COURT:  Yes.

7             THE WITNESS:  Past experience.

8             THE COURT:  No.  No.  I don't mean that.  I mean, did

9    someone tell you that this is the same wine that is in the

10   bottle in that case, or there is just wine on the table and you

11   taste it?

12            THE WITNESS:  No.  They would bring out bottles of

13   wine on the table, and then we would open them up and it would

14   go that way.

15            Any one of these private cellars are a good example

16   when there is a lot of wine is I will go through randomly and

17   I'll choose bottles out of different cases and we'll do a

18   tasting.  You know, where it involves a lot of money, I want to

19   get some idea as to not just the authenticity of certain things

20   but, also, I want to get an idea of the provenance, which, you

21   know, whether those wines have been in fact in a proper storage

22   condition for their -- most of their lives or whether they

23   haven't.

24            THE COURT:  Which of those at the terms, provenance or

25   authenticity, describes whether it is counterfeit or not?

Dc5dkur2                              Collins - direct

1           THE WITNESS:  Oh, the authenticity is what determines
2    whether it is counterfeit or not.
3           THE COURT:  It is the authenticity?
4           THE WITNESS:  Yes.  The provenance, you could have
5    wines that have bad provenance that yet are also authentic.
6           THE COURT:  Right.  So one is upright instead of on
7    its side could be of good provenance.  But I'm still trying to
8    figure out how you know if it is authentic or not, or, more
9    particularly, how do you know if it is counterfeit or not?
10          THE WITNESS:  Without tasting the wine?
11          THE COURT:  Is there any way --
12   Q.  The process.  As a result of this process, then how do you
13   determine if a wine is questionable or not authentic?
14   A.  Well, all of those things that I sort of checklisted, I
15   listed.  That sort of for me becomes here's the pluses, here's
16   the minuses.  And, you know, my recommendation then would be
17   based upon, you know, how many different things that I thought
18   were inconsistent with what that wine should look like or
19   should be and how many things did I look at that say those are
20   consistent with what that wine should be.
21   Q.  For example, you are looking at an old wine that has what
22   appears to be a new cork.
23   A.  Yes.
24   Q.  Does that necessarily mean that the wine is not authentic?
25   A.  That doesn't necessarily mean that it's not authentic, but

Dc5dkur2                        Collins - direct

1    it works against it quite a bit in terms of my recommendation.

2    Your risks are much higher.

3    Q.  Was there a lot of recorking that went on in the '70s?

4    A.  The main place there was recorking was there was wine firms

5    in England that regularly recorked wines before they sent them

6    out.  We had a lot of issue with those particular wines because

7    they would frequently top those out before they recorked them.

8    Q.  What does that mean?

9    A.  It means that they would add more wine to bring the levels

10   up in all of the bottles.  If you are doing that properly, you

11   are taking a bottle -- you are taking a sacrificial bottle from

12   the wine and topping with the exact wine.

13          The issue that we had on this process with one or two

14   wine firms was that they weren't -- that they were using wines

15   that weren't the wine that was being topped up and in which

16   case, you know, they were adulterating the wine.  They were

17   essentially invalidating the wine.

18   Q.  What sort of things would you see on the label that would

19   cause you to question the authenticity of a wine?

20   A.  Well, aside from the paper quality, which is a key one --

21          THE COURT:  Did you say "paper quality"?

22          THE WITNESS:  Paper quality, yeah.  That you -- if you

23   have a bottle that's had its label on it for a long period of

24   time, the label is going to have -- is going to age similar to

25   like if you sat a piece of paper into the cellar and 50 years

Dc5dkur2                          Collins - direct

1    later you are looking at the piece of paper.

2              I look at the print particularly and, you know, at the

3    imagery that's on the label.  I look for color contrast in

4    these processes, which are frequently not as clear on labels

5    that have been reproduced.

6    Q.  Will you sometimes compare pictures you have taken to known

7    images of what the label is supposed to look like?

8    A.  Yes.  For example, with a 45 Mouton Rothschild, this

9    catalog has a series of all of the artist labels in it.

10             THE COURT:  All of the what?

11             THE WITNESS:  All of the labels -- standard different

12   label every year that was attributed to a certain artist.

13             THE COURT:  Artist?

14             THE WITNESS:  Yes.  And those -- so, I mean, also, we

15   had, like every other wine importing company in the United

16   States at the time, we had large files of labels from these

17   properties, because we were required by the federal government

18   to submit label approvals, you know, to import the wines, and

19   so the chateaus and the domains would supply us with.  When I

20   was on the -- when I was on these vining trips, you know, I

21   always was picking up labels so that I would have them when I

22   got back to use for label approvals.

23   Q.  Would other importers in the United States have been

24   required to have copies of the labels as well?

25   A.  Yes.  The way the law worked was that any importer had to

Dc5dkur2                          Collins - direct

1    have -- at that time, back in the '70s and '80s and '90s, you

2    had to do your own label approval with the federal government.

3    You couldn't -- you could use someone else's label on a customs

4    clearance if you had a letter.  Each time you had to get a

5    separate letter that it said it's OK for someone to use this

6    label approval, but every company basically did this process

7    themselves.

8          THE COURT:  So did I understand that in 1985 you

9    recommended to your client not to purchase that wine?

10         THE WITNESS:  On the ones with the --

11         THE COURT:  No, that is just a question.  Is that

12   true?

13         THE WITNESS:  With Connoisseur Wine Imports?  We

14   basically got our bid.

15         THE COURT:  So you did bid?

16         THE WITNESS:  Oh, yes.  But you were running a tally

17   sheet.  Here's the bottles we're not going to get very much

18   money for, here's the ones that we are going to get a lot of

19   money for.  You know, where do we draw this line where we --

20   you know, how much money are we willing to invest on it?

21         THE COURT:  Why did you decide to bid?

22         THE WITNESS:  Pardon?

23         THE COURT:  I say, why did you decide to bid at all?

24         THE WITNESS:  Oh, because a lot of wines in the

25   collection were very rare and very unique and there was a ready

Dc5dkur2                              Collins - direct

1    client base for them.

2                THE COURT:  And what did you find when you did your

3    authentication?

4                THE WITNESS:  Of overall for the cellar, you mean?

5                THE COURT:  Well, specifically and overall, yes.

6                THE WITNESS:  Specifically, I found that the

7    authentication of the wines was pretty close to impeccable.

8                What I found --

9                THE COURT:  Because?

10               THE WITNESS:  Was impeccable.

11               THE COURT:  How was it impeccable?

12               THE WITNESS:  In that I was able to take -- I was able

13   to take written documents that were available on the desk and

14   down there and match them with the wine and say, look, here's

15   when it was imported, here's when it was purchased.  And, you

16   know, this is an unusual circumstance.  Everybody doesn't keep

17   records as well as --

18               THE COURT:  How about all of those other things that

19   were part of your test?

20               THE WITNESS:  Of when we are doing the inspection?

21               THE COURT:  Yes.

22               THE WITNESS:  That was -- the major issue was the

23   percentage of wines that either weren't going to?

24   A.  Be sellable because they had gone over the hill or they

25   were ones that should have been drunk --

Dc5dkur2                          Collins - direct

1          THE COURT:  They were what?

2          THE WITNESS:  They were wines that should have been

3     drunk decades before, or they were ones that fell into these

4     cases where you had -- where you had some bottles were stored

5     properly, some bottles were not stored properly.  So it

6     developed into -- it was a lengthy process because there was a

7     lot of money that was going to be involved in those.  And that

8     was probably -- at one point there is a stop loss.  You just

9     say I'm not -- we can't afford to pay more than this because we

10    are not likely to re-- you know, we are not likely to make a

11    profit on it.

12         THE COURT:  But that is a failed cost/benefit

13    analysis, right?

14         THE WITNESS:  Sure.

15         THE COURT:  I am talking about your process of

16    authenticating the wine itself, not how much profit you could

17    make or --

18         THE WITNESS:  Sure.  In that cellar the authentication

19    went relatively smoothly, you know, because I didn't have to

20    spend as much time going through all the cases if you opened up

21    a case that had never been opened and there is the first

22    bottle; you look at it that way.

23         THE COURT:  What did you do?  That is what I am

24    saying.

25         THE WITNESS:  Yes.  The number of cellars like this

Dc5dkur2                    Collins - direct

1    that I have had the occasion to authenticate and to work with

2    since 1985 has been extremely small.  This is -- it is more

3    like a historical anecdote, this particular cellar, as opposed

4    to what we go through today.

5            The frequent situation today on this authentication is

6    that we are presented with bottles of wine via an auction house

7    or a private collector that we have no records substantiating a

8    background.  And in the case of auction houses, we don't

9    have -- the auction house doesn't divulge where the wines came

10   from and so the authentication process becomes a lot more

11   severe because you don't have the benefit of knowing exactly

12   where the wine has been all its life.

13   BY MR. MOONEY:

14   Q.  Have you found wines in the work that you have done for

15   your clients that you have recommended against their purchase

16   because you think the authentication is in question?

17   A.  Yes.  Lots of wines.

18   Q.  And comparing what you found in the 1970s to the '80s and

19   the '90s and then on up through, what is the frequency that

20   you've seen of questionable bottles?

21   A.  The frequency has increased -- it's increased tenfold.

22   It's been from where the -- the first cellar that I really ran

23   into an authentication problem was in Switzerland in 1978, when

24   I --

25            THE COURT:  1978?

Dc5dkur2                    Collins - direct

1              THE WITNESS:  1978, when I had the consultant

2       business.  I was going to broker that cellar through an auction

3       house in London and a retail -- and Draper & Esquin, a retail

4       store in San Francisco.

5              THE COURT:  And which?

6              THE WITNESS:  And the retail store of Draper & Esquin.

7       Q.  What happened?

8       A.  Well, the cellar was a disaster.  Everything I had been

9       told was going to be there was different than what it was.

