Dccdkur1                          Trial

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                            S1 12 Cr. 376(RMB)

 5   RUDY KURNIAWAN, a/k/a "Dr. Conti,"
     a/k/a "Mr. 47,"
 6
                  Defendant.
 7
     ------------------------------x
 8                                           December 12, 2013
                                             8:57 a.m.
 9
     Before:
10
                        HON. RICHARD M. BERMAN,
11
                                             District Judge
12

13                        APPEARANCES

14   PREET BHARARA,
          United States Attorney for the
15        Southern District of New York
     JASON HERNANDEZ,
16   JOSEPH FACCIPONTI,
          Assistant United States Attorneys
17
     WESTON, GARROU & MOONEY
18        Attorneys for defendant
     BY:  JEROME MOONEY
19
     VERDIRAMO & VERDIRAMO, P.A.
20        Attorneys for defendant
     BY:  VINCENT S. VERDIRAMO
21
                  – also present –
22
     Ariel Platt, Government paralegal
23
     SA James Wynne, FBI
24   SA Adam Roeser, FBI

25
```

Dccdkur1                    Trial

1              (Trial resumed; jury and defendant not present)

2              MR. MOONEY:  Your Honor, a little issue.

3          I have concern about the placement of the screen for

4    the press.  What's happening is when exhibits go up -- I had

5    mentioned this to Mr. Hernandez.  When exhibits go up on there,

6    the press comes up and crowds around it and there is whispering

7    going on there, and they are just feet away from where the jury

8    is.  I am just wondering if we could move that screen a little

9    further away, maybe to the other side of the bar so that --

10             THE COURT:  I don't know that we can -- is it on a

11   rolling thing?

12             THE CLERK:  It is on wheels.

13             MR. MOONEY:  It is on wheels.

14             THE COURT:  So we could move it back a little bit and,

15   you know -- and Christine, you will tell the press -- or I'll

16   tell the press, you know, keep it down.

17             MR. MOONEY:  Because we don't know what they're

18   saying.

19             (Discussion off the record)

20             THE COURT:  Let's just talk to the press instead of

21   trying to move that because it won't work.  Let's leave that

22   where it is.

23             (Discussion off the record)

24             (Pause)

25             (Defendant and witness present)

Dccdkur1                    Trial

1          THE COURT:  How are you?

2          MR. HERNANDEZ:  Good morning.

3          THE COURT:  Good morning, everybody.  I gather we have

4   a full jury and we will call them out and continue with Agent

5   Schmatz's testimony.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Dccdkur1                    Trial

1           (Jury present)

2           THE COURT:  So we have one more juror, I think, or

3    two.  OK.

4           So, good morning, everybody.  Please be seated.  Nice

5    to see you.

6           You will remember that at the end of yesterday we had

7    FBI Special Agent Trenton Schmatz on the witness stand, and we

8    will continue with his direct examination this morning.

9           THE CLERK:  Sir, before we begin, I would like to

10   remind you, you are still under oath.

11          THE WITNESS:  Yes, ma'am.

12          THE CLERK:  Thank you.  You may be seated.

13    TRENTON SCHMATZ,

14       Resumed, and testified further as follows:

15   DIRECT EXAMINATION (Resumed)

16   BY MR. HERNANDEZ:

17   Q.  Agent Schmatz, I want to pick up where we left off

18   yesterday.  We were about to look at Government Exhibit 14-3,

19   which is a collection of different documents and images that

20   were taken by Agent Wynne from the FTK report for one of the

21   computers seized from the defendant's home.  Do you remember

22   that?

23   A.  Yes.

24          MR. HERNANDEZ:  All right.  With the Court's

25   permission, if we could display 14-3, the folder?

Dccdkur1                          Schmatz - direct

 1                THE COURT:  Sure.

 2                MR. HERNANDEZ:  We have to wait a moment for the

 3      switch over so the jury could see it.

 4                THE COURT:  Yes.  And you and I.

 5                MR. HERNANDEZ:  That's right.

 6      BY MR. HERNANDEZ:

 7      Q.  OK.  Agent Schmatz, how many documents or files or images

 8      are in this folder?

 9      A.  It looks like 610.

10      Q.  All right.  We are not going to go through all 610, but

11      what I would like to do, with the Court's permission, is if

12      Mr. Platt could just scroll down this folder, we reflected the

13      largest images sizes so the jury could just see what's in this

14      folder.

15                THE COURT:  OK.

16                (Pause)

17                MR. HERNANDEZ:  We will stop there.  We are maybe a

18      quarter of the way through.  The jury, if they would like, they

19      can see the rest of the images.

20                I would like, Mr. Platt, if you could, just to pull up

21      five images in particular so we could see those a little bit

22      closer up.

23                Mr. Platt, could you pull up the image that is marked

24      76394.

25                (Pause)

Dccdkur1                    Schmatz - direct

1           And then can you pull up 76069.

2           (Pause)

3           Then 74850.

4           (Pause)

5           54526.

6           (Pause)

7           And then 58651.

8           (Pause)

9           All right.  Thank you.

10   BY MR. HERNANDEZ:

11   Q.  Some of the files in this folder say they are png files or

12   jpg files.  Do you know what those are?

13   A.  Yes.  Those are both graphic file types.  So, for instance,

14   you may be familiar with jpg, which is jpegs.  Those are

15   typically the files that your run-of-the-mill digital camera

16   will produce, and it is just a graphic file type.

17           Png also is a graphic file type.  It stands for

18   Portable Network Graphic, and this file type has a little less

19   compression than a jpeg file, which means that it will

20   typically take up more room.  The size will be bigger.

21   However, it will have more detail typically.

22   Q.  And that detail translates into a higher quality image?

23   A.  Correct.

24           MR. HERNANDEZ:  And if we could show just to the

25   witness Government Exhibit 14-5.

Dccdkur1                      Schmatz - direct

1              Could you just scroll across the screen, Mr. Platt, so

2    the witness can see the document a little bit better.

3    Q.  Do you recognize this document?

4    A.  Yes, I do.

5    Q.  How do you recognize it?

6    A.  I created this document.  It's a file listing of the files

7    that are on that disc.

8    Q.  All right.  So is it a file listing of the same files that

9    we just looked at in 14-3?

10   A.  Yes.

11   Q.  What kind of data does it contain?

12   A.  So on this file listing, what I did was I culled down some

13   of the metadata from the files to include the file name, the --

14   if you could just scroll across.  I don't want to leave

15   anything out.  OK.

16              So what we have here is we have -- the first column is

17   the item number.  The item number is what FTK assigns to every

18   file that it finds within the computer.  It will assign its own

19   unique file number.

20              Then the next column is the file name.  And in this

21   case most of them have the file names -- their original file

22   names.  Some of them, if you look there, you will see "DC" with

23   a number across it.  That stands for a deleted file.  The way

24   the Windows operating system works is when a file is deleted or

25   put into the recycle bin, it no longer refers to it with its

1    original file name; it will give it a "D," for deleted, and

2    then the "C" would be the drive that it was deleted from.  So,

3    for instance, you see -- most of them I believe are DC, so

4    deleted from the C drive, and then it gives it a number.  So

5    that is the file name.

6          The next one is the full path.  And that would be the

7    path within the Windows operating system in which the file was

8    found when we did our examination.

9          And then after that we have the creation, modification

10   and access dates of each file, so the date the file was created

11   on that particular media.  Now, just to distinguish, it is not

12   the date the file -- it is not necessarily the date the file

13   was truly created but the date that file was created on that

14   particular hard drive or thumb drive, or whatever.  So, for

15   instance, if, you know, I had a digital camera and I took a

16   picture on January 1st and then on February 1st I decided to

17   transfer that picture to my computer, the creation date of that

18   picture should show up as February 1st.  So that is the

19   creation date.

20         The modification date would be the last date that that

21   particular file had been modified in any way.  For instance,

22   you type up a Word document and you make changes along the way,

23   your last modification date will display as the modification

24   date of that file.

25         And the access date would be the last date that you

Dccdkur1                        Schmatz - direct

accessed or that a user accessed that file, so went into that

file, you know, double clicked on it, if you will, to take a

look at it.

          The next file there is deleted.  I was mentioning that

before, that when a file goes into the recycle bin, that it

will give it that DC designation.  But what FTK does in its

file listing is that it only recognizes deleted files as files

that it actually had to recover, so things that were then

emptied from your recycle bin.  So you can think about it as if

when you take out your garbage, you know, you may take your

garbage from your kitchen.  You may put it into your garbage

can outside, you know, your side door.  So now that garbage is

outside your house and you've gotten rid of it.  If you ever

needed to go back, you could go and open up your garbage and

find something out of there.  However, once the garbage men

come and take your garbage, then it is truly gone.  And that is

the way we think about the recycle bin, and that's the way the

FTK program thinks about it as well.

          So in this case these files, these files in the

beginning, were considered to be recycled files.  That's why

the deleted section is not checked.

          So then we have the recycle column.  Those were files

recovered from the recycle bin, and then I included the recycle

bin original name so that we know what the name of the file was

before it got that DC designation.

1          And that's the end of that particular file.

2          MR. HERNANDEZ:  The government offers 14-5.

3          THE COURT:  I will allow it.

4          (Government's Exhibit 14-5 received in evidence)

5          MR. HERNANDEZ:  Mr. Platt, if you could focus in on

6    the create/modify date.

7    Q.  This spreadsheet contains several hundred entries, doesn't

8    it?

9    A.  Yes.

10   Q.  Because there were several hundred files in the folder?

11   A.  Correct.

12   Q.  And if we could, I'm just going to ask Mr. Platt to scroll

13   through the first page from the create/modify date and ask the

14   jury just to take a look at the dates and we will go all the

15   way down to the bottom of the first page.

16          (Pause)

17          MR. HERNANDEZ:  I think we can stop there for a

18   moment.

19   Q.  Agent Schmatz, is it fair to say that there are a number of

20   create or modify dates that are from 2004/2005 from the files

21   from this computer?

22   A.  Yes.

23          MR. HERNANDEZ:  No further questions.

24          THE COURT:  Mr. Mooney.

25          MR. MOONEY:  Thank you.

Dccdkur1                              Schmatz - direct

1    CROSS-EXAMINATION

2    BY MR. MOONEY:

3    Q.  Good morning.

4    A.  Good morning.

5         MR. MOONEY:  Could you bring up 14-2, please?

6    Q.  What was Exhibit 14-2?

7         THE COURT:  Let's see.  Let him bring it up.

8         MR. MOONEY:  It is not there?  Maybe I can work from

9    the Elmo.  I will switch over to the Elmo.

10   Q.  Have you looked at the three files in Government's Exhibit

11   14 -- 14-1, 14-2 and 14-3?

12   A.  The three files?

13   Q.  The three compilations.

14   A.  The discs that we talked about yesterday?

15   Q.  I think so.  I just want to clarify exactly what we've

16   gotten.

17   A.  I just don't remember what each of the 14s is.  I

18   apologize.

19   Q.  OK.  But some were taken from his computer, some were taken

20   from the camera and some were taken from the flash drives.

21   A.  Are we talking about the files?

22   Q.  Yes.  You were just looking at 14-3 a few minutes ago.

23   A.  OK.

24   Q.  Where did 14-3 come from?

25   A.  The files from 14-3 were from the 80-gigabyte hard drive

Dccdkur1                        Schmatz - cross

1   from one of the Sony Vaio laptops.

2   Q.  That was from one of the computers?

3   A.  Correct.

4   Q.  That is where those came from.

5          Do you know where the files that are included within

6   14-2 came from?

7   A.  I don't know which one got designated as 14-2.

8   Q.  Now, if I show you -- there appear to be a bunch of

9   thumbnails.  If I show you those thumbnails, does that help you

10  figure out where those came from?

11  A.  If I could see the exhibit, I could be able to tell you

12  exactly.

13  Q.  Do you have the exhibit?

14          MR. MOONEY:  Does he have the exhibit?

15          MR. HERNANDEZ:  Your Honor, we have the exhibit on a

16  CD.  We don't have it loaded up since the folders are dense and

17  they take a long time to load.

18          THE COURT:  All right.

19  A.  Even if I could see the physical disc, I could just --

20          THE COURT:  Do you have the three discs?  Yesterday

21  there were three discs, one each for two laptops and then one

22  for the other devices.  Do you have those discs?

23          MR. HERNANDEZ:  We have those.

24          Those are the FTK reports?

25          THE COURT:  Yes.

Dccdkur1                          Schmatz - cross

1          MR. HERNANDEZ:  We have those.

2          THE COURT:  So why don't we just show that to

3  Mr. Mooney and maybe that will help him and to the witness.

4          Would that help you, Mr. Mooney?

5          MR. MOONEY:  If it would help him, it would help me.

6          I could bring you the book.  I could show you the

7  book.

8          THE WITNESS:  Sure.  Absolutely.

9          THE COURT:  You could do you that.

10 Q.  Here is the printouts of 14-2.  However --

11         THE COURT:  Could you locate that in the meantime?

12         MR. HERNANDEZ:  We are happy to do that, your Honor.

13 The exhibits, though, the 14-1, 2 and 3 were taken from the FTK

14 report.

15         THE COURT:  I get it, but I would rather have them

16 handy.

17 BY MR. MOONEY:

18 Q.  Looking at this, can you figure out where those came from?

19 A.  Not just by looking at these.  I mean, I just need to --

20 they either came from the 500-gigabyte hard drive or from the

21 flash media that I did.  I just don't know what 14-2 refers to.

22 I just need to see it again.

23 Q.  That is fair.  What about the camera?  Where did the camera

24 end up?

25 A.  The SD card from the camera wound up with the flash media

Dccdkur1                         Schmatz - cross

```
 1   that we examined.
 2   Q.  But is it fair to say, at least, that since 14-3 was the
 3   hard drive from one of the computers, 14-1 and 14-2 are each
 4   going to represent either the flash media or the other
 5   computer?
 6   A.  Yes.
 7             THE COURT:  Mr. Moody, you have those discs.  If you
 8   want to show the witness?
 9             MR. MOONEY:  There we go.
10             THE WITNESS:  Perfect.
11             MR. MOONEY:  The disc doesn't tell us where they went.
12             THE COURT:  Well, maybe he could --
13   Q.  Maybe you could interpret it.
14   A.  Sure.
15   Q.  I want to make sure we know where the things we are talking
16   about came from.
17             Maybe that is my confusion, because those are your
18   discs.  Can you tell us where each of those -- the images from
19   each of those, where they went and ended up in Exhibits 14-1, 2
20   and 3?
21             MR. HERNANDEZ:  Your Honor, I am going to object
22   because of personal knowledge, because it was Agent Wynne who
23   took the documents.
24             THE COURT:  I will allow it.  Let him answer the
25   question.
```

Dccdkur1                          Schmatz - cross

1          MR. HERNANDEZ:  I am going to offer a proffer of where

2     things came from, if that is helpful to Mr. Mooney.

3          MR. MOONEY:  That would help.  We could at least have

4     a proffer, your Honor.

5          THE COURT:  Why don't you just go off the record and

6     why don't you just explain it to him.

7          MR. MOONEY:  Great.

8          (Counsel conferred)

9          MR. MOONEY:  We getting updated ones and maybe the

10    update will help.

11         Can we stipulate then, for the record, that 14-2 are

12    images that were taken from the BlackBerry Torch?

13         MR. HERNANDEZ:  We have no objection, yes.

14    BY MR. MOONEY:

15    Q.  Do you remember the BlackBerry Torch?

16    A.  I do remember it.  I didn't do the examination on the

17    BlackBerry Torch, though.

18    Q.  So somebody else would have collected those images and put

19    them in here?

20    A.  I didn't do the examination.

21    Q.  So you don't know whether what was on the BlackBerry Torch

22    was accurately collected and put into the exhibit; is that what

23    you are telling us?

24    A.  No.  I'm only telling you I didn't do the examination so

25    it's difficult for me to answer any questions other than, you

Dccdkur1                        Schmatz - cross

1    know.  I mean --

2              THE COURT:  Why don't you tell us again what you did

3    and then what somebody else did.

4              THE WITNESS:  Sure.  So the BlackBerry Torch was one

5    of the items that Special Agent Wynne brought to me for

6    examination.  However, this particular BlackBerry Torch, I

7    believe it was password protected with a level of encryption

8    that we couldn't break in the field.  So in those instances we

9    will send those to our headquarters lab, and our headquarters

10   lab is the one that conducted the examination of the BlackBerry

11   Torch.

12             MR. HERNANDEZ:  Your Honor, may I object?

13             May I speak to Mr. Mooney for a second to clarify?

14             THE COURT:  Sure.

15             MR. MOONEY:  Maybe that will help.

16             (Counsel conferred)

17             MR. MOONEY:  Your Honor, I would like to read into the

18   record a stipulation.

19             This is stipulation Exhibit No. 29-10.

20             "It is hereby stipulated and agreed by and among the

21   United States of America, by Preet Bharara, United States

22   Attorney for the Southern District of New York, Joseph P.

23   Facciponti and Jason P. Hernandez, Assistant United States

24   Attorneys, of counsel, and Rudy Kurniawan, defendant, by and

25   with the consent of his attorneys, Jerome Mooney, Esq. and

Dccdkur1                      Schmatz - cross

1    Vincent Verdiramo, Esq., that Government Exhibit 12-9-A is a

2    disc that contains in electronic format true and accurate

3    copies of electronic documents and other information stored in

4    the electronic memory of Government's Exhibit 12-9."

5              And 12-9 was the BlackBerry Torch.

6              "It is further stipulated and agreed that this

7    stipulation may be received in evidence at trial of the

8    above-referenced matter," and it is signed out by the parties.

9              THE COURT:  Great.

10             I don't remember.  Was that offered before, and if it

11   was not, if you want to offer it now, I will --

12             MR. MOONEY:  We offer it now, your Honor.

13             THE COURT:  I will admit it into evidence.

14             MR. MOONEY:  Thank you.

15             MR. HERNANDEZ:  It is 29-10.

16             (Government's Exhibit 29-10 received in evidence)

17             MR. MOONEY:  Has 14-2 been admitted into evidence,

18   then?

19             MR. HERNANDEZ:  Yes.

20   BY MR. MOONEY:

21   Q.  So just to clarify, and then we can move on, your role and

22   your job was to make sure that the material was gathered from

23   these various device, at least the ones that you had control

24   of, and then collected onto the discs, and you were not

25   responsible, then, for removing or selecting what was on the

Dccdkur1                          Schmatz - cross

1   discs that would then be displayed in the exhibits; is that

2   fair?

3   A.   That's somewhat fair.  I mean, you know, I was the one who

4   actually did the physical exportation of the files, but it was

5   primarily Special Agent Wynne who then selected the files that

6   he found to be relevant to his investigation.

7   Q.   Have you had enough opportunity to examine the 14 series of

8   exhibits, 14-1, 2 and 3, to look at what's there?

9   A.   If you could just tell me what 14-1, 2 and 3 are?

10  Q.   For example, you were shown 14-3.  That is the one that

11  Mr. Hernandez was showing you up on the screen.

12  A.   So the Sony Vaio, the 80-gig hard drive?

13  Q.   Yes.

14  A.   Yes, I did have an opportunity to look through that.

15  Q.   What we saw on the screen was not everything that was on

16  the Sony Vaio, was it?

17  A.   Correct.

18  Q.   It was a number of things that had been selected --

19  A.   That's correct.

20  Q.   -- to be put on there?

21  A.   Yes.

22  Q.   And the same process occurred with regards to the others,

23  is that correct?

24  A.   The others --

25  Q.   14-1 and 14-2, you would expect the same process?

Dccdkur1                        Schmatz - cross

1    A.  14-1 being the flash media and 14-2 being the 500-gig hard

2    drive?

3    Q.  Yes.

4    A.  Yes.

5              THE COURT:  Would it be fair to say that you made the

6    discs, so to speak, and Special Agent Wynne asked you to remove

7    some data from there which wound up in the exhibits that

8    Mr. Mooney is talking about?

9              THE WITNESS:  I think it would be fair to say that

10   Special Agent Wynne primarily selected the files.  If I --

11   during the course of my examination, if I see a file that I

12   feel is going to be relevant, I will select it for, you know,

13   presentation to the investigator.

14   BY MR. MOONEY:

15   Q.  And the primary media in the 12 series, those discs that

16   you made, there was an enormous amount of data that was in

17   there, is that true?

18   A.  I really don't remember.

19   Q.  Over 200,000 files, weren't there?

20   A.  Over 200,000 files on the discs?

21   Q.  On those discs.

22   A.  I don't know.  I don't know how many files are on there.

23   Q.  But at any rate, as we look at the exhibits that have been

24   culled from there, we should not expect that those are going to

25   be everything or necessarily even most of what would have been

Dccdkur1                         Schmatz – cross

1   included on the computers; there could be lots of other things?

2   A.   Certainly.

3             MR. MOONEY:  No more questions.

4             THE COURT:  Any redirect?

5             MR. HERNANDEZ:  No, your Honor.

6             THE COURT:  Thanks very much.

7             We will have the government's next witness.

8             (Witness excused)

9             MR. HERNANDEZ:  The government calls Laurent Ponsot.

10            THE CLERK:  Sir, if you could step up here, please.

11   Remain standing by that chair, and raise your right hand

12   please.

13    LAURENT PONSOT,

14        called as a witness by the government,

15        having been duly sworn, testified as follows:

16            THE CLERK:  Could you please state your full name for

17   the record and spell your first as well as your last name?

18            THE WITNESS:  Laurent Ponsot.

19            THE CLERK:  Spell your first name, please.

20            THE WITNESS:  L-a-u-r-e-n-t.

21            THE CLERK:  And spell your last name.

22            THE WITNESS:  P-o-n-s-o-t.

23            THE CLERK:  Thank you, sir.  You may be seated.

24   DIRECT EXAMINATION

25   BY MR. HERNANDEZ:

Dccdkur1                          Ponsot - direct

1    Q.  Good morning.

2             THE COURT:  If we could ask you to speak into that

3    microphone.  Thanks.

4    BY MR. HERNANDEZ:

5    Q.  Good morning, Mr. Ponsot.  Could you tell us where you

6    live?

7    A.  I'm living in Burgundy in the village of Morey Saint Denis.

8             THE COURT:  And that would be France, right?

9             THE WITNESS:  France, yes.

10   Q.  Can you tell us what you do for a living?

11   A.  I'm the wine maker.

12   Q.  Where?

13   A.  In Morey Saint Denis, in Burgundy, in France.

14   Q.  And does the Domaine have a name?

15   A.  The estate is Domaine Ponsot, the same as my family name.

16   Q.  And do you have a position or a title at Domaine Ponsot?

17   A.  I am the manager, co-owner of the winery.

18   Q.  And who is the other owner?

19   A.  My three sisters are the co-owners.

20   Q.  And how long have you been the manager or the head of the

21   Domaine Ponsot?

22   A.  I came back working in the family winery in 1981, and since

23   that time I work at the Domaine.  I took over from my father in

24   1992.

25   Q.  And approximately how long was your father the head of

Dccdkur1                         Ponsot - direct

1   Domaine Ponsot?

2   A.  My father was during probably 35 years head of the Domaine.

3   Q.  And who was the head of the Domaine before your father?

4   A.  My grandfather, Hippolyte Ponsot, was from 1922 until 1958.

5   Q.  You told us that you live and you work in Burgundy.  The

6   jury has heard quite a bit about Burgundy.  Would it be helpful

7   for you to explain a little bit about where you live and where

8   you work if we show the jury a map of Burgundy so you could

9   point out where the Domaine is?

10  A.  Yeah.  That would be a big help, for sure.

11           MR. HERNANDEZ:  Your Honor, may we use the easel and

12  bring what's been marked for identification as Government

13  Exhibit 19-1.

14           I ask if the witness could step down from the stand so

15  that he can point on this map to different locations.

16           Is that all right, your Honor?

17           THE COURT:  Sure.

18           MR. HERNANDEZ:  Mr. Ponsot, could you just step down

19  here for a moment.

20           (At the jury rail)

21  BY MR. HERNANDEZ:

22  Q.  What we have here is Government Exhibit 19-1.  Tell us if

23  you recognize this map.

24  A.  Yes.  This big map is a map of the vineyards of Burgundy.

25           And this is the map of France, and the location of

Dccdkur1                          Ponsot - direct

1   Burgundy, France is located like center east of the country and

2   south of Paris.  And this is not the biggest wine region in

3   France, but this is one of the most famous, for sure, with

4   Bordeaux.

5           And this is -- if I may go on explaining?

6   Q.  Please.

7   A.  From Dijon to Macon, this is the whole wine region.  But

8   the wine region which is focused on today is what we called the

9   Cote de Beaune and Cote de Nuits.

10  Q.  Thank you.

11  A.  So to make it quite short, the best red wines of Burgundy

12  are produced in the Cote de Nuits, which is between Dijon and

13  Cote Corgoloin, which is this little village here.

14          So there is a red line here that separates Cote de

15  Nuits from Cote de Beaune.  So maybe the Concord Burgundy red

16  are produced here and the white down here.

17  Q.  Could you show us where your village is?

18  A.  The village of Morey St. Denis is here, right in the center

19  of the best red wines of Burgundy.

20  Q.  Thank you very much.  You can return back to the witness

21  stand now.  Thank you.

22          Could you tell us a little bit about how Domaine

23  Ponsot started?

24  A.  Domaine Ponsot has been established in 1872 by my ancestor

25  William Ponsot.  William Ponsot bought the house and vineyards

1   in Morey St. Denis in 1872, and we go on working in the family

2   since that date.

3   Q.  And do you know what it means if a wine is estate bottled?

4   A.  Estate bottling is the fact that at the winery the wine is

5   taken from a barrel into bottles.  This is an explanation that

6   I can maybe do a bit longer, because during centuries the wine

7   in Burgundy was made by the wine makers and sold in barrels to

8   a negociant.  A negociant is a company which is that of a wine

9   merchant that used to take the barrels, age the wine during one

10  or two years or more, and then bottle it and put that on the

11  mark.  This is a system of marketing the wine in Burgundy

12  during centuries until the early '70s, I would say, where the

13  winemakers then started estate bottling.  So they had a machine

14  in their winery to feel the bottles and put the cork on.  So

15  this is what we call estate bottling.

16  Q.  Do you know when Domaine Ponsot began estate bottling?

17  A.  So domain Ponsot was one of the ten first wineries to

18  estate bottling before the Second World War.  It was in our

19  case in 1932.

20  Q.  Could you tell us generally the kinds of wines that Domaine

21  Ponsot makes today?

22  A.  Yes.  Before I say what we are producing, I think it's time

23  to help the jury to understand the classification of Burgundy.

24  Q.  If you could explain the classification system first and

25  then tell us what wines you make, that would be very helpful.

1   Thank you.

2   A.   So the classification in Burgundy is on four levels.  You

3   have the first level, I would say good wines but not the top

4   wines, which represent nearly 50 percent of the production of

5   Burgundy, and the name of these wines are Bourgogne.

6   Q.   Could you spell that, as well?

7   A.   Which is Burgundy in French.  Bourgognon is

8   B-o-u-r-g-o-g-n-o-n.

9        So the classification starts with the Bourgogne first

10  level.  Then you have an appellation Village, the level

11  Village, which represents the name of other villages of

12  Burgundy; for example, Pommard, Morey St. Denis.

13       And then you have an upper level, which is Premier

14  Cru.

15       And then you have the creme de la creme, which are

16  named Lafitte Grand Cru.  And the Grand Cru represents only

17  2 percent of the surfeit of production of Burgundy, 1 percent

18  of the production.  There is a law that makes that we cannot

19  produce too much in the Grand Cru, too much wine; we have a

20  limit.  So this is why it is 2 percent of the surfeit but only

21  1 percent of the production.

22       So this is the classification.

23       And Domaine Ponsot is owning 22 appellations, so

24  different kind of wines, including some in each category but we

25  have specialty 12 Grand Cru that represent nearly 80 percent of

Dccdkur1                         Ponsot - direct

1    our production.

2    Q.  So most of the wine that Domaine Ponsot makes is the

3    top-level Grand Cru wine?

4    A.  Yes.  This is it.

5    Q.  And, historically, has Domaine Ponsot also made Grand Cru

6    wines?

7    A.  Domaine Ponsot has made Grand Cru wines from the very

8    beginning, except that during several years after the

9    foundation, we had no classification in Burgundy.  The

10   classification started in 1935 and '36.  I mean, the legal

11   classification of the four levels.  But we already had the

12   parcels, the piece of ground that are named the Grand Cru.

13             THE COURT:  Who started the four levels?

14             THE WITNESS:  So my grandfather was a doctor in law.

15   And when he came back in 1922, he had the idea that they must

16   classify the wines because many people were not having the

17   right name on the right wine and so on.  So to make it really

18   legal, he was the first to start writing notes about that and

19   he was the first to establish these laws, the rules and the

20   laws, and the laws have been voted in 1935 after the work of my

21   grandfather plus other winemakers together.

22             THE COURT:  So he established them but they've

23   actually been enacted into law in France.  These are legal --

24             THE WITNESS:  Yes.  Exactly.

25             MR. HERNANDEZ:  If we could show to the witness

Dccdkur1                         Ponsot - direct

1      Government Exhibit 19-3.

2      Q.  Mr. Ponsot, if you look at your screen, could you tell me

3      if you see anything on the screen?

4      A.  Yes, I do.

5      Q.  Could you recognize what it is?

6      A.  It is a map of the appellation of my Village.

7      Q.  OK.  Would it be helpful to you to explain a little bit

8      more about how wines classifieds in Burgundy if we focused in

9      on this map so you could explain it to the jury?

10     A.  Yeah, I can explain especially what is an appellation.

11                THE COURT:  Could you hold on for a second.

12                And could you just approach for a minute?

13                (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Dccdkur1                        Ponsot – direct

1                    (At the sidebar)

2                    THE COURT:  So I just thought of something that could

3        be helpful and I don't know if it is too late to do.  Could you

4        have like a glossary, maybe handwritten even, so that the court

5        reporter would know all of these names and terms so he wouldn't

6        have to interrupt?

7                    MR. HERNANDEZ:  A lot of these are on our list of

8        names and places, and we have been supplementing it along.  We

9        will make an extra effort to have even more of them prepared.

10                   THE COURT:  If you could cull that even handwritten

11       and so we would have it for the court reporter.

12                   MR. HERNANDEZ:  Sure.

13                   (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

Dccdkur1                         Ponsot - direct

1             (In open court)

2             MR. HERNANDEZ:  Your Honor, could we publish 19-3 to

3    the jury?

4             THE COURT:  Yes.

5    BY MR. HERNANDEZ:

6    Q.  Mr. Ponsot, are we looking here at a map of your village,

7    Morey St. Denis?

8    A.  Yes.  It is exactly that.

9             MR. HERNANDEZ:  And I am going to ask Mr. Platt if he

10   could just focus in on the colored portion of the map so we can

11   get as close as we can there.

12   Q.  All right.  Mr. Ponsot, can you just tell us what that is

13   we are looking at here in this map?

14   A.   In this map you can see the different colors.  But more

15   than colors, you can see the different names located inside a

16   grove.  For example, along the upper corner on the right, you

17   see an appellation named Monts Luisants.  So this is what we

18   call an appellation.  This is a ground limited on which you can

19   produce only this wine, whose name is Monts Luisants.  And

20   having said that, you see many different kind of names which

21   represent many different kind of appellations.

22            Then regarding the colors, you have the bottom of the

23   page lightly pink colors, this is what I named as a village

24   wine.  So the second level of appellation.

25            If you go a little higher, you see the light red, and

Dccdkur1                        Ponsot - direct

1    this is we call Premier Cru.

2              And then in darker red you have the Concord.  And the

3    Concord in Morey St. Denis are the number 5.

4    Q.  OK.  Are two of them Clos de la Roche and Clos St. Denis?

5    A.  Yeah.  Both of these appellations are produced by Domaine

6    Ponsot.

7    Q.  Thank you, Mr. Ponsot.

8              Now, is there anything that you consider to be special

9    about the wines of Burgundy?

10   A.  The wines of Burgundy are among the most well known on the

11   planet, along with the Bordeaux wines.  So, yeah, these are

12   wines, especially the Grand Cru, which are reaching a very high

13   price due to the demand because the production is very, very

14   small.

15   Q.  Where are Domaine Ponsot wines sold today?

16   A.  Domaine Ponsot wines are sold into 48 countries.  Only

17   8 percent in France, 8 percent in U.S.A.  I think 8 percent is

18   the maximum I sell to one country, but some other countries get

19   only 1 percent.

20   Q.  So we are lucky.  Do you do anything to promote Domaine

21   Ponsot wines?

22   A.  Well, I think I don't really need to promote Domaine Ponsot

23   wines.  The demand is much higher than what we can produce.

24   And I asked my assistant to register all the requests of

25   bottles in the last two years, and we counted approximately 45

Dccdkur1                          Ponsot - direct

1    clients potentially per bottle.  So I try, instead of

2    promoting, to keep hidden.

3    Q.  Now, the Domaine itself in Burgundy, do you keep a stock of

4    older wines and even older wine labels there?

5    A.  Yeah.  We have a good library of old wine labels from the

6    time my grandfather did the wines.  And we have also some old

7    bottles, unfortunately, not as much as I would, but my

8    ancestors and my father were good drinkers so they didn't leave

9    me a lot of wine.  And so we have a collection of something

10   like 1,000 bottles only of older wines.

11               MR. HERNANDEZ:  And if we could show the witness, just

12   the witness, two exhibits, 36-10 and 36-11.

13   Q.  Mr. Ponsot, these will appear on your screen.

14   A.  Yes.

15   Q.  The first is 36-10.  Just take a moment to look at that.

16               And then if we could show 36-11.

17               Do you recognize those two exhibits, Mr. Ponsot?

18   A.  Yes.  Those are labels used by my grandfather.

19   Q.  And are these the labels that you provided to the FBI in

20   connection with this case?

21   A.  I did.

22               MR. HERNANDEZ:  We offer 36-10 and 36-11.

23               THE COURT:  I will allow it.

24               (Government's Exhibits 36-10 and 36-11 received in

25   evidence)

Dccdkur1                          Ponsot - direct

1   Q.  Can we see 36-10 first.

2           We have on the screen 36-10.  Could you just tell us a

3   little bit about this label?

4   A.  This label was the type of label used by my grandfather in

5   the '30s, and --

6           THE COURT:  Maybe you could walk us through each

7   section of the label and explain "Appellation Controlee," for

8   example.

9   A.  Yes.  What you see as Appellation Controlee on the upper

10  corner left, it means that the wine is under the new law.  The

11  law started in 1936 in Morey St. Denis, in my Village.  So this

12  was the second year that you could write on the label this.  It

13  means that you have to produce the wine a certain way, to farm

14  the vines a certain way.  The rules are quite strict.  So this

15  is what we call Appellation Controlee that gave the

16  classification I mentioned earlier.

17          What is remarkable on this label is that at the time

18  my grandfather was making wine, they had no television.  So at

19  night he would take all the labels and sign them by hand.  So

20  you have the signature of my grandfather on the corner.

21  Q.  Is that the lower left corner?

22  A.  The left corner.

23  Q.  And this is a Grand Cru wine from the Clos de la Roche

24  Appellation or Vineyard, is that correct?

25  A.  Exactly.

Dccdkur1                    Ponsot - direct

1   Q.  From 1938?

2   A.  This is the label of this wine, Clos de la Roche 1938.

3           You can notice that the character of Clos de la Roche,

4   the place, is very much from the time, in the -- it was a time

5   of building like the Chrysler Building, and they wrote a lot of

6   things with these kind of letters.

7           THE COURT:  So explain just all the other writing on

8   there, too.

9           THE WITNESS:  Yes.  What is written in green across

10  the label "Mise Du Domaine" means estate bottling.  It is a

11  word in French to say estate bottling.

12          And then down on the right corner down, "H." is the

13  initial of my grandfather, Ponsot.  "Proprietaire" means owner

14  in Morey St. Denis.

15          So below that you have "par Gevrey-Chambertin," the

16  next village.

17  Q.  And that last hyphenated word, that is another village?

18  A.  It is the next village from Morey St. Denis, and this is

19  where the Post Office was.

20  Q.  OK.

21          THE COURT:  There is a date on there.  If you could

22  explain what the date means on the label?

23          THE WITNESS:  1938 is the date of the vintage.  So on

24  the wines produced in 1938, two or three years later, I don't

25  know when my grandfather did the estate bottling, but they

Dccdkur1                          Ponsot - direct

 1   could put this label on the bottle.

 2              THE COURT:  So it's the vintage, as opposed to when

 3   the wine was bottled?

 4              THE WITNESS:  No.  When the wine was produced.

 5              THE COURT:  Produced?

 6              THE WITNESS:  Produced in 1938 and bottled we don't

 7   know, probably 1940.

 8              THE COURT:  And where was it in between?

 9              THE WITNESS:  In the barrel in the cellar down in our

10   house.

11   BY MR. HERNANDEZ:

12   Q.  Then if we could look at 36-11.

13              This label looks a little bit different.  Could you

14   tell us just what some of the differences are here?

15   A.  What is a little different, it was the second kind of label

16   my grandfather made.  And this was used during the '40s and

17   '50s at the end of the '50s.

18              And what you see, which is similar, is that you still

19   have the name of the appellation "Clos de la Roche" right in

20   the middle.  The word "Appellation Controlee" that on the

21   previous label was in the corner is now just below the name of

22   the appellation.  There is still the name of my grandfather and

23   the address on the corner down right.

24              On the corner up right, you still have the word Mise

25   Du Domaine -- that means estate bottling -- plus the vintage.

Dccdkur1                        Ponsot - direct

```
 1              And on the left upper corner, you have a new

 2     designation, which is "Grand Vin de Bourgogne."  This is not

 3     registered in any law.  This just means that my grandfather was

 4     thinking that it was a great wine already.

