DCDBKURT1                          Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                                S1 12 Cr. 376(RMB)

RUDY KURNIAWAN, a/k/a "Dr. Conti,"
a/k/a "Mr. 47,"

              Defendant.

------------------------------x
                           December 13, 2013
                           9:07 a.m.

Before:

               HON. RICHARD M. BERMAN,

                           District Judge

                 APPEARANCES

PREET BHARARA,
    United States Attorney for the
    Southern District of New York
JASON HERNANDEZ,
JOSEPH FACCIPONTI,
    Assistant United States Attorneys

WESTON, GARROU & MOONEY
    Attorneys for defendant
BY:  JEROME MOONEY

VERDIRAMO & VERDIRAMO, P.A.
    Attorneys for defendant
BY:  VINCENT S. VERDIRAMO

       – also present –

Ariel Platt, Government paralegal
Bibi Hayakawa, Government paralegal

SA James Wynne, FBI
SA Adam Roeser, FBI

DCDBKURT1                    Trial

1              (Trial resumed)

2              (In open court; jury present).

3              THE COURT:  Okay, everybody.  Nice to see you.  Please

4   be seated and we'll start.

5              We'll have the next government witness.

6              MR. HERNANDEZ:  Government calls William Koch.

7              THE COURT:  Okay.

8              THE DEPUTY CLERK:  Sir, please remain standing.

9    WILLIAM KOCH,

10        called as a witness by the Government,

11        having been duly sworn, testified as follows:

12             THE DEPUTY CLERK:  Can you state your name for the

13   record, please?

14             THE WITNESS:  William Koch, spelled K-O-C-H.

15             THE DEPUTY CLERK:  Thank you.

16             THE COURT:  Please be seated.

17             THE WITNESS:  Thank you.

18             THE COURT:  All right, Counsel.

19   DIRECT EXAMINATION

20   BY MR. HERNANDEZ:

21   Q.  Good morning, Mr. Koch.

22   A.  Good morning.

23   Q.  Mr. Koch, can you please tell the jury what you do for a

24   living?

25   A.  I'm president and chief executive officer of a company

DCDBKURT1                    Koch - direct

called Oxbow Carbon, although I know "carbon" is a four-letter

word now.  But what we do is we buy a product from oil

refineries, two products, called petroleum coke and sulphur.

Petroleum coke is about 95 percent carbon and with some other

impurities in it, and then we dispose of that.  It's a waste

product for the oil refinery, as is sulphur.  And we sell those

to power plants, steel plants, aluminum plants, cement plants,

et cetera, all around the world.  We, I think, sell to a

hundred different countries.

         And then we process the aluminum-- or we process the

petroleum coke to make it into a product that is used to make

aluminum.

Q.  And what's your educational background, Mr. Koch?

A.  I'm sorry, I missed one other thing.  We're also in the

gas-drilling business.  So I'm in the politically incorrect

businesses, unfortunately, but we call ourselves waste disposal

people for the refineries.

         My educational background?  I grew up in Wichita,

Kansas.  So you can say I'm a hick.  I went to public school

there.  Then I went to Culver Military Academy because I was a

bit undisciplined when I was a teenager.  Then I went to MIT.

And I got three degrees from MIT over a long period of time:

The first was a BS, Bachelor of Science; next was an MS, Master

of Science; and the last was an ScD, which is a doctor of

science.

1          I had a professor once who actually taught my father,

2    who went to MIT as well.  He said, "Why in the world do you

3    want to get a doctorate?"

4          I naturally said, "Well, because I think it's

5    prestigious and I love science."

6          He said, "Well, you know what BS is, don't you?"

7          I said, "Yes, a Bachelor of Science."

8          He said, "No, the real BS."  And then he said to me,

9    "Well, you know what MS is, don't you?"

10         I said "No."

11         He said, "More of the same."  And then he said, "You

12   know what a Ph.D. is, don't you?"

13         I said "No."

14         He said, "Piled higher and deeper."  He was trying to

15   discourage me from spending all that time at MIT.

16   Q.  It didn't work.

17         Your company, Oxbow, could you tell us where it's

18   located?

19   A.  Well, the headquarters are in West Palm Beach, but we have

20   facilities in quite a number of states in the United States and

21   then we have offices in about 30 different countries.

22   Q.  Do you live in West Palm Beach where the headquarters of

23   Oxbow are located?

24   A.  I live on an island called Palm Beach, which is a Fantasy

25   Island, the good and the bad of it.  And my office is only 20

1    minutes from my house.

2    Q.  Mr. Koch, are you a collector of any kind?

3    A.  My wife calls me a horder, but I am a collector of numerous

4    things.

5    Q.  Can you give us an example of the types of things you like

6    to collect?

7    A.  Well, I like to collect art, paintings, sculpture.  I

8    collect some antiquities.  I have collected a lot of Western

9    items.  I'm a Western fanatic.  I have Western photographs, I

10   have Western guns, Western paintings, Western clothes for men

11   and women and babies, Western saddles, et cetera.  Even have

12   the one and only picture of Billy the Kid.  But, anyway, that's

13   one of my fascinations, is the West.

14   Q.  How about wine?

15   A.  I have-- yes, unfortunately I have a lot of wine.  I have a

16   cellar of 43,000 bottles.  You see why my wife calls me a

17   horder.  And I try to collect wines that I think are the very

18   best, that I enjoy, that I love drinking.

19          Then I have four types of wines that I try to collect

20   every year just to satisfy my obsession with collecting.  And

21   I've tried to have every year of, say, Chateau Lafite, which I

22   believe I have about 150 years or so; I collect Mouton, which I

23   have about 120; Latour, which I have about 100, 100 years; and

24   then Petrus, which I have about 90 years.  Unfortunately, about

25   half of all of those years are fake.

DCDBKURT1                     Koch - direct

1   Q.   Now, when did you first start collecting wine?

2   A.   Well, I'll ramble a little bit.  I'm sorry.  When I was at

3   MIT, we'd have parties once a month and we'd do binge drinking

4   to break up all the hard monotony-- not the monotony, the

5   pressure of hard work.  I found I got hepatitis and couldn't

6   drink for a number of years, which is great.  Saved me from

7   being an alcoholic.

8          And then I found out I could drink wine, so I started

9   off with Mogen David, and then went to Lancers because it had a

10  nice bottle that you put corks in on your dinner table.  Then I

11  started after that gradually trying to get better and better

12  wines.

13         So I got where I could afford it.  In the late '70s

14  and early '80s I became a voracious collector.

15  Q.   You weren't binge drinking at MIT on Chateau Petrus, were

16  you?

17  A.   I certainly wasn't.  It was on-- no.

18  Q.   Now, what do you do with the wines you collect?

19  A.   Well, I put them in a-- well, I mean, I have two

20  definitions.  I have wines that are drinking wines and then I

21  have wines that are collection wines that I just want to brag

22  about that I've got them.  For example, Thomas Jefferson wines.

23  I bought those because they were very historical.  Then I found

24  out they were fake.  Now I brag and show people the fake Thomas

25  Jefferson bottles rather than the real ones.

1          So I have these collection wines, and I've described

2    the four types of wines that I do collect and try to get

3    every year.  But then 99 percent of my collection is drinking

4    wines.  I do that because I love to drink fine wines with my

5    friends, with new people that I meet that love-- that also

6    appreciate outstanding wines and historical wines.  And, also,

7    I entertain.  Sometimes we sell a wine dinner at my house for

8    auction for the Police Foundation to put their kids through

9    school or, you know, underprivileged kids, charities and

10   things.

11         But I generally like drinking with other people.  I

12   don't have a good time drinking by myself.  But one of the

13   great things for me is that if I could have good friends, good

14   music, beautiful paintings on the wall and great food and great

15   wine, then you can look and see the love the artist had for his

16   paintings, the love that the musician had in playing or making

17   the music, and you could taste the love in the wine.

18   Q.  Have you ever sold any wine that you bought?

19   A.  Once.  I sold it at an auction because a guy conned me into

20   it.  He said, "Prices are high.  We could clean out your cellar

21   of second-rate wines."  But then he put in it a lot of very

22   good wines.  Now I'm mad that I let him sell it.  Wish I

23   hadn't.

24   Q.  Do you plan to sell any more wine in the future?

25   A.  No.  If you ask me what I'm going to do with the wines that

1   I have in my cellar, because I can't drink them the rest of my

2   life, I'll give them to my kids either to drink or to sell.

3   Q.  And where, generally, do you buy the wine from?

4   A.  Well, I used to buy them wherever I could get them, but

5   mostly I've bought wines from-- primarily from auction houses

6   and also from dealers and occasionally I bought them directly

7   from the vineyard.

8   Q.  Mr. Koch, when you buy wine, does it matter to you whether

9   the wine in the bottle is authentic?

10  A.  Absolutely.  I mean, that's like buying a Picasso painting

11  that's fake in a beautiful frame.  No, the whole value is in

12  the authenticity of the wine.

13  Q.  All right.  That was an easy one, I'll give you that.

14          But how about this:  Does it matter whether the

15  physical aspects of the bottle, things like the label and the

16  cork, are authentic?  Does that matter to you?

17  A.  You bet, it sure does.  What's the old saying?  If it walks

18  like a duck, squawks like a duck, has feathers like a duck,

19  it's a duck.  So if the label is fake, the cork is fake, the

20  capsule is fake, the bottle is fake, what do you think is in

21  the bottle?  There's a 99.99 percent probability the wine is

22  fake as well.

23  Q.  This jury has seen a bottle of wine from a Napa winery

24  called Duckhorn.  You're not suggesting there are ducks in that

25  bottle.  Right?

1    A.  No.  No.

2    Q.  Just checking.

3         Now, would it matter to you if the bottle had been

4    reconditioned by someone other than the domaine or the chateau

5    that produced the wine?

6    A.  Absolutely, because the only reason you have the recon--

7    that you have the bottle reconditioned is because you want to

8    drink it at some time or maybe sell it.  But the only place

9    you-- but the way they recondition it is they open the cork,

10   put some real-- let's say they're reconditioning Chateau

11   Lafite, a Chateau Lafite bottle.  You'd want Lafite wine going

12   back in.  You wouldn't want Duckhorn wine going into a Lafite.

13   So, of course.  You don't know what the guy did who was

14   reconditioning it.

15        MR. HERNANDEZ:  Your Honor, may I approach to show the

16   witness a few bottles?

17        THE COURT:  Sure.

18   Q.  Mr. Koch, may I show you three bottles of wine that have

19   been admitted into evidence?

20   A.  Yes.

21   Q.  And these were admitted as bottles that you purchased.

22   Government Exhibit 4-1 says it's a double magnum of 1947

23   Chateau Petrus.

24   A.  Yes, I recognize this bottle.

25   Q.  Okay.  And then I'm going to show you two other bottles,

DCDBKURT1                    Koch - direct

1    4-2 and 4-2A.  And on the label it says that this is 1934

2    Domaine de la Romanee-Conti Romanee-Conti.  Take a look at

3    those two bottles, if you would.

4    A.  Yes.  These are my bottles because I could tell because we

5    bar code every bottle that's put into my cellar and these have

6    my bar codes on them.

7    Q.  All right.

8    A.  I also know that I bought these bottles.

9    Q.  That's a system you use to keep track of the bottles?

10   A.  Yes.  Yes, it does.

11   Q.  I'm going to ask you a few questions about the big bottle,

12   that big bottle of Chateau Petrus first.

13   A.  Yes.

14   Q.  The jury has heard that you purchased this from Acker

15   Merrall & Condit in May of 2005.  So just for your

16   understanding of the questions I'm going to ask, the jury's

17   already aware of that.  They've seen evidence about that.

18   A.  Okay.

19   Q.  My question to you is, when you purchased this bottle, what

20   did you think you were buying?

21   A.  I thought I was buying 1947 Petrus for a high price.

22   Q.  And --

23   A.  I was expecting it.  '47 was an outstanding year, so I

24   believed I was really buying '47 Petrus that was in the

25   bottle.

DCDBKURT1                       Koch - direct

1    Q.  And would you have paid that high price for that bottle if

2    you had doubts about the authenticity of the wine or the bottle

3    itself?

4    A.  I wouldn't have paid the high price.  In fact, I wouldn't

5    have even bought the bottle if I had suspicions or even a 10

6    percent or 20 percent doubt.  I wouldn't have bought it.

7    Q.  Now I'm going to ask you a few questions about 4-2 and

8    4-2A.  Those are the standard-size bottles that say "1934

9    Romanee-Conti."

10   A.  Yes.

11   Q.  The jury has that those were sold through The Cellar I

12   auction by Acker Merrall & Condit in January of 2006.

13   A.  Yes.

14   Q.  So my first question to you about those bottles, or related

15   to them, is did you receive the catalog for The Cellar I

16   auction that was held in January of 2006?

17   A.  Yes, I did.

18          MR. HERNANDEZ:  And, Mr. Platt, are you able to pull

19   up 15-3, which is just the cover of that catalog which has been

20   admitted into evidence?  If we could just publish to the jury

21   to see that this is the catalog that has been admitted into the

22   evidence, The Cellar, which is January of 2006.

23          THE COURT:  Do you all have it?

24          THE JURY:  Yes.

25   Q.  Do you see that on your screen, Mr. Koch?

DCDBKURT1                          Koch - direct

1   A.  Yes, I do.

2   Q.  All right.  And that's the auction from which you purchased

3   those two bottles?

4   A.  I believe it is.

5   Q.  And you bought other bottles from this auction as well,

6   didn't you?

7   A.  Yes.

8   Q.  Now, did you read any portion of this catalog, the one on

9   the screen right now, before you bid on the bottles in the

10   auction?

11   A.  Yes.

12   Q.  Can you tell us if you remember reading any particular

13   portions, if you read the whole thing or if you read select

14   portions?

15   A.  I read-- I did read select portions.  I believe I read the

16   introduction to it and the verbiage in it about how Acker

17   Merrall was praising these bottles and this collection and

18   saying they've inspected it and said they're wonderful, et

19   cetera, et cetera.  And then I went through it and picked out

20   certain bottles that I thought would fit in my collection and

21   then I read all of the details that were entered about those

22   bottles.

23   Q.  So when you bid on those two bottles in front of you, 4-2

24   and 4-2A, what did you think you were bidding on?

25   A.  Exactly what they said in the catalog.

DCDBKURT1                    Koch – direct

```
1    Q.   Would you have paid what you did for those bottles if you
2    had any doubts about the authenticity of the wine or the
3    bottles themselves?
4    A.   No, I wouldn't have bought at all.
5    Q.   Now, did there come a time when you learned that the three
6    bottles that are in front of you that we've been talking about
7    were fake?
8    A.   Yes.
9    Q.   What was your reaction when you learned that?
10   A.   I was disappointed and I was angry.
11   Q.   Why?
12   A.   Well, I got conned, got cheated.  No one likes to be conned
13   or cheated.
14   Q.   And did there come a time when you learned who consigned
15   those three bottles of wine to Acker Merrall & Condit?
16   A.   Yes.
17   Q.   And who did you find out consigned them?
18   A.   Rudy consigned them.
19   Q.   Rudy Kurniawan?
20   A.   Yes.
21   Q.   And since then have you looked in your cellar to see if you
22   had any other potentially fake wines that you may have
23   purchased that were consigned by the defendant?
24   A.   Yes.
25   Q.   And --
```

DCDBKURT1                      Koch - direct

1    A.  I have over-- well, just in Burgundy alone --

2              MR. MOONEY:  Objection; nonresponsive.

3              THE COURT:  Overruled.

4    A.  Just in Burgundy alone, I have found over 219 bottles of

5    wine that was consigned by Rudy that I paid $2.1 million for.

6              MR. MOONEY:  Objection; foundation.

7              THE COURT:  Overruled.

8    A.  But I have not yet gone through all the Burgundy-- or

9    Bordeaux that I have, but I estimate that it's about another 50

10   to 100 bottles that I paid probably anywhere from a half

11   million to a million.

12   Q.  And when you say that you personally have gone through, has

13   anyone assisted you in going through those wines in your

14   cellar?

15   A.  I've had-- yes.  I've had-- well, the investigation has

16   been very extensive and long term.  I had about six or eight

17   different experts go through them:  An expert in glass, an

18   expert in labels, an expert in glue, an expert in corks, and an

19   expert who studied fake wines.  I've even taken wines to the

20   chateaus to ask them if they ever made these kind of wines.

21             I note that Rudy has sold a number of 1921 double

22   magnums of Petrus --

23   Q.  Let me just stop you right there.

24   A.  Sorry.

25   Q.  Let me just stop you right there for just one moment.

DCDBKURT1                    Koch - direct

1   A.  Okay.

2   Q.  I just want to be clear that when you say you believe you

3   found all these fakes that were consigned by the defendant, am

4   I correct that you've formulated that opinion because you've

5   hired a number of people to examine the bottles and they've

6   told you that they believe them to be fake?

7   A.  Yes.  I've even gone to the extent of taking these bottles

8   to France to have them put in a cave and the cesium content

9   measured because there was a cesium of 178, I believe --

10              MR. MOONEY:  Objection, your Honor.

11              THE COURT:  Overruled.

12  A.  -- that did not exist in the world until the first atomic

13  bomb went off.  So many of the bottles I found that were dated

14  in, say, 1933 or '34 or even 1858 had cesium in it.  So they

15  were made after 1945, when the atomic bombs went off.

16  Q.  Just one final question that may have been obscured because

17  there was an objection.

18              You said you found over two hundred Burgundy bottles

19  you said you believed were consigned by the defendant that are

20  fake.  Is that right?

21  A.  We know they were consigned by him through discovery and

22  other lawsuits I have.

23  Q.  Just one final question.

24  A.  Sorry.

25  Q.  What was the total value of the wine?

DCDBKURT1                        Koch – direct

1   A.  The total value of the 219 bottles was in excess of $2.1

2   million.

3   Q.  Thank you.

4            MR. HERNANDEZ:  No further questions.

5   A.  No, not the value.  The total price I paid.  Sorry.

6            MR. HERNANDEZ:  Can I have just one second, your

7   Honor?

8            THE COURT:  Yes, sure.

9            (Pause)

10           MR. HERNANDEZ:  No further questions.

11           THE COURT:  Thank you.

12           Mr. Mooney, cross-examination.

13           MR. MOONEY:  Thank you, your Honor.

14  CROSS-EXAMINATION

15  BY MR. MOONEY:

16  Q.  Good morning, Mr. Koch.

17  A.  Good morning, sir.

18  Q.  This cesium test that you talked about, you didn't-- you

19  have a Ph.D. in science.  Right?

20  A.  I have a Doctor of Science in science.

21  Q.  But you didn't invent this test.  Right?

22  A.  No, I didn't.

23  Q.  Somebody else invented the test?

24  A.  Yes.

25  Q.  Did you look at the science to see how the test works?

DCDBKURT1                    Koch - cross

1    A.  Well, what they did was measured the rays that came off.  I

2    mean, it's fairly clear-cut.

3    Q.  Do you know how many different places are conducting the

4    test right now?

5    A.  I only know that-- I only know of one, and that's in

6    France.

7    Q.  Do you know if they've written any authoritative journals

8    or pieces on what they're doing?

9    A.  I believe they have.

10   Q.  Do you know if that's been peer reviewed at all?

11   A.  Peer reviewed?

12   Q.  Yes, sir.

13   A.  I don't know.  I didn't investigate that.

14   Q.  So you heard that they came up with this test and you went

15   off to have some bottles tested?

16   A.  Well, but the test was scientifically sound, in my opinion,

17   and very logical, so...

18   Q.  And we don't have anybody here today or in this trial to

19   tell us about how the test works?

20   A.  I could get you one right away if you want.

21   Q.  I imagine you could.

22   A.  Yes, I can.

23   Q.  How many bottles out of your collection did you have taken

24   to France and run through this cesium test?  Total.

25   A.  Total?

DCDBKURT1                     Koch - cross

1   Q.   Total.

2   A.   It's a guess, but I would say two dozen or so.

3   Q.   And just to be clear, you've inspected your collection of

4   wines not just for wines that you believe came to you through

5   Mr. Kurniawan's hands at some point, but from any source.   Is

6   that correct?

7   A.   Yes.   I've inspected-- I had my collection inspected by

8   all these experts to find fake wines.   Then, when I found the

9   fake wine, I traced down from where it came, from whence it

10  came.

11  Q.   There's a lot of fake wine in your collection, is there

12  not?

13  A.   Well, right now we estimate about five hundred bottles of

14  fake wine.

15  Q.   And would you put the figure at something like $6.6

16  million?   That's your purchase price?

17  A.   My purchase price-- well, from 431 bottles, my purchase

18  price was $4.4 million.   I haven't added all these other

19  bottles to it, but it could be anywhere up to $6 million.

20         THE COURT:   So, I'm sorry, did you say you found five

21  hundred fake bottles in your entire collection?

22         THE WITNESS:   That's what I believe.   But the last

23  numbers that I have, that was done two summers ago, was 443

24  bottles for which I paid $4.4 million.

25         THE COURT:   Okay.

DCDBKURT1                    Koch - cross

 1              THE WITNESS:  And I haven't added the other bottles to

 2      that yet because my cellar is still undergoing inspection.

 3              THE COURT:  Okay.  So let's, for argument's sake, say

 4      it's around five hundred bottles.

 5              Out of how many total bottles are in your cellar, did

 6      you say?

 7              THE WITNESS:  I have 43,000 bottles in my cellar.

 8              THE COURT:  So I'm not so good at math, but what

 9      percentage, roughly, of your collection do you think is fake?

10              THE WITNESS:  Well --

11              THE COURT:  So far.

12              THE WITNESS:  It's less than 1 percent.  But the

13      problem is I've done an analysis on the age of a bottle versus

14      the value of it.  And it may be 1 percent, but it probably is

15      25 percent of the value of the collection.

16              THE COURT:  I got it.

17              THE WITNESS:  Because say I paid $100,000 for one

18      bottle of Thomas Jefferson wine and I have only four of

19      them.  Well, I have four for which I paid $400,000.  Those were

20      all fake.  What I found is that the fakers faked these very

21      old, highly expensive bottles.  They make the most money that

22      way.

23      BY MR. MOONEY:

24      Q.  Do you recall, back on the 18th of September of this year,

25      having a meeting with Agent James Wynne, sitting over here at

DCDBKURT1                     Koch - cross

1   the end of this table?

2   A.  Yes.

3   Q.  Okay.  And do you recall on that occasion being asked the

4   overall value of fakes that you believed that were-- that you

5   had identified in your cellar?  Do you remember him asking you

6   that question?

7   A.  I don't remember it exactly.  But when I talked to people

8   about fake wine, I usually bring that up because it's a huge

9   irritant to me.

10  Q.  And didn't you, sir, on that occasion state to him that

11  with continued inspection you had identified approximately 6.6

12  million in fake bottles in your collection?

13  A.  I don't exactly remember that, I'm sorry.

14  Q.  And that meeting was just a few months ago, wasn't it?  The

15  meeting you had with Mr. Wynne, it was September of this year,

16  wasn't it?

17  A.  Yeah, I believe so.

18  Q.  You do remember having a meeting?

19  A.  Yes.  I've had about two meetings or three meetings with

20  them.

21  Q.  Now, at the point in time that you first became somebody

22  who started collecting wines, you were buying from just about

23  any source you could buy from, I think you told us.

24          Is that a fair statement?

25  A.  Yes.

 1   Q.  And at that point in time, you weren't worrying too much

 2   about it.  Whatever they said it was, that's what you'd accept

 3   and buy.  Correct?

 4   A.  Correct.

 5   Q.  And you were buying through auction houses and dealers

 6   primarily.  Right?

 7   A.  Well, I mean, it's been a continuum.  Initially I bought

 8   from stores, liquor stores.

 9   Q.  Okay.

10   A.  And restaurants.

11   Q.  And some from private individuals?

12   A.  Well, no.  When I got more and more-- well, for a long

13   period of time I just bought it from liquor stores and from

14   restaurants.  And then, when I got some more money, I started

15   buying-- I started then going to try to buy better wines and

16   then someone introduced me to auctions at the time.  You know,

17   I was an MIT nerd and so I wasn't aware of auctions for a long

18   time.

19   Q.  And when you went to the auctions, did you trust the

20   auction house to have inspected what they were selling you?

21   A.  I don't remember really going to an auction house to buy

22   wine.  I went to an auction house to buy art, but I got wine

23   catalogs from the auction houses and then I bought directly

24   from the catalogs.

25              To answer your question, yes, I trusted them, what

DCDBKURT1                    Koch - cross

1    they said in the catalog.

2    Q.  And a fair amount of your Western memorabilia are things

3    that you picked up at auction houses, are they not?

4    A.  I would say an amount, but a lot of my Western memorabilia

5    came from estates of horders that I bought.  That's why I've

6    got so much, because I bought four different estates directly

7    from the executor of the estate.

8    Q.  And with --

9    A.  But I have bought at auctions.  I bought a lot of things at

10   auction.

11   Q.  And with regards to the Western memorabilia that you've

12   accumulated, a lot of those pieces are essentially antique

13   pieces now, are they not?

14   A.  Yes.

15   Q.  And one of the things that -- as a collector of antiques,

16   you really do want that piece to be as much in the original

17   condition as it can be, don't you?

18   A.  Depends upon what you want to use it for.  If I want to

19   decorate a cabin of a pioneer, I want a beat-up piece of

20   equipment, you know.  If I want to decorate a parlor of a

21   wealthy person, pretend wealthy person, then I want a very fine

22   piece.

23       As I said, it depends.  I have different motivations

24   on collecting.  I have a spectrum of motivations on what I

25   collect in the Western lineups.

DCDBKURT1                    Koch - cross

1   Q.  But one of the things that you learned, one of the things

2   with regards to most of those pieces, is they've gone through

3   other people's hands first?

