**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA        :

                                   12 Cr 376

                           :

       Plaintiff,               **DEFENDANT'S SENTENCING**

                           :     **MEMORANDUM AND**

     -vs.-                    **POSITION ON SENTENCING**

                           :     **FACTORS**

.
RUDY KURNIAWAN      :

                           :

        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Comes now Defendant by and through his attorneys Jerome H. Mooney and Vincent S. Verdiramo, and respectfully submits the following memorandum with respect to sentencing:

## INTRODUCTION

Following *United States v. Booker*, 543 U.S. 220, 2005, sentencing courts are relieved of exclusive dependence on the Sentencing Guidelines and are now mandated to consider all of the 18 U.S.C. §3553(a) "[f]actors to be considered in imposing a sentence." There are seven equally weighted factors, two of which – (4) and (5) – are devoted to the Federal Sentencing Guidelines. The remaining five factors focus on the individual characteristics of the Defendant and the unique factual circumstances of the offense committed. It is the unique role and responsibility of the Judge to weigh mercy, punishment, and societal needs and to pass a judgment that, to the maximum extent possible, meets all of these individual needs.

1

### CONSIDERATION OF SENTENCING FACTORS

(1)     <u>The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant</u>:

This factor has two parts.  It provides a look at the Defendant as an individual and at what actually took place leading to the conviction.

(A)     <u>The History and Characteristics of the Defendant</u>

Rudy Kurniawan was born of Chinese decent in Indonesia on October 18, 1976. Raised as a Christian in an Islamic society, his religion and ethnicity cast him as an outsider in the land of his birth.  Although his family was financially successful they were often subjects of discrimination and always lived with fear.  If anything, their wealth created additional isolation.  They lived in a protected compound away from the population.  Because of the dangers beyond their walls the family rarely ventured out. Rudy was away from this atmosphere for much of the time between ages 5 and 16, having been sent to attend school in Singapore.  This, of course, also meant that he spent most of his time away from his family.  And, even there, cultural diversity tends to split down ethnic lines, so the Chinese community is largely separate.  The experience was isolating.

Rudy came to the United States to attend school in 1993.  Prior to then, he had been to the United States only briefly on family vacations.  At the time he came for school he did not plan to stay in the United States.  He attended school first in Sacramento, but then transferred to California State University at Northridge, in the Los Angeles area, where he received a degree in accounting in 1996.

After graduation, Rudy's father wanted him to get work experience, so he did accounting for a number of small companies over the next few years.   Rudy lived with one of his brothers while he attended school and after graduation.  He and his brother were very close.  After very severe ethnic riots occurred in Indonesia in 1998 his mother came to the United States.  Rudy's father stayed in Indonesia to attend to business, but visited frequently.

His father died in 2000.  After the death of his father Rudy did not want to return to Indonesia.  His father had always been the strong stabilizing figure and his absence increased the fear of living in Indonesia.  He was not sure where he wanted to go, but did not like the fear and repression which the family was subject to in the homeland.  It was then, with his mother now living in the United States, that Rudy started to think about staying in the United States.

Rudy moved from his Pasadena address to a house in Arcadia that was purchased by the family for his mother, brother, and him.

Rudy was devastated when his brother committed suicide in 2002.  This was only a little more than a year after the loss of his father.  At this time Rudy had few friends beyond his brother.

Rudy filed a petition for amnesty.  His mother filed a similar application.  His mother's application was granted, but inexplicably, Rudy's was denied (without any explanation for the conflicting results.)

Rudy appealed from the denial of his application. While the appeal was pending Rudy moved giving him a new address, the Arcadia house that he shared with his mother. This address was known to the ICE and used by ICE for mail regarding the case. That

3

appeal was denied, but strangely, and to Rudy's great prejudice, notice of the denial was mailed **only** to the old Pasadena address.  Rudy never received it.  Rudy had (and has) other remedies regarding the denial of the appeal, but had he known of the denial, he would certainly have aggressively pursued further remedies, which may have been lost to him by virtue of his failure to further challenge the denial in a timely manner..

These remedies, however, are now largely mooted.  Rudy's conviction in the instant matter will make it virtually impossible for him to remain in this country.  It is anticipated that when released he will be deported to Indonesia.

(B)    <u>The Nature and Circumstances of the Offense.</u>

Rudy had little experience with wine prior to coming to the United States.  At a birthday celebration for his father in 1999, Rudy, then only 22, ordered a bottle of 1995 Opus One.  The waiter instead brought a bottle of the 1996, which vintage had just been released.  Over time, Rudy learned that older does not necessarily mean better for wine, and that there are many components to the taste of wine.  He enjoyed the taste and leaned that he had an unusual ability to discern subtle differences between one wine and another. He began to hone this skill by purchasing wines from a local dealer in the Los Angeles area and then tasting them, mostly at home.  He would open three or four bottles, taste and compare the wines, then return to them a day or two later and see if and how the taste had changed as the wine oxidized.

Rudy began buying wines of increasing quality and corresponding price.  Rudy started to attend wine tastings at the Red Carpet, a wine store in the Los Angeles area. The manager of the establishment noticed Rudy and invited him to some other tasting events.  Rudy, still in his early 20's, was the youngest person present at these events.

Soon the youngster became a prodigy as others began to note the sophistication of his palate.

> Kurniawan was a gifted taster, someone with not only a discerning palate but also a prodigious memory—a taste library in his head. He could peg some wines "double-blind," deducing their identities without knowing in advance that they were even among the group being served. He was soon making a splash in auction rooms, spending an estimated $1 million a month. Wallace, Benjamin, "Château Sucker", *New York Magazine*, May 13, 2012.

Rudy found that he enjoyed the recognition.  He had been elevated into a world that could normally only be entered by those whose financial success put them in the spotlight and allowed them to spend what to most people would be lavish amounts on conspicuous consumption of something completely unnecessary to their survival or wellbeing.

Rudy was different from the others in this club.  He was far younger, and although his family had wealth, he, himself, had not succeeded financially on his own merit.  Where he excelled was his palate.  He could taste things in a wine that very few could recognize, let alone quantify.  To be a member of this "club," he had to start buying wine.  He now entered the 'Wild West' of the rare wine world - the wine auctions.  "[I]n the moneyed stratosphere of hyperrare collectible wine, merely opening one's wallet is often lionized as an act of courage or virtue."  *Id.*

Rudy began to buy more wine.  He started in the relatively safe world of on-line auctions, but soon moved up to the frenzy of the real thing – the fast moving adrenalized world of lie auctions.  He bought high end wines (virtually all wines placed for auction are expensive by most people's standards), and he bought very expensive wines.  This put him head to head with other members of this rarefied club of older wealthier men.

At a 2002 charity auction in Paso Robles, California, he just kept bidding for a bottle of California Syrah until he won.  It appeared that once he started bidding for a bottle he did not know how to stop.

