E5t0kurc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          12 CR 376

5    RUDY KURNIAWAN,

6                Defendant.

7    ------------------------------x

8                                          New York, N.Y.
                                           May 29, 2014
9                                          10:00 A.M.

10

11

     Before:
12
                       HON. RICHARD M. BERMAN,
13
                                           District Judge
14

15                        APPEARANCES

16   PREET BHARARA
          United States Attorney for the
17        Southern District of New York
     JASON HERNANDEZ
18   STANLEY OKULA
     Assistant United States Attorneys
19
     JEROME MOONEY
20   VINCENT S. VERDIRAMO
     Attorneys for Defendant
21

22

23

24

25

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

E5t0kurc

```
 1              (Case called)

 2              (In open court; defendant present)

 3              THE DEPUTY CLERK:  Please rise.

 4              THE COURT:  How are you, please be seated.

 5         Okay, so nice to see you all.

 6         As you know from my order dated May 27th, I didn't

 7    think I was ready to go forward with the sentencing today,

 8    because I as indicated in that order, there are some things

 9    that are missing and that would be helpful.

10         So, Mr. Hernandez, we had asked someone from probation

11    to be here, particularly the people who prepare the presentence

12    report.  But, so far, no response.  And we did send an e-mail,

13    so maybe you could convey what I'm looking for, because I think

14    in large measure it is the probation presentence report that

15    has some gaps that I would like to try and fill in.

16              MR. HERNANDEZ:  We'll do that, your Honor.

17              THE COURT:  Great.  Thanks so much.

18         So let me go over what they are, just so it's clear.

19         So the presentence report is helpful in the sense that

20    it, you know, recounts much of the testimony and evidence

21    adduced at trial.  That's sort of less helpful at this stage.

22         Everyone knows -- having some more background on Mr.

23    Kurniawan's motivation, personal history, interviews, et

24    cetera, that's really -- I mean most of us know what happened

25    at the trial.  What we don't know is that.  So I would like the
```

E5t0kurc

1    probation department to -- and I would like them to do it

2    forthwith -- to try and develop a little bit more of that

3    information.

4            For example, they mentioned that Mr. Kurniawan's

5    mother is still living in the house in LA; is that right?

6            MR. MOONEY:  Yes, your Honor.  She still is.  And

7    she's been expecting somebody to call her.

8            THE COURT:  Yeah, me too.

9            MR. MOONEY:  And as of yesterday, she had not been

10   contacted.

11           THE COURT:  Yeah, I get that.

12           And so there is mention of the need for a Mandarin

13   interpreter, but I'm sure there are plenty available, and so

14   that should happen.

15           For example, she was, as we all know, also living

16   there at the time of Mr. Kurniawan's arrest.  So she's

17   someone -- and as a mother, would have perhaps some insight.

18           So that would be helpful.

19           And what about other family members; brothers.  Are

20   they amenable to being interviewed, or --

21           MR. MOONEY:  Yes, your Honor.  There are two brothers.

22   One of them speaks pretty good English.  The other one has very

23   poor English.  And we are gonna see what we can do to try to

24   make some connections to at least make that contact.  They are

25   both located in Asia, but --

E5t0kurc

1          THE COURT:  What's the language that the one who

2    doesn't speak such good English is, principally?

3          MR. MOONEY:  He would speak Indonesian.  And Chinese.

4    They all speak Chinese.

5          THE COURT:  Mandarin?

6          MR. MOONEY:  Yes.

7          THE COURT:  Perhaps the same interpreter for the

8    mother --

9          MR. MOONEY:  That would be possible.

10          THE COURT:  There are ways to fix that.  And I think

11    it would make our job more easier.

12          MR. MOONEY:  Okay.

13          THE COURT:  So, okay then.  This is in the presentence

14    report.  You all are aware there is a net worth column of

15    8 million, plus.  That can't be.  Net worth is usually assets

16    minus liabilities.  They didn't minus any liability.  So that's

17    an incorrect statement.  And it doesn't -- it's not just

18    technical.  We need to know, for these issues of restitution

19    and forfeiture, et cetera, et cetera, what the numbers are.

20    And they don't add up in the presentence report, so we need

21    much more in depth.  And perhaps that's something you can help

22    the probation department with.

23          MR. HERNANDEZ:  We are happy to do that.

24          There are also assets, for example, that are not

25    accounted for in the report.  So there are some gaps.  And we

E5t0kurc

 1    have some resources that we can help probation to provide a

 2    more complete report.

 3              THE COURT:  Great.  And you're welcome, Mr. Mooney, to

 4    weigh in on that process also.

 5              MR. MOONEY:  We'll see what we can do to help out with

 6    that.