10             There was a lot of storage.  It was supposed to -- it

11      was represented to me as a famous person's cellar.  It became a

12      large question in my mind who actually even owned the wine.

13      And, more importantly, all of the wines that we were being

14      supplied -- that I had been supplied on the list, nothing --

15      nothing matched.

16             THE COURT:  Nothing matched with what?

17             THE WITNESS:  If it said there was going to be a 1945

18      Lafite, you would look and there was no 1945 Lafite.  It would

19      be 1946 Lafite, or there would be no Lafite at all.  So this

20      cellar opened my eyes quite a bit to, you know, what the

21      downside of all of this rare wine business could be because I

22      couldn't get out of the place fast enough.  But this --

23      Q.  Did you find bottles you believed to be counterfeit in the

24      course of that inspection?

25      A.  From the list that I was provided, I found multiple bottles

Dc5dkur2                        Collins - direct

1  that I didn't think were -- what they said was right.

2             THE COURT:  Wait a minute.  I don't know what that

3  means.

4             They didn't match -- this didn't match -- wait a

5  minute.

6             THE WITNESS:  When I went there, they supplied me

7  beforehand -- the reason I went to the trouble to go to the

8  trip was they supplied me with a list that had all of these

9  rare wines on it that were available.

10             THE COURT:  OK.

11             THE WITNESS:  This is similar to in a large -- this is

12  the way I received the Lucia cellar is exactly the same way.

13  You know, I was brought this list of, you know, we have all of

14  these things, and, you know, you start out from there.

15             THE COURT:  And so the list didn't match the

16  bottles -- the labels, I guess?

17             THE WITNESS:  Yeah.  I don't think -- I would --

18  immediately looked at some things and said, well, you know,

19  this can't be an 1870 Lafite even if it doesn't have a label on

20  it because the bottle is way too modern, you know.  That was

21  the first tipoffs.

22             And at the same time that was -- when we were doing

23  cellars in England --

24             THE COURT:  We are in that Switzerland -- you know,

25  that was your first incident, right --

1              THE WITNESS:  That's correct.

2              THE COURT:  -- of problems?

3              THE WITNESS:  That's correct.

4              THE COURT:  And I am trying to figure out what that

5      problem was.

6              THE WITNESS:  Well, there was a lot of wine here that

7      was going to be tried to be sold for something that I couldn't

8      believe that it was.

9              THE COURT:  I'm trying to figure out how you came to

10     the conclusion it wasn't what it said it was?

11             THE WITNESS:  The authentication process that I was

12     referring to, if the first three bottles that I did that, you

13     know, let's say, the run through, nothing matched.

14             THE COURT:  I don't know what that means.  Nothing

15     matched.  What didn't match with what?

16             THE WITNESS:  The label would say 1945.  The bottle

17     didn't match.  The cork had no -- it had no identification on

18     it.  There would be a property or you would expect that there

19     would be a cork identification.  The label itself looked

20     remanufactured.  The -- you know, the inks weren't -- you know,

21     the inks weren't sharp.

22             THE COURT:  The inks weren't sharp?

23             THE WITNESS:  Yes.

24             THE COURT:  But these are old bottles, right?

25             THE WITNESS:  These are old bottles.

Dc5dkur2                          Collins - direct

```
 1              THE COURT:  Do you think they should be sharp?
 2              THE WITNESS:  Yes.  Because I think the method of
 3   imprintation, of imprinting the label, is that you get a clear
 4   ink read.  And what you see on one set of copied, that they
 5   don't have a clear ink read, that you are not seeing any -- you
 6   are not seeing any distance between the paper and the ink in
 7   terms of there is no sharp edge which would be created by
 8   printing.
 9              THE COURT:  So you rejected on behalf of your buyer
10   that Swiss purchase, is that right, or the proposed --
11              THE WITNESS:  Yes.  This whole purchase I totally
12   rejected, yes.
13              THE COURT:  And just to again sum up, you rejected it
14   because specifically what was wrong with what you saw?
15              THE WITNESS:  I specifically rejected it because the
16   bottles of wine that were represented as bottles of a certain
17   chateau and a certain vintage bore no resemblance to previous
18   bottles of those chateaus and those vintages that I had seen.
19   BY MR. MOONEY:
20   Q.  You talked about one of the things that you looked at as
21   being the capsule?
22   A.  Yes.
23   Q.  What does the capsule consist of?
24   A.  It's the covering of the cork on the top of the bottle.
25   Q.  And what form does that come in?
```

Dc5dkur2                          Collins - direct

1    A.   In the older bottles it is lead, a ball of wax.

2    Q.   Do you see modifications that are sometimes made to the

3    capsule after the bottles went to the chateau?

4    A.   Yes.

5    Q.   Does that necessarily mean that the wine itself is not

6    authentic?

7    A.   The modifications to the capsule don't work in the wine's

8    favor.

9    Q.   Do people commonly add wax to the bottle?

10   A.   Well, I've seen this in cellars in California.  If you have

11   a wine cellar and you are not planning to market it, there is

12   people that do this to maintain the quality level of the wine

13   if they have a problem with a cork leaking, for example, or

14   things like this.

15   Q.   And if a cork is leaking, is one of the remedies to --

16   A.   Yes.

17   Q.   -- increase the wax?

18   A.   Yes.

19   Q.   Now, over the years, as you've attended these auctions, you

20   said that you've seen questionable wines that have shown up in

21   the market.

22   A.   Yes.

23   Q.   All right.  And you testified that that was an increasing

24   issue, is that fair?

25   A.   Yes.

Dc5dkur2                         Collins - direct

1   Q.  Have you seen the same bottles of questionable wine showing

2   up time after time?

3   A.  Yes.

4        MR. HERNANDEZ:  I object.  I ask for clarification of

5   what that means, "the same bottles."

6        THE COURT:  That's fine.

7   A.  Yes.  Sure.

8   Q.  Any incidents you can give of where you saw a wine

9   bottle -- tell us an incident where you again had identified

10  wine as being questionable or counterfeit and then you saw it

11  again?

12  A.  There is a lawsuit that's on right now concerning a bottle

13  of 1945 -- a magnum of 1945 Domaine de la Romanee-Conti,

14  Romanee-Conti.

15  Q.  Without identifying the parties in the lawsuit, had you

16  previously seen that bottle?

17  A.  Exactly.  There were two magnums and one jeroboam of that

18  wine that were imported in California in 1998.  They were

19  imported through a company for a retail account, and I was

20  called on to look at these bottles of wine, and I'd ascertained

21  that they were fake.

22        THE COURT:  They were what?

23        THE WITNESS:  That they were fake.

24        THE COURT:  Fake?

25        THE WITNESS:  That they were counterfeit.

Dc5dkur2                              Collins – direct

1              THE COURT:  And this was when?

2              THE WITNESS:  This was in 1998.

3              THE COURT:  You looked at these bottles in 1998?

4              THE WITNESS:  In Oakland, California, yes.

5              THE COURT:  In Oakland, California?

6              THE WITNESS:  Yes.

7              THE COURT:  And you determined that they were fake?

8              THE WITNESS:  Yes.

9              One of these bottles is this bottle that has shown up

10   on this recent lawsuit.  It has exactly the same strip label on

11   it.  There is a strip label that is the identification of the

12   importer.

13             THE COURT:  And where is the bottle now?

14             THE WITNESS:  Where is it now?

15             THE COURT:  Yes.

16             THE WITNESS:  It is in the court somewhere, I believe.

17             THE COURT:  Where?

18   Q.  This bottle is subject --

19             THE COURT:  No.  Where is it now?

20             THE WITNESS:  I don't know.  I am not involved in that

21   lawsuit.

22             THE COURT:  I.  Know, but how do you know that it is

23   the same bottle that you saw?

24             THE WITNESS:  The position of the strip --

25             THE COURT:  Have you looked at it?

Dc5dkur2                        Collins - direct

                    THE WITNESS:  I didn't look at it this year.  I looked

at it in 1998.

                    THE COURT:  I understand.  So how do you know that the

bottle in this lawsuit, whatever it is, is the same bottle?

                    THE WITNESS:  Because of the identification, because

of the photograph that was circulated in the news has the

import strip label on it.

                    THE COURT:  So you saw a photo --

                    THE WITNESS:  Yes, I have.

                    THE COURT:  -- of this litigated bottle?

                    THE WITNESS:  Yes.

                    THE COURT:  You said that is a bottle that you had

seen in 1998 in Oakland, is that right?

                    THE WITNESS:  That is correct.

                    THE COURT:  And how did you draw that conclusion?

                    THE WITNESS:  Because there is not an import label

from somebody that normally imports this wine.  This was

something that was done as a private-party importation.  So it

has a strip label that would be considered unique for this

particular wine.

                    I probably went into this -- there is -- the reason

that I also think that the wine is fake, or a counterfeit, is

because it's 1945 Romanee-Conti, and it's my opinion that there

was never anything larger than a bottle ever produced in this

wine.

Dc5dkur2                              Collins - direct

1              THE COURT:  I'm trying to figure out how you know the

2    bottle you saw in Oakland is the same as the bottle --

3              THE WITNESS:  Well, without examining it in person, I

4    don't know a hundred percent.

5              THE COURT:  Ah.

6              THE WITNESS:  But the preponderance of evidence is

7    that that strip label, located exactly in the same place of

8    that label of that bottle of wine, would be the same bottle of

9    wine.

10             THE COURT:  And what does that say?

11             THE WITNESS:  It said it is imported by the firm that

12   handled the importation.

13             THE COURT:  So you think it can only be one bottle in

14   the world --

15             THE WITNESS:  I think there is three, and this is one

16   of them, the three that I examined.