 5     Q.  This is good stuff?

 6     A.  Good stuff.  That's it.

 7              So it's just a notice to the customer that probably

 8     this is a good wine.  OK?  Maybe it was pretentious but I think

 9     it was a good wine.

10     Q.  OK.

11              THE COURT:  There are a few more.

12     Q.  Right above "Clos de la Roche."

13     A.  Right above Clos de la Roche -- and this is the first time

14     my grandfather did it -- he mentioned how many bottles he has

15     made totally from this wine.  So you can see in French it means

16     we have made 2,000 bottles of this wine.  This is the

17     translation of what is written on top of the appellation.  So

18     2,000 bottles of 1949 Clos de la Roche have been produced, not

19     one more.  And we have still in our cellar in the library 7,

20     and this is what is left.

21     Q.  I want to ask you some questions about the library or the

22     cellar that you referenced.

23              MR. HERNANDEZ:  And if we could show just to

24     Mr. Ponsot three exhibits, 36-7, 36-8 and 36-9.

25     Q.  Mr. Ponsot, that will come up on your screen.  Just take a
```

Dccdkur1                         Ponsot - direct

1   look at each exhibit, and at the end I am going to ask you if

2   you recognize these exhibits.

3            (Pause)

4            Mr. Ponsot, do you recognize these three exhibits?

5   A.  I do recognize them.

6   Q.  How do you recognize them?

7   A.  These are pictures I've taken and sent to you of our

8   library, the two first, and the last one is a bottle -- old

9   bottle that we keep in the library.

10            MR. HERNANDEZ:  The government offers 36-7, 36-8 and

11  36-9.

12            THE COURT:  I will allow that.

13            (Government's Exhibits 36-7, 36-8 and 36-9 received in

14  evidence)

15            MR. HERNANDEZ:  Can we begin with 36-7, and publish

16  this to the jury, please.

17  Q.  Mr. Ponsot, what are we looking at in 36-7?

18  A.  We are looking at a row in our library of bottles.  This is

19  the row where we keep the oldest bottles we have in our cellar.

20  Q.  This is a photograph you took of your cellar in Burgundy?

21  A.  I did, yes.

22  Q.  And can we look at 36-8.

23            What is in 36-8?

24  A.  This is a closer view of the left side of this row in our

25  cellar, where we keep some very old bottles.  We keep them in

Dccdkur1                         Ponsot - direct

1    boxes with no label on it.  In the box, every bottle has been

2    reopened in 1985, refilled with the same wine, recorked with a

3    new cork, and we put wax on it at that time.  So in 1985,

4    during the winter, we did that for all the wines which were

5    older than 1970.

6    Q.  You personally participated in that?

7    A.  I did myself all of these recorkings in the very strange

8    way we have.  In order to avoid the wine being affected by the

9    oxygen, we did it in a temperature of 2 Celsius, which means

10   30 -- I don't know, 39 Fahrenheit.  So very cold.

11                  (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DCCBKURT2                    Ponsot - direct

BY MR. HERNANDEZ:
Q.  And why do you do that that way?

A.  In order to avoid the oxidation of the wine.  The wine is
an element which is natural, very fragile, and oxygen is the
enemy of the wine.  It's the enemy except when you drink it.
When you drink the wine, you need oxygen to excite flavor and
aroma.  But when you keep the wine in the barrel or in the
bottle, you avoid everything that comes from outside.

        We need a little of oxygen through a cork, which is
porous, to make the wine age carefully, but this is very
limited.

        MR. HERNANDEZ:  And can we look at 36-9 --

        THE COURT:  So the cork is designed to allow some
oxygen into the wine?

        THE WITNESS:  Yeah.  The natural corks are porous.
And we found the system a long time ago to close the bottles,
which is not the best way because the corks are natural and you
don't know in advance which kind of porosity you will have.
And when you take a cork from the same tree, because the corks
are made from the tree, you can have two corks which are
totally different in porosity.  And you can bottle two wines,
side by side, keep the two bottles in your cellar during 30
years, and the one will be fantastic because the cork made this
work of just letting a little air getting in, and the next one
will be totally destroyed because the cork is too porous and
let too much oxygen go in.

1       So this is something quite important for the future of

2    the explanations.

3    BY MR. HERNANDEZ:

4    Q.  And you mentioned that in 1985 you rewaxed some of the-- or

5    you waxed, rather, some of the older bottles.

6           MR. HERNANDEZ:  So if we can look at 36-9.

7    Q.  What does 36-9 show?

8    A.  36-9 is a bottle of 1959 Clos de la Roche, still the same

9    operation, that we recorked and waxed in 1985.  And you can

10   notice that the wax is red.  This has been taken last year.

11   The photograph has been taken last year, so it's almost 30

12   years since we did the recork and the wax.  So this is still

13   very neat.

14   Q.  The bottles, when they leave the domaine when they're to be

15   sold, do they always have labels on them?

16   A.  Yes.  We never sell a bottle with no label.  It's nonsense.

17   We put a label on each bottle that is the leaving the Domaine

18   Ponsot.

19          THE COURT:  When you put the wax over the cork, does

20   that still allow oxygen to come into the bottle?

21          THE WITNESS:  Yeah, the wax is also porous, but less

22   than a cork.  So when we have very old wines, we don't want too

23   much oxygen goes in because it has already been exposed to

24   oxygen through the original cork during the wine, and so we try

25   to limit the entrance of oxygen into the wine by waxing them.

1          We never wax wines that we release now.  But if we

2     have the chance, if my sons or grandsons have the chance to

3     find bottles that I made myself in 40 years or something, they

4     could do what we did at that time and rewax it to protect

5     them.

6     Q.  Now, prior to 1985, did Domaine Ponsot ever produce any

7     wines where the bottle was sealed with wax?

8     A.  No.  My grandfather, my father, always used capsules and no

9     wax.

10    Q.  So 1985 was the first and only time wax was used?

11    A.  Exactly.

12    Q.  The wax looks like it does in 36-9?

13    A.  It looks exactly what we used until last year we changed

14    the cork.

15          THE COURT:  What's the difference between wax and a

16    capsule?

17          THE WITNESS:  Well, the capsule is very easy to use.

18    Wax takes a lot of time.  And wax is very fragile.  When you

19    have to open a bottle, it's not the best way to do because you

20    have to break the wax.  The wax is becoming very hard.  And

21    when you break it, some elements of the wax can get into the

22    bottle afterwards if you don't clean it correctly.

23          It's a way to protect the wine.  It's not the best way

24    to serve the wine, I would say.  So the capsule is really an

25    easy way and it's also porous.  It's made from-- I don't know

1    the word in English, but it's a metal which is soft.  But I

2    don't know the word in English.  It's not lead, but it's kind

3    of --

4              THE COURT:  It's porous?

5              THE WITNESS:  It's porous as well.

6    BY MR. HERNANDEZ:

7    Q.  I want to show you a few exhibits that have already been

8    admitted into evidence.  It's Government Exhibit 1-140,

9    Government Exhibit 1-181 and Government Exhibit 1-204.

10             And the first two exhibits, 1-140 and 1-181, say that

11   they are labels from Domaine Ponsot and then 1-204 just has

12   vintages on them.

13             I'd like you to take a look at these two exhibits,

14   please.  These three exhibits.

15             Mr. Ponsot, do you know whether those three exhibits

16   contain authentic Domaine Ponsot labels?

17   A.  They don't.

18   Q.  And how do you know that?

19   A.  Just by looking at them.  We know what kind of flavors we

20   produced and we never produced these kind of flavors.  Never,

21   ever.

22   Q.  Which exhibit are you referring to?

23   A.  181.

24   Q.  Okay.

25   A.  So as you saw previously, the kind of label used in 1945

1    were the-- '49, I'm sorry, were the ones the same as we used in

2    1947.  So these 45 and '47 cannot exist.

3              MR. HERNANDEZ:  Mr. Platt, can you have 36-11 up on

4    the screen so the jury can see this?

5    Q.  Up on your screen, Mr. Ponsot, that's the 1949 label you're

6    referring to?

7    A.  Exactly, '49.

8    Q.  And could you --

9              THE COURT:  Excuse me.  Just so I'm clear, this one is

10   a label that your family produced.  Correct?

11             THE WITNESS:  On the screen?

12             THE COURT:  Yes.

13             THE WITNESS:  Yes.

14             THE COURT:  The one on the screen.

15             THE WITNESS:  Yes, exactly.

16   Q.  The one on the screen, this is a copy of the label you got

17   from the Domaine.  Correct?

18   A.  Yes.  I gave you a copy of this earlier.

19   Q.  And if you could just hold up 1-181 so that the jury can

20   see.

21             You're saying those are not authentic labels?

22   A.  These are totally different.

23             And then on Exhibit 1-140, these are not authentic

24   Domaine Ponsot labels, but very close.  This is a very good

25   copy, believe me.

 1              THE COURT:  But you said it's not authentic?

 2              THE WITNESS:  No, it's not authentic for several

 3    reasons.

 4              THE COURT:  Are you going to get into how it's not?

 5              MR. HERNANDEZ:  I'm going to ask him right now.

 6    Q.  If you could just tell us why these labels you think are

 7    not authentic.

 8              THE COURT:  Start with the first one, the first batch.

 9    Q.  You can start with the first batch.  This is Government

10    Exhibit --

11    A.  This one?

12    Q.  Yes.  We'll start with Government Exhibit 1-181.  Tell us

13    why you think those are not authentic.

14    A.  Because they are not looking like what you see on the

15    screen, the 1949 Clos de la Roche.   In the '40s we used only

16    the type of labels that you can see on the screen and not this

17    kind of yellowish color and not really looking alike, this one.

18    We never used that.

19    Q.  How about the back of the label?  Is there anything about

20    the back of that label that is important to you?

21    A.  Yeah, the back of the label also is really yellow and--

22    well, just by the memory of the family, we never used that.  My

23    father is still alive and I asked him a lot of things about

24    that --

25              MR. MOONEY:  Objection, hearsay.

DCCBKURT2                      Ponsot - direct

 1            THE COURT:  Overruled.  Keep going.

 2   A.  My father gave me a lot of information of what he has done

 3   himself.  And I am myself very interested into the history of

 4   the family.  And I had contacts with my grandfather before he

 5   passed.  So I know a lot myself, but my father knows more.  And

 6   for sure these cannot exist.

 7            THE COURT:  So can you tell that just from looking at

 8   it casually?  It's obvious to you?

 9            THE WITNESS:  It's obvious.  It's totally obvious.

10   Q.  Do you know how labels have historically been applied to

11   the bottles at Domaine Ponsot?  Do you need something to make

12   the labels stick?

13   A.  Yeah, we use the same-- the same kind of glue that

14   everybody used to put paper on the wall.  Exactly the same.

15   And we would by hand put that with a -- pencil, you say?  I

16   don't know the word in English.

17   Q.  That's okay.

18   A.  So stick the label and we do by hand.

19   Q.  Do you know what a self-adhesive label is?

20   A.  Self-adhesive?

21   Q.  It's one that comes already sticky on the back.

22   A.  Yeah.

23   Q.  Have you seen those before?

24   A.  Yeah.

25   Q.  Has Domaine Ponsot ever used a self-adhesive label?

1   A.  We did start in 1989 with these self-adhesive labels.

2   Q.  And before then?

3   A.  Never.

4   Q.  Okay.  Could you then take the next exhibit and tell us why

5   you don't think those are authentic Domaine Ponsot labels?

6   A.  Well these, as I said, are looking like our real labels.

7   Q.  Could you just tell us the number before you explain why?

8   A.  Exhibit 1-140.

9   Q.  Thank you.

10   A.  These types of labels was used mainly in the early-- the

11   late '50s and the '60s and early '70s.  This type.  Square,

12   rectangle.  And on these my father would put his name.  Instead

13   of saying only "Domaine Ponsot," my father would add his own

14   name with his initials.  And so we really cannot find these

15   kind of labels authentically at Domaine Ponsot.

16   Q.  And, Mr. Ponsot, has Domaine Ponsot ever given permission

17   to someone outside the domaine to make Domaine Ponsot labels

18   and apply them to bottles?

19   A.  Never.

20   Q.  And then the last exhibit, can you tell us the number and

21   tell us whether you think that's authentic or not?

22   A.  Well, these are --

23   Q.  Could you tell us the number before you begin?

24   A.  Oh, yeah.  Exhibit 1-204.  This is what is normally applied

25   on top of the neck of the bottle to give the indication of the

DCCBKURT2                    Ponsot - direct

1    vintage.  We have used this kind of small labels on top of

2    these on a bottle, but this-- this is looking alike our

3    little -- how you say?  Crest.  But we never used that from a

4    full page.  We have been delivered directly from the-- from the

5    printer as a single one.  But I-- well, this is looking alike.

6    I can't-- I can't say-- I can say this is not our genuine

7    stuff, but it's really looking alike.  It's a copy, but very

8    well done.

9    Q.  Thank you, Mr. Ponsot.

10   A.  It's obvious for me.

11   Q.  Now I'm going to ask you about a different subject.  I want

12   to direct your attention to April of 2008.

13          Now, did you become aware of a wine auction here in

14   Manhattan held by Acker Merrall & Condit in April of 2008?

15   A.  Yes, I did.

16   Q.  How did you become aware of it?

17   A.  I got a message by e-mail from a friend of mine whose name

18   is Doug Barzelay asking, very simply, "Since when are you

19   producing the Clos Saint-Denis?"  The Clos Saint-Denis is one

20   of the two Grand Cru that we produced in our village.  And I

21   don't know why he was asking these questions, so I didn't

22   answer by an answer.  I answered by a question:  "Why are you

23   asking?"

24          And by return, he sent me an e-mail saying there is an

25   auction in two days in Manhattan in which they will sell 1945,

DCCBKURT2                    Ponsot - direct

```
 1   '49 -- I don't remember, but '40-- '40s, '50s, '60s and '70s of
 2   the Clos Saint-Denis.  The Clos Saint-Denis is an appellation
 3   that we started in 1982.
 4         I remember I said previously that I came back to the
 5   winery in 1981.  It was just after the harvest in October.  The
 6   reason was that my father had the opportunity to add to the
 7   portfolio of the winery some new appellations that the rich
 8   person from Paris just bought.  And he wanted that the family
 9   Ponsot would work on the vineyards, make the wine, age the
10   wine, and give the bottles-- a part of the bottles to himself.
11   We call that a shared crop system.
12         THE COURT:  Shared crop?
13         THE WITNESS:  Shared crop.
14   A.  So we shared at the end of my work, of my father's work,
15   two-thirds of the bottles for us and one-third for the owner.
16   This is the system.
17         So we had this opportunity.  And my father was saying
18   it's too much.  I don't want to take it.  And I said, Okay, I
19   come back to the winery.  I was having my own life outside.
20         THE COURT:  Meaning it's too much work?
21         THE WITNESS:  Too much work.  Yeah, too much work.
22   A.  So this is when we started the Clos Saint-Denis.  I came
23   back in late '81 and '82, were the first vintage we made of the
24   Clos Saint-Denis.  So there's no reason that we can find older
25   bottles of the Clos Saint-Denis with the Ponsot name on it.
```

1   Q.  What did you do after Mr. Barzelay told you about these

2   wines being auctioned that Domaine Ponsot never made?

3   A.  Well, it was a shock for me when I had the e-mail by return

4   knowing that someone would sell these old bottles.  I was

5   sitting at my desk, fortunately, otherwise I would fall down.

6   The thing is that I immediately called Doug Barzelay to ask him

7   to take pictures if possible, send me the catalog with an

8   e-mail as a pdf file, which he did.  And I saw not only Ponsot

9   wines, but all the catalog.  And so finally I got some pictures

10  of some wines.  So only watching the pictures I knew that

11  everything was not authentic.

12          So I had also to ask Doug Barzelay who I should

13  contact at the auction house to try to withdraw the wines from

14  the auctions.  So he gave me the name of John Kapon.  I didn't

15  know this person before that.

16          And so I gave a phone call to John Kapon and asking

17  him to do that, to withdraw the wines.  I said who I am and why

18  I said that.  And so after two phone calls, I heard on the

19  phone a yes, meaning he would withdraw the wines from the

20  auction, but it was not a yes I really liked.  I was not sure

21  that he would do that.  It was maybe a yes to end the

22  conversation.

23          So I decided to go.  I had planned to go to USA a bit

24  later.  I changed my plans and the next day I took a plane to

25  come to the auction.  So the day of the auction I was in the

1     room ten minutes after it started.

2                THE COURT:  In New York?

3                THE WITNESS:  In New York, in Manhattan.  I flew the

4     same day.  The plane landed at four and I was at six, a little

5     after six, in the room where they started the auction.

6     Q.  And do you know whether they auctioned the bottles or not?

7     A.  Well, they were starting following the catalog with old

8     champagnes and the Ponsot wines were a bit later.  But the

9     wines were there in the room.

10               THE COURT:  On the table?

11               THE WITNESS:  Not on the table.  Someplace.

12               THE COURT:  Okay.

13    A.  I didn't see from the place I was, but some people -- I had

14    many friends in the room that wanted to buy old Ponsots,

15    because it's very rare to find so many bottles of Domaine

16    Ponsot in the same place.  And so many people came for this

17    purpose and I know a lot of them.  I am-- you know, when you

18    sell wines, it's not the same thing like when you sell tables

19    or a car.  You become friends with the people which are

20    drinking the wine.

21               So we had the good relation with a lot of people in

22    the room, so they told me that some of them saw the bottles.

23               So I didn't know Kapon.  Kapon didn't know me.  At

24    that time you can't believe it, but I had very long hair and I

25    was very easy to recognize.  And some fellows went to Kapon and

DCCBKURT2                         Ponsot - direct

1    say that I'm here.

2             So when is turn of the lots of Domaine Ponsot wines

3    arrived, John Kapon said, "At the request of the winery, with

4    the accordance of the owner, we will withdraw the wines from

5    the auction."

6             So at that minute a lot of people were mumbling and

7    not very happy because some of them came from outside town to

8    buy that.  And so they went on selling the rest of the wines.

9    And at the end of the auction I had for sure, as you can

10   imagine, many questions.

11   Q.  Now, Mr. Ponsot, for the jury in this trial we've already

12   admitted the bottles, some of the bottles from that auction and

13   they're at the table.

14             MR. HERNANDEZ:  Your Honor, I'd ask the witness, if he

15   could, to step down so he could explain why those wines are not

16   authentic.

17             THE COURT:  Sure.

18   Q.  Mr. Ponsot, if you could step down.

19             So, Mr. Ponsot, there are a number of bottles here on

20   the table.  And I'm going to first ask you about the bottles

21   that have numbers that start with 8 and then dash, because

22   those are the bottles that have been admitted in this trial as

23   from the April 2008 Acker auction.

24             So I'm going to hand you a bottle and tell you the

25   exhibit.  And if you could tell the jury why a particular

1   bottle, if you believed to be authentic or inauthentic.  And

2   we'll begin here with this first row of bottles starting with

3   8-22.  And if you could just hold the bottle up so the jury

4   could see it and explain why you think the bottle is authentic

5   or not.

6   A.  Well, for this one it's very obvious.  It's a Clos

7   Saint-Denis and it says '45.  So 1982 is the first.  So this

8   cannot exist.  It's obvious.

9        On top of it, we never sold any wine to Nicolas,

10  which is a French wine merchant that used to sell a lot of

11  wines all over the planet.  And this wax has never been applied

12  by us.  But we don't need to know about this because this,

13  together, cannot exist.

14  Q.  Because a Clos Saint-Denis from 1945 can't exist.

15  A.  Right.

16  Q.  But with respect to the wax, because it's a point you may

17  want to make later, the only time the domaine is waxed you said

18  was in 1985?

19  A.  1985 we started using wax.

20        MR. HERNANDEZ:  And if Mr. Platt could just pull up on

21  the screen that photograph of the wax that you applied, which

22  is 36-9.

23  Q.  And if you could just hold the bottle up so the jury can

24  see the comparison in the color.

25        Is there any difference in the color?  Mr. Ponsot, is

1    there any difference in the color?

2    A.   The wax can change a little color with the time, but 1985

3    until last year, when I took this picture -- or this year, I

4    don't remember exactly -- the color stayed quite stable.  It's

5    still red.  This has been applied with a different color than

6    the original.  Looking like old, but I think new.

7    Q.   Very good.

8         And then I'll ask you then to look at Government

9    Exhibit 8-24.  If you could hold that up for the jury as well

10   and tell whether you think that is an authentic bottle.

11   A.   Well, it's, again, a Clos Saint-Denis, 1959.  So, again,

12   obviously cannot exist.  On top of it, this capsule is saying

13   selected by Alexis Lichine.

14   Q.   Can you spell that?

15   A.   Alexis Lichine.  A-l-e-x-i-s L-i-c-h-i-n, and normally

16   there is an "e."  This guy was known for importing wines, but

17   he has never been our importer.  Never.  And on top of it, it's

18   recommended by someone I don't know at all, importer and wine

19   merchant.  No idea who these people are.  Never related to our

20   winery.

21   Q.   And then I'll show you 8-25.

22   A.   Clos Saint-Denis, 1962.  Again, no way.  And you see the

23   capsule has been taken away.  When you drink a bottle, you take

24   the capsule away from the top to open it.  Why would you open

25   the capsule down to check if the cork is printed?  And if it's

1   not printed, then you can take this bottle for doing something

2   else with.  It's a trick.

3   Q.  Okay.  Thank you.

4         So those are the Clos Saint-Denis wines.

5         Now I'm going to ask you about the Clos de la Roche

6   wines.  I'm going to hand you Exhibit 8-27.  What can you tell

7   us about whether you think that bottle is from Domaine Ponsot

8   or not?

9   A.  It's not from Domaine Ponsot exactly for the same reason as

10  the Clos Saint-Denis.  You see Clos de la Roche and you see

11  1929.  And I told previously that we started estate bottling

12  with a vintage '32.  So this cannot exist.

13  Q.  And is there anything else about that bottle that tells you

14  that it's not an authentic wine from Domaine Ponsot?

15  A.  This is the main thing.  It can say "appellation

16  controlee."  It's not controlled.

17  Q.  And the wax.

18  A.  The wax, no.  No way.  It's obvious for me.  It's already

19  '29 and a Clos de la Roche.  It cannot match.

20  Q.  And then Government Exhibit 8-28, can you tell us what that

21  is and tell us whether you think it's authentic?

22  A.  So this is not authentic.  It can be existing, it's 1937

23  Clos de la Roche, but remember you have seen some old labels of

24  Domaine Ponsot including the 1938 which was exactly the same

25  style as the 1937.  So it's not looking alike the original

DCCBKURT2                     Ponsot - direct

1    label.

2              MR. HERNANDEZ:  Mr. Platt, could you pull up 36-10,

3    which has already been admitted?

4    Q.  And we have on the screen 36-10, the label from 1938 that

5    was previously shown.

6              So you're saying if this was to be an authentic

7    bottle, it would have to be the label that's 36-10 on the

8    bottle?

9    A.  Exactly, except the vintage would change from 1938 to 1937.

10   But this was the same kind of labels.  On top of it, we never

11   used any gold capsule like this.  Which actually has been cut,

12   too.

13   Q.  Okay.  Thank you.

14             And I'll show you Government Exhibit 8-29.  Can you

15   tell us about that bottle?

16   A.  Yeah.  Again, it's a Clos de la Roche, 1945.  We produced

17   1945 Clos de la Roche.  You have seen the labels of the 1949

18   and the 1945 must look alike the 1949 and not like this one.

19   This was the label used, as I said, in the late '50s and the

20   '60s and early '70s with this little crest on top of it.

21   Q.  Okay.  Then I'll show you Government Exhibit 8-33.

22   A.  So 1959 Clos de la Roche.  This was the kind of label we

23   used.  This was the kind of vintage we used.  But this is not

24   the wax we used.  This is not made by-- sold by Nicolas.

25   Never.  And this is a copy.  It's very easy for me to see that

DCCBKURT2                    Ponsot - direct

```
 1   it is a copy that has been dirt to make it authentic and old.

 2   Because at that time it was written the name of my father on it

 3   on top of the "Domaine Ponsot." And the paper is different.

 4   It's not the same kind of paper we used.

 5        It's very close. It's a good copy, but it's not

 6   authentic.

 7   Q.  And then I'll show you 8-36.

 8   A.  1966.  So this also can be the original label, well done.

 9   This can be used as well.  But what about this capsule?  Really

10   not the one we used at that time.  We had a plain red, not a

11   flashy one.  And on top of it, all these names of importers, we

12   don't know at all.  We never used Pearson's, one importer in

13   Baltimore.  We never used Walter Eisenberg as a taster.  We

14   have the same importer in USA since the vintage 1934.

15        And I saw one of the-- one of the stickers here say

16   Frank Schoonmaker.

17   Q.  And you're looking at 8-25.

18   A.  Frank Schoonmaker was our first importer.  And it cannot

19   match with '62 because he retired before that, but during a

20   wine we had this guy.  So on some of the old labels we can have

21   a Frank Schoonmaker sticker on it, not on this one.