4   A.  Generally they have.  If they're old, they have.

5   Q.  Because you weren't around to have bought them when they

6   were originated.

7   A.  No, I wasn't.

8   Q.  So somebody else had to have them first.

9   A.  Of course.

10  Q.  And we rarely find pieces that were stuck away in the back

11  room of the factory someplace and discovered by accident so

12  that we could now have them in a pristine form.  Isn't that

13  fair?

14  A.  Well, I have pristine items that have been stuck away.

15  Q.  Okay.

16  A.  I have a case of Winchester rifles that were never

17  opened.

18  Q.  And those are rare.

19  A.  Those are rare.  Exactly.

20  Q.  Those are very rare.

21  A.  Very, very rare, right.

22  Q.  For every case of Winchester rifles that were never opened,

23  there are tens of thousands of Winchester rifles that are in

24  various stages of repair in the hands of people all over the

25  place.  Is that right?

1    A.   I would say hundreds of thousands.

2    Q.   And those Winchester rifles that are out there, some of

3    them are going to be in pretty good shape and some of them are

4    going to be in perfectly awful shape.  Isn't that correct?

5    A.   That's true.

6    Q.   And then, also, with regards to those Winchester rifles

7    that are out there, over the years people will have done things

8    to them.  Is that right?

9    A.   Yes.

10   Q.   And if I bought one of those Winchester rifles, I might be

11   the first guy that bought it, I might make modifications to it.

12   Is that right?

13   A.   You might have, but I try to avoid anyone making a

14   modification to it or buying something that's been subsequently

15   enhanced.

16   Q.   Sure.

17   A.   Now, I bought items that the American Indians had and

18   they've enhanced them, but that adds a different value because

19   it shows that they were in the possession of the American

20   Indians.

21   Q.   Sure.  Now you've got a historic activity that occurred

22   with regards to it.

23   A.   That's right.

24   Q.   So activities that occurred with regards to around the time

25   of the origination of the product or the device may be just

DCDBKURT1                       Koch – cross

1    part of the history of the device.  Later, when the device

2    becomes a collectible, that changes.  Right?

3    A.  Yes, but I will modify that somewhat to say that if someone

4    reconditions a gun or someone puts carvings on the gun, if it's

5    not historical or if it's fake, then that diminishes the value.

6    Reconditioned Winchesters have a considerably less value than

7    one that is in similar condition and has not been

8    reconditioned.

9    Q.  Now, not all of those changes that may have been made to

10   something like that were done by people who were trying to make

11   it look to be something other than it was.

12          MR. HERNANDEZ:  Objection.

13   Q.  Is that true?

14          THE COURT:  I didn't understand the question.

15          MR. MOONEY:  Okay.

16   Q.  You said that-- strike that.  Bad question.  I'll rephrase.

17          Sometimes, sometimes, people will take-- and let's

18   stay with your Winchester example.

19          Some people will take the old Winchester someplace

20   along the line and something will being broken or something

21   won't be as it should be and they'll fix it.  Right?

22   A.  Yes.

23   Q.  Okay.  And when people do that, most of the time it's just

24   well-meaning.  Right?

25          MR. HERNANDEZ:  Objection.

DCDBKURT1                        Koch - cross

```
 1              THE COURT:  Sustained.  If you know.
 2              THE WITNESS:  Well --
 3              THE COURT:  Well, you don't have to answer.
 4    Sustained.
 5              THE WITNESS:  Okay.  Thank you.
 6    Q.  Okay.  But you don't necessarily want people to have fixed
 7    an old item, do you?
 8    A.  Again, it depends.  You know, the Indians would break a
 9    rifle, break its stock, and then they'd put some wet rawhide
10    around it or piano wire or something else to fix it.  Now, that
11    adds significance to the gun.
12    Q.  That you want.
13    A.  That's good.
14              But if a guy has a broken stock and, say, his father
15    replaced it with a stock, I, as a collector, would want to know
16    that the stock was replaced because that changes the value of
17    it.
18    Q.  And people don't always tell you that, do they?
19    A.  No, they don't.  Quite often they don't tell you.
20    Q.  And sometimes a lot of people don't even seem to think it's
21    significant.  They just think I fixed it, I made it better.
22    A.  Well, it depends upon if it's a $100 gun, so what?  If it's
23    a $10,000 gun, yeah, it's very important.
24              THE COURT:  So, Mr. Mooney, could we move from guns to
25    wine?
```

1          MR. MOONEY:  Certainly, your Honor.

2     Q.  You said that--

3          MR. MOONEY:  Maybe if I could give you one more gun

4     analysis first, your Honor.

5          THE COURT:  Okay.

6     Q.  We talked about broken.

7          Another thing that might happen is people might just

8     clean an old gun or clean an old weapon, use an abrasive of

9     some kind to bring back up the shine.  You don't want that, do

10    you?

11    A.  No.

12    Q.  But it happens, doesn't it?

13    A.  It happens.  But I'll tell you something else since you

14    brought up guns.  I have some guns that have been antiqued and

15    had someone's name engraved on it, Chief Ouray, for example.

16    When I took the gun apart -- I had a gunsmith take it apart --

17    I had found out it had been antiqued.  I found out that the

18    documentation that went with the gun was all forged.  And so

19    someone was selling me a misrepresented -- and what I call a

20    fake -- gun.

21    Q.  It was a conscious fake.

22    A.  Yes.

23    Q.  An intentional effort to make it look something different

24    than what it was.

25    A.  Yes.

DCDBKURT1                          Koch - cross

1   Q.  That's quite a bit different, isn't it, from the person

2   who says, Well, this thing is old and dirty and pitted and I'm

3   going to shine up the barrel and make it look pretty again?

4             MR. HERNANDEZ:  Objection.

5             THE COURT:  I'll allow it.  And then --

6             MR. MOONEY:  And I'll then move on.

7             THE COURT:  Then we get to the wine.

8   Q.  That's quite a bit different, isn't it?

9   A.  Well, I bought a gun that was given to "Lonesome" Charley

10  Reynolds, who was customers' personal guide.  Died at the

11  Little Bighorn.  And there was a plaque on the gun that said

12  "Given to Charley Reynolds by George Custer."  And it was all

13  tarnished.  I bought it from a very reputable, fine gun antique

14  dealer.  And he warned me, he said "Do not polish that plaque

15  because you'll show it's too new and you'll ruin the value."

16            So cleaning up a gun, reconditioning it, you know, if

17  the guy's using the gun and he cleans it just to keep it in

18  good working order, that's one thing.  But if he cleans it up

19  to sell it, then it takes all the original antique stuff off of

20  it, that's a different story.  That crosses the line.

21  Q.  Yet many, many people do that, don't they?

22            MR. HERNANDEZ:  Objection, your Honor.

23            THE COURT:  Sustained.

24  A.  I don't know --

25            THE COURT:  Let's go.

DCDBKURT1                         Koch - cross

1          MR. MOONEY:  Okay.

2    Q.  Well, look, you bought different kinds of collectibles.

3    One of the kinds of collectibles that you buy is wine.

4    A.  Yes.

5    Q.  And you broke your wine into two different categories.

6    Right?  You have the wine for drinking and then you have the

7    wine for collecting.

8    A.  That's correct.

9    Q.  When you went off and bought the Jefferson bottles, you

10   really-- did you really think, well, I'm going to go drink

11   these?

12   A.  No.

13   Q.  Did you expect that what was in the bottle would be even

14   drinkable?

15   A.  I had no idea.

16   Q.  Okay.

17   A.  I will tell you the best wine I've ever drunk was an 1853

18   Latour, but that came from the Latour cellar.  But it was

19   absolutely fantastic.  So some of these old wines can last.

20   You just do not know.  The probability is they won't last.

21   Q.  Yes.

22   A.  They'll be vinegar, but you don't know.  But the value of

23   the Thomas Jefferson bottle was in the fact that it supposedly

24   belonged to Thomas Jefferson and he bought it.

25   Q.  So that was a collectible piece.

DCDBKURT1                    Koch - cross

1    A.  Yes.

2    Q.  And some of the wines, the wines don't necessarily have to

3    have been owned by a famous person for you to buy them for

4    collectible purposes?

5    A.  No, I've already testified that I try to buy every year of

6    these four wines.

7    Q.  Yet a good number of people out there that are buying the

8    wines aren't buying them as collectibles; they're buying them

9    for the purposes of drinking them.  Right?

10   A.  People buy wines for a whole lot of different reasons,

11   including reselling them or bragging, as I do, to some of my

12   friends, or to drink.  There's a whole spectrum of them.

13   Q.  But the ones you're buying for drinking you're thinking of

14   in a little bit different way than the ones you're buying for

15   the purposes of collecting, aren't you?

16   A.  Yes.

17   Q.  Because the ones that you're buying for drinking, that big

18   bottle that's sitting up there in front of you that says

19   "Petrus" on the outside --

20   A.  The double magnum.

21   Q.  Okay.  Did you buy that as a collectible or did you buy

22   that for what you thought was inside the bottle?

23   A.  I bought it to drink.

24   Q.  You bought that to drink.

25   A.  Yes.

1  Q.  And it could say anything on the outside.  What you really

2  were concerned about was what was on the inside.

3  A.  I'm concerned what-- you don't want to buy a Mercedes with

4  a Volkswagen engine in it if you're buying a high-caliber car.

5  You want to buy the object of what's in it that says on the

6  outside, because that's the only thing that identifies what's

7  in it.

8  Q.  So the problem with that is that the outside identification

9  tends to indicate to you that what's said on the outside is not

10 what's on the inside?

11 A.  Wait a minute, I kind of lost that logic there.

12         THE COURT:  So did I.

13 Q.  Okay.  So what you're telling us, though, if I understand

14 correctly, is what you want is you want to know that the right

15 thing is inside there.

16 A.  Yes, that's right.  I want to know that what's inside here

17 is what is said on the label.

18 Q.  Because you want to drink?

19 A.  I want to drink it.

20 Q.  And when you drink it, you want it to be what it says it

21 is?

22 A.  Absolutely.

23 Q.  And what you were sold.

24 A.  That's right.  Otherwise it could be dishwater.

25 Q.  Now, you've never opened that bottle?

DCDBKURT1                        Koch - cross

1    A.   I haven't opened this bottle.

2    Q.   Did you send that bottle off for cesium testing?

3    A.   No.

4    Q.   Did you send that bottle-- did anybody do any test of

5    what's inside the bottle?

6    A.   No.  I could tell you why.

7              THE COURT:  Well, wait until he asks you.

8              THE WITNESS:  Okay.  Sorry, sir.

9              THE COURT:  That's all right.

10   Q.   You gave us a list of the primary wines that you are

11   accumulating in your cellar.  And those are primarily Bordeaux

12   wines.  Is that right?

13   A.   No, in my cellar I accumulate a tremendous amount of

14   different wines, everything from Kiwi wines to California

15   wines, Spanish wines, Italian wines.

16   Q.   When you talked about the ones that you were trying to get

17   the full years of, the four types, the Chateaus, Lafite's a

18   bordeaux.  Right?

19   A.   Yes.

20   Q.   Mouton's a bordeaux?

21   A.   Yes.

22   Q.   And Latour and Petrus?

23   A.   Well, yes.

24   Q.   Okay.  So the ones that-- your primary passion is for

25   Bordeaux?

DCDBKURT1                    Koch - cross

1    A.  No.  No.  I said earlier that to satisfy my incessant

2    collection habit, I wanted to collect every year of these

3    wines.  Now, if I hadn't gotten stung by most of them being--

4    most of the older wines being fake, I probably would have

5    collected La Tache and Domaine de la Romanee-Conti as well, but

6    I stopped with those four.  But my primary passion is

7    collecting outstanding wines that I could drink and share with

8    my friends.

9    Q.  And the reason that you stopped is you found out that 50

10   percent of those that you had were all fakes?

11   A.  I don't know whether 50 percent are fakes, but it's

12   mainly-- I haven't added it up compared to what I've got, but

13   it's generally the pre-'45 wines are fake.

14   Q.  Pre-'45s?

15   A.  Yes, generally.  I'd have to go back and look.  I got so

16   many fake wines I can't keep them all in my head,

17   unfortunately.

18   Q.  And I take it at the time that you bought all of those fake

19   wines, or each of those fake wines, you didn't know that they

20   were fake wines?

21   A.  I sure didn't.  I believed what I was told and I believed

22   what was represented in the catalogs and I believed the

23   labels.

24   Q.  And when in time was it that you started to question the

25   authenticity of what was in your cellar?

1    A.   When in time?

2    Q.   When in time?  What period of time did that start?

3    A.   2005.

4    Q.   And that was after you had begun to have the problem with

5    the Jefferson bottles?

6    A.   That's when I found the Jefferson bottles were fake, proved

7    that they were fake, and then that's when I got some additional

8    information that there were other fake wines such as magnums of

9    1921 Petrus and others.  So that's when I said, man, if these

10   Jefferson bottles are fake, I've got some other bottles that

11   are fake, I better look at my entire cellar, you know.  It

12   opened a curtain for me.

13   Q.   And that was on --

14   A.   I pulled the curtain back from the Oz, you know, the

15   wizard.

16   Q.   Did you start talking to the auction houses and places

17   where you had purchased these?

18   A.   I talked to a couple.  One auction house was good, that

19   talked to me about fake wine.  That was Sotheby's.  Then, when

20   I talked to the other auction houses, I got gobbledygook:  "We

21   verify everything.  Everything that we sell is true."

22   Q.   Was Acker Merrall one of those?

23   A.   Acker Merrall was one of those, yes.  Zachy's was one of

24   them, Christies was one of them.

25   Q.   They didn't seem concerned about the problem?

DCDBKURT1                    Koch - cross

1    A.  They said they were concerned, but they were not helpful.

2    And when I got down to it, they started pointing at a clause in

3    their catalog that said you buy as is, where is, and anything

4    that is said in the catalog is an opinion only or by our

5    employees is an opinion only and you can't rely on it.

6            Needless to say, that made me quite angry because the

7    guy can say We're lying to you or We're selling you this is

8    Petrus, but you can't believe me.  And that's like a car

9    salesman saying I'm selling you this Mercedes.  You can believe

10   me.  And then later the fine print says, No, you can't believe

11   me and I'm not responsible if it's really a Volkswagen.

12           So I've sued on that and have found that --

13   Q.  You've got a number of lawsuits that you've filed against

14   people with regards to wine.  Is that right?

15   A.  Yeah, but at least the lawsuit that we filed has gotten

16   that get out of jail card abolished or modified.

17   Q.  Now, in this day and age, now the auction houses are

18   starting to change those policies.  Is that right?

19   A.  Yeah, that's right.

20   Q.  And you've sued a bunch of auction houses?

21   A.  Yes.

22   Q.  You've sued a bunch of individuals?

23   A.  I've --

24   Q.  You've sued Mr. Kurniawan?

25   A.  Yes, I have.

1    Q.  And that lawsuit's pending.  Right?

2    A.  Yes.

3    Q.  Okay.

4    A.  And I sued Eric Greenberg.

5    Q.  And you sued Eric Greenberg.

6    A.  Yes, who bought a lot of wines from Rudy --

7    Q.  And you bought --

8            THE COURT:  Okay, okay.

9            THE WITNESS:  I should be quiet or --

10           THE COURT:  No, no, no.  I'm just trying to focus in

11   on this lawsuit.

12           THE WITNESS:  Okay.

13           THE COURT:  This case right here.

14           THE WITNESS:  All right.

15   Q.  Now, you talked about reconditioning wines.

16           I take it that-- and you've got a couple of wine

17   cellars.  Is that right?  You've got a couple of different

18   houses and they each have wine cellars?

19   A.  Yes.

20   Q.  One of those wine cellars is 1,300 square feet?

21   A.  Well, you've got better information than I do.

22   Q.  Okay.  The other is 1,700 square feet?

23   A.  I don't know where you get your information.  Gosh, I've

24   never heard those numbers.

25   Q.  Haven't you reported those in interviews before?

1   A.  I don't remember.

2   Q.  Are they big cellars?

3   A.  Yes, they are big cellars.

4   Q.  And you bar code-- you bar code the bottle so you'll be

5   able to figure out where they are.  Right?

6   A.  Yes.

7   Q.  And then from the bar code they go into the computer and

8   the computer then can tell you where to go find them in the

9   wine cellar?

10  A.  That's correct.

11  Q.  So this isn't-- this isn't a little corner that you're

12  standing in with a rack down one side and a rack down the other

13  side where you can stand in one place and look at all the

14  bottles, is it?

15  A.  Well, in those two cellars, that's right.

16  Q.  And you've got a lot of wine, 43,000 bottles, that are down

17  in these two cellars?

18  A.  Well, I actually have four cellars.

19  Q.  Oh, okay.

20  A.  So the other cellars are the ones that you described, when

21  you go down and there's two racks or three racks.

22          MR. HERNANDEZ:  I'd object to these questions on

23  relevance grounds.

24          THE COURT:  Okay.  We'll allow a little leeway, but

25  I'd urge Mr. Mooney to focus in on the case.

DCDBKURT1                      Koch - cross

1   Q.  And in connection with the passion that you've got with

2   respect to wine, you've used wine motif in some of the

3   decorating in at least one of your houses, haven't you?

4   A.  Yeah, in two bathrooms.

5   Q.  And you have a wall that's made out of wine bottles?

6   A.  I would say it looks more like a door that's made out of

7   wine bottles.

8   Q.  And it's wine bottles that are backlit.  Right?

9   A.  Yeah.

10         THE COURT:  That are what?

11         MR. MOONEY:  Backlit so that the light comes from

12  behind them.

13  A.  Boy, you've done some good investigation.  Been in my

14  house?

15  Q.  You never invited me, sir.

16  A.  No, I have wine bottles that are stacked like this.

17  Q.  Okay.

18  A.  So you see the butt end and I've got the other side lit.

19  Now, it's about that wide and about 6 feet tall and it's

20  stacked with bottles that I've drunk or that friends and I have

21  drunk.

22  Q.  And then you've got a ceiling that's made out of corks?

23  A.  Yes, and the corks came out of the bottles that we've

24  drunk.

25  Q.  So you pull the corks, keep the corks, and there they are?

DCDBKURT1                    Koch - cross

1   A.  That's right.

2   Q.  And that's kind of pleasing to look up and say, you know,

3   I've drank those?

4   A.  That's right.

5   Q.  And hopefully you're looking up and not laying there.  You

6   didn't drink all of those at one time.

7   A.  No.

8   Q.  Okay.  And you've got a wall that's wallpapered in labels,

9   don't you?

10  A.  Partially wallpapered.

11  Q.  Okay.

12  A.  I'll give you some help here.  The labels are all labels

13  that we've drunk, of wines that we've drunk.  And I've also put

14  the-- I have a wainscoting of the ends of the crates on the

15  side, you know.  But it's a small bathroom.

16  Q.  I didn't know that part.

17  A.  Well, just helping you out.

18  Q.  It sounds really pretty.

19  A.  Yeah, but the crates and the labels and the corks and the

20  bottles are all from wine that we've consumed.

21  Q.  And it's just a way for you to enjoy that aspect of your

22  passion.  Is that right?

23  A.  Well, it reminds me of great times and great wine.

24  Q.  And once you get closer to the age we are, we need to be

25  reminded of those great times.

DCDBKURT1                    Koch - cross

1   A.  You're absolutely right.  Except you're a young stud, you

2   know.  I'm a fat old man.

3   Q.  I suspect we're closer in age than you think.

4           Now, in order to really work your way through your

5   collection and determine the extent of the problem with regards

6   to the fake wines, you've ultimately employed five or six

7   different experts to look at your bottles.  Is that right?

8   A.  Yes.

9   Q.  And you've sent bottles over to the chateaus?

10  A.  Yes.

11  Q.  And you've sent bottles, as you said, a couple dozen of

12  them, off for this cesium testing to see if they're old or

13  new?

14  A.  Yes.

15  Q.  And some of the experts haven't been able to determine

16  things that other experts have been able to determine.  Is that

17  right?

18  A.  That's true.

19  Q.  So --

20  A.  Excuse me.  One other thing that we've done is that we've

21  hired a materials specialist, who will look at a label, tell

22  you when the paper was made, tell you when the print was made,

23  tell you what kind of glue it is.  He's a scientist.

24  Q.  Sure.

25  A.  And, you know, we found labels.  He'll tell you whether the

DCDBKURT1                     Koch - cross

1    labels were Xeroxed, you know.  We found Xeroxed labels.  We

2    found 1858 labels that were put on with Elmer's glue, you know.

3    Things like that.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DCDLKUR2                          Koch - cross

1    Q.  And those people can easily detect that, can't they?

2    A.  I wouldn't say easily.  They -- it takes them a certain

3    amount of time.  There's one expert who could look at it and

4    just from his knowledge of it can look at it, but it takes him

5    20 minutes per bottle.  There's another expert that takes about

6    an hour, hour and a half per bottle.  So it varies with what

7    they're looking for.

8    Q.  And part of the reason that you've had to have all these

9    experts come in and look at everything is that you just can't

10   be confident based upon your own eye that which bottles are

11   correct and which bottles are not?

12   A.  That's absolutely true.  I can't even tell a fake dollar

13   bill.  I don't want to be a wine expert; I want to be a wine

14   consumer.

15   Q.  Sure.  And now you've got some bottles I think you said

16   that were reconditioned?

17   A.  Yes, but they're labeled reconditioned by the chateau on

18   such and such a date.

19   Q.  And what's important about reconditioning, of course, as

20   you told us, is that if somebody is going to recondition

21   bottles, you don't want them adding something other than the

22   actual wine?

23   A.  Yes.

24   Q.  So --

25   A.  I've had some wine in which antifreeze was added to it.

DCDLKUR2                         Koch - cross

1    Sorry.

2    Q.   Well, you do know that at the end of World War II, some of

3    the American soldiers irritated the French mightily by adding

4    alcohol to the wine?

5    A.   (Laughing)

6    Q.   So if you're going to have a bottle of a say a '62

7    Romanee-Conti that it's been reconditioned, you would want it

8    conditioned with a 62 Romanee-Conti?

9    A.   Yes.   That's absolutely right.

10   Q.   Okay.   And if somebody is cleaning up the bottles of wine

11   and fixing things on the bottles of wine, that would affect the

12   value of the wine as a collectible, wouldn't it?

13   A.   Well, no.   It would also affect whether I as a consumer

14   would want to buy that bottle because I've seen guys, Eric

15   Greenberg in particular, who did clean up the bottles and his

16   idea of cleaning it up is considerably different than my idea

17   of cleaning it up.

18   Q.   And that's sometimes even putting new labeling on the

19   bottle?

20   A.   That's right.

21   Q.   And at that point in time it means you don't want the

22   bottle anymore, but it doesn't change what's in it, does it?

23   A.   It makes you suspicious of what is really in the bottle.

24   Why would a person want to change the label, why, unless he was

25   trying to sell you something, unless he had a huge economic

DCDLKUR2                          Koch - cross

1    motive to sell it for a much higher price than he bought it or

2    got it.  Because anybody knows, as I told you, that you want to

3    look at the original item, not the reconditioned item.

4    Q.  You think maybe he just wants to make it look better?

5              MR. HERNANDEZ:  Object to "he," whoever "he" is.

6              THE COURT:  Sustained.

7              MR. MOONEY:  May I have a moment?

8              No more questions, your Honor.

9              THE COURT:  Any redirect?

10             MR. HERNANDEZ:  Yes, your Honor.

11   REDIRECT EXAMINATION

12   BY MR. HERNANDEZ:

13   Q.  Mr. Koch, I'm actually going to begin, I'm going to start

14   where Mr. Mooney began, just a few questions about rifles and

15   then we'll get to wine, if that's okay?

16   A.  Sure.

17   Q.  You were talking about Winchester rifles as an item that

18   you purchase, and Mr. Mooney asked you some questions about how

19   sometimes people may make modern, current-day modifications to

20   an old Winchester rifle.

21             Do you remember those lines of questions?

22   A.  Yes.

23   Q.  Now, if you were to be bidding on an old Winchester rifle

24   in an auction that had been modified let's say in 2013, would

25   you expect that fact to be disclosed by the person consigning

DCDLKUR2                          Koch – redirect

```
 1   it or by the auction house?
 2   A.  Absolutely.  If it weren't in there, I would say it was, it
 3   was verging on fraud.
 4   Q.  And would it affect the value or your willingness to bid on
 5   that item if the Winchester rifle didn't have its original
 6   parts?
 7   A.  Absolutely.  It would have lowered it by 95 percent or to
 8   zero, its value.
 9   Q.  Now, a rifle, that has lots of different parts, correct?
10   A.  Yes.
11   Q.  So I'm going to ask you about two parts here.
12           There's the butt or the stop, that's the part that
13   goes against your shoulder, right?
14   A.  Yes.
15   Q.  And then let's use the trigger because everybody knows what
16   that is, the part you pull to make it fire, right, right,
17   that's the trigger?
18   A.  Yes.
19   Q.  If someone modifies just the trigger on an old Winchester
20   rifle, is it possible to examine the other parts of the rifle
21   to determine whether they're original?
22   A.  Yes.
23   Q.  Now, how about a bottle of wine, if the label and the cork
24   are modified on or changed on a bottle of wine, can you with
25   the same ease tell whether the wine is authentic?
```

DCDLKUR2                        Koch - redirect

1    A.  No.

2    Q.  Why?

3    A.  Because if you open the cork to get at the bottle of wine,

4    you'll destroy it, you'll destroy the wine because it

5    deteriorates when it gets in contact with oxygen.  And so other

6    people have thought about, you know, putting a needle in and

7    pulling it out that way.  Well, you put a needle in, you put a

8    channel for oxygen to get in.  So this is in a scientific term

9    testing the wine and it's called destructive testing.  You

10   destroy it when you test it, and it's impossible to do it in a

11   nondestructive way.