On September 10, 2005, Rudy bought a bottle of 1947 Ponsot Clos Saint Denis at an Acker Merrall and Condit ("Acker Merrall") auction.  In order to win he had to outbid Don Stott, a wealthy collector who would eventually buy wines sold by Rudy.

On March 15, 2008, Rudy once again came head to head with Don Stott over a bottle at auction.  This time it was a 1934 Ponsot Clos de la Roche.  Rudy paid $22,800 for this bottle.  This was only a month before the scheduled Acker Merrall auction in which Rudy had consigned over 100 bottles of purported Ponsot wines.

By 2003 Rudy was buying millions of dollars a year of wine at auction.  His buying was almost compulsive and did not follow any logical sequence, and was more than he could reasonably consume.   Prior to his buying frenzy he had no cellar, and all of the others he was beginning to rub shoulders with had prodigious cellars.  He **needed** a cellar, not necessarily the physical structure, but a collection of bottles that would match the boasts of the collectors with whom he was now interacting.

While records for 2003 and the first half of 2004 are not available, records show that in the second half of 2004 Rudy spent over $700,000 buying wine.  In 2005 he spent over $7 Million and in 2006 over $15 Million.[1]  From July 2004 thru 2011 Rudy spent over $40 Million purchasing wine.

For the most part, Rudy was a buyer during the early years, but he also sold some wines on Winebid.com, placed some in auctions at Acker Merrall, and, consistent with

---

[1]  This information is compiled from the financial records produced by the government.  It is drawn from credit card and bank account statements.  Only those transactions labeled as wine or to known wine dealers, auction houses, or sellers were included.

what seemed to be the pattern among high end buyers he sold and traded a few bottles within the group he had met through tastings.

The wine market was awash with counterfeits, and Rudy realized that he was not immune after some wines he sold to Eric Greenberg in 2003 (mostly through Winebid.com) turned out to be fake. Greenberg had recently discovered that his 60,000 bottle cellar was riddled with false wines. Many, but by no means all, of these were traced to Royal Wine Merchants, LTD. Royal Wine Merchants had a dubious reputation and was credited with being a major source of questionable wines. In a recent settlement of a lawsuit it has agreed to no longer deal in high end expensive wines. See pages 30-31 *infra*.

Nonetheless, Rudy was undeterred by the nature of the market. He continued to purchase, participating in high end auctions such as the Christie's Doris Duke auction on June 4, 2004 where he and Greenberg successfully purchased some 'exceptional' wines with corresponding prices.

As he became more visible at auctions, the nature of the tastings to which he was invited began to change. Now, he was able to engage in special tastings with very high end wines. This, however, came with the expectation that he would contribute wines to these events, and he did. Rudy had made some very good finds, and he was not reluctant to make what he had found available to his 'friends', no matter what it had cost. Bringing extraordinary wines brought acceptance and recognition.

One of the important people that Rudy met, and was befriended by, was renowned wine critic Allen Meadows. Rudy received recognition from Meadows when

Rudy provided some bottles of La Tache to a tasting that occurred in June of 2003. Meadows reported favorably on the event and took to Rudy, recognizing his ability.

In September of 2003 Rudy hosted a tasting at Melisse Restaurant in Santa Monica, California. There were about fifteen people present including Edouard Mouiex the son of Christian Mouiex, an important figure in the wine community. This event was Rudy's introduction to additional members of the fine wine community.

Some have suggested that even at Melisse, on this special night, there were questionable wines, maybe even some which trace to Hardy Rodenstock.[2]  Given the nature of the market and the prevalence of counterfeits the odds of this being true are very high. The event included bottles of Petrus in vintages dating back as far as 1921. These wines are some of the rarest in existence, but also most prone to counterfeiting.

Rudy liked the feeling of being the center of attention. It gave him a feeling of achievement and belonging that he had never before experienced. He wanted to feel that way again. He wanted to enjoy the spotlight and the recognition of this special group of people.

Rudy continued to arrange and host tastings. In this way he continued to enjoy the feeling of recognition. An example is a later event in honor of Rudy's mother's birthday. Actor Jackie Chan was a special guest. The highlight of the evening for Rudy was when Jackie Chan stood on a chair and applauded Rudy. It was the best night of his life.

Authentic wines of this caliber are very hard to locate and even more difficult to acquire. When something like that is found, it is usually not made available for tasting,

---

[2]  See Wallace, Benjamin, "Château Sucker", *New York Magazine*, May 13, 2012.

but spirited away in the cellar of one of the uber-wealthy who compete in this sport. After his successes in 2003, Rudy's need to find similar wines became obsessive.

The existence and extent of false bottles in the high end market was well recognized by everyone. It was an unspoken truth that every cellar had large numbers of fake bottles.[3]

And, when fraudulent bottles were identified the remedy was to put them back at auction to continue the game. This 'shell game' was the subject of recent litigation involving William Koch and Eric Greenberg. In October of 2005 Koch paid $3.5 Million for wines he bought from Zachy's Auction House. Fraudulent wines from that sale were later attributed to Mr. Greenberg. In that litigation it was revealed that many of these wines had been identified as fraudulent in an insurance claim filed by Greenberg in 2002 and even subject to a settlement between Greenberg and Royal Wine Merchants, although many of the bottles were retained by Greenberg.

From Greenberg and the other collectors, Rudy learned that **everybody** expected there to be counterfeits. In fact, part of the contest was to see who could figure out what was real and what was fraudulent. The remedies if you got a bad bottle were to drink it, and point out how it was wrong, or just put it up for auction so that it would pass to the next guy down the line. "Rather than blowing the whistle on a counterfeiter, many duped buyers prefer to recoup their losses by reselling the phony wine to other unsuspecting

---

[3] "The amount of fake and counterfeit fine wine in the global market is still 'huge' according to Maureen Downey, a fine wine authentication excerpt." Schmitt, Patrick, "Fake Wine: 'We are Scratching the Surface'", *The Drinks Business,* November 12, 2013. *See also* Hirsch, Jesse, "The Wine Detective: Maureen Downey Reveals Forged Bottles", *SF Weekly, August 29, 2012.* Shaw, Lucy, "China Flooded with Counterfeit Fine Wine, *The Drinks Business,* August 11, 2011." The latest lawsuit to be filed is *LeCrew v. The Antique Wine Company, LDT.*, U.S. District Court, Northern District of Georgia (Case No. 1:14-cv 0149-JEC).

buyers.[4]  Every auction contained such bottles, and the identification – or speculation – as to the authenticity of wines purchased and drank became the newest parlor game. "Intriguingly, [Allen Meadows] also thinks that claiming fraud has become fashionable in certain wine circles – a mark of connoisseurship."[5]  To the extent counterfeits were part of the game Rudy became interested in them.