 7              THE COURT:  So then, as you know, the probation

 8    department makes a recommendation that the sentence should be

 9    below the guidelines sentence they computed.  And, you know,

10    I'm happy to have their thoughts on the matter, but they really

11    don't explain why it goes from, presumably, from 168 to 120 and

12    not to 80 or some other number.  I mean there is no rationale.

13    And that would be useful and helpful.  The numbers, in and of

14    themselves, don't really tell us much.  So that would be

15    important.

16              So does anybody know -- another matter, I have this

17    letter from William Koch.  It is undated.  Is there a date that

18    I should fix to that letter?

19              MR. HERNANDEZ:  Your Honor, Mr. Koch's lawyers sent me

20    a copy of the letter with the date, May 22nd, which I can hand

21    up to your deputy.

22              THE COURT:  Oh, great.  I can substitute that letter

23    with the undated one.

24              MR. HERNANDEZ:  You could.  I think it's the exact

25    same letter, they just put the date on it.

E5t0kurc

1          THE COURT:  All right.  So that's helpful.

2          And I'll make this part of the docket, his letter.

3    We'll post it, if it is not already posted.

4          There is reference in two places to Mr. Koch's letter,

5    presumably, to the Court.  I don't think I have seen that.

6          MR. HERNANDEZ:  Yes, your Honor, if I might bring that

7    forward.

8          THE COURT:  Great.  So we'll make that, also, a court

9    exhibit.

10          MR. HERNANDEZ:  Thank you, your Honor.

11          THE COURT:  Just for the record, Mr. Mooney, it is

12    dated 2014?

13          MR. MOONEY:  That's correct, your Honor.

14          MR. HERNANDEZ:  And I do --

15          THE COURT:  Counsel, that --

16          MR. HERNANDEZ:  I'm sure we are going to get inquiries

17    about this in our sentencing submission.  We argued that

18    documents, such as these, if your Honor is going to rely on

19    them, should be part of the public record.

20          THE COURT:  I usually say all submissions go on the

21    public record.  So if they have not, I'll put them on there.

22    But you all should, too.

23          MR. HERNANDEZ:  I ask only because these good people

24    here will call our press office as soon as this proceeding is

25    over, and they'll ask whether that is a public record.  So it

E5t0kurc

1    is helpful to have that clarification.

2             MR. MOONEY:  We have no objection, your Honor.  It's

3    been our practice to send those in through probation.

4             THE COURT:  Yeah, no, I know.

5             MR. MOONEY:  The way we usually do it, that's why it

6    happened that way.

7             THE COURT:  I can confirm that those are three good

8    people, by the way.

9             So we'll -- yeah, we will put this on.  And if you do

10   it, too, you know, it doesn't matter.

11            So, now, just to -- because this looks like a somewhat

12   more complicated issue, and from the materials as well, Mr.

13   Hernandez.  Is it likely, or possible, or probable in this

14   case, that we'll have three different numbers; one for

15   restitution, one for forfeiture, one for actual and intended

16   loss.

17            Could you give us just a little preview of what you

18   think is happening there?

19            MR. HERNANDEZ:  I do think, your Honor, we're going to

20   have, probably, three different numbers.  The actual loss

21   represents the fake bottles that were sold.  And intended loss,

22   as I'm sure your Honor knows, includes bottles, for example,

23   that were consigned, or withdrawn, or sales that were never

24   consummated.  That's gonna be the largest number, because of

25   the inclusion of the intended loss.

E5t0kurc

| 1 | THE COURT:  And that number is, among other reasons,

| 2 | significant, because it drives the guideline range.

| 3 | MR. HERNANDEZ:  It does.  But I'll make one

| 4 | observation, which is that there is really only a two-point

| 5 | difference in the guidelines range between the parties.  The

| 6 | government says, when you combine intended loss and actual

| 7 | loss, it is between 20 and 50 million.  And Mr. Mooney's most

| 8 | recent submission says that the, you know, the actual loss or

| 9 | maybe the total loss, is a little over 7 million.

| 10 | THE COURT:  Up to 20.

| 11 | MR. HERNANDEZ:  Up to 20, right.

| 12 | So when you look at the guideline breakdown, the two

| 13 | breaks are seven to twenty million and twenty to fifty.  So

| 14 | we're talking about a two-point difference.  In the end, we'll

| 15 | still obviously need to be accurate.  And we're doing as best

| 16 | we can because -- so you have the largest number of intended

| 17 | and actual loss.  Then you have the forfeiture number, which is

| 18 | probably the second largest number.  That's the proceeds gained

| 19 | from the sale of the fake wines.

| 20 | THE COURT:  Right.

| 21 | MR. HERNANDEZ:  And then the last number, restitution,

| 22 | is probably the smallest number, because there were people who

| 23 | got refunds, for example.  So Mr. Kurniawan would swap the

| 24 | bottles and give them either some authentic wine or return

| 25 | money, or an option house would.