17             THE COURT:  Were those the only three that there could

18   be of that?

19             THE WITNESS:  They are not evidently the only three

20   that are for sale.  If we went to London right now, there is

21   evidently somebody that claims to be selling one also.

22             THE COURT:  So how do you know that what you saw is

23   not the one in London?

24             THE WITNESS:  Then I would say that all of these that

25   we are referring to are counterfeit.

Dc5dkur2                          Collins - direct

1            THE COURT:  So now there are how many of them?

2            THE WITNESS:  The only ones I know are these three

3    that I've actually physically examined.  But as is the case of

4    counterfeiting wine, that quantity could change in a moment's

5    notice.

6            The reason that I feel strongly about that particular

7    bottle of wine is two-fold.  One is is that there is a wealthy

8    collector in Silicon Valley that purchased the jeroboam and

9    opened it and told me it was fake.

10           THE COURT:  He told you it was fake?

11           THE WITNESS:  Yes.

12           And, secondly, the wine happens to be the wine of my

13   birth year.  And when I went to Domaine de la Romanee-Conti in

14   1976, I specifically inquired about all of the 1945 vintages of

15   the wine.  And most -- the cellar master at the time -- it is

16   in my notebook, I specifically wrote down that, and I

17   specifically asked whether there were larger formats of the

18   wine.  There was only two barrels of the wine made.  It was

19   never sold commercially.  It was sold to private parties that

20   were collectors and friends of the domain in 1947/'48.

21           The one case that I referred to that was in the Lucia

22   collection is one of the few cases of wine, one of the few

23   examples of wine that I've ever actually seen.

24           The bottle of -- the Romanee-Conti was picked two days

25   after I was born.  So I kind of was trying to collect things

Dc5dkur2                    Collins - direct

like this for my own personal cellar.  But I had to settle for

a Laroche which was actually picked the day I was born, or it

is the other way around.  I don't know whether -- which came

first.

BY MR. MOONEY:

Q.  Mr. Collins, given the state of the market, do you have an

opinion as to what the risk is for a buyer if they just go out

into the market and start buying wines from auctions and

private cellars to end up with counterfeit wines?

A.  Well, it depends on -- it depends on what wine we are

talking about.  If you talking about you want to start buying a

lot of wines that cost less than a hundred dollars, I would say

your risks are pretty low.  If we are talking about these

same --

        THE COURT:  And why would the risk be low if it is

under a hundred dollars?

        THE WITNESS:  Well, it would be like a currency

counterfeiter making pennies when they could make

hundred-dollar bills.  You know, there is not a lot of

authenticity problems with inexpensive wines from burgundy or

bordeaux.

        THE COURT:  It sounds like you are saying that there

is not a lot of upside in selling cheap wines but --

        THE WITNESS:  Well, there is a lot of upside to it if

you are a consumer, if you are actually drinking the wine.

Dc5dkur2                          Collins - direct

1              THE COURT:  I'm trying to figure out -- I still don't

2    get why wine that's $100 or less is less likely, in your

3    opinion, to be counterfeit.

4              THE WITNESS:  Well, because I think if someone was to

5    sit here and decide to counterfeit a bottle of wine and they

6    had a choice between making a $5,000 bottle of Petrus out of it

7    or they could choose an Ol Muli in a lesser vintage that they

8    would at the most get $50 for, that they would choose to

9    counterfeit the Petrus.

10             THE COURT:  So you're saying more likely it would be

11   counterfeit because there is a bigger upside in the resale, not

12   because necessarily the wine is or isn't what it purports to

13   be?

14             THE WITNESS:  Precisely.

15   BY MR. MOONEY:

16   Q.  Are there particular domains that are more commonly found

17   in counterfeit than others?

18   A.  Yeah.

19   Q.  What would those be?  Give us some examples.

20   A.  Well, an example would be Chateau Petrus, which is probably

21   one of the most -- it is a small domain, small chateau, and the

22   production is limited.  And it was popularized by the press in

23   the '70s and '80s, and it achieved a very high price.  And I've

24   seen more examples of counterfeit bottles of Chateau Petrus

25   than I have of any other chateau.

Dc5dkur2                        Collins - direct

1          THE COURT:  And where did you see them?

2          THE WITNESS:  Oh, the home for a lot of them used to

3    be Las Vegas.  I used to sell wines to casinos in Las Vegas,

4    and the running joke amongst the sommeliers down there was two

5    out of every three bottles of Petrus were fake.

6          THE COURT:  But that's what they told you, right?

7          THE WITNESS:  Yeah.  There is people like master

8    sommeliers like Raj Parr, P-a-r-r, that have written this in

9    Spectator articles.  There is --

10   Q.  Did you also see questionable bottles?

11   A.  Yes.

12         THE COURT:  Where?

13         THE WITNESS:  Where?  In MGM Grand, specifically in

14   that casino.  But that's because I knew the wine director.  So

15   we were looking at these -- there was a case where they used

16   the bottles to reward people who lost a lot of money on the

17   tables so they can flip open the thing and say, here, we're

18   going to open a $10,000 bottle of wine for you.

19         There was three bottles of Petrus that had been

20   ordered by this one customer.  One of the bottles was rejected.

21   We actually tasted the dregs of all three bottles, and the

22   bottle that was rejected we thought was the real one and the

23   two that were accepted were the phony ones.

24   BY MR. MOONEY:

25   Q.  And are there any other domains that are particularly

Dc5dkur2                          Collins - direct

1    subject to counterfeiting?

2    A.  Well, the largest single worldwide problem right now is

3    Chateau Lafite Rothschild.

4    Q.  Where is that a problem?

5    A.  It's a huge problem in China.

6    Q.  How do you know that?

7    A.  Well, I worked -- I have a client that worked directly with

8    in Shanghai.

9            THE COURT:  You have a client who what?

10           THE WITNESS:  That I worked directly with in Shanghai,

11   and there is a series of collectors that I work directly with

12   one person whose name is Lloyd Sun.

13           THE COURT:  Have you been to China?

14           THE WITNESS:  No.  We were on our way -- I was going

15   to China to authenticate this auction in last April.  It was a

16   Christie's auction, but then they told everyone that no one was

17   going to be able to examine the bottles.

18           THE COURT:  So have you ever authenticated any wine in

19   China?

20           THE WITNESS:  Not in physically -- not in physically

21   in China.  I've photographed, yes.

22           THE COURT:  You've authenticated wine that was, what,

23   for sale in China?

24           THE WITNESS:  Yes.  I've rejected bottles of wine that

25   were for sale in China.

Dc5dkur2                          Collins - direct

1          THE COURT:  I'm not understanding you.

2          THE WITNESS:  Oh --

3          MR. HERNANDEZ:  Your Honor, may I just ask Mr. Collins

4     either sit a little closer to the microphone?  There are parts

5     of the testimony where he fades out.

6          THE WITNESS:  Sorry.

7          MR. HERNANDEZ:  Thank you.

8          THE COURT:  I'm just trying to understand.  You said

9     the biggest problem or the big problem of counterfeit wine is

10    in China today, right?

11         THE WITNESS:  That is one of them, yes.

12         THE COURT:  I thought you said that was a big one.

13         THE WITNESS:  Well, for this particular chateau,

14    that's for sure the biggest.  I will go with it is the biggest.

15         THE COURT:  But you have never been to China?

16         THE WITNESS:  I have not.

17         THE COURT:  And you have never authenticated any wine

18    in China?

19         THE WITNESS:  Not in China per se, no.

20         THE COURT:  So you don't know directly whether any

21    wine in China is or isn't --

22         THE WITNESS:  No.  I've looked at bottles of wine that

23    have been brought back from China, yes.

24         THE COURT:  So explain that.

25         THE WITNESS:  They will --

Dc5dkur2                          Collins - direct

 1                  THE COURT:  How did that happen?

 2                  THE WITNESS:  The client I deal with, Lloyd Sun, he

 3      has a cellar both in Los Angeles and down in Chinatown.  So

 4      wines are transferred back and forth.

 5                  THE COURT:  OK.  So what were the circumstances?

 6                  THE WITNESS:  I'm sorry?

 7                  THE COURT:  What were the circumstances?  What did you

 8      do with respect to --

 9                  THE WITNESS:  He brought back a bottle of Lafite to

10      show me one that was available at a restaurant there.

11                  THE COURT:  Was it a bottle that was full or a bottle

12      that was empty?

13                  THE WITNESS:  No.  It was one that was full.  We did

14      the same authentication that I just listed.

15                  THE COURT:  I'm sorry?

16                  THE WITNESS:  I did the same procedure that I just

17      listed to look at this, and we didn't think it was a real

18      bottle.

19                  THE COURT:  OK.  Why not?

20                  THE WITNESS:  The way the printing was on the label

21      didn't appear to be consistent with Chateau Lafite labels.  The

22      bottle didn't appear to be -- it had a flatter base to it, so

23      it didn't appear to be a bottle that would be consistent with

24      what Chateau Lafite would use.

25                  The cork -- we didn't pull the capsule so the capsule

Dc5dkur2                          Collins - direct

1    was generic.  We did not have a Chateau Lafite stamp on it.

2    Those alone would be enough --

3              THE COURT:  Those what?

4              THE WITNESS:  Those reasons alone would raise more

5    than one red flag at this point.

6              THE COURT:  OK.  I'm sorry to interrupt, counsel.  We

7    are going to soon have to --

8              MR. MOONEY:  I understand.

9              THE COURT:  -- give the government a chance.

10             MR. MOONEY:  Yes.  I'll wrap up.

11   BY MR. MOONEY:

12   Q.  Have you had an opportunity to review some of the wine

13   bottles that are involved in this case?