22        Then, further, Frank Schoonmaker was relative with

23   uncle of someone whose name was Lehman, and Lehman started to

24   take over from Schoonmaker.  And Lehman had also a cousin whose

25   name was Robert Haas.  And they became our importer, one after
```

DCCBKURT2                    Ponsot – direct

1    the other.  It's not the same company, but it's the same

2    family, so to say.  And I'm still having the same wine importer

3    in the USA whose name now is Vineyard Frank and they started

4    with this particular name in 1973.

5    Q.  Okay.  And those are the end of my questions about the 8

6    series exhibits, so these are all from that April 2008 auction.

7         While I have you up here, I'm going to ask you about

8    the bottles that start with the number 9 dash.  These are not

9    from that auction, but these purport to be Domaine Ponsot

10   wines.  And I think what I can do here is show to you that

11   these are three bottles, standard size bottles, that are

12   Government Exhibits 9-6, 9-5, and 9-4.  And they are,

13   respectively, Clos Saint-Denis wines from Domaine Ponsot from

14   1971, 1962 and 1959.

15        Now, just to save time, is there anything about these

16   three bottles together that you can tell us about their

17   authenticity?

18   A.  Well, again, it's very obvious.  The three vintages are

19   anterior to the date that we started to produce, 1982.  So no

20   need to go further on the capsules, which are not genuine, and

21   the sticker and importer.  It just cannot exist.

22   Q.  Okay.  Then we have 9-3, 9-2 and 9-1.  These are larger

23   bottles.  These are magnums.  Is that right?

24   A.  Yes.

25   Q.  These are also Clos Saint-Denis from 1971, 1962 and 1959.

DCCBKURT2                      Ponsot - direct

```
 1   Same result?
 2   A.  Exact.  Exactly the same reason why.  I can attest that
 3   this is not authentic.
 4            MR. HERNANDEZ:  Okay.  Thank you.  May the witness
 5   return?
 6            THE COURT:  Sure.
 7   Q.  Can you take a seat again?  Thank you.
 8            So before you got down to look at the bottles,
 9   Mr. Ponsot, we were talking about that April 2008 auction where
10   your wines were withdrawn from the Acker Merrall auction.
11            Did you ever learn who consigned or tried to sell
12   those lines through Acker Merrall?
13   A.  So after the auction, I had many people coming to talk to
14   me and I learned at that time that the owner of the bottles was
15   Mr. Rudy Kurniawan.
16   Q.  And did you know who Rudy Kurniawan was at the time?
17   A.  I don't know, but I didn't meet Rudy Kurniawan that
18   evening.
19   Q.  Did you meet him ever?
20   A.  Doug Barzelay, that I mentioned earlier, the guy who gave
21   me the advice of it, was there.
22            THE COURT:  At the auction?
23            THE WITNESS:  At the auction.  He was at the auction.
24   A.  And I ask him to try to find out if I can meet the owner.
25   And he said to me, okay, we organize a lunch tomorrow with
```

1   Mr. Rudy Kurniawan, Mr. John Kapon, myself and Mr. Doug

2   Barzelay.

3            So the next day we're at lunch at Manhattan, the four

4   of us, at the restaurant Jean-Georges and I met for the first

5   time Mr. Rudy Kurniawan at that moment, having been introduced

6   to him, and then we sat for lunch.  After the usual salutation,

7   I immediately started to ask the question that I had in mind

8   for several days:  "Where are the bottles coming from?  Can you

9   give me the way you bought them?  Where did you get these

10  bottles?"

11           And so at that moment I saw Mr. Rudy Kurniawan

12  watching his plate and saying "I don't know.  I buy so many

13  bottles that I cannot remember where the bottles are coming

14  from."

15           I was suspecting something bizarre because when you

16  have --

17           THE COURT:  You were?  You personally?

18           THE WITNESS:  Yeah.

19  A.  I was suspecting that something was bizarre because when

20  you have such an answer from someone which can have in his

21  hands 84 bottles of old wines from Domaine Ponsot -- which is

22  very, very rare.  Some other wineries are not that rare, but

23  Domaine Ponsot is very rare.  And myself I have never seen in

24  my life so many old bottles of my winery together in one

25  place.

1        So when you have that, you probably know where they

2    are coming from, especially if you pay a lot of money for these

3    kind of bottles.  You should know where they come from.  So I

4    found it a little bizarre.  But, okay, we went on having lunch.

5    I didn't really insist at that time --

6    Q.  Before you continue on, you said that Rudy Kurniawan was

7    watching his plate.

8        Can you describe what you mean by that and what his

9    demeanor was when you were asking him where he got the bottles

10   from?

11   A.  I had the feeling that he was feeling not very comfortable

12   at that moment.  Just a feeling, but we never from that moment

13   crossed the eyes together.  I don't know how you say in

14   English, but...

15   Q.  Do you mean there wasn't eye contact?

16   A.  Eye contact.  So we had a nice lunch.  I didn't want to

17   insist at that moment.  I wanted to think about it and decide

18   what I would do further.

19   Q.  And did you contact Rudy Kurniawan sometime after the

20   lunch?

21   A.  Yeah, we-- at the end of the lunch, he gave me his e-mail

22   address.  And a bit later, in May, I sent him an e-mail saying,

23   again, hello and can you tell me about the provenance of the

24   wines.

25   Q.  Provenance meaning the history of where they came from?

1   A.  Exactly.

2   Q.  And did Rudy Kurniawan respond to your e-mail?

3   A.  Yeah, he did.  He did respond.

4          MR. HERNANDEZ:  Can we show Mr. Ponsot 36-17?

5   Q.  Please look at 36-17 and tell me if you recognize it.  We

6   can also magnify it if it's hard to read.

7   A.  So in order to have more information, I wanted to talk to

8   him directly.  And I --

9   Q.  Before you explain, though, do you recognize this document?

10  A.  Yeah, I do recognize.

11  Q.  How do you recognize it?

12  A.  It's an e-mail with my e-mail address at that time that I

13  sent to Rudy Kurniawan in June '08.

14  Q.  And he responds to your message?

15  A.  He did.

16         MR. HERNANDEZ:  The government offers 36-17.

17         THE COURT:  I'll allow it.

18         (Government's Exhibit 36-17 received)

19         MR. HERNANDEZ:  Okay.  If we can publish this to the

20  jury.  And I believe the message actually begins at the bottom

21  of page 1.  Well, that's all right.

22  Q.  Okay.  So do you see where it says "From:

23  Laurent@Domaine-Ponsot.com"?  Whose e-mail is that?

24  A.  It's my e-mail.  One of my e-mails.

25  Q.  Okay.  And this message is to ri8@hotmail.com.  Is that the

1  e-mail address that Kurniawan gave you?

2  A.  This is what he gave me.

3  Q.  And it's dated May 16th, 2008.  It begins with "Dear

4  Rudy."

5          MR. HERNANDEZ:  And then if we could see the next

6  page.

7  Q.  Then, if you could just read this message, Mr. Ponsot.

8  Could you read it out loud?

9  A.  Okay.  Well, I wrote "It was a pleasure for me to meet you

10  and to have a chance to talk over an excellent lunch when I was

11  in New York.  I look forward to seeing you if possible, when I

12  am next in Los Angeles, from July 17th to 19th.

13          "After also traveling to Washington and Philadelphia,

14  I have recently returned to Burgundy.

15          "I would like to follow up on our discussion at lunch,

16  as I remain committed to finding whoever is the source of the

17  counterfeit Ponsot wines.

18          "As you had promised, will you please e-mail me the

19  information of who sold you these wines?  I will then be

20  responsible to deal with them.

21          "With warm regards, Laurent Ponsot."

22  Q.  Okay.  And if you could go to the first page of the

23  e-mail, there's a response here from Rudy Kurniawan and the

24  date is-- is that June 5th, 2008?  Is that correct?

25  A.  It is correct.

1   Q.  Okay.  And can you just read what the defendant wrote back

2   to you?

3   A.  Well, he wrote:  "I am replying to you the second time and

4   hopefully you get this, again, I am very excited and would love

5   to have dinner and wines with you in July."

6           "The wines I bought from The Cellar of Pak Hendra in

7   Asia, my cell phone is" -- such -- "if you need any help."

8           "Cheers."

9           MR. HERNANDEZ:  Okay.  And, Mr. Platt, if you can just

10  highlight Pak Hendra.

11  Q.  So from this message, what did you understand the defendant

12  to be saying about Pak Hendra?

13  A.  So I was happy to have a name.  But when you say in Asia,

14  it's quite wide, Asia, so I don't know really what country was

15  that.

16  Q.  Before you explain some more about that, did you meet Rudy

17  Kurniawan again in person any time after this e-mail?

18  A.  Yes.

19          THE COURT:  Could I just interrupt for one second?

20  Had you ever heard, when you received this e-mail, of this Pak

21  Hendra?

22          THE WITNESS:  No, I never heard of this name.  Never.

23  And I can tell you that I sell from Asia from 1982 to many

24  countries and I know quite well the market there.

25  Q.  You testified earlier that when you sell wine, you get to

DCCBKURT2                        Ponsot - direct

1   know a lot of the collectors.  Right?  You testified about that

2   previously.

3   A.  Yes, I did.  Yeah.

4   Q.  And do you know any collectors in Asia?

5   A.  I know a lot of them.  I know many, many collectors in

6   Asia.  And I know, also, wine merchants for sure.

7   Q.  And did you ask around if anyone knew anyone named Pak

8   Hendra?

9   A.  Later on, I did, yes.

10  Q.  Did you then see the defendant in person again?

11  A.  Sorry?

12  Q.  Did you see Rudy Kurniawan in person after this e-mail?

13  A.  Yes, I did.

14  Q.  Was that around July 2008?

15  A.  It was in July, yeah.

16  Q.  And where was it?

17  A.  It was in Los Angeles.  I made a trip to Los Angeles to, so

18  to say, interview him.  But we had nice dinner.  I invited him

19  to Italian restaurant in Los Angeles and he came with some

20  bottles.  I learned later on that he was used to bring bottles

21  when he was invited to dinner.  Own bottles for sure.

22          So I selected one or two bottles that he offered and

23  we drank them.  We had, as I remember, white wine from my

24  winery and another 1955 La Tache from Domaine de la

25  Romanee-Conti.

1              So at that time I was also focused on the source of

2     the wine.

3     Q.  So during that dinner, did you again ask Kurniawan what the

4     source of the wines was?

5     A.  Well, he gave me a name, so I wanted to know more.  So when

6     I ask, "Can you give me more details on it?" he gave me two

7     phone numbers on a piece of paper.  He wrote it down on a piece

8     of paper saying this is in Jakarta.

9              THE COURT:  So this relates now to the wine that was

10    sought to be sold at the auction?

11             THE WITNESS:  Exactly.

12             THE COURT:  This is the conversation?

13             THE WITNESS:  This is the conversation, yeah, on the

14    wines of the auctions.

15             THE COURT:  And is it just the two of you at this

16    dinner?

17             THE WITNESS:  Exactly, the two of us.

18    Q.  When you were asking Kurniawan for more information, what

19    was his demeanor?

20    A.  Well, as he gave me already a name, he was less

21    uncomfortable than the first time we met.  Then he gave me two

22    phone numbers.

23    Q.  Okay.

24    A.  So I was thinking that I should be happy with that.

25    Q.  You said the numbers were in Jakarta?  That's Indonesia?

DCCBKURT2                        Ponsot - direct

```
 1   A.  This is what he said, yes.

 2             MR. HERNANDEZ:  And if we can look at 36-1 for the

 3   witness.

 4   Q.  Do you recognize 36-1?

 5   A.  I do recognize.  It is a copy of the two phone numbers that

 6   I gave you.

 7   Q.  Okay.  And who did you get these two phone numbers from?

 8   A.  I got it from Rudy Kurniawan at the restaurant.

 9   Q.  In July in Los Angeles?

10   A.  In July in Los Angeles.  Restaurant is Il Grano.

11   Q.  So these are the two numbers he wrote down to you and gave

12   you and he said these were the source of the wines from the

13   April 2008 auction?

14   A.  This is exactly that.

15             MR. HERNANDEZ:  Government offers 36-1.

16             THE COURT:  I'll allow it.

17             (Government's Exhibit 36-1 received)

18             MR. HERNANDEZ:  If we could publish that to the jury.

19             THE COURT:  So this is not your handwriting?

20             THE WITNESS:  Sorry?

21             THE COURT:  This is not your handwriting?

22             THE WITNESS:  No, no.  I saw Rudy Kurniawan writing--

23   writing this note in front of me on the table.

24   Q.  All right.  So these are the two numbers you testified

25   before about that he gave you to reach the source of those
```

1    counterfeit wines?

2    A.   Yes.

3    Q.   Now, after the dinner was over, did you try to call either

4    of these numbers?

5    A.   I did try.

6    Q.   What happened?

7    A.   Several times for one of them because-- had no answer.

8    Only once to the other one because it was-- the noise at the

9    end was like a fax machine.  So I said if a fax, I cannot

10   reach.  And I don't want to write a message by fax to someone I

11   don't know.  So I gave up with the other.

12          I must admit I don't remember which was which, but I

13   tried both and one was having never an answer.

14   Q.   What was your reaction when neither number worked?

15   A.   Well, my reaction was that Rudy Kurniawan was lying to me

16   again, saying that it's from Jakarta.  The phone number doesn't

17   reach.  I learned from friends in Singapore that Pak --

18          MR. MOONEY:  Objection, hearsay.

19          THE COURT:  Overruled.

20   Q.   You may continue.

21   A.   Pak was meaning Mister and Hendra is a familiar name very

22   common in Indonesia.

23   Q.   So Pak is the equivalent of Mister in English?

24   A.   Yes.

25   Q.   And Hendra is a very common name?

DCCBKURT2                        Ponsot - direct

1  A.  Very common name.

2           MR. HERNANDEZ:  Your Honor, at this time we have a

3  stipulation that's related to one of these phone numbers that

4  I'd like to read into the record.  I know there's an exhibit

5  related to it.  We'll leave the phone numbers up and I can just

6  read the-- well, actually, let me backtrack there.

7           This stipulation has some pretty technical language in

8  it because it has web addresses.  Could we put this up on the

9  screen as I read it and then, when we get to that technical

10 point, just refer to the stipulation?

11          THE COURT:  Sure.

12          MR. HERNANDEZ:  So that we don't have to-- you'll see

13 it's pretty confusing.

14          THE COURT:  This is a stipulation again between the

15 government and the defense.  Right?

16          MR. HERNANDEZ:  It is.  It is.  It's 29-6.

17          So if Mr. Platt can pull it up and when we get to that

18 part, it's on the second page, I'll note it.

19          It says:  "It is hereby stipulated and agreed by and

20 among the United States of America, by Preet Bharara, United

21 States Attorney for the Southern District of New York, Joseph

22 P. Facciponti and Jason P. Hernandez, Assistant United States

23 Attorneys, of counsel, and Rudy Kurniawan, the defendant, by

24 and with the consent of his attorneys, Jerome Mooney, Esquire

25 and Vincent Verdiramo, Esquire, that if called to testify, the

DCCBKURT2                    Ponsot - direct

office manager at the Internet Archive, located in San

Francisco, California, would testify as follows:

         "1, the Internet Archive is a website that provides

access to a digital library of internet sites and other

cultural artifacts in digital form.  Like a paper library, we

provide free access to researchers, historians, scholars, and

the general public.  The Internet Archive has partnered with

and receives support from various well-known institutions and

libraries, including the Library of Congress.

         "2, the Internet Archive has created a service known

as the Wayback Machine.  The Wayback Machine makes it possible

to surf more than 240 billion pages stored in the Internet

Archive's web archive.  Visitors to the Wayback Machine can

search articles by URL (i.e., a website address).  If archived

records for a URL are available, the visitor will be presented

with a list of available dates.  The visitor may select one of

those dates, and then begin surfing on an archived version of

the web.  The links on the archived files, when served by the

Wayback Machine, point to other archived files (whether HTML

pages or images).  If a visitor clicks on a link on an archived

page, the Wayback Machine will serve the archived file with the

closest available date to the page upon which the link was

appeared and was clicked.

         "3, The archived data made viewable and browsable by

the Wayback Machine is compiled using software programs known

DCCBKURT2                         Ponsot - direct

as crawlers that surf the web and automatically store copies of

website files, preserving these files as they exist at the

point of time of capture.

          "4, The Internet Archive assigns a URL on its site to

the archived files in the format" -- and this is where I'm

going to pause, your Honor.  It goes on to list the different

formats in a website URL.  And I'll pick up with "Thus, the

Internet Archive URL"-- and then it goes on to list a long URL.

Picking up with the stipulation, "would the URL for the record

of the Internet Archive home page HTML file"-- in parens the

name of the website-- "archived on January 26, 1997 at 4:58

a.m. and 28 seconds."  And then the same format in parens that

I'll skip over.

          Picking up with the stipulation, "A web browser may be

set such that a printout from it will display the URL of a web

page in the printout's footer.  The date assigned by the

Internet Archive applies to the HTML file but not to image

files linked therein.  Thus images that appear on the printed

page may not have been archived on the same date as the HTML

file.  Likewise, if a website is designed with 'frames,' the

date assigned by the Internet Archive applies to the frameset

as a whole, and not the individual pages within each frame.

          "5, Government Exhibit 36-16 is a true and accurate

copy of a printout of the Internet Archive's records of the

HTML files for the URLs and the dates specified in the footer

DCCBKURT2                      Ponsot - direct

1    of the printout.

2            "It is further stipulated and agreed that Government

3    Exhibit 36-16 and this stipulation may be received into

4    evidence at the trial of the above-referenced matter.

5            "Dated:  December 5th, 2013."

6            Signed by the government and counsel for the

7    defendant.

8            So at this time we offer 29-6 and 36-16 into evidence.

9            THE COURT:  I'll allow it.

10           (Government's Exhibits 29-6 and 36-16 received)

11           MR. HERNANDEZ:  And, Mr. Platt, if you can pull up the

12   previous Exhibit 36-1.  And this is a split-screen situation,

13   if we could.  And focus in just on the phone numbers.  And then

14   pull up 36-16.  And if you could just zoom in on the very top

15   where it says Lion Air, the part where there's a graphic.

16   Thank you.

17   BY MR. HERNANDEZ:

18   Q.  Okay.  This is 36-16, the document that's just been

19   admitted.  Lion Air is an airline according to this web page.

20           MR. HERNANDEZ:  And then if you could just back out

21   and then focus in where it says "Product & Service" in the

22   paragraph down below.  Actually, if you could just focus in on

23   the text itself.  Just make it even closer.  Is that as close

24   as we can go?  Well, that's fine.

25           If you can highlight the last number in bold on the

1    right.  And I'd just ask the jury to compare the first number

2    in 36-1, which the defendant gave to Mr. Ponsot, to the number

3    listed on the Lion Air web page on the right.

4            Mr. Platt, for the page on the right, this is the Lion

5    Air page, if you could just focus in on above the graphic that

6    says "Lion Air."  That's where it says "Wayback Machine."  Give

7    us that whole bar.  And if you could just focus in on that

8    green font on the right.  It shows that the Wayback Machine

9    retrieved this copy of the Lion Air web page, an archived copy,

10   on July 13, 2008.  So that's the way the Lion Air page would

11   have appeared at that time.

12   BY MR. HERNANDEZ:

13   Q.  And, Mr. Ponsot, remind us again, when was the lunch, what

14   month and year, when the defendant gave you these two phone

15   numbers?

16   A.  It was July 2008.  I guess the 19th.

17   Q.  Thank you.

18           All right.  Mr. Ponsot, picking up with where we were

19   before I read that stipulation, did you see the defendant, Rudy

20   Kurniawan, again after that July 2008 lunch?

21   A.  Yes, I did.

22   Q.  When was that?

23   A.  It was in May 2009, again in Los Angeles and again at a

24   dinner.

25   Q.  Okay.

1    A.   That I organized myself.

2    Q.   And was anyone else present?

3    A.   No, it was just the two of us.

4    Q.   Did you ask the defendant any questions about Pak Hendra,

5    the phone numbers that he gave you or the source of the

6    counterfeit wines?

7    A.   Yeah.  Well, I said to him that what he gave me is not

8    something that I can follow and I could not reach any person.

9    I didn't know about what the phone number at that time, but I

10   could not reach anyone.  I say, "Well, give me the more

11   information.  Give me the real truth now."  And I was a

12   little more -- not aggressive, always kind, but more firm in

13   asking.  So we had this dinner gently.  I'm not an aggressive

14   person, never.  And I wanted to know.

15            So at the end I was a little more giving pressure to

16   him and saying, "Now you have to tell me the truth."  He

17   promise that the next day by return he would send me an e-mail

18   with all of the names of the providers, and I still wait until

19   today.

20   Q.   So you never received the e-mail?

21   A.   Never.

22   Q.   Now, after the Domaine Ponsot wines were removed from that

23   Acker auction in April of 2008, did you do anything on your own

24   to investigate counterfeit wines in the marketplace?

25   A.   Yes, I did.  When we had the lunch at Jean-George, I

DCCBKURT2                     Ponsot - direct

1    understood that there is something behind that.  I mean, you

2    cannot find so many old bottles which are not accurate and, I

3    would say, fake.  They are fake.  So I wanted to understand.

4           I mean, This is-- when you are a winemaker and when

5    you see your bottles faked, the first idea you have is a bit of

6    glory.  You say, Wow, somebody is counterfeiting my wines?  It

7    means my wines are at a good level.  So this is a human being.

8    Everyone that is a winemaker when he has this problem goes

9    through the same feeling.  But very quickly I said to myself,

10   yes, but someone one day will open a bottle and he will be

11   disappointed because it's not the wine I made and this is not

12   good for the reputation of the winery.

13          But on top of it -- and this is what my idea was --

14   it's dirtying the spirit of the appellations of Burgundy.  What

15   I didn't mention when I showed you the map is in Burgundy, 70

16   kilometers long, 1 kilometer wide, you have 1,250 different

17   appellations.  I think you know now what an appellation is.

18   It's a type of wine.  So 1,250 on a very small surface.  This

19   is what we call the terroir.  There is no translation in

20   English.  Terroir means location.  Terroir is t-e-r-r-o-i-r.

21   Even though the connoisseur in English use this word, terroir.

22   This means the location where the vine is growing, where the

23   wine is produced.  Due to all of the elements that nature gave

24   us plus the human being that is in the middle as an element of

25   the chain between the roots of the vine and the glass of wine.

1          So this is very important to say.  And through the

2     fake bottles, I think that this spirit, this unique thing on

3     the planet, is dirt.  My idea was to try to wash the integrity

4     of the terroir of Burgundy.

5          So I decided -- I said sometimes that I was starting a

6     crusade against the fakers.  This is kind of.  But when I

7     started, I was more like a Don Quixote with the windmills.  I

8     didn't know what I could find on the way.  Maybe nothing.  I

9     was feeling a bit naive probably at the beginning, but I

10    started to investigate.

11         And my system of investigation was very simple.  I

12    know a lot of the wine trade, of the people that are drinking

13    wines.  So I went to all invitations possible to try to drink

14    the most possible wines.  And when I found one suspect, follow

15    the link, try to find out where the wine is coming from and so

16    and so.  So I did it during almost two years.

17    Q.  And --

18    A.  I did it.  It was not my job.  I am a winemaker.  But each

19    time I had the opportunity, I did it.  And sometimes I did it

20    on purpose.  I made a trip specifically to go to a place where

21    I could maybe find something.  So this is what I did during

22    almost two years.

23    Q.  And during that period, did you have to spend any money to

24    do those investigations?

25    A.  Yeah.  Well, I did spend money because when I had to fly to

DCCBKURT2                        Ponsot - direct

1    Singapore or to Los Angeles or to someplace like that and take

2    a hotel room and rent a car.  I estimate my costs from the

3    beginning of my investigation to today at 120,000 euros.

4           MR. HERNANDEZ:  No further questions.

5           THE COURT:  Do you want to take a two-minute break?

6    Okay.  We'll take a break and then we'll have

7    cross-examination.

8           (Recess)

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Dccdkur3                     Ponsot - cross

```
 1              (Jury not present)
 2              THE COURT:  Did you say that there was a housekeeping
 3    issue?
 4              MR. HERNANDEZ:  There is, just in terms of scheduling,
 5    your Honor, for today.
 6              THE COURT:  OK.
 7              MR. HERNANDEZ:  The next witness after Mr. Ponsot is
 8    Christopher Roumier, and then --
 9              THE COURT:  And he is here?
10              MR. HERNANDEZ:  And he is here.
11              We may not go exactly 12:45 for lunch, because then we
12    have another witness who is short and then another witness who
13    needs to start at 2.  He is not available until 2.
14              THE COURT:  So, actually, it would help me because I
15    have a meeting.  If we stopped at 12:30, would that help you?
16              MR. HERNANDEZ:  I think it would.  I am just letting
17    the Court know that we may need a little bit shorter lunch
18    break.  It is only because a small logjam of witness but we are
19    going to clear it this afternoon.
20              THE COURT:  Well, it wouldn't be shorter.  It would
21    actually be longer, but there is nothing I can do about that on
22    the back end.
23              So my proposal to you is we stop here at 12:30 and
24    resume at 2 o'clock.
25              MR. HERNANDEZ:  Well, we would like to use up as much
```

Dccdkur3                          Ponsot - cross

```
 1    time as we could.  It just means that --

 2              THE COURT:  There is a meeting I have between 1 and 2

 3    that I have to go to.

 4              MR. HERNANDEZ:  Great.  I am saying that the lunch

 5    hour I'm not suggesting that we change.  It is just that we

 6    have a witness who needs to start basically at 2.  And if it

 7    means interrupting a witness, if the Court is amenable --

 8              THE COURT:  No problem.

 9              MR. HERNANDEZ:  -- we could put him on.

10              THE COURT:  Just as a heads up, so my 2 o'clock

11    meeting could run over a little bit.  It is a Board of Judges

12    meeting, so I have to be at that.

13              But, yeah, I have no problem with taking witnesses out

14    of turn starting --

15              MR. HERNANDEZ:  Great.

16              MR. MOONEY:  We are good with that.  We are good with

17    stopping at 12:30.

18              THE COURT:  Just one question for -- one comment for

19    the media.  Just something to think about.

20              At the end of the day, when the jurors go out, the

21    jurors are hearing -- I don't know if it is media or not, but

22    the jurors are hearing, or have heard, as they go to the

23    elevator people talking about the case.  And so they worry

24    because my rule is don't be around people talking about the

25    case.
```

Dccdkur3                          Ponsot - cross

1          So if you do -- you don't have to answer now -- one of

2     two things.  Either you could stay in here until they have gone

3     down in the elevator, or you could make sure that you are not

4     talking about the case within the earshot of the jury.  But in

5     any event, just heads up.  OK?  So, yes.

6               (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Dccdkur3                              Ponsot - cross

1              (Jury present)

2              THE COURT:  Please be seated, everybody.

3              If I might, Mr. Mooney, I have two sort of background

4    questions, if I might ask the witness before you start?

5              MR. MOONEY:  Certainly, your Honor.

6              THE CLERK:  Judge.

7              Sir, I would just like to remind you, you are still

8    under oath.

9              THE WITNESS:  Sorry?

10             THE CLERK:  You are still under oath, providing sworn

11   testimony.

12             THE WITNESS:  Yes.

13             THE COURT:  So if you could just explain -- you have

14   seen the bottles and there are different sizes on that table.

15   And we've also seen before you arrived yesterday and the day

16   before even bigger bottles.

17             And could you just sort of generally tell us, is there

18   a rationale for when wine is in a small bottle or a bigger

19   bottle or yet a bigger bottle still, and what that rationale

20   is?

21             THE WITNESS:  Well, usually people were bottling in

22   what we call the 750 milliliter bottles, which is the actual

23   main bottles you see -- in quantity you see on the table.

24   Every winery that was estate bottling would put some wine in

25   larger formats only, I would say, 2, 3, maximum 10 percent of

Dccdkur3                          Ponsot - cross

1    the appellation of one specific vintage.  And the much bigger

2    formats, like Jeroboam and Methuselah, which are all

3    multiplications of the size of the bottle, a magnum is twice as

4    big as a bottle, Jeroboam is four times, and the Methuselah is

5    eight times.  So this is really made very rarely.

6           For example, in our winery, we started the Jeroboams

7    and Methuselahs with vintage 1993.  Neither my father nor my

8    grandfather would ever bottle in these big formats, but magnum,

9    yes.  This is traditional in Burgundy to bottle a little of the

10   wine in magnum.  The magnum has the capacity to age better than

11   the bottle because you have double quantity, volume, with the

12   same surface of cork.  So the oxygenation, that I said earlier,

13   is slower in a magnum so the wine can age longer.

14          So we would put the wine in the bottles to drink

15   earlier and leave the magnums laying down in cellars, drink

16   them later.

17          THE COURT:  Thank you.

18   CROSS-EXAMINATION

19   BY MR. MOONEY:

20   Q.  And maybe just to stay with that theme for a second.  If

21   you go back to the early periods of the vineyards, most of the

22   vineyards would primarily, particularly in Burgundy,

23   particularly put the wine and sell it in barrels, is that true?

24   A.  Yeah, they were sold in barrels.

25   Q.  And so if you go back -- and I think you said '32 was the

Dccdkur3                      Ponsot - cross

1    first year that your records show that Ponsot was doing estate

2    bottling?

3    A.  Exactly.

4    Q.  But it is not the first year that they were producing wine?

5    A.  No, it was not.

6    Q.  You were producing wine out of the Burgundy region going

7    back to the 1800's, is that right?

8    A.  1872.

9    Q.  And so at least the commercial wine, most of the commercial

10   wine that was being sold during that period of time, would be

11   put into barrels and then the barrels would be sold to

12   negociants?

13   A.  Exactly.

14   Q.  And then the negociants would be the ones who would then

15   bottle the wine, is that true?

16   A.  Exactly.

17   Q.  Now, at the vineyard -- you still had bottles back in those

18   early periods, didn't you?

19   A.  Not before 1932.

20   Q.  No bottles at all; you didn't put any bottles to consume

21   for yourself?

22   A.  No.

23   Q.  No bottles that were sold to restaurants?

24   A.  Nope.  Never.

25   Q.  So, of course you weren't there in 1932, were you?

1   A.  I was not there, yeah --

2   Q.  I know I wasn't.

3   A.  Regarding, we know what --

4   Q.  But there is no records to show anything going out to

5   restaurants or anybody at that period of time?

6   A.  No.

7   Q.  For at least for Domaine Ponsot?

8   A.  No, we have no record specifically on that.

9   Q.  You showed us a picture of some of the wines that you still

10  have kept inside of the library or the archives.  And the

11  bottle that we saw, when we saw an individual bottle -- I

12  couldn't tell, was that a bottle or was that a magnum that we

13  were looking at?

14  A.  I think it was a bottle.

15  Q.  OK.  And there was no label on that bottle, was there?

16  A.  No.

17  Q.  And when you bottle wines to keep inside the vineyard,

18  those bottles originally are not labeled, are they?

19  A.  No.

20  Q.  Once you label a bottle, you are taxed on it, is that

21  right?

22  A.  We do?

23  Q.  Don't you become taxed on the bottle under French law once

24  you put a label on the bottle?

25  A.  No.

Dccdkur3                          Ponsot - cross

1    Q.  So that is not true?

2    A.  No.

3    Q.  But you do keep bottles around the vineyard that don't have

4    labels on them?

5    A.  Yes.  We keep it in the cellar, as we say, naked.

6    Q.  And when the label goes on is when the bottle leaves the

7    vineyard?

8    A.  Exactly.

9    Q.  Unless you give it to a friend or pass it on to someone?

10   A.  Be even if we give a bottle to a friend, if we share a

11   bottle with a friend, we put a label on.

12   Q.  But even then you are going to label; it, is that what you

13   are saying?

14   A.  Exactly..

15   Q.  And the label that you are primarily concerned about, of

16   course, is something down here on the bottom that would

17   identify the information that you gave us about what the wine

18   was.

19          (Pause)

20          And was that a yes?

21   A.  Yes.

22   Q.  I'm sorry.  This is being taken down so you have to answer

23   out loud.

24   A.  Yes.  Clearly.

25   Q.  Thank you.  Then, of course, you would also want to put the

Dccdkur3                          Ponsot - cross

 1    vintage up on it, is that correct?

 2    A.   On some of the vintages, yes.   Some other vintages, it was

 3    written directly on the label.

 4    Q.   Right.   So this combination of label and estate, the

 5    vintage is separate?

 6    A.   Yes.

 7    Q.   But some of the others that you showed us on the Clos de la

 8    Roche, the vintage was right there on the label itself?

 9    A.   Exactly.

10    Q.   So all you needed in that case would be just the one label?

11    A.   Yes.

12    Q.   Then after it leaves you, other people who start handling

13    the wines might add stickers to it, is that right?

14    A.   Might what?

15    Q.   Put stickers on them.

16    A.   Yes, stickers.

17    Q.   Other people --

18    A.   Stickers, yes.

19    Q.   For example -- and I understand that you've already said

20    that what's on here does not appear to be your wine.   So I am

21    not implying anything different by asking you questions about

22    it.   OK?

23    A.   OK.

24    Q.   So, for example, if we look at Exhibit 8-26, it has a green

25    sticker up here at the top.   And it talks about a -- I've got

Dccdkur3                        Ponsot – cross

1    to get my glasses.

2              Maybe you can read it.  Whose sticker is that at the

3    top?  I think you recognized it before, didn't you.

4    A.  Frank Schoonmaker.

5    Q.  OK, Schoonmaker.  And you know who that is?

6    A.  I know.  I never met this guy because he died before I was

7    born but I know him.

8    Q.  And what, for example, would that company do?

9    A.  Importing wine.

10   Q.  So if they had gotten wines from Ponsot and then imported

11   them someplace, then they would add their sticker label?

12   A.  They would add then that.

13   Q.  And it looks like this one has been Scotch taped on there,

14   doesn't it?

15             But you are saying that that sticker on this bottle

16   doesn't fit with what we see on the label?

17   A.  No.  Absolutely not.

18   Q.  The timing is out of whack somehow?

19   A.  Yes.

20   Q.  Is that because the Frank Schoonmaker comes afterwards or

21   comes before?

22   A.  No.  He was the first to import my grandfather's wines in

23   the early '30s.

24             THE COURT:  How does that work?  Do you sell the wine

25   to the importer, or is the importer just an agent?

Dccdkur3                        Ponsot - cross

1              THE WITNESS:  No.  We sell to the importer.

2              THE COURT:  So the importer then sells it to U.S.?

3              THE WITNESS:  Ship it to U.S., and then from there

4    sells to the market directly.

5    BY MR. MOONEY:

6    Q.  And then, for example, on Exhibit 8.29, we've got another

7    importer's sticker that's been added to that bottle.

8    A.  Yeah.  This I don't know even the name.

9    Q.  Right.  But once the wines left the vineyard, once you've

10   sent it out, you sold it off to somebody, you don't know what's

11   going to happen in terms of who adds their stickers along the

12   way as it passes through their hands, is that it?

13   A.  That's for sure.

14   Q.  You don't put serial numbers on your bottles, do you?

15   A.  Not at that time.  We do now.

16             THE COURT:  And "at that time," you mean when?

17             THE WITNESS:  Everything you have on the table.

18             THE COURT:  At that time, you did not?

19             THE WITNESS:  No.  We started that within the vintage

20   2007.

21   BY MR. MOONEY:

22   Q.  So very recently?

23   A.  Very recently.

24   Q.  You also said that prior to 1985 you did not use wax --

25   A.  No.

Dccdkur3                         Ponsot - cross

1    Q.   -- capsules?

2    A.   No.  We did not.

3    Q.   And the capsules that you used were just the foil?

4    A.   It was a foil.

5    Q.   And I think you've told us that, for example, if we look at

6    these two, you didn't use a bright colored foil for that?

7    A.   No.  Plain red.

8    Q.   And you used something more like this capsule?

9    A.   More like this.

10   Q.   And does this look like it is a correct capsule in 8.26 --

11   8-26?

12   A.   Yeah.  This is kind of -- normally it is a little more

13   Burgundy color than this one, but it's the kind of foil.

14   Q.   But then starting in 1985, you started putting wax capsules

15   on them?

16   A.   Only on the old bottles that have been reopened, refilled,

17   to store in the library, not systematically to the others.  We

18   went on using foil.

19   Q.   So did you take everything that was in the library in 1985

20   and open it and reseal it and rewax it?

21   A.   Yes, everything which was before 1970.

22   Q.   So anything that left the vineyard after 1985 would have --

23   that was pre-'70, or '70 or before, would have a wax capsule on

24   it, is that right?

25   A.   If we sold something after 1985 out from the Domaine which

Dccdkur3                          Ponsot - cross

1   was pre-1970, it would wear the wax.

2   Q.  And, in fact, you sold a good number of those wines?

3   A.  Not that I remember.  I told earlier that we didn't have a

4   lot of old bottles in the library.  So we tried to keep it and

5   drink it with the family or with friends.  I made only one

6   auction one day myself in which I they have some of these

7   bottles.  And we made special labels for this auction.

8   Q.  Didn't you sell a bunch of wine to Christie's?

9   A.  No.

10   Q.  In February of 2000, didn't the Domaine sell a number of

11   '49, '50 and earlier -- well, strike that.

12        Didn't you sell in February of 2000 a good number of

13   pre-'85 wines --

14   A.  Yes, we did.

15   Q.  -- at an auction at Christie's?

16   A.  Not Christie's.

17   Q.  Not Christie's.  Sotheby's?

18   A.  Sotheby's.

19   Q.  I'm sorry.  OK.

20   A.  But these wines were wearing a special label.

21   Q.  And those included two Methuselahs?

22   A.  Yes.

23   Q.  How big is a Methuselah?

24   A.  It is eight times a bottle.

25   Q.  And it included at least nine Jeroboams?

Dccdkur3                    Ponsot - cross

1   A.  I don't remember exactly but this is possible.

2   Q.  And there is no Methuselahs or Jeroboams sitting on this

3   table, are there?

4   A.  No.

5   Q.  A Jeroboam is at least twice as big as this?

6   A.  Exactly.

7   Q.  And a Methuselah?

8   A.  Four times.

9   Q.  Is four times as big as this?

10  A.  As a magnum.

11  Q.  Which means it's eight times as much as this?

12  A.  Exactly.

13  Q.  "This" being the 750, the regular bottle.

14          Do you ever recondition or recork wines for people who

15  have your wines?

16  A.  No, we don't.  We have done that only once in the winter

17  1985.

18  Q.  So if I've got an old Ponsot, I can't bring it back to you

19  and have it reconditioned or recorked?

20  A.  No.  You can bring it to me to authenticate but not to

21  recondition.

22  Q.  OK.  In fact, your recommendation is probably that I just

23  drink it, right?

24  A.  Do what you want.

25  Q.  That's what this is designed for, isn't it?

Dccdkur3                         Ponsot - cross

1   A.  The wine is be made to be drunk, that's for sure.

2   Q.  And when we don't drink it and we leave it sitting around,

3   bad things can start to happen to it, right?

4   A.  If you drink too much.

5   Q.  Well, that's true, too.  But, for example, looking at 8-22,

6   I mean, what's wrong with that bottle even if it was right?

7   A.  Well, if it's a real wine.

8   Q.  Even if it was real, even if that was real, what is wrong

9   with it?

10  A.  What was wrong?

11  Q.  Yes.  Is there anything wrong with --

12  A.  Oh, yeah.  The neck.  The neck is wrong.  A 1945 with such

13  a neck, if it is a real bottle, I buy it immediately.  It is

14  impossible that the 1945 has such a small -- the neck, for the

15  jury, is the air, the surface of air inside the bottle.  I said

16  that through the cork the wine breathes, so to say, and the air

17  gets in and the wine is going out by evaporation.  So when you

18  have a '45, a good '45, the neck would be here, not here.  This

19  is a really good bottle.

20          It can happen.  It is rare.  But when you have that,

21  this is a really good bottle.  Unfortunately, this one is not

22  real.

23  Q.  And this one is leaking, isn't it?

24  A.  It is leaking on top, yeah.

25  Q.  And that is bad?

Dccdkur3                          Ponsot - cross