12   Q.  Well, there are some questions also about testing, about

13   cesium testing?

14   A.  Yes.

15   Q.  Mr. Mooney asked you about whether that big bottle had been

16   cesium tested and you said no.  Do you remember that?

17   A.  Yes.

18   Q.  And you weren't given an opportunity to explain why.  You

19   said you could tell us why.

20           Do you want to tell us why it wasn't tested?

21   A.  Oh, sure.  Well, because the atom bombs went off in 1945

22   and thereafter.  And if I want to determine the year of it, if

23   the year were accurate, that's all cesium testing does is tell

24   you the year, tell you whether it was post '45 or pre-'45.

25           And so you use cesium testing when you're getting a

DCDLKUR2                    Koch - redirect

1   very expensive bottle that's a 1736 or I bought one bottle that

2   was for 1711.  I should have had that cesium test.  But I

3   already found out that was fake because it said Chateau Lafite

4   Rothschild on it and the Rothschilds didn't own Lafite in those

5   years.

6           So you only take it back to this very, very old wines

7   where they're demanding a very high price because of its age.

8   Q.  So for that 1947, the test isn't helpful because there was

9   already atomic testing and cesium in the environment; is that

10  right?

11  A.  That's right, that's right.  You know, and to test the

12  liquid in wines, even if you do chemical testing, that doesn't

13  prove much because there's over a hundred thousand different

14  components in wine and various combinations of that give you

15  all the taste and so it's extremely difficult to do that.  And

16  people said, well, you taste it, you test it by tasting.

17  That's hogwash because you and I will have different tastes.

18  Tasting is a subjective test.

19  Q.  So is that why the labels and the corks and the physical

20  items are so important?

21  A.  Absolutely, absolutely.  Because those are the real things

22  that you could put your hands on and your mind around that

23  shows that this is a real bottle.

24  Q.  Now, you were also asked some questions about collectible

25  wine versus drinking wine that you keep at home.

1          Do you remember those questions?

2   A.  Yes.

3   Q.  And you were asked about whether it matters to you whether

4   the wine inside is authentic, do you remember those questions,

5   whether the wine inside the bottle is authentic?

6   A.  Yes.

7   Q.  Just so that we're absolutely clear, I'm going to ask you a

8   couple questions about collectible wine first and drinking wine

9   second.

10  A.  Right.

11  Q.  Let's talk about collectible wines first.  Does it matter

12  to you that the wine inside the bottle in a collectible wine is

13  authentic?

14  A.  Absolutely.

15  Q.  Does it matter to you that the physical parts of the

16  label -- of the bottle, the label, the cork are authentic in a

17  collectible bottle of wine?

18  A.  Absolutely.

19  Q.  All right.  Now let's talk about the drinking wines.

20          Does it matter to you that the liquid inside the

21  drinking wines is authentic?

22  A.  Of course.  That's what you're putting in your body.  Of

23  course you want it to be what it says it is.

24  Q.  Now, what about the corks and the labels for the drinking

25  wines, does that matter to you too?

1    A.  Of course, because the corks and labels tell you whether

2    it's original or not because that's what the fakers can do.

3    They fake the corks, they fake the label, they fake the

4    capsule, and they can even fake the bottle, so.

5    Q.  So is it fair to say that it doesn't matter to you what

6    classification of wine it is in your cellar, you want all the

7    wine in your cellar to be authentic and you want all the

8    bottles to be authentic?

9    A.  Absolutely.

10   Q.  And that affects your both willingness to buy and price you

11   would pay?

12   A.  Absolutely.

13   Q.  Now, you were asked a few questions about your home

14   decoration choices; do you remember that?

15   A.  Yes.

16   Q.  So there are some rooms in your home that have corks as

17   part of the decoration; is that right?

18   A.  Well, let me be precisely accurate.  In my home in Palm

19   Beach, Florida, I have a bathroom, a small bathroom, that's

20   right next to my wine cellar that has corks on the ceiling.

21   One wall right off the commode that has the bottles stacked.

22   Then on half the wall I have the labels.  And then on the other

23   half, the bottom of the wainscoting, I have the ends of the

24   crates.

25             Now, on Cape Cod, where I have a summer house, I have

DCDLKUR2                    Koch - redirect

1   another cellar and a very tiny john, bathroom, right next to

2   that.  And there I only have -- I have a regular wood

3   wainscoting and a regular black ceiling.  But there we put, I

4   wallpapered a small part of it with the wine labels of all the

5   bottles of all the wines that we drank on the cape.

6   Q.  So we're talking about two bathrooms here?

7   A.  Yes, just two.

8   Q.  And take a look around in the jury box there, right where

9   you're sitting, just right now in the box you're sitting in,

10  about -- compare the bathroom size to the size of the jury box

11  you're in.

12  A.  About the same size.  Maybe difference might be, you know,

13  6 inches here, 6 inches there, about the same size.

14  Q.  Room for a sink maybe?

15  A.  Room for a toilet, room for a sink.

16  Q.  I'm sorry.  Let me correct something.  I said jury box.  I

17  meant witness box.

18  A.  Okay.  The jury box is much bigger.  I'm sorry.

19  Q.  Let me be more precise and figure out exactly how luxurious

20  this bathroom is.

21      You're looking around in the witness box, right?

22  A.  Yes.

23  Q.  You were referring to the witness box when you were

24  answering?

25  A.  Yes, I was.

DCDLKUR2                          Koch - redirect

 1   Q.   Okay.   I was gesturing to the witness box, but, you know,

 2   everything we do here is for the jury so I had them on my mind.

 3           But you meant the witness box, right?

 4   A.   Yeah, I'm sorry.

 5   Q.   It's my fault.

 6   A.   I thought -- you were pointing at me, so I thought it was

 7   where I was.

 8   Q.   Entirely my fault.

 9           THE COURT:   You know, Mr. Hernandez, in this

10   courtroom, both the jury box and the witness box we consider

11   luxurious.

12   Q.   Now, the labels you say that you have in your summer home,

13   the wine labels that you have in the bathroom, did you print

14   those on your home computer?

15   A.   No.   We rinsed them or soaked them off the bottles, real

16   labels.

17   Q.   And then did you scan them into your computer and then

18   print them and put them on the wall?

19   A.   No, heavens no.

20   Q.   Did you use any wax to decorate your home?

21   A.   No.   I mean we wax tables, but we don't put wax, no.

22   Q.   Have you ever used an ink pad maybe to paint the walls

23   instead of paint from the hardware store?

24   A.   Heavens no.

25   Q.   And do you know the wines of Domaine de la Romanee-Conti,

1   are you familiar with them?

2   A.  Oh, that's the premier wine of Burgundy.

3   Q.  Do you know they have serial numbers on them stamped in

4   black ink?

5   A.  Yeah, yeah.

6   Q.  Did you ever use serial number stamps to decorate your

7   home?

8   A.  No, of course not.

9   Q.  Mr. Koch, you also were asked some questions about you

10  hired a number of experts to examine bottles, and you said that

11  you have an expert who's examined the bottles and takes about

12  20 minutes per bottle to make these examinations; is that

13  right?

14  A.  Yes, that's one expert.

15  Q.  What was that person's name?

16  A.  Mike Egan, I believe.

17  Q.  And you said that you yourself are not a wine expert?

18  A.  No, I'm not.

19  Q.  You're a drinker?

20  A.  I'm a consumer.

21  Q.  So your primary employment or you don't have any employment

22  related to the wine business, right?

23  A.  No.

24  Q.  And you don't spend most of your time either buying or

25  selling wine or drinking wine, correct?

1   A.  No, I do not.

2   Q.  And one final subject.  You were asked some questions about

3   reconditioning.  You were asked by Mr. Mooney if you bought a

4   1962 Romanee-Conti, you'd want it reconditioned with a '62

5   Romanee-Conti, correct?

6   A.  Yes.

7   Q.  My question to you is would you want that reconditioning to

8   be done by the Domaine de la Romanee-Conti exclusively, in

9   other words, no one else?

10  A.  Absolutely right.  I would only want it done by the

11  Domaine.

12  Q.  If another collector had done it in their home, say in

13  their kitchen, would that affect your willingness to buy that

14  bottle?

15  A.  Absolutely.  I wouldn't buy it because he could have put

16  dishwater in it.

17          MR. HERNANDEZ:  No further questions.

18          THE COURT:  Okay.  Thanks very much, Mr. Koch.

19          THE WITNESS:  Thank you.

20          (Witness excused)

21          THE WITNESS:  Do you want me to take these bottles

22  home with me?

23          MR. HERNANDEZ:  I'll hold them a little longer.

24          MR. MOONEY:  I thought we were going to open them.

25          MR. HERNANDEZ:  The government calls David Parker.

DCDLKUR2                        Koch - redirect

1    DAVID PARKER,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. HERNANDEZ:

6    Q.  Good morning, Mr. Parker.

7    A.  Good morning.

8    Q.  Mr. Parker, where do you live?

9    A.  I live in Vancouver, Washington, just outside of Portland,

10   Oregon.

11   Q.  What do you do for a living?

12   A.  I own several companies that sell wine and publish

13   information.

14        MR. MOONEY:  I can't hear the witness.

15   Q.  I'll ask the question again.  The audio isn't great in the

16   courtroom.  If you could speak directly into microphone.  I'm

17   going ask you the question again.

18        What do you do for a living?

19   A.  I own several companies, two that sell wine, one that

20   publishes information.

21   Q.  What are the names of the two companies that sell wine?

22   A.  Brentwood Wine Company and Benchmark Wine Group.

23   Q.  Is there a difference in the focus or what those two

24   companies do with respect to wine?

25   A.  Yes.  Brentwood Wine Company is an internet auction house

DCDLKUR2                        Parker - direct

1   for rare wine.  Benchmark Wine Group is a wholesale and retail

2   for fine and rare wine.

3   Q.  And what did you -- when did you start these businesses?

4   A.  Brentwood was started in 1998, Benchmark in 2002.

5   Q.  What did you do for work before you started Benchmark and

6   Brentwood?

7   A.  I headed up engineering for a number of high tech firms,

8   most recently Tektronix in Oregon.

9   Q.  Mr. Parker, do you know someone named Rudy Kurniawan?

10  A.  Yes, I do.

11  Q.  How do you know him?

12  A.  I've met him at several wine events.  He is also a customer

13  of both Brentwood and Benchmark.

14  Q.  Have you ever sold Rudy Kurniawan wines from Domaine de la

15  Romanee-Conti?

16  A.  Yes.

17  Q.  You have in front of you, there's some paper copy of

18  exhibits.  I'd ask you if you could look at Government

19  Exhibit 33-2.  Tell me if you recognize that document.

20  A.  Yes, I do.

21  Q.  How do you recognize it?

22  A.  This is an invoice from Benchmark Wine Group to Rudy

23  Kurniawan for the purchase of five bottles of Romanee-Conti

24  1962.

25  Q.  What's the date of this invoice?

DCDLKUR2                              Parker - direct

1    A.  June 6, 2006.

2    Q.  Did this invoice come from Benchmark's records?

3    A.  Yes, it did.

4    Q.  And is it regular practice of Benchmark to keep invoices

5    like this?

6    A.  Yes, it is.

7              MR. HERNANDEZ:  The government offers 33-2.

8              THE COURT:  I'll allow it.

9              (Government's Exhibit 33-2 received in evidence)

10             THE COURT:  Are we publishing it at this time?

11             MR. HERNANDEZ:  If we could publish it to the jury,

12   please.

13             Mr. Platt, if you could just focus in on maybe the

14   first half of the document.

15   Q.  So, Mr. Parker, you can use the computer or the hard copy,

16   whichever one is easier for you.  Just check to make sure we

17   can all see what you're talking about.

18             But this exhibit is an invoice from Benchmark Wine

19   Group, one of your companies, correct?

20   A.  Yes, it is.

21   Q.  And the order date is June 6, 2006, correct?

22   A.  Yes.

23   Q.  And who's the person that the wine was billed to and

24   shipped to?

25   A.  Rudy Kurniawan.

DCDLKUR2                        Parker – direct

1    Q.  And then I'm going to ask you to explain, do you see the

2    bar where it starts with product?

3    A.  Yes.

4    Q.  I'm going to ask you to explain what's in the bar below it,

5    the information, tell us what each of those abbreviations

6    means.

7    A.  Okay.  DRC is an abbreviation for Domaine de la

8    Romanee-Conti.  Romanee-Conti is the best vineyard that that

9    Domaine has.

10        1962 would be the year, the vintage of the wine.

11        And then in parenthesis, 2.5 inches BC.  That would be

12   a measurement of how far below the cork the level of the wine

13   was at that time.  So in this case, two and a half inches below

14   the cork to the top of the wine if the bottle is stood up.

15        CC would be corroded capsule, the capsule being the

16   foil on the top of the bottle.

17        BSL would be bin stained label, a label that had a

18   stain in it.

19        And then excellent color means the wine is of an

20   excellent color when lit from behind.

21   Q.  All right.  And the number of bottles that were sold?

22   A.  Five.

23   Q.  Now, in this invoice you noted that basically the

24   evaporation, the gap between the bottom of the cork and where

25   the wine begins is two and a half inches, right?

1   A.  Yes, that's right.

2   Q.  There's a fancy word for that, it's called ullage, right?

3   A.  Yes.

4   Q.  Can we call it like the air pocket or something like that?

5   A.  Yeah, any of those are fine.

6   Q.  So we're talking about the same thing.

7           Now, how did you know that when you sold these bottles

8   in June of 2006 to the defendant that there was two and a half

9   inches of air between the cork and the wine in the bottles?

10  A.  We measured that at the time of check-in when we first took

11  the wine from the consignor or seller.

12  Q.  Did you personally measure it?

13  A.  Yes, I did.

14  Q.  Can you describe to the jury how you measured it.

15  A.  Well, we stand the bottle up, as those bottles are.  We

16  take a ruler and we measure from the very bottom of the cork as

17  we can see it to the top of the liquid.

18  Q.  Now, sometimes the capsule, the little foil part, can cover

19  portions of the cork.  What do you do then?

20  A.  Well, in most cases the amount that's covered is easy to

21  tell.  It's usually about an eighth of an inch.  And then we

22  would allow an eighth of an inch for that amount.

23  Q.  When you measured these five bottles, were you careful in

24  making that measurement of that air pocket?

25  A.  Yes.

DCDLKUR2                          Parker - direct

1   Q.   Why?

2   A.   Well, it goes to value very highly.  The lower the fill,

3   the lower the value of the wine and it can drop off quite

4   quickly, the value can.

5   Q.   And at the time in June of 2006, did Benchmark sell a lot

6   of wines of this caliber and price?

7   A.   I would say this is very much at the top end of the types

8   of wines that Benchmark sold.  But, yes, Benchmark does sell in

9   this range.

10  Q.   I'm going to ask you now to look at a document in front of

11  you that's Government Exhibit 33-4.

12          Do you recognize that document?

13  A.   Yes, I do.

14  Q.   What is it?

15  A.   This is the check-in sheet.  This is the sheet that we use

16  to record various conditions when we look at a wine as we're

17  taking ownership of it.

18  Q.   And there's a lot of handwritten notes on here.  Do you

19  recognize the handwriting?

20  A.   Yeah, it's mine.

21  Q.   Is there any relationship between the notes on the wines in

22  33-4 and the Government Exhibit that was just admitted, 33-2?

23  A.   Yes, a lot of the same abbreviations and also the same

24  ullage, if you want to use that word, for a number of the

25  bottles.

DCDLKUR2                     Parker - direct

```
1    Q.  So the notes in 33-4 relate to the bottles that were sold
2    to Rudy Kurniawan in June 2006?
3    A.  Yes, they do.
4    Q.  Was it Benchmark's practice to keep records like this with
5    notations on the condition of the bottles in Benchmark's
6    records?
7    A.  Yes, for bottles like this.
8    Q.  And that's a regular practice of Benchmark?
9    A.  Yes.
10             MR. HERNANDEZ:  Government offers 33-4.
11             THE COURT:  I'll allow it.
12             (Government's Exhibit 33-4 received in evidence)
13             MR. HERNANDEZ:  Can we publish that exhibit to the
14   jury, please.
15             Mr. Platt, I'm going to ask you to highlight -- first
16   if we could focus in on the bracket under five failed corks.
17   I'm sorry, could we just focus in on that and then we'll do a
18   highlight.  So I ask you to highlight the line that starts with
19   07162 and then the two numbers that end in 66 and 69.
20   Q.  Mr. Parker, I'm going to ask you to explain to us what
21   these notations mean starting with the first line that's in
22   yellow highlighting and then work your way down.
23   A.  Okay.  The first line that's highlighted starts with 07162.
24   That's the specific serial number of one of the bottles.  Each
25   of the bottles has a unique serial number for Romanee-Conti.
```

1              LCC would be lightly corroded capsule.

2              BSL would again be bin stained label.

3              And then the two and a half inches BC would again be

4      two and a half inches below cork for the fill.

5              After that we removed about 50 percent of the value of

6      that bottle as compared to if it had been in excellent

7      condition because of the lower fill and other conditions on

8      that wine.

9      Q.  Okay.  Now, these are Domaine de la Romanee-Conti serial

10     numbers, correct?

11     A.  That's right.

12     Q.  You said you made some notations to deduct a percentage of

13     value because of the fill, correct?

14     A.  The fill and the other conditions also.

15     Q.  And the other conditions.

16             Now, how would it have affected the price of these

17     bottles if that air pocket, the ullage, was only say an inch

18     and a half rather than 2 inches?

19     A.  There will be a much lower deduction for the wine.  In

20     other words, it would have been worth much more money.

21     Q.  Now, these three wines that you took these notes upon, are

22     these three of the wines that you sold in June of 2006 to the

23     defendant?

24     A.  Yes.

25     Q.  Now, there are also some notes about other bottles of wine

DCDLKUR2                        Parker - direct

1    here.  Did you sell any of those to the defendant?

2    A.  Yes, other -- yes, we did.

3    Q.  In total, how many bottles of 1962 Romanee-Conti did you

4    sell to the defendant?

5    A.  Through Benchmark Wine Group we sold him five, and then

6    through Brentwood Wine Company we sold him two or he won two in

7    auction.

8    Q.  Did you, after you sold these, were they shipped in June of

9    2006 or there about?

10   A.  Yes, I believe so.

11   Q.  And did you see any of these seven bottles that you sold to

12   the defendant at any time after June of 2006?

13   A.  Not until yesterday.

14   Q.  All right.  Did you see any auction catalogs after June of

15   2006 where you saw a photograph of these bottles?

16   A.  Yes, yes, I did.

17   Q.  Could you describe that and explain to us when you saw it

18   and where you saw it.

19   A.  It was an Acker Merrall & Condit auction catalog, I

20   believe, from the April time frame, 2006.  It had -- at least

21   two of the bottles had the same serial numbers apparent in the

22   photo as the bottles that we sold to Rudy.

23   Q.  So you could see two matching serial numbers from the

24   bottles that you sold to the defendant?

25   A.  Yes, that's right.

DCDLKUR2                         Parker - direct

1   Q.  Was this in the Cellar II catalog which was October 2006?

2   A.  I'm not sure which catalog it was.

3   Q.  Was there anything that struck you about the bottles when

4   you saw the photograph?

5   A.  The fills looked very significantly higher than when we had

6   the bottles.

7   Q.  And in as basic terms as you could, what do you mean by

8   that?

9   A.  The fill level of the wine in the bottles in the

10  photographs was much higher, perhaps an inch or so, as opposed

11  to the two and a half inches that when we had the bottles.

12  Q.  It looked like there was more wine in the bottles than from

13  when you sold it?

14  A.  Yes, yes.

15          MR. HERNANDEZ:  May I approach the witness, your

16  Honor.

17  Q.  I'm going to show you three bottles of wine that have

18  already been admitted into evidence, Government Exhibit 6-1,

19  6-2, and 6-3, and all three of these bottles were admitted

20  through Truly Hardy, the first witness in the trial, and they

21  all bear the sticker of the Cellar II auction on the back.

22          My question to you is, please take Government

23  Exhibit 33-4, your handwritten notes on the bottles you sold to

24  the defendant in June of 2006, and compare those serial numbers

25  to the serial numbers on those bottles in front of you and tell

DCDLKUR2                          Parker – direct

1   me if there are any matches.

2   A.  Yes, this matches three of the bottles.

3   Q.  Can you tell us, referring you to the exhibit number and

4   the serial number, what the matches are?

5   A.  Yes.  07162 is this bottle here.  07169 is this bottle.

6   Q.  When you say this bottle, could you read the government

7   exhibit number?

8   A.  Yes.  For the first one, 07162, Government Exhibit 6-1.

9   07169, Government Exhibit 6-3.  And 07166 is Government

10  Exhibit 6-2.

11  Q.  So, Mr. Parker, these are the exact bottles that you sold

12  to the defendant in June of 2006?

13  A.  Yes.

14  Q.  And they had a two-and-a-half-inch air pocket when you sold

15  it to him in June of '06?

16  A.  Yes, that's right.

17  Q.  Mr. Parker, what would you need to measure the distance of

18  the air pocket in those three bottles right now in the same way

19  that you did in June of 2006 when you sold the bottles to the

20  defendant?

21  A.  A ruler.

22          MR. HERNANDEZ:  May I?

23          THE COURT:  You may.

24  Q.  I'm going to hand you a ruler.  I'm going to ask you to

25  measure the air pocket, the ullage, on all three bottles in the

1  exact same way you did in June of 2006 when you sold them and

2  tell us what the distance is referring to each Government

3  Exhibit number.

4  A.  Okay.  Government Exhibit 6-2.

5  Q.  And if you could, just vocalize what it is that you're

6  doing so that we have for the record a description of how

7  you're doing this.

8  A.  So I am measuring from the bottom of the cork to the top of

9  the liquid.

10         So in this case this looks to be about one and an

11  eighth inches on, again, Government Exhibit 6-2, serial No.

12  07166.

13  Q.  Thank you.  Go on to the next bottle which is Government

14  Exhibit?

15  A.  6-3.  This appears to be exactly 1 inch, again, 6-3 or

16  serial No. 07169.

17  Q.  And then now you're looking at Government Exhibit?

18  A.  6-1.  This appears to be one and a quarter inches and,

19  again, Government Exhibit 6-1, 07162 serial number.

20  Q.  Thank you, Mr. Parker.  I'm going to take these bottles,

21  just move them out of the way.

22         You've had a good chance to look at these bottles?

23  A.  Yes.

24  Q.  Do you know what it means to recondition a bottle of wine?

25  A.  Yes, I do.

DCDLKUR2                          Parker - direct

1   Q.  And when you examined these bottles, did you see any

2   evidence that they were reconditioned by Domaine de la

3   Romanee-Conti sometime between June of 2006 and the Cellar II

4   auction in October of 2006?

5   A.  No, not at all, in fact, to the contrary.  They would not

6   look like that if they had been reconditioned by the Domaine.

7   Q.  How would they look?

8   A.  They would have new capsules on them.  They would have a

9   sticker on them indicating that they had been reconditioned.

10  And I don't believe they would have left the labels in that

11  condition, but that would be a decision of the Domaine.

12  Q.  And would it affect the value of these bottles of wine if

13  someone other than Domaine de la Romanee-Conti added wine to

14  these bottles?

15  A.  Oh, yeah.  Nobody else should be doing that.  That would

16  destroy the value of the wine in my opinion.

17  Q.  Am I correct that the only way a level of wine can go up

18  from two and a half inches to one and a half or 1 inch is if

19  someone adds wine to the bottle?

20  A.  Yeah, that would be correct.

21  Q.  Over time wine evaporates, correct?

22  A.  Yes, it does.

23  Q.  But it doesn't regenerate?

24  A.  No.

25          MR. HERNANDEZ:  No further questions.

DCDLKUR2                          Parker - direct

1   CROSS-EXAMINATION

2   BY MR. MOONEY:

3   Q.  Good morning, Mr. Parker.

4   A.  Good morning.

5   Q.  Now, you told us that Mr. Kurniawan bought not just these

6   five bottles from you, but he bought a total of seven bottles

7   of the '62 DRC; is that correct?

8   A.  Yes, that's correct.

9   Q.  And four of those were on the invoice that we saw?

10  A.  Five.

11  Q.  Excuse me, five of them.  Five of them are on -- if we can

12  put the Elmo on, please.

13          THE COURT:  Is that what you wanted, Mr. Mooney?

14  Q.  Five of them are on this Exhibit 33-2 that we saw; is that

15  correct?

16          Those you sold to him in June 6 of 2006; is that

17  right?

18  A.  Yes, yes.

19  Q.  And the price on those bottles was over -- almost $6,100 a

20  bottle, $6,095 each; is that right?

21  A.  Yes, that's right.

22  Q.  And then you wrote down distances in this note.

23          Is this a contemporaneous note that you prepared?

24  A.  The handwritten note was at the time that the wines were

25  checked in, yes, at that exact time.

1   Q.  When you were -- when you were first interviewed by

2   Mr. Koch's investigators back in November of 2009, you had not

3   been able to locate that; is that correct?

4   A.  That's correct.

5   Q.  And you told him at that point in time that you had a file

6   on Mr. Kurniawan but you didn't know where it was?

7   A.  I believe my office staff had the file, yes, and we

8   didn't -- weren't able to put our hands on it immediately.

9   Q.  And even when you were later interviewed by the FBI you had

10  not at that point found this file, had you, a couple years

11  later?

12  A.  I'm not sure which documents we had provided, but we

13  continued to provide the documents over time as we found them.

14  Q.  The other two bottles that were purchased by Mr. Kurniawan

15  were purchased on the internet auction?