Rudy was invited to more tastings and was exposed to more rare wines.  And it came to him that using the correct blend of other available wines he had the ability to reproduce the taste to match the special experience.  If he could not find the wines to give him acclaim, he could create them.  But it wasn't enough just to create the taste.  Rudy, like all other wine buyers and collectors, had become aware that the market was awash in fakes.  In his frenzied buying, Rudy had unwittingly acquired many fakes.  Some were fairly obvious; some were very sophisticated.  He really didn't mind the fake labels; what irritated him was when he opened such a bottle and found the contents undrinkable.

Rudy knew he could do better.  He knew that he could faithfully reproduce not just the package, i.e., the bottle and all its accoutrements, but the contents – the taste of the wine within.  It was a challenge, and he was up for it.

At first it was not necessary to recreate the bottle.  Bottles from tastings were available.  It was not uncommon to keep a fine bottle to remember the experience of the tasting.  Rudy had done this.  Now, as he looked at the empty bottle, he knew what he

---

[4]  Collins, Dan, "Ín Vino Veritas? Inside the Bogus World of Wine", *Huffington Post,* August 7, 2012.  In December of 2010 a magnum of DRC La Tache 1962 was sold by Christie's.  The customer later returned the bottle as fake.  An identical bottle including the same bottle number on the label was then listed in the Christie's catalogue for auction in 2013. It was only pulled from auction when several well known individuals complained about its authenticity.  Hellman, Peter, "Christie's Pulls Burgundy from Auction After Authenticity Questioned, *Wine Spectator,* May 29, 2013.

[5]  Steinberger, Mike, "Excuse Me Waiter, There's Fake Wine in My Glass"*, Slate.com,* September 12, 2007.

needed to reproduce the contents.  From his experience, he was able to find just the right mixture of available wines, some with age, some newer, but all adding the flavor that was needed.  In this way, what was gone, returned.  It was challenging, exciting, compelling and fun – and not a little addictive.  More to the point, it was what the in-crowd secretly seemed to want – and only those in the know, knew.[6]

Sometimes it was just reconditioning actual bottles.  Most Chateaus of fine collectable wines had maintained a practice of reconditioning wines.  Over time the fill of the wine would reduced.  The Chateau would open the bottle, top off the wine with wine from the same vintage, if available, or a reasonable substitute if not, recork and seal the bottle.[7]   Refreshing with a younger vintage can actually help the wine, giving it new life.[8]

As shown at trial, Rudy also engaged in the practice of reconditioning.  He would acquire multiple bottles of particular wine with relatively low fill, then sacrifice a bottle's contents to recondition the remaining bottles.  He trusted that he could taste the open bottles and determine that the contents were in good condition before reconditioning and

---

[6] An individual who participated in a Rudy wine dinner is cited as saying: "'There's something romantic about drinking the best wines on earth,' he muses. 'Even if the wine wasn't what it said on the label, I still had a great time.'"  Hirsch, Jesse, "The Wine Detective:  Maureen Downey Reveals Forged Bottles", *SF Weekly,* August 29, 2012.

[7] "Meadows also points out that authenticity is a slippery concept as fine wine is concerned.  Until fairly recently, wineries customarily reconditioned older Bordeauxs and Burgundies, a process that sometimes involved topping up the bottles with wines from younger vintages.  Not only that: Merchants in Britain and Belgium, upon receiving new vintages from Bordeaux and Burgundy, habitually blended in wines from other vintages (and sometimes other places) in order to make the new arrivals more pleasing to their clients."  Steinberger, Mike, "Excuse Me Waiter, There's Fake Wine in My Glass", *Slate.com,* September 12, 2007.  "In the past some chateaux would also 'recondition' the wine i.e. if the level of the wine had fallen in the bottle it was usually topped up with a tiny drop of the same wine.  [ ] However problems arose when the customer brought in old or rare bottles as it was difficult to find the same vintage to top it up with.  In this instance a vintage of similar quality was chosen for the job."  Nick, "The World's Most Expensive Faulty Wine – Chateau Cheval Blanc 1947", *Bordeaux-undiscovered.co.uk/blog,* December 20, 2013.

[8] In recent years, this reconditioning has been discontinued by virtually all wineries, to some extent due to criticism over the use of younger wines.

resealing.  This was reflected at trial in the seven bottles of 1962 DRC purchased by Rudy and resold later as six, but with higher fill.  The final product had been tampered with, had been adulterated in that what he did was not revealed, but properly contained the product that had been purchased.  A bonus was that Rudy ended up with most of a bottle to enjoy himself.

Rudy became friends with John Kapon, President of Acker Merrall.  Rudy had started to brag about his own cellar, although his representations overstated what was really there.  Although, Rudy had placed a few bottles in Acker Merrall auctions as early as 2004, mostly he had been only a buyer at auction.  Mr. Kapon convinced Rudy that with his prodigious, growing collection of wine and the depth of his cellar, he should start to sell some bottles.  The auctions had been active and the prices for rare wines, even in a market peppered with false bottles, were increasing.

Rudy liked the idea.  It fit with the image that he was developing of himself as a major player in this field.

In 2005, Rudy sold some of the wines he had purchased along with some that he had modified.  Acker Merrall a private sale to William Koch.  Most of what was sold were bottles that had been purchased by Rudy in prior auctions.  Not all of these were authentic; some bottles were refilled and/or replicated by Rudy.

Kapon began to urge Rudy to put together a large collection of wines from his collection and cellar (many of the wines purchased by Rudy at Acker Merrall's auctions were still in the hands of Acker Merrall and easily available.)  Rudy agreed and provided wine for two large auctions in 2006.  Approximately 14,000 bottles of wine were put up for auction at these two events.  The great majority of which had been previously

purchased by Rudy.  These included many vintages from Italy, Australia, Germany and the United States in addition to the Burgundy and Bordeaux offerings. At the request of John Kapon, Rudy started to 'price' support Acker Merrall by agreeing to buy wines at the reserve price when bidding fell short.  The charges would be placed on his 'account' and the wines held by Acker Merrall.

By this time Rudy had collected the materials necessary to reproduce authentic looking bottles.  He had a printer in Indonesia who created authentic reproductions of labels and stickers.  Rudy also ordered stamps and authentic wax to mark and seal the bottles from other vendor.

All of the reproduction bottles that Rudy created were carefully created by his own hand in the kitchen of his home in Los Angeles.  As shown by the evidence at trial, two or three bottles at a time would be soaked in the sink to remove the old labels.  Then the new labels and appropriate stickers were carefully applied.  Only after all of this was done and a proper looking bottle created would the bottle be filled with a mixture of other wines that would match, as close as possible, the taste of the vintage that was proclaimed by the label.  This was slow, meticulous work.  Working alone, Rudy created, filled and corked only a relatively small number of bottles. But, for the most part, they were very special wines. Rudy was able to produce bottles only when he was actually physically present in Arcadia, and then only when not attending to other business.  Still, he was able over the years to create hundreds of bottles.  There were few at first, but more later when pressure from Acker Merrall increased.