E5t0kurc

```
 1           So in the area of restitution, to use the prime

 2   example, William Koch, Mr. Koch, decided not to return his

 3   bottles.  He has estimated he has 2.1 million or so fake

 4   bottles that he bought from Mr. Kurniawan.  He would be

 5   eligible for restitution in that amount.

 6           THE COURT:  So if he decides, for example, not to

 7   return them, but he's still entitled to restitution?  I mean if

 8   he returned them, he would get -- presumably, he would get

 9   something for them, no?

10           MR. HERNANDEZ:  Well, he would get pennies on the

11   dollar, I think is fair to say, certainly, at this point.  I

12   don't know what would have happened if he returned them in

13   2006.  But there are -- certainly are arguments that they are

14   worthless.  So I don't know that anyone is going to return them

15   or accept them at this point.

16           There is also evidence in his civil suit against Mr.

17   Kurniawan, there are all sorts of reasons, there are other

18   people who, for different reasons, have kept their bottles, as

19   well.  And what we have attempted to do, although it is

20   difficult to do -- because not everyone is as transparent as

21   Mr. Koch, or willing to put their information on the line -- is

22   to look at what other victims have had in terms of their

23   losses.  And some have had, Mr. Eagan, the expert who

24   testified, looked through cellars and created their lists.

25   Some are not as precise.  And we tried to be conservative in
```

E5t0kurc

1    that regard.

2              There are a handful of people who bought in excess of

3    $10 million of wine, combined.  All of the very, very likely

4    counterfeited kinds of wines.  The rarest.  The most expensive.

5    The large formats.  And those people are much more hesitant to

6    come forward.  We could subpoena those people and say show us

7    what you bought and let's -- we could subpoena and say give us

8    the bottles.  But then we would have to take months and a lot

9    of dollars to then go through their wines to estimate the loss

10   amount, which is probably not a wise use of resources.

11             So given that there is a two-point difference here,

12   and for restitution purposes we'll only submit a restitution

13   request for victims that have provided some form of

14   documentation for their losses, it's gonna be the smallest

15   number.

16             THE COURT:  So stay on that for a moment.

17             So the two-point difference gets you -- what are the

18   two guideline ranges that -- that result from that two-point

19   difference?

20             MR. HERNANDEZ:  Sure, I wrote them down on the

21   presentence report.  If you give me a second, I can flip to

22   that.

23             THE COURT:  One is the 165 to -- I think it's --

24   that's what it is.

25             MR. HERNANDEZ:  Right.  That's the range that the

E5t0kurc

```
1    probation and the government have.  That's at a level 35.  And

2    then at a level 33, which is the two-point difference for loss,

3    the range is 135 to 168.

4              THE COURT:  I see.

5              MR. MOONEY:  And that's if you just go from the

6    presentence report, your Honor.  There are some other issues

7    obviously unrelated to loss.

8              THE COURT:  Right, right, right.

9              MR. MOONEY:  Okay.  And I might add that with regard

10   to the restitution issue, the defense, we are in litigation

11   with Mr. Koch.  So we have conversations there.  But we have

12   also been trying to reach out to some of the other people we

13   know about, try to work out whatever differences there might be

14   in regards to what those people are entitled to, and get them

15   some money, if possible.

16             THE COURT:  Right.

17             Now, are those situations going to be netted out, so

18   to speak, before we get to fixing the restitution number here.

19   Because I guess if somebody got paid, he wouldn't -- wouldn't

20   need restitution.  So I noticed --

21             MR. HERNANDEZ:  Right.

22             THE COURT:  -- in the government's submission, there

23   is a whole series of people who got reimbursed from, I don't

24   know --

25             MR. HERNANDEZ:  Right.  We wouldn't submit restitution
```

E5t0kurc

1    orders for those individuals.  But it is in there, included

2    because it's intended loss.  It shows you how much they bought,

3    they got to return it, but --

4              MR. MOONEY:  I do not know, your Honor, whether we'll

5    have those things wrapped up and settled.  I mean it is really

6    quite fascinating, even with the numbers being where they are,

7    the difficulty we are having getting some people to even want

8    to talk about it.

9              THE COURT:  You mean buyers?

10             MR. MOONEY:  Yes, your Honor.

11             THE COURT:  Yeah.

12             MR. MOONEY:  People we want to give money to.

13             THE COURT:  Right.

14             So we have to figure out how we're going to go about

15    dealing with that.  And one thing -- just as a heads up -- I

16    like to do.  Sometimes we get to sentencing and then somebody

17    will say, well, Judge, we'll have the restitution within 90

18    days.  I want to have it before the sentencing so that we can

19    really wrap things up.  So that will mean, as best it can be,

20    Mr. Hernandez, we'll need the list of names, how much they get,

21    addresses, where the restitution goes to, all of that.  And to

22    the extent that you and Mr. Mooney can agree on that, obviously

23    that would be ideal, the greater extent the agreement, the

24    better it will be.