14   A.  Yes.

15   Q.  When did you get a chance to do that?

16   A.  Yesterday.

17   Q.  OK.  And do you have any preliminary -- were you able to

18   conclude your examination and feel comfortable with the end

19   results, or do you still have more work you are going to do?

20   A.  Well, I haven't -- I haven't compiled everything at this

21   point.  I am comfortable with having successfully done an

22   examination of all of the bottles that were there.

23   Q.  Do you have a preliminary conclusion with regards to the

24   bottles that you saw, as to whether there are counterfeits or

25   whether they are authentic wines?

Dc5dkur2                          Collins – direct

1   A.   There is a high percentage of probability that there is

2   numerous counterfeit wines in the wines that I reviewed.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DC5KLIR3                      Collins - direct

1    Q.  In your opinion, though, would somebody buying in the open

2    market end up with a high percentage of counterfeit wines in

3    their cellars?

4    A.  Buying these sorts of --

5    Q.  These sorts of wines?

6            THE COURT:  Not sorts, but which bottles did you look

7    at, the bottles in this case?

8    BY MR. MOONEY:

9    Q.  The bottles in this case?

10   A.  Yes.

11           THE COURT:  You think there is a high probability

12   they're counterfeit?

13           THE WITNESS:  I have to continue, complete the report

14   on every single thing, but there is certainly numerous bottles

15   in there that I believe are counterfeit.

16           THE COURT:  There are?

17           THE WITNESS:  Yes.

18           THE COURT:  How many did you look at?

19           THE WITNESS:  What was the total?  51, wasn't it?

20           THE COURT:  Do you recall?

21           THE WITNESS:  I don't know the exact number.  I've got

22   it -- they wouldn't allow us to bring in a commuter.

23           THE COURT:  Do you have a rough idea if there is one

24   or 10?

25           THE WITNESS:  Number of counterfeits?

DC5KLIR3                        Collins - direct

1              THE COURT:  Number of bottles, first of all, you

2      examined?

3              THE WITNESS:  I think there was around 50.

4              THE COURT:  You examined?

5              THE WITNESS:  Yes.

6              THE COURT:  This was yesterday?

7              THE WITNESS:  Yes.

8              THE COURT:  As best you understand, how many would you

9      say of the 50 were counterfeit?

10             THE WITNESS:  Well, there were a few issues that I

11     wanted to follow up some investigation on, and then I haven't

12     completely compiled it, but I would say 80 percent would be

13     that I think are counterfeit.

14             THE COURT:  Why?

15             THE WITNESS:  I did each bottle the way that I

16     explained, and what I did at the end of each examination is I

17     marked basically pluses and minuses for the different things

18     that we would be looking at, and the ones that had a lot of

19     minuses, you would -- there were wines that if, if I was

20     examining this, this bottle of wine for a client that I have

21     that was looking to purchase it, I would say well, I would

22     reject this bottle of wine because it has too many issues.

23     BY MR. MOONEY:

24     Q.  Are the reasons you would reject these the same for every

25     bottle across the board or do they vary from bottle-to-bottle?

1  A.  They vary.  They didn't vary necessarily from

2  bottle-to-bottle within the same exact wine, but they did vary

3  from bottle-to-bottle if you're looking at different lots.

4  Q.  If we were going to go into an individual evaluation of

5  each of these, we would be here for quite some time?  You can

6  discuss it --

7  A.  Not as long as I was there looking at them.

8          THE COURT:  Is it fair to say that if somebody were

9  your client who were looking to buy those wines, the wines that

10 are --

11         THE WITNESS:  I would recommend against a large

12 percentage.

13         THE COURT:  The wines in this case?

14         THE WITNESS:  Yes.

15         THE COURT:  From what you saw, would you recommend

16 your buyer buy any of them?

17         THE WITNESS:  Yeah, there is bottles of wine that I

18 think -- two recommendations.  There is bottles of wine that I

19 think are authentic.  If that was the goal of the client, then

20 I would recommend buying it.

21         THE COURT:  How much?  How many?

22         THE WITNESS::  I am sorry, I just haven't worked

23 through the whole report.  There is maybe, maybe 7 or maybe 10

24 I can think of for sure I can say are authentic.

25         Again I would like to do that on a case-by-case and

DC5KLIR3                          Collins - direct

1   see if my numbers change any.  I didn't finish each examination

2   with the idea of drawing an overall graph of this particular

3   situation because the bottles are very different from each

4   other.  There is different issues with different bottles.

5           There is one or two lots that I suspect might be

6   authentic.

7           THE COURT:  You suspect are authentic?

8           THE WITNESS:  Yeah.  I need to do a little more

9   research in terms of when a domain name became in use.  Some of

10  the bottles of wine that are in this case -- do you want me me

11  to be specific?

12          THE COURT:  I am trying to figure out, so if you have

13  a client, and you went yesterday and did that examination, I am

14  trying to figure out from what you saw, whether or not you

15  would recommend to your client to buy any of that wine or some

16  of it or all of it?

17          THE WITNESS:  If we're talking about the kind of

18  client that I like to have here who is looking to buy wine to

19  drink it, then I would say that there is virtually none that I

20  would recommend buying.

21          THE COURT:  None?

22          THE WITNESS:  None because some of these wines,

23  specifically old white wines, I don't believe that those

24  wines -- if those wines are authentic, then they are no longer

25  good to drink and they should have been consumed a long time

DC5KLIR3                          Collins - direct

1    ago.

2              In fact, we were talking about one of the chateaus a

3    moment ago, and I look at a lot of these older bottles of wine

4    that are for sale, and right now all of them are all over the

5    internet and in these auctions.  I would recommend to my

6    clients against buying any of them not just because they might

7    not be authentic, but because if they are authentic, they're

8    going to be over the hill.  They're not going to be drinkable

9    wine.

10             THE COURT:  So again what is your assessment of what

11   you saw yesterday in terms of what you would recommend to a

12   client, buy or not buy?

13             THE WITNESS:  If they want to buy because they wish to

14   own a certain label and they want an authentic bottle, then

15   there are authentic bottles.

16             If they want to buy because they want to have a great

17   bottle of wine to drink tomorrow night, I recommend against

18   virtually all of them.

19             THE COURT:  Virtually all of them?

20             The ones you would recommend that they could buy to

21   put on a shelf, so to speak, is that what you're saying?

22             If you can't drink it, you're still going to recommend

23   they buy?

24             THE WITNESS:  I can come up with a long list of other

25   things I would spend the money on besides a bottle of wine that

DC5KLIR3                         Collins - direct

1   is no good, that you would sit on a shelf.

2           THE COURT:  But you're saying there are maybe some of

3   those that you saw yesterday?

4           THE WITNESS:  That are no good, you mean?

5           THE COURT:  I don't know.  You're the --

6           THE WITNESS:  Without the use of a cork screw, I would

7   say it would have been a tough day to open up a lot of those

8   bottles of wine and find one of them was good.

9           THE COURT:  Virtually none would be good to drink, and

10  I am still trying to figure out how many you think were

11  authentic?

12          THE WITNESS:  Well, again I am not exactly sure of the

13  percentage.  Let's say 10 percent, 15 percent.  Again one of

14  the wines has a specific vineyard reference to it that -- it is

15  a wine originally imported by Esquin in 1951 prior to this

16  merger, prior to them moving on to another importer 20 years or

17  30 years later.  It uses a name for a specific ancient domain.

18          THE COURT:  Ancient?

19          THE WITNESS:  There is a domain reference, okay, for

20  the vineyard, okay?

21          If the vineyard reference was used and bottles of wine

22  imported by Esquin, John Esquin, from George Roumier in the

23  start of this company in 1951-52, I owned two bottles that

24  originally came out of there from 1945 vintage that were not

25  labeled with the current domain name, but were labeled with

DC5KLIR3                          Collins - direct

1  this ancient domain name.

2          So I know there is an interrelationship there from the

3  old days at Esquin.  The reason I can't speak with certainty on

4  that, on these particular bottles, is because I don't know

5  whether the label I photographed was actually a label that was

6  used by any of three people, either John Esquin, Harleys of

7  Bristol or George Roumier.  I don't know that for sure.

8          I have a few places I might be able to look that up to

9  confirm.  So that is why there is this questions in my mind on

10  certain issues.  There are other wines in here that there is no

11  question in my mind that they wouldn't pass the muster as I

12  would give it for the clients that I represent.

13              THE COURT:  Okay.  Is that it, Mr. Mooney?

14              MR. MOONEY:  No more, your Honor.

15              THE COURT:  Okay.

16  CROSS-EXAMINATION

17  BY MR. HERNANDEZ:

18  Q.  Good afternoon, Mr. Collins.

19  A.  How do you do?

20  Q.  You understand that the reason that you're here is that you

21  may be testifying as an expert in a criminal trial of Mr.

22  Kurniawan.  You understand that, right?

23  A.  Yes.

24  Q.  You understand one of the roles of an expert testifying who

25  is to offer their opinions about certain matters that maybe the

DC5KLIR3                         Collins - cross

1   jury needs expert guidance on?

2   A.  Yes.

3   Q.  So the first thing I want to do is ask you to identify for

4   us all of the opinions that you've formulated based on your

5   examination of everything and everything in this case.

6   A.  You're specifying the only actual examination that I have

7   done of anything in this case is the bottles of the wine that I

8   was able to examine yesterday.

9   Q.  I understand that.  Next week you may be testifying in this

10  trial and offering opinions about certain facts and evidence.

11  All I'm trying to do is get a catalog from you, a list of what

12  those opinions are.

13           One of them you just mentioned is 80 percent of the

14  wine you examined yesterday is fake.

15  A.  Ah-huh.

16  Q.  That is a opinion of yours, correct?

17  A.  Yes.

18           THE COURT:  Is that your statement, 80 percent is fake

19  from what you saw yesterday?