```
1    A.  That is bad.  It has been exposed to heightened pressure.
2    Q.  And if it is leaking, it also tends to be that more oxygen
3    stays inside and --
4    A.  Yes.
5    Q.  Now, you said that another problem that you saw with these
6    wines is that the capsules have been cut in many circumstances.
7         Do you know why capsules are frequently cut from old
8    wines?
9    A.  There is absolutely no reason you cut a capsule from the
10   bottom.  When you cut a capsule is to open the bottle, to make
11   the cork free to be opened by a corkscrew.  The only reason why
12   you would eliminate the bottom of the capsule is to see what
13   the cork is saying.
14        It can happen in your cellar when you have a -- when
15   the label is a little wet and difficult to read.  Then you can
16   do that, to see if there is a print on the cork saying the
17   vintage and the name of the winery.  Otherwise, you have to do
18   that to check.
19   Q.  But if you've got questions about what you are seeing and
20   you want to look at the cork, it is hard to see the cork if the
21   capsule is not cut, isn't it?
22   A.  Yes.  For sure.
23   Q.  So some experts sometimes will actually cut the capsule to
24   take a look?
25   A.  Some experts are doing that, for sure.
```

Dccdkur3                         Ponsot - cross

```
 1              THE COURT:  So when you open a bottle of wine, you cut
 2      the capsule at the top?
 3              THE WITNESS:  At the top.
 4              THE COURT:  And then --
 5              THE WITNESS:  And then you put the corkscrew in and
 6      you extract the cork, or you eliminates the whole capsule.
 7      BY MR. MOONEY:
 8      Q.  So you don't know when these capsules got cut?
 9      A.  No, I don't know.  But I say that this is also a way to see
10      if the cork is marked.  If it is not, you can use the bottle
11      for something else.
12      Q.  Does Domaine Ponsot mark its corks?
13      A.  We do.  We do.  And we have the name and appellation and
14      vintage from the vintage 1986, not before.  Before we had only
15      the name Domaine Ponsot and the prices we paid.
16      Q.  From the time it started doing estate bottling in '32, did
17      it have the regular name on the -- the name of Ponsot on the
18      cork?
19      A.  I don't know.  I'm not sure.
20      Q.  You do know that most of Burgundy was using just generic
21      corks?
22      A.  Generic corks.  And our reason most of the Domaine estates
23      bottle, many of these people would not expect one day to be
24      faked, so they didn't take any precaution.
25      Q.  Do you know when Domaine Ponsot started using corks that
```

Dccdkur3                    Ponsot - cross

1    had the names on them?

2    A.  I don't know, really.

3    Q.  So if we look at a 1959 Ponsot Denis that somebody has cut

4    to expose the cork, which you've already told us that there

5    would be no reason at all to cut the capsule on this bottle,

6    would there?

7    A.  Except to look to see what kind of wine it is, if it is

8    eventually written on the cork.

9    Q.  To see if it says something other.  Because that couldn't

10   be a Domaine Ponsot, could it?

11   A.  It cannot be a Clos St. Denis because it is an earlier

12   vintage.

13          But you see this magnum with no label, you just have a

14   capsule.  You eliminate the capsule, you see that the cork is

15   not -- there is nothing written on the cork.  So you can use

16   this bottle to produce another wine.

17   Q.  Now, there was Clos St. Denis prior to --

18   A.  1982 is the first vintage.

19   Q.  Of Ponsot?

20   A.  Of Domaine Ponsot.

21   Q.  But there was Clos St. Denis wine?

22   A.  Oh, for sure.

23   Q.  The vineyard existed?

24   A.  It exists.

25          And something I didn't say to the jury is that an

Dccdkur3                    Ponsot - cross

1    appellation can be divided in many owners.  Not only Domaine

2    Ponsot is producing Clos de la Roche or Clos St. Denis but

3    several.  The best example is the Clos de Vougeot, which is one

4    property which is owned by 85 owners or 50 hectares.  So each

5    owner has a little part.  And each one has the right to put his

6    label on the wine he is producing from this particular

7    appellation.

8            So, for sure, Clos St. Denis was existing before us.

9    When we got the vineyard, it was planted since 1905, a very old

10   vine.  So we went on farming and making the wine, but someone

11   else did it before.

12   Q.  You didn't come in in 1982, tear up all the vines and plant

13   new vines?

14   A.  No.  It was planted from 1905.  It is one of the oldest

15   vines still existing in Burgundy.

16   Q.  I think you told us that originally your grandfather would

17   sign his name on the labels of the bottles?

18   A.  Yeah, he did.

19   Q.  Did he sign his name on the labels before they went onto

20   the bottles or after they were on the bottles?

21   A.  No.  Before that.

22   Q.  Before that?

23   A.  In his armchair --

24   Q.  He would sit there and sign them in front of the fireplace?

25   A.  In front of the fireplace at night instead of watching TV.

Dccdkur3                    Ponsot - cross

1    Q.  And that is something that you remember from being a child?

2    A.  Yeah.  I saw him many times doing it.

3    Q.  And I don't want to be indelicate but what is your

4    birthday?

5    A.  1954.

6    Q.  1954.  So from sometime after 1954, you remember that

7    practice going on?

8    A.  Well, I was very young and I still have a vision of my

9    grandfather doing it.

10   Q.  Sure.  And --

11   A.  But he quit in 1958 his job of winemaker.

12   Q.  So there would not be any signed by him after 1958?

13   A.  No.  Last vintage.

14   Q.  And, of course, you don't know if every year leading up

15   until 1958 he signed every last label that went out?

16   A.  No, I don't know.

17   Q.  You said that Domaine Ponsot never dealt with Nicolas, is

18   that correct?

19   A.  It is correct.

20   Q.  Did you deal with another company by the name of

21   Remoissenet?

22   A.  Never.

23   Q.  Never sold to them?

24   A.  Never.

25   Q.  Who were the negociants that Ponsot sold to -- Domaine

Dccdkur3                    Ponsot - cross

1    Ponsot sold to?

2    A.  We didn't sell to negociants; we sold to wine merchants.

3    Q.  Prior to 1932, before you did estate bottling, I thought

4    you said you sold to negociants?

5    A.  No, I didn't say that.

6    Q.  You sold directly to merchants?

7    A.  No.  We at that time, another branch of the family was

8    owning restaurants.

9    Q.  So you sold only to restaurants prior to 1932?

10   A.  The restaurants of the family.  We sold the barrels to the

11   restaurants of the family, which was in Northern Italy.

12   Q.  So you would sell it in barrels to restaurants?

13   A.  To the restaurants.

14   Q.  But not in bottles to restaurants?

15   A.  Not in bottles.

16   Q.  You don't know then what the restaurants did with it after

17   they got it?

18   A.  They probably bottled it, surely.  But you cannot sell then

19   the wine to clients in the restaurant from the barrel directly.

20   Q.  How many different restaurants were you selling to at this

21   point in time?

22   A.  My ancestors were owning all the railway station

23   restaurants in Northern Italy.  So they had something like ten

24   different restaurants in all the northern cities of Italy.  My

25   ancestors -- French ancestors, wearing the name of Ponsot

Dccdkur3                          Ponsot - cross

Freres, Ponsot Brothers.

Q.   And did none of the wines stay at the vineyard at all prior
to 1932?

A.   I guess, my ancestor was keeping for drinking himself, but
I have no recall of that.

Q.   You would think that they would keep some to drink,
wouldn't you?

A.   He was a good drinker, as I said.

Q.   I mean, you tend to drink your own product when you can,
don't you?

A.   Exactly.

Q.   And share it with some of your other friends?

A.   And I don't pass my turn.

Q.   You would be invited less often if you never brought any of
yours, right?

A.   Well, I don't need to bring.  When I'm invited, people have
already my wine.  And sometimes I am a little fed up drinking
always the same wines, mine.

Q.   So one of the things that tends to happen is when you get
invited to dinner, people show up and they bring your wines?

A.   Well, I said, wow, it's great, and we enjoy it for sure.

Q.   It is a compliment?

A.   It is a compliment.  For sure, it is a compliment.

Q.   It is a compliment that they would show up and say here's
your wine?

Dccdkur3                           Ponsot - cross

1   A.   Yes.

2   Q.   That's what I brought for this occasion, it is your wine?

3   A.   Yes.  Quite often.

4   Q.   Didn't you tell on earlier dates the estates -- that it

5   wasn't 1932 that the vineyard started estate bottling but it

6   was actually 1934?

7   A.   Well, this is what my father said.

8            THE COURT:  So let's just hear what you know and not

9   what he told you.

10           THE WITNESS:  Yeah.  But my father said to the public

11  that it was 1934.  And I discovered that it was 1932, and that

12  was because I found in the -- I have to dig in the family

13  archives, and I found that my grandfather started in 1932.  And

14  my father didn't remember it well, that's it.

15  Q.   So when you had earlier said 1934, you were relying upon

16  just what your father had told you?

17  A.   It was not a lie.  It was just a mistake.

18  Q.   I understand.  You were relying upon information that you

19  had been given?

20  A.   Yes.

21  Q.   And you subsequently learned that information was wrong?

22  A.   It was wrong.  Due to this case, I had to dig in the

23  archives, and I found out that my grandfather started in 1932.

24  And I found bottles -- real bottles of 1932 in the cellar of a

25  restaurant in France to which my grandfather was selling.

Dccdkur3                          Ponsot - cross

1    Q.   So if there was a 1932 bottle that you found in a

2    restaurant, that would make it rather difficult if it hadn't

3    bottled until 1934?

4    A.   Exactly.

5    Q.   And you would be talking about the same thing here where

6    you are saying it is just not possible?

7    A.   Yes.  But now we have recourse.

8    Q.   So now you have things to say, OK, we now know that is '32.

9    A.   Exactly.  We have the recourse now.

10   Q.   Because we weren't there.

11   A.   That's for sure.

12   Q.   And it was a long time ago.

13          And things were a lot less formal back then, weren't

14   they?

15   A.   It was not really formal.  As I said previously, nobody

16   would expect that someone one day would copy a bottle.  So they

17   didn't take much precaution.

18   Q.   And I've heard your grandfather -- is it Hippolyte, is that

19   the right way to pronounce his name?

20   A.   Yes.

21   Q.   -- he has been described as something of a Renaissance man;

22   would that be fair?

23   A.   He was not a renaissance, but he worked hard to do it -- in

24   the dark, probably.

25   Q.   And he was not one to necessarily be tied down by lots and

1   lots of paperwork; he loved what he was doing?

2   A.  He was really a passionate guy.

3   Q.  Even though you don't recondition wines or recork wines for

4   people, have you heard of collectors, people on their own,

5   recorking their wines?

6   A.  Never heard of that.

7   Q.  Have you heard of collectors or other people adding wax to

8   protect their wines?

9   A.  I've never heard that.

10  Q.  Now, if you had a wine like this one, that was starting to

11  show leakage, one of the things you could do is open it and

12  drink it immediately, right?

13  A.  This is one option.

14  Q.  The other thing that you could do is you could at least

15  seal it with wax or something, couldn't you?

16          MR. HERNANDEZ:  Objection just to the "you."  Does he

17  mean Domaine Ponsot, or someone else?

18          THE COURT:  That is a good point.

19          MR. MOONEY:  That is a good point.

20          THE COURT:  Rephrase.

21  Q.  If this were your bottle of wine and let's pretend for a

22  moment that it's one that you would value and you see that it

23  is leaking, you don't want to leave it like that, do you?

24  A.  If it's a bottle stored in our library we see leaking, for

25  sure we would change the wax.  We would eliminate the wax that

Dccdkur3                    Ponsot - cross

 1   is leaking, check the cork, because if it is leaking the cork

 2   is not genuine, so we would maybe change that.  Only if we have

 3   the wine stored in our library.

 4          When I have in my private cellar a wine like that, I

 5   drink it or I eliminate the wax and lay down for a longer time.

 6   But I would never rewax a wine which is already labeled in my

 7   private cellar whether it be from Bordeaux, Burgundy, Italy or

 8   whatever.

 9   Q.  So you personally would just not do that?

10   A.  No.  And on top of it, to put wax on a bottle, it is quite

11   a system.

12   Q.  You said that there came a point in time when you started

13   to learn that there were unauthentic bottles of Ponsot wines in

14   the marketplace.

15          Do you recall when you first learned that there were

16   bottles out there that weren't real?

17   A.  The first time I saw one was in 1995, one bottle in Kuala

18   Lumpur.

19   Q.  So as of 1995, you became aware that at least somebody out

20   there had made a bottle that purported to be a Ponsot bottle?

21   A.  Exactly.

22   Q.  Ponsot wine.

23          And it was not?

24   A.  It was not.  And it was a bad fake.  The label was really a

25   photocopy.  So it was easy to determine that it was not a real

Dccdkur3                         Ponsot - cross

1   wine.

2   Q.  And at that point in time -- the first one you saw, you

3   sort of complimented, ah, this is -- they like it enough to

4   want to make a copy?

5   A.  A human being.

6   Q.  But then you started seeing more and more of it, right?

7   A.  I don't say I saw a lot.  Privately one bottle, two; a case

8   sometimes.  But until this auction, I never sold so many

9   bottles.

10          THE COURT:  And which auction was that?  2000 --

11          THE WITNESS:  The auction in 2008, April 25th.

12  BY MR. MOONEY:

13  Q.  That's when you saw a big grouping of them altogether?

14  A.  Yes.

15  Q.  That appeared --

16  A.  I saw that in the catalog already.

17  Q.  You looked in the catalog.  Mr. Barzelay said check it out,

18  and you looked in the catalog.

19          Then you flew out to New York and -- I'm sorry.  You

20  have to answer out loud.

21  A.  Yes.  I did fly to New York.

22  Q.  I am sorry.

23  A.  Yes.

24  Q.  I just want -- we have to make sure that the court reporter

25  can get the things down.  Otherwise it looks like I am talking

Dccdkur3                    Ponsot - cross

1  to myself.

2  A.  I was willing that the auctioneer would not sell the

3  bottles before we could really authenticate by good expertise.

4  Q.  And they didn't sell them, did they?

5  A.  No.

6  Q.  They held them back?

7  A.  They did.

8  Q.  And Mr. Kurniawan agreed with that, didn't he?

9  A.  He did.

10  Q.  He said don't sell these because there is a problem.

11          THE COURT:  Is that a question?

12          MR. MOONEY:  Yes.  That is a question.

13  A.  Yes.  I've been told that he was agreeing.

14  Q.  And then you went to lunch with Rudy Kurniawan and

15  Mr. Kapon?

16  A.  Exactly.

17  Q.  And the conversation was about the bottles at the auction?

18  A.  It was.

19  Q.  And Mr. Kurniawan told you at that lunch that he had bought

20  all the bottles from a single source, is that correct?

21  A.  No.  He didn't say anything like that.

22  Q.  He didn't tell you that?

23  A.  He said nothing about the source.

24  Q.  He told you he bought the bottles in Asia?

25  A.  He didn't send me anything about the provenance of the

Dccdkur3                          Ponsot - cross

```
 1   bottles.

 2   Q.  So nothing at all at that point in time?

 3   A.  He just said he didn't remember.

 4   Q.  He said he would get back to you and give you information?

 5   A.  I don't --

 6              THE COURT:  He said he would follow up?

 7              THE WITNESS:  Yeah.

 8   Q.  He said he would follow up?

 9   A.  Yeah.

10   Q.  And he did follow up, didn't he?  He sent you an e-mail?

11   A.  He did.

12   Q.  And he identifies in the e-mail somebody by the name of

13   Mr. Hender?

14   A.  Exactly.

15   Q.  But he doesn't tell you anything more about who Mr. Hender

16   is?

17   A.  No.

18   Q.  Well, you didn't know who Mr. Hender was?

19   A.  I didn't know at all.

20   Q.  And at least at that point in time you didn't have any

21   other contact information except that Mr. Hender lived in Asia?

22   A.  This was the only information I have.

23   Q.  Now, did you know at that point in time that Rudy came from

24   Indonesia?

25   A.  I didn't know.
```

Dccdkur3                         Ponsot - cross

1   Q.  You later did learn that he was of Indonesian birth, right?

2   A.  I learned later on that he was from Indonesia.

3   Q.  And then you had to leave.

4        After you had come to New York and you had been there

5   for the auction, you had other things you had to do so you left

6   the country and went back to France, right?

7   A.  No.  I stayed in the country because I had a trip planned

8   for later, but I decided to follow up doing my schedule in

9   Athens.

10  Q.  You had business to attend to and you attended the

11  business?

12  A.  Yes.  I went to see -- work on my business.

13  Q.  And then you had an opportunity to come back, and that's

14  when you communicated by e-mail with Rudy and said let's get

15  together and go to dinner?

16  A.  I did.

17  Q.  And he said, Sure?

18  A.  Yes.

19  Q.  He seemed happy to meet with you?

20  A.  I was not focused on him at that time.  I was just willing

21  to want what happened.  So I was nice and that's it.

22  Q.  And he didn't say, no, he can't do it; he said, sure, let's

23  meet?

24  A.  Exactly.

25  Q.  And you met for dinner?

1   A.  We did.

2   Q.  You went to a nice restaurants?

3   A.  I don't know if it's a nice one.  It is a good one.

4   Q.  Do you remember the name of that restaurant?

5   A.  Il Grano.  It is on Santa Monica Boulevard.

6   Q.  Some people in Burgundy will tell you that it is a nice

7   restaurant.

8   A.  No, because people from outside Los Angeles didn't know

9   this restaurant.

10  Q.  I could tell you why but I won't tell.

11          So you didn't bring in any wines today, did you?

12  A.  No.

13  Q.  You traveled.  You had come in from out of town?

14  A.  Exactly.

15  Q.  You didn't go down to the library and grab a couple and

16  bring it along with you?

17  A.  I don't do that.

18  Q.  But Mr. Kurniawan brought some wines?

19  A.  He did.

20  Q.  And, in fact, at that particular dinner he brought a '75

21  Ponsot, a white wine, right?

22  A.  Exactly.

23  Q.  And he brought a Richebourg?

24  A.  It could be.

25  Q.  It could be?

Dccdkur3                         Ponsot - cross

1    A.   I don't remember.

2    Q.   And the two of you had dinner and the two of you drank the

3    wines?

4    A.   We did.

5    Q.   And they were good wines?

6    A.   Yeah.  We had, I remember, a 1955 La Tache.  He brought

7    many bottles but I didn't want to drink all of them.  I picked

8    only two, I think.

9    Q.   Could the '55 La Tache have been at the later dinner?

10            You went to dinner twice, didn't you?

11   A.   No.  It was at this dinner.

12   Q.   So you think it was a '55 La Tache at that restaurant.

13            (Pause)

14            And that's the dinner where he wrote down the

15   telephone number for you?

16   A.   It was.

17            MR. MOONEY:  Would you put up Exhibit 36-1, please.

18   And if you would highlight the little --

19   Q.   This little piece of paper, is that the original piece of

20   paper that it was written on?

21   A.   It is a copy.

22   Q.   So you didn't write it down?

23   A.   No, I didn't.

24   Q.   That is not your handwriting?

25   A.   Absolutely not.

Dccdkur3                    Ponsot - cross

1   Q.  But you saw him take this piece of paper and write down

2   that number?

3   A.  I did see him doing it.

4   Q.  And then he handed it to you and said, This is the number?

5   A.  Exactly.

6   Q.  And this, of course, was now in the summer of 2008?

7   A.  It was July 19th, 2008.

8   Q.  Did he tell you anything else about these numbers or what

9   they are connected to or what they had to do with?

10  A.  No.  He just told me this is the contact for Pak Hender.

11  Q.  Did he say this is Mr. Hender's numbers?

12  A.  Exactly.

13  Q.  Did you ever ask him what Mr. Hender's first name was?

14  A.  I was thinking that Pak was the first name at that time.

15  Q.  But you didn't know at that point that Pak was the first

16  name?

17  A.  I didn't know at that point that Pak would mean mister.

18  Q.  But for sure is not a first name, is it?

19  A.  Well, I didn't know.  I don't speak fluent Indonesian.

20  Q.  OK.  But you later learned that Pak just means mister?

21  A.  Later.  When I went to Singapore in February of 2009, I

22  investigated and I learned that Pak would mean mister.

23  Q.  Were there conversations at this first dinner about

24  Mr. Kurniawan buying wines directly from the Domaine?

25  A.  No.

Dccdkur3                          Ponsot - cross

 1  Q.  You don't remember any conversations to that effect?

 2  A.  No, we didn't talk about that.

 3  Q.  At that point in time, which was the summer of 2008, at

 4  that point in time was Domaine Ponsot selling its wine in Asia?

 5  A.  Yes.  For sure.

 6  Q.  And who was the representative in Asia at that point?

 7  A.  Well, we sell to seven countries in Asia.  So we --

 8  Q.  You have a different importer in each of the seven

 9  countries?

10  A.  We have several importers, one or two in each country.

11  Q.  So it is not an exclusive arrangement?

12  A.  No.  I don't give any exclusivity to anyone.

13  Q.  So you -- it would have been possible for you to have

14  entered into a new distribution agreement with somebody for an

15  Asian country?

16  A.  Well, I decide myself.  But in some small countries, one

17  importer is sufficient, so.

18  Q.  But you don't remember any conversations with Rudy about

19  buying for distribution?

20  A.  No.

21  Q.  This piece of paper that the numbers are written on, is

22  that a sticky pad or is it just a piece of regular paper?

23  A.  Regular paper.

24  Q.  And if we go back to the full sized picture again.

25            Does this accurately represent the size of it?

Dccdkur3                    Ponsot - cross

```
 1   A.  No.  No.  The size is much smaller.

 2   Q.  The size is smaller?

 3   A.  This is a copy on a full page, but the size just is

 4   surrounding the numbers.

 5   Q.  And where is that piece of paper now?

 6   A.  I guess in the hands of the FBI.

 7   Q.  So you gave it to the U.S. Attorney's Office?

 8   A.  Yes.

 9   Q.  The actual piece?

10   A.  Yes.

11   Q.  Were you surprised that he could just write those numbers

12   down?

13   A.  I'm never surprised of anything.

14   Q.  Did you see him look at anything else?  Did he look in his

15   phone or anything?

16   A.  I don't remember.  I don't remember if he was looking that

17   in his cellphone or in a little booklet, I don't know.  I have

18   no memory of that.  But I just remember that he was writing on

19   a paper.

20   Q.  You remember the paper and you remember him doing the

21   writing?

22   A.  Yep.

23   Q.  And that's etched in your memory?

24   A.  Yes.  But I don't remember if he had that in mind or if he

25   write it on a cellphone or whatever, I don't remember that.
```

Dccdkur3                      Ponsot - cross

1    Q.  It could have been any of those?

2    A.  It can be, yeah.

3    Q.  So where he got it or what his source of these numbers are,

4    you don't know?  All you do know --

5    A.  I don't really remember.

6    Q.  -- is that he absolutely was the person.  And so this is

7    going to be his handwriting; is that what you are telling us?

8    A.  It is.

9    Q.  How long after you received these telephone numbers did you

10   start calling him?

11   A.  When I went back to Europe some days later.

12   Q.  So within days you are calling the numbers?

13   A.  What?

14   Q.  Within days you are calling the numbers?

15   A.  Days, yeah.

16   Q.  Days.  Within days afterwards you are calling?

17   A.  I don't know.  Maybe ten days.  I don't remember.  Maybe

18   five days.  I don't really remember when.  When I went back to

19   France.

20   Q.  One of them was a fax number?

21   A.  One was related to a fax machine, apparently.  The sound

22   was like a fax machine, and the other one never answered.

23   Q.  So nobody ever answered either of these numbers and said

24   Lion Air?

25   A.  No.

Dccdkur3                         Ponsot - cross

1   Q.  And you have seen the exhibit that says that this was a

2   telephone number for an airline, correct?

3   A.  I've seen that.

4   Q.  So nobody tried to sell you any airline tickets when you

5   called those numbers?

6   A.  I mean, maybe when you call an airline, it is long to

7   answer sometimes.

8   Q.  But that dinner that you had with Rudy in July of 19 -- or

9   of 2008, that wasn't your last dinner with him; you had dinner

10  with him again later, didn't you?

11  A.  Yes.

12  Q.  A year later?

13  A.  In May '09.

14  Q.  Well, just less than a year.

15          (Pause)

16          And you'd asked again to get together with him.  You

17  started sending him some new e-mails and saying let's get

18  together, right?

19  A.  This is what I did.

20          (Continued on next page)

21

22

23

24

25

1    Q.  And he said sure.

2    A.  Yeah.

3    Q.  He was perfectly willing to meet with you.

4    A.  Absolutely.

5    Q.  And so you went to another acceptable restaurant?

6    A.  We went to Fourteen.

7    Q.  Fourteen.  Okay.  Acceptable restaurant?

8    A.  Very well known.

9    Q.  And once again, Rudy's the one that brought the wine?

10   A.  Yes.

11   Q.  And this time he brought two different '73 Ponsot Clos de

12   la Roches.  Right?

13   A.  Exactly.

14   Q.  And the two that he brought, they had different labels on

15   them, didn't they?

16   A.  Exactly.

17   Q.  And the two of you sampled them.  Right?

18   A.  We did.

19   Q.  And ultimately you determined that one of the two bottles

20   that he brought to dinner was authentic.  Right?

21   A.  Exactly.

22   Q.  And you had questions about the other one?

23   A.  Well, I had no questions.  I knew it was not real.

24   Q.  The other one was not real.

25   A.  There was no question about it.

1   Q.  Okay.  Did you ask him why he brought a bottle of your wine

2   to dinner which was not real?

3   A.  No, he told me already that he would-- he's not sure that

4   both are real.

5   Q.  Okay.

6   A.  He said, "Let's open."  And I knew by watching the labels

7   that one was authentic and the other was not already.  So we

8   sampled both because it was fun to do it.

9   Q.  So a year earlier, he had been the person who put up a

10  bunch of your wines that turned out to not be real for an

11  auction.

12  A.  Yeah.

13  Q.  And then a year later he told you he had some questions

14  about one of the bottles that he had.

15  A.  Exactly.

16  Q.  So he brought these two bottles.  And one of them was real

17  and you drank it?

18  A.  Exactly.

19  Q.  And the other one was not real?

20  A.  Was not real.

21  Q.  And he told you at that time that he couldn't tell for

22  sure?

23  A.  No, he told me that he buys wines, a lot of wines, and for

24  sure in the wines he buys he can be fooled by some providers

25  and he can buy also fake wines.  And this is why he wanted to

1   show the two bottles, as a victim of the fakers.

2   Q.  Now, over the period of time, at least from that time to

3   now, you started to get very active and very involved in trying

4   to get out and police some of the problems that are going on.

5   Is that fair?

6   A.  It is.  It is correct.

7   Q.  And you started to learn that the wines that were coming up

8   at auctions, particularly the wines from Burgundy, that there

9   was just a high probability that these wines that were being

10  sold were fakes?

11  A.  Yes, I did.

12  Q.  In fact, you've stated openly, haven't you, that the vast

13  majority of Burgundy wines, at least from the, what, pre-'70s

14  that are sold are fakes?

15  A.  What I say was that the wines coming from the four main

16  wineries of Burgundy.  I didn't say from Burgundy.

17  Q.  Okay.

18  A.  Probably 80 percent of the wines from these four wineries

19  pre-1980 were fake.

20  Q.  So pre-1980.  And those four wineries -- Ponsot's one of

21  them I take it?

22  A.  Yes.

23  Q.  What are the other three?

24  A.  Domaine Roumier, Domaine Rousseau and Domaine de la

25  Romanee-Conti.

1   Q.  So if I go out and buy a pre-1980 bottle from any one of

2   those four vineyards, there's a reasonably good chance if I

3   don't take some precautions that I'll buy a fake bottle?

4   A.  That's correct.

5   Q.  And when you first started on this crusade to get these

6   fixed, the auction houses weren't too willing to cooperate and

7   help, were they?

8   A.  I have been speaking with the head chief of the wine

9   department of Christies and Sotheby's and they were willing to

10  help.

11  Q.  So they were willing to help now?

12  A.  Yeah.

13  Q.  So are they now not selling any of your wine without

14  letting you take a look, at least taking a look at pictures?

15  A.  Now they take more precautions, but no.  I can't answer for

16  them.

17  Q.  Okay.  And these are conversations you've had or things

18  you've been working on since about 2009.  Is that right?

19  A.  That's correct.

20  Q.  But they haven't started saying, Well, we're going to send

21  you pictures of your wine before we sell it, have they?

22  A.  Sporadically I have some requests of authentification.

23  Q.  And what they said instead is, well, we'll be more careful?

24  A.  Exactly.

25  Q.  Have you seen any signs that they're being more careful?

1   A.  I've seen one in Hong Kong earlier this year.  They put on

2   each bottle at the auction a code that authenticate the bottles

3   from coming from the cellar of the person that was selling.  It

4   doesn't mean the bottle was not fake.  It means it was coming

5   from this place.  So if you find it, like, fake, you know where

6   to ask about the provenance.  So they try.

7   Q.  And that was an auction in Hong Kong?

8   A.  Hong Kong by Christies.

9   Q.  It used to be New York was the center of most of the big

10  auctions, is that right, and London?  New York and London?

11  A.  It used to be.

12  Q.  And Hong Kong is now becoming the big location.  Right?

13  A.  The reason is that there is no tax on wine in Hong Kong.

14  Q.  And there's a lot of money coming out of Asia to start

15  buying wine?

16  A.  Yeah, but other people from Europe or USA are buying also

17  in Hong Kong.

18  Q.  So everybody's going to Hong Kong now to buy the wines?

19  A.  Exactly.

20  Q.  So that's what --

21  A.  More and more.

22  Q.  And the Hong Kong market's been going on for-- that isn't

23  brand new, is it?  There's been auctions in Hong Kong for a

24  long time?

25  A.  For the bordeaux, for the clarets, it's a long time.  But

DCCBKURT4                    Ponsot - cross

```
 1    for the Burgundy, it started in the late '80s.