16  A.  Yes, Brentwood Wine Company.

17  Q.  And those were done about approximately the same period of

18  time?

19  A.  Yeah, I believe that invoice was June 1 of 2006.

20  Q.  When you were working with the investigators on this thing,

21  there was some confusion in your mind about what the serial

22  numbers were for those bottles, wasn't there?

23  A.  Not so much the serial numbers but which Romanee-Conti it

24  was.

25  Q.  The other two bottles that you bought, didn't you

DCDLKUR2                          Parker - cross

1    originally tell them that the serial numbers were 07165 and

2    07185?

3    A.   The other two bottles?

4    Q.   The other two bottles.

5    A.   I don't remember exactly which ones I told them when.

6    Q.   And, of course, 07165 and 07 -- let's put back up

7    Exhibit 33-4, would you, if you'd highlight 07165, just

8    highlight it, not expand it.  Thanks.

9               Okay.  That's the serial number you have on this note

10   as one of the ones that was provided by Brentwood -- by

11   Benchmark, not Brentwood.

12   A.   This note, this note here does not specifically define

13   which ones were provided by Benchmark and Brentwood.  What this

14   note is indicating with that bracket is that four of the

15   bottles were all two and a half inch below cork, very similar

16   to each other.

17   Q.   Does this identify the other two bottles that were sent by

18   Brentwood?

19   A.   Yes.  I think you'll see a total of seven bottles there.

20   And between the five that were sent from Benchmark and the two

21   that were sent from Brentwood, that exhausts all seven of

22   these.  So every one of the serial numbers you see there

23   beginning with an 07 was sold to Rudy Kurniawan.

24   Q.   So if we looked everything from 07162 down to 07185, those

25   are the seven bottles?

1   A.  Yes, that's right.

2   Q.  That you sold to Mr. Kurniawan?

3   A.  Yes, that's right.

4   Q.  Are you sure that you measured this in inches and not in

5   centimeters?

6   A.  Yes, I am.

7   Q.  Do you always write down that ullage?

8   A.  Do I always write down the ullage on every wine?

9   Q.  Yes, on every wine.

10  A.  No, not every wine, only the very high value bottles where

11  that's an issue.

12  Q.  And do you know whether or not 07166, Exhibit 6-2, had a

13  capsule on it when you sold it?

14  A.  Yes.  All the bottles had capsules when we sold them.

15  Q.  But there's no capsule on it now?

16  A.  There's none now.

17  Q.  You don't know when that was removed?

18  A.  No idea.

19  Q.  And do you know if 07162 had a cut capsule?

20  A.  I believe it did not.

21  Q.  And do you know whether 07169, Exhibit 6-3 had a cut

22  capsule?

23  A.  Again, I believe it did not have a cut capsule.

24  Q.  When you looked at the auction catalog on Acker Merrall, do

25  you remember how many bottles were being sold?

1   A.  I believe it was roughly six, perhaps seven.

2                MR. MOONEY:  If we go back to the Elmo.  You guys got

3   the catalog someplace.

4   Q.  Does that look like the page from the sale catalog that

5   showed the six bottles?

6   A.  Looks like it, although the picture was in color.  It would

7   be easier to read than this one.

8   Q.  I'm not graced -- there we go.  That's nice.  Much nicer.

9   A.  Yes, that's the picture.

10  Q.  Give a better picture of what there was?

11  A.  Yes.

12  Q.  And that's six bottles that were sold, right?

13  A.  Yes.

14  Q.  Now, originally -- strike that.

15          You met Mr. Kurniawan originally back in about 2001,

16  2002; is that correct?

17  A.  Roughly.  Might even have been a little bit earlier than

18  that.

19  Q.  And you met him as somebody who became a big buyer of wines

20  back in that period of time?

21  A.  Yes, yes.  When I first met him, it was not quite as clear

22  how big a buyer.  But over time he developed the reputation for

23  being a big buyer.

24  Q.  So he bought more and more and more as time went on?

25  A.  By reputation.  He bought relatively few bottles from us.

DCDLKUR2                    Parker - cross

1   Q.  He spent hundreds of thousands of dollars with you, didn't
2   he?
3   A.  Well, he placed one order that we brokered for a very large
4   amount and never paid, so we never consummated that deal.
5   Q.  So the order never went through?
6   A.  Yes, that's right.
7   Q.  And you and he have been in dispute over that for a good
8   number of years, haven't you?
9   A.  No.  We dropped that a long time ago.  We didn't put the
10  order in with the broker and let it lie, canceled the order.
11  Q.  That was a $420,000 order?
12  A.  Roughly.  Series of orders that equal that amount.
13          MR. MOONEY:  No more questions.
14          THE COURT:  Any redirect?
15          MR. HERNANDEZ:  Very briefly, your Honor.
16  REDIRECT EXAMINATION
17  BY MR. HERNANDEZ:
18  Q.  Mr. Parker, you were asked some questions about the
19  conditions of those bottles by Mr. Mooney.
20          Do you remember those questions?
21  A.  Yes.
22  Q.  Have you ever received any wine that was consigned to an
23  auction house before, either bought it yourself or had it pass
24  through your hands?
25  A.  Yes.

1   Q.  And do you know whether sometimes auction houses cut the

2   capsules to look at the corks?

3   A.  Yes, I know that they do sometimes.

4   Q.  So you don't know because you weren't at Acker, but is that

5   a possible reason for why those capsules were cut?

6   A.  Yes, it is.

7   Q.  And the photograph of the bottles in the catalog that

8   Mr. Mooney showed you, do you remember the set of those

9   bottles?

10  A.  Mm-hmm, yes, I do.

11  Q.  Just so that we're clear, some of those bottles are visible

12  and some are not, correct?

13  A.  Yes.  Some of them are partially obscured by other bottles.

14  Q.  And are you saying that these three bottles here in front

15  of the jury are the visible bottles in the picture or something

16  else?

17  A.  I believe they're ones that are in the picture, but these

18  three we cannot see the serial numbers on I don't believe.

19  There are two in the picture that show the full serial numbers

20  that are part of this group of seven.  I don't believe these

21  three are specifically visible with their complete serial

22  numbers.

23  Q.  So those three are part of the ones that are partially

24  obscured?

25  A.  In my recollection, yes.

DCDLKUR2                    Parker - redirect

1    Q.  All right.  But you recognize some of the other serial

2    numbers where they are visible as being some of the seven total

3    bottles you sold to the defendant?

4    A.  Yes, that's right.

5    Q.  And then Mr. Mooney asked you about an order, a $420,000

6    order for wine that the defendant placed but never paid so,

7    therefore, there was no transaction; is that right?

8    A.  Yes, that's right.

9    Q.  Do you remember what kinds of wines the defendant had

10   placed the order for?

11   A.  They were old wines, primarily European, and, relatively

12   speaking, they were on the lower end of the value for wines of

13   that age.  They were I guess what I would call middling wines,

14   not necessarily in keeping with the level of wine that

15   Mr. Kurniawan generally poured or appeared to generally offer

16   out.

17   Q.  So these were not the top wines of Burgundy or the top

18   wines of Bordeaux?

19   A.  They generally weren't, and where they were, they were very

20   off vintages.

21            THE COURT:  They were off vintages?

22            THE WITNESS:  Some of the vintages are worth far less

23   than others.  So what these generally were were some very good

24   names but poor vintages, or good vintages, poor names.

25   Q.  And when you say it's an off vintage or a bad vintage, that

DCDLKUR2                        Parker - redirect

```
 1   just means the weather was lousy and the wine may not be that

 2   great?

 3   A.   That's right, and the wine would be worth a lot less also.

 4             MR. HERNANDEZ:  No further questions.

 5             THE COURT:  Okay.  We'll excuse the witness and maybe

 6   we'll take a two-minute break.

 7             (Witness excused)

 8             (Continued on next page)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

DCDLKUR2

1              (Jury not present)

2              THE COURT:  So if I could ask the counsel where we

3    stand witness-wise.

4              MR. HERNANDEZ:  So the next is Antonio Castanos.  I

5    think he's a pretty short witness, maybe 20 minutes on direct,

6    I would say, probably at most, although, Mr. Facciponti, about

7    20 minutes?

8              MR. FACCIPONTI:  Twenty minutes, your Honor.

9              MR. HERNANDEZ:  And then we have another witness who's

10   on the way because if the Court intends to go as far as

11   2 o'clock, it's possible that we'll finish that witness too,

12   which would put us in prime, prime position to rest on Monday.

13             THE COURT:  Great.  So we will go to two.  And, okay,

14   take two minutes.

15             MR. HERNANDEZ:  Thank you.

16             (Recess)

17             (Continued on next page)

18

19

20

21

22

23

24

25

DCDBKURT3                          Castanos - direct

1           THE COURT:  Okay.  We're ready now for the next

2      witness.

3           (In open court; jury present)

4           MR. FACCIPONTI:  The government calls Antonio

5      Castanos.

6       ANTONIO CASTANOS,

7           called as a witness by the Government,

8           having been duly sworn, testified as follows:

9           THE DEPUTY CLERK:  Please state your name for the

10     record.

11          THE WITNESS:  Antonio Castanos Beltran.

12          THE DEPUTY CLERK:  Can you spell that, please?

13          THE WITNESS:  Castanos, C-a-s-t-a-n-o-s.  Beltran,

14     B-e-l-t-r-a-n.

15     DIRECT EXAMINATION

16     BY MR. FACCIPONTI:

17     Q.  Mr. Castanos, I would just ask that you move your chair up

18     close to the microphone and pull the microphone close to where

19     you're speaking.  Just for the court reporter who's taking

20     everything down, try and speak as slowly as possible.

21     A.  Yes, sir.

22     Q.  In what city and state do you live?

23     A.  Los Angeles, California.

24     Q.  What do you do for a living?

25     A.  I'm in the restaurant business.

DCDBKURT3                        Castanos - direct

1    Q.  Do you own a restaurant?

2    A.  Yes, sir.

3    Q.  What is that restaurant called?

4    A.  Guido's G-u-i-d-o's.

5    Q.  Where is that restaurant located?

6    A.  11980 Santa Monica boulevard.

7    Q.  In L.A.?

8    A.  L.A.

9    Q.  What kind of restaurant is it?

10   A.  Italian.

11   Q.  Before you owned Guido's, what did you do for a living?

12   A.  I own other restaurants.

13   Q.  Do you know someone named Rudy Kurniawan?

14   A.  Yes, I am.

15   Q.  Approximately when did you first meet him?

16   A.  It's about 10, 12 years ago.

17   Q.  About 10 or 12 years ago?

18   A.  Yes, sir.

19   Q.  And what were the circumstances under which you met him?

20   A.  I was in a place in Los Angeles called Twenty/20.  I was in

21   my way in and he was coming out.

22   Q.  What was Twenty/20?

23           THE COURT:  You were going in and he was coming out?

24           THE WITNESS:  Exactly, yes, sir.

25   Q.  What kind of place is Twenty/20?

DCDBKURT3                          Castanos - direct

```
 1    A.  It's a wine place.

 2    Q.  A wine store?

 3    A.  Wine store, yes.

 4    Q.  And did you speak with him?

 5    A.  Couple of minutes.  Two minutes.

 6    Q.  Did you see him any time after that?

 7    A.  Yes.

 8    Q.  When was that?

 9    A.  Well, at the conversation we have for this couple of

10    minutes, I mentioned to him that I have a restaurant in Santa

11    Monica Boulevard, in West Los Angeles.

12    Q.  Did he ever come to your restaurant?

13    A.  Yes, he did.

14    Q.  Approximately how many times?

15    A.  Several times over the years.

16    Q.  And did you have any understanding as to what Mr. Kurniawan

17    did for a living?

18    A.  Not exactly.

19    Q.  You know he collected wines?

20    A.  That, yes.

21    Q.  Do you know if he sold wines at auctions?

22    A.  Yes.

23    Q.  Did there come a time when Mr. Kurniawan asked you to

24    consign wines for him at an auction?

25    A.  Yes, he did.
```

DCDBKURT3                          Castanos - direct

```
 1    Q.   Approximately when was that?

 2    A.   That was about 2006.

 3    Q.   Around 2006?

 4    A.   Yes, sir.

 5    Q.   Approximately how many times did Mr. Kurniawan ask you to

 6    consign wines for him at an auction?

 7    A.   Several times.

 8    Q.   Several times?

 9    A.   Yes.

10    Q.   Okay.  When you consigned wines for him, did he tell you

11    not to tell anyone that the wines were coming from him?

12    A.   It was mention me that in the beginning it's a private

13    collector and he don't want to see his name there.

14    Q.   Okay.

15            THE COURT:  So do I understand, so you consigned the

16    wines for auction under your name?

17            THE WITNESS:  Yes.

18    Q.   Did Mr. Kurniawan ever tell you why he didn't want you to

19    tell anyone that the wines were coming from him?

20    A.   There wasn't anything specific about that.

21    Q.   Did he ever tell you that he didn't want his name out

22    there?