Starting in 2006, a part of the allure for Rudy to participate in the auctions and to have increasingly valuable submissions was in the form of advances made by Acker

Merrall to Rudy.  After Kapon valued Rudy's proposed list of wines for the auction, he then made advance payments to Rudy.  This quickly became millions of dollars.  Trying to keep up with the very wealthy members of the elite wine collector group was expensive and Rudy started to see himself as a part of their world.  With the additional money coming in from the advances he was able to play the part.  But, in doing so he was spending large sums.   The required restaurants, clothing and jewelry were very expensive.

Rudy now needed to generate large amounts from the auctions just to pay back the advances.  By the end of the first auction in 2006, virtually all of the proceeds went back to Acker Merrall.  That increased the importance of another auction.  This one would be in October of 2006 and would be even larger than the one before.  Again, most of the product put up for sale came from earlier purchases.  Rudy did not even pay attention to what he had paid.  Whether he was making a profit or taking a loss on this product never became a part of his calculations.

Once the auction was set and wines committed, the advances started again.  But as before, the money was gone by the time the auction took place, so the net proceeds left almost nothing.

Even though Rudy had sold thousands of bottles of wine for millions of dollars in 2007, he was short money.  He did not want to ask his family for money.  They had provided him with millions. He wanted his family to see him as being successful, and even able to repay some of what he had been given, so he looked to his new found 'friends' for loans.  He secured the loans with bottles of wine, both real ones from his purchases and also those he created in his home.  In addition, even though there was not a

scheduled auction at that time, Acker Merrall continued to advance money in anticipation of a future auction.   The difficulty was that most of the truly valuable wines that Rudy had purchased had either been sold or consumed at various events and tastings.  It would take a long time to create enough bottles for an auction that would measure up to the earlier ones.  During 2007 Rudy created and turned over to Acker Merrall wines for an auction that would take place in 2008.  Much of 2007 went to creating and supplying those bottles and to spice up some private sales.  In June of 2007 he made a sale to David Doyle.  Many, but not all, of these bottles were created by Rudy.

In late 2007 Rudy applied for a $3 Million loan from Fine Art Capital.  He was introduced to Fine Art Capital by Ed Milstein, a well known member of the wine community, and an owner of Fine Art Capital's parent company Emigrant Savings Bank. This loan was secured by art owned by Rudy with a value in excess of $6 Million. In early 2008, the loan was granted and Rudy received approximately $2.5 Million.  At the time of the loan Rudy fully intended to repay the loan.  The security that he turned over to Fine Art Capital was not property that he wanted to part with.  It had a value of more than twice the amount of the loan.  This was clearly established by the fact that after the loan defaulted, the property was sold and Fine Art Capital was fully paid all of its principal, interest, and expenses regarding the loan, and the residual funds realized were turned over to Acker Merrall.

In addition to the loan from Fine Art Capital, Rudy still owed millions of dollars to Acker Merrall for advances that they had made in anticipation of the upcoming auction and purchases he had made but not paid for.   The advances were based primarily on bottles Rudy consigned during 2007.  What he owed was further increased as interest,

costs and fees, together with charges for more purchases, were added.  The auction was planned for April of 2008.  A major focus of this auction would be 107 bottles of wine purportedly from Domaine Ponsot, however, many of these were reproductions.

Ponsot wines were problematic because some of the purported vintages could not have even existed.  Laurent Ponsot, from Domaine Ponsot, questioned half of the bottles.  The Ponsot wines were pulled from the auction and held, leaving Rudy unable to repay the sums he owed to Acker Merrall, and squarely in the negative spotlight. Acker Merrall and John Kapon started to distance themselves from him.  The relationship soured, and Rudy, who acknowledged that he owed them money, agreed to the entry of a judgment against him in late 2008.

Mr. Ponsot pushed Rudy for the provenance of the wines that he had placed for auction, but, of course Rudy could provide none.

After the 2008 failed auction, Rudy sold only limited amounts of wine, most of which was from his prior purchases.  The debacle of the 2008 auction initially caused him to stop creating wines.  Rudy still had friends and supporters, but most people did not want to deal with him.  He was embarrassed by the many mistakes made with the Ponsot wines.  The fact that he had the ability to faithfully recreate the taste of storied wines that he had actually tasted continued to nag at him, and he found himself once again working on a limited number of such recreations.  During this period he engaged in some private sales.

By 2011 he had a number of new bottles that had been produced.  These, together with other wines that he had obtained from other sources over the years were consigned

to auction in London.  Prior to the auction, twelve lots of this wine were withdrawn by the auction house as being suspicious.

Shortly thereafter, on March 8, 2012, now more than two years ago, Rudy was arrested.  He has been in custody since that time.

(2)     The Need for the Sentence Imposed

Significantly, 18 U.S.C. 3553(a) counsels that: "The court shall impose a sentence sufficient, **but not greater than necessary**, to comply with the purposes set forth in [this sub-section]". *Id.* (Emphasis added)

(A)     After consideration of the unusual circumstances of this matter and all of the factors, a departure and/or variance to a sentence of time served (the functional equivalent of a three year sentence) would reflect the seriousness of the conduct and would be sufficient to provide a just punishment for Mr. Kurniawan.

As of the date of sentencing, Rudy will have been in custody for almost 27 months.  Upon his release from custody Rudy will be held for immigration and then deported from the United States.  An additional consequence of his immigration status is that the transitional release to half way house that would normally further shorten his release date is not available to Rudy.  He will not be released from Federal custody until he has served a full 85% of the actual sentence. (Non-violent offenders receive a fifteen percent reduction for good time.)   Then he will be turned over to the Immigration Service.

An example of the impact of good time and half way house release is as follows: If a U.S. citizen were sentenced to three years (36 months) he would receive a release date at 30.6 months (36 months less 5.6 months for 15% good time).  The standard guide

for transition back to the community would be half way house up to ten percent of the sentence, or 3.6 months.  Subtracting the 3.6 months from the 30.6 month release date would result in a probable physical release at the completion of 27 months – the amount of time Rudy will have served by the current sentencing date.

       (B) The second part of this factor is the deterrent effect of the sentence.  This is implicated by the message that the sentence sends to those who look only at the conduct involved by the defendant and the penalty imposed for that conduct.