25             MR. HERNANDEZ:  We'll work to eliminate whatever

E5t0kurc

1    disagreements there are.  If there are, we'll identify them.

2            You know, at the end of the day, your Honor, I think

3    that there are certainly two victims that we, I think, have

4    very, very well documented losses for.  That's Mr. Koch and

5    Mr. Fascitelli.

6            THE COURT:  And that total is, roughly?

7            MR. HERNANDEZ:  Almost $8 million.  And I think our

8    argument, as a fall-back argument here, because it is difficult

9    to calculate some of these losses for different reasons, is

10   that if your Honor concludes that they suffered approximately

11   $8 million worth of losses -- and there are some other

12   individuals with very, very clear losses, they are just smaller

13   amounts -- and that the intended loss in this case is in excess

14   of $13 million, based on consignments and based on what was

15   found in the home, that already puts you into the 20 to

16   50 million-dollar range.

17           We're not interested in unnecessarily creating

18   disputed issues of fact over losses that may be too difficult

19   to pin down.  So we'll try and resolve those differences and

20   make it clearer.

21           THE COURT:  Right.  So that was going to be my next

22   question, that we'll be able to resolve all those issues Mr.

23   Mooney and Mr. Hernandez, on the papers?  Or is there going to

24   have to be some sort of hearing.  What is your thought about

25   that?

E5t0kurc

1          MR. MOONEY:  I don't know that we know that, your

2     Honor.  We're probably okay with -- we'll be able to figure out

3     where we are with regard to the actual loss issue, with regard

4     to the things that are happening.  And we're probably okay with

5     something in the neighborhood of the 8 million-dollar range.  I

6     think where we probably have a lot of difficulty is with regard

7     to this sort of intended range, because there is so many things

8     that have been thrown into that that we think just are

9     improbable and just don't meet the level where the Court should

10     seriously consider them.  But I don't know that that is the

11     sort of thing that would be the subject of a hearing, as much

12     as something we can probably adequately handle with briefing.

13     We have certainly given the Court a lot of briefing on those

14     subjects.

15          THE COURT:  You certainly have.  I have a 575 page

16     submission from you.

17          MR. MOONEY:  I apologize for that.  Also apologize

18     for, and deeply distressed with, Fed-Ex.  We put that package

19     with Fed-Ex on Saturday, and find out that it didn't get

20     delivered to the Court until yesterday.

21          THE COURT:  Yeah.  Yeah --

22          MR. MOONEY:  And they are supposed to be the gold

23     standard.

24          THE COURT:  -- you can rest assured that we have it

25     all.  I can't say we have absorbed it all, but we have it all.

E5t0kurc

1            So, all right, I think that's it.

2            I have one other question.  Do we anticipate any

3    victim testimony, or are we gonna have this all on letters or

4    submissions.

5            MR. HERNANDEZ:  I don't think so, your Honor.  I think

6    Mr. Koch's letter is -- I don't think he intends to attend in

7    person.  And I have spoken to -- a couple of the wine makers at

8    one point had expressed an interest, but since they testified,

9    I don't think there is gonna be anything more.

10           THE COURT:  Great, okay.  So, all right, again, if you

11   would impress upon the probation department that I really need

12   this information.  And also bring to their attention the dates

13   by which this is supposed to happen, which are set forth in the

14   order dated May 27, 2014, then we'll by in pretty good shape,

15   it seems to me.

16           MR. HERNANDEZ:  We'll do that.

17           THE COURT:  Okay.

18           So now the question is what is the alternative

19   sentence date.  I think Mr. Mooney was hoping for a date in mid

20   July.  I think I can accommodate that.  Let me propose one to

21   you and see if this works.  I think it is a Thursday.  It's

22   July 17th at 9:30; is that workable for all of you?

23           MR. MOONEY:  Yes, your Honor.

24           MR. HERNANDEZ:  It's acceptable for the government,

25   your Honor.  Since Mr. Kurniawan is in custody, I don't know if

E5t0kurc

1    the marshals can produce him right at 9:30.

2            THE COURT:  I'll work on that.  I think they should be

3    able to do that.

4            So, okay, anybody have anything else they want to

5    discuss?

6            MR. HERNANDEZ:  No.  Thank you.

7            THE COURT:  Good.  This is very helpful.

8            And I think this will give rise to a better record for

9    sentencing when we get this information nailed down.

10           Thanks.  Nice to see you all.

11           MR. HERNANDEZ:  Thank you.

12           MR. MOONEY:  Thank you.

13           (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25