20           THE WITNESS:  At this moment I'd say that is very

21  close.

22           THE COURT:  Did you also say, if I understood, a

23  hundred percent you would recommend to a client not to buy if

24  their sole purpose was to drink it?

25           THE WITNESS:  That's correct.

DC5KLIR3                    Collins – cross

1          THE COURT:  Right?

2          THE WITNESS:  Yes.

3          THE COURT:  So there is some percentage that you might

4     recommend that a client buy if what they wanted to do was to

5     put it up on a shelf?

6          THE WITNESS:  That's correct.

7          THE COURT:  As to that percentage, the shelf

8     percentage, you haven't finished your investigation as to

9     whether you'd make that recommendation, either?

10         THE WITNESS:  Yeah, I'd like to firm up.  There is a

11    little bit of research that I would like to do before I make my

12    opinion exactly this way or exactly that way.  I am not

13    positive on one, particularly one particular wine.

14         No, on the basis of my examination yesterday, I'd say

15    that is an accurate representation of my opinion.

16    BY MR. HERNANDEZ:

17    Q.  So that is one of your opinions, Mr. Collins.  What other

18    opinions do you have in this case?

19    A.  Well, indeed, another opinion that I have is based on these

20    wines where this is particularly unique to the situation that I

21    see in the marketplace or whether it is commonplace.

22         THE COURT:  I didn't understand that.

23    BY MR. HERNANDEZ:

24    Q.  We don't understand.  Can you explain what you mean by

25    that.

DC5KLIR3                          Collins - cross

A.  As time has gone on here over the 35 years, more and more

I've been asked to examine bottles of wine that they think are

counterfeit.  The current clients that I have right now, you

know, have asked me to pre-authenticate things that they're

thinking of purchasing.

          There is the overall auction marketplace to me offers

ample opportunity to purchase counterfeit wines because they're

the kinds of authentication processes that everybody used 30

years ago are not being applied.

          There was a recent auction in China that I was asked

about different wines, and by the sheer, by the sheer

appearance of the bottles and the photographs and the catalogs,

I would have rejected those bottles of wine.

Q.  What time period do you attribute the spike in counterfeits

in the market to?

A.  It has kind of gone in spurts.  I think there was a large

spike in counterfeits in the 80's, and I think there was a very

large spike in counterfeits in the 90's.

Q.  How about 2004 to 2012?

A.  I don't think -- we are looking at this from overall world

position, I think there has been unabated spike in counterfeits

over that period of time also.

Q.  What other opinions do you have?

A.  In relationship to?

Q.  Any opinion you intend to offer in this trial?

DC5KLIR3                    Collins - cross

A.  Well, I believe I'm in this trial to base opinions on the

bottles of wine that we just examined.  I think that is my

primary --

Q.  We have that, your opinion about those bottles.  Anything

else?  It is okay if you have two opinions.  You don't only

have to have one?

A.  Sure, I understand that.  Generally the opinions that I've

expressed today about the overall situation in the marketplace

would be opinions that I would have that might or might not be

applicable to this trial.

        THE COURT:  So the opinions, the opinion that you have

that is directly applicable to this trial is that the wine you

examined in this trial is, by and large, you would not

recommend that any of your clients buy?

        THE WITNESS:  That's correct.

BY MR. HERNANDEZ:

Q.  So, Mr. Collins, we have your opinion about the bottles you

examined and we have your opinion about the increasing number

of fake wines in the market, I'll use that as my shorthand.

        Are there any other opinions you intend to offer in

the trial?

A.  The only other opinions that I think might be useful is

whether the authentication process that I am involved in, and I

am involved with in certain clients right now is preemptive,

and when this marketplace might be quite a different if people

DC5KLIR3                    Collins - cross

1    had exercised the same kind of diligence in pre-authenticating

2    these large purchases before they make them.

3    Q.  Do you understand this is a criminal case, right?

4    A.  Pardon?

5    Q.  Do you understand this is a criminal case, right?

6    A.  I understand it is a criminal case.

7    Q.  Do you have any other opinions besides those that you

8    listed that you intend to offer at trial?

9    A.  None that I am aware of.

10   Q.  Do you have an opinion about whether or not the defendant

11   counterfeited any wine?

12   A.  I am sorry?

13   Q.  Do you have an opinion about whether or not the defendant,

14   Rudy Kurniawan, counterfeited any wine?

15   A.  No.

16             THE COURT:  By the way, excuse me, do you know him?

17             THE WITNESS:  I've met him twice.

18             THE COURT:  When was that?

19             THE WITNESS:  Once three years ago he attended a

20   dinner that I was at, and I am sorry I don't remember the exact

21   date, I put on a German wine tasting about 7 years ago or 8

22   years ago that he attended.

23             THE COURT:  Did you meet him?  Those are the only

24   times you've ever met him?

25             THE WITNESS:  Those are the only times I have met him.

DC5KLIR3                        Collins - cross

1           THE COURT:  And the circumstances of your meeting was

2     for what?

3           THE WITNESS:  I am sorry?

4           THE COURT:  You were just at the same dinner or you

5     talked or you conversed?

6           THE WITNESS:  We conversed very little.  On the German

7     wine tasting, I don't think we conversed at all.  He was with a

8     group of other people that attended the tasting, and on the

9     other dinner I can think of, there was five or six people

10    attending that dinner that had a lot of opinions, so I don't

11    think he expressed very much.  We didn't have any direct

12    conversations of substance.

13          THE COURT:  Do you have any understanding of who he is

14    and what he does?

15          THE WITNESS::  Do I right now?

16          THE COURT:  Did you either time you met him?

17          THE WITNESS:  Sure.

18          THE COURT:  What is that?

19          THE WITNESS:  My opinion of?

20          THE COURT:  Who he is?

21          THE WITNESS:  Well, it was a fellow that was a large

22    wine collector, invested a lot of money in wine in that period

23    of time.

24          THE COURT:  In which period of time?

25          THE WITNESS:  In that decade, the decade of, say

DC5KLIR3                    Collins - cross

1    let's -- I don't know the exact dates, but 2001 to 2010,

2    something like that.

3              THE COURT:  So you knew him to be a large wine

4    collector?

5              THE WITNESS:  Yes, that was his reputation, yes.

6              MR. HERNANDEZ:  I should have asked before, but is it

7    possible to turn on the Elmo to see an exhibit.  Is that all

8    right?

9              THE COURT:  Yes, sure.  Is it plugged in?

10             MR. HERNANDEZ:  It would be a good thing to check.

11             (Pause)

12             THE COURT:  Did you understand Mr. Kurniawan to do the

13   same kinds of work in the wine industry that you did?

14             THE WITNESS:  Not really.  I mean we didn't have any

15   of the same clients, if that was the question?

16             THE COURT:  Do you think he had the same understanding

17   of wine that you did?  Or the same degree of knowledge?

18             THE WITNESS:  Without seeming egotistical, I've been

19   at it for a long time.  Opinions are like noses when it comes

20   to wine, everybody has one, but I feel confident in my own.

21             THE COURT:  In your own opinion?

22             THE WITNESS:  Expertise in this area.

23             THE COURT:  I see.

24   BY MR. HERNANDEZ:

25   Q.  Mr. Collins, I asked you whether you had an opinion whether

DC5KLIR3                    Collins - cross

1   or not the defendant made counterfeit wines and you said no,

2   correct?

3   A.  That's right.

4   Q.  No opinion?

5   A.  That's right.

6   Q.  Are you aware that the government has several boxes worth

7   of evidence that it alleges were used to counterfeit some of

8   the very same wines that you examined yesterday?

9   A.  The only way I would be aware of that as something I've

10  read in the paper.

11  Q.  As you sit here today, are you aware the government has

12  alleged that it has boxes upon boxes of evidence to support

13  that the defendant counterfeited wines?

14  A.  Counterfeited wines that it has, the boxes, I am aware of

15  that.

16  Q.  As you sit here today, were you aware of that?

17  A.  Yes.

18  Q.  Were you aware of that yesterday before you started the

19  examination?

20  A.  Yes.

21  Q.  Wouldn't it have been helpful for your examination for you

22  to look at that evidence?

23  A.  I did the examination as cleanly as I could.  I didn't

24  review any of the documents that I guess I'm supposed to review

25  here concerning the other expert testimony and so forth.

DC5KLIR3                        Collins – cross

1   Q.  That is not what I am asking you about, Mr. Collins.  I
2   want to make sure -- I don't want to cut you off.  I want to
3   make sure you understand the question.  The government alleges
4   it has, for example, thousands of wine labels that were used to
5   replicate the same bottles you examined.  You didn't ask to see
6   those yesterday, did you?
7   A.  No.  They weren't available to me.  I only looked at what I
8   was told that I could look at.
9   Q.  Would it be helpful for you to look at those?
10  A.  Well, I don't know that it would change the evaluation when
11  I did my examination.
12  Q.  How could it not?
13  A.  Well, there could be a bottle, a label sitting in this book
14  that wouldn't change my evaluation of the bottle, one way or
15  another.
16  Q.  Without examining the evidence, it is your judgment now
17  that there is no need to look at the evidence, it couldn't help
18  you, is that your answer?
19  A.  If you want me to look at it and render an opinion, I could
20  do that.
21  Q.  Mr. Collins, I don't want you to testify in this trial so,
22  no, I don't want you to look at the evidence.  I am asking you,
23  have you already determined that evidence would not be helpful?
24  A.  You're asking --
25          (Multiple voices)

DC5KLIR3                          Collins - cross

1   Q.  Let me start again.  Mr. Collins, do you understand we have

2   moved to exclude your testimony, right?

3   A.  I am sorry?

4   Q.  We have moved to preclude you from testifying in this

5   trial.  You understand that, right?