 2    Q.  And the Bordeauxs went way back?

 3    A.  Yeah, Hong Kong was belonging to England, and England and

 4    Bordeaux has a good relation for centuries.

 5    Q.  In fact, Bordeaux wines are very, very popular all over

 6    Asia, aren't they?

 7    A.  Exactly.

 8    Q.  The problem with the Bordeauxs in Asia dwarf the problems

 9    with the Burgundys, don't they?

10    A.  That's correct.

11    Q.  In fact, if you want to go buy a Lafite Rothschild in Asia,

12    the chances are it's going to be hard to find one that isn't

13    fake?

14              MR. HERNANDEZ:  Objection.

15              THE COURT:  If you know.

16              MR. MOONEY:  If he knows.

17    A.  I don't know.

18    Q.  One of the things that's additionally made the Asia market

19    popular is it's common in Asia, is it not, to use wine as

20    gifts?

21    A.  No idea.

22    Q.  And after you had your second dinner with Rudy in Los

23    Angeles in 2009, that was still a friendly sort of dinner,

24    wasn't it?

25    A.  It was?
```

1    Q.  You were still friendly with him when you talked to him on

2    that occasion?

3    A.  Yes.

4    Q.  And did you ask him who's this Pak Hendra guy?  Who's

5    Mr. Hendra?

6    A.  No.  I said to him, "You gave me information which are not

7    really correct.  So now you have to give me the real provenance

8    and you have to tell me the truth."

9    Q.  And he didn't tell you any more after that?

10   A.  He said, "I promise I will do that by return maybe

11   tomorrow."

12   Q.  And you had discovered by that point in time that he was

13   from Indonesia.  Right?

14   A.  Oh, yeah, for sure.

15   Q.  And you also knew that he had family that was still in

16   Indonesia?

17   A.  I don't know about it.

18   Q.  And you know that Indonesia can be a little bit of a scary

19   place, don't you?

20   A.  I don't think so.

21   Q.  So you never considered that he might have just been afraid

22   to tell you any more?

23   A.  No.

24   Q.  You think that might be a possibility, that he might just

25   have been afraid to tell you any more?

DCCBKURT4                          Ponsot - cross

1   A.  I don't think so.

2            MR. MOONEY:  No more questions, your Honor.

3            THE COURT:  Okay.  Any redirect?

4            MR. HERNANDEZ:  Very briefly.

5   REDIRECT EXAMINATION

6   BY MR. HERNANDEZ:

7   Q.  Mr. Ponsot, you were just asked some questions by

8   Mr. Mooney about an opinion that you have that for all of the

9   Burgundy that's older than 1980 from the auction market from

10  four domaines-- yours, Rousseau, Roumier and Domaine de la

11  Romanee-Conti -- you think as much as 80 percent could be fake.

12           Do you remember that?

13  A.  This is what I said, I'm believing.

14  Q.  Okay.  Do you remember when you came to that opinion?

15  A.  Yeah, well, during my investigation, I was collecting the

16  most example possible of wines sold at auctions in the last 20

17  years.  And I saw appearing, for example for Domaine Rousseau,

18  four times the amount of magnums produced in 1959 in 20 years.

19  Okay.  You can resell the same magnum twice or three times, but

20  still it makes a lot of magnums still alive today of my Clos de

21  la Roche '59 or my grandfather's or father's one.  So these

22  cannot exist.  It's impossible.

23           And I make also counts -- probably my friend from

24  Domaine de la Romanee-Conti, he can say better, but they

25  produced three barrels of 1945 Romanee-Conti and if you found

1    at each auction one or two bottles or magnums or things like

2    that.  So that cannot happen.

3         It's just-- and on top of it, I think we have to focus

4    on what the wine is.  The wine is not a beverage.  The wine is

5    a product that is shared by people.  I think the wine is the

6    best cement of diplomacy and friendship.  And when you own a

7    bottle which is rare and good, you are tempted to drink it with

8    your friends or with your relatives rather than to sell it.

9         And today, unfortunately, I say that, from my point of

10   view, too many people are buying wines to speculate on it.  And

11   this is not a good thing.  It comes to the point that these

12   wines cannot be a tool, but it's a product between people.

13   Q.  And you began your investigation in 2009, you said?

14   A.  Well, already 2008.

15   Q.  2008/2009?

16   A.  But 2009 a bit more, yeah, because I took more time to do

17   that.

18   Q.  So is that then around the time where you formulated the

19   opinion, the belief, about the number of fakes in the market?

20   A.  Yeah.  I think at the end of '09 I had this certitude that

21   it was like that.

22   Q.  And you had also testified previously that in the mid-'90s,

23   you saw a fewer amount of fake wines in the market?

24   A.  Yeah.  I think that the real start of the fake wines was at

25   the end of the '90s, especially the 2000 year.  The thing is

1   that new clients appeared on the planet.  People from Asia for

2   sure, from Russia, also from America, becoming a little more

3   rich, weren't willing to go into the culture of the planet.

4   The wine has always been a means of culture on the planet.  And

5   wanted to, because they were wealthy, they wanted to buy the

6   best.  So they read books, they had critics that helped them,

7   and they wanted only the very best and the oldest.  Because

8   everybody says that the old Burgundies are really very good.

9           So the problem is that it doesn't exist, or very, very

10  little.  So some people, very smart, decided to produce old

11  bottles.  So this is when it started for, for this kind of new

12  clients.

13  Q.  Thank you.

14          MR. HERNANDEZ:  No further questions.

15          THE COURT:  Thank you very much.

16          THE WITNESS:  Thank you.

17          (Witness excused)

18          THE COURT:  Yes.  So --

19          MR. HERNANDEZ:  Your Honor, if there's no objection

20  from the government or from defense counsel, Mr. Ponsot, now

21  that he's testified, can watch the remaining proceedings?

22          THE COURT:  Sure.

23          MR. HERNANDEZ:  The government calls Christophe

24  Roumier.

25          MR. MOONEY:  With the understanding now that he's

1    released as a witness.  He can't be recalled.

2              THE COURT:  You have no intention to recall him?

3              MR. HERNANDEZ:  No.

4              THE COURT:  And do you?

5              MR. MOONEY:  We do not, your Honor.

6              THE COURT:  Mr. Hernandez, we'll go to 12:30.

7              MR. HERNANDEZ:  Yes, your Honor.

8              THE DEPUTY CLERK:  Sir, if you could step up here,

9    please.  Remain standing by that chair and raise your right

10   hand.

11    CHRISTOPHE ROUMIER,

12         called as a witness by the Government,

13         having been duly sworn, testified as follows:

14             THE DEPUTY CLERK:  Could you please state your name

15   for the record.

16             THE WITNESS:  Christophe Roumier.

17             THE DEPUTY CLERK:  Could you spell your first name.

18             THE WITNESS:  Christophe?

19             THE DEPUTY CLERK:  Yes.

20             THE WITNESS:  C-h-r-i-s-t-o-p-h-e.

21             THE DEPUTY CLERK:  Thank you.  And would you spell

22   your last name.

23             THE WITNESS:  R-o-u-m-i-e-r.

24             THE DEPUTY CLERK:  Thank you, sir.  You may be seated.

25             MR. HERNANDEZ:  May I?

 1            THE COURT:  Proceed.

 2   DIRECT EXAMINATION

 3   BY MR. HERNANDEZ:

 4   Q.  Mr. Roumier, could you tell us where you live?

 5   A.  I'm living in Chambolle-Musigny, a small village in

 6   Burgundy, in France.

 7            THE COURT:  Excuse me just a minute.  I want to

 8   interrupt to say we're going to go to 12:30 and then resume at

 9   2 o'clock.

10            THE WITNESS:  Okay.  Okay.

11   Q.  And what do you do in Burgundy for a living?

12   A.  I'm winemaker.  Vine grower and winemaker.

13   Q.  And for a particular domaine?

14   A.  For the Domaine Georges Roumier, which belongs to my

15   family.

16   Q.  Do you know who founded Domaine Roumier?

17   A.  So the domaine was founded by my grandfather, Georges, who

18   married in 1924 a woman in the village whose family had this

19   estate.

20   Q.  And in between your grandfather and you at the domaine, is

21   there someone in between who is the head of the domaine?

22   A.  No.  No.

23   Q.  Okay.

24   A.  Yes.  Excuse me.  Yes, between my grandfather and me was my

25   father.

DCCBKURT4                          Roumier - direct

1    Q.  And are those the only three heads of the domaine in the

2    history of the domaine?

3    A.  Yes.  I'm the third generation in that.

4    Q.  What's the first vintage or year of wine that Domaine

5    Roumier produced that you're aware of?

6    A.  Excuse me?

7    Q.  Sure.  The first year or vintage of Domaine Roumier.

8    A.  At my knowledge, this is 1924, the first.

9    Q.  All right.  That's the year that Domaine Roumier was

10   founded by your grandfather?

11   A.  It's the year that the estate was established under my

12   grandfather's name.

13   Q.  Okay.

14   A.  Yeah.

15   Q.  Now, we have a map here that we're going to use that we're

16   going to ask you, if you could, just to show us, so the jury

17   understands, where Chambolle-Musigny is.

18             MR. HERNANDEZ:  Can the witness step down, your Honor?

19             THE COURT:  Sure.

20   Q.  Can you just step down and stand right here and we'll bring

21   the map right over.  You can just step around.

22             This is Government Exhibit 19-1.  Mr. Roumier, the

23   jury has seen this from one of your neighbors who testified

24   just previously.

25             Could you show us where, here on this map, your

1  village Chambolle-Musigny is?

2  A.   It's exactly here.  So it's to the north-- south to north.

3  We are just by the north of what we call Burgundy Coast.  You

4  know, in France we have-- we don't have counties like in United

5  States.  We call them department.  It would be mostly

6  equivalent.  And we are located in the department which name is

7  Cote-d'Or, which is larger than this, which the main city is

8  Dijon.

9  Q.   Okay.  And your village Chambolle-Musigny is just south of

10 Morey-Saint-Denis?

11 A.   Yes, it's 1 kilometer and a half south.

12 Q.   Thank you very much.  You can return.

13         Now, what kind of what wines does Domaine Roumier

14 make?

15 A.   So nowadays Domaine Roumier produces mainly red wines

16 because the region around us is more designed, the soil

17 quality, is better to make pinot noir, so red wines as a

18 consequence.  We produce Bourgogne rouge, Chambolle d Musigny--

19 Q.   I'm going to ask you to hold on there for a minute.  I'm

20 going to ask you about a few particular wines.  But do you make

21 Grand Cru, red Burgundy, red wine, pinot noir?

22 A.   Yes.

23 Q.   Do you also make chardonnay?

24 A.   And one chardonnay, yes.  Corton-Charlemagne, which is an

25 appellation in the south.

1   Q.  And that's a white wine?

2   A.  It's a white wine.

3   Q.  Now, do you make wine from an appellation called

4   Bonnes-Mares?

5   A.  Yes.

6   Q.  And has the domaine historically made wine from

7   Bonnes-Mares?

8   A.  Yes, ever, from the beginning.

9   Q.  From 1924?

10  A.  Yes.

11  Q.  Now, are you familiar with a domaine in Burgundy called

12  Domaine Belorgey, spelled B-E-L-O-R-G-E-Y?

13  A.  Yes.  This is a domaine that does not exist anymore.  This

14  was, in fact, a family name, which-- this is a family from

15  Dijon who had vineyards, holdings, in Bonnes-Mares.  And my

16  grandfather purchased the vineyard, a section of his vineyard,

17  in 1952.

18  Q.  So beginning in 1952, Domaine Roumier made wine from this

19  family section of that vineyard?

20  A.  Yes.

21  Q.  And does Domaine Roumier keep a stock of older wines or

22  older wine labels in your cellar?

23  A.  We have, yes, a stock of old wines.  Very few old labels

24  because often they were used or destroyed by time.  So we don't

25  keep them very much, or just a few samples, that's all.

DCCBKURT4                    Roumier - direct

1   Q.  And have you tasted all of the vintages of Domaine Roumier

2   wines in your cellar?

3   A.  Some, yes.

4   Q.  Okay.  And what is the oldest vintage of Domaine Roumier

5   wine that you have in your cellars?

6   A.  '26.  1926.

7   Q.  And do you have many wines from 1924 through, let's say,

8   1959 in your cellar?

9   A.  I don't have any in 1924, no.  1925.  Very few '26s.

10  Something like four bottles.  All together-- in Bonnes-Mares

11  you're talking about?  Bonnes-Mares only?

12  Q.  Yes.

13  A.  This would maybe represent something like 80 or maybe

14  something like that, 80 bottles all together.

15  Q.  So it's not a large --

16  A.  In that period of time.

17  Q.  Okay.  And do you follow whether your wines are bought and

18  sold in the marketplace at all?

19  A.  Yes.  Yes, some were, but you don't track every bottle of

20  course.

21  Q.  Of course not.

22          Now, I'd like to show you a few exhibits that have

23  already been admitted.  And I'm going to come hand them to you.

24          MR. HERNANDEZ:  Your Honor, may I approach?

25          THE COURT:  Sure.

 1   Q.  You can stay there.  I'll bring them to you.

 2         This is Government Exhibits 1-200, 1-208, 1-182, and

 3   1-183.

 4         And, Mr. Roumier, I'm going to ask you some questions,

 5   the same question about all of these exhibits.  I would just

 6   ask that you can take each bag and just tell us the number

 7   before you tell us about what's in the bag so that we know

 8   which bag you're talking about.

 9         And the question is, could you please examine these

10   labels and tell us whether you think these are authentic

11   Domaine Roumier labels?

12   A.  May I open the box?

13   Q.  You may.

14         THE COURT:  Yes.

15   A.  Okay.  The look, they look exactly the same.

16   Q.  Which exhibit are you looking at, Mr. Roumier?

17   A.  I'm sorry.

18   Q.  That's okay.

19   A.  183.  Is that right?

20   Q.  Yes, it's 1-183.

21   A.  The look is really close to ours.  Paper also.  Maybe the

22   cut around is a little different from our labels.  But, again,

23   those labels which I have never look as young as these here.

24   They look very new.  And so the-- I don't know what you call

25   the cut, the edge cut on the labels, which I have found in my

1   grandfather's office are not as clean nor as neat as these.

2   Q.  So for the labels in 1-183, do you believe those to be

3   authentic labels from Domaine Roumier?

4   A.  The look, yes.  The rest, no.  And there is a fair amount

5   of these.

6   Q.  And why does it matter that there's a fair amount?

7   A.  Because the production of Bonnes-Mares from Belorgey can

8   definitely exceed in the year of production three thousand

9   bottles.  And it's hard to imagine that we have so many

10  remaining labels of this vintage, particularly '59, right

11  here.

12  Q.  Okay.  If you want to continue with the other exhibits,

13  then we can set these aside unless you have something to

14  testify about these labels.

15  A.  These labels?  I don't know these labels.  I've never saw

16  them.

17  Q.  I'm going to hold these up so the jury can see.  You're

18  testifying about the white label now?

19  A.  Yes.

20  Q.  So this is a version of the white label that you're

21  testifying about?

22          MR. MOONEY:  Is that from the same package?

23          MR. HERNANDEZ:  It is.

24  Q.  And what is your view on the authenticity of these white

25  labels?

1           THE COURT:  He asked you.

2           THE WITNESS:  Oh, I'm sorry.

3           THE COURT:  Do you think these white labels are

4    authentic?

5    A.  I've never seen such labels at the estate.  There's

6    something strange on them, the fact-- maybe-- maybe it's

7    something that has existed, but I have never seen it.  It's

8    strange that-- we usually design the Domaine-- no, designate

9    the Domaine Roumier by my grandfather's name.  So "G" does not

10   appear here.  It's only written "Domaine Roumier."  The initial

11   of my grandfather's first name doesn't appear, which is

12   strange.

13   Q.  I see.

14          So in between "Domaine" and "Roumier" usually there

15   should be Domaine G. Roumier for your grandfather's first name,

16   Georges?

17   A.  Yes.  And, again the title "Domaine," as my sense, appears

18   after 1961, not before.  Before this was just G. Roumier, only

19   his name.

20   Q.  All right.  And then if you could go just to the next

21   exhibit, which is 1-182.  I'll take care of this.

22   A.  So here is 182.  182.

23   Q.  Can I take a sample of one of those labels from you to put

24   it up on the screen?  I'll take one so they can see what you're

25   about to testify about and we'll put this on the ELMO.

1              So you have a pack of labels in your hand.  I'm going

2    to put the same one that you're looking at, and it says this is

3    Bonnes-Mares 1923 from Domaine de Romanee and then above that

4    you see there's a reference to that Domaine Belorgey that we

5    talked about previously.

6              Do you think this is an authentic Domaine Roumier

7    label?

8    A.  No, again, that's very hard to believe.  Again, my

9    grandfather purchased the vineyard of Mr. Belorgey in 1952.

10   And how can he make the appearing the name of Belorgey on the

11   wine that he would have produced in 1923 where it was not yet

12   established?  So it is very hard to believe.

13   Q.  So if I understand you, you're saying two things.

14   A.  I say two things.  I say, first, in 1923 my grandfather was

15   not yet established.

16   Q.  I see.

17   A.  Second, if ever in this time he could not produce any

18   Belorgey wine because he purchased the vineyard in 1952 only,

19   not before.  Not before, yes.

20   Q.  I see.

21   A.  So that's not possible.  Again we have-- may we go on?

22   Q.  Yes, please.

23   A.  1934, same situation, except in this year my grandfather

24   was established, but he was not knowing he would one day

25   purchase the Belorgey section.

1   Q.  So in 1934 your grandfather was making wine, but not from

2   the Belorgey section of Bonnes-Mares?

3   A.  No.  No.  He was making Bonnes-Mares from other places, but

4   not from that section.

5   Q.  So an authentic wine label from Domaine Roumier from 1934

6   could not have Domaine Belorgey on it?

7   A.  Yes.  Same with '26 year, '27, '45, '47, '49.  These are

8   very good vintages, by the way.

9   Q.  So that's another observation about the vintages, about the

10  years.  These are all very good years in Burgundy?

11  A.  Yes.  All of them.

12  Q.  Okay.

13  A.  There is no bad one here.

14  Q.  Okay.  I think for time purposes I'm not going to ask you

15  to look at these other two.  Would you like to continue look at

16  these?

17  A.  I want to look at this one.

18  Q.  Sure.

19  A.  This one is another generation.  It doesn't have the

20  same --

21  Q.  Sure.  Let me take a sample of this one.  You're looking

22  now at a 1971.

23          MR. HERNANDEZ:  And, your honor, we're done just with

24  this label --

25          THE COURT:  We can go another couple minutes.

```
1              MR. HERNANDEZ:  Okay.
2    Q.  You're looking now at the 1971, and I think you were
3    pointing out that the label looks a little bit different in
4    design?
5    A.  Yeah, which is not a surprise because they had been
6    redesigned in the meanwhile which is-- I think that's the
7    design of that period.  Yes, it is it.  This is it.
8    Q.  Now, are you familiar with some of the old labels that you
9    have in the domaine?  Have you seen them before?
10   A.  Yes.  Not all, but, yeah, I recognize this style here.
11   Q.  Okay.  And do you know whether the old label for Domaine
12   Roumier you had to put glue on them or whether they came
13   already with the adhesive on the back?
14   A.  Excuse me?
15   Q.  Sure.  So to apply an old label, would your father or
16   grandfather have had to put glue or did it already come sticky
17   on the back and you peel it off?
18   A.  Yes, they had to use some glue.  Yes.
19             MR. HERNANDEZ:  Okay.  This is the point where I would
20   ask him to examine some bottles.  So if you want to--
21             THE COURT:  We'll start that.
22             MR. HERNANDEZ:  Sure.
23   Q.  If, Mr. Roumier, you could come down here to me.  We have
24   some bottles here I'd like you to take a look at.
25             This is Government Exhibit 7-3.  If you could show it
```

1    to the jury.  You just testified about this label, the 1923

2    Bonnes-Mares label.  It says "Domaine Belorgey."

3            Do you have an opinion about whether or not this is a

4    wine that could have been produced by Domaine Roumier?

5    A.  No.  Again, in 1923 my grandfather was not established yet.

6    And if ever he had produced wine, I don't know how -- he

7    couldn't have known that he one day would purchase this

8    vineyard with this name, so no.

9    Q.  All right.  There's also another bottle here that's 7-6.

10   It's the same vineyard, Bonnes-Mares, and it says "Belorgey,"

11   but it's 1934.

12           Is that the same answer, this could not exist

13   either?

14   A.  Same.  Same answer.  Same answer.

15   Q.  And then the last one I'll ask you about is 7-7.  This one

16   is Bonnes-Mares, Domaine Belorgey, 1945.

17           Is that the same answer because --

18   A.  Same answer.

19   Q.  Because 1952 is the first year that it could bear that?

20   A.  Yes.  Yeah.

21   Q.  Very good.  Thank you.  You can return to the witness

22   stand.

23           THE COURT:  This would be a good time then.

24           MR. HERNANDEZ:  Very good.

25           THE COURT:  So we're going to take a lunch break now.

DCCBKURT4                        Roumier - direct

1    We'll excuse the witness.  Hold on one second.  Let me see

2    counsel over here.

3                  (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (At the sidebar)

2            THE COURT:  So just to make sure that the witnesses

3    know that they should not be discussing their testimony over

4    the lunch break or whatever.  I don't know if they're friends,

5    for example--

6            MR. HERNANDEZ:  They are.

7            THE COURT:  -- with the prior witness.

8            MR. HERNANDEZ:  Yeah.

9            THE COURT:  So there might be an inclination to have

10   lunch together.

11           MR. HERNANDEZ:  I'll let them know.

12           THE COURT:  Great.  Thanks.

13           MR. HERNANDEZ:  Just for planning, I have maybe five

14   more minutes with this witness.

15           THE COURT:  Oh, really?

16           MR. HERNANDEZ:  So I think we can --

17           MR. MOONEY:  -- stop him and put --

18           MR. HERNANDEZ:  Depending on how long your

19   cross-examination is.

20           THE COURT:  Is it only five minutes?

21           MR. HERNANDEZ:  It is.  It's very brief.

22           THE COURT:  I would do it then.  Will that help

23   dramatically?

24           MR. HERNANDEZ:  I could do that.  I could finish him

25   at 2 o'clock, I think, and still put Aubert de Villaine on.  It

1    depends on--

2              MR. MOONEY:  We'll see how we are.  I'll give you a

3    pretty good idea.

4              THE COURT:  It's okay to stop then now?

5              MR. MOONEY:  Yes.  We're good.

6              THE COURT:  Great.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DCCBKURT4                    Roumier – direct

1              THE COURT:  So we're going to take our lunch break

2    now.  As for the jury, you'll get a little longer lunch today,

3    until 2 o'clock.  And I'll see you at 2.  I may be a couple of

4    minutes even later than two.  I have a meeting I have to go to,

5    so just for your information.

6              (Recess)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          MR. HERNANDEZ:  We have two matters, your Honor.  We

3   have two matters, your Honor.  One matter is that Bryan

4   Kalliel, who the government expects to call this afternoon or

5   tomorrow morning, apparently was sitting in the courtroom for

6   about seven minutes during Laurent Ponsot's testimony.  The

7   agents noticed him and then asked him to leave.  We don't

8   expect that his testimony will have anything to do with

9   Mr. Ponsot's testimony.  I have spoken to defense counsel about

10  it and they don't appear to have an objection so we're fine

11  with that.

12         MR. MOONEY:  I came in the elevator by myself on the

13  way up here and when I walked in there was person in there who

14  I believed is a juror.  I reflexively said, Hi.  I didn't say

15  anything.  She didn't say anything else either.  We both

16  existed.  I just want to make that known.

17         THE COURT:  In a full confession when I came up from

18  Floor 8 to 12 and then 16, there were three jurors.

19         MR. VERDIRAMO:  There was one standing directly behind

20  me in the security line.

21         THE COURT:  Everywhere.

22         MR. VERDIRAMO:  They always seem to be.

23         (Continued on next page)

24

25

```
 1                (In open court; jury present)

 2                THE COURT:  Good to see you all again.  Please be

 3      seated everybody.  We'll continue with the government's direct

 4      examination of Mr. Roumier.

 5                THE DEPUTY CLERK:  Sir, before we begin I would like

 6      to remind you that you are still under oath.

 7                THE WITNESS:  All right.  Thank you.

 8      BY MR. HERNANDEZ:

 9      Q.  Mr. Roumier, I want to ask you if you know someone named

10      Don Stott?

11      A.  Yes, I know Don, yes.

12      Q.  How do you know him?

13      A.  I know him for several years.  I cannot tell you exactly

14      when I met.  He has been introduced by friends when he was

15      visiting Burgundy for tasting in the cellar probably more than

16      10 years ago.  Something like that.  I had to see him several

17      times along the years, yes.  I know him.

18      Q.  Do you have in front of you an exhibit that is marked 40-2?

19      Do you see that?

20      A.  I see the 40-2, yes.

21      Q.  Do you recognize what that is?

22      A.  Yes.

23      Q.  What is it?

24      A.  This is -- this was a tasting that was organized by Don at

25      his home.  This was in 2007 in January, 2007 and this was the
```

DCC6KUR5                        Roumier - direct

1   program for the tasting.

2   Q.  Did you drink several older Roumier wines during that

3   tasting?

4   A.  There was a magnum of '62, which is not on the list here,

5   yes.

6   Q.  But other than that did you drink older Roumier wines

7   during that tasting?  For example, did you taste a 1923 Roumier

8   during that tasting?

9   A.  Yeah.  But the 1923 is on the list.

10  Q.  I understand.  I am just asking just generally whether you

11  drank old Roumier wines that night?

12  A.  If -- that were not appearing on this list?

13  Q.  No.  Forget whether they are on the list or not.  Did you

14  have older Roumier wines to drink that night at all?

15  A.  Yes.

16  Q.  And among those was one a 1923 Roumier?

17  A.  Yes.  Yes.

18              MR. HERNANDEZ:  The Government offers 40-2.

19              THE COURT:  I will allow it.

20              (Government's Exhibit 40-2 received in evidence)

21              MR. HERNANDEZ:  If we can publish that to the jury.

22  BY MR. HERNANDEZ:

23  Q.  So the jury is seeing on the screen just a copy of what you

24  have there.  You can leave it there, Mr. Roumier.  You can

25  leave it right there if you want.  On the cover what we're

1   looking at now on the computer screen that is right in front of

2   you --

3   A.   Yep.

4   Q.   This is the first page of the program for that night?

5   A.   That's the first page of the program, yes.

6   Q.   And can just you tell us what bottle is pictured on the

7   cover?

8   A.   So this picture shows Bonnes-Mares 1923.

9   Q.   And if we can just turn to the next page.  Just focus in on

10  the list of what was at the dinner.  I am not going for ask you

11  to read the whole list of the wines, but there is a long list

12  of Roumier wines here, is that correct?

13  A.   Yes.

14  Q.   Do you remember tasting the one that is on the cover that

15  is 1923 Roumier?

16  A.   Yes, I do.

17  Q.   That is the same one you just testified earlier in the day

18  that the name began in 1924?

19  A.   Yes.

20  Q.   That is the same one that Belorgey doesn't appear on the

21  Roumier wines until '52?

22  A.   Yes.

23  Q.   Did you have any impressions when you tasted that wine that

24  was on the cover?

25  A.   I made a description of that wine for the day.  You know

DCC6KUR5                      Roumier - direct

1   how it is difficult sometimes to evaluate an old wine two

2   bottles of the same wine can be different at a certain age.

3   The wine we're tasting old.  It was not a very good wine, but

4   it was tasting old.  That is all I can say.

5   Q.  You also tried a 1929 as well?

6   A.  Yes.

7   Q.  Do you remember any impressions you had of that one?

8   A.  Not clearly about this one, no.

9   Q.  But given what you've testified about before about when the

10  Domaine started and when Belorgey acquired that plot by Domaine

11  Roumier, do you believe that the wine on the cover of this

12  program to be authentic Domaine Roumier wine?

13  A.  No.  For me it cannot be.

14          THE COURT:  Mr. Mooney.

15  CROSS-EXAMINATION

16  BY MR. MOONEY:

17  Q.  Good afternoon.

18  A.  Good afternoon.

19  Q.  When you went to this tasting at Don Stott's house, you

20  wrote tasting notes, did you not?

21  A.  Yes.

22  Q.  And what are tasting notes?  Tell us what tasting notes

23  are.

24  A.  These are descriptions because these are personal notes

25  that I take for myself just to try to remember the wine after a

DCC6KUR4                    Roumier - cross

 1   period of time where I could have forgotten them.  These are
 2   just of course descriptions of the wine, color, flavor.
 3   Q.  We'll get you some water.
 4   A.  Type of tannins, the touch, the texture the wine.  So the
 5   feeling that the wine provides you on the palate and so a
 6   general description of the wine.
 7   Q.  And is that a habit that you've gotten into in writing down
 8   notes when you taste wines?
 9   A.  Yes.  It is a habit to lots of people.  In fact to wine
10   passionate and who want to keep records of what they have
11   tasted.
12   Q.  How many people were at this dinner that you went to at Don
13   Stott's?
14   A.  I have to refer to the list.  I don't exactly remember the
15   number we were.
16   Q.  It was quite a few people?
17   A.  Yes.  Quite a few -- 11, 12.
18   Q.  Did you see other people making notes?
19   A.  Oh, yes.  Yes.
20   Q.  In fact, that is the normal thing to write down tasting
21   notes --
22   A.  Yes.
23   Q.  -- when you drink a fine wine, isn't it?
24   A.  Yes.
25   Q.  The '23 that we see here on the cover, you've testified

1    here that that wine could not exist for a couple of reasons, is

2    that right?

3    A.  Yes.

4    Q.  On the night of the Don Stott's dinner, you were not so

5    sure, were you?

6    A.  As I told you, tasting a wine is as always a question of a

7    feeling and you can mistake change, the aromatics can be

8    different from a bottle to another, you yourself can also have

9    different attitude to the same wine.  So I wasn't sure.  I just

10   wrote down -- if you have my tasting notes somewhere, I wrote

11   in French.  But I said that the wine was not authentic.  This

12   was my last word on it anyway because the wine had, if I may

13   say, a taste that is not the touch of tannins that we obtain in

14   Burgundy.  It had a very big mouth feeling, a feeling of

15   alcohol and a richness which is not typical of our wines.

16   Q.  You recall writing, Though, I cannot explain how this may

17   have occurred as the labeling of the bottle was so authentic in

18   look?

19   A.  The look, yes.  This is the same type of look of at the

20   bottle that I was shown this morning is very -- it looks old

21   and it looks authentic.  But still again as mentioned before

22   the fact that cannot be possible on that ventage.

23   Q.  So what happened is you essentially were fooled at least at

24   first by what you saw even though this is your Domaine?

25   A.  I was offered a wine to taste, I tasted it, and I wrote

DCC6KUR4                        Roumier - cross

1   that it was not authentic.

2   Q.  So you know all the details of the winery.  You know all

3   the timing of things, right?

4   A.  Some.  Not all details, yes, but many.

5   Q.  Well, okay.  I take it you were not there in 1923?

6   A.  No.  I swear.

7   Q.  But you know as much about to the Domaine Roumier as

8   anybody?

9   A.  Yes, I think.

10  Q.  And yet you were not really sure when you went to the

11  tasting -- you tasted it and you said it tasted wrong, but you

12  didn't immediately recognize the bottle as being a fake, did

13  you?

14  A.  I wrote it was not authentic.

15  Q.  You didn't recognize the label from the outside of the

16  bottle?

17  A.  Yes.  I had said to the company of people who were there

18  that this type of phrase was not possible on such a wine and

19  that the vintage '23 to my opinion was not produced by my

20  grandfather because he started in '24.

21  Q.  But you could understand then how somebody who didn't have

22  your depth of knowledge could be mistaken by this bottle and

23  then it is okay?

24            MR. MOONEY:  Objection.

25            THE COURT:  I will allow it.  You can answer if you

1    know.

2    Q.  You can understand that?

3    A.  I can understand that if I take your question right that

4    someone can be fooled and think it is an authentic wine.

5    Because so then if this is the question I say, Yes, because the

6    look is acceptable.  But if you know the estate and the

7    history, you know that it is not possible.

8    Q.  This wasn't the only bottle you drank that night, is that

9    correct?

10   A.  No.  There was a list of different wines.

11   Q.  And you drank, what, about 13 or 14 wines to taste sound

12   about right?

13   A.  Something like that.  We don't drink.  We taste.  So it

14   means you don't swallow the wine.  The way it --

15            THE COURT:  It would be helpful to explain.

16   Q.  Why don't you explain that.  If you drank 13 bottles, your

17   tasting of those would be pretty blurry by the end?

18   A.  Yes.  You can understand that.  So the process is that you

19   evaluate the wine by, like I said before, the color, the nose,

20   you smell of the wine and then you take a little bit of wine in

21   your mouth.  You -- how you say -- swirl the wine in the mouth

22   so have a feeling of it on your palate and your tongue and then

23   you spit.  You have a small bucket and you spit the wine.  You

24   don't drink all of it of course.

25   Q.  The majority of the wines you tasted that night you didn't

1   have any problem with?

2   A.   There were acceptable old wines, yes, but again on my

3   tasting notes I did not make -- I didn't say -- because these

4   were personal tasting notes, I would never think that they

5   would finish here.  I didn't write down that Belorgey was

6   something suspicious.  It was wrong for me from the beginning.

7   Q.   There were a couple that you did have suspicions about out

8   of the 13 wines, right?

9   A.   All those that were carrying the name Belorgey and were

10  vintages older than 1952 were wrong to me.

11          MR. MOONEY:  Can we flip through the program.  Let's

12  go to the next page.

13  Q.   This next page that you looked at it briefly before, this

14  tells us what the courses of the dinner are going to be and

15  what wines are going to go with it, is that correct?

16  A.   Yes.

17  Q.   So if we look at this, there is 15 wines that are listed

18  here.  Would that be consistent with what probably was tasted?

19  A.   19 wines were listed I think.

20  Q.   Okay.  These were all Roumier wines, right?

21  A.   They were labeled with the name Roumier on them.

22  Q.   In your tasting notes you identified two of these as being

23  suspect, right?

24  A.   Yes.  Let's say I wrote this for only two of them, yes.

25  Q.   Only two?

DCC6KUR4                          Roumier – cross

1    A.  Because this was too much.

2    Q.  If you could go to the next page, please.

3           THE COURT:  So I understand.  So the dinner is served

4    at a tasting?

5           THE WITNESS:  Yes.

6           THE COURT:  You eat the food so to speak, but you

7    don't drink the wine?

8           THE WITNESS:  Yes.  Yes.

9    Q.  And this next list, this is a list of the people who were

10   in attendance at the dinner?

11   A.  Yep.

12   Q.  Was everybody there?

13   A.  Yes.

14   Q.  Your name got special treatment.  Your name is on the wine?

15   A.  My grandfather's name.

16   Q.  So if we can go to the next page.  I think that is it.?

17          MR. MOONEY:  You can take that one down.

18          If we can go to the Elmo, please.

19   Q.  Mr. Roumier, I am showing you a page from government's

20   Exhibit 1-328.  I will represent to you that this is one of the

21   numerous notebooks kept by Mr. Kurniawan where he puts tasting

22   notes.  And would you take a quick note -- do you recognize the

23   wine that he is tasting there?

24   A.  So apparently this is Bonnet Roumier 1985.  I don't -- I

25   cannot read what is written after that.

DCC6KUR4                         Roumier - cross