23    A.   Yes.

24    Q.   Did you continue consigning wines for Mr. Kurniawan until

25    approximately 2012?
```

DCDBKURT3                    Castanos - direct

```
 1   A.   That's correct.
 2   Q.   Now, what was the arrangement you had with Mr. Kurniawan
 3   for the wines you consigned for him?
 4   A.   Well, it was sometimes I just buy the wines from him and I
 5   put the wines at auction.  And sometimes I have a percent, a
 6   percent of the sale of the wines.
 7   Q.   So sometimes you owned the wines and you gave it to the
 8   auction house?
 9            THE WITNESS:  Yes.
10            THE COURT:  And sometimes you didn't own the wines and
11   you gave it to the auction house?
12            THE WITNESS:  That's correct, your Honor.
13            THE COURT:  Who did own the wine in the second case?
14   When you didn't own it, who owned it?
15            THE WITNESS:  Him.
16            THE COURT:  Him?
17            THE WITNESS:  Mr. Rudy Kurniawan.
18            THE COURT:  Yes.
19   BY MR. FACCIPONTI:
20   Q.   And when you consigned wines for him at the auction house,
21   did you receive-- who did you give the money to when the wine
22   sold?
23   A.   To him.
24   Q.   And did you keep a portion of that money for yourself?
25   A.   That's correct.
```

DCDBKURT3                         Castanos - direct

1    Q.  Approximately how much did you keep?

2    A.  Usually was about 5 percent of that.

3    Q.  Approximately how much money -- in all of the times that

4    you consigned wines for Mr. Kurniawan, approximately how much

5    money did you make from this?

6    A.  I would say about $400,000.

7    Q.  What would happen if the wines you consigned for him didn't

8    sell?

9    A.  If it didn't sell, it would be-- he would take it back.

10   Q.  Take it back.

11          And was that the case even when you had purchased the

12   wines from him?

13   A.  Yes.

14   Q.  Are you familiar with the e-mail accounts --

15          THE COURT:  So wait a minute.  How does that work?

16   The wine comes back to you?

17          THE WITNESS:  If the wines --

18          THE COURT:  If it didn't sell.

19          THE WITNESS:  If the wines come back to me, I would

20   give it back to him.

21          THE COURT:  And he would give you your money back?

22          THE WITNESS:  Yes and no, because I don't give the

23   money yet.

24          THE COURT:  Oh, you didn't pay for it.

25          THE WITNESS:  Yet.  It's on location.

1           THE COURT:  I see.  I get it.

2   Q.  Are you familiar with an e-mail account dscellar@gmail.com?

3   That's dscellar@gmail.com.

4   A.  Yes, sir.

5   Q.  Whose e-mail account is that?

6   A.  Mr. Rudy Kurniawan.

7           THE COURT:  I'm still confused.  Did you ever pay for

8   the wine you got from him before you gave it to the auction

9   house?

10          THE WITNESS:  Sometimes yes, sometimes no.  Sometimes

11  I will buy the wine automatically and I will pay automatically

12  to him.

13          THE COURT:  Before you went to the auction house?

14          THE WITNESS:  Exactly, and until I decide to put in

15  the auction.

16  Q.  Let me direct your attention to 2012.

17          Did you consign wines from Mr. Kurniawan for an

18  auction that was directly held by Spectrum Wine Auctions at a

19  company called Vanquish?

20  A.  Yes, sir.

21  Q.  Like the other auctions, did Mr. Kurniawan tell you not to

22  tell anyone the wines came from him?

23  A.  It probably wasn't mentioned that word, but...

24          MR. MOONEY:  Object to "probably," your Honor.

25          THE COURT:  Yes.  What do you remember?

DCDBKURT3                    Castanos - direct

1   A.  Well, I knew-- I knew that they don't supposed to know, but

2   at the same time everybody knew that.

3   Q.  Well, did you ever tell Spectrum when you consigned the

4   wines from Mr. Kurniawan that these wines were coming from

5   Mr. Kurniawan?

6   A.  No.

7   Q.  Did you tell anybody at Spectrum or at Vanquish that any of

8   these wines were coming from Mr. Kurniawan?

9   A.  No.

10  Q.  And so you understood that he did not want you to tell

11  anyone that his name was associated with these wines?

12  A.  Yes.

13         MR. FACCIPONTI:  Your Honor, we have a stipulation

14  that we'd like to read into the record.

15         THE COURT:  Okay.

16         MR. FACCIPONTI:  "It is hereby stipulated and agreed

17  by and among the United States of America, by Preet Bharara,

18  United States Attorney for the Southern District of New York,

19  Joseph P. Facciponti and Jason P. Hernandez, Assistant United

20  States Attorneys, of counsel, and Rudy Kurniawan, the

21  defendant, by and with the consent of his attorneys, Jerome

22  Mooney, Esquire and Vincent Verdiramo, Esquire, that:

23         "1, Government Exhibits 16-1, 16-2 and 16-3 are true

24  and correct copies of documents of Spectrum Wine Auctions; the

25  original records were made at or near the time by, or from

information transmitted by, a person with knowledge of the

matters set forth in the records; they were kept in the course

of a regularly conducted business activity; and it was the

regular practice of that business activity to make the records.

"2, If called to testify at trial, a custodian of

records from Spectrum Wine Auctions would testify based on

their personal knowledge that Spectrum Wine Auctions caused to

be delivered via the United States Postal Service a copy of the

catalog for the February 8th, 2012 wine auction in London,

United Kingdom, which has been marked as Government Exhibit

16-3, to the 86 residents of New York, New York identified in

Government Exhibit 16-1.

"It is further stipulated and agreed that Government

Exhibits 16-1, 16-2, and 16-3 and this stipulation may be

received in evidence at the trial of the above-referenced

matter.

"Dated:  December 5, 2013," and signed by counsel for

both of the parties.

Your Honor, we offer Government Exhibits 16-1, 2 and 3

and Government Exhibit 29-9, which is this stipulation.

THE COURT:  I'll allow it.

(Government's Exhibit 29-9 received)

BY MR. FACCIPONTI:

Q.  Mr. Castanos, there's a catalog in front of you marked

Government Exhibit 16-3 that has just been entered into

1    evidence.

2    A.   One moment.  Glasses.  Glasses.  Yes, sir.

3    Q.   When I was asking you questions about the Spectrum Wine

4    Auction that you consigned wines for Mr. Kurniawan, is that the

5    catalog from that auction?

6    A.   Yes, sir.

7    Q.   And what is the date of that auction as written on the

8    front page of that catalog?

9    A.   February 8, 2012.

10   Q.   And that auction was supposed to take place in London?

11   A.   That's correct.

12          MR. FACCIPONTI:  We would actually also like to

13   publish to the jury Government Exhibit 16-1.

14          THE COURT:  All right.

15          MR. FACCIPONTI:  And if we could just enlarge maybe

16   just the first quarter of that document.

17   Q.   And, Mr. Castanos, you just heard from the stipulation that

18   this is a list of people in New York City who received that

19   catalog in the mail.  Correct?

20   A.   Yes.

21   Q.   I'd like now to ask you to turn-- there's a binder of

22   documents in front of you, Mr. Castanos.

23   A.   This?

24   Q.   Can you locate-- yes, that's it.

25          Could you locate the document that's been marked as

DCDBKURT3                       Castanos - direct

1   Government Exhibit 38-5?  Do you have that in front of you?

2   A.  Yes, sir.

3   Q.  Do you recognize that as an e-mail exchange between you and

    Mr. Kurniawan?

5   A.  That's correct.

6   Q.  And are you talking about the Spectrum Auction in that

7   e-mail exchange?  Mr. Kurniawan, are you talking about the

8   appraisal that the Spectrum Auction gave for that-- for the

9   wines consigned in that auction?

10  A.  I'm-- I'm not-- I'm not sure if that's the--

11  Q.  Let me help you out.  Do you see the first page of the

12  attachment, the first attachment to that exhibit?  Do you see

13  at the very top the word "Spectrum" is written, "Spectrum

14  Auctions"?

15  A.  Sir?

16          THE COURT:  I think you'll have to--

17          MR. FACCIPONTI:  Yes, your Honor.

18  A.  Am I in the wrong one?  Sorry.  Sorry.

19  Q.  So, Mr. Castanos, do you see this is an e-mail that has

20  some attachments regarding the Spectrum Auction?

21  A.  That's correct, yes.

22          MR. FACCIPONTI:  Your Honor, we offer Government

23  Exhibit 38-5.

24          THE COURT:  I'll allow it.

25          (Government's Exhibit 38-5 received)

1          MR. FACCIPONTI:  May we publish that to the jury?

2          THE COURT:  Sure.

3   Q.  Now I'd like to focus on the top e-mail which is first in

4   time.  So there appears to be two e-mails there.

5          MR. FACCIPONTI:  If we can enlarge that, the top

6   e-mail.

7   Q.  Do you see that that is an e-mail that appears to be from

8   you to Mr. Kurniawan at dscellar@gmail.com?

9   A.  That's correct, yes.

10  Q.  What is the date on that?

11  A.  November 11, '11.

12  Q.  2011?

13  A.  That's correct.

14  Q.  And does that say-- in this e-mail are you forwarding him

15  the appraisal of the wines for that auction that had been

16  prepared by Spectrum?

17  A.  That's correct, yes.

18  Q.  And --

19         THE COURT:  Did Spectrum do the appraisal for you?

20         THE WITNESS:  Yes.  Yes, your Honor.

21         THE COURT:  You asked them to do it?

22         THE WITNESS:  Yes, your Honor.

23         MR. FACCIPONTI:  So now if we could highlight the

24  bottom e-mail on that chain.

25  Q.  Do you recognize that as an e-mail from Mr. Kurniawan to

1    you?

2    A.  Yes, sir.

3    Q.  And the date on that is November 14, 2012?

4    A.  That's correct.

5    Q.  I'm sorry, 2011.

6           I'm just going to read this for you starting with the

7    first sentence:  "This is the reserve from another auction

8    house.  I have checked auction average and this is definitely

9    correct.  What Spectrum gave is ridiculously low and not in

10   line with market.

11          "I can't e-mail you the appraisal as it has name and

12   info on it, but I have type in the numbers here.  These are all

13   going into Feb and March HK sale.  They split between bord and

14   burg."

15          Do you have any understanding of what "HK" means?  Is

16   that Hong Kong?

17   A.  Hong Kong, yes.

18   Q.  And "bord" and "burg" means bordeaux and burgundy?

19   A.  That's correct, yes.

20   Q.  Mr. Castanos, I'd like you to turn to what's been marked as

21   Government Exhibit 38-6.  It should be the next document in

22   your binder.

23          Do you see there?

24   A.  Yes, sir.

25   Q.  Do you also recognize that as an e-mail chain between you

DCDBKURT3                         Castanos - direct

1   and Mr. Kurniawan regarding the Spectrum auction?

2   A.  Yes, sir.

3             MR. FACCIPONTI:  Your Honor, we offer Government

4   Exhibit 38-6.

5             THE COURT:  I'll allow it.

6             (Government's Exhibit 38-6 received)

7             THE COURT:  Do we have that?  Yes?  Okay.

8   Q.  Now, this is a little confusing in terms of the sequential

9   order --

10            THE COURT:  Excuse me for a second before you go to

11  this.

12            So with respect to the previous exhibits and the

13  appraisal from Spectrum, right?

14            THE WITNESS:  Yes.

15            THE COURT:  So you got the appraisal from Spectrum for

16  the wine that was going to be auctioned?

17            THE WITNESS:  Yes.

18            THE COURT:  So was that a case where you had paid for

19  the wine before or not?

20            THE WITNESS:  No.

21            THE COURT:  You didn't --

22            THE WITNESS:  I don't pay nothing for this particular

23  wines.

24            THE COURT:  So you have the appraisal done, but you

25  didn't own the wine?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1              THE WITNESS:  No.

2              THE COURT:  Okay.

3    BY MR. FACCIPONTI:

4    Q.  Okay.  So I'd like you to look at the first, top e-mail.

5              MR. FACCIPONTI:  If we can please enlarge that for the

6    jury.

7    Q.  Do you see this is an e-mail from someone named Walker

8    Strangis to you?

9    A.  What is that?

10   Q.  This is Government Exhibit 38-6.

11   A.  Thirty-eight.  Yes, sir.  I got it.  I think I got it.

12   Q.  Okay.  And this is an e-mail from Walker Strangis to

13   yourself?

14   A.  To me, yes.

15   Q.  And it's dated February 2, 2012?

16   A.  Yes.

17   Q.  It says "Hi, Antonio.  Any further details on these lots

18   will be a very big help.  Please give any dates or specifics

19   that you can.  Thanks."

20              Who is Walker Strangis?

21   A.  Walker Strangis is the wine consignment for Spectrum.

22   Q.  And do you see that below that--

23              MR. FACCIPONTI:  If we can enlarge the e-mail that

24   appears at the bottom of that page for the jury.

25   Q.  -- he is forwarding you an e-mail that someone else had

1   sent to him?

2   A.  That's correct, yes.

3   Q.  And he had deleted the name of the person who sent that

4   e-mail to him?

5   A.  That's correct.

6   Q.  And so just reading that e-mail that had been forwarded:

7          "Hi, Walker, I hope all is well.  A few questions

8   regarding your upcoming sale.  I'm looking for detailed

9   provenance on the wines below.  Not provenance like 'he bought

10   them from a trustworthy source,' but the date and location of

11   where he bought them and where that place sourced the wine.  I

12   know guys like to remain anonymous and I won't go digging on

13   who he is or talk to any of the auction houses directly, but in

14   order to bid on these in good faith I do need as many details

15   as possible.

16          "I" also need --

17          THE COURT:  I may also.

18   Q.  "I may also need photos of the cork stamps when possible.

19   Is that all doable?  Thanks!"

20          Then you see he lists three wines below and by lot

21   number:  Lot 72, a '45 Musigny, four bottles; lot 132, a '45 La

22   Tache; and lot 133, a '45 Romanee-Conti.

23          Were these three wines that Mr. Kurniawan had given

24   you to consign to Spectrum?

25   A.  Yes, sir.

DCDBKURT3                    Castanos - direct

1   Q.  And you then forwarded that e-mail to Mr. Kurniawan.

2   Correct?

3   A.  Yes.  Yes.

4           MR. FACCIPONTI:  And so if we could look on the second

5   page of this document and enlarge the e-mail that appears

6   there.

7   Q.  Does this appear to be Mr. Kurniawan's response to you?

8   A.  Yes.

9   Q.  Okay.  And that is dated February 2nd at 2012?

10  A.  That's correct, yeah.

11  Q.  Okay.  And he responds "All of these old burgandies came

12  from one large private collection that I bought about ten years

13  ago.  As far as I know, the cellar was accumulated between the

14  '80s and '90s through retailers, brokers and auctions.  Mostly

15  from Europe."

16          Now, Mr. Castanos, I'm going to ask, with the Court's

17  permission, that you step down from the witness stand and

18  examine the bottles of wine that appear in front of you.

19          Actually, before you do that, I have one more document

20  to show you.

21          MR. FACCIPONTI:  Can we have Government Exhibit 14-4A?

22  This is an exhibit that has already been entered into evidence.

23  It was a document that was pulled from one of Mr. Kurniawan's

24  computers.

25          Can we enlarge the top of that document from left to

DCDBKURT3                          Castanos - direct

1   right?

2   Q.   Does this document-- it should be in your binder as well,

3   Mr. Castanos.

4   A.   What?

5   Q.   14-4.  Does this appear to be a list of wines that you had

6   consigned to Spectrum for Mr. Kurniawan?

7   A.   Yes, sir.

8   Q.   Okay.

9           MR. FACCIPONTI:  And if we can highlight the writing

10  that appears in the right-hand corner of that top ribbon.

11  Q.   If you want to look on your screen there, does your name

12  appear as the consigner?

13          THE COURT:  You can see on here.

14  A.   Yes.  Yes.

15  Q.   Is there a number next to your name?  Is that number

16  10445?

17  A.   That's correct.

18  Q.   Now, Mr. Castanos, I'd like you to step down and look at

19  the bottles.

20          THE COURT:  Be careful there.

21          THE WITNESS:  Yes.

22  Q.   These bottles are all marked as Government Exhibits 3-1

23  through 3-14.  Just starting with Government Exhibit 3-8--

24          THE COURT:  So maybe you want to go over to the other

25  side so the jury can see what you're doing.

1              MR. FACCIPONTI:  We have a cart over here.  I'll move

2    that, your Honor.

3    Q.  Just asking generally, do you recognize these as some of

4    the wines you consigned to Mr. Kurniawan from the Spectrum wine

5    auction?

6    A.  Yes.

7    Q.  And do these-- do all of these bottles-- and you're free to

8    look at all of them-- have a label on the back from Spectrum

9    Wine Auctions?

10   A.  That's correct.

11   Q.  Do they all have the same number, consignment number,

12   10445?

13   A.  Yes, sir.

14   Q.  And do some of these bottles appear in the Spectrum

15   catalog?

16   A.  (Indicating)

17             MR. FACCIPONTI:  Can we have --

18             THE COURT:  Did we get an answer for that?  Madame

19   Court Reporter?

20             THE REPORTER:  No.

21             MR. FACCIPONTI:  I think he nodded his head yes.

22             THE COURT:  No, but she has to--

23             MR. FACCIPONTI:  He can say it.

24   Q.  Do some of these lines appear in the catalog as well?

25   A.  Yes, they are.

DCDBKURT3                          Castanos - direct

1            MR. FACCIPONTI:  Can we have page 71 from the Spectrum

2    catalog?

3    Q.  What is the serial number that appears on Government

4    Exhibit 3-8?

5    A.  0905.

6            MR. FACCIPONTI:  If we can enlarge that on the...

7            MR. HERNANDEZ:  Is it published to the jury?

8            MR. FACCIPONTI:  Yes.

9            Your Honor, we offer Government Exhibits 3-1 through

10   3-14.

11           THE COURT:  I'll allow it.

12           (Government's Exhibits 3-1 through 3-14 received)

13   Q.  You can return to the witness stand, Mr. Castanos.

14           Now, were all of these wines sold at the Spectrum

15   Auction?

16   A.  That, I don't know.

17           MR. FACCIPONTI:  Can we now have Government Exhibit

18   16-2?

19   Q.  It's on the screen in front of you, Mr. Castanos.

20   A.  Yes.

21   Q.  Does this appear to be a list of lots that had been

22   withdrawn from the Spectrum Auction?

23   A.  That's correct, yes.

24           MR. FACCIPONTI:  We have no further questions, your

25   Honor.

1          THE COURT:  Okay.  Thank you.

2          So counsel for the defense.

3          MR. MOONEY:  Thank you, your Honor.

4    CROSS-EXAMINATION

5    BY MR. MOONEY:

6    Q.  Good morning, Mr. Castanos.

7    A.  Good morning, sir.

8    Q.  Still morning.

9          We've got a number of bottles of wine here on the

10   table.

11         Do you recall how many bottles you sent to the

12   Spectrum Auction?

13   A.  How many?

14   Q.  Do you remember how many there were?

15   A.  No, I don't.  I don't count every one bottle we send

16   there.

17   Q.  Okay.

18         MR. MOONEY:  Could we go back to Exhibit-- we were

19   just looking at it-- 14-4, please?

20         THE COURT:  You can see it on the screen if you'd

21   like.

22         THE WITNESS:  Okay.

23         MR. MOONEY:  If you would magnify the top part.

24         THE WITNESS:  Yes, sir.

25   Q.  Does that tell you what the bottle count was that was sent?

DCDBKURT3                           Castanos - cross

1   Calling your attention to the right-hand side.

2   A.  Yes, 429.

3   Q.  So this is only a portion of those wines?

4   A.  Yes, sir.

5   Q.  Spectrum did not sell all the wines.  Right?

6   A.  No.

7   Q.  And some of the wines, according to what we just saw, they

8   withdrew.  Right?

9   A.  That's correct, yes.

10  Q.  And do you know which ones were withdrawn?

11  A.  Not exactly.

12  Q.  And some of them didn't sell.  Right?

13  A.  Yes.

14          MR. MOONEY:  You can take this down now.

15  Q.  What happened to the wines that didn't sell?  Did you get

16  them back?

17  A.  No.

18  Q.  Did Spectrum at some point want to send some of the wines

19  to Hong Kong?

20  A.  Not-- not that wines, no.

21  Q.  Not in this auction?

22  A.  No.

23  Q.  Okay.  Was there another auction where they wanted to send

24  them to Hong Kong?

25  A.  I think-- I think what you talking about is some of the

1    wines, they was not going to London.  They were offered to sell

2    it in Hong Kong.

3    Q.  So --

4    A.  But they have nothing to do with this particular wines.

5    Q.  So the 429 were destined for London for potential sale?

6    A.  That's correct.

7    Q.  And the ones that-- the ones that were not-- that were

8    withdrawn from sale, did Spectrum communicate with you with

9    regards to the ones they were withdrawing?

10   A.  Yes.

11   Q.  Did they tell you we're going to withdraw some of these,

12   we're not going to sell some of these?

13   A.  Oh, yes.

14   Q.  Did you have communications with them about why they were

15   not going to sell some of these?

16   A.  They tell me that they're gonna withdraw some wines because

17   there were some problems.

18   Q.  Some problems or issues with them?

19   A.  Have issues, exactly.

20   Q.  And do you know how many bottles altogether that they

21   pulled?

22   A.  No.

23          MR. MOONEY:  If we could go back to Exhibit 16-2 and

24   put that up.

25   Q.  So we see a number of different lots that show problems or

 1   that are withdrawn.  Is that correct?

 2   A.  Yes, sir.

 3   Q.  This doesn't tell us why any lot was withdrawn, does it?

 4   A.  No.

 5   Q.  And we also see notes on conditions.

 6           Were those withdrawn, the ones that are marked under

 7   conditions?

 8   A.  I guess so.

 9   Q.  For example, lot 28 says "Signs of past seepage."  Do you

10   see that?

11   A.  Yes.

12   Q.  What does that mean?

13   A.  That means that the wine is not in good condition.  That

14   the wine's been leaking.  You know, it been leaking for some

15   reason.

16   Q.  And would you serve a wine like that in your restaurant,

17   one that showed signs of leakage?

18   A.  No.

19   Q.  Would you knowingly sell one that showed signs of

20   leakage?

21   A.  No.  That probably that was there.  I don't know.

22   Q.  And then lot 79 also appears to show signs of leakage.

23   A.  Signs of leakage mean sometimes that the bottle, the bottle

24   of the wine.  That doesn't mean that the wine -- the wine you

25   cannot sell it.  But the wine, if it have sign of leakage, that

1    mean that the bottle of the wine is different, is less.  That's

2    all that that mean.  You know, when they put that in there,

3    signs of leakage.

4    Q.  It identifies a potential problem--

5    A.  Exactly.

6    Q.  -- with the wine.

7            Now, over the period of time from when you first met

8    Mr. Kurniawan, say ten years ago, you became fairly friendly

9    with him, didn't you?

10   A.  We were friends, yes.

11   Q.  And you liked him?

12   A.  Yeah.

13   Q.  You thought he liked you?

14   A.  Well, he was calling me dad and he was call my wife mom.

15   Put it this way.

16   Q.  He'd come into your restaurant and the two of you would get

17   together from time to time.  Is that right?

18   A.  That's correct, yeah.  Yes.

19   Q.  And you had a wine collection of sorts, did you not?

20   A.  Yes, I was.

21   Q.  Did you ever get up to -- did you ever see any of his wine

22   collection, go to his warehouse?

23   A.  Yes.

24   Q.  His wine was primarily kept in a warehouse.  Is that right?

25   A.  That's correct.

DCDBKURT3                    Castanos - cross

1   Q.  Where was that warehouse located?

2   A.  I think is in Santa Clarita or-- actually, it's Gina's

3   Place, Pacific wine distributor.  It's around that area.  I

4   think Santa Clarita or something like that in California.

5   Q.  You knew he had a separate business called The Wine Hotel?

6   A.  I know that, but I never been there.  Yes.

7   Q.  But the warehouse was not The Wine Hotel.  That was

8   something different?

9   A.  Something different, yes.

10  Q.  And in the warehouse, how big a space did he have?

11  A.  Huge.

12  Q.  And a lot of wine was stored there?

13  A.  Huge.

14  Q.  Case after case after case?

15  A.  Hundreds of.

16  Q.  Is the warehouse the primary place you would go to get the

17  wines to send off to auctions?

18  A.  I never went there to pick up any wines.  He usually

19  deliver the wine to my house.

20  Q.  Did you ever go through bottles at the warehouse with him,

21  take a look and see what was in there?

22  A.  I look without look too much.  I was there one day when it

23  was-- one day when he was there.  Yes, I look, and I was -- it

24  was impressive, yeah.

25  Q.  Did you ever go over to his house on Naomi?

1    A.  Never.

2    Q.  Did he come to your house?

3    A.  Yes.

4    Q.  So if there were wines that were going to be auctioned,

5    he'd bring the cases over to you?

6    A.  Yes, sir.

7    Q.  How would the wines be packaged to get to you and to then

8    be sent off?

9    A.  Cartons like this.

10   Q.  These types of Styrofoam boxes?

11   A.  Usually like this or in wood.

12   Q.  Sometimes they were in wooden cases?

13   A.  Sometimes wood.

14           THE COURT:  And then how did they get to the

15   auctions?

16           THE WITNESS:  The Spectrum people, they were coming to

17   my house and they pick it up and they take from there.

18           THE COURT:  With a truck?

19           THE WITNESS:  A truck.

20   Q.  And Spectrum had offices in the Los Angeles area?

21   A.  In Orange County.

22   Q.  In Orange County.

23           And was it your understanding that Spectrum would

24   inspect the bottles after they would decide to sell the lots?

25   A.  Definitely.

1    Q.  And did you consider yourself to be a sufficient expert to

2    be able to look at a bottle of wine and know whether it was

3    authentic or not?

4    A.  Well...

5    Q.  For example, can you tell us whether this is really --

6    Exhibit No. 3-14 is really what it says it is on the outside?

7    A.  To me, personally, I don't like it because the color of

8    the bottle, but I can't say that's fake, no.  No, I can't say

9    that.

10   Q.  Okay.  But let me see if I understand you correctly.  What

11   you're telling us is the color of the wine in there looks bad.

12   Is that right?

13   A.  Yeah.

14   Q.  This purports to be-- well, we don't know.  It might be a

15   white wine, but that doesn't--

16   A.  It's white wine, it's 50 years old?  Who knows?

17   Q.  You wouldn't drink that?

18   A.  No, thank you.

19   Q.  But you don't know from your personal expertise whether or

20   not this is a correct label?

21   A.  I wouldn't know.

22   Q.  So you would rely upon others for that?

23   A.  Definitely.

24   Q.  And one of the areas -- one of the sources that you would

25   rely upon for that kind of information or that kind of material

1    would be the auction house.  Right?

2    A.   Yes.

3    Q.   So you weren't surprised when the auction house went

4    through the 429 bottles and came up with a number of them that

5    they said they wouldn't sell.  Right?

6    A.   Yes, that's-- that's surprise me, yes.

7    Q.   That had become fairly common, hadn't it?

8              THE COURT:  Wait.  I think he said-- did you say it

9    was a surprise?

10             THE WITNESS:  It was surprising for him to come--

11             THE COURT:  He said it was surprising.

12   Q.   It was surprising--

13   A.   It was surprising that he come with that many bottles.

14   Q.   How many bottles did they withhold?

15   A.   I have no idea.

16   Q.   More than what's here?

17   A.   Yes.

18   Q.   But not a great number more?

19   A.   Yes.  I don't know the amount.

20   Q.   You had been submitting bottles for other auctions, hadn't

21   you?

22   A.   Yes, sir.

23   Q.   And had the auction houses in the earlier years looked at

24   the bottles?

25   A.   I guess they looked at the same way that this guy looked

1    at.

2    Q.  Did you expect that the auction houses in the earlier years

3    were looking at the auctions-- or at the bottles?

4    A.  Of course.

5    Q.  Which auction houses were you dealing with prior to this

6    Spectrum auction in 2012?

7    A.  Zachy's and Christies.

8    Q.  Zachy's?

9    A.  And Christies.

10   Q.  And Christies.

11          And how many times had you sent bottles off to be

12   auctioned off at Zachy's, for example?

13   A.  Three or four times.

14   Q.  And that was during the period from 2006 up until when?

15   A.  Until Christies went to New York and...

16   Q.  How many bottles had Zachy's pulled out and sent back to

17   you?

18   A.  None.

19   Q.  How many bottles had Christies pulled out and rejected?

20   Well, when you sent the bottles to auction at Christies, did

21   they pull any out and say we're not selling these?

22   A.  No.  I don't recall to pull out bottles.  Maybe they-- when

23   they check every bottle of wine, you know, they can find some

24   they don't like and they refuse that bottle.  Probably there

25   were few along the way.  I cannot recollect now how many

1   bottles, but I'm sure that there had to be few if I along the

2   way.

3   Q.  So there may have been some from Christies that were

4   rejected?

5   A.  Could be.

6   Q.  Now, when you were sending bottles of wine off for auction

7   at Zachy's, some of those bottles were from your personal

8   collection.  Is that correct?

9   A.  Yes, many of them.

10  Q.  And some of those bottles came from Mr. Kurniawan?

11  A.  That's correct.

12  Q.  And sometimes you would buy the bottle from him and put it

13  in the auction consignment?

14  A.  That's correct.

15  Q.  Other times you would basically take it from him, like on

16  consignment, and put it in?

17  A.  That's correct.

18  Q.  And when you sent consignments of wine off to the auction

19  houses, would you frequently receive advances from him?

20  A.  No.

21  Q.  Did you receive advances-- ever receive advances from him?

22  A.  Yes.

23  Q.  And how would the advances be determined?

24  A.  By the quantity of the wine you put in there.

25  Q.  And then that would be based, what, on the reserve price or

1   on the expected price?

2   A.  The reserve price, yeah.

3   Q.  And how would that-- how would the advances then be

4   covered?  How would you pay the-- you didn't expect to pay the

5   advances.  You expected that they would get them.  Right?

6   A.  The advances they would have paid to me.

7   Q.  Okay.

8   A.  And the wines, if they are mine, I don't have to give

9   nothing to anyone.  In this particular case, the wines they

10  were from Rudy, Mr. Kurniawan.  So every one penny plus some

11  money, I give it to him.

12  Q.  So you got the advances and then you'd give the advances to