   Individuals who can afford to pay thousands of dollars for a bottle of wine are members of a sophisticated class and have resources and extraordinary remedies at their finger tips.  They have regular lawyers, sometimes phalanxes of them, at their call.  It is thus clear, that the consequences of wronging them are not likely to go unpunished. They can and will take care of themselves. Mr. Koch alone has sued auction houses and at least three different individuals who sold him wine.  He has obtained judgments against both Hardy Rodenstock and Eric Greenberg, settled with many more, and is still in litigation with several others, including Rudy.  In some real sense the well publicized reality of having to deal with Mr. Koch and similarly situated others will serve as its own powerful deterrent regardless of the ultimate result of the case.

   The high end wine market, primarily represented by a small group of collectors and the auction houses that cater to them, seems to recognize, even accept, that fraudulent wine is a part of its culture.  It is of note that in spite of years of controversy, open general acknowledgement of the phenomena and many thousands of blog entries discussing what is real and what is not, the 'market' has shown no inclination to correct itself.

Mr. Kurniawan's conviction may have some deterrent impact, but, fairly stated, it seems that the industry and its enthusiasts are not really interested in solving the 'problem'.  The issue of counterfeit wines could easily be mitigated, if not completely solved, by requiring provenance for product that is offered for sale.  This practice is common in the fine art community, and while not eliminating forgery, significantly limits it.

Thus, the fine wine community, and in particular the auction houses, had two potential responses to Mr. Kurniawan's prosecution.  First, combat the phenomena and try to clean up the business by increasing standards by requiring provenance, or alternatively, just accept that it will continue and move the auctions to a less regulated place where enforcement activities are likely to be more tolerant and thus more limited.

The market chose acceptance.

Even prior to Mr. Kurniawan's conviction, Acker Merrall and most other auction houses dealing in fine wine auctions opened offices and began conducting their business in Hong Kong.[9]  No requirement for provenance has been added.  No disclosure of the sellers is required.  The presence of false and forged bottles is still rampant.[10]

---

[9]  "[Maureen Downey] also noted that 'some vendors in the USA who were selling fake wines saw an opportunity in Asia and moved their product and sometimes their whole business over there.'"  Schmitt, Patrick, "Fake Wine:  We Are Scratching the Surface", *The Drinks Business,* November 12, 2013.

[10]  Serena Sutcliffe of head of Sotheby's wine department is quoted as saying "that there was still a 'huge amount' of counterfeit wine being sold privately through dealers or 'some auction houses.", Schmitt, Patrick, "Counterfeit Wine Scams 'Tip of the Iceberg'", *The Drinks Business,* July 17, 2012.
     Revenues from wine auctions in 2011 rose 17% from the year before "despite the fact that many of the old and rare wines in the market are almost certainly fake, according to vintners and investigators like Cornwall."  Collins, Dan, "In Vino Veritas? Inside the Bogus World of Wine", *Huffington Post* August 7, 2012.
     "Laurent Ponsot, the owner of one of Burgundy's most prestigious wines, Domaine Ponsot, estimates that 80% of the highly prized old and rare Burgundies offered for sale are bogus."  *Id. See also* Cho Lee, Jeannie, "Ponsot worked 'closely with FBI' for Kurniawan Arrest, *Decanter.com,* March 14, 2012.

It is clear that there is no deterrence for the market and a greater prison sentence for Rudy beyond the time he has now served will not have any meaningful impact on those who engage in this trade.  If one can afford to buy this product it matters little where the sale takes place.  Hong Kong is within as easy a reach as New York.  It seems clear, no matter how counter-intuitive it may be, that no sentence that this Court imposes will have any impact on this trade, the market, or its participants.  Only the buyers and sellers themselves can meaningfully affect this practice and protect themselves; and they can do it easily.

In crimes of this kind (amongst this rarified small universe of players) deterrence comes not from the threat of prosecution but from the loss of reputation and threat of civil enforcement.  As Mr. Koch has proven, civil claims can reach over borders and impact those who would engage in this behavior.  Mr. Koch has even obtained a substantial United States judgment against Mr. Rodenstock, a German citizen.[11]

Further, as noted by the Court in *United States v. Adelson,* 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) *affirmed,* 301 Fed Appx 93 (2d Cir. 2008) "there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenses."  In varying a potential sentence of life to three and one half years Judge Rakoff observed:

> Moreover, the Government at no time here presented any evidence or cited to any studies indicating that a sentence of more than three and-a-half years was necessary to achieve the retributive and general deterrence

---

Maureen Downey is quoted as saying that "'any serious collector' of old and rare wines will have purchased counterfeit vintages in the last 15 years."  Hirsch, Jesse, "The Wine Detective:  Maureen Downey Reveals Forged Bottles", *SF Weekly,* August 29, 2012.

[11]  On March 17, 2014 Julian LeCraw, Jr. filed suit against the United Kingdom based company Antique Wine Company alleging that they knowingly sold him counterfeit wine.  *See also* Hellman, Peter, "Atlanta Wine Collector Accuses London Merchant of Selling Fakes; Sues for $25 Million", *Wine Spectator,*  April 22, 2014.

objectives applicable to a case like this one. And "necessary" is the operative word, for section 3553(a) expressly dictates that "[t]he court shall impose a sentence sufficient, *but not greater than necessary,* to comply with the purposes set forth in paragraph (2) of this subsection" (emphasis supplied). Accordingly, the Court was convinced that three-and-a-half years of prison time was all that was necessary to achieve the purposes set forth in § 3553(a)(2).
*Id. at* 514-515.

The substantial variance was affirmed by the Second Circuit finding that the District Court had carefully and appropriately considered the §3553(a) factors. *United States v. Adelson,* 301 Fed. Appx 93 (2d Cir. 2008).

Mr. Kurniawan's 27 months in custody is not insubstantial and along with all of the other factors such as loss of reputation, forfeiture of property and orders of restitution will have a sufficient deterrent effect.

(C)     Mr. Kurniawan has no history of criminal activity.

Mr. Kurniawan has engaged in no other criminal activity and is not a person from whom society needs protection.  Upon his release, he will be deported.  It is unlikely that he will ever be allowed back into this country, and this court could order that he not engage in the sale of high end wines in the future as a condition of supervised release.  If he were ever allowed back into this country he would be subject to supervised release with conditions and would be accountable for any conduct after his release.

(D)     There are no educational or vocational training, medical care or other correctional treatment that would assist Mr. Kurniawan through incarceration.

(3)     The Kind of Sentences Available:

The Court is not presently constrained except by a maximum sentence of 20 years on each count.

21

(4)      The Sentence Suggested by the Federal Sentencing Guidelines

The Pre-Sentence Report has not yet been received by Defendant.  Only hours ago has the defense received some information relating to loss calculations from the government.  It is the burden of the government to establish loss.  Accordingly, for the purposes of this memorandum, relevant calculations of potential Federal Sentencing Guidelines are based upon information made available at trial.   Based on those calculations Mr. Kurniawan is at a criminal history category I and a sentencing level of 25, calling for a sentence of 57 to 71 months.  (70-87 months if valuation is over $7 Million.)