6   A.  Yes.

7   Q.  My question to you is, have you already determined that it

8   would not be helpful to your examination to examine the

9   evidence the government claims it has that supports the

10  counterfeiting allegations in this case?

11  A.  Well, I don't understand that I have been -- that that is

12  what the requirement is for me in this case.  We're going into

13  a whole other area from up my expertise is.  You're asking me

14  to make an opinion about evidence I haven't seen and whether

15  this would change my opinion on things.

16          The answer is no, I don't know that things I haven't

17  seen would change my opinion on things that I've seen.

18          THE COURT:  Because from what you've already seen, you

19  would recommend to a client a hundred percent not to buy the

20  wine.  Isn't that right?

21          THE WITNESS:  Yeah.  I don't understand why people

22  would want to buy a lot of these wines out of auction in the

23  first place.

24          THE COURT:  I got it.

25          THE WITNESS:  Everybody has can do their own thing

DC5KLIR3                    Collins - cross

 1    here, but the clients that I have and the position that I take

 2    on this is you're asking me to render an opinion, and that

 3    opinion is going to be based on the review that I just made.

 4              THE COURT:  Based on that, you would tell your client

 5    don't buy this wine?

 6              THE WITNESS:  I would.

 7              THE COURT:  Right.  Do you have any -- I forget if you

 8    said -- never mind.  That is fine.

 9              We could probably move on because he has already

10    concluded that this.

11              MR. HERNANDEZ:  We will move on.  May I approach?  I

12    have a couple of bottles to show to Mr. Collins?

13              THE COURT:  Sure.

14              (Pause)

15    BY MR. HERNANDEZ:

16    Q.  Mr. Collins, you have before you two bottles, one that is

17    Government Exhibit 8-31, says it is a 1949 Domaine Ponsot, Clos

18    Saint-Denis.

19    A.  I am sorry?  The one here?

20    Q.  Correct.  Do you see the sticker on it that says --

21    A.  This says --

22    Q.  I am sorry?

23    A.  What did say the name of the wine was?

24    Q.  Clos Saint-Denis.  Does that say Clos Saint-Denis?

25    A.  You have made a mistake.  This is Clos de a Roche,

DC5KLIR3                        Collins - cross

1    according to the label.

2    Q.  I am sorry.

3    A.  According to the label.

4    Q.  Understood.  There is the second bottle.  Let's talk about

5    the second bottle.

6    A.  Sure.

7    Q.  That says it is a Roumier 1923 Bonnes-Mares, Government

8    Exhibit 72, correct?

9    A.  Yes.

10   Q.  Did you examine -- talk about 72, the Roumier bottle.  Did

11   you examine that bottle yesterday?

12   A.  Well, I don't have my notes here,.  Your government exhibit

13   was what I coded all of my stuff off of.  I am pretty sure this

14   is one of the bottles I examined.

15           THE COURT:  The one on your left you think you

16   examined yesterday?

17           THE WITNESS:  Yeah.

18           THE COURT:  Would it --

19           THE WITNESS:  Without benefit of notes, yes.  There

20   was more than one bottle than this.

21           MR. MOONEY:  For assistance of the Court, Mr. Collins

22   made all of his notes on the computer.  Our printer we tried to

23   set up today didn't work.

24           THE COURT:  Okay.

25           MR. MOONEY:  His notes are in the hotel room because

DC5KLIR3                          Collins - cross

1    they're outside the exclusion zone.

2              THE COURT:  I see.  Okay.

3              MR. HERNANDEZ:  It is not a memory test.

4              THE COURT:  Yes.  You should understand that we're

5    just trying to ask you about your best recollection.

6              THE WITNESS:  Sure.  I understand perfectly.

7    BY MR. HERNANDEZ:

8    Q.  Mr. Collins, with respect to that particular wine --

9    A.  Yes.

10   Q.  -- would you tell us where else in the marketplace you have

11   seen 1923 Roumier Bonnes-Mares that has, you see in the middle

12   of the label it says Domaine Belorgey?

13   A.  Yes.

14   Q.  Where else have you seen that wine?

15   A.  I have never seen it, a 1923 bottle of Bonnes-Mares labeled

16   with this name in the marketplace.

17   Q.  Until yesterday?

18   A.  Well, I can't see it in the marketplace, yes.

19   Q.  That is the first time you have seen that bottle?

20   A.  That's correct.

21   Q.  Do you see that to be one of the fakes that you saw?

22   A.  Yeah.  To try to get to the bottom of the mystery isn't

23   easy in this era of wine because you have a lot of records that

24   have been gone by the wayside.

25              The reason, the reason this intrigued me was because

DC5KLIR3                    Collins - cross

1    of the name the ancient Domaine Belorgey, okay.  My experience

2    with that name came from old bottles of Esquin wine that

3    existed when this merger happened.

4         There was a catalog, old Esquin catalog that

5    identified the ancient Domaine Belorgey as being Domaine

6    Roumier.  It also identified a particular Cuve of Bonnes-Mares

7    that was under a Harleys of Bristol label as being Domaine

8    Roumier.  This would have not been unusual in that era for

9    there to be multiple ways the wines had been labeled.

10         The bottle of wine I got from Esquin that I drank in

11   1945 did not have this label.  It had a different label, had a

12   squarish label that identified itself specifically as Domaine

13   Belorgey.

14              THE COURT:  The one you drank?

15              THE WITNESS:  That's correct.  The one I have actually

16   physically seen before now did not have this particular label.

17              THE COURT:  The one you drank, do you think was a

18   genuine article?

19              THE WITNESS:  Yeah.  I also think it was a label that

20   came through Esquin, and unfortunately the people who would

21   know the exact answer on this are no longer living.

22         We imported, you understand that Esquin was the

23   importer for Domaine Roumier for up until 1977.  You know that,

24   right?

25              THE COURT:  Well, he is trying to ask you if you could

DC5KLIR3                    Collins - cross

1   figure out if that bottle on your left in front of you is fake

2   or not fake?

3            THE WITNESS:  There is some real, I think there is

4   some -- I would feel a lot stronger about it if I could find an

5   example of this particular label in old Esquin documents or

6   things like that.  If you are saying okay, you have to make the

7   decision right this moment?

8            THE COURT:  Yes, if you did, and I was your client,

9   would you recommend that I buy that?

10           THE WITNESS:  I wouldn't recommend buying it because I

11   don't personally think a 1923 bottle of any Bonnes-Mares is any

12   good any more.  That would be the reason I wouldn't by it.

13   That would be reason No. 1.

14           No. 2, if you were saying do I really want to take a

15   chance with Roumier, I would say that this label is

16   inconsistent with any label I've ever seen of Domaine Roumier,

17   although the names are correct, and -- well, this was a

18   different model, again looking for the reference of the paper

19   and so forth but, no, if I had to make a recommendation right

20   this second you are going to write the check or not write the

21   check, don't write the check.

22   BY MR. HERNANDEZ:

23   Q.  Don't write the check because it is fake or some other

24   reason?

25           THE COURT:  Red flags?

DC5KLIR3                          Collins - cross

1           THE WITNESS::  It is in my zeroes and pluses I was

2      talking about, this one has some zeroes.

3      BY MR. HERNANDEZ:

4      Q.  Mr. Collins, isn't it true that the first year that Domaine

5      Roumier made a Bonnes-Mares with the vines from the Domaine

6      Belorgey was 1952?

7      A.  No.

8      Q.  That is false?

9      A.  That's correct.

10     Q.  Why do you think that is false?

11     A.  Because it was imported by Esquin starting with the 1945

12     vintage referenced.  There is -- now, you can say well, you

13     know, the Christophe could tell you something different.

14          My relationship with Roumier goes back to Jean Re and

15     his father, okay?

16          The confusion to the answer to that question is were

17     they renting the grapes prior to purchasing them?  This is not

18     an unusual situation.  Were they marketing Belorgey for the

19     family?

20          I don't know the exact circumstances of that, but I do

21     know there were names that uses the ancient Domaine Belorgey

22     shipped from Roumier prior to what was the year 1952.

23     Q.  Mr. Collins, isn't it true that 1924 was the first year

24     that Domaine Roumier bottled wine and sold commercially?

25     A.  Well, again, I am not positive of that because without --

DC5KLIR3                    Collins - cross

1    how I used to look up things like this, years ago in the City

2    Hall where you see things are referenced.  There is a reference

3    in review -- to wine du Burgundy written by Camille Dubey 1920

4    premier edition lists some of the owners of the properties.

5           Belorgey is listed as owner of the property.  Roumier

6    was not.  Roumier was not included in the list any time through

7    the publication of that book which the last time it was

8    published was 1948.

9    Q.  Do you know who Clive Coates is?

10   A.  Do I know who Clive Coates is?  Of course!

11   Q.  Do you know who he is?

12   A.  Yeah.

13   Q.  He is a master of wine, right?

14   A.  Yes.

15   Q.  Considered one of the most knowledgeable people about

16   burgundy, isn't he?

17   A.  He is one of the knowledgeable people.

18   Q.  One of the most knowledgeable, isn't he?

19   A.  How do you want to measure knowledge?

20   Q.  He wrote a seminal book on Burgundy Cote D'Or.  It is over

21   900 pages long, right?

22   A.  Yes.

23   Q.  A standard reference for people who want to learn about

24   burgundy, isn't it?

25   A.  One of them.

DC5KLIR3                          Collins - cross

1    Q.  It is one of the standard references?

2    A.  Yes.

3    Q.  It is this book, right?

4    A.  Yep.

5    Q.  In this book there is a profile of Domaine Roumier, and it

6    says the nucleus of the domaine lies in the dowry of Genevieve

7    Quanquin, Q U A N Q U I N, who married George Roumier in 19124.

8    It also says that the domaine was further enlarged in the

9    1950's before Bonnes-Mares from Domaine Belorgey arrived in

10   1952.  You're saying that is wrong?