```
 1   Q.  Hard to read the writing.  Does that -- would this be about
 2   the right size for normal tasting notes?
 3   A.  Yes.  I am sure.  I am much shorter, I know.
 4   Q.  This is consistent with what somebody does when they are
 5   writing down after they have been tasting?
 6   A.  Pretty much, yes.
 7   Q.  I don't know if you can read it.  Does it look like it is
 8   consistent with what that wine should be?
 9   A.  Excuse me?  Can you repeat the question?
10   Q.  Does this look like a consistent description of what you
11   would expect the '85 Roumier to be?
12   A.  Again, tasting a wine is a personal feeling so the feeling
13   of one person differs with mine.  So these are words that I
14   would -- some of them, which I see here I could use to describe
15   a wine, yes.
16   Q.  You know right in the center he called it excellent?
17   A.  Yes, I see that.
18   Q.  Would that be consistent with the '85 Roumier?
19   A.  It is a very good wine and a good vintage.
20             THE COURT:  So wouldn't it be helpful to know what
21   everything says there for the jury?
22             MR. MOONEY:  I think it would.
23             THE COURT:  Can you read it, or can you make it out?
24             THE WITNESS:  If you can't, that's fine.
25             MR. MOONEY:  Yes.
```

DCC6KUR4                    Roumier – cross

 1    Q.  Does it look like ruby color?

 2    A.  Ruby color, yes.

 3    Q.  But would that be consistent with what would you find in a

 4    '85 Roumier, a ruby color?

 5    A.  Yes.

 6    Q.  One of the things you do when you tasting the wine is you

 7    look at the color first?

 8    A.  Generally speaking, yes.

 9    Q.  Starting off by describing the color would be appropriate

10    in the tasting?

11    A.  Yes.

12    Q.  And then do you sometimes swirl the wine?

13    A.  Yes.

14    Q.  What is the purpose of swirling the wine inside the class?

15    A.  The main purpose is so that you give the wine larger

16    surface inside the walls of the -- the wall of the glass to

17    evaporate some aromatics.

18    Q.  So it is not to prove you are not too drunk to drink it?

19    A.  No.

20    Q.  When you get that air into it is that going to help it come

21    alive?

22    A.  Yes.  How do you say?  So swirling of the wine into the

23    glass it helps the wine to take some oxygen, which is another

24    good reason to do that above all in a young wine because a

25    young wine needs more oxygen to develop flavor.

1    Q.  And then is it common at that point to smell the wine?

2    A.  Yes.

3    Q.  And you haven't put any in your mouth at that point?

4    A.  No.  Generally speaking people, me included, prefer to

5    first have the impression of the nose before they start to

6    taste.

7    Q.  Eyes, nose, and then finally the mouth gets to enjoy the

8    flavor?

9    A.  Yes.

10   Q.  And then when you taste it, when it comes to your mouth is

11   one of the things you start to do is to describe the other

12   tastes, the things that it reminds you of?

13   A.  Yeah.  Because the same logically the aromatics that you

14   have on the nose are those that you will find on the palate as

15   well because of tannins, which do not express flavors by

16   themselves, the combination makes so that the feeling in mouth

17   differs slightly from this on the nose.  So it is interesting

18   to have the progression and go step by step.

19   Q.  There is a description in here looks to me like fruits,

20   spices and coffee.  Do you see that before "excellent"?

21            THE COURT:  Where is that?  On what line?

22   A.  I see spices.

23            MR. MOONEY:  Of the description starting near the end

24   of the fourth line down of the body.

25   Q.  Do you see that.?

DCC6KUR4                        Roumier – cross

1   A.  Spices and coffee, no?

2   Q.  Toffee.  I guess it could be toffee?

3   A.  Yeah.

4   Q.  And taking notes are primarily a personal thing, right?

5   They are written for you to keep yourself?

6   A.  Yes.  Except for professional people who it is their job.

7   Q.  Some people publish them and make money?

8   A.  Some.

9   Q.  Sometimes you may share them with a friend or somebody

10  else?

11  A.  Again, it is our personal feelings.  You know, if you go to

12  a museum and watch for a nice paint, you can exchange with your

13  friends as well.  So it is part, yes, of the pleasure to taste.

14  Q.  You've met Mr. Kurniawan, have you?

15  A.  Yes.

16  Q.  And in fact you have had wines with him before, haven't

17  you?

18  A.  Yes.  Oh, before, no.  After.

19  Q.  After --

20  A.  After, yes.

21          THE COURT:  So what is the date?  When did you first

22  meet him if you can remember?

23          THE WITNESS:  I met him at San Francisco.  Cote d' Or,

24  an event in San Francisco.

25  Q.  When was this?

DCC6KUR4                         Roumier – cross

1    A.  2008.

2              THE COURT:  That is the first time you met him?

3              THE WITNESS:  Yes.

4    Q.  Do you recall having a bottle of wine with him and signing

5    the bottle?

6    A.  I don't remember that detail, no.  I know I had several

7    wines with him, yes.

8              MR. MOONEY:  If we can show this just to the witness,

9    then.

10   Q.  Do you see that?

11   A.  Yes.

12   Q.  Do you recognize that as one of your bottles?

13   A.  Yes, definitely.

14   Q.  What wine is that?

15   A.  Bonnes-Mares 1934.

16   Q.  Does that have your signature on it?

17   A.  Yes.

18   Q.  Do you remember signing that bottle now?

19   A.  I don't remember signing it, no.

20   Q.  Any doubt in your mind that that is your signature?

21   A.  It is mine.

22             MR. MOONEY:  I don't think we marked this with a

23   number.  We would designate this E-1 and move its admission.

24             THE COURT:  I will allow it.

25             (Defendant's Exhibit E-1 received in evidence)

1           MR. HERNANDEZ:  I ask now that the jury be able to see

2    it.

3    BY MR. MOONEY:

4    Q.  So you don't remember anything about this wine?

5    A.  No.  I could not make the description now.  At this party I

6    didn't take notes.

7    Q.  Do you see the label near the neck of the bottle?  Can you

8    read what that says?

9    A.  What do you mean the neck label?

10   Q.  No.  Below the vintage there is another label that is on

11   there.

12   A.  Yes.

13   Q.  That is not a label that your vineyard put on there?

14   A.  No.  No.  This label that used by the sommeliers to know

15   whose bottle.

16   Q.  What do we see on that label?

17   A.  Here --

18           MR. MOONEY:  We have the colored one.  That is so much

19   nicer.

20           THE COURT:  Do you have a question pending?

21           MR. MOONEY:  Yes.  Well, I wanted him to read the

22   label just under the 1937, the white label.

23           THE COURT:  1934?

24   A.  Roumier Montrachet.

25   Q.  We can clearly see your signature and it says something.

DCC6KUR4                          Roumier - cross

```
 1   Can you read what that says above your signature?

 2   A.  I cannot read.  I cannot read what it says.

 3   Q.  Very good.  Thank you.

 4           MR. MOONEY:  See if we can expand that a little better

 5   around the signature.

 6   A.  It says maybe for Rudy.

 7   Q.  That is as good as we're going to get.  Does that help at

 8   all?

 9   A.  To Rudy.

10   Q.  It would appear then this is a bottle that was supplied by

11   Mr. Kurniawan that the two of you drank on some occasion, is

12   that right?

13   A.  We were more than two.  We were a group of people around

14   this wine, yes.

15   Q.  And you memorialized -- did he ask you to sign the bottle?

16   A.  Certainly.  I don't do that spontaneously.  So, yes.

17   Q.  You just don't take every bottle and start signing it?

18   A.  No.

19   Q.  He asked you to sign this bottle and you agreed to sign the

20   bottle?

21   A.  Yeah.

22   Q.  And that is not an uncommon thing?  People will very often

23   memorialize occasions by writing their names on the bottles?

24   A.  That is something that can happen with special bottles

25   drunk in special conditions.
```

1   Q.  It is a way for people to remember the occasion?

2   A.  Yes, I guess.

3   Q.  You've seen people like to keep the bottles very often

4   because they remind them of the occasion that they had?

5   A.  Yes.  Yes.

6   Q.  And especially when you have got tasting notes of it and

7   you have got the bottle and you can take those things back and

8   you can go back and really enjoy the experience?

9   A.  But again I did not take notes on this specific day of the

10  tasting here.  This was a different time than in this program.

11  Q.  I understand.  This was not the stock dinner?

12  A.  No.

13  Q.  This was something entirely different?

14  A.  This was in San Francisco.

15  Q.  Now, the Domaine Roumier started with your grandfather in

16  the '20s.

17  A.  1924.

18  Q.  Was '24 the first -- is that the first year you show that

19  they had wine or is it the first year that they owned the

20  vineyard?

21  A.  This was the year of marriage my grandmother -- my

22  grandfather married my grandfather.  The estate, so the

23  vineyard, where belonging to my grandmother's family so they

24  receive as a dowery.

25  Q.  So the vineyard was there in the family?

1    A.  Yes.

2    Q.  Then your grandfather comes in this '24?

3    A.  Yes.

4    Q.  So it becomes Roumier in '24 because your grandmother would

5    have been named something else, right?

6    A.  Yes.  Exactly.

7    Q.  Wines that were produced, wines that had been released

8    prior to that would be under a different name?

9    A.  A different name.

10   Q.  Do you know what that name would be?

11   A.  It was carrying the family name, which is difficult.  I

12   will have to spell it.  Quanquin, Q-u-a-n-q-u-i-n.

13   Q.  And your grandfather continued to run the vineyard for a

14   good number of years?

15   A.  Yes.  My grandfather passed away in 1965.  My father

16   started to work with my grandfather in 1954 about and retired

17   in 1990 and I started to work with my father in 1981.

18   Q.  So your grandfather owned and ran the vineyard through the

19   World War II period?

20   A.  Yes.

21   Q.  And the World War II period was a very difficult period

22   time in Burgundy, was it not?

23   A.  It was.  So was also the '20s and '30s as to wine producer.

24   The wine was selling for little money and the war was also a

25   difficult time, yes.  That's right, but wine was selling for

DCC6KUR4                    Roumier – cross

1    little money.

2    Q.   There was a period of time from 1999 up until 1395, which

3    Burgundy was actually occupied, isn't that right?

4    A.   Yes.

5    Q.   And during the occupation there was the nazis actually put

6    someone in Burgundy who was in charge of everything that was in

7    charge that was supposed to go on with wines in Burgundy?

8    A.   Yes.  I have been told.

9    Q.   You've heard this?

10   A.   Yes.

11   Q.   You know these histories?

12   A.   Yes.

13   Q.   You also know that during that period of time lots of wines

14   that people had when they saw what was happening, they hid the

15   wines?

16   A.   Yes.  Some people did that, yes.

17   Q.   Because they knew that one of the first things that was

18   going to happen is that the Germans were going to start asking

19   for the wine?

20   A.   Yes.

21   Q.   And in fact they did, didn't they?

22   A.   Not in every place.  I heard stories like this.  I heard

23   that some nazis have taken some bottles, but I never heard of

24   restriction.  I never heard of total destruction of bottles.

25   Q.   But Roumier wine was taken by the Germans?

DCC6KUR4                          Roumier - cross

```
 1   A.  No.

 2   Q.  No, was it not taken?

 3   A.  No.  My grandfather had been -- how do you say that? -- had

 4   been gassed during the first world war so he was not in

 5   enrolled during the second and he remain at home.  So we didn't

 6   have German people at home.

 7   Q.  So he stayed on the Domaine?

 8   A.  Yes.

 9   Q.  But he was still answering to the wine fuhrer?

10   A.  To the?

11   Q.  The to the German that was in charge of the wine in

12   Burgundy, right?

13   A.  Probably.  I don't know the exchange.  I don't know the

14   story of the exchange here.

15   Q.  And during World War II you weren't allowed to sell any

16   wine to the United States, were you?

17   A.  No.

18   Q.  You weren't allowed to sell any wine to the UK?

19   A.  No.  Probably not.

20           MR. HERNANDEZ:  Objection.  Although interesting,

21   relevance.

22           THE COURT:  I will allow a little latitude.

23           MR. MOONEY:  Well, I am getting there.

24   Q.  So isn't it true that lots of strange things began

25   happening with regards to how things were bottled and what was
```

DCC6KUR4                      Roumier - cross

1   put together.  There were bottles coming out of the vineyards

2   at that point in time that represented to be things that they

3   weren't?

4                 THE COURT:  If you know.

5   Q.  If you know.

6   A.  I am afraid I don't understand exactly what you mean.

7   Q.  I mean, in order to meet the demands that the Germans were

8   making, wasn't it common particularly in Burgundy for the

9   vineyards to put together all sorts of false and phony bottles

10  and things to send over to the Germans?

11  A.  I don't know.  I don't know.

12  Q.  That's fair.  You weren't there.

13  A.  I wasn't there.  I've had some reports from the family, but

14  not this sort of detail.

15  Q.  Thankfully somehow your father got through that period

16  okay, or your grandfather got through that period okay.

17  A.  Uh-huh.

18  Q.  And continued to thrive afterwards.

19                Now, I think we've talked about the fact that the

20  things are informal in terms of the records of the vineyards.

21                Isn't it also --

22                THE COURT:  Wait.  What have we talked about?

23  Q.  You said that your records were kind of informal during

24  your early period, or did I mistaken that for somebody else?

25  A.  You mean the family records?

DCC6KUR4                    Roumier - cross

1   Q.   Yes.   The records of the winery.

2   A.   Yeah.   There was almost nothing.

3   Q.   So you can't go back today and, you know, say in 1947 we

4   produced X amount of bottles of wine?

5   A.   No.   I don't have real numbers.

6   Q.   And, in fact, during that period of time the wine that was

7   kept in the estate and not sent out of the other places, the

8   bottles were not even labeled, were they?

9   A.   No.   They were naked bottles.

10         THE COURT:   Which time period are we talking about?

11  What is your question?

12  Q.   During the '30s, '40s, '50s and even the '60s, '70s and '80

13  any bottles kept in the estate are not labeled?

14  A.   Yes, exactly.   The habit is to put the label when you ship

15  the bottle out of the estate.

16  Q.   So if you took a 1945 Bonnes-Mares and released it to

17  somebody in 1985, you would put a label on it at the point in

18  time that you released it?

19  A.   Yes.

20  Q.   And as a result some confusion gets created because you see

21  different labels on the same bottles or on the same wines?

22  A.   This may happen.

23         MR. MOONEY:   Turn the Elmo back on again.

24  Q.   This is from 142 I think it is.   Do you see there two

25  bottles of the 1962 Bonnes-Mares?

DCC6KUR4                         Roumier - cross

```
 1    A.  Yes, I see it.

 2    Q.  And two very, very different labels, right?

 3    A.  Yes.

 4    Q.  Then another example from the that same exhibit.  So we

 5    have two '71s there and then a different '71 over there, is

 6    that right?

 7    A.  Yes.

 8    Q.  Is that correct?

 9    A.  Yes.  Absolutely.

10    Q.  So there was --

11    A.  Except -- excuse me to interrupt you.  If you can show the

12    first photo.

13    Q.  The first one?  Sure.

14            THE COURT:  Are these in evidence?

15            MR. MOONEY:  Yes.

16            THE COURT:  So we can show this to everybody?

17            MR. MOONEY:  Yes, sir.  We should be showing these to

18    everybody.

19    A.  The left label is not ours.

20    Q.  Okay.

21    A.  It is not my estate.

22    Q.  Does that mean that bottle is a fake, or does it mean it is

23    somebody else?