13  him?

14  A.  That's correct.

15  Q.  Because he supplied the wine.

16  A.  Yes.

17  Q.  And then the expectation is that the wine will be sold and

18  the sale of the wine will cover the advances plus additional

19  money?

20  A.  Yes, sir.

21  Q.  And that's how it usually worked.  Right?

22  A.  That's the way it usually worked.

23  Q.  Did you get bottles of wine from other people that went in

24  to some of the auction consignments to put up?

25  A.  Maybe small quantities.  Some people say, Tony, you gonna

1    be -- you gonna put these wines in auction?  Can you put that

2    for me?  I say okay.

3              THE COURT:  And by "small quantities," what do you

4    mean?

5              THE WITNESS:  I mean is one case, two cases.

6    Somebody, they want to sell the wines and they coming to me.  I

7    said, You have auction going, can you please do that for me?

8    Say okay.

9    Q.  Did you make any secret of the fact that you had wines from

10   Rudy that you were putting in to auctions?

11   A.  It wasn't secret then.  Practically everybody knew where

12   the wine coming from.  Practically.

13   Q.  And with regard to the Spectrum wine auction, was there any

14   question in your mind that the people at Spectrum knew who the

15   wine came from?

16   A.  Well, I already say that one time.  You know, is like I was

17   sitting, you know, have a meeting with certain people.  And I

18   say, We are drinking water here, right?  I say yes.  But nobody

19   no say we are drinking water, but we're drinking water.  So is

20   the same thing.  People knew that the wine was coming from him

21   especially in the wine in the auction in London.  We know that

22   the guy from London, Richard Brenner, he was buying Rudy's wine

23   at the same time.

24             THE COURT:  So how do you think he knew the wine you

25   gave him was from Mr. Kurniawan?

1           THE WITNESS:  Because I think he have certain kind of

2       wines that people, they are familiar with them.  People that

3       were here in New York, you know, and the ones that were here in

4       New York.  That's my personal...

5           THE COURT:  That's your opinion.

6           THE WITNESS:  My opinion.

7           THE COURT:  You're assuming that.

8           THE WITNESS:  Assuming that.

9   Q.  And part of the reason you're assuming that is because you

10  knew that Vanquish was also getting wines from Rudy at the very

11  same time?

12  A.  That's correct.

13  Q.  Would Rudy bring bottles of wine into your restaurant from

14  time to time to drink with dinner?

15  A.  Not that often.

16  Q.  So --

17  A.  I have my own wines, too.

18  Q.  So he would sometimes order wines from you?

19  A.  Not order.  You know, if he come in, we gonna have dinner

20  or something, whatever, we have a small party or something.  He

21  come in only occasionally, you know, when I have a birthday or

22  something.  He come in there, maybe he can bring one or two

23  bottles of wine.  So do I.  I have my wine at the table, too.

24          Is that what you mean?

25  Q.  And after he'd come into your restaurant, he didn't make a

1    big thing about the bottles, did he?  He didn't care about the

2    bottles?

3    A.  When you say he don't care, what you mean?

4         THE COURT:  Yes, I don't understand the question.

5    Q.  Did he make you -- make sure that he got all his empty

6    bottles back or did he just not care?

7         THE COURT:  Well, there's two questions there.  Ask

8    the first one first.

9         MR. MOONEY:  Okay.

10   Q.  Did he ask you to give him back the bottles, empty

11   bottles?

12   A.  He-- I mean --

13   Q.  If you remember.

14   A.  I mean, if you're talking about one or two bottles, he

15   never take the bottle back.  One or two bottles, I don't think

16   that had-- practically I don't think they go anywhere, because

17   one or two bottles, it doesn't make a difference.  I don't

18   know.  You know what I mean?

19        THE COURT:  I guess he asked you if he ever asked you

20   to send the empty bottles back to him.

21        THE WITNESS:  What I tried to tell him, the wine he

22   bring, he bring to my restaurant, that was insignificant.  It

23   was nothing-- it was nothing to make a big deal about it.

24   Because when you talk about $100, $200 worth of wine, that not

25   what we talking about here.  Correct?  That's what I'm trying

1    to say.

2              THE COURT:  I understand.

3    Q.  Now, on some of the consignments sent to auction, you

4    didn't use your name.  You used your son's name, didn't you?

5    A.  No.  The last-- in the last consignment, the last

6    consignment, because it was -- the quantity was too much and I

7    think I say I'm gonna split it.

8    Q.  So you put part of it under your name and part of it under

9    his name?

10   A.  That's correct.

11   Q.  That's part --

12             THE COURT:  Wait.  Part your name and part who?  Your

13   son's?

14             THE WITNESS:  My son's name.

15   Q.  And part of the reason that you said did that was that you

16   wanted your son's name to start getting some recognition with

17   regards to this?

18   A.  That was the intention to do, yeah.

19   Q.  And I take it some day you'd like him to be able to take

20   over from you?

21   A.  One of these days, but not yet.  Not yet.

22   Q.  Not yet.  I'm not suggesting anything.

23   A.  Okay, thank you.

24   Q.  I've been to your restaurant.  I liked it.

25   A.  Oh, thank you very much.  I hope to see you again some day.

1    We can talk a little more about it.

2              MR. HERNANDEZ:  Objection.

3              MR. MOONEY:  I live across -- withdrawn.

4    A.  Please, I need some customers there back, you know.

5    Q.  You wouldn't put your son's name on an auction or on a

6    consignment if you thought that there were difficulties or

7    problems or fraud going on, would you?

8    A.  Definitely not.  And I want to say more about that.

9    Definitely not because I have four people, four people from

10   Spectrum to come and to check these wines out for one month.

11   For one month.  And two people in London checking this wine for

12   one month and exchange photographs and things like that.

13             So at the same time this guy in London buy wine from

14   Rudy at the same time, so that make me feel comfortable.

15   Comfortable that everything is fine.  Now looks like it's

16   not.

17   Q.  And as you sit here today, do you personally know if

18   there's actually any problem with any of these bottles?

19   A.  Personally?  No.

20   Q.  Have you ever bought fake bottles before?

21   A.  Yes.

22   Q.  That happens, doesn't it?

23   A.  Definitely.

24   Q.  Do you know the names of any of the individuals, the

25   experts that inspected the wine for Spectrum?

1   A.  Yeah.  Is Walker Strangis, Amanda Crawford, Jason Boland

2   and somebody else.

3   Q.  Do you know if there's a Mr. Egan?

4   A.  He may be there, but this particular person never come to

5   me.

6   Q.  And all of the inspections in Los Angeles did not result in

7   withdrawing-- there was no wine withdrawn until it had been

8   sent to London.  Is that correct?

9   A.  Yes.

10  Q.  And it was only after it was in London that somebody

11  decided there was problems with some of these wines?

12  A.  Yes, sir.

13  Q.  And to this day, has anybody ever told you what the

14  problems are with any of these wines that are sitting here?

15  A.  Well, I just see the wines now.  I don't know exactly what

16  the problem is now.  I guess...

17  Q.  Some of these wines appear to have drinkability problems,

18  don't they?

19  A.  Yeah.  Well, yes.

20         MR. FACCIPONTI:  Objection.  I don't know what he

21  means by that.

22         THE COURT:  Sustained.

23         MR. MOONEY:  No more questions, your Honor.

24         THE COURT:  Any redirect?

25         MR. FACCIPONTI:  Very briefly.

1           Can we have Government Exhibit 14-4A back up?

2    REDIRECT EXAMINATION

3    BY MR. FACCIPONTI:

4    Q.  Mr. Castanos, you remember Mr. Mooney asked you some

5    questions about your opinion about who knew whether these wines

6    were Mr. Kurniawan's or not.  Correct?

7    A.  Yes.

8    Q.  This is the consignment list for the wines Mr. Kurniawan

9    gave you.  Correct?

10   A.  Yes.

11   Q.  And that includes the wines that are marked as the

12   Government Exhibit 3 series on the table there.  Correct?

13   A.  Yes.

14           MR. FACCIPONTI:  If you can highlight the upper

15   right-hand portion again.

16   Q.  That's your name there.  Right?

17   A.  That's correct.

18   Q.  That's not Mr. Kurniawan's name.  Right?

19   A.  No.

20   Q.  And yet these are wines that you got from him.  Correct?

21   A.  That's correct.

22   Q.  You did not buy these wines from him.  Correct?

23   A.  No.

24   Q.  He told you not to tell anybody to use his name in

25   connection with these wines.  Correct?

DCDBKURT3                      Castanos - redirect

1    A.  Yes.

2    Q.  And you did not tell anybody that he was the person who

3    gave you these wines.  Correct?

4    A.  Correct.

5    Q.  Now, do you remember Mr. Mooney asked you some questions

6    about whether you knew these wines were counterfeit or not?

7    A.  Yes.

8    Q.  And you're not an expert on that.  Correct?

9             MR. FACCIPONTI:  Could we have the ELMO --

10            THE COURT:  Wait.  Do you have a question pending?

11            MR. FACCIPONTI:  Yes, I do, your Honor.

12            THE COURT:  Are you an expert on whether wine is

13   authentic or not?

14            THE WITNESS:  Expert?  No.

15            MR. FACCIPONTI:  Can we have the ELMO up?  I'm going

16   to try and --

17            THE WITNESS:  I have opinion, but, no.

18            THE COURT:  Okay.  You should tell them, tell the

19   jury.  He says he has an opinion.

20            THE WITNESS:  I have opinion, but I'm not an expert.

21   BY MR. FACCIPONTI:

22   Q.  Do you see the label here, it says Percy Fox Limited?  Can

23   you spell the way that says 32 Sackvilee Street?  Can you spell

24   that for the jury?  Is it S-A-C-K-V-I-L-E-E?

25   A.  Percy Fox?

DCDBKURT3                       Castanos - redirect

1    Q.  Yes.  The street, is it spelled S-A-C-K-V-I-L-E-E?

2              THE COURT:  Well, we see that.

3    A.  Yeah.

4              MR. FACCIPONTI:  Okay.  No further questions, your

5    Honor.

6              THE COURT:  All right.  Thanks very much.

7              THE WITNESS:  Done?

8              THE COURT:  Yes, you're finished.  Be careful walking

9    down.

10             THE WITNESS:  Thank you, sir.  Thank you, your Honor.

11             THE COURT:  You bet.

12             (Witness excused)

13             MR. HERNANDEZ:  Government calls Douglas Barzelay.

14    DOUGLAS E. BARZELAY,

15         called as a witness by the Government,

16         having been duly sworn, testified as follows:

17             THE DEPUTY CLERK:  Can you state your name for the

18    record, please.

19             THE WITNESS:  It's Douglas E. Barzelay,

20    B-a-r-z-e-l-a-y.

21             THE DEPUTY CLERK:  Thank you.

22    DIRECT EXAMINATION

23    BY MR. HERNANDEZ:

24    Q.  Mr. Barzelay, can you tell us what city you live in?

25    A.  I live in Southampton, New York.

1    Q.  Are you currently working?

2    A.  I am not.  Well, I am part time.  I'm retired.  I retired

3    after a long career in the law.  Currently I'm working in a

4    small business part time with some friends where we source

5    wines from private collections for restaurants.  And I am in

6    the process of writing a book on burgundy.

7    Q.  So you must collect wine then?

8    A.  I do.

9    Q.  And can you tell us when your interest in wine started and

10   how it developed over time?

11   A.  It really started after I got out of law school in 1973 and

12   I moved to New York.  And it was a time at which the wine

13   market had just crashed and wine at that time was quite

14   inexpensive.  It was very easy to find great bottles of wine

15   for $5, $7.  Ten dollars was a lot to spend on a bottle of

16   wine.  And so with a bunch of friends we would buy bottles,

17   put them in brown bags, taste them, and just argue about them

18   and try to figure out why we liked them and defend our

19   positions.  And then, after that, we would sit down and just

20   finish them.

21   Q.  How did you fare in those arguments?  Pretty well?

22   A.  I learned a lot.  It was an interesting time.  Today you

23   have all kinds of journalists who tell you-- are happy to tell

24   you what to think about particular wines, but that fortunately

25   didn't exist back then.  So I and others really had to figure

DCDBKURT3                    Barzelay - direct

1   out what we liked and why we liked it.  And fortunately it

2   wasn't an expensive proposition.  Some of those same bottles

3   are going today for 50 or 100 times the price, so it was a very

4   different world.

5   Q.  Thank you.

6        Do you have any experience with older burgundy wines?

7   A.  Yes.  I began -- the kinds of tastings I was talking about

8   were mostly bordeaux at that time in the '70s, but I started to

9   get interested in burgundy.  And then sometime in the early

10  '80s, the prices of young burgundy started to go up and I

11  discovered that old burgundy was around and available and less

12  expensive.

13       And as I started tasting them, I also discovered that

14  they had an extraordinary quality that the young ones didn't

15  have.  And at the time I think most people wrote them off and

16  said burgundy just dies in the bottle after, say, 20 years.

17  But I was drinking things 30, 40, 50 years old and they were

18  amazing experiences.  And I was getting them, as I say, for

19  less than the current vintage.  So I started buying as much as

20  I could afford at the time.

21  Q.  Are there a number of things, maybe one thing in

22  particular, that you loved about the wines of Burgundy and old

23  burgundy wines?

24  A.  Yeah.  I think there's a quality to them -- it's hard to

25  describe, but with time these wines just take on a

DCDBKURT3                          Barzelay – direct

seamlessness.  It's an entirely involving sensory experience

and there's a wholeness, an ethereal quality to the wines.

It's quite extraordinary and, in my experience, unique in the

wine world.

                    (Continued on next page)

1    Q.  When you buy wine, where do you buy it from, do you buy it

2    from auctions, retail stores or other places?

3    A.  All of the above, brokers, also buy some in France, yeah.

4    I've just bought over the years wherever I could find things.

5    Q.  Mr. Barzelay, do you know someone named Rudy Kurniawan?

6    A.  I do.

7    Q.  And do you see him sitting in the courtroom here today?

8    A.  Yes, I do.

9    Q.  Could you identify him by an article of clothing and where

10   he's sitting in the courtroom?

11   A.  Yes.  He's sitting at the table over there in the glasses.

12          MR. HERNANDEZ:  Let the record reflect that

13   Mr. Barzelay has identified the defendant?

14          THE COURT:  The record will so reflect.

15   Q.  Mr. Barzelay, when did you first meet the defendant?

16   A.  I don't recall exactly.  I believe it was sometime in 2004.

17   His reputation somewhat preceded him in the kind of narrow

18   world of wine collectors.  Somebody coming on the scene who's

19   young, who's spending a great deal of money in the auction

20   houses, who appears to be quite knowledgeable, word gets

21   around.  And so I had heard about Rudy I think well in advance

22   of when I met him.

23          First time I can recall having met him was I may have

24   seen him at one or more auctions in 2004, but I definitely

25   recall seeing him and talking with him around the Acker Merrall

1    put on a series of I think it was two days of tastings in

2    October of 2004 called top 100 wines of all time or something

3    like that, and so that I recall meeting him and talking with

4    him at that time and being part of a group that went out to a

5    dinner after that event was over.

6    Q.  Did you have other occasions to talk with him or meet him

7    between 2004 and 2008?

8    A.  Yes.  On a number of occasions I would see him at auctions

9    in New York.  I remember there were -- there was at least one

10   dinner at Cru in October of 2005 where he had invited a number

11   of people down to the restaurant and was paying for the whole

12   event, opening a lot of rather expensive old bottle and rare

13   old bottles of wine and I was part of that dinner.

14        And then there were several other occasions, including

15   a major tasting of Romanee-Conti wines that some friends and I

16   put together to which he was invited.  So there was a number of

17   occasions, yes.

18   Q.  Is it fair to say you've had several conversations with

19   Rudy Kurniawan about fine rare wine?

20   A.  Yes.

21   Q.  Now, have you ever spoken to Rudy Kurniawan about

22   counterfeit wine?

23   A.  On several occasions.  There were -- the first I can

24   remember is actually around that 2004 top 100 wines event where

25   there were several wines served at that event that were clearly

DCDLKUR4                        Barzelay - direct

1    fraudulent.  And I recall Rudy saying that he had supplied a

2    number of wines for the event, that all of his wines were

3    correct, that he would never provide a fraudulent wine and that

4    he was quite proficient at noting the differences.  So that was

5    one event.

6            Another, the dinner in October of 2005 that I

7    mentioned, the subject came up again and he suggested that what

8    we all ought to do after events like this was to -- that

9    because of the incidents of fraudulent wines and the

10   possibility that bottles could be reused, that what we all

11   ought to do is deface the labels of the bottles, mark them so

12   that they could never be reused.

13   Q.  Do you recall any conversations with the defendant about

14   the details about wine labels or other physical aspects of old

15   Burgundy wines?

16   A.  There were several conversations that I do recall.  One was

17   a conversation about a bottle of 1875 Romanee-Conti that was

18   for sale in Europe and I remember talking to him and asked him

19   about if he knew about it.  And he said is that the bottle from

20   a particular broker because if it is, I've looked at it and

21   it's a fake and that -- we had that kind of conversation on a

22   few occasions where he would say don't go near this or that

23   bottle.  It's a fake.

24           He would also, on a few occasions I know he asked me

25   particular questions about say labels for -- well, one that I

1  particularly remember, some labels for Roumier wines that were

2  not the standard Domaine label and whether they could be real

3  or not and it was I believe a negociant bottling.  Someone else

4  other than the Domaine had bottled the wine and put a slightly

5  different label on it.  So there were a few conversations like

6  that.

7  Q.  Did Kurniawan ever tell you where he bought the wines in

8  his collection from?

9  A.  Sometimes he would talk about specific auctions and places

10  that he bought them.  And on at least one occasion I can recall

11  asking a question and he just sort of gave me a half smile and

12  referred to a magic cellar.

13          But in general he had, well, he had a prodigious

14  memory in general and particularly for wines, particular wines

15  at particular auctions and where he had bought things from

16  brokers and so on.

17  Q.  Now, based on your several conversations with Rudy

18  Kurniawan and also other conversations you've participated in

19  with him and others, do you have an opinion as to whether

20  Kurniawan was knowledgeable about older Burgundy wines?

21  A.  He was indeed very knowledgeable about older Burgundy

22  wines.

23          THE COURT:  Did he say he was indeed?

24          THE WITNESS:  Indeed, yes.

25  Q.  Did have an opinion as to whether he was skilled at

1   identifying counterfeit bottles of wine?

2   A.  I believe he was skilled at identifying counterfeit wines,

3   yes.

4   Q.  So you mentioned Acker Merrall & Condit.  You know that's a

5   wine auction house.  Correct?

6   A.  Yes.

7   Q.  Have you ever received any of their auction catalogs?

8   A.  I used to receive them regularly.  Before the auctions they

9   would mail me copies of the catalogs.

10  Q.  These would come in the U.S. mail?

11  A.  Yes.

12  Q.  So are you familiar with the catalog for a January 2006

13  auction called The Cellar?

14  A.  I am.

15  Q.  And how about an October 2006 catalog called The Cellar II?

16  A.  Yes.

17  Q.  Did you receive copies of these catalogs?

18  A.  I did.

19  Q.  In the U.S. mail?

20  A.  In the mail, yes.

21  Q.  Did you look at the Burgundy wines that were offered in

22  those two catalogs in 2006 when you received them?

23  A.  In quite some detail, yes.

24  Q.  And why?

25  A.  Well, I was very interested.  These were the kinds of wines

that I like to buy when I could and enjoyed drinking and so I
wanted to look through and see what might be available and what
I might potentially bid on.

Q.  You said you've been collecting these wines with a great
passion since the seventies?

A.  Yes.

Q.  What was your reaction when you saw the total spread of
older Burgundy wines in those two auctions?

A.  I would say it was slightly different.  I think in the
first auction I was struck by how many of the old and rare
bottles that I'd seldom ever seen were available for sale and
it seemed -- it seemed remarkable I guess is the conclusion I
drew at that time.

     I think by the time of the second sale it seemed
incredible that just there were more and more of these wines.
And one example of it was the 1959 Musigny from Domaine Roumier
which I don't think I'd ever seen a bottle at auction and here
were, I don't know whether it was something like six.  Only
about 200 bottles were ever made and released under the Domaine
label, and here there were either six in the first auction and
12 in the second or the reverse of that.  I don't recall
exactly, but it's just an incredible number.

     And that was repeated time and again in the catalog.
Wines that were very rare and I had seldom if ever seen
available at auction in prior years were now available in half

1    case or case quantities.

2    Q.  Now, are these the kinds of wines that you would be eagerly

3    seeking out through auction houses, brokers, and other avenues?

4    A.  To the extent I could afford it, yes.

5    Q.  But you're friends with a number of other collectors for

6    whom maybe price isn't even an issue, right?

7    A.  Yes, that's certainly true.  And those were people I was

8    talking with at the time and they were very interested, keenly

9    interested in a lot of the wines and were asking me questions

10   about the wines and had I had them and what did I think about

11   the purchase of, that kind of question.

12   Q.  Was one of those people someone named Don Stott?

13   A.  Yes.  Don is an old and good friend of mine.

14   Q.  And he's an avid Burgundy collector of old wines like you,

15   right?

16   A.  He is.  He got into it somewhat later but more than made up

17   for lost time.  He collected extremely avidly I would say.

18   Q.  And he has the bank account too to go and buy it if he

19   finds it and likes it?

20   A.  Yes.  I think his general attitude was if he wanted it, he

21   just wanted to buy it and he was not terribly concerned about

22   the price.

23   Q.  Let me ask you, and there are other people like Don Stott

24   out there collecting, as well, that you know?

25   A.  There are and there have been today.  That was not the case

1    at all when I started, but that whole world changed radically

2    over the years, really in the 2000s probably more than at any

3    other time.

4    Q.  While we're talking about Mr. Stott, if we could show I

5    believe what's already been admitted as 40-2, a program from a

6    dinner at Mr. Stott's home.

7            Mr. Barzelay, it's going to appear on the screen in

8    front of you.

9    A.  Yes.

10   Q.  We have what's here already been admitted through

11   Christophe Roumier a program of a dinner on January 14, 2007 at

12   Mr. Stott's home, and you're listed as one of the attendees.

13           Did you in fact attend this dinner?

14   A.  I attended it.  I was also one of the people who helped

15   plan it, yes.

16   Q.  And what was the theme of this dinner, can you just remind

17   us?

18   A.  The intention in the Cellar I auction, this idea had

19   started with the Cellar I auction and the fact -- grew out of

20   the fact that there seemed to be so many of these great wines

21   that it was a little worrisome about whether they were in fact

22   real.  There was an offer of money back guarantee in effect for

23   anyone who was unhappy with the wines and returned them.

24           So Don and I thought that it would be a good idea to

25   taste some of the wines that he had bought at the auction -- he

DCDLKUR4                          Barzelay - direct

1     bought quite a bit -- and to see if they were real and, if

2     necessary, to take advantage, he would take advantage of the

3     return guarantee.

4               THE COURT:  Who made the guarantee, the auction house?

5               THE WITNESS:  It was listed in the catalog, but it was

6     what the catalog said, I believe, was that the seller

7     guaranteed.

8     Q.  That night did you know where --

9     A.  I'm sorry, just to finish up, we decided that it would be,

10    since we were going to taste predominantly Roumier wines, it

11    would be a great idea to have the producer come because he

12    would be the best source of opinion on whether the wines were

13    real or counterfeit, and also Allen Meadows, who's a prominent

14    critic and writer on Burgundy.

15              And so in the process of getting that dinner together

16    and getting a date, the Cellar II auction occurred.  Don bought

17    addition wines in that auction and so we included wines from

18    both when the dinner finally took place in January of 2007.

19    Q.  And then when you had the dinner in January 2007, did you

20    know at that time who had consigned these Roumier wines to the

21    Acker auction that Mr. Stott bought?

22    A.  Yes.  It was Rudy Kurniawan.

23    Q.  And did you taste the wines that are on the list of the

24    program here?  If we could go to the previous page, can remind

25    us what the lineup was.

1   A.  Yes, I tasted all of the wines.

2   Q.  Did you have any personal impressions or feelings about the

3   authenticity of any of the wines?

4   A.  Yes.  And to be clear, a few of those wines were not from

5   the Cellar I and Cellar II sales.

6   Q.  So I'll ask you just to answer with respect to the wines

7   that were from the Cellar I and Cellar II sales.

8   A.  From the Cellar I and Cellar II sales, we tasted I think it

9   ultimately came to be 11 or 12 bottles because we tasted two

10  bottles of two of the wines.  And six or seven of them were

11  clearly fraudulent wines, so roughly 70 percent.

12  Q.  Can you explain what you mean by that?

13  A.  They did not, did not taste at all as they were represented

14  to be.  In some cases the wines clearly tasted more like wines

15  from the Rhone, which is a different part of France.  In other

16  cases they didn't taste like wines of the particular year that

17  they were represented to be although they were probably

18  Burgundies of some sort but difficult to tell what.

19  Q.  If we could go to the first page of the exhibit, one of the

20  wines that was consumed that night that features prominently on

21  the cover purports to be a wine from 1923 from Domaine Roumier.

22          Do you see that?

23  A.  I do.

24  Q.  Have you ever seen in all of your time searching for these

25  wines a 1923 Domaine Roumier wine in the marketplace?

1  A.  Never.

2  Q.  After this tasting, did your view or your impressions of

3  Rudy Kurniawan change in any way?

4  A.  Yes, quite considerably.  I think up until that point and I

5  had had some concerns based on some prior tastings about the

6  fact that there were wines that I felt were fraudulent that he

7  had supplied for some tastings, but up until that point I just

8  assumed it was the normal problems that a large collector might

9  have and in buying a few bottles here and there that were not

10  going to be correct.

11          But the wines were -- there were so many of them that

12  they were so self-evidently fraudulent that at that point I

13  came to believe it was impossible that Rudy could not have

14  known that these bottles were fraudulent and that he was an

15  active and witting participant in a scheme to distribute these

16  wines.

17  Q.  And was that based on not only the number of wines you

18  considered to be clearly fraudulent, but also all the previous

19  conversations and interactions you had with Rudy Kurniawan and

20  his knowledge base that you thought he had?

21  A.  Yes.  It was based essentially on the fact that I knew he

22  was extremely knowledgeable.  He had a very fine palate.  He

23  clearly knew himself the difference between a correct wine and

24  a fraudulent wine and he often talked about that and identified

25  fraudulent wines and that he would when he was speaking be very

DCDLKUR4                        Barzelay - direct

1   proud of his collection and of the quality of it and that, you

2   know, he was, even though he was collecting very large amounts

3   of wine, he was familiar when we talked with every single wine

4   and tasted most of them a number of times.

5         I think based on all of those factors, it just seemed

6   to me no longer possible that this was just an unwitting

7   transmission of these wines.

8   Q.  I'm going to direct your attention to April of 2007.

9   A.  Right.

10  Q.  Did you attend a special Romanee-Conti tasting in New York

11  in that month?

12  A.  Yes.  I was one of the people that helped organize that

13  tasting.

14  Q.  Can you tell us a little bit briefly about what that

15  tasting was?

16  A.  It was a -- what we were attempting to do was to have the

17  most comprehensive collection of Romanee-Conti wines that had

18  ever been tasted in a single place and at a single time.  And

19  in the event I think we had 70, we had collected 74 vintages of

20  the wine.

21  Q.  And is that the tasting that this jury has heard from

22  Aubert de Villaine, the manager, the head of Domaine de la

23  Romanee-Conti, also attended?

24  A.  He did, yes.

25  Q.  Did Rudy Kurniawan attend this event?

1    A.  He did.

2    Q.  You said you were one of the managers or the organizers of

3    this event?

4    A.  Right.

5    Q.  But you also said that in January of '07 after the tasting

6    at Mr. Stott's home you had a negative view now of Rudy

7    Kurniawan.  So why then in April of 2007 did you invite him to