      (A)      Proposed calculations of the guidelines:

           Base offense level (U.S.S.G. 2B1.1(a)):       7

           Special Offense Characteristic (U.S.S.G. 2B1.1 (b))

              Loss between $2.5M and $7M      18

                  - Alternately -

              Loss between $7M and $20M    (20)

              Sophisticated Means         2

           Adjusted Offense Level:        27 (29)

           Acceptance of Responsibility:     -2

           (See letter from Mr. Kurniawan submitted to probation.)

           Total Offense Level:         25 (27)

A defendant who goes to trial is not necessarily denied acceptance of responsibility.  In the instant matter Mr. Kurniawan challenged the search of his home.  That motion was denied, and the Court allowed evidence from the search to be presented

against him at trial.  The magnitude of that determination on his ultimate conviction could only be properly gauged by presentation of the evidence at trial.  Only by standing trial and allowing the evidence to be presented could Mr. Kurniawan create a record that will allow the Court of Appeals to clearly focus on the relative importance of the search as a part of the proof presented against him.  Although Rudy did make the government prove its case, *he neither testified nor present any affirmative evidence that he did not engage in the creation of some counterfeit or altered bottles of wine*.  U.S.S.G. §3E1.1 Application Note 2.

The major issue for guideline calculation relates to the issue of loss.  Regarding Count 2, Fine Art Capital was fully re-paid principal and interest on its loan and all costs from the sale of the security pledged by Rudy (and valued by him as the basis for the loan) which security Fine Art Capital accepted as a potential source of repayment (which in this case functioned exactly as Rudy "said" it would and as Fine Art Capital bargained for.)  Fine Art Capital suffered no loss and was never even in a position of insecurity.  Accordingly there is **no** loss.  U.S.S.G. §2B1.1 Application Note 3(E).  Thus, the calculations from Count 1 alone will determine the offense characteristic for loss.

Loss calculations under Count 1 should be based only on those counterfeit bottles knowingly sold by Mr. Kurniawan.  Evidence at trial related to approximately 267 bottles.  It is clear from the evidence at trial that not every bottle sold by Rudy was counterfeit.  In fact, given the huge amount of his buying (over $40 Million), the limited capability for production, and the large number of bottles sold, that the relationship of counterfeits to real bottles is likely to be low.  Accordingly, loss cannot be determined from what any buyer bought.

The government's expert, Michael Egan testified that he examined many of the bottles sold by Rudy. He claimed he had examined 1,077 counterfeit bottles that had been sold by Rudy to seven different people.  He does not provide the amount spent by the individuals. He testified that the bulk of these bottles had been sold to Mr. Koch and Mr. Fascitelli. (Trial testimony page 1068.)

Mr. Fascitelli did not testify at trial.  Mr. Egan included Fascitelli bottles within his evaluation.  Again, no separate valuation for the Fascitelli bottles is provided.

Donald Stott was another buyer who received some false bottles.  The record does not provide exact figures on his loss except that his bottles are included in the Egan data.

William Koch claims his loss to be about $2.1 Million, (based upon 219 bottles) but he may be including everything that he bought, both authentic wines and even some counterfeits bought by Rudy himself and resold unwittingly by him.  (Trial testimony page 752)  Given that Mr. Egan testified that the bulk of the 1,077 bottles that he had determined to be counterfeit came from Koch and Fascitelli it would appear that the 219 bottles identified by Mr. Koch are included within the Egan figures.

Mr. Doyle did not testify, but his assistant, Susan Twellman, did.  She identified 30 bottles believed to be counterfeit.  There were 12 each of 1959 and 1962 Ponsot and six 1945 Domaine Romanee-Conti (DRC). (Trial Testimony Page 707)  According to Government Exhibit 31-1, the value of these 30 bottles was $384,000.[12]

Based upon trial evidence, what was spent on wines created by Rudy is between $2,500,000 and $7,000,000.  If an average bottle price of $5,000 is utilized, then, the 1077 bottles identified by Mr. Egan would result in a value of $5,385,000, since this does

---

[12]  The 1959 Ponsot is $7,000 per bottle.  The 1962 Ponsot is $5,000 per bottle.  And, the 1945 DRC is $40,000 per bottle.

not include Doyle's $384,000 it must be added, thus totaling $5,769,000 a figure less than $7 Million.   But even if additional losses are considered, clearly the actual loss will not exceed $20 Million.

(B)   Criminal history score.   Mr. Kurniawan is placed in a category I criminal history as he has no prior criminal record.

(5)   Any Pertinent Policy Statement.

This is the second of the seven factors that are predicated on the Federal Sentencing Guidelines.

Here, it would appear that the Sentencing Guidelines call for a "Downward Departure Consideration".   U.S.S.G. §2B1.1 Application Note 20(C) (November 2013 Edition) provides "[t]here may be cases in which the offense level determined under this guideline **substantially overstates the seriousness** of the offense.   In such cases, a downward departure may be warranted." (Emphasis added.)   In this unusual case, the relative amount expended by each individual compared to his personal wealth and the relevant subjective impact on him as a result of having purchased fake wine causes the valuation based merely on sums spent to be over stated.

The products being sold were bottles of wine.   A 2008 study found that the average price for a 750ml bottle of wine in the United States was just over $7.[13]   The

---

[13]   Cholette, Susan and Castaldi, Richard M.   "Analyzing the US Retail Wine Market Using Price and Consumer Segmentation Models" *San Francisco State University* (2008) Page 2.  This study evaluates the wine marketplace and establishes a hypothetical market for 2008 based upon prior years' data.

A peer-reviewed research article published in 2008 categorized U.S. consumption by retail price of wine into categories as Jug Wine – under $3, Pop Premium - $3 to $7, Super Premium - $7 to $14, and Ultra Premium – over $14.  Goodhue, Rachael E., Green, Richard D., Heien, Dale M.  and Martin, Philip L.  "California Wine Industry Evolving to Compete in 21st Century", *California Agriculture*, Volume 62, Number 1, page 12, January – March 2008, Table 2.

Another study looked at the consumption of wine at lounges and restaurants.  It found that 48 percent of consumers buying a bottle of wine at a restaurant would not pay more than $30.  34% would

study looks at earlier studies that considered anything over $15 as luxury or ultra premium and proposes establishing a new category for the Luxury Super Segment of the wine market to include therein wines that retail for $25 per bottle and above. *Id. at* Pages 4-5. Here, the bottles at issue were bought for **thousands of dollars**, **sometimes tens of thousands**. Given this staggering disparity between the high and low ends of the wine spectrum, it seems not unreasonable to suggest that the relative impact is not properly reflected by the actual dollar amount involved.