11   A.  Well, I am saying that a bottle labeled as Domaine Belorgey

12   arrived in Esquin, it was dated 1945.  Whether that was

13   something George Roumier did for John Esquin to obtain

14   something else for them to sell, I don't know.

15            The only reference I had to it -- I looked into these

16   bottles of wine because I had a chance to own one, to drink

17   one, and so this is all very curious to me.  I never brought

18   this subject up with Jean Roumier because I didn't know that

19   this would ever be quite such an issue.

20   Q.  The last question about the Roumier.

21   A.  Sure.

22   Q.  You have never in the marketplace seen that label, though,

23   anywhere, right?

24   A.  Well, how do you mean?

25            THE COURT:  He means before yesterday?

DC5KLIR3                      Collins - cross

1              THE WITNESS:  1923?

2    BY MR. HERNANDEZ:

3    Q.  That is that bottle right there?

4              THE COURT:  That label on that bottle?

5              THE WITNESS:  No.

6    BY MR. HERNANDEZ:

7    Q.  I will show you 8-24.  This is finally the 1959 Domaine

8    Ponsot, Clos Saint-Denis.  Is that a bottle you examined

9    yesterday?

10   A.  Yep.

11   Q.  Before yesterday how, many bottles of pre-1982 Domaine

12   Ponsot Clos, Saint-Denis have you seen in the marketplace?

13   A.  Zero.

14   Q.  Are you familiar with a collector named Pat Hendra?

15   A.  No.

16             THE COURT:  By the way, do you recall seeing that

17   bottle yesterday?

18             THE WITNESS:  Yes.

19             THE COURT:  The one on the right now?

20             THE WITNESS:  Yes, this one here.

21             THE COURT:  On your list of what you'd recommend to me

22   or -- not me or a buyer, would you recommend he buy that

23   bottle?

24             THE WITNESS:  No, I wouldn't recommend you buy any of

25   the bottles of Ponsot.

DC5KLIR3                        Collins - cross

1              THE COURT:  Any of them?

2              THE WITNESS:  No.  All of the ones that were, all of

3      the ones that were presented yesterday had severe issues.

4              THE COURT:  Going to their authenticity, as you said

5      before?

6              THE WITNESS:  Yes.

7              THE COURT:  Going to their provenance, as you said

8      before?

9              THE WITNESS:  No, much more authenticity, every single

10     one of the bottles that was presented to me yesterday with this

11     particular name on it.

12             THE COURT:  The one on your right hand?

13             THE WITNESS:  Yes, the Ponsot, right, you had the list

14     there, correct, it was 12 or 14 bottles, there was one of them

15     that was -- one was a Magnum, it had a strip labeled Esquin

16     Imports.  I know for a fact Esquin never imported any wines

17     from Domaine Ponsot.  Domaine Ponsot was imported by a wine

18     merchant who was a competitor.  That strip label never would

19     have been attached to that bottle of wine.  We wouldn't have

20     bought wines out of auction.

21             In the case of this bottle and in the case of the Clos

22     de a Roche, the same thing, they all appear to be of the same,

23     labels all appear to be the same run.

24             THE COURT:  The same run?

25             THE WITNESS:  Yeah, they all appear to be newer labels

DC5KLIR3                        Collins – cross

that perhaps were a stack of labels that came from Ponsot or

perhaps there were a stack of labels that came from an importer

or anybody.  The only differentiation I could find in the

labels were some were a little smudgier than others.

          This one is a perfect example because this one is

labeled as (French).  The way I identified the bottles that I

explained earlier, every one of these came up with failing

marks.

          THE COURT:  With fail marks?

          THE WITNESS:  Failing marks.

          THE COURT:  They were suspect?

          THE WITNESS:  Highly -- without -- I don't think there

would even be a need to open any of these wines to declare them

all counterfeit.

          THE COURT:  You don't think there would be a need to

open any of those wines to declare them all counterfeit, is

that what you said?

          THE WITNESS:  That's correct.

          THE COURT:  Could I just see counsel for a minute at

the sidebar.

          (At Sidebar)

          THE COURT:  Let me just understand sort of the optics.

          You want him to testify that all of the wine he saw

yesterday, or most of it, there is a high degree of probability

is counterfeit?

1          MR. MOONEY:  That's correct.

2          THE COURT:  You think that helps you?

3          MR. MOONEY:  We do.  We do.  Part of it, part of what

4    his use is, and we get dribbles and drabs with regard to Egan,

5    we got the latest stuff on Egan yesterday.

6          THE COURT:  Egan?

7          MR. MOONEY:  Their expert.  He is largely our rebuttal

8    witness to talk about changes, different things than Egan says

9    about these particular bottles, they be counterfeits, but there

10   is information about the bottles and about what he sees in them

11   we think might be helpful to the jury to understand.

12         THE COURT:  I am trying to figure out what that is.

13         For this witness -- now talking sort of as a

14   disinterested observer -- how does it help you for him to stand

15   up and say these wine are all counterfeit?

16         MR. MOONEY:  Because it goes to not whether they're

17   counterfeit or not, but it goes to whether or not perhaps our

18   client was the one that counterfeited them or somebody else

19   counterfeited them.

20         THE COURT:  But he has no knowledge of that.

21         MR. MOONEY:  Certainly he can't testify to that.  He

22   can testify to what he sees on the bottles and he can testify

23   to the different things that are present there.

24         MR. HERNANDEZ:  He doesn't want to look at the

25   evidence.

1          THE COURT:  I got that.

2          MR. MOONEY:  We are not asking him to do that.

3          MR. HERNANDEZ:  I will do it.

4          MR. MOONEY:  You gave it to us yesterday in terms of

5  Egan doing it yesterday, yesterday, I got that.

6          MR. HERNANDEZ:  Absolutely not true.

7          THE COURT:  So you want to press forward and him

8  declared an expert?

9          MR. MOONEY:  That's correct.

10          THE COURT:  Even though he's going to testify that all

11  of these wines are counterfeit, which is, of course, the

12  government's principal accusation, Count No. 1 is, right, that

13  is true, too?

14          MR. MOONEY:  Yes.

15          THE COURT:  He also has no idea one way or another

16  whether your client counterfeited these bottles.

17          MR. MOONEY:  We don't know for sure we'll use him.

18          THE COURT:  That is why I am having trouble

19  understanding.

20          MR. MOONEY:  If I don't have my own expert, I am stuck

21  with only what they give.

22          THE COURT:  Or cross-examination?

23          MR. MOONEY:  Or cross-examination.  If the

24  cross-examination -- and you know as well as I do I get stuff

25  on cross-examination and then I am stuck with not being able to

 1   put on anybody to say that is nonsense.

 2              THE COURT:  Okay.

 3              MR. MOONEY:  If I don't have my own expert to be able

 4   to potentially come in, like we said originally, we didn't, we

 5   didn't know that -- we didn't expect he would disagree with

 6   everything that Egan said, but --

 7              THE COURT:  Putting that aside, though, I want to make

 8   sure you want him to testify knowing that really his sole

 9   opinion here is that they are counterfeit and certainly with a

10   hundred percent that he wouldn't tell anybody to buy these, and

11   he doesn't know who counterfeited or where the problem comes

12   from.

13              MR. MOONEY:  He is saying 80 percent of them are

14   counterfeit.

15              THE COURT:  And 20 percent he wouldn't buy to drink.

16              MR. MOONEY:  Absolutely wouldn't buy to drink.

17              THE COURT:  Or a hundred percent.

18              MR. MOONEY:  Not the same as being counterfeit.

19              THE COURT:  I get that.  Even as to the 20 percent, he

20   is not really sure in some instances.

21              MR. MOONEY:  He hasn't finished his work.

22              THE COURT:  Why?  And you think that is helpful?

23              MR. MOONEY:  I think that is helpful because there

24   won't be a question -- look, we would probably stipulate to a

25   lot of the wines being counterfeit, but I suspect they're still

DC5KLIR3                    Collins - cross

1   going to want to put an expert on to say that.

2              THE COURT:  Whatever.

3              MR. MOONEY:  If they have an expert, I want to have my

4   expert available.

5              THE COURT:  Essentially I think what you're saying you

6   want him because he will say they've counterfeit for reasons

7   different than his expert says.

8              MR. MOONEY:  He may.

9              THE COURT:  Even if he did, you think would be

10  helpful?

11             MR. MOONEY:  I think that would be helpful.

12             THE COURT:  Okay, let's keep going.  You must almost

13  be finished, right, with him?

14             MR. HERNANDEZ:  If your Honor has enough information

15  to make a decision now, I'll stop right here.

16             THE COURT:  Yes, I think I do.

17             (In open court)

18             MR. HERNANDEZ:  No further questions.

19             THE COURT:  Did you have anything else?

20             MR. MOONEY:  No, your Honor.

21             THE COURT:  Thank you very much.

22             (Witness excused)

23             THE COURT:  Any other witnesses the defense wishes to

24  call?

25             MR. MOONEY:  No, your Honor.

DC5KLIR3

1          THE COURT:  Any the government wishes to call?

2          MR. HERNANDEZ:  No, your Honor.

3          THE COURT:  Give me a couple of minutes.

4          (Recess)

5          THE COURT:  So please be seated.

6          So we discussed at this Daubert hearing the defense

7    proposal to present during the trial next week Mr. C.R. Collins

8    as an expert witness.  With the provisions that I will describe

9    to you, I am going to allow the defense to use Mr. Collins as

10   an expert, but let me explain exactly what I think he can

11   testify to based on today's Daubert hearing.

12         So, first of all, the proponent of expert testimony

13   has the burden of establishing by a preponderance of the

14   evidence that the admissibility requirements of Rule 702 are

15   satisfied.  Ultimately, the District Court is the ultimate

16   gatekeeper.