24    A.  I don't mean it is fake.  I mean that it is not a label

25    that is ours.  It has been labeled at the estate.
```

DCC6KUR4                    Roumier – cross

1   Q.  So the one that would labeled by the estate is the one on

2   the right?

3   A.  Yes.

4   Q.  The one on the left?

5   A.  It has the look and it is –- it has a look of our label on

6   the right, yes.

7   Q.  Now, one of the things you would also sell out wine in

8   barrels?

9   A.  Yes.

10  Q.  And they would then be bottled?

11  A.  Yes.

12  Q.  Would that be an explanation?

13  A.  It could be an explanation to that.

14  Q.  So we can end up with here the 1962 Bonnes-Mares with two

15  very different looking bottles --

16  A.  Yes.

17  Q.  -- because of that activity?

18  A.  Yes.

19          MR. MOONEY:  No more questions, your Honor.

20          THE COURT:  Any redirect?

21          MR. HERNANDEZ:  No, your Honor.

22          THE COURT:  Thank you very much, Mr. Roumier.

23          MR. HERNANDEZ:  The government calls Aubert de

24  Villaine.

25   AUBERT DE VILLAINE ,

DCC6KUR4                          Roumier – cross

1              called as a witness by the Government,

2              having been duly sworn, testified as follows:

3    DIRECT EXAMINATION

4              THE INTERPRETER:  Isabelle Duchesne, French

5    interpreter.

6              THE DEPUTY CLERK:  Are you the certified in the

7    Southern District?

8              THE INTERPRETER:  I am federally approved in the

9    Southern District.

10   BY MR. FACCIPONTI:

11   Q.  Good afternoon, Mr. De Villaine.

12   A.  Good afternoon.

13   Q.  If you want to move your seat a little forward and perhaps

14   pull the microphone closer to you so we can hear you better

15   when I ask you questions.

16              Where do you live?

17   A.  I live in Burgundy.

18   Q.  That is in France?

19   A.  It is in France.

20   Q.  What do you do for a living?

21   A.  I make wine.  I am what you call in France a vigneron,

22   winemaker.

23   Q.  Do you work at a particular winemaking entity in Burgundy?

24   A.  I am the co-manager the do man Domaine de la Romanee-Conti.

25   Q.  I am going put up on the screen that has been labeled

DCC6KUR4                          De Villaine - direct

 1    Government 19-5.

 2              MR. FACCIPONTI:  Mr. Platt, can you enlarge the upper

 3    right-hand quadrant of that map and if we can highlight

 4    Romanee.

 5    Q.  Is it fair to say that Burgundy is one of the great

 6    winemaking regions in the world?

 7    A.  Burgundy has been -- Burgundy is it a stretch of 50

 8    kilometers long.  It had been producing wine since 2000 years

 9    and building a type Montrachet that is quite unique in the

10    world.  That is where you find is most extreme.  In this

11    stretch you have 1,247 parcels of land, each with name, each

12    with a designation, and been producing wines for many

13    centuries.  And the -- this -- between all these parcels you

14    have a hierarchy that has been established since centuries or

15    so where you have the top and bottom you have and make the very

16    good wines, but not regarded as the Grand Cru.

17    Q.  The Grand Cru are considered the best wines?

18    A.  The Grand Cru represent 1 percent of the world production.

19    It is very few -- few villages.  You don't find them in all the

20    villages.  They are regarded as something extremely precious

21    where the great wines of this world are made and of course have

22    prices on the market that are quite high.

23    Q.  Can you tell us a little bit about the history of the

24    Domaine de la Romanee-Conti?

25    A.  Domaine de la Romanee-Conti you may start with the Conti

DCC6KUR4                        De Villaine - direct

which is a vineyard of around 4 acres and a half, 1 acre 50,

which has been delineated since at least the 13th century

because that is when you find the first map of this vineyard.

At the time it was established by the monks.  You know the

monks were extremely -- extremely -- important in the beginning

of Burgundy.  The monks, the church they were given a lot of

land by the dukes of Burgundy and nobles and they produced --

they were the ones who really started the kind of production

that we practice today.  They are our founding fathers.

        And so the monks had this vineyard, which they sold in

the 13th Century to a family, and this family kept the vineyard

for three -- I think 300 years and then gave it fame, and

called it at one point Romanee.  We don't know exactly why.

Something related to Roman occupation or another.  We don't

really know.  They called it Romanee.

        Then they sold it to a very important person of the --

of the times, the Francois de Conti, who was the cousin of

Louis XV, who was the king of France at the time and who bought

this vineyard for deeds at a very exaggerated price because he

gained a very high reputation.  He kept it for his own

consumption.  And of course he didn't keep -- he didn't keep it

for very long because the Revolution arrived and he -- you

know, the properties of the church and of the nobles were

confiscated and sold and so it was sold and went to two

hands -- three hands in 1869 by ancestor, who bought it.  At

1    the time he was constituting an important estate and it

2    remained since in my family.

3            And of course I was always been the top wine of the

4    estate where we make other Grand Cru like that La Tache,

5    Richebourg.  Names that were known by the collectors.

6    Q.  So just so there is no confusion there is an Appellation

7    called Romanee-Conti and the domaine itself, which makes wines

8    from other Appellations besides Romanee-Conti is also called

9    Romanee-Coni?

10   A.  As I said is delineation that exists since at least since

11   13th Century and is 4 acres and a half and that is all and the

12   Domaine Romanee-Conti represents an estate of about 20, 28

13   hectares or about 60 acres.

14   Q.  So just so you are not confused when I say Romanee-Conti, I

15   am just referring to the vineyard.  When I say domaine, I am

16   referring to the whole Domaine Conti.

17   A.  Uh-huh.

18   Q.  How many -- what Grand Cru wines does the domaine make?

19   A.  Makes seven Grand Cru.  Romanee Conti and La Tache and

20   these two are fully owned by us.  They are most vineyards in

21   Burgundy are shared by certain number of growers more or less.

22   These two are owned only by us.  And then we have Richebourg

23   part of Richebourg, Grands Echezeaux.  To give you an example

24   is a Grands Echezeaux is a shared by 10 different growers.  We

25   have about half of it and the rest is shared by half other

1    growers.  It is the same pattern.  Grands Echezeaux in the

2    white part of the Burgundy, which is more south.  Plus one

3    other Grand Cru in another village, Corton, which we have since

4    a short time.

5    Q.  Does the domaine make any wines that are not Grand Cru?

6    A.  No.  We produce a very small quantity of Grand Cru.  That

7    is a certain way of making wines.  It is 98 percent of our

8    production.

9    Q.  What is your personal history with the domaine?

10   A.  I have -- the beginning for me was living in Burgundy.  It

11   has since the beginning that I've always heard of as something

12   extremely precious and something that the family had to keep at

13   any price, but I wasn't very close to the land.  And we were in

14   the -- I was born in 1939 and when I was a young, the Burgundy

15   was still in the state of very difficulties.  A lot of young

16   people in Burgundy were going -- were doing studies of other

17   kind and not staying in the vineyards.  Myself, that was my

18   case.  It -- I did completely different studies.  But when I

19   was 25, I decided that that is what I wanted to do.  So I -- I

20   asked my father and his partner if I could be accepted and they

21   did and so I started the business from scratch working in the

22   vineyards.  At the same time some of the courses I learned and

23   learned which was I think precious for me to start in this and

24   I was named co-manager in 1974 and since I've been a

25   co-managing.

DCC6KUR4                        De Villaine – direct

1   Q.  You referred to difficulties at the domaine had in the

2   1930s.  Was one of those difficulties the phylloxera insect?

3   A.  That was a state in the 19th Century and then in 1880 the

4   phylloxera arrived and it started from the south of France and

5   went up and destroyed all the vineyards on its way.  It was a

6   terrible bug, an insect that is extremely dangerous for the

7   vineyards and destroyed the vineyards without possible defense

8   except injections, which everything did for a while but it was

9   something that was extremely complicated to practice and to

10   practice on a large scale.  So fortunately the Americans sent

11   us the insect but they sent us also the remedy?

12               THE COURT:  The cure?

13               (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

DCCBKURT6                    de Villaine - direct

BY MR. FACCIPONTI:

Q.  So the Phylloxera, that came from the United States

originally?

A.  Originally, yes.

Q.  And the ultimate remedy was American grape roots which were

resistant to the insect?

A.  It was noticed that some American kind of vines were

resisting to Phylloxera.  So some smart people and scientists

realized that if we grafted our vine, our kind of vine, on this

old stock, we could make wine with the same taste and without--

with the vines not being attacked by Phylloxera.

        So that's what happened.  Vineyards were little by

little all replanted that way, except very few.  And the last

one left was the Romanee-Conti, where Dominique Conti had so

much respect, knew that the owners, my family, couldn't--

couldn't bend to tear it out, to replant.  So they kept the

vineyard with injections of carbon disulfide until the second

World War when this stuff could not be found anymore and the

vineyard became weaker and weaker.  And at the very end, when

it was torn out in '45, the production was six-- two barrels,

six hundred bottles in all.

        So that was the time when they decided to kill it out

and replant it.

Q.  So the 1945 vintage of Romanee-Conti was only six hundred

barrels together?

1    A.  Sorry?  I didn't...

2    Q.  Six barrels?

3    A.  Two barrels.

4    Q.  Two barrels?

5    A.  Two barrels, six hundred bottles.

6    Q.  Six hundred bottles.  Sorry.

7            As a result, are there many bottles left of 1945

8    Romanee-Conti out there?

9    A.  We have -- at the domaine we have no more bottles of 1945.

10   No more.  It's-- it was both a very small in quantity vintage,

11   but also a great vintage.  A great vintage.  It was also --

12   Q.  Why was it a great vintage?

13   A.  Because the conditions, the climatic conditions, were very

14   good.  You know, in Burgundy, we have-- it's a region that is

15   quite north.  The grape variety always make the greatest wines

16   in difficult conditions always.  And so in Burgundy very often

17   the season is difficult.  You have rain, storms, sometimes

18   drought.  And it is not easy.

19           And 1495 was a year when all the conditions were very

20   good.  And so all of the vines produced a great vintage, of

21   course, but with a very small quantity with Romanee-Conti.

22   Q.  So it's fair to say any bottle of 1945 Romanee-Conti is

23   rare, hard to find, and very valuable?

24   A.  It is-- it is extremely rare.  I would be surprised today

25   that you still have a bottle existing, although you find some

1   in some auction sales, which is always surprising.  But if a

2   real bottle is on the market, it of course would be at the

3   very, very high price because nothing is more rare and more

4   looked for than a bottle of Romanee-Conti '45.

5   Q.  And, generally speaking, are wines from older vintages rare

6   and hard to find?  Are wines from older vintages rare and hard

7   to find?

8   A.  Oh, yes, they are very hard to find.  All the winemakers,

9   not only Romanee-Conti, but the others, of the first part of

10  last century exist by -- are very smaller.  It's a question of

11  a few bottles left.  But the Romanee-Conti is especially--

12  especially rare.

13  Q.  Let's turn to a different subject now.

14          Are you familiar with the term "reconditioning"?

15  A.  Hmm?

16  Q.  What is reconditioning?

17  A.  Reconditioning means to take bottles that have-- old

18  bottles, old bottles that have some problem.  Some problem that

19  the person who has the bottle wants to be repaired.

20          So there are several levels of reconditioning.  If it

21  is-- if it is only the label that is damaged, then you would

22  replace the label.  But if it is the wine that has had a

23  problem, for instance if the cork has let the wine go so what

24  they call the ullage, the distance between the wine and the

25  cork, has become very important, then it would be good to

DCCBKURT6                        de Villaine – direct

1    refill the bottle with the same wine, of course, in order to

2    allow the wine to last for a longer time.

3            So that would be reconditioning, complete

4    reconditioning.

5    Q.   Where does the reconditioning occur?

6    A.   When?

7    Q.   Where.

8    A.   Where?  Only at the-- reconditioning is something that we

9    have done for customers who are familiar.  And we stopped

10   something like 15, 20 years ago because we realized -- I

11   realized that all the bottles that were given to us to do that

12   in fact were-- it was for being resold.  In other words, for

13   speculation.  And when you are a grower, you make wine for

14   being drunk and not for speculation.  So I stopped-- I stopped

15   reconditioning.

16           I'm sorry, did I complete your question?

17   Q.   That is correct.

18           When you did recondition, what would you do with the

19   original label and bottle and the cork?  Would you replace all

20   of that?

21   A.   The bottle is refilled.  I mean, it's the same bottle.  If

22   you do a reconditioning, a complete reconditioning is refilling

23   the bottles, you need a certain number of bottles and use one

24   bottle to refill the others.  That's why we never did it for

25   one bottle, but for several bottles.  And you sacrifice one

DCCBKURT6                    de Villaine - direct

1    bottle to refill the others.

2    Q.  When you reconditioned those several bottles, would you put

3    new labels on them and give them new corks and capsules and all

4    that?

5    A.  Yes.  Yes.

6    Q.  I'm going to hand you three bags of evidence that have

7    already been admitted.  It's Government Exhibits 175-- I mean

8    1-175, 1-180 and 1-176.

9          Let me ask you to look at Government Exhibit 1-175

10   first.  I just want to open up and take a look at these

11   materials that are there.

12          MR. FACCIPONTI:  If we could have the ELMO, please.

13   Q.  Do those appear to be labels for Romanee-Conti in front of

14   you?

15   A.  Mm-hmm.  Mm-hmm.

16   Q.  And specifically do they appear to be labels for very old

17   vintages?

18   A.  Mm-hmm.

19   Q.  What can you say about some of these vintages that you see

20   here?

21   A.  About the vintages, they are all great vintages.  If I can

22   say, first thing that I would say is that for me it is--

23   numbfunding (sic)?  It's extraordinary to see the number of

24   labels of wines that have completely disappeared, that we don't

25   ever not even have any bottle left at the domaine.  And to see

1   labels like this, it's quite-- quite incredible.

2              The vintages are great vintages, '99, '95-- or, I'm

3   sorry, 18-- 1915.  1915, 1919 vintages, great vintages.

4   Q.  Do you keep old labels at the domaine?

5   A.  We keep labels as long as we have the wines.  I only keep--

6   but, you know, if we had-- unfortunately, we don't have any

7   more.  If we had some bottles of these vintages, we would keep

8   a few labels just for-- but they would never be for sale, you

9   know.  They would be sort of family treasures that we would

10  drink in families sometimes.

11  Q.  So is it surprising to you that you see-- do you have

12  labels at the Domaine for these vintages anymore?

13  A.  No.  No, we don't have any more.

14  Q.  So is it surprising to you to see a stack of several dozen,

15  if not several hundred, labels for vintages that probably don't

16  even have wines that exist anymore?

17  A.  It is-- it is more than extraordinary.  If it is for a

18  movie or whatever.

19  Q.  You said it's for a movie or something?  Like a movie

20  proper?

21  A.  And, you know, in these labels we never had any-- we never

22  had these self--- self-adhesive, self-adhesive labels.

23  Q.  So the Domaine has never made self-adhesive labels?

24  A.  No, never.

25  Q.  And do you see in there labels for a 1945 vintage of

1    Romanee-Conti?

2    A.  They are-- they are well quite copied.

3    Q.  Do you see --

4            THE COURT:  Wait.  Did you see they are quite well

5    copied?

6            THE WITNESS:  Copied.

7    Q.  Do they look similar to what the Domaine's labels looked

8    like during that time period?

9    A.  Yes, very much.  Very much so.  Very much so.

10   Q.  Would you say there's about maybe 20 or 30 1945

11   Romanee-Conti labels in your hand?

12   A.  I never had that many in my hands.

13   Q.  If you could just put these to the side and look at

14   Government Exhibit 1-180.  It's for a vintage called-- you're

15   go to go have to help me with this -- Les Gaudichots?

16   A.  Les Gaudichots.  Let me see.  There's the elastic.

17   Les Gaudichots '29, is it?

18   Q.  1899.

19   A.  1899.

20   Q.  What is this wine?

21   A.  This is Les Gaudichots was a Premier Cru, what they call

22   Premier Cru, until 1931 when it was attached to La Tache.  And

23   La Tache and Les Gaudichots became La Tache.  So this is a

24   label that doesn't exist anymore.  It existed in 1899, of

25   course, but it doesn't exist anymore.  And obviously that kind

 1    of wine, if it existed, would be extremely looked for by

 2    collectors because it's something, I mean, extremely, extremely

 3    rare.

 4    Q.  Have you ever seen an 1899 label for Les Gaudichots?

 5    A.  Never.  Never.  Frankly, never.

 6    Q.  Finally the exhibit there is Government Exhibit 1-176.

 7    What is the-- what is the vintage-- what is the wine for these

 8    labels?

 9    A.  Your question is?

10    Q.  What wine is this for?

11    A.  This is for-- this is for Richebourg Vieux Cepages.  I told

12    you the story about Romanee-Conti being kept as an old vineyard

13    before Phylloxera, the way the vineyards were attended before

14    Phylloxera before 1945.  I told you about this.

15           Maybe I should just add to my explanation that the

16    vineyard of Romanee-Conti, like this small vineyard of

17    Les Gaudichots, was something like nobody really knew.  Maybe

18    three, four hundred years old.  Because the vines were

19    reproduced.  When a vine had given fruit for 30, 35, 40 years,

20    it will be-- it would be buried.  You would make a little ditch

21    at the bottom of the vine and bend the vine in the ditch and we

22    cover with dirt.  And you will have one, two or three shoots

23    restarting new vines.

24           And so the vineyards were reconstituted permanently

25    like this for hundreds of years.  And of course when the

1   Phylloxera arrived, this was impossible.  And the Richebourg --

2   there was a small part of Richebourg which was kept exactly the

3   same way.  And so this little part of Richebourg produced until

4   1945 also very small quantities of wine.  It was, depending on

5   the vintage, two to three hundred bottles per year.

6   Q.  So in 1945, perhaps only two or three hundred bottles of

7   Richebourg old vines was made?

8   A.  Mm-hmm.

9   Q.  And is there anything striking about a label that perhaps

10  is printed for a 1945 -- if we look at the screen -- 1945

11  vintage on one side and a 1942 vintage on the other?

12  A.  No comment.

13  Q.  Based on everything you've seen, do you have any conclusion

14  about the authenticity of these labels?

15  A.  I know it's-- those are labels, printed by a printer, but

16  they have never been-- they have never been our labels.  And

17  they are not-- they are a fantasy.  They are not our labels.

18  Q.  Has the domaine ever printed its labels on laser printer?

19  A.  Has a domaine?

20  Q.  Does the domaine print its wine labels on a laser printer?

21  A.  No.  No, no.  No.

22  Q.  And has anyone named Rudy Kurniawan ever been authorized to

23  print labels for the Domaine?

24  A.  No.  No.

25          MR. FACCIPONTI:  We have no further questions, your

1  Honor.

2          THE COURT:  Mr. Mooney.

3          MR. MOONEY:  Before you take everything away --

4          THE COURT:  Do you want to keep some of that?

5          MR. MOONEY:  Yes, I want to keep some of that.

6          THE COURT:  Okay.

7          MR. MOONEY:  There it is.  You were hiding it.

8  CROSS-EXAMINATION

9  BY MR. MOONEY:

10  Q.  Good afternoon.

11  A.  Good afternoon.

12  Q.  You've looked at a lot of printed material there and one in

13  particular that you were shown was this one.  This is the label

14  that says 1945 on one side and 1942 on the other side.

15          Do you ever print labels on both sides?

16  A.  No, we don't need to save paper that much.

17  Q.  It would be kind of difficult to have to look through the

18  bottle to see what it was on the other side, wouldn't it?  And

19  this would be pretty confusing to look in the bottle and see a

20  bottle that said 1945 on one side and you look in there and

21  it's 1942?

22  A.  Obviously.  And, well, it would be difficult to see through

23  the wine.

24  Q.  Yes.  Maybe if you tipped the bottle.  Or after you drink

25  it, you get a surprise?

1            It's unlikely, isn't it, that anybody would ever

2    expect that this is something that would be put on a bottle?

3    A.  Totally.  Totally, yes.  I've never seen it.

4    Q.  You certainly wouldn't do anything like this?  You'd never

5    put that on a bottle, would you?

6    A.  Certainly not.  If a label like this was in the stack of

7    labels, we immediately throw it out.

8    Q.  Now, do you know a company by the name of Nicolas?

9    A.  Nicolas?

10   Q.  Nicolas.

11   A.  Yes.

12   Q.  And what kind of business are they in?

13   A.  Nicolas used to be in the wholesale business for long time

14   in the 20th Century and then they started to be only in the

15   retail business.  We have known them-- we have known them for a

16   long time.  Forever.

17   Q.  And Romanee-Conti has had a relationship with Nicholas, has

18   it not?

19   A.  Yes, like every grower in Burgundy.

20   Q.  And there was a period of time when they would even do some

21   bottling, wouldn't they?

22   A.  They are doing.  There was a time when, like most of the

23   domaines in Burgundy, our domaine was selling wine in bulk to

24   ship it to some people and one of them being Nicolas.  And that

25   was until the -- until, I'd say, the '30s.

1   Q.  And they would receive the wine in barrels?

2   A.  They would receive the wine in barrels, mm-hmm.

3   Q.  And at some point in time, they would take the wine from

4   the barrels and put it in the bottles?

5   A.  Exactly.

6   Q.  And then you would also bottle the wine at the estate?

7   A.  Yes.

8   Q.  When did you first start bottling wines at the estate?  Do

9   you know?

10  A.  Oh, a very long time ago.  This ancestor I was speaking

11  about who created the domaine in 19th Century was himself

12  bottling and sending practically all the wines he made, a good

13  part of that, in barrel.  And Dominique Conti was only been

14  sold in bottle since that time.  The other wines were sold in--

15  some other wines were sold in barrels, but Dominique-Conti

16  itself was always sold in bottle.

17  Q.  And over the years the nature of how the bottles are

18  manufactured has changed.  Is that right?

19  A.  Yes.

20  Q.  In the early period they would be hand blown?

21  A.  At the very early period, yes.

22  Q.  And when you look at the bottles, you can tell the

23  difference between an old hand-blown bottle and a newer bottle?

24  A.  Hand-blown, it's really very long time ago.  Even I don't,

25  frankly, don't remember exactly when it stopped and became an

1   industrial bottles.  But this, the hand-blown bottles, are at

2   least a hundred years-- at least a hundred years ago or more.

3   Q.  The domaine has not kept a library of its labels over the

4   years, has it?

5   A.  Yes, we have kept a certain library, but some labels have

6   disappeared.  It's not, you know-- it's only very recently that

7   we encounter the problem of fake bottles.  There was no-- there

8   was no -- how you say?  It was not one of our priorities to

9   keep old labels.  So we still have a certain library of old

10  labels, but not all vintages produced and not all the wines

11  produced.

12  Q.  It's got some gaps in it?

13  A.  Hmm?

14  Q.  There's some labels for which you do not have a copy?

15  A.  Yes.

16  Q.  And we've heard that a lot of the vineyards or most of the

17  vineyards when they would bottle wines originally, that the

18  bottles are not labeled at the time they're bottled.  They're

19  only labeled before they leave the vineyard.

20          Does domaine -- does Romanee-Conti do the same thing?

21  A.  This has happened in Burgundy because our cellars are damp.

22  And if we labeled before shipping and putting in our cellars,

23  the labels would be damaged.  So they are put on the bottles

24  only at the moment of the shipping, yes.

25  Q.  What's the oldest bottle of wine that you think that you

1    have in your cellar?

2    A.   A bottle -- we have one bottle of Richebourg in 1911.

3    Q.   And that 1911 doesn't have a label on it, does it?

4    A.   No.  No.

5    Q.   So I doubt you'd want to sell it to me and I don't think I

6    can afford it.  But if you were willing to sell me that bottle,

7    you'd have to put a label on it at that point, wouldn't you?

8    A.   It's out of the question anyway.

9    Q.   We can't negotiate.

10   A.   No.

11   Q.   But the same would be true of some of the newer ones, I

12   take it maybe from the '70s or something like that.

13   A.   We still have some inventories of '70s or '76 of our

14   vintages, very small inventories, and they are in the cellar

15   without label.

16   Q.   And they're not labeled?

17   A.   No.

18   Q.   And when a wine-- when the bottles come back in for

19   reconditioning, it's going to be one of those bottles that

20   you're going to pull out to try to match up and do the

21   reconditioning?

22   A.   When we used to do it.  And if we do it for ourselves,

23   sometimes we do it for ourselves, a few bottles left in one

24   vintage.  You need at least six bottles and you open them, you

25   taste them to see if there is no problem of corkage or

DCCBKURT6                    de Villaine - cross

whatever, and then you sacri-- you take one bottle that you use

for to fill the others.  And with what's left with the wine you

use, you drink.

Q.  And there's nothing wrong with that.

        And one of the reasons that you would recondition a

wine would be because the integrity of the cork is now becoming

questionable?

A.  Exactly.  That's when the-- if the quality of the cork --

if you can see that there are some mold, some mold, you know,

then it's better to open, to recondition it.

Q.  Then --

A.  But, you know, I must say that the best thing to do with a

bottle like this is really to drink it.  Really to drink it.

Because once you open a bottle to refill it, then you take away

some of the quality of the wine because it's a tough-- wine is

something alive.  You know, it's alive.  And if you give it a

treatment like this, it will really suffer and the wine will

never come back to its former way.  So it's much better to

drink it with good friends.

Q.  But if I opened that wine and had a little bit of it and

wanted to drink more of it later, I could always put a cork

back in it on a temporary basis, couldn't I?

A.  Very, very, very temporary.  Because in old bottles like

that, they become oxidized very quickly and after one hour, one

or two hours, the wine may already become difficult to taste.

DCCBKURT6                    de Villaine - cross

1   Q.   So if I open it, I should drink it.

2   A.   Exactly.

3   Q.   And when it's at that point-- you don't make wine for me to

4   put in a showcase with nice lights on someplace for people to

5   look at, do you?  You make wine for me to drink?

6   A.   Exactly.  And that's why it's for people like us, you know,

7   who put all this effort to make nice wines.  And it is

8   difficult.  It's a big effort.  It's a lot of details.  To see

9   some of these bottles become objects of speculation is really

10  something that we don't like.

11  Q.   Now, you've met Rudy, haven't you?  Mr. Kurniawan.

12  A.   I have met Rudy, yes.

13          THE WITNESS:  Hello, Rudy.

14  Q.   And did you first meet him back in 2003?

15  A.   Possibly.  I must say I didn't recall the dates, but I

16  remember meeting him in two circumstances, yes.

17  Q.   Do you remember drinking a wine with him?

18          MR. MOONEY:  Could we put this on?  This comes from

19  14-2.

20  Q.   Do you recognize this bottle of wine?

21  A.   Yes.

22  Q.   And does that bear your signature?

23  A.   Yes.

24  Q.   And does it have a date on it?

25  A.   The 2/17 (ph), yes.

DCCBKURT6                    de Villaine - cross

1    Q.  And this is a bottle of your wine.  This is a

2    Romanee-Conti.  Right?

3    A.  That's exactly right.

4    Q.  And this was a bottle of wine that you drank with Rudy?

5    A.  It must be, yes.

6    Q.  Okay.  And you signed the bottle?

7    A.  I can see that I put the [French].  I'm very often asked to

8    sign bottles.  And I put certainly this for him because we must

9    have drank it with other people and I put for him [French]

10   "Very cordially, Aubert."

11   Q.  You didn't bring this bottle to the tasting, did you?

12   A.  I, frankly, have no memory of this tasting.  So I don't

13   think I brought it, no.

14   Q.  Normally other people bring bottles.  Right?

15   A.  Right.

16   Q.  And I take it, it's a phenomena that we've been hearing

17   about, that when you go places to taste, people tend to show up

18   with bottles of your wine.  They don't tend to show up with

19   other people's wines.

20   A.  It depends.  It depends.  Sometimes, yes.  For bottles like

21   this, it's very good for me because this is a wine they we--

22   for instance, today we don't have -- in 2003 I don't remember.

23   Today we don't have one bottle left, unfortunately.

24   Q.  And there was a later occasion, at least one that you drank

25   with him, is there not?  Let me see if you remember.  Does that

1  bottle look familiar to you?  This is also from 14-2.

2  A.  I don't remember.  It's maybe the bottle that we tasted at

3  this big tasting of Romanee-Conti in New York.  I don't

4  remember exactly the year.  It may be that bottle.

5  Q.  This hasn't been admitted yet, so perhaps we should close

6  this out.

7          Let me show you from the same bottle.  And this has

8  been provided as Defense B-22.

9          Is that your signature on there?

10 A.  Yeah, it is.  Must be.

11         MR. MOONEY:  Your Honor, we would move the admission

12 of B-22.

13         THE COURT:  I'll allow it.

14         (Defendant's Exhibit B-22 received)

15 Q.  So does that help you remember this event or this tasting?

16 A.  I would think it is this tasting of Romanee-Conti in New

17 York at the restaurant something, what, ten years ago?

18 Frankly, I don't remember.  I see other signatures too.

19 Q.  There are quite a few signatures on there, aren't there?

20 A.  Yeah.

21 Q.  Let's go back.  This one is part of 14.2.  If you look at

22 this part of the bottle--

23 A.  You know, sometimes it's a habit of people to sign --

24 Q.  You see quite a few people's signatures on there, don't

25 you?

DCCBKURT6                        de Villaine - cross

1   A.  Must be a memory.

2   Q.  And then, if you look up on there, there's even more up

3   there.

4   A.  Mm-hmm.  Must have been the tasting, I guess.

5   Q.  And this name that is signed on either side of the 1945, do

6   you remember who that is?

7   A.  Here?

8   Q.  Allen Meadows?

9   A.  Allen Meadows, yes.

10  Q.  Okay.  So this bottle that you all drank on that

11  occasion --

12  A.  Tasted.

13  Q.  That's a 1945 Romanee-Conti, isn't it?

14  A.  Mm-hmm.

15  Q.  So one of the rarest bottles that one could potentially

16  find?

17  A.  Mm-hmm.

18  Q.  And it tasted very good, didn't it?

19  A.  If I can remember, there was no-- it was a bottle that was

20  appreciated by everybody, yes.

21          THE COURT:  That was what?

22          THE WITNESS:  Appreciated.

23          THE COURT:  It was appreciated?

24          THE WITNESS:  Appreciated by everybody, yes.

25  Q.  Do you remember Mr. Meadows-- and you know who Mr. Meadows

DCCBKURT6                        de Villaine - cross

1   is?  He's a critic.  Right?

2   A.   Mm-hmm.

3   Q.   Do you remember him rating this as a 100?

4   A.   No, I don't remember, but very possible.

5   Q.   You would not be surprised if he would rate your '95-- or

6   your '45 Romanee-Conti as 100, would you?

7   A.   The Meadow family does the rankings that are used here, you

8   know, 100.  So what means 100, I don't know, but it means that

9   the wine was very good, perfect.

10          THE COURT:  Counsel, what exhibit was that?

11          MR. MOONEY:  Say again, your Honor?

12          THE COURT:  What exhibit?

13          MR. MOONEY:  Those are-- we haven't given them a

14   specific number, but they came out of 14.2.  What we would like

15   to do, your Honor, is designate this one that has the two

16   bottles on it as Defense Exhibit B-31 if that's acceptable.

17          THE COURT:  Yes, that's fine.

18          MR. MOONEY:  And separately admit it as that.

19          And this one -- and we'll trim away the other half of

20   it that only has the one.  We ended up with two printed on each

21   one.  Make that one B-32.

22          And then also provided in discovery-- maybe turn the

23   jury off for now.  We would submit-- here's another picture of

24   the full bottle.  This was provided as B-1.  We would move its

25   admission.

DCCBKURT6                    de Villaine - cross

1              THE COURT:  Is this the same as --

2              MR. MOONEY:  These are more pictures of the same

3   bottle, your Honor.

4              THE COURT:  I see.  What number is this one?

5              MR. MOONEY:  B-1, Bravo 1.

6              THE COURT:  That's what you're calling it, Exhibit

7   B-1?

8              MR. MOONEY:  That's how we provided it to the

9   government.  So I'm keeping the same numbers.  That's why we

10  jumped to the 31 on the other one.  And then this one is Bravo

11  22, B-22.  And then Bravo 23, which is the one he did look at

12  and identified his signature on.  And then, finally, Bravo 29.

13  And we move the admission of all of those exhibits.

14             THE COURT:  Okay.  Just so I understand, they are

15  pictures of the same bottle?

16             MR. MOONEY:  They are all pictures of the same bottle.

17             Then the earlier one we have-- oh, Bravo 32, excuse

18  me, b-32 is not.  B-32 is the one that he identified as the

19  bottle from 2003.  Those are separate bottle but he did

20  identify it.

21             THE COURT:  Okay.

22             MR. MOONEY:  So we would move the admission of each of

23  those?

24             THE COURT:  I'll allow it.  I'll allow them.

25             MR. MOONEY:  Thank you, your Honor.

1              (Defendant's Exhibits B-1, B-22, B-23, B-29, B-31 and

2      B-32 received)

3      BY MR. MOONEY:

4      Q.  It's common for people who do tastings to write down

5      tasting notes.  Is that right?

6      A.  Mm-hmm.

7      Q.  And you often write down notes when you do tastings, don't

8      you?

9      A.  I do.

10     Q.  And you would not be surprised if Mr. Kurniawan wrote down

11     notes when he went to tastings?

12     A.  Mm-hmm.

13     Q.  It's quite common for people that are going to taste these

14     kinds of wines.  In fact, if you got a whole bunch of people

15     together, you would expect each of them would want to write

16     down their impressions.  Right?

17     A.  Mm-hmm.  Mm-hmm.

18              MR. MOONEY:  If we could have the ELMO back on again.

19     Q.  I'll show you, this is from Government Exhibit's 1-328 and

20     purports to be a tasting note from Mr. Kurniawan.

21              Do you see the entry there for a 1990 La Tache?

22     A.  Mm-hmm.

23     Q.  And do you know what a La Tache is?

24     A.  La Tache --

25     Q.  You better.  That's one of your labels, is it not?

DCCBKURT6                        de Villaine - cross

1    A.  Should I say what La Tache is?  No?  Yes?

2    Q.  Yes.  La Tache is one of the wines that you produce.

3    Right?

4    A.  Yes, one of the wines that we produce exclusively.

5    Q.  And so I know it's probably a little bit difficult to read,

6    but would this be-- from what you can see, is that consistent

7    with what you would expect for just normal tasting notes?

8    A.  You mean that kind of notes?

9    Q.  Yes, this kind of note.  These kind of descriptions.

10   A.  Oui, but I would say you have to let me have some time to

11   read.

12   Q.  Okay.

13   A.  Unless you read it for me.

14   Q.  Well, it says "Ruby core but surprisingly mature and light

15   rim.  Herbs" --

16            THE COURT:  Slow down.  Surprisingly--

17   Q.  Surprisingly mature and light rim.

18            THE COURT:  Is that a period after that?

19            THE WITNESS:  Yes, period after that.

20   Q.  Would that make sense?  That's the first line.

21   A.  Mm-hmm.

22   Q.  Would that be consistent with what one would do in tasting

23   notes?

24   A.  Yes.  Yes.  Tasting notes is --

25   Q.  So he's describing --

 1            THE COURT:  Wait, he's answering your question.

 2   Q.  I'm sorry, go ahead.

 3   A.  Tasting notes is a mixture of personal impressions that you

 4   describe in your own words and also words that are understood

 5   by the community of tasters.  So it's a mixture.  That's the

 6   typical tasting notes, yes.

 7   Q.  Then it goes on to say "herbs and game with some 90

 8   greenness shown"?

 9   A.  Mm-hmm.

10   Q.  Is that consistent with what you would expect for the 1990

11   Latour?

12   A.  At that time possibly, yes.  When was that?  In what --

13   Q.  This would have been-- this would have been in August of

14   '08.

15   A.  '08?  You know the wine has an evolution in the bottle and

16   this today may taste different, but at the time, yes, it's

17   quite possible.

18   Q.  The wine's going to change over time, isn't it?

19   A.  Wine changes, yes.  It's alive and it changes.  It is an

20   evolution.  And if the wine is a great wine, an evolution

21   towards very vine aromas and taste which become finer and finer

22   with time.  And this greenness that was noted here has perhaps

23   disappeared today.  I don't know.

24   Q.  Because all wine has a life.

25   A.  Mm-hmm.

1  Q.  And you design your wines so that they'll reach a peak

2  period, be at their best, but you can't keep them there

3  forever, can you?

4  A.  They are -- the wine is actually designed by a combination

5  of nature and us and our work.  And without nature, without

6  the exact way it is given by nature, we couldn't make great

7  wines.  So it's very-- these wines are the product of a

8  marriage of men and nature, I'd say.  A work of art by both, by

9  two entities.

10 Q.  What's a vertical tasting?

11 A.  Vertical tasting is a tasting of the same wine in a certain

12 number of vintages.  Horizontal.  Vertical tasting is a tasting

13 of -- you take La Tache and you taste in three, four, five,

14 six, however many Contis, however many Contis tastings that

15 have been prepared for years by the people who gave it.  We

16 tasted 75 vintages in several days.

17 Q.  Do you recall back in 2005, in the period December 2nd

18 through December 4th, a tasting of La Tache wines that occurred

19 here in New York?

20 A.  I tell you, frankly, my memory has become weak now, much

21 weaker than it used to be.  And I don't remember practically

22 any of this particular tasting where I was present, supposed to

23 be I was present.

24 Q.  And you were present.

25 A.  Very possible.

DCCBKURT6                        de Villaine – cross

 1   Q.  And with wines that dated back to 1934.

 2   A.  Mm-hmm.

 3   Q.  Do you remember that?

 4   A.  Mm-hmm.

 5   Q.  At Per Se Restaurant?

 6   A.  At Per Se Restaurant?

 7   Q.  Yes.

 8   A.  But wasn't it a Romanee-Conti tasting?  It was a La Tache

 9   tasting?  It's very possible.

10   Q.  Something that took place over a period of three days, is

11   that right?

12   A.  Mm-hmm.

13   Q.  And you knew that one of the individuals who was supplying

14   wines for that tasting was Mr. Kurniawan.  Is that right?

15   A.  I didn't know about the wines, supplying the wines.  Before

16   the tasting I didn't know.

17   Q.  Did you see Mr. Kurniawan at that event?

18   A.  I must have seen him, yes.  If he was there, I seen him.

19   Q.  Do you know somebody by the name of Wilf Jaeger?

20   A.  Yes.

21   Q.  Was that somebody who might have supplied wines too?

22   A.  Very possibly, yes.  It's a great cellar.

23   Q.  And Burt McMurtry?

24   A.  Yes.

25   Q.  But you don't specifically remember how that was all put

 1   together and what happened in that event?

 2   A.  No, frankly, I don't.  I don't remember specifically.  But

 3   you mentioned these names now.  I remember now that we had this

 4   tasting.

 5   Q.  You don't remember that it was one of those wine tasting

 6   events that was written about and that people are still talking

 7   about?

 8   A.  Mm-hmm.  Mm-hmm.  Well, I've been to a few of them, so,

 9   you know, I don't remember them all.  I'm sometimes confusing

10   one with another.  But this must have been a great tasting.

11   Q.  You would have remembered if you went to such an event and

12   you were presented with wines that weren't your own, wouldn't

13   you, pretending to be yours?  You would have remembered that?

14   A.  Yes, I would remember.  Yes, I think so.

15   Q.  And that didn't happen, did it?

16   A.  At the time, I don't know.  I have no memory that there

17   were wines that were in suspicion.  I don't remember that.  But

18   I feel for that I should go back to my files and see my notes.

19   To answer you precisely, I should have my notes with me.

20   Q.  So without your notes, you're not exactly sure?

21   A.  I am not exactly sure.

22   Q.  But you don't have any memory as you sit here today of

23   somebody giving you a wine and you saying, What are you giving

24   me this for, that's not a Romanee-Conti?  That didn't happen?

25   A.  It happened to me several times to be offered to taste

DCCBKURT6                    de Villaine - cross

1    Romanee-Contis and writing in my notes that they really didn't

2    look like Romanee-Conti, but I didn't do-- didn't do anything.

3    Q.  But you don't have any memory of it being on this occasion?

4    A.  No.

5              MR. MOONEY:  No more questions, your Honor.

6              THE COURT:  Any redirect?

7              MR. FACCIPONTI:  Just two questions, your Honor.

8              MR. MOONEY:  I'm going to return this to you.  I won't

9    be responsible for it.

10   REDIRECT EXAMINATION

11   BY MR. FACCIPONTI:

12   Q.  Mr. de Villaine, do you remember Mr. Mooney asked you

13   questions about the '45 bottle of Romanee-Conti that you

14   tasted?

15   A.  Mm-hmm.

16   Q.  Would you be surprised if someone told you they had six

17   bottles of '45 Romanee-Conti?

18   A.  I would be very surprised.

19   Q.  Why would you be surprised?

20   A.  Because when you have a production of six hundred bottles

21   in a vintage, with a wine that has been so much looked for and

22   be in the hands of so few people, you really wonder today how

23   you could have one person with six bottles.  It seems-- it

24   seems very complicated, very difficult to understand.

25   Q.  Earlier you made a comment about a problem with fake

DCCBKURT6                              de Villaine - redirect

1   bottles.

2              Why are fake bottles and counterfeiting a problem for

3   the domaine?

4   A.  Well, because it's something that is extremely destroying

5   for it.  It puts a cloud of doubt, you know, on the

6   authenticity of the wines.  When somebody sees a bottle of

7   Romanee-Conti or La Tache or any other wines, it puts a cloud

8   of doubt.  And then a cloud of doubt is the beginning of less

9   reputation.  It's not good for your reputation.  It's not good

10  for the reputation of Burgundy in general.  And it can be-- it

11  can be very destructive.

12             MR. FACCIPONTI:  We have no further questions, your

13  Honor.

14             THE COURT:  Thank you very much.  Thank you.

15             (Witness excused)

16             THE COURT:  Next witness would be would?

17             MR. HERNANDEZ:  Susan Twellman.

18             THE COURT:  Okay.  So we could put her on the stand.

19  I need to talk to counsel for a moment, please.  You know what?

20  We'll take a two-minute break.

21             Let me see counsel at sidebar.

22             (Recess)

23             (Continued on next page)

24

25

DCCBKURT6                           de Villaine - redirect

1                (At the sidebar)

2                THE COURT:  So, Mr. Mooney, one of your exhibits which

3        I admitted and for which are several photos of a bottle of 1945

4        wine--

5                MR. MOONEY:  Right.

6                THE COURT:  It's actually photos of four exhibits.

7                MR. MOONEY:  Right.

8                THE COURT:  Has a name on it that I recognize.

9                MR. MOONEY:  Okay.

10               THE COURT:  At the top.  The name is Josh, J-o-s-h,

11       Leuchtenberg, L-e-u-c-h-t-e-n-b-e-r-g.

12               MR. MOONEY:  Okay.

13               THE COURT:  And I should tell you how I recognize it.

14       He lives in my building.  And, in fact, he's on the board of--

15       it's a co-op building.  I know him casually.  I've never had

16       dinner with him or a meal with him, but I--

17               MR. FACCIPONTI:  Or any wine.

18               THE COURT:  Or any wine with him.

19               MR. MOONEY:  And you certainly weren't invited for the

20       '45, I dare say.

21               THE COURT:  I certainly wasn't.  But since it came up,

22       I thought I should put it on the record.  It won't have any

23       influence on me one way or another but I wanted you to know

24       about that.

25               MR. MOONEY:  And I'm assuming he's not one of your

DCCBKURT6                        de Villaine – redirect

1    witnesses.  He's not one of ours.

2              MR. HERNANDEZ:  He's not.

3              THE COURT:  And he's not one of yours?

4              MR. MOONEY:  No.

5              MR. VERDIRAMO:  He signed the bottle so he must have

6    liked it.

7              THE COURT:  I guess.

8              MR. VERDIRAMO:  New York is a very small town.  People

9    don't realize how small a town it is.

10             THE COURT:  I was looking --

11             MR. MOONEY:  We can go off the record with that.

12             THE COURT:  We're done.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Pleads be seated.

2          THE DEPUTY CLERK:  Ma'am, I would ask you to raise

3    your right hand, please.

4     SUSAN TWELLMAN,

5        called as a witness by the Government,

6        having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    BY MR. HERNANDEZ:

9    Q.  Ms. Twellman, I am going to ask you to move the microphone

10   close to.

11         Can you please tell us what city and state you live

12   in?

13   A.  Laguna Hills, California.

14   Q.  What do you do for a living?

15   A.  I manage the estate of David Doyle.

16   Q.  How long have you done that for?

17   A.  Since 1997.

18   Q.  What are your responsibilities for managing David Doyle's

19   estate?

20   A.  I handle all his financial affairs, his family office, and

21   manage his wine cellar.

22   Q.  Can you tell us just very briefly what David Doyle's

23   professional background is?

24   A.  David is retired from the software industry.  He was a

25   software founder of Quest software, and he is currently retired

1   and spends much of his time traveling and visiting various

2   restaurants.

3   Q.  Do you know if Mr. Doyle buys old and rare wine?

4   A.  Yes.

5   Q.  How do you know that?

6   A.  Because I complete many of the purchases.

7   Q.  Do you know someone named Rudy Kurniawan?

8   A.  Yes, I do.

9   Q.  How do you know him?

10  A.  We were friends with Rudy and I know him from wine tastings

11  and from purchasing wine from him.

12  Q.  So you said you know him from purchasing wine from him.

13  Just to be clear, do you know if Mr. Doyle has purchased wine

14  from Rudy Kurniawan?

15  A.  Yes, we have.

16         MR. HERNANDEZ:  I am going to ask if we can show to

17  Ms. Twellman, Government Exhibit 31-1.

18  Q.  You have it in paper copy in front of you.

19         Do you see 31-1?

20  A.  Yes.

21  Q.  Tell me if you recognize that document?

22  A.  Yes, I do.

23  Q.  How do you recognize it?

24  A.  It is a document that we provided from David's e-mail.

25  Q.  You recognize Mr. Doyle's e-mail address on this e-mail

1   string?

2   A.  Yes, I do.

3   Q.  Do you recognize him to be corresponding with Rudy

4   Kurniawan?

5   A.  Yes, I do.

6   Q.  Is the general subject of this e-mail exchange about a

7   purchase of wine that David Doyle is going to buy from Rudy

8   Kurniawan?

9   A.  Yes.

10          MR. HERNANDEZ:  The government offers 31-1.

11          THE COURT:  I will allow it.

12          (Government's Exhibit 31-1 received in evidence)

13  BY MR. HERNANDEZ:

14  Q.  This is a multiple e-mail exchange, right?  There are

15  multiple times where Mr. Doyle and Rudy Kurniawan are writing

16  back and forth about a purchase of wine?

17  A.  Yes, it is.

18  Q.  Can you tell us based on the last e-mail exchange whether

19  there was a purchase of wine and if so how much Doyle paid for

20  the wine?

21  A.  Yes.  It says here that there was an agreed upon price for

22  several bottles, which are listed previously for 3,227,000.

23  Q.  Then if you flip to the attachment to this e-mail, you will

24  see it looks like a spreadsheet.  Tell me if you see that.

25  A.  Yes.

DCC6KUR7                          Twellman - direct

1   Q.  Are there any wines from the Domaine Ponsot that are a part

2   of this transaction?

3   A.  Yes, there are.  The 1959 and 1962.

4   Q.  And are those in both standard size, 750 millimeter and

5   also some magnum?

6   A.  Yes.

7   Q.  Do you see a line there for DRC?

8   A.  Yes.

9   Q.  Is there a line for 1945 Romanee-Conti?

10  A.  Yes.

11  Q.  How many bottles is listed under that heading?

12  A.  Six.

13  Q.  Now I am going to ask you a few questions just about

14  whether you know that transaction was consummated.

15          Do you know if Mr. Doyle paid Rudy Kurniawan for those

16  wines?

17  A.  Yes.  I wired the funds.

18  Q.  Can you look at 25-10, which is another exhibit in front of

19  you?

20  A.  Yes.

21  Q.  That is a record.  We had a stipulation in the case about

22  this being the Wells Fargo record for the defendant Rudy

23  Kurniawan.  What you have is the June 2007 statement and all

24  but one transaction is blacked out.

25          Do you see the transaction that is there?

DCC6KUR7                        Twellman - direct

1   A.  Yes.  That transaction shows the wire information from our

2   account.

3   Q.  So that reflects that from your account Rudy Kurniawan was

4   paid that $3.2 million figure?

5   A.  Yes.

6            MR. HERNANDEZ:  The government offers 25-10.

7            THE WITNESS:  3,227,000.

8            MR. HERNANDEZ:  Thank you.

9            THE COURT:  I will allow it.

10           (Government's Exhibit 25-10 received in evidence)

11   BY MR. HERNANDEZ:

12   Q.  Do you know whether Mr. Doyle ever received the Domaine

13   Ponsot bottles in that schedule?

14   A.  Yes.

15   Q.  How do you know that?

16   A.  I received them.

17   Q.  What did you do with them after you received them?

18   A.  Put them into our cellar.

19   Q.  Since they were put into your cellar, have you shipped any

20   to New York?

21   A.  Yes.

22   Q.  Can you tell us what the circumstances were?

23   A.  Yes.  I shipped them on the request of an FBI agent.

24   Q.  Is that James Wynn?

25   A.  Yes.

1          MR. HERNANDEZ:  Your Honor, we heard testimony before

2     that Agent Wynn received the bottles out here on the table

3     which are 9-1 through 9-6 from Ms. Twellman and now with

4     Ms. Twellman's testimony, we would offer those into evidence.

5          THE COURT:  I will allow them.

6          (Government's Exhibits 9-1 to 9-6 received in

7     evidence)

8     BY MR. HERNANDEZ:

9     Q.  I guess I will just say to make the record complete that

10    these are all bottles of Domaine Ponsot from the Clos Saint

11    Denis vineyard from 1971, 1962 and 1959.

12         Now, after Mr. Doyle made this purchase from Rudy

13    Kurniawan, do you know whether Mr. Doyle and Kurniawan kept in

14    touch?

15    A.  Yes, they did.  They were friends.

16    Q.  Sorry.  I didn't hear the last word?

17    A.  I said, Yes they did.  They were friends.

18    Q.  And I am going to ask you to look at an e-mail that is

19    marked 31-11 that is right in front of you.

20         Do you see that?

21    A.  Yes.

22    Q.  Do you recognize it?

23    A.  I do.

24    Q.  How do you recognize it?

25    A.  I provided it to you from David's e-mail.

1  Q.  Is that an e-mail from Rudy Kurniawan to Mr. Doyle?

2  A.  Yes, it is.

3          MR. HERNANDEZ:  Government offers 31-11.

4          THE COURT:  I will allow it.

5          (Government's Exhibit 31-11 received in evidence)

6  BY MR. HERNANDEZ:

7  Q.  Now, in June of 2007 Mr. Doyle had paid $3.2 million a

8  little bit more than $3.2 million for some wine that Rudy

9  Kurniawan delivered, correct?

10  A.  Yes.

11  Q.  This is an e-mail from July 25th, 2007, from the defendant

12  to David Doyle, and I am going to read it.  It says, Hey, Dave.

13  I am just really in need of three mill to pay bills

14  immediately.  In real deep, deep s-h-i-t.  Can you help while

15  we wait on others?  Only if it is not in your way or whatever

16  reasons.  I completely understand.  Have fun in Thailand.

17  Please advise ASAP at your convenience.  Thanks, Rudy.  Please

18  don't get pissed at me.  Dot, dot, dot, dot and a frown.

19          THE COURT:  Can you just indicate for the record what

20  the subject is?

21          MR. HERNANDEZ:  The subject is "Got the message from

22  Susan."

23  Q.  Now, Ms. Twellman, my question to you is:  We have seen the

24  transaction for the wine that was a little over $3.2 million.

25  Is this message from Rudy Kurniawan about a different

DCC6KUR7                        Twellman - direct

1    three-million dollar potential loan or purchase or transaction?

2    A.  Yes, it is.

3    Q.  And the "got the message from Susan," do you understand

     what that is a message from?

5    A.  Yes.  That's me.

6               MR. HERNANDEZ:  Thank you.  No further questions.

7               THE COURT:  Counsel.

8    CROSS-EXAMINATION

9    BY MR. VERDIRAMA:

10   Q.  Good afternoon, Mr. Twellman.

11              How are you doing today?

12   A.  I am doing well.  Thank you.

13   Q.  Good.  Just a couple of questions.

14              With regard to the wines that were the subject of

15   these deliveries, did you contact my client --

16              THE COURT:  The subject of the deliveries of the wines

17   on the table?

18   Q.  When those came in, that was part the $3 million purchase

19   you just spoke on?

20   A.  Repeat that.

21   Q.  The $3.2 million purchase, these wines were part of that

22   purchase?

23   A.  To the best of my recollection, yes.

24   Q.  You are not sure?

25   A.  I -- I am not sure.

1   Q.  When Mr. Doyle purchases wines are they logged into any

2   kind of logbook?

3   A.  Yes.

4   Q.  And are they bar scanned or in any other way recorded?

5   A.  Yes.

6   Q.  And did you produce those records with regard to purchases

7   to the government?

8   A.  Say that again.

9   Q.  Did you produce those records of the scanning of the bar

10  codes to the government?

11  A.  No, I did not.

12  Q.  So sitting here today then we're not exactly positive, are

13  we, that those bottles are in fact part of the purchase from

14  the $3.2 million?

15  A.  No.  I am positive those are the bottles that were

16  purchased from the spreadsheet for the 3.2 million.  And they

17  didn't get put into the system right away because they came to

18  us in very poor condition.

19  Q.  Okay.  Those are the bottles you said when they came they

20  were dirty?

21  A.  Yes.

22  Q.  And when you informed Mr. Kurniawan they were dirty, he

23  came down and cleaned them for you, did he not?

24  A.  Yes.

25  Q.  He was fully cooperative with regard to that?

DCC6KUR7                          Twellman - cross

1   A.  Always.

2   Q.  In fact, you guys were pretty good friends, weren't you?

3   A.  Yes.

4   Q.  You would go to dinner quite often together?

5   A.  Yes.

6   Q.  Rudy told me sometimes you would go to a place called

7   Cotton Los Angeles and drink some really good wine and have a

8   good time?

9   A.  Yes.

10  Q.  Would it be fair to say that Mr. Doyle and my client were

11  very good friends, very close?

12  A.  Yes.

13  Q.  Spent a good deal of time together?

14  A.  Yes.

15  Q.  In fact, there were times when they would go to tastings --

16          THE COURT:  One question at a time.

17  Q.  Mr. Doyle has his own plane?

18  A.  Yes.

19  Q.  Sometimes he would give Mr. Kurniawan a ride on the plane?

20  A.  Yes, he has.

21  Q.  And they would share wines?

22  A.  Yes.

23  Q.  Fairly often, as often as they possibly could when friends

24  get together?

25  A.  Yes.  They have similar palates.

1   Q.  Similar palates.

2   A.  They have similar knowledge of wine.

3   Q.  Now, did you have any knowledge of an understanding between

4   Mr. Doyle and Mr. Kurniawan that if Mr. Doyle ever got wine

5   that he wasn't happy with that Mr. Kurniawan would endeavor to

6   replace it and satisfy Mr. Doyle?

7   A.  Yes.

8   Q.  In fact he did that previous to this, correct?

9   A.  He came --

10          THE COURT:  Previous to?

11  Q.  Previous to this purchase?

12          THE COURT:  Excuse me.  Previous to when?

13          MR. VERDIRAMA:  This purchase.

14  A.  I would need to know exactly what you are referring to

15  because I am not sure.  Right off the top of my head I do not

16  remember trading anything out with him.

17  Q.  Do you know whether at any point they ever traded bottles

18  for bottles, or you just don't recall?

19  A.  I don't recall.

20  Q.  Now, the other e-mail with regard to the prosecution read

21  to you with the additional $3 million, do you know whether that

22  actually ever took place?  Did Mr. Doyle ever give him the $3

23  million based on that?

24  A.  I don't know off the top of my head in relation to this

25  e-mail.

DCC6KUR7                          Twellman - cross

1   Q.  Where is the rest of the wine that was purchased for the

2   3.2 million?

3   A.  In my cellar.

4   Q.  In California?

5   A.  Uh-huh.

6   Q.  None of it was shipped to Australia?

7   A.  If it were, it is back.

8   Q.  Now, with other wines that Mr. Doyle purchased from

9   Mr. Kurniawan, were they ever -- strike that.

10          Mr. Doyle owns a restaurant in Australia, does he not?

11  A.  Yes, he does.

12  Q.  It has got a pretty fabulous wine list?

13  A.  Yes, it does.

14  Q.  And he privately sources some of the wines to put on that

15  wine list?

16  A.  Yes.

17          MR. HERNANDEZ:  Objection.

18          THE COURT:  I will allow it.

19  Q.  Do you know whether any of the wines that Mr. Doyle ever

20  purchased from Mr. Kurniawan ended up on that wine list?

21  A.  I don't know off the top of my head.

22          MR. VERDIRAMA:  Thank you.

23          THE COURT:  Anything else?

24          MR. HERNANDEZ:  No, your Honor.

25          THE COURT:  Thank you very much.  You may step down.

DCC6KUR7                          Twellman - cross

 1              (Witness excused)

 2              MR. FACCIPONTI:  The government calls Bryan Kalliel.

 3      BRIAN KALLIEL,

 4          called as a witness by the Government,

 5          having been duly sworn, testified as follows:

 6      DIRECT EXAMINATION

 7      BY MR. FACCIPONTI:

 8      Q.  What city and state do you live?

 9      A.  Los Angeles, California.

10      Q.  For whom do you work?

11      A.  Melisse restaurant.

12      Q.  Is that spelled M-e-l-i-s-s-e?

13      A.  It is.

14      Q.  Where is that restaurant located?

15      A.  In Santa Monica, California.

16      Q.  What kind of restaurant is it?

17      A.  It's a French restaurant.

18      Q.  What is your job there?

19      A.  I am the wine director, sommelier.

20      Q.  What is a sommelier?

21      A.  The person in charge of all the wine, liquid in the

22      restaurant, buying and selling, opening, handling of wine.

23      Q.  How long have you had that job at Melisse?

24      A.  Almost 12 years.

25      Q.  Do you know someone named Rudy Kurniawan?

1    A.  I do.

2    Q.  Do you see him in court today?

3    A.  Yes, I do.

4    Q.  Can you identify him by where he is sitting and something

5    he is wearing?

6    A.  Gentleman with the black rim glasses on.

7                THE COURT:  Which table?

8                THE WITNESS:  The second table with his hand up.

9                MR. FACCIPONTI:  Can the record reflect that the

10   witness has identified the defendant?

11               THE COURT:  The record will so reflect.

12   Q.  When did you first meet Kurniawan?

13   A.  In early 2000, 2001.

14   Q.  What were the circumstances in which you met him?

15   A.  He came into the restaurant and from his first visit --

16   first visit I think he came in with a couple of wines, but

17   bought a few nice bottles of wine.  And that is when we first

18   met Rudy.

19   Q.  He brought a few bottles with him?

20   A.  I think maybe one or two.

21               MR. VERDIRAMA:  Can we ask the witness keep his voice

22   up.

23   Q.  Mr. Kalliel, if you can pull your chair up.

24               THE COURT:  Lean into the microphone.

25   Q.  Try to speak into the microphone?

1   A.  Okay.

2   Q.  Did he come to the restaurant once or more than once?

3   A.  Several times.

4   Q.  How often would he come eat at Melisse?

5   A.  Probably for a while every couple weeks.  Maybe come one

6   week once or twice and not for a couple and then back for

7   several visits depending on the time of year, what was being

8   offered as food-wise or the people he was meeting.

9   Q.  Did there come a time when Kurniawan stopped dining at

10  Melisse?

11  A.  Yes.

12  Q.  Approximately when was that?

13  A.  About two years ago, three.

14  Q.  When Kurniawan ate at Melisse, were you one of the people

15  who served him?

16  A.  Yes.

17  Q.  Would he dine alone or with others?

18  A.  With others.

19  Q.  The people who were with him, were they wine collectors?

20  A.  Yes.

21  Q.  Approximately how many would come with him to dine?

22  A.  No less than four and upwards of eight to ten.

23  Q.  Who would pay for these dinners?

24  A.  Generally Rudy.

25  Q.  You said he brought -- did he typically bring his own wine

1   to the restaurant?

2   A.   Yes.

3   Q.   What kind of wines would he bring when he dined there?

4   A.   Generally high-end Burgundy an Bordeaux.  Sometimes a

5   little champagne.  White and red Burg, Bordeaux.

6   Q.   What was the price range of these wines?

7   A.   On the restaurant wine list or -- in the restaurant they

8   would have often been starting at a couple grand and jumping up

9   quite high.

10          THE COURT:  So?

11  A.   Maybe at auction half that depending on what he did.

12  Thousands of dollars a bottle often.

13          THE COURT:  How high on the restaurant wine list?

14          THE WITNESS:  Well, kind of hard to say because you

15  don't see a lot of wines in order to put a price tag on them.

16  I guess anywhere from five to $20,000.

17          THE COURT:  Per bottle?

18          THE WITNESS:  Per bottle.

19  BY MR. FACCIPONTI:

20  Q.   After you served Kurniawan's wine, what would you do with

21  the empty bottles?

22  A.   I would put them in a box and put them in his car or save

23  them for him to pick up.

24  Q.   Why would you do that?

25  A.   Because he had instructed us that he wanted to save all the

1    bottles and the corks.

2    Q.  What, if anything, did Kurniawan say to you about the way

3    you opened bottles of wine?

4    A.  Well, he always used to say that I would never break a

5    cork.  So that --

6              THE COURT:  Meaning you wouldn't?

7              THE WITNESS:  Meaning I would not.

8    Q.  In total approximately how many bottles had you returned to

9    Kurniawan?

10             THE COURT:  You mean empty bottles?

11   A.  Empty bottles, between 50 and 100 I would say.

12   Q.  How many of your other customers ever asked to get as many

13   bottles back?

14   A.  Not too many.  Generally birthdays or anniversary bottles.

15   Q.  So let me ask the question again.  How many of other

16   customers asked to get as many empty bottles back?

17   A.  Oh, none.

18   Q.  What were some of the circumstances under which a customer

19   might ask to have an empty bottle back?

20   A.  Maybe their birthday year wine or the anniversary of their

21   marriage.

22   Q.  What, if any reason did Kurniawan give you for requesting

23   to have all these empty bottles back?

24   A.  That his mother liked to save them.

25   Q.  Did his mother ever dine at Melisse?

DCC6KUR7                    Kalliel - direct