8    this event?

9    A.  Actually the invitation had been extended about two years

10   previously.  The difficulty of collecting this many wines, it

11   took us two or three years of trying.  And at the time Rudy was

12   invited, he was well-known as one of the premier collectors of

13   Romanee-Conti in the world.

14           And we were, all of the people who were invited to the

15   tasting were being asked to contribute wines from their

16   cellars, so he had also by that time sent ahead a number of

17   wines to be used in the tasting and that would have been

18   finished I think in 2006 at some point because I was very

19   concerned that the bottles get there well in advance of the

20   tasting with -- particularly with older bottles, if they don't

21   sit for months, they can just taste off and be bad and so I

22   wanted to make sure everything was representative.

23   Q.  So you didn't feel you could withdraw the invitation

24   because it had been extended previously -- let me finish the

25   question.

DCDLKUR4                    Barzelay - direct

1    A.   Sorry.

2    Q.   You didn't feel you could withdraw the invitation because

3    it had been extended two years before and Kurniawan had

4    committed to bringing some of the wine for the event and if he

5    didn't attend, the wine wouldn't attend either?

6    A.   That's correct.   And although we tried to have duplicate

7    bottles from different sources of every wine, that wasn't

8    possible.   And he had supplied some of the more difficult to

9    find wines for this tasting, many of those were off vintages

10   because the best vintages often tend to come to auction and be

11   collected, but the lesser vintages are often much harder to

12   find.   But he also was the person who supplied the really the

13   most rare wine, the 1945, for that event, and he was the only

14   source of that wine.

15   Q.   And did you detect any problems with the wines that

16   Kurniawan provided?

17   A.   There were no problems with any of those wines.   And,

18   again, we had a group of people, very experienced tasters

19   tasting more than 70 wines together.   Any problems you would

20   have seen instantly.   And Aubert, of course, is more than

21   expert.   If any of the rest of us missed something, he

22   certainly would not have.

23        So we had no problems with wines being that we felt

24   were fraudulent, other than some negociant bottlings that we

25   expected to find a problem with.

1   Q.  Did the people who were invited to this event know that the

2   head of the Domaine, Mr. de Villaine, was going to be in

3   attendance?

4   A.  Yes, everyone knew that.  And, in fact, we had rescheduled

5   the dinner once already because he couldn't make an earlier

6   date.

7   Q.  At the end of the event did Kurniawan say anything to you?

8   A.  At the end of the event we asked the participants if anyone

9   would like a bottle as a souvenir and a few people took a

10  bottle with them.  Rudy told me he would like all of the empty

11  bottles sent back to him in California.

12  Q.  Do you mean all of them from the tasting or all the ones

13  that he provided?

14  A.  All of the ones that he provided and that we had opened.

15  There were a number of bottles from him and from others that

16  because we had backups, second bottles of everything, there

17  were a number of unopened bottles and those, of course, went

18  back to the people who supplied them.  But this refers to open

19  and empty bottles.

20  Q.  Can we show the witness Government Exhibit 13-26.  And if

21  we could focus on maybe just the top third so Mr. Barzelay can

22  see the document a little bit better.

23          THE WITNESS:  Would it be possible to get a glass of

24  water?

25          THE COURT:  Sure.

1    A.  Yes.

2    Q.  Do you recognize this document, Mr. Barzelay?

3    A.  This is a series of emails back and forth from Rudy,

4    between Rudy and me.

5    Q.  And do you recognize that to be your email address at the

6    time?

7    A.  Yes, yes, it was.

8    Q.  Is the subject matter the empty bottles that you just

9    mentioned from that Romanee-Conti tasting?

10   A.  The subject matter is the empty bottles and the full

11   bottles.

12           MR. HERNANDEZ:  Government offers 13-26.

13           THE COURT:  I'll allow it.

14           (Government's Exhibit 13-26 received in evidence)

15           MR. HERNANDEZ:  May we publish this to the jury?

16           THE COURT:  Sure.

17           MR. HERNANDEZ:  Can we start at the bottom of the

18   exhibit.

19   Q.  We're not going to read all of this email, Mr. Barzelay,

20   but this is an April 24, 2007 email from yourself to Rudy

21   Kurniawan, correct?

22   A.  Yes.

23   Q.  And really all that you're communicating in this email is

24   where to be for this tasting and what to wear and some

25   excitement, right?

1    A.  Yes.

2    Q.  So let's move up an email chain.

3            So this email comes from Rudy Kurniawan May 1, 2007.

4    That's after the tasting, right?

5    A.  That's correct.

6    Q.  And the email reads, can you please arrange to have my

7    bottles of RC shipped to Rudy Kurniawan, then giving an address

8    in Arcadia and phone number.  It ends with, thanks for the

9    great weekend, still recovering.  Probably won't drink RC for a

10   few weeks...

11           Did I read that correctly?

12   A.  Yes.

13   Q.  And then can we move up to the email above that.  And we

14   can group the last remaining emails, I think.  I think we'll be

15   able to read them all.

16           All right.  And then you respond on May 2, 2007, will

17   do.  Assume you want full bottles, backups that were not used,

18   shipped to the same address as well as the empties.

19           Is that correct?

20   A.  That's correct, yes.

21   Q.  And then 15 days later can you read what Kurniawan wrote?

22   A.  He writes, did you ship abbreviation for bottles.

23   Q.  And then you responded that same day, should go out

24   beginning of next week.  FedEx Ground for empties, overnight

25   for fulls.

1           Is that correct?

2   A.   That's correct.

3   Q.   Did you in fact ship the empty bottles and the full bottles

4   to Rudy Kurniawan?

5   A.   Eventually, yes.  The empties went out somewhat later than

6   stated in this email and the fulls went out later still because

7   there was warm weather at this time.

8   Q.   Mr. Barzelay, there were other participants at this event

9   that brought wine.

10          Did any of them ask to have all of their empty bottles

11  shipped to them?

12  A.   None, no one.

13  Q.   Did anyone take home any bottles at all?

14  A.   I would say half to two-thirds of the participants chose to

15  take a single bottle, yes.

16          MR. HERNANDEZ:  If we could show just to the witness

17  13-27.  Can we just focus in on maybe the top third or so of

18  this email.

19  Q.   Mr. Barzelay, when you can read that, just tell me if you

20  recognize this email.

21  A.   I do.  Again, these are further emails in the same chain on

22  the same subject.

23          MR. HERNANDEZ:  Government offers 13-27.

24          THE COURT:  I'll allow it.

25          (Government's Exhibit 13-27 received in evidence)

1        MR. HERNANDEZ:  And can we publish just what we have

2    magnified here is perfect, publish this to the jury.

3        THE COURT:  Sure.

4    Q.  I'm going to pick up in the email that's in the middle,

5    Mr. Barzelay.  This is May 30, 2007.  Kurniawan writes, still

6    no bottles.  I got the email from Michael somewhere and I will

7    check my cost ASAP.  Your prices are hilarious, with a wink and

8    a smile.

9        And then above that you write on May 30, empty bottles

10   were sent FedEx last Tuesday or Wednesday so should have

11   arrived.  I will try to trace.  Full bottles and the empty '45,

12   which is packed with them, not sent yet due to warm weather

13   here.

14       Did I read that correctly?

15   A.  Yes.

16   Q.  So Mr. Kurniawan was still going after you because you

17   hadn't sent him the bottles by or he hadn't received them by

18   May 30, 2007?

19   A.  That's correct.

20   Q.  But you did in fact send them?

21   A.  I did eventually, yes.

22   Q.  Do you understand his reference to I will check my cost

23   ASAP, your prices are hilarious, do you understand what he

24   means?

25   A.  Yes.  As part of the tasting, in order to equalize people's

 1    contributions, everyone was asked to provide their cost prices

 2    for the wines that they supplied.

 3    Q.  Meaning how much they paid for it?

 4    A.  Meaning how much they paid for it.

 5    Q.  As opposed to how much it might be worth today?

 6    A.  Or at the time, yes, that's correct.  It was not based on

 7    market value.  It was purely cost value.  We had asked Rudy

 8    several times for that information and he had said, well, I

 9    don't really keep much in the way of records and but I'll try

10    to find it.

11          After waiting and this was -- this started before the,

12    before the tasting and then we were waiting afterwards.  And

13    finally one of the other organizers, Michael in this email,

14    sent out an email saying, well, here's what we think they

15    should be and if you've got other prices, tell us what they

16    are, but we'd really like to get this settled and that was

17    the -- that was the reason for the reference I will check my

18    cost ASAP.  Your prices are hilarious.  He obviously felt they

19    were way low.

20    Q.  I'm going to ask you about a different subject now.

21          In 2008 were you familiar with the wines of Domaine

22    Ponsot?

23    A.  Yes.

24    Q.  Do you know anyone from Domaine Ponsot?

25    A.  I'm familiar with and friendly with Laurent Ponsot who was

1    the proprietor of the Domaine.

2    Q.  In April 2008 did you receive a wine auction catalog from

3    Acker Merrall & Condit for an April 25, 2008 auction?

4    A.  I did.

5    Q.  How did you receive it?

6    A.  It was sent to me by mail.

7    Q.  And did you review that catalog?

8    A.  I did.

9    Q.  Was there anything that particularly stuck out to you when

10   you saw it?

11   A.  There were a number of things.  But in particular the thing

12   that I most focused on was a selection of very old Ponsot Clos

13   St. Denis from, if I recall, the sixties, the fifties, and the

14   forties.

15   Q.  Why did that stick out to you?

16   A.  I had never seen any Clos St. Denis from Domaine Ponsot

17   prior to 1985 and I wasn't aware it existed.  So I was rather

18   surprised to see it and decided to check on it.

19   Q.  How did you check?

20   A.  First thing I did was go to the Domaine website and as it

21   confirmed the fact that the Domaine had only started making

22   this wine under a sharecropping agreement with the owners of

23   the property sometime in around about 1982, in the early 1980s.

24       I then, I called a couple of friends, including Allen

25   Meadows, to see if they were aware of anything earlier and they

1   had never seen anything before about 1985.

2           And then it occurred to me that, well, possibly the

3   Domaine had had some kind of sharecropping agreement with

4   someone else at the time, that it ended long ago and the way to

5   find that out was to contact Laurent Ponsot.

6   Q.  Did you do that?

7   A.  Yes, we did.

8   Q.  And did you tell him what it is that you saw in the

9   catalog?

10  A.  We, at first the question was when did the Domaine first

11  start making Clos St. Denis and --

12          MR. MOONEY:  Objection, hearsay.

13          THE COURT:  Overruled.

14          That was your question?

15          THE WITNESS:  That was mine.  That was our question,

16  yes.

17          And he was, he wanted a lot more information as a

18  result of that question, wanted to know why we were asking and

19  asked.  And at that point I or one of us said to him that these

20  wines were up for auction at Acker Merrall -- this was maybe a

21  week or two before the auction or I'm not sure the exact timing

22  but at some point before the auction -- and that there were

23  pictures of these bottles available.  And he obviously wanted a

24  great deal more information about this at the time.

25  Q.  Now I'm going to move forward in time to the auction

1    itself.  Did you attend the auction?

2    A.  I did.

3    Q.  Do you know whether Rudy Kurniawan was there?

4    A.  He was.

5    Q.  And how about Laurent Ponsot, you did see him there?

6    A.  Yes, he came.  He attended the auction.

7    Q.  And what happened to those Domaine Ponsot wines that you

8    noticed in the catalog, were they auctioned or not?

9    A.  They were not.

10   Q.  Because no one bought them or for some other reason?

11   A.  No.  I had previously been -- I had contacted the

12   auctioneer, John Kapon, prior to the auction to tell him that

13   these bottles were clearly fraudulent and that they needed to

14   be withdrawn and we had several conversations about that.

15   Ultimately, at the auction when the bottles were to come in the

16   sequence, he announced that all of the Ponsot bottles had been

17   withdrawn at the request of the Domaine.

18   Q.  Now, the following day after the auction did you have a

19   lunch with John Kapon, Rudy Kurniawan, and Laurent Ponsot?

20   A.  I did.  John had asked me to attend that luncheon and he

21   wanted Laurent and Rudy to talk and he wanted Rudy to tell

22   Laurent essentially where he had gotten the bottles.

23   Q.  And did that topic come up, the question of where Kurniawan

24   had got the bottles from during the lunch?

25   A.  It came up several times.  I believe that John was the

1   first to ask the question.  Rudy was --

2   Q.  Before -- I'm going to ask you in a minute what Kurniawan

3   said.

4   A.  Okay, sorry.

5   Q.  But before you do, can you describe what his demeanor was

6   during this lunch and, in particular, while the topic of the

7   source of the bottles came up?

8   A.  His demeanor in general was I found him to be nervous,

9   fidgety, much quieter and less self-assured than he normally

10  was.  He -- often when he spoke his eyes would be downcast.  He

11  was generally I would say his demeanor was very uncomfortable,

12  very nervous.

13  Q.  Now, what did he say with respect to where he got the

14  bottles from?

15  A.  He said he couldn't remember and he would have to go back

16  and check his records.

17  Q.  What was your reaction when you heard him say that?

18  A.  I found that to be totally incredible.

19          THE COURT:  Totally what?

20          THE WITNESS:  Lacking credibility.

21  Q.  Why?

22  A.  My based on my prior experiences with him and the fact that

23  he seemed to know in great detail the history of pretty much

24  every bottle, the idea that he didn't know anything about where

25  these particular bottles came from did not seem credible.  And

DCDLKUR4                    Barzelay - direct

1   given the conversations we had about his general lack of

2   recordkeeping, I didn't believe it was likely that he had some

3   set of records that he would be going back to check.

4            In short, I thought that he was trying to evade the

5   question.  And, indeed, each time it came up, as soon as he

6   would give that answer, he'd try to change the subject.

7            MR. HERNANDEZ:  Thank you.

8            No further questions.

9            THE COURT:  Counsel.

10           MR. MOONEY:  Thank you, your Honor.

11  CROSS-EXAMINATION

12  BY MR. MOONEY:

13  Q.  Good afternoon, Mr. Barzelay.

14  A.  Good afternoon.

15  Q.  You're writing a book about Burgundy?

16  A.  I am, trying.

17  Q.  But you've written things, have you not?

18  A.  I have.

19  Q.  And you've been published in some places?

20           THE COURT:  You mean about wine or anything?

21  Q.  Just generally.

22  A.  Well, on the subject matter of wine, most of what I've

23  written has been for a blog that I write.  It's not a

24  separate -- it's not published by someone else.

25  Q.  Well, you put your name on it, don't you?

1   A.  Absolutely.

2   Q.  And you copyright it, don't you?

3   A.  Yes.

4   Q.  And you put it out there for the world to see?

5   A.  Absolutely.

6   Q.  And you assume people are going to read it, at least you

7   hope they will?

8   A.  I hope so.

9   Q.  And one of the subjects that you write about is

10  Mr. Kurniawan, is it not?

11  A.  That's correct.

12  Q.  And so is it fair to say in at least in your writings you

13  expressed an opinion and taken a position with regards to

14  Mr. Kurniawan and his role with regards to counterfeit wine?

15  A.  I have expressed my opinions, yes.

16  Q.  And expressed it publicly?

17  A.  Yes.

18  Q.  Let's go back then.  When you first met him, first became

19  aware of him, I think you told us it was back sometime around

20  2004?

21  A.  As best I can recall, yes.

22  Q.  And he'd come on to the scene as a collector?

23  A.  Yes.

24  Q.  He'd come on to the scene as somebody who was buying

25  quantities of wines?

DCDLKUR4                     Barzelay - cross

1    A.  Yes.

2    Q.  And he was buying Bordeaux and Burgundies?

3    A.  At least, yes.

4    Q.  And other things?

5    A.  Yes.

6    Q.  And you understood back then that he sort of had a

7    reputation as somebody who would buy just about anything,

8    right?

9    A.  I'm not sure I'd say that, no.  In fact, no.

10   Q.  Or at least pay just about anything?

11   A.  For the things that he was interested in buying, yes.

12   There were definitely wines he told me at various times he had

13   no interest in.

14   Q.  There was even an auction at one point where there was

15   something he wanted, he didn't even bring his paddle down, he

16   just left his paddle up in the air, right?

17   A.  I don't know that I was there.  May have heard that story,

18   but I don't recall being there.

19   Q.  But at any rate, lots of stories were going around --

20   A.  Yes.

21   Q.  -- about how much he was spending and how much he was

22   buying?

23   A.  Yes.

24   Q.  And it was millions of dollars that he was spending buying

25   wines; is that right?

1   A.   That's what I heard.

2   Q.   And you had no reason to believe otherwise?

3   A.   That's correct.

4   Q.   And he started showing up at places where wines were being

5   drunk and he would bring wines; is that right?

6   A.   At the dinners I attended, he mostly bought wine in New

7   York, mostly bought wines off the list.  His practice in Los

8   Angeles I have heard was different, but I don't know that from

9   my own experience.

10  Q.   So you didn't go to dinners with him in Los Angeles?

11  A.   No.

12  Q.   When you went to dinners with him here, he would buy from

13  the list that was available in the restaurant?

14  A.   Yes.

15  Q.   And spent fairly lavishly?

16  A.   Yes.

17  Q.   Were other people invited to these dinners that were

18  recognized people within the wine collector community?

19  A.   Yes.  There were usually, well, I only attended two or

20  three dinners, but I'd say eight to ten people.  Allen Meadows

21  attended one or two of those, whom I've mentioned, the

22  journalist, and other collectors, yes.

23  Q.   Allen Meadows is an important person in the wine community,

24  isn't he?

25  A.   He's a respected journalist, yes.

DCDLKUR4                    Barzelay - cross

1   Q.  He tastes wines and writes about what he tastes?

2   A.  Yes.

3   Q.  And if you're going to be a player in that community, he'd

4   be one of the people that you'd want to get close to; is that

5   right?

6   A.  I would suppose, yes.

7   Q.  And Mr. Stott that you mentioned would also be someone that

8   was a player, right?

9   A.  He was also someone who was buying a great deal of wine,

10  yes, constantly.

11  Q.  In fact, Mr. Stott and Mr. Kurniawan would often be on the

12  opposite bidding side of pieces, would they not?

13  A.  That's correct, yes.

14  Q.  And sometimes the prices of certain items would go high

15  because those two gentlemen would be the ones in the game; is

16  that fair?

17  A.  That's fair, yes.

18  Q.  And you remember the Doris Duke auction, for example?

19  A.  Yes.

20  Q.  That was one example where there was some fierce bidding

21  that went on between Mr. Stott's interests and Mr. Kurniawan's

22  interests; is that right?

23  A.  I don't recall specifically.  I know they both bought a lot

24  of wine at that particular auction.

25  Q.  And that auction was unique because there was some very,

1   very rare wines that were being made available for sale,

2   weren't they?

3   A.   That's correct, yes.

4   Q.   There was a case of '34 La Tache, wasn't there?

5   A.   I don't recall '34 La Tache.   There was a great deal,

6   multiple cases of '34 Romanee-Conti.   That was one of the

7   centerpieces of that auction.

8   Q.   And Mr. Kurniawan ended up buying some of those?

9   A.   Yes.

10  Q.   So this dinner at Cru that you told us about in October of

11  2005, that would be one where what Mr. Kurniawan did was just

12  bought wine from the menu?

13  A.   As best I recall, yes.

14  Q.   And then he paid for the wine, he paid for the dinner, he

15  paid for everything?

16  A.   Yes.

17  Q.   How many people were at that dinner?

18  A.   Probably eight, maybe ten.

19  Q.   And some pretty wealthy people, weren't there?

20  A.   I believe so, yes.

21  Q.   None of them got their wallet out, it was his American

22  Express card that paid for it?

23  A.   That's my recollection, yes.

24  Q.   Do you sometimes take people out to lunch and dinner in

25  terms of what you're doing as your wine business?

DCDLKUR4                          Barzelay - cross

1    A.  Sometimes, yes.

2    Q.  And important influential people, are those the sort of

3    people you might be willing to buy dinner for?

4    A.  No, that's not what this business is about.

5    Q.  The people whose business you want to attract would be,

6    those would be the sort of people --

7    A.  No, they would be sommeliers in restaurants predominantly.

8    Q.  Those are people who would be your customers?

9    A.  Customers, yes.

10   Q.  You said you had a conversation with Mr. Kurniawan clear

11   back in 2004 at the top 100 wine event?

12   A.  That's correct.

13   Q.  And you knew at that point in time that he'd really only

14   been on the scene of the rare wine world for about a year, is

15   that right, maybe two?

16   A.  I had only known of his being on the scene for that period

17   of time, yes.

18   Q.  It was there was no question he was a fairly recent entry

19   into this scene?

20   A.  Yes, that's correct.

21   Q.  And he was a young man.  He was quite a young man then,

22   wasn't he?

23   A.  He was still in his late twenties, I believe, yes.

24   Q.  So it hadn't even been that long that he had been legal to

25   drink, even in Los Angeles.

1          So do you consider yourself an expert at being able to

2    spot fraudulent bottles?

3    A.  I think expert is a term of art in the law as I understand

4    it.  I'm reasonably good at it but I don't necessarily -- what

5    such a knowledge I have is pretty much confined to Burgundy.

6    It doesn't extend to Bordeaux.  And I don't pretend to be

7    completely knowledgeable on the subject.  It's a very

8    complicated subject.

9    Q.  And, in fact, it's pretty dangerous to start to think you

10   know it all, isn't it?

11            MR. HERNANDEZ:  Objection.

12            THE COURT:  If you want to answer, you can answer.

13   A.  Yes.

14            THE COURT:  I think our experience is for everybody.

15   Q.  But what you were getting from Mr. Kurniawan at that point

16   was I know it, I can do it, right?

17   A.  I would say, yes.

18   Q.  Didn't that make you just kind of shake your head a little

19   bit and say, boy, he's looking for trouble?

20   A.  No, that wasn't my reaction.  I mean I did, I did wonder.

21   I wondered how what the -- how deep his knowledge was, where he

22   had gained it, what the basis of it was, yes.

23   Q.  You knew people like Allen Meadows, how many years had

24   Meadows been out doing this?

25   A.  A very long time, probably 30 years.

1   Q.   You knew people like Michael Egan?

2   A.   I don't know.

3   Q.   Mr. Edgerton, for example?

4   A.   I'm aware of who he is, but I don't.

5   Q.   But at least Meadows is somebody you knew had done it a

6   very, very long time?

7   A.   Yes.

8   Q.   And what you did know about Mr. Kurniawan is that his

9   palate was very good, right?

10  A.   He did seem to have an excellent palate, yes.

11  Q.   So he was able to taste things and he could do blind

12  tastings and tell you what you they were?

13  A.   I did not experience that.  I heard stories about that, but

14  I did not experience that.

15  Q.   But that was part of what had sort of elevated him into the

16  recognized world, if you will, was it not?

17  A.   I don't know of my own knowledge.

18  Q.   In fact, there was another conversation you told us about

19  between the two of you where there were two Romanee-Conti wines

20  of the same vintage but with different labels on them -- do you

21  remember you were testifying about that before -- and

22  Mr. Kurniawan raised a question why are we looking at two

23  different labels; is that right?  Is that what happened?

24        MR. HERNANDEZ:  Object.  I don't think that's the

25  right wine.

1        THE COURT:  If you recall.

2   Q.  Am I picking the wrong wine?  You remember an event with

3   you and Mr. Kurniawan where there two same year vintages of the

4   same wine with different labels?

5   A.  I'm not sure exactly what you're referring to.

6   Q.  Let me see, look closer at my notes.

7        THE COURT:  Only if you're aware.

8   Q.  Maybe it was a Roumier?

9   A.  Are you referring to what I said earlier about him asking

10  me about certain labels, yes.  We were not comparing side by

11  side, but he had I believe sent me a picture of a Roumier

12  label.

13  Q.  And basically said what's -- how can this be?

14  A.  Right.  Is this -- have you seen this before?

15  Q.  As if this looks like it's fake to me.

16       And you explained it to him because you knew the

17  difference, right?

18  A.  On that particular occasion, actually, as I recall, I did

19  not respond.

20  Q.  So you didn't tell him this was a negociant and that's why?

21  A.  It was after the point where I had come to question why he

22  was asking me these things.

23  Q.  But it seemed to indicate that maybe his expertise was not

24  quite as good as he expressed it as being, wouldn't it, if he

25  didn't know that that was a negociant label and that was

DCDLKUR4                          Barzelay – cross

1    something that exists?

2              MR. HERNANDEZ:  Objection.

3              THE COURT:  Sustained.

4              Did you have that sense?

5              THE WITNESS:  No, that was not my conclusion.

6    Q.  Okay.  Now, you helped to plan the Don Stott dinner; is

7    that right?

8    A.  In January of 2007, the Roumier tasting, yes, that's right.

9    Q.  You've testified at some length about that.  I'll try not

10   to belabor it too much.  But --

11             THE COURT:  Let me stop for a minute.  Did you want a

12   break -- we're going to end at two -- or do you want to keep

13   going?  Keep going.  Anybody need a break?  No.

14             All right.  So maybe we'll take five minutes.  Now

15   you'll find back in the jury room we've got a little snack or

16   something to tide you over, but we will end at 2 o'clock.

17             (Continued on next page)

18

19

20

21

22

23

24

25

DCDLKUR4

1          (Jury not present)

2          THE COURT:  So my guess is this could turn into ten

3    minutes or so because there is a little something for them back

4    there.

5          MR. HERNANDEZ:  Okay, Judge.  Would you like us to

6    give you an update at this time?

7          THE COURT:  Yeah, that would be great.

8          MR. HERNANDEZ:  So Mr. Barzelay is the last witness we

9    have for the day, so we won't have another witness.  And then

10   on Monday we expect to rest.  We think we're going to get our

11   case in entirely on Monday.

12         THE COURT:  Would you have another witness on Monday?

13         MR. HERNANDEZ:  We do have I believe two more

14   witnesses on Monday.  And then there are one or two more small

15   matters that I want to talk to Mr. Mooney and Verdiramo about

16   that I think we can do by stipulation.  If not, we might have

17   two custodians to get a couple of documents in that we think

18   are relevant but we're on track.  We expect to rest on Monday.

19         And then we want to raise the issue if there's going

20   to be a defense case and whether the defendant is going to

21   testify, when we're going to get notice, 3500, and those sorts

22   of things.

23         MR. MOONEY:  We have Mr. Egan.

24         THE COURT:  Hold on one second.

25         Those two witnesses that you have on Monday, are they

1    long or short?

2              MR. HERNANDEZ:  One is long.  Mr. Egan is the expert,

3    the wine authentication expert, but not terribly long.  And the

4    other one is probably maybe a half-hour or so.  It's the ICE

5    agent to testify about immigration matters.

6              MR. MOONEY:  That might be a little problematic.  We

7    have Mr. Collins scheduled to come in on Monday so we've got

8    him available first thing Tuesday morning based upon what we

9    talked about before.  We may have one or witness, another

10   expert that we're trying to make arrangements to get up here on

11   Monday, and that's all we anticipate.

12             MR. HERNANDEZ:  Okay.  So just so that we're clear,

13   two witnesses.

14             MR. MOONEY:  We may wrap up, we may be done Monday

15   with time left over, but I don't have Mr. Collins physically

16   here until Tuesday morning.

17             THE COURT:  Okay.  So we'll have a charge conference

18   or something like that.  So your witnesses are scheduled for

19   Tuesday.

20             MR. MOONEY:  That's correct.

21             THE COURT:  One or both.

22             MR. MOONEY:  That's correct, your Honor.

23             THE COURT:  Okay.  So that will work.

24             MR. MOONEY:  Okay.

25             THE COURT:  So if we have open time on Monday say in

DCDLKUR4

1    the afternoon, we will have our charge conference.

2              MR. MOONEY:  Perfect.

3              THE COURT:  Then we'll have your witnesses.  Then

4    we'll talk at the charge conference about when the summations

5    will be depending on how long your witnesses are going to --

6              MR. MOONEY:  Right.

7              THE COURT:  -- really.  If your witnesses were

8    finished in the morning, for example, we'd go right to

9    summation.

10             MR. HERNANDEZ:  Okay.

11             THE COURT:  Is that fair?

12             MR. HERNANDEZ:  That sounds good.

13             Is Mr. Mooney comfortable putting on the record that