A comparison would be the theft of a $200,000 Rolls Royce from a wealthy person with a garage full of vehicles versus the theft of a $10,000 Ford from a worker who needs to get to and from work, and for whom the car may represent a major part of his net worth. Can it really be said that the harm from the theft of the Rolls Royce is 20 times greater than the harm from the theft of the Ford? In reality, the true harm and injury are more likely to stem from the more needed vehicle. Thus the best or the truest measure of harm is not always the amount of the loss.

Comparing a price of $5,000 for the counterfeit bottles to the $50 price of a v**ery special luxury** wine purchase for the average consumer the ratio is 100/1.[14] Using this ratio to ascertain a comparative value would reduce $7 Million to $70,000, and $20 Million to $200,000. Using this comparative evaluation it is clear that the sums spent on the purchase of these bottles out of the context of their relative value to their purchasers over-represent the actual harm. Just as Judge Oetken found in the *Koch v. Greenberg*

---

spend up to $49 and 35% would spend up to $74. Guenther, Erin "Consumer Wine Trends: Americans Drinking More, "Better" Wines", *Wine Business.com* January 21, 2013.

[14] The actual average price per counterfeit bottle sold is not known. What is known is that all such bottles sold for thousands of dollars each and $5,000 would represent the lower end of the pricing. Mr. Koch claims to have spent $2.1 Million purchasing 219 bottles of wine from Rudy. That would average $9,589 per bottle.

case, there was no "indifference to, or reckless disregard for, the health or safety of others. [ ] The fraud in this case did not result in death, serious physical injury, or even minor physical injury. The fraud did not result in a restriction of liberty or an insult to [a person's] human dignity. [ ] The fraud did not cause an economic loss that interrupted [a person's] life by interference with [a person's] housing, employment, or savings for retirement.  And the fraud did not involve actually or potentially vulnerable victim[s]." (See pages 29-30 infra.)    Unlike most of the financial fraud and questionable market related behaviors occurring during this same period of time the harm done by Rudy has had little or no lasting impact on the victims.

A  look  at  the  impact  of  the  fraud  in  the  financial  sector  provides  a  clear comparison.[15]   The National Commission examined the great recession financial crisis which surfaced during the same time Rudy was engaging in his activity and set forth the degree of harm that resulted from the misconduct in the financial markets.

> "The  economic  impact  of  the  crisis  has  been  devastating.  And  the  human devastation is continuing. The officially reported unemployment rate hovered at almost 10% in November 2010, but the underemployment rate, which includes those who have given up looking for work and part-time workers who would prefer to be working full-time, was above 17%. And the share of unemployed workers who have been out of work for more than six months was just above 40%. Of large metropolitan areas, Las Vegas, Nevada, and Riverside–San Bernardino, California, had the highest unemployment— their rates were above 14%."  National Commission on the Causes of the Financial and Economic Crisis in the United States, "Financial Crisis Inquiry Commission Report", January 2011, at page 23.
>
> "The loans were as lethal as many had predicted, and it has been estimated that ultimately as many as 13 million households in the United States may lose their homes to foreclosure. As of 2010, foreclosure rates were highest in Florida and

---

[15]   "The boom in the sale and price of rare wines several years ago mirrored the U.S. housing bubble. Instead of mortgage brokers willing to look the other way while people with sketchy income signed on to six-figure mortgages, the wine boom was fueled by an industry willing to look the other way when seemingly unavailable vintages popped up for auction."  Collins, Dan, "In Vino Veritas?  Inside the Bogus World of Wine", *Huffington Post,* August 7, 2012.

Nevada; in Florida, nearly 14% of loans were in foreclosure, and Nevada was not very far behind. Nearly one-quarter of American mortgage borrowers owed more on their mortgages than their home was worth. In Nevada, the percentage was nearly 70%. Households have lost $11 trillion in wealth since 2006." *Id.*

Yet, virtually no prosecutions emanated from this activity.

"Wilcox [a Special Agent with the Florida State Department of Law Enforcement] told the Commission that the 'cost and length of these investigations make them less attractive to most investigative agencies and prosecutors trying to justify their budgets based on investigative statistics.' She said it has been hard to follow up on other cases because so many of the subprime lenders have gone out of business, making it difficult to track down perpetrators and witnesses. Ameriquest, for example, collapsed in 2007, although Argent, and the company's loan-servicing arm, were bought by Citigroup that same year." *Id. at* 164

That is not to say that Rudy's conduct in anyway should be lauded or excused. It suggests only, that the *relative* harm should be utilized to reduce the guideline range to a level that more properly represents the impact of the specific crime on the specific victims, victims whose affluent financial status was well known to Rudy.

Taking this into consideration an adjustment to the valuation in U.S.S.G. 2B1.1(b)(1) pursuant to Application Note 20(C) to reflect actual harm would be more properly represented by applying the ratio established above to arrive at the relative valuation of $70,000 and $120,000 if the government has proven loss up to $12 Million (which would add 8 levels instead of 18 or 20) or, if loss is proven up to $20 Million, $120,000 and $200,000 (which would add 10 levels, instead of 18 or 20). If Mr. Kurniawan is given acceptance of responsibility this would result in a total offense level of 15 or 17. If he is not given acceptance of responsibility the result is a total offense level of 17 or 19. The relevant guideline ranges are:

Level 15      –      18-24 months

Level 17      –      24-30 months

Level 19      –      30-37 months

Mr. Kurniawan will have already been in custody for 27 months at the time of sentencing.

 (6) <u>The Need to Avoid Unwarranted Sentence Disparities.</u>

Alteration and mislabeling of wine appears to date back as far as wine itself.

> "Wine fraud has been practiced since Roman times; in fact, the Romans themselves doctored wines with various substances, including lead, to make them taste sweeter—never mind that drinkers could have ended up dead. More recently, this gambit was nearly the undoing of the entire Austrian wine industry in the mid-1980s, when some unscrupulous producers employed diethylene glycol as a sweetener. (Sweet wines rate higher than dry ones in the Austrian classification system.) Unfortunately, the compound they chose is used to make antifreeze and can kill or cause kidney damage. The ruse was discovered before anyone died, and a chemist, among others, was eventually charged with the crime. But before the plot was uncovered, a treated wine won a gold medal in a European wine fair."  Teague, Lettie, "Wine Scams: A Counterfeiter's Confession", *Food and Wine*, October 2008.

There are no comparable U.S. criminal cases.  In the European Union, Khaled Rouaba, a Belgium wine merchant was convicted on March 27, 2004 of selling 360 bottles of counterfeit 1900 Chateau Lafite and one 1900 Chateau Marguax.  He was given a suspended sentence of one year in prison and a 300,000 Euro fine.