17         So the citation is United States versus Williams, 506

18   F.3d 151, a Second Circuit case from 2007.  The case law tells

19   us also although a hearing is sometimes required in order for

20   the court to properly exercise its gatekeeping function, such a

21   hearing is not required in all cases.  The cite is Kerrigan

22   versus Maxon Industries, 223 F. Supp. 2d 626, a case from the

23   Eastern District of Pennsylvania, 2002.

24         Based on the submissions of the government and the

25   defense, I thought it was important to have such a hearing

DC5KLIR3

because I thought it was a close, somewhat of a close call as

to whether Mr. Collins would be an expert.  We have had the

hearing.  I was able to observe his demeanor and credibility,

and among other factors, these were adduced during his

testimony.

He has some 30-plus years of consulting experience in

the wine industry, since the mid to late 1970's.  He appears to

have been to some 300-plus wine auctions.  He has had previous

wine employment experience with Draper & Esquin, and he has

experience on his own as a consultant in the wine industry.

He testified that he has, among other, his other

functions, has been an adviser to clients as to whether or not

they should purchase particular wine based on issues of

authenticity, provenance, and/or relatedly whether such wine is

counterfeit.

He also explained his methodology, how he goes about

reviewing a bottle, for example, of wine to authenticate and

talking about the label and the cork and the bottle itself and

the wine and the space between the cork and the top of the

wine, et cetera, et cetera.  It is all in the transcript.

He also mentioned that he yesterday examined the

bottles of wine that are in controversy in this case and

concluded his opinion, that is -- which he certainly may give

at the trial -- he concluded that if he were recommending the

purchase of that wine to one of his clients with a hundred

DC5KLIR3

percent certainty, he would recommend against buying it for
drinkability.

       If I remember correctly, with 80 percent at least
certainty he would recommend that there was sufficient red
flags as to the authenticity and/or whether or not the wine was
counterfeit, 80 percent he would tell his clients with
certainty not to acquire the wine.

       With the remainder, he said some of the wine appeared
to be authentic or "authentic" I think would be charitably what
he concluded, but he said even as to that wine, he had not with
certainty concluded his examination.  So even that wine is
suspect.

       As I've said to counsel at sidebar, in large measure
Mr. Collins supports, in my opinion -- I am not responsible for
trial strategy, but it seems to support the opinion of the
government or the central fact the government is seeking to
establish at this trial, which is that the wine that Mr.
Collins examined yesterday is in large measure not authentic.

       But, anyway, he certainly can give that testimony.  He
certainly can give his opinion as to that as well.  Beyond
that, I have difficulty in understanding or even permitting
opinions that go much beyond that.

       (Continued on next page)

Dc5dkur4

THE COURT:  I think he can opine, Mr. Collins can,
that in the wine industry, or in his experience, there is or
can be counterfeit wines, but I don't think he can go beyond
that.  He established no basis for the conclusion, if there is
such a conclusion, that there is more counterfeiting today than
there was before.  The only way you could ever establish that
would be through direct knowledge (a) of the amount of
counterfeiting now and the amount then.  But in order even to
do that you would have to know how much wine is sold today
versus how much wine was sold at a historical point in time,
and he presented no information or no knowledge to make that
comparison.  So I would not allow him to testify that there is
a bigger wine counterfeiting problem today than there has been
in the past.

By the way, I'm not concluding that I know one way or
another whether there is or there isn't, but I don't think he
does either.  I don't think he has presented enough of a basis
or a background to say that.

So with that, those limitations -- and here,
importantly, in my determination are these principles.  So the
cases tell us -- and one such case is United States v.
Carneglia, C-a-r-n-e-g-l-i-a.  It is an Eastern District case
from 2009, and you can find these quotes there.  One is that
the Federal Rules of Evidence and the Rules of Criminal
Procedure are designed to ensure that the defense, as well as

Dc5dkur4

the government, can fully present their cases to secure

fairness.  Application of the rules to permit the defendant to

gather and present information favorable to his defense needs

to take into account the due process and fairness.

So the defense is trying to, you know, mount its

defense, and largely I am significantly persuaded by this

concept that we should essentially go the extra step in favor

of the defense in an evidentiary issue such as the one we have

before us.  And when we're talking preponderance, that might

even help tip the scale in favor that there is a preponderance.

So for those reasons and for those limitations, I will

allow, if the defense in fact is intending and wishes to call

Mr. Collins next week, to call him and he can testify as an

expert.

So thanks very much, and I think we have done all of

our preparation and we are just ready to see each other on

Monday and commence the trial.

MR. MOONEY:  What time do you want us on Monday, your

Honor?

THE COURT:  I would like you there at 9:15 in the

courtroom.  So we are going to be, remember, in 26A on Monday

for purposes of picking the jury because it is a larger room.

When we get the jury picked, we will come down here to commence

the trial.  If it takes, for example, all day, we would stay up

there all day.  Perhaps we will stay up there all day anyway

Dc5dkur4

1    since you will all be organized to be there.  Maybe I should

2    just say we will spend the first day in 26A.

3            MR. MOONEY:  One other housekeeping matter, your

4    Honor.  I am hoping that is our letter on clothing.  We found

5    out that Mr. --

6            THE COURT:  It is not.  It is your application for

7    cell phone and --

8            MR. MOONEY:  We are happy about that one, too.

9            THE COURT:  Yes.

10            MR. MOONEY:  But we learned that Mr. Kurniawan has

11    been moved from Brooklyn to next door, and our letter says that

12    he is in Brooklyn.  So we would ask the Court to interlineate

13    in our letter, just cross out the Brooklyn MDC and change it to

14    the Manhattan MDC in the letter.

15            THE COURT:  OK.  That doesn't appear here at all.

16            MR. MOONEY:  No.  It is in the letter that we sent

17    over requesting clothing.  It should have been faxed over.

18            THE COURT:  Christine, do you have that?  Let me take

19    a look.

20            It is coming down from chambers.

21            MR. MOONEY:  Great.  One other matter, your Honor.

22            The government has a warrant to pick up

23    Mr. Kurniawan's automobiles.  His mother speaks only Chinese.

24    So we have been trying to make arrangements so that she isn't

25    faced with a bunch of people showing up and doesn't know what

Dc5dkur4

1   is going on with the working of that.  Apparently, the warrant

2   is ready to expire.  I think we all agree that we can get a

3   week extension so that we can go through the steps of making

4   sure that that has all been cleared --

5         THE COURT:  That is fine.

6         MR. MOONEY:  -- that has the least amount of

7   disruption to her as possible.

8         THE COURT:  That is fine.

9         MR. SITHIAN:  Yes, your Honor.  Anand Sithian, I am a

10   Special Assistant U.S. Attorney.

11         The government has agreed with counsel for the defense

12   to extend the warrant for a week, to December 16th, to

13   negotiate a surrender of the vehicle.

14         THE COURT:  That's fine.  I will approve that

15   extension.

16         MR. SITHIAN:  Thank you.

17         THE COURT:  We are just waiting for the order.

18         MR. VERDIRAMO:  Your Honor, I have been now advised,

19   as well, I apologize, but we have to submit yet another letter

20   to the Court with regard to his dietary restrictions that we

21   would ask your Honor to -- a so-ordered letter as well with

22   regard to his dietary restrictions.

23         THE COURT:  Haven't you done that already?

24         MR. VERDIRAMO:  No.

25         THE COURT:  I see.

Dc5dkur4

1          MR. VERDIRAMO:  As soon as I possibly can.  I stepped

2     out of here to take care of the other letter.

3          THE COURT:  I will sign that.

4          MR. VERDIRAMO:  Thank you, your Honor.

5          Or, possibly, Judge, to save a step, the letter that

6     has come down from chambers that addresses the clothing issue,

7     if your Honor wanted to hand write in language that he be

8     provided a vegetarian diet, that would take care of the whole

9     thing.

10          THE COURT:  Do you think that would work?

11          MR. VERDIRAMO:  I would hope so, Judge, that you

12     further order that he be provided a vegetarian diet.

13          THE COURT:  I will do it if you want.  In my

14     experience, you know, it may very well work to have both ideas

15     in the same letter.  Sometimes it is better --

16          MR. VERDIRAMO:  If it doesn't work, I will resubmit

17     it.

18          THE COURT:  OK.

19          MR. VERDIRAMO:  Thank you, Judge.

20          MR. MOONEY:  We will know quickly.

21          THE COURT:  So instead of Brooklyn --

22          MR. MOONEY:  He is in Manhattan.

23          THE COURT:  Is he already in Manhattan?

24          MR. MOONEY:  He is already in Manhattan.  They moved

25     him today, which I guess is a lot more convenient for the next

Dc5dkur4

1    couple of weeks.

2              THE COURT:  I would think.

3              (Pause)

4              Counsel, do you want to take a look at this and see if

5    that works for you?

6              MR. VERDIRAMO:  Thank you, your Honor.

7              (Pause)

8              Your Honor, I think this is perfect.  Thank you very

9    much.

10             THE COURT:  Let us just make a copy for our files.

11             MR. VERDIRAMO:  Yes, your Honor.  Thank you.

12             (Pause)

13             THE COURT:  OK.  I think that's it, folks.

14             Thanks.  Good to see you.

15             MR. MOONEY:  Thank you very much, your Honor.

16             MR. VERDIRAMO:  Thank you, Judge.

17             THE COURT:  Yes.

18                             -   -   -

19                      INDEX OF EXAMINATION

20   Examination of:                           Page

21   CORNELIUS ROBERT COLLINS

22    Direct By Mr. Mooney  8 Cornelius Robert Collins.

23   Cross By Mr. Hernandez . . . . . . . . . . . .69

24

25