```
 1    A.  She did.

 2    Q.  In total approximately how many times did she dine there?

 3    A.  For me two or three times.

 4    Q.  Out of all the times Mr. Kurniawan came there?

 5    A.  Yes.

 6            MR. FACCIPONTI:  We have no further questions, your

 7    Honor.

 8            THE COURT:  Counsel.

 9    CROSS-EXAMINATION

10    BY MR. VERDIRAMA:

11    Q.  Good afternoon, Mr. Kalliel.

12            How are you?

13    A.  I am well.  How are you?

14    Q.  Good.

15            You started at Melisse when?

16    A.  I started there in 1999 and took over the wine program a

17    few years later.

18    Q.  You started as a bartender there?

19    A.  I was.

20    Q.  And you are not a master of wine, are you?

21    A.  I am not.

22    Q.  Have you -- what course did you take to become a sommelier?

23    A.  I am predominately self-taught, but I have been in the

24    court of master sommeliers and have taken a couple courses

25    there.  I have been in wine tasting groups, but we are probably
```

DCC6KUR7                      Kalliel - cross

1    the number one restaurant in Los Angeles for fine wine,

2    high-end wine.  So just due to the huge amount of wine groups

3    that come in on a weekly, biweekly basis I probably taste more

4    wines like that than any other restaurant.

5    Q.  And as the sommelier in this restaurant are you a salaried

6    employee?

7    A.  Yes, I am.

8    Q.  Do you also receive commission on the wine sales?

9    A.  I do not.

10   Q.  Now, you said that around 2001 or so Mr. Kurniawan started

11   coming in every couple weeks?

12   A.  It seems like that.  I would say 2001, 2002.

13   Q.  And it would vary?  It would come and go as to when he

14   would come?

15   A.  When he first started coming in, he sort of make a slash

16   and had come in sort of regularly.  He came in very generous

17   and a nice guy and came in and the chef liked him and Rudy

18   would order a lot of food and bring a lot of wine.  First he

19   started buying wines and then he started bringing more of his

20   and buying less but always brought in a lot of people and a lot

21   of business.  So it created a lot of stir and buzz and

22   restauranteurs like that.

23   Q.  So the things he was doing in your restaurant helped your

24   restaurant's reputation?

25   A.  Well, that will remain to be seen, but it appeared to in

1    the beginning.

2    Q.  It didn't hurt, did it?

3           Now, when he would bring in his own wine, management

4    didn't have a problem with that, correct?

5    A.  No.

6    Q.  And on average how many bottles would he bring with him on

7    each visit, do you know?

8    A.  Well, generally no.  Aside from an occasional visit that

9    was smaller, generally no less than six or eight and oftentimes

10   we didn't even open things they were backups.  So quite a few.

11   Q.  He would share these wines with you as well as with

12   everybody else at the table?

13   A.  He would.

14   Q.  So you got to taste an awful lot of very good wine with

15   Mr. Kurniawan?

16   A.  I tasted a lot of wine with Rudy over the years.

17   Q.  Now, on direct you were asked a question about the returns.

18   You said Mr. Kurniawan always asked for the bottles and corks

19   back?

20   A.  Yes.

21   Q.  The age of these bottles, were they generally older bottles

22   of wine?

23   A.  The labels on them or the wine inside of them?

24   Q.  The wines themselves and the corks?

25   A.  Well, they were -- they were represented to be older, yes.

1   Most of them did have age on them.

2   Q.  Do you recall being interviewed by the FBI on September the

3   11th, 2011?

4   A.  I do.

5   Q.  In fact, two agents came over to Melisse to interview you?

6   A.  They did.

7   Q.  That doesn't happen every day, does it?

8   A.  It doesn't.

9   Q.  And you sat down and you spoke to him.  What time of day

10  was it when they arrived?

11  A.  I would say it was just before service.  Between 2:00 and

12  4:00.

13  Q.  Now, do you recall making a statement to them that you

14  believed that most of the bottles Kurniawan brought to the

15  restaurant contained real wine?  Do you recall making that

16  statement?

17  A.  Well, most of wine is real that is in bottles.  Oftentimes

18  the bottles we drank I thought were good and there was many

19  times in tastings and parties that they didn't taste like the

20  wines that would be inside the labels.

21  Q.  That would be your opinion, correct?

22  A.  That would be my opinion.

23  Q.  Now, do you recall telling the agents when they came

24  something about dinners and the agents asked you to find the

25  menus for those dinners?

 1   A.  They asked me to find the menus?

 2   Q.  I will read you what is in the FBI report.  Tell me if you

 3   agree what it states?

 4   A.  Sure.

 5           MR. FACCIPONTI:  Objection.

 6           THE COURT:  Sustained.  Do you want to try to refresh

 7   his recollection?

 8           MR. VERDIRAMA:  Yes, Judge.

 9   Q.  Do you recall making statement to the FBI agents?

10           THE COURT:  Do you recall being asked a question and

11   giving a particular answer, is that what you mean?

12           MR. VERDIRAMA:  Yes, Judge.

13   Q.  Do you recalling being asked whether you drank wine

14   Mr. Kurniawan and you had informed the FBI agents that you

15   drank half bottles of 1947 Lafleur?

16   A.  No.  It was half bottle of 1947 Cheval Blanc specifically.

17   Q.  Do you recall describing the wines as being beautiful?

18   A.  I recall telling them the wines were not '47 Cheval Blanc

19   inside the bottles?

20   Q.  Do you recall advising the FBI that you recalled opening a

21   lot of half bottles --

22           THE COURT:  Are you asking questions.  Are you

23   referring to answers he gave?  That is how we refresh someone's

24   recollection.  Usually verbatim the question and answer.

25           MR. VERDIRAMA:  I can only go by the 302, Judge.

DCC6KUR7                    Kalliel - cross

1   Q.  Do you recall drinking six of 1947 Lafleur at anytime with

2   Mr. Kurniawan?

3   A.  No.  That is not correct.  We were talking right before

4   service in a bit of a hurry and what I was referring to was

5   four to six bottles of '47 Cheval Blanc in half bottles that

6   had younger corks, high fill levels, quite a bit younger would

7   be the wine.  Still good wine.  I tasted many wines that

8   were -- you know, the only way somebody is going to mistaste

9   something is not by having a lousy wine in the bottle.  It

10  still could still be a good wine that is in there, but I had

11  spoke of '47 half bottles of Cheval and the night of the Petrus

12  dinner one bottle of '47 Lafleur.

13  Q.  Do you recall drinking a magnum of Lafleur with

14  Mr. Kurniawan?

15  A.  I do not.

16  Q.  Do you recall six half bottles of Cheval Blanc 1947?

17  A.  I do.  I tasted all of them as I opened them.

18  Q.  Do you recall describing those wines as being beautiful?

19  A.  I don't exactly recall that.

20  Q.  Did you ever go to any of the auctions at Christie's?

21  A.  No.  But we've had Christie's dinners at Melisse.

22  Q.  Do you recall at any of the Christie's dinners at Melisse

23  the Cheval Blanc bottles being opened?

24  A.  I don't recall if it was a Christie's dinner.  But I had

25  the Cheval Blanc '47 specifically or Cheval Blanc.  Which are

1    you asking me?

2    Q.  I am sorry?

3    A.  You asked me on the Christie's on the auction, did any

4    bottles of Cheval Blanc.

5    Q.  The 47?

6    A.  The 47, I don't recall if the 750 bottle of '47 Cheval

7    Blanc was a Christie's dinner or not.

8    Q.  Did you yourself sell any wine to Mr. Kurniawan?

9    A.  Yes, I did.

10   Q.  Did you act as a broker with regard to certain sales?

11   A.  Yes, I did.

12   Q.  What were those sales?

13   A.  It was a mixed case of 2001 Domaine de la Romanee-Conti.

14   Q.  Did you broker any other sales?

15   A.  For Rudy?

16   Q.  Yes.

17   A.  No.

18   Q.  Now, back in 2002 would you describe Mr. Kurniawan as being

19   somewhat of a novice with regard to his wine tasting?

20   A.  I don't think a novice.  I think when I have spoke of it in

21   the past, Rudy came on pretty quickly into the scene and seemed

22   to have a pretty good palate quite quickly.

23   Q.  Did you ever tell the FBI that you helped educate Rudy?

24   A.  I don't know if I -- I wouldn't say I helped educate him,

25   no.  He brought in a lot of wines.  I watched him transition

1   from -- well, if you will, from high-end certain domestic wines

2   that he used to bring in, Harlans and alike, to more

3   exclusively Burgundy, Bordeaux.  I have watched him transform

4   as a pretty good taster in the groups and be able to blind

5   taste quite a few of the wines pretty well.

6   Q.  Now, do you recall a party that Mr. Kurniawan gave for his

7   mother at Melisse?

8   A.  I recall two of them and, yes.  One where -- I think there

9   was maybe two.  One where he bought out the restaurant and one

10  where he did not and she was at the center table.

11  Q.  Is there anything about the wines that were served at those

12  dinners that you recall?

13  A.  Well, I do recall thinking that the '82 double magnum of

14  Mouton was one of the freshest bottles of Mouton that I tasted.

15  Q.  Now, at that dinner that was served was the actor Jackie

16  Chan at that dinner?

17  A.  Yes, he was.

18  Q.  Did he keep the bottles from that dinner if you recall?

19  A.  He did keep a bottle and I don't recall which exactly.  I

20  remember him asking for something after standing on the chairs

21  drinking.

22  Q.  Now, on direct you said to your recollection you had

23  returned to Mr. Kurniawan between 50 and 100 bottles.  Do you

24  recall giving answer that?

25  A.  Yes.

DCC6KUR7                          Kalliel - cross

```
 1   Q.  You were asked a question if as many of your customers got
 2   that amount of bottles back and you answered none.  Do you
 3   recall being asked that question and giving that answer?
 4   A.  Yes.  You are saying no single customers like Rudy would
 5   have asked for as many bottles as he asked for back, correct.
 6             THE COURT:  That was the question before?
 7             THE WITNESS:  Yes.
 8   Q.  Now, how many other customers brought in the kind of wines
 9   that Rudy brought in on a regular basis?
10   A.  A lot.
11   Q.  The same amounts?
12   A.  No.  Generally most wine groups people would bring in a
13   bottle or two of their own and they would all converge and
14   bring in these bottles.  Sometimes they did with Rudy's
15   dinners, too.
16   Q.  Rudy would collect the corks and bottles and bring them
17   home?
18   A.  I can tell you that he always collected and brought back
19   the bottles that he brought.  I believe sometimes they were
20   from other people if they didn't want them, which we usually
21   just tossed them.
22             MR. VERDIRAMA:  Thank you very much.
23             THE COURT:  Anything else?
24             MR. FACCIPONTI:  Very quickly, your Honor.
25   REDIRECT EXAMINATION
```

1    BY MR. FACCIPONTI:

2    Q.   Mr. Kalliel, do you remember when Mr. Verdiramo asked you

3    some questions about the half bottles of '47 Cheval Blanc?

4    A.   Uh-huh.

5    Q.   Do you remember how many other bottles were opened that

6    evening when those '47s were opened?

7    A.   Probably more than a dozen or so.

8    Q.   When were the Cheval Blancs opened at the beginning of the

9    evening or at the end of the evening?

10   A.   They were opened at the end of the night, at the end of the

11   big wine dinner.

12   Q.   Did anything strike you as odd about that?

13   A.   Well, I think I said that I thought it did a disservice to

14   a wine of that quality to pop open six half bottle and spread

15   them around and just guzzle them up.

16   Q.   During the time that you served Mr. Kurniawan, did you ever

17   notice anything about the corks that you pulled from the

18   bottles?

19   A.   Yes.  Sometimes they seemed newer than the bottles

20   indicated they would be.  Couple times they didn't quite match.

21   The rest of the corks as far as branding, a couple times they

22   were -- one time I recall one that was from a double magnum

23   that was -- sort of lacked the mold you might see around the

24   top of a bottle where you have a seal even when a bottle -- an

25   old cork could be a little loose.  It didn't have that.  So

DCC6KUR7                    Kalliel - redirect

1    when you went to get into it, it was -- it had movement right

2    away and there was nothing there to indicate that it had

3    been -- it had kept its seal over the years to keep the amount

4    of freshness that the wine would have with age.

5    Q.   Did there ever come a time in which you questioned

6    Mr. Kurniawan about some of the corks?

7    A.   The only time was at the Petrus dinner.

8    Q.   What happened?

9    A.   We opened a few bottles and a couple people were standing

10   around and one of them -- I also sort of recollect what I

11   didn't say was one of them was sort of blank.  It had a mark on

12   it, but it didn't match the others.  And another one had a

13   stamp, a square rectangular stamp that seemed odd and

14   incorrect.

15   Q.   What did you say to Mr. Kurniawan and what did he say to

16   you?

17   A.   I think I spoke out of turn and said something to the

18   effect of that this didn't seem like a real cork and he said --

19   I think he basically -- he basically said, Please, to me to

20   indicate -- I thought to indicate that maybe I should just

21   serve the wine and not voice my opinions.

22            MR. FACCIPONTI:  No further questions, your Honor.

23   Thank you very much.

24            (Witness excused)

25            THE COURT:  Ladies and gentlemen, that will be it for

today.  Let me just give you my usual instructions to you at

the end of the day.  First, do not talk with each other about

this case or about anyone that has anything to do with it until

the end of the case when you go to the jury room to decide on

your verdict.

          Second, do not talk with anyone else about this case

or about anyone who has anything to do with it until the trial

has ended and you've been discharged as jurors.  By "talking,"

I am referring to all forms of communication, not just

face-to-face but also e-mailing, texting, Tweeting and

blogging, etc.  I am also referring to communications in any

forum such as Facebook, My Space or Twitter.  Additionally do

not remain in the presence of other persons who may be

discussing the case base face-to-face, orally or online.

          Third, do not let anyone talk to you about the case or

about anyone who has anything to do with it.  And if someone

should try to talk to you about the case, please report that to

me or Christine immediately.

          Fourth do not read any news or Internet stories or

articles or blogs, etc., or listen to any radio or TV or

Internet reports about the case or about anyone who has

anything to do with it.

          Fifth, do not do any type of research or any type of

investigation about the case on your own.

          So just as a heads up we're right on schedule.

DCC6KUR7                           Kalliel – redirect

1    Tomorrow we certainly will not go beyond 2:00 and we'll see how

2    we do during the day.  Perhaps a little bit earlier.  You can

3    plan on being out of here by 2:00 tomorrow.  We'll start same

4    time, same place.  Leave your notes and see you tomorrow.

5                    (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DCC6KUR7                         Kalliel – redirect

1          (Jury excused)

2          THE COURT:  Can I get an idea, counsel, who is coming

3     tomorrow, how many witnesses.

4          MR. HERNANDEZ:  Well, Judge, I actually handed a list

5     and we'll go as far as we can go.  I think we're on track to

6     rest on Monday as we projected.  The first witness will be

7     William Coke and then I expect to definitely reach Doug

8     Barzelay and David Parker.  So those three I think we can count

9     on if we have as much time as I think we do.

10         THE COURT:  In that order?

11         MR. HERNANDEZ:  In that order.  And if we have more

12    time Antonio Castanos, Don Stott.

13         THE COURT:  Otherwise we move them to Monday.

14         MR. HERNANDEZ:  Yes.  I think we're on track for

15    Monday.

16         THE COURT:  Great.  Thank you.  See you tomorrow.

17         (Adjourned to December 13, 2013 at 9:00 a.m.)

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2      Examination of:                           Page

3      TRENTON SCHMATZ

4      Direct By Mr. Hernandez . . . . . . . . . . 505

5      Cross By Mr. Mooney . . . . . . . . . . . 512

6      LAURENT PONSOT

7      Direct By Mr. Hernandez . . . . . . . . . . 521

8      Cross By Mr. Mooney . . . . . . . . . . . 581

9      Redirect By Mr. Hernandez . . . . . . . . . 621

10     CHRISTOPHE ROUMIER

11     Direct By Mr. Hernandez . . . . . . . . . . 625

12     Cross By Mr. Mooney                        645

13     AUBERT DE VILLAINE

14     Direct The Interpreter . . . . . . . . . . 667

15     Cross By Mr. Mooney . . . . . . . . . . . 682

16     Redirect By Mr. Facciponti . . . . . . . . . 700

17     SUSAN TWELLMAN

18     Direct By Mr. Hernandez . . . . . . . . . . 704

19     Cross By Mr. Verdirama . . . . . . . . . . . 711

20     BRIAN KALLIEL

21     Direct By Mr. Facciponti . . . . . . . . . . 716

22     Cross By Mr. Verdirama . . . . . . . . . . . 721

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1   Redirect By Mr. Facciponti . . . . . . . . . . 730

 2                    GOVERNMENT EXHIBITS

 3   Exhibit No.                              Received

 4     14-5    . . . . . . . . . . . . . . . . . . 511

 5     29-10   . . . . . . . . . . . . . . . . . . 518

 6     36-10 and 36-11  . . . . . . . . . . . . . 532

 7     36-7, 36-8 and 36-9  . . . . . . . . . . . 537

 8     36-17   . . . . . . . . . . . . . . . . . . 561

 9     36-1    . . . . . . . . . . . . . . . . . . 566

10     29-6 and 36-16  . . . . . . . . . . . . . . 571

11     40-2    . . . . . . . . . . . . . . . . . . 643

12     31-1    . . . . . . . . . . . . . . . . . . 706

13     25-10   . . . . . . . . . . . . . . . . . . 708

14     9-1 to 9-6   . . . . . . . . . . . . . . . 709

15     31-11   . . . . . . . . . . . . . . . . . . 710

16                    DEFENDANT EXHIBITS

17   Exhibit No.                              Received

18     E-1    . . . . . . . . . . . . . . . . . . 656

19     B-22   . . . . . . . . . . . . . . . . . . 690

20     B-1, B-22, B-23, B-29, B-31 and B-32  . . . . 694

21

22

23

24

25
```