14   the defendant is not going to testify?  Because that makes a

15   big difference.

16             THE COURT:  Well, yeah, I think he suggested that.  I

17   always give the defense some latitude in that regard.  He

18   probably has to discuss that more with Mr. Kurniawan.

19             (Continued on next page)

20

21

22

23

24

25

1           (In open court; jury not present)

2           MR. MOONEY:  One of the things I always have to do

3   is I always have to ask him and let him make the final

4   decision.

5           THE COURT:  And you should do that in this case.  So

6   we won't bind you to what--

7           MR. MOONEY:  Right.  I think it is highly unlikely.

8           THE COURT:  Okay.  Whatever.  But he has the right to

9   make that decision, obviously.

10          MR. MOONEY:  Absolutely.

11          THE COURT:  And, indeed, I would urge you to discuss

12  it with him at great length, or whatever length you think is

13  appropriate.

14          MR. MOONEY:  All we can do is make our

15  recommendations.  Some people follow them and some people

16  don't.

17          MR. HERNANDEZ:  So in the event that the defendant

18  does decide to testify, it will be on Tuesday, not Monday,

19  Judge?

20          MR. MOONEY:  That's true.

21          MR. HERNANDEZ:  Is that fair to say?

22          MR. MOONEY:  Yes.

23          THE COURT:  All right.  Just to make sure

24  Mr. Kurniawan has heard, we're having a discussion about the

25  balance of the trial, when it's likely to end.  It's our sense

DCDBKURT5                    Trial

1   that the government's case will conclude on Monday.  And then

2   your defense case will start on Tuesday.  And in that context,

3   counsel, your counsel, has indicated that the question about

4   whether or not you testify is solely your decision -- obviously

5   speaking with counsel -- and he's going to let us know about

6   that probably on Monday.

7              THE DEFENDANT:  Thank you, your Honor.

8              THE COURT:  Okay?  Fair?

9              All right.  I'll be back in a minute.

10             (Recess)

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2          THE COURT:  Please be seated.

3          THE DEPUTY CLERK:  Mr. Barzelay, I remind you you're

4   still under oath.

5          THE WITNESS:  Yes, thank you.

6   BY MR. MOONEY:

7   Q.  Mr. Barzelay, when we stopped, we were beginning to talk

8   about the Don Stott dinner.

9          Do you recall that dinner?

10  A.  Yes, the dinner I assume you're speaking of in January of

11  2007.

12  Q.  And at that dinner, a good part of the wines that were

13  tasted had come from the purchases from The Cellar I and Cellar

14  II auctions at Acker Merrall.  Is that right?

15  A.  That's correct.

16  Q.  And I think you told us that of the 15 bottles that were

17  there, 11 of them were bottles that were sourced in one way or

18  another to Rudy?

19  A.  Eleven or 12, yes.

20  Q.  And you told us that from that, you thought five or six

21  were fakes?

22  A.  No, six or seven.

23  Q.  Six or seven?

24         Now, when you originally met with Stanley Los, an

25  investigator for Mr. Koch -- do you recall that, meeting with

1  him?

2  A.  I recall meeting with him, yes.

3  Q.  And do you recall telling him the number of fakes that you

4  thought there were?

5  A.  I do not recall the substance of that.

6  Q.  Do you recall telling him that were four fakes?

7  A.  No.

8  Q.  Do you recall listing for him the '55 Roumier Musigny, the

9  '29 Bonnes-Mares, the '23 Bonnes-Mares, and the '45

10 Bonnes-Mares?

11 A.  I recall those wines were fake.  There were also, as I

12 recall, two bottles each that we tasted of the '55 and the '23.

13 So that could account for the difference in count.

14 Q.  Again, those wouldn't be part of the list of 11, would

15 they?  Those would be others?

16 A.  No, they would be part of that list.

17 Q.  I see.

18        So of the 15 wines that are listed on the program, not

19 all-- not 11 of those 15 or 12 of those 15 came from Rudy

20 because part of what he brought, part of what was there, were

21 double bottles.  Is that right?

22 A.  That's correct.  There were two wines where we tasted a

23 second bottle.  That would be listed once on the program.

24 Q.  So that was the '23 and the other was the '29?

25 A.  No, '23 and '55.

1    Q.  The '23 and the '55.  Okay.

2            So we have those four wines, but six different

3    bottles?

4    A.  Yes.  I think there may have been one other that fell in

5    that category, but, yes.

6    Q.  Then, subsequent to that, you had an opportunity to make

7    further examination of Mr. Stott's cellars.  Is that correct?

8    A.  That's correct.

9    Q.  And you found a good number of anomalies when you started

10   going through wines in his cellars.

11           Is that fair to say?

12   A.  Of bottles that he had purchased in The Cellar I and Cellar

13   II auctions, yes.

14   Q.  And other auctions.  Right?

15   A.  We were-- I was specifically looking at the bottles that

16   were purchased in that auction.  This was not a general review

17   of the cellar.

18   Q.  So when you were doing your examination, that was your

19   focus, was just that part of his cellar?

20   A.  He had asked me to do that because he wanted to return

21   bottles under the terms of the guarantee.

22   Q.  And you even tasted some of the wines that you found,

23   didn't you?

24   A.  We did.

25   Q.  Of the wines that you were looking at.

1    A.   Yes.

2    Q.   And in the course of doing that, you found even more

3    confusion, didn't you?

4    A.   I wouldn't say confusion.  I would say more fraudulent

5    bottles.

6    Q.   And didn't you then start finding buildings that looked

7    like they had fraudulent labels, but authentic wine?

8    A.   That was true at the dinner in January of 2007, yes.

9    Q.   And you found bottles with exactly the same labels that you

10   did not think were authentic labels.  One bottle would be not

11   real and the other bottle would be real.  Is that right?

12   A.   No, we found bottles that had labels that appeared

13   similar-- that appeared new and inauthentic and similar to

14   those on the bottles that were not real, but that nonetheless

15   when tasted the bottles tasted real.

16   Q.   And you wrote about this back in 2012, didn't you?

17   A.   Yes.

18   Q.   And you wrote about it in your article about

19   Mr. Kurniawan?

20   A.   Yes.

21   Q.   Do you recall in that article writing the following:  "The

22   labels on the fraudulent bottles --

23              MR. HERNANDEZ:  Objection.

24              THE COURT:  I'll allow it.

25   Q.   "The labels on the fraudulent bottles were surprisingly

1    pristine for wines that were ostensibly 50 to 85 years old, and

2    there were other label and capsule issues; however, the

3    authentic bottles looked much the same (in other words, in this

4    case it wasn't that the fakes looked real; rather, the real

5    bottles looked fake)."

6         Is that what you wrote?

7    A.   That is what I wrote.  That's a part of what I wrote, yes.

8    Q.   Now, the next time after the Stott dinner that you had an

9    opportunity to sample wines that were supplied by

10   Mr. Kurniawan, by Rudy, was the Per Se dinner?

11   A.   The series of -- yes.  The Romanee-Conti tasting.

12   Q.   And that's over three days.  Right?

13   A.   Yes.

14   Q.   Because even tasting, you're not going to do 70 wines in

15   one sitting.

16   A.   Sometimes we do.

17   Q.   Okay.  Not as good an idea.  Right?

18   A.   No.

19   Q.   And Rudy supplied a pretty good number-- how many bottles

20   of wine did he supply?  Do you remember?

21   A.   I don't recall.  Of the wines that we actually used, it

22   was, I'm guessing, somewhere around a dozen, but I'm not

23   certain.  There were also bottles that he supplied that we did

24   not use.

25   Q.   Right.

DCDBKURT5                    Trial

1   A.  I'm just not sure of the exact number.

2   Q.  So by the end-- but by the end of the dinner, there were

3   full bottles left over?

4   A.  Yes.

5   Q.  And these were pretty good bottles of wine?

6   A.  Yes, presumably.

7   Q.  These are not the kinds you're just going to stick on the

8   shelf someplace.  You sort of want to watch out for these?

9   A.  Well --

10  Q.  They're expensive?

11  A.  They're expensive bottles of wine, yes.

12  Q.  So after the dinner you've got a number of expensive

13  bottles of wine that belong to Rudy?

14  A.  Yes.

15  Q.  And those bottles are going to be returned to him?

16  A.  That's correct.

17  Q.  And then he also asked for his empties and there were,

18  what, eight or ten of those?

19  A.  Actually, he just asked for his empties initially.  He

20  didn't ask at all about the full bottles.

21  Q.  But the e-mail communication you had with him talks about

22  the full and the empties.  Right?

23  A.  In one of the e-mails that I just read, as you'll note, it

24  asks do you also-- it refers to the full bottles.  It was the

25  first --

DCDBKURT5                    Trial

1   Q.  It says "the bottles."

2   A.  I was reminding him that he had those as well.

3   Q.  Well, it didn't say "the empties."  It just said "the

4   bottles," didn't it?

5   A.  I'd have to look.

6          THE COURT:  You have to look at the exhibit.

7          MR. MOONEY:  Let's pull that up and take a look, shall

8   we?

9          THE COURT:  This is the first of two methods of

10  shipment, Mr. Mooney, remember?

11         MR. MOONEY:  Well, I think it's just before that.  I

12  think the first one in the series is 13-26.

13  Q.  Okay.  Now, the very bottom, if we look at this e-mail

14  thread--

15         MR. MOONEY:  Let's highlight again the very bottom

16  parts.

17  Q.  So this is the beginning of the thread.  This is where

18  you've invited-- you told him where and when to be.

19  A.  That's correct.

20  Q.  Okay.  So that's important in something like this, to know

21  where and when to be there.

22  A.  Absolutely.

23  Q.  Okay.  So you're giving him that information.

24         MR. MOONEY:  So now let's stop that and let's go back

25  up to the next.  The one above that.  No, the next one above--

1  no, no, before you get to that there's one more.  Just below

2  that.

3          THE WITNESS:  That's all part of the same.

4          MR. MOONEY:  There we go.  We'll do both of them.

5  Okay.

6  Q.  Then what you get is you get "Thanks for the great

7  weekend."

8          And then, above that, he says "Can you please arrange

9  to have my bottles of RC shipped to" and then gives the

10  address.  Right?

11  A.  Yes.

12  Q.  He doesn't say which bottles he's talking about.

13  A.  That's correct, in this e-mail.

14  Q.  Okay.  So let's go up then.  And then the next thing we get

15  after that is you say "Will do.  I assume you want full bottles

16  (backups that were not used) shipped to the same address as

17  well as the empties?"

18  A.  That's correct.  That's the e-mail I was referring to where

19  I was reminding him he had full bottles as well as empties to

20  be returned.

21  Q.  Okay.  And that's from you to him?

22  A.  Yes.

23  Q.  So when you-- but his e-mail to you just said Send me my

24  bottles of RC?

25  A.  That's correct.

1   Q.  Okay.  And then you-- because part of the thing is you're

2   going to -- you're not going to pack them all together and use

3   the priority fast shipping for both the full bottles and the

4   empties, are you?

5   A.  That's correct.

6   Q.  Now, you need to use overnight mailing for the full bottles

7   in order to protect the contents.  Right?

8   A.  Yes.

9   Q.  You can't put those in a truck and have them moving across

10  the country in the hot sun?

11  A.  If it were refrigerated, you could.

12  Q.  But that's more-- you're more worried about the shipment

13  that way.  Right?

14  A.  Yes.

15  Q.  So the fast way to do it is to do it overnight?

16  A.  The fast way.

17  Q.  And even then you were concerned about the weather.  You

18  said I don't want to send it to you right now because it's too

19  warm?

20  A.  The full bottles, yes.

21  Q.  The full bottles, right.

22  A.  Yes.

23  Q.  But then you sent the others out by ground.

24  A.  That's correct.

25  Q.  And later on you get an e-mail from him asking, hey, you

DCDBKURT5                    Trial

1    know, it's May 30th and I haven't seen my bottles.  Right?

2    A.  Yes.

3    Q.  But at that point in time, you still hadn't even sent the

4    full bottles?

5    A.  That's correct.

6    Q.  And he doesn't say Where are my empties?  He says Where are

7    my bottles?  Right?

8    A.  Yes.

9    Q.  Do you remember how many full bottles there were?

10   A.  I do not.  Probably-- no.

11   Q.  You say "bottles."  I take it that means there was more

12   than one.

13   A.  Yes, I would-- as best I can recollect, there was somewhere

14   in the neighborhood of a case.

15   Q.  A case?

16   A.  It could have been more or less.

17   Q.  If somebody had 12 of your bottles of Romanee-Conti, would

18   you want them?

19   A.  Absolutely.

20   Q.  Okay.  And then I think you said-- when the people drank at

21   this big Per Se dinner, that one went off without a hitch and

22   everything tasted great?

23   A.  Not everything tasted great, but it went off without a

24   hitch, yes.

25   Q.  Okay.  Everything went off as it should be?

DCDBKURT5                    Trial

1   A.  Yes.

2   Q.  And one of the-- one of the highlights of that dinner was,

3   in fact, the wine that had been supplied by Rudy.  Isn't that

4   correct?

5   A.  Yes.  The highlight, I would say.

6   Q.  The highlight, the number one, the best, the crème de la

7   crème, was the '45 Roumier.  Right?

8   A.  Yes, absolutely.

9   Q.  And he supplied that?

10  A.  Yes.

11          MR. MOONEY:  In fact, could we put the ELMO on for a

12  minute?

13  Q.  I show you what's been previously marked as Defense Exhibit

14  B-31.

15          Does that look like the '45 Roumier?

16  A.  It does.

17  Q.  Is your name on there someplace?

18  A.  I presume it is.  I recall signing it.

19  Q.  Okay.

20  A.  I don't think I can see it on the small screen, but it

21  should be there.

22  Q.  And this was one of the bottles that you shipped back to

23  Mr. Kurniawan, is it not?

24  A.  That's correct.

25  Q.  Yes.  And this bottle has some pretty important signatures

1   on it, too, doesn't it?

2   A.   It has the signatures of all of the people who attended,

3   yes.

4   Q.   Including Christophe Roumier?

5   A.   No.

6   Q.   Aubert de Villaine?

7   A.   Aubert de Villaine, yeah.

8   Q.   Aubert de Villaine.   Roumier would not have been invited to

9   this one, okay, because this is the DRC.

10          So that would be a bottle you would expect he would

11   want back.   Right?

12   A.   Yes.

13   Q.   And if that had been your bottle, you would want it back.

14   Right?

15   A.   That's correct.

16   Q.   Now, additionally, after that one of the things that you

17   tried to do is to figure out what people had paid for some of

18   the wines, for the wines that they had supplied.   Is that

19   right?

20   A.   That's correct.

21   Q.   And that's in May of 2007.   And at that time you asked Rudy

22   what the sources were on the bottles that he had supplied to

23   that dinner?

24   A.   No, we asked -- starting before the dinner, it was the same

25   question, what his cost had been, not where the bottles came

 1   from.

 2   Q.  And he was never able to provide you those cost figures,

 3   was he?

 4   A.  That's correct.

 5   Q.  And he told you that he just didn't have very good

 6   records?

 7   A.  He did.

 8   Q.  And you knew that he had been just gluttonously buying wine

 9   for the years preceding?

10           MR. HERNANDEZ:  Objection.

11           THE COURT:  If you can answer the question.

12   A.  He had been buying in large quantities, yes.

13   Q.  Okay.  So in a way you weren't surprised that he couldn't

14   specifically give you information, but in other ways you

15   thought, gee, he should be keeping track of this.  Is that

16   fair?

17   A.  I thought whether or not he had specific records, that he

18   had a pretty good memory for what he bought where and what he

19   paid for it.  And so I did expect more information than I got.

20   Q.  He didn't have it on that occasion, did he?

21   A.  No.

22   Q.  And there were no questions about those.  Right?

23   A.  He didn't supply it.

24   Q.  He didn't supply it.

25           And then, almost a year later, we have the incident

1    with regards to the Ponsot wines?

2    A.  That's correct.

3    Q.  And we have a catastrophic number of wines that purport to

4    have come from Ponsot Domaine that are just obviously fakes.

5    Right?

6    A.  That's correct.  A large number.

7    Q.  And it creates this-- you start to get the ball rolling

8    when you call up Mr. Ponsot and you tell him there's a problem

9    here.  And he comes all the way out to New York.  Right?

10   A.  He did, yes.

11   Q.  All right.  And nobody ever disagrees that there's this big

12   stack of false wine there.  Right?

13   A.  That's correct.

14   Q.  So then you go to a lunch the next day.  And at this lunch

15   is Mr. Ponsot, whose wines those purported to be, and

16   Mr. Kapon, who is the person who Mr. Kurniawan has been doing

17   business with in the auctions, and yourself and Mr. Kurniawan.

18            And Mr. Kurniawan was the one that put the wine in

19   that auction, is that right, those Ponsot bottles?

20   A.  Yes, correct.

21   Q.  If you were Mr. Kurniawan going to that lunch, wouldn't you

22   be embarrassed?

23            MR. HERNANDEZ:  Objection.

24            THE COURT:  Sustained.

25   Q.  You said that he looked nervous, he looked fidgety.  Is

DCDBKURT5                    Trial

1    that right?

2    A.   That's correct.

3    Q.   Could he have just been ill at ease and very, very

4    embarrassed?

5            MR. HERNANDEZ:  Objection.

6            THE COURT:  Sustained.

7    Q.   You knew he was from Indonesia, didn't you?

8    A.   I was told he was from Indonesia.  I have no knowledge of

9    where he's from.

10   Q.   Rudy didn't tell you at that lunch, Oh, what are you

11   worried about, these wines are fine, did he?

12   A.   No.

13   Q.   But he didn't provide the source of where they had come

14   from?

15   A.   He did not.

16   Q.   And just as he had on previous occasions, he didn't provide

17   information?

18   A.   I'm not sure I understand --

19   Q.   Strike that.

20           And to this day, as you sit here, you really don't

21   know where those Ponsot wines came from, do you?

22   A.   I do not.

23           MR. MOONEY:  No more questions.

24           THE COURT:  Okay.  Any redirect?

25           MR. HERNANDEZ:  Yes, your Honor.

1    REDIRECT EXAMINATION

2    BY MR. HERNANDEZ:

3    Q.  Mr. Barzelay, do you remember being asked some questions

4    by Mr. Mooney about something you had written about having

5    found bottles with fake labels, but authentic wine inside of

6    them?

7    A.  Yes.

8    Q.  Do you remember those questions?

9    A.  Yes.

10   Q.  You had written about that before coming here today at some

11   point?

12   A.  I had written that in the blog article that Mr. Mooney

13   referred to, yes.

14   Q.  And why had you written that observation or why had you

15   noted that you found authentic wine with fake labels on it?

16   A.  Well, I was trying in that article to be as comprehensive

17   as I could of my understanding of what had happened with all

18   these fake wines and to fully report to the reader as many of

19   the impressions as I could that I had had.

20   Q.  You were also asked some questions about a statement that

21   Rudy Kurniawan made about a lack of keeping records.

22           Do you remember that?

23   A.  Yes.

24   Q.  It was something -- in sum and substance, Kurniawan said he

25   didn't keep records.  Correct?

1   A.  I'm not sure I would go that far, but that he didn't have

2   any organized set of records.

3   Q.  I see.

4           So it wasn't that he didn't have them; just they

5   weren't organized?

6   A.  The impression I got was that to the extent he had records

7   of purchases, they were not organized.  But I didn't get any

8   sense that I could tell you of what he might have kept or not

9   kept.

10  Q.  Well, that's my question.  Whatever it is he told you about

11  his recordkeeping system, or lack of records, you don't have

12  any personal knowledge to know whether that's true or not.

13  Right?

14  A.  That's correct, I do not have any personal knowledge.

15  Q.  You haven't been to see his records ever, have you?

16  A.  No.

17  Q.  You are just going off of what he told you?

18  A.  That's correct.

19  Q.  And a couple final questions.

20          You were shown that bottle of '45 Romanee-Conti that

21  everyone had signed from the tasting.

22  A.  Yes.

23  Q.  Is that one of the bottles that Mr. Kurniawan got back?

24  A.  Yes, it is.

25  Q.  One of the empty bottles?

1   A.   Yes.

2   Q.   And that's a special bottle, isn't it?

3   A.   It certainly is, yeah.  It was a very special occasion and

4   a privilege to drink that one.

5   Q.   Did Kurniawan ask just for the '45 back or did he ask for

6   all of the bottles?

7   A.   He asked for all of the empty bottles that he had supplied.

8   Q.   And were all of the bottles that he supplied special

9   bottles like that '45?

10  A.   Not at all.

11  Q.   Can you explain more?

12  A.   I mean, he had supplied, and we had drunk, a number of

13  bottles, as I say, from off vintages, wines that were not by

14  any stretch of the imagination great wines.  We were tasting

15  them because we wanted to be as inclusive as possible, but many

16  of those poor vintage wines had given up the ghost a long time

17  ago.

18  Q.   And were those off-vintage wines signed by all of the

19  participants like that '45?

20  A.   There was no other bottle that was signed by the

21  participants.

22  Q.   Thank you.

23          MR. HERNANDEZ:  No further questions.

24          THE COURT:  Okay.  We'll excuse the witness and that

25  will be it for today.

1              (Witness excused)

2              THE COURT:  Let me just go over a few things with the

3      jurors.  Keep your notes in your seats.

4              And, Noam, I want to make sure that they're secured

5      over the weekend.

6              And then remember for over the weekend these

7      instructions:  First, do not talk to each other about the case

8      or anyone who has anything to do with it until the end of the

9      case, when you go to the jury room to decide, deliberate, on

10     your verdict.

11             Second, do not talk with anyone else about the case or

12     about anyone who has anything to do with it until the trial has

13     ended and you have been discharged as jurors.  And you remember

14     talking is in the broadest sense.  Social media, e-mailing,

15     texting, Tweeting, et cetera, is included.  And anyone else

16     includes members of your family and your friends and embraces

17     social media.  So you can tell them that you're a juror in a

18     case, but don't tell them anything else about the case until

19     after you've been discharged by me.

20             Third, do not let anyone talk to you about the case.

21     If someone were to do that, please report that to me or to

22     Christine immediately.

23             Fourth, do not read any news or internet stories or

24     articles, blogs, et cetera, or listen to any radio or TV or

25     internet reports about the case or about anyone who has

DCDBKURT5                        Barzelay - redirect

1    anything to do with it.

2              Fifth, do not do any type of research or any type of

3    investigation -- for example, on the internet -- about the case

4    on your own.

5              So just to bring you up to date schedulewise, we're

6    very much on the schedule that I described on Monday.  My

7    expectation is that certainly before Thursday, Thursday at the

8    latest, I will give you the instructions and we'll have the

9    summations and you'll begin your deliberations.

10             And it could even be a little bit before Thursday.

11   We'll see.

12             So have a great weekend and I thank you for your

13   attention.  See you on Monday.

14             (Jury excused)

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury not present)

2          THE COURT:  Okay.  Yes?

3          MR. HERNANDEZ:  Since your Honor isn't taking written

4     submissions, I want to make an oral application at this point.

5     We think it's too late for the defense to provide notice that

6     they're going to call potentially a handwriting expert, and

7     here are the reasons why.  The only documents, one document,

8     it's 36-1, it's the note that Laurent Ponsot said that the

9     defendant gave him with --

10         THE COURT:  The two phone numbers?

11         MR. HERNANDEZ:  -- the two phone numbers.

12         THE COURT:  Correct.

13         MR. HERNANDEZ:  That was produced in discovery from

14    the very beginning.  If anyone has read any article, I'm sure

15    Mr. Verdiramo and Mr. Mooney have, about this case, those

16    numbers are mentioned by Laurent Ponsot in every article about

17    it.  It's no secret that we were going to bring this fact out.

18    And to be given notice now that maybe an expert, whose name we

19    don't know, might be called on Tuesday, we will not be able to

20    call an expert to rebut that, to analyze the report.

21         So we're going to make an application at this point to

22    preclude the defense from making this eleventh-hour motion for

23    an expert.

24         MR. MOONEY:  Your Honor, we didn't get the 3500

25    materials until just before trial, as the Court knows --

1            THE COURT:  Well, you got it a week ago.

2            MR. MOONEY:  A week ago.

3            THE COURT:  Right.

4            MR. MOONEY:  And there are three different versions

5    that Mr. Ponsot had told with respect to what happened with the

6    note throughout -- at different times.  At one point in time,

7    he said that he wrote it down.  At least that's what -- and we

8    have nothing that comes directly from him.  All we get is what

9    other people said.  So at one point he I wrote --

10            THE COURT:  In his testimony?

11            MR. MOONEY:  Not in his testimony here in court, but

12    in the materials that we received previously.  So there was

13    that version.

14            There was another version that said that Mr. Kurniawan

15    supplied it.

16            And then there was the third version, which is what we

17    got in court, was that Mr. Kurniawan wrote it down at the time

18    in front of him.  And that's why when he said that, you know, I

19    assured that.  So we immediately went back, because we looked

20    at this and said, Wait a minute, this doesn't look right,

21    because we had been seeing --

22            THE COURT:  Well, what's not right?  Where do you

23    think the numbers came from?

24            MR. MOONEY:  We don't think that this-- this doesn't

25    look anything -- that doesn't look anything like

DCDBKURT5                    Barzelay - redirect

1    Mr. Kurniawan's handwriting.

2              THE COURT:  You think Mr. Ponsot made up those

3    numbers?

4              MR. MOONEY:  I don't know who wrote those numbers

5    down.  If Mr. Ponsot wrote the numbers down and Mr. Kurniawan

6    told him to write them down, he could have written them down

7    wrong.  It's important whether Mr. Kurniawan wrote the numbers

8    or not.  And Mr. Kurniawan --

9              THE COURT:  So here's the thing.  You'll have to

10   submit letter briefs.  The government can submit something

11   today and you can submit something tomorrow, after you've read

12   it, and I'll take a look at it.

13             MR. MOONEY:  Okay.

14             MR. HERNANDEZ:  Judge, just to correct something,

15   this was not produced as 3500 material.  That's why there's an

16   RK stamp.  There's only two Indonesia numbers in the whole

17   discovery.

18             THE COURT:  I get it.

19             MR. MOONEY:  We don't know what that means.  It

20   comes-- it's just there.  It's one of three hundred-- it's one

21   of six hundred thousand documents with an RK number.

22             MR. HERNANDEZ:  There's an index that says where it

23   came from.

24             THE COURT:  Okay.  Okay.  So let's have a short letter

25   application with authorities.  It is kind of late in terms of

DCDBKURT5                    Barzelay - redirect

1   experts, but you'll see what your authorities say.  And then

2   you could submit that -- you've got plenty of time today -- by,

3   say, 7 p.m.  You can fax for that purpose.  And then we'll have

4   Mr. Mooney respond by tomorrow.  It should be easily done by

5   midday, right?  Because you already know what you're going to

6   argue, but you'll see that.  So let's say 2 o'clock from you,

7   Mr. Mooney.

8            MR. MOONEY:  Okay.

9            THE COURT:  And the fax number for this purpose is

10  212-805-6717.

11           And you might spend a couple minutes, too, and see if

12  you can work this out without an application with Mr. Mooney.

13  I don't know if there's some possibility to come up with a

14  stipulation that might cover this topic.

15           MR. VERDIRAMO:  Judge, can I just repeat that number

16  back to make sure we have it correctly?  212-805-6717?

17           THE COURT:  Correct.

18           MR. VERDIRAMO:  Thank you, Judge.

19           THE COURT:  Okay.

20           (Adjourned to December 16, 2013, at 9:00 a.m.)

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2    Examination of:                         Page

 3    WILLIAM KOCH

 4    Direct By Mr. Hernandez  . . . . . . . . . . 738

 5    Cross By Mr. Mooney  . . . . . . . . . . . . 752

 6    Redirect By Mr. Hernandez  . . . . . . . . . 780

 7    DAVID PARKER

 8    Direct By Mr. Hernandez  . . . . . . . . . . 790

 9    Cross By Mr. Mooney  . . . . . . . . . . . . 803

10    Redirect By Mr. Hernandez  . . . . . . . . . 808

11    ANTONIO CASTANOS

12    Direct By Mr. Facciponti . . . . . . . . . . 813

13    Cross By Mr. Mooney  . . . . . . . . . . . . 833

14    Redirect By Mr. Facciponti . . . . . . . . . 851

15    DOUGLAS E. BARZELAY

16    Direct By Mr. Hernandez  . . . . . . . . . . 853

17    Cross By Mr. Mooney  . . . . . . . . . . . . 881

18    Redirect By Mr. Hernandez  . . . . . . . . . 912

19                    GOVERNMENT EXHIBITS

20    Exhibit No.                          Received

21     33-2   . . . . . . . . . . . . . . .792

22     33-4   . . . . . . . . . . . . . . .796

23     29-9   . . . . . . . . . . . . . . .821

24     38-5   . . . . . . . . . . . . . . .823

25     38-6   . . . . . . . . . . . . . . .826
```

3-1 through 3-14  . . . . . . . . . . . . . 832

13-26   . . . . . . . . . . . . . .872

13-27   . . . . . . . . . . . . . .874