In recent years the most well infamous wine counterfeiter is Hardy Rodenstock. His creation of bogus bottles of 1787 Chateau Lafite represented to have once belonged to Thomas Jefferson became the most known wine fraud in history.  Mr. Rodenstock's activities are well documented in the book *Billionaire's Vinegar* which is now being made into a movie.

29

Rodenstock, like Rudy, was unmasked and publicly shamed, causing him to withdraw from the public eye; although the subject of a number of civil actions, Rodenstock was never criminally charged.

In 1988, Mr. Koch purchased four bottles of wine, from two different sources, but all originating from Rodenstock and all purported to have once belonged to Thomas Jefferson.   In October of 2005 Mr. Koch bought a magnum of 1921 Petrus which, although deemed to be a very good fake, was in fact a fake which the Court found was also created by Rodenstock.   Mr. Koch purchased at least nine additional fake vintages produced by Rodenstock.

Mr. Koch sued Rodenstock for fraud.   The Court found that Rodenstock had "decided to forge bottles of rare wine, while representing to others that he had discovered them." *Koch v. Rodenstock,* 2012 WL 5844187 (May 9, 2012) *1.

Approving the May 9, 2012 Report and Recommendation of the Magistrate Judge the Court imposed judgment against Rodenstock for $311,486.90 in compensatory damages and another $311,486.90 in punitive damages.

In a similar civil case, *Koch v. Greenberg* (Case No. 07 Civ 9600) the jury imposed a $12 Million punitive judgment against Greenberg for selling fake wines.

In 2002, Greenberg claimed to have a 60,000 bottle cellar.   These included a large number of counterfeits, many having been purchased from Royal Wine Merchants. Greenberg settled with Royal Wine Merchants but as part of the settlement elected to retain many of the bottles.   Astonishingly, he later sold these bottles at auction. Judge Oetken found that the conduct of Greenberg was flagrant:

> "The reprehensibility and flagrancy of Greenburg's conduct indicate that some punitive award is appropriate in this case. To deceive for one's

30

personal, pecuniary gain and exploit one's superior knowledge—the gravamen of the fraud here—reflects reprehensibility that warrants some sanction. [ ] It is also true that Greenburg's conduct in this case can be characterized as flagrant. With its verdict, the jury found that Greenberg had brazenly committed 24 acts of fraud—that is, that he had made false statements or misleading omissions with respect to each of the 24 bottles at issue in the case, which he sold for up to tens of thousands of dollars each. Moreover, there was evidence from which a reasonable jury could infer that Greenberg had engaged in this sort of behavior before." Opinion and Order, March 31, 2014 at Page 41 (hereinafter Greenberg Order).

In none-the-less remitting the punitive damage award from $12 Million to

$711,622, Judge Oetken focused on the relative harm of the conduct involved:

"While the flagrancy of Greenburg's fraud merits some award of punitive damages, the harm he caused is less compelling. This harm was economic in nature and none of its targets—neither Koch nor other potential buyers at auction—were financially vulnerable. Moreover, the tortious conduct did not evince an indifference to, or reckless disregard for, the health or safety of others, as Koch himself characterized the wine at issue as collectible artifacts rather than something that he would actually imbibe." Greenberg Order at Page 42

"This dispute is about an extremely high-end luxury item. Greenberg deceived a wealthy collector whose hobby involves expenditures that most people will never contemplate." Greenberg Order at Page 43

"The fraud in this case did not result in death, serious physical injury, or even minor physical injury. The fraud did not risk any such injury. The fraud did not result in a restriction of liberty or an insult to Koch's human dignity by way of discrimination. The fraud did not cause an economic loss that interrupted Koch's life by interference with his housing, employment, or savings for retirement. And the fraud did not involve actually or potentially vulnerable victims. In the scheme of conduct that can be punished by damages in a civil case, this is not a fraud deserving of punishment that pushes the limits of the Due Process Clause." Greenberg Order at Page 44

"The jury found that Greenburg had shamelessly defrauded customers with 'garbage.' Yet his conduct did not cause a particularly egregious harm: he was dealing in luxury goods marketed to a sophisticated and wealthy subset of the population. The harm was strictly economic, and the victims were far from vulnerable consumers. These facts merit a relatively low award of punitive damages." Greenberg Order at Page 46

Judge Oetken's observations of Mr. Greenberg's behavior and the impact that it had on his victims is equally relevant in the instant matter.   Just as Judge Oetken remitted the very significant punitive damage award, it seems appropriate in the instant matter to depart and/or vary from the sentencing guideline sentence.

In yet another civil action, *Koch v. Royal Wine Merchants, LTD*. (United States District Court, Southern District of Florida, Case No 11-81197), settlement was reached on a completely prophylactic basis, i.e., Royal Wine Merchants agreed in the future not to sell any rare and expensive wines. Order entered April 9, 2014. Such a prophylactic restriction on Mr. Kurniawan would be a meaningful remedial consideration and would mitigate in favor of a reduced sentence.

(7)    The Need to Provide Restitution.

Mr. Kurniawan had always offered a money back guarantee to those who bought wines from him.  In recent years he has had difficulty keeping this promise.  However, he is endeavoring to reach settlements on restitution with those who bought what he created. While none of the victims has suffered serious relative harm, Rudy is committed to making them whole.  Rudy has made efforts to repay his victims and will continue to do so.  His release will markedly increase his ability to repay those to whom he owes money.

(8)    Forfeiture

Forfeiture is not specifically identified as a sentencing factor, but, "constitutes part of the sentence, in that it is utilized to enhance the punishment." *U.S. v. Cherry*, 330 F.3d 658, 669 (4th CA 2003).  In this case it has substantial impact.  The government has seized and seeks to forfeit millions of dollars of property belonging to Mr. Kurniawan. This includes not only the home in which his mother resides – purchased by the family

32

before he ever started selling wine – but other real estate, investments, bank accounts, jewelry, automobiles, and large amounts of wine stored at a warehouse in Los Angeles. The forfeiture alone will have a huge punitive affect.

(9)   <u>Fine</u>

Given that the government has seized all of Mr. Kurniawan's property and that restitution will be significant, it is respectfully submitted that the Court should either find that Mr. Kurniawan is unable to pay a fine, or impose a fine of $12,500 the low end of the guidelines for levels 26-28.  U.S.S.G. 5E1.2.

The forfeiture of Rudy's property will be a substantial punishment.

## CONCLUSION

For all of the reasons stated above this court should apply a guided departure from the Sentencing Guidelines pursuant to U.S.S.G. 2B1.1 Application Note 20 and/or a variance to a sentence of 27 months and a fine not in excess of $12,500.

Respectfully submitted this 1st day of May, 2014.


__/s/ _____
Jerome H. Mooney

Weston Garrou & Mooney
12121 Wilshire Boulevard, #525
Los Angeles, CA 90025
Tel.: 310-442-0072; Fax: 310-442-0899
Email:  jerrym@mooneylaw.com