E7OKKURS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                        12 CR 376 (RMB)

RUDY KURNIAWAN,

                Defendant.

------------------------------x

                                      New York, N.Y.
                                      July 24, 2014
                                      11:45 a.m.


Before:

                HON. RICHARD M. BERMAN,

                                      District Judge


                        APPEARANCES


PREET BHARARA,
     United States Attorney for the
     Southern District of New York
STANLEY J. OKULA
     Assistant United States Attorney

JEROME MOONEY
VINCENT S. VERDIRAMO
     Attorneys for Defendant

E7OKKURS

1          (Case called)

2          THE COURT:  Let me note just at the outset, Counsel,

3   I've been handed a document called "Consent Preliminary Order

4   of Forfeiture as to Specific Properties/Money Judgment."  It's

5   a forfeiture order in the amount of $20 million, and it's

6   signed by Mr. Adams for the government, by Mr. Kurniawan, and

7   by Mr. Mooney as his counsel.

8          Is that your understanding, that this is to be entered

9   into this case?

10          MR. OKULA:  Yes.  Your Honor had requested that the

11   parties, if you will, settle or bring to the Court's attention

12   whether there were any outstanding issues with respect to the

13   forfeiture.  We had alerted the Court that we had presented the

14   defense with the consent order.  I understand that now with the

15   defendant's signature on it, that this essentially resolved,

16   with the Court's imprimatur, the issues relating to forfeiture.

17          THE COURT:  Mr. Mooney, is that your understanding as

18   well?

19          MR. MOONEY:  That is, your Honor.

20          And just to also clarify the record, we wanted to make

21   sure that -- to clarify, that there's a list of assets that are

22   contained within that order.  Many of those assets are no

23   longer in Mr. Kurniawan's possession -- they have been sold or

24   gone other places -- and it is, of course, our understanding

25   and confirmed by the government that they understand that he

E7OKKURS

1   doesn't necessarily have all of these things, and the

2   forfeiture only extends to the extent that he still has an

3   ownership, or control, or possession of the assets.

4          THE COURT:  And, Mr. Kurniawan, you signed this

5   document this morning after conferring with counsel?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  OK.

8          One small thing.  I notice that it's not dated next to

9   Mr. Kurniawan's signature.  May I put in today's date in that

10  space?

11         MR. MOONEY:  Yes, please, your Honor.  He did sign it

12  just a few minutes ago.

13         THE COURT:  Right.  I'm going to insert July 24, 2014.

14         And then just for the record, let it be clear that I

15  have also signed and dated myself this order of forfeiture.

16  So, that will be posted on the docket as part of the record.

17         So just let me just outline where we are going.  And

18  those of you who can't stay the whole time, you're welcome to

19  come and go as you please.  By prearrangement, we have a few

20  things to accomplish.  One relates to the issue of loss,

21  possibly restitution, that remains unresolved.  There was an

22  application by the defense for what's called a Fatico hearing

23  on this subject.

24         I determined that since the submissions -- the written

25  submissions in the record had been so voluminous on the issue

E7OKKURS

1    of sentencing -- and helpful, I might add, there's at least a

2    dozen letters between the government and defense counsel,

3    roughly, even maybe the government has a couple more,

4    Mr. Mooney, than you do, but not much.  So it's so extensive, I

5    have so much information, that I don't think a full-blown

6    evidentiary hearing is necessary, but I did say that I would

7    allow the lawyers up to a half hour each to address that issue.

8            And after we finish that, we will take a brief pause,

9    and then we will proceed to the sentencing.

10           And just one other thing that you should be aware of:

11   There is an issue of -- and I will explain in more detail what

12   this means -- loss restitution that likely won't be resolved

13   today and for which we have set a Tuesday afternoon, next week,

14   set aside to hear that discussion.  That relates to an entity

15   called Mission Fine Wines.  And the lawyers may have more to

16   say about that even today, but in the event that we don't

17   resolve that issue today, we will resolve that issue on

18   Tuesday, but it's my estimation -- correct me if I am wrong,

19   Counsel -- that however we resolve that issue is unlikely to

20   impact the sentence that's imposed today; that is to say, it's

21   unlikely to affect either the sentencing guideline range, or

22   the offense level, or the amount of loss, or the amount of

23   restitution, for that matter.  It might affect the amount of

24   restitution, I guess.

25           Is that your sense?

E7OKKURS

1          MR. OKULA:  Yes, your Honor.  We agree with that,

2     because the amount of the intended loss, in the government's

3     view, is tens of millions of dollars in excess of the

4     $20 million cutoff period for the guideline range, that it's

5     irrelevant for a determination of the sentencing guidelines for

6     the imposition of punishment today.

7          We also note, and the Court appreciated through the

8     order your Honor entered, that there is a mechanism under the

9     United States Code that allows your Honor to determine

10    restitution within 90 days after imposing sentence, and that is

11    implicit in your Honor's directive that we have a hearing, if

12    necessary, next Tuesday.

13         I would just add that your Honor directed that we turn

14    over, for lack of a better phrase, the Downey report related to

15    the Mission Fine Wines.  We did that this morning to

16    Mr. Verdiramo.  We filed it also electronically with the Court.

17    I've also given the Court an update with respect to the William

18    Koch restitution issue.

19         THE COURT:  Is that a fair statement, Mr. Mooney?

20         MR. MOONEY:  Yes, your Honor.  And I might add with

21    regards to the -- to Mr. Koch, as of a few hours ago, we

22    finally concluded and entered into a settlement agreement as

23    between Mr. Kurniawan and Mr. Koch with regards to their civil

24    issues and their issues as it relates to, I guess, also this

25    case.

E7OKKURS

1          Mr. Koch is going to receive a consent judgment which

2      will be entered in the California case.  There are some

3      additional things that Mr. Kurniawan has agreed to do once all

4      of the proceedings related to this case are completed, and

5      finished, and out of the way, and it is our understanding that

6      Mr. Koch is withdrawing his request to participate and receive

7      an order of restitution in this matter.

8          THE COURT:  In fact, in the letter -- I did receive

9      Mr. Okula's letter this morning about both the report with

10     respect to Tuesday's possible hearing, and in that letter, the

11     last paragraph says, "With respect to the restitution claim of

12     William Koch, we have been informed by counsel for Mr. Koch

13     that he is withdrawing his claim of restitution in this

14     criminal proceeding, opting instead to pursue his remedies

15     against the defendant in California State court proceedings."

16     So that's compatible with what you have just said.

17         MR. MOONEY:  That's the settlement that we just handed

18     in.

19         THE COURT:  I'm going to say this again later, but

20     just so people understand, particularly what Mr. Okula was

21     saying:  In sentencing, we always do a sentencing guidelines

22     analysis, even though the United States Sentencing Guidelines

23     are no longer mandatory.  That's one of the factors to be

24     considered, not to be the determinative factor.

25         In order to do a thorough guideline analysis in a case

E7OKKURS

1   like this, involving fraud, the Court has to make a

2   determination as to what, legally speaking, the loss has been

3   in the case.  And as you will see in more detail soon, there

4   is, as is not uncommon, a disagreement between the defense, and

5   the government, and probation, by the way, as to what the loss

6   amount in this case is.

7           The sentencing guidelines have parameters that would

8   affect the sentencing guideline range.  One parameter is I

9   believe it's 7 million to 20 million dollars in loss.  That, I

10  think, is the defense position, that the loss falls there in

11  that range.  And the government says that the loss falls in

12  excess of $20 million, and the relevant range there is from 20

13  to up to 50 million dollars.  So, if the loss, in fact, falls

14  in this latter range, that would have the tendency to increase

15  the offense level, and consequently increase the sentencing

16  guideline range of incarceration.  So, that is a determination

17  that we will make during the course of the sentencing.

18          But in that regard, we are going to hear from -- since

19  the government on this issue bears the burden of proving by a

20  preponderance of the evidence what the loss amount is, why

21  don't I turn to you for this part of the presentencing

22  proceeding, Mr. Okula.

23          MR. OKULA:  Thank you, your Honor.  Do you wish me to

24  address from here or the podium?

25          THE COURT:  Whatever you're more comfortable doing.

E7OKKURS

1            Yes, that might be better.

2            MR. OKULA:  I think at this point, your Honor, if I

3      may, we are down to an issue with respect to three victims,

4      because Mr. Koch has withdrawn his claim, because the defendant

5      is conceding the Devine claim, the Reid Buerger claim.  What we

6      are left with is a dispute regarding the David Doyle claim, the

7      Michael Fascitelli claim, and the Andrew Hobson claim.  And I'm

8      not going to go at length -- I know your Honor has budgeted a

9      half hour for this, your Honor -- but we have made extensive

10     submissions, and I respectfully submit that nothing that the

11     defense has submitted in response to our submissions and our

12     explanations about the bases for those restitution claims has

13     undercut, certainly by a preponderance of the evidence, the

14     government's proof establishing those claims.  But I will

15     briefly review what the group is and give the Court a little

16     bit more evidence.

17            Your Honor, I would add, also, at the beginning that

18     to the extent that the Court has any concern about the

19     sufficiency or even the hearsay nature of the Twellman

20     affidavit, because that was one of the main oppositions that

21     the defendant advanced in trying to undercut the Twellman

22     affidavit --

23            THE COURT:  And you're now talking about an affidavit

24     submitted on behalf of Mr. Doyle?

25            MR. OKULA:  That's correct.

E7OKKURS

1        So, just in summary, Susan Twellman, who testified at

2    trial with respect to the fake nature of, I believe, six

3    bottles of DRC of Mr. Doyle -- on behalf of Mr. Doyle --

4        THE COURT:  Hold on just one second, Mr. Okula, just

5    so we make it clear.  So, these three people -- Doyle,

6    Fascitelli and Hobson -- the reason we are devoting this extra

7    time to this proceeding is quite simple in this respect, that

8    if one accepts the government's proof simply with regard to

9    these three people, they would take us over the $20 million

10   amount that I said before.  So, this is not insignificant for

11   that.  That would mean that the loss amount would exceed

12   $20 million, it would still be less than $50 million, but that

13   would have an impact on the guideline of sentence?

14       MR. OKULA:  And it would also mean, your Honor, if we

15   have to get to that point, that we wouldn't have to get into

16   the area of to what extent could and should your Honor -- and

17   we respectfully urge your Honor and emphatically urge your

18   Honor -- that the other proof in the case demonstrates tens of

19   millions of dollars of intended loss, which separate and apart

20   from the actual losses, get us above the $20 million amount for

21   guideline purposes.

22       But staying with the restitution figure, it's our

23   position, your Honor, that the Twellman affidavit, which relies

24   on an expert -- an ink expert that they employed who conducted

25   analysis of virtually every single bottle of the Doyle

E7OKKURS

1    purchases from Mr. Kurniawan, for which he paid approximately

2    $15.11 million, that virtually every one of those bottles was

3    fake.

4              Now, the determination in that regard, I realize that

5    we didn't set forth with jot and tittle all of the particular

6    aspects of that ink expert's analysis, nor do I think that it's

7    necessary.  But, your Honor, the expert who conducted that

8    analysis is an individual named Barrett Deck.  Mr. Deck has

9    been engaged in analysis of ink and labels for over 22 years,

10   and his analysis was that the nature of the labels that were on

11   the bottles purchased by Mr. Doyle from Mr. Kurniawan; that is,

12   that they were essentially of an ink jet type of printing that

13   was done, it was of a type that was not done at the time the

14   bottles were allegedly created.  So, it's a simple analysis,

15   your Honor.

16             And I realize I'm giving more detail now than was set

17   forth in the four corners of our restitution submission for

18   Mr. Doyle, but even if you look at the four corners of our

19   submission, we spell out that Ms. Twellman swore under oath --

20             THE COURT:  Let's do that, then.  Let's look at what

21   you have submitted and summarize it.

22             MR. OKULA:  She said under oath in her affidavit that

23   they retained this ink expert, and that this ink expert had

24   determined that this overwhelming high percentage of the Doyle

25   purchases -- and she did essentially the analysis of how much

E7OKKURS

1    of the wine and determined that it was essentially 98 percent

2    of their purchases were fake based on that ink analysis by that

3    expert.

4              That standing alone, by a preponderance of the

5    evidence, for restitution purposes in this proceeding --

6              THE COURT:  And for loss purposes.

7              MR. OKULA:  Yes.

8              So, turning now from the Doyle claim --

9              THE COURT:  So, that gets you to what dollar figure

10   for loss and/or restitution is the government asserting on

11   behalf of Mr. Doyle?

12             MR. OKULA:  Well, even though the Koch claim is

13   withdrawn, we, of course, count the 2.1 million for Mr. Koch

14   for the loss purposes, adding the $15 million for David Doyle,

15   that gets us to 17.1, adding the conceded $1.5 million of Brian

16   Devine, that gets us to 18.6.  And then adding what the defense

17   concedes is at least $3 million of the Fascitelli claim, that

18   puts us over the $20 million, your Honor.

19             So, what we're arguing about, then, is what portion of

20   the Fascitelli and the Hobson claims should also be counted.

21             So, let me turn to Mr. Fascitelli.

22             THE COURT:  Before you do, you reduced the Doyle

23   amount somewhat.  Why don't you explain that.  I think you went

24   from 15.11 million to 15 million.

25             MR. OKULA:  I just essentially rounded it down for the

E7OKKURS

1    purpose of doing the math, your Honor, just now.

2              THE COURT:  All right.

3              MR. OKULA:  But by no means -- I submit, your Honor,

4    that that's the correct amount, the 15.11 amount.

5              THE COURT:  Got you.  OK.  And now you're going to

6    Fascitelli?

7              MR. OKULA:  Yes, your Honor, unless the Court has

8    further questions with respect to Mr. Doyle.

9              THE COURT:  I don't.  Incidentally, you will see, we,

10   too, as say the Court and Ms. Murray in particular, have gone

11   through the analysis of loss and done independently a

12   bottle-by-bottle analysis.  So, we have a pretty good sense of

13   at least what we think are the loss amounts.

14             MR. OKULA:  Turning, then, to Mr. Fascitelli, your

15   Honor, essentially the defendant's argument is that -- well,

16   let me back up a second.

17             As part of our submission, your Honor, we submitted

18   three reports of the government expert, Mr. Egan, Michael Egan.

19   And those three reports were analysis of what are known as

20   Cellar I, Cellar II, and the third report was --

21             THE COURT:  You're talking now about the auctions --

22             MR. OKULA:  Yes.

23             THE COURT:  -- for Cellar I, Cellar II, and the third

24   is?

25             MR. OKULA:  The third report, your Honor, was a

E7OKKURS

stand-alone report of the $5.5 million worth of Fascitelli

purchases from Mr. Kurniawan.

        The confusion on the defendant's part, we respectfully

submit, is that they take the 69 percent figure that related to

the analysis of Cellar I or Cellar II, which is not part of the

$5.5 million claim, and therefore, say that that amount should

be reduced or should serve as a reduction for the defendants --

for the Fascitelli claim.

        But what should be understood by the Court is that the

analysis done by Mr. Egan of the $5.5 million purchase was that

the overwhelming super high percentage and what he estimates is

90 percent of the wines that constituted that $5.5 million

amount were determined by him to be fake.

        So, our bottom line is this:  You should not use a

69 percent figure to reduce the 5.5.  At best, it should be a

10 percent reduction, which Egan says is an amount that is sort

of a conservative estimate of ones that he either positively

couldn't label as fakes or he wanted to have a conservative

estimate on what he could stand by and represent or essentially

have us represent in court.  And it's the 90 percent figure.

So if you apply the math to that -- and in applying the math,

one important thing your Honor has to do is that it is conceded

that the defendant never delivered $684,000 worth of bottles to

Mr. Fascitelli.

        In doing the math, the defendant tried to apply their

E7OKKURS

1    69 percent figure to the whole $5.5 million amount.  But our

2    claim with respect to that is very simple:  If the defendant

3    promised to deliver $5.5 million worth of wine and delivered,

4    say, 80 percent of that wine, and 90 percent of that 80 percent

5    was fake, and didn't deliver the $684,000, but held onto that

6    money, that's as much a part of the restitution and fraud claim

7    as delivering phony wine, because the fraud claim is simple --

8    the victim here, Mr. Fascitelli, gave Mr. Kurniawan

9    $5.5 million and said give me that wine in exchange.  The

10   defendant agreed to do that.  The fact that he didn't deliver

11   some of the wine shouldn't serve to reduce his restitution

12   claim.

13        So, if you apply the 90 percent math, your Honor, to

14   the Fascitelli claim, so if you back out the 684,000, what you

15   need to do is apply 90 percent to the $4,816,000 figure

16   analysis, and under that analysis, the total would be

17   5,018,400, and that consists of the 684,000, which you back

18   out, plus 90 percent of the 4.816 million, which is 4,334,400.

19   And if I haven't thoroughly confused you, your Honor, I'll run

20   through it again for you.

21        THE COURT:  I think I'm pretty clear, but you might

22   run through it again just so everybody else --

23        MR. OKULA:  Sure.

24        So we have the $5.5 million at the outset, we're

25   backing out 684,000, which leaves us with 4,816,000.  The Egan

E7OKKURS

analysis is that 90 percent of that is fraudulent.  So, if you

apply 90 percent to the 4.816 million, you end up with

4,334,400.  Then you add back in the amount that the defendant

promised to deliver, but never delivered, which is the 684,000,

which gives rise to a total of 5,018,400.

          So that --

          THE COURT:  So, if you are correct there, between

Mr. Doyle and Mr. Fascitelli, you're over the $20 million mark?

          MR. OKULA:  Indeed, your Honor.

          THE COURT:  And you were going to do Mr. Hobson, too,

I think?

          MR. OKULA:  Yes, very briefly.

          Your Honor, we submitted the Hobson reports.  Recall

that Mr. Fascitelli was a -- I'm sorry, Mr. Allan Frischman,

who was a government expert, conducted a posttrial analysis of

a representative sample of the Hobson bottles by going up to, I

believe, Greenwich, Connecticut, Mr. Hobson's residence, and

examining this representative sample, and looking at that

sample and extrapolating the analysis -- and an extrapolation

analysis, your Honor, is nothing new under restitution law.  I

know your Honor is familiar with different areas of cases.  I

happen to do principally criminal tax cases, and the law is

abundantly clear that if there is a solid methodology employed

in conducting a representative sample of a subset or a part of

the universe that is believed to be fraudulent, and there is a

E7OKKURS

solid methodology in making the determination that a certain

percentage of those are frauds or fakes, then the Court is

perfectly entitled to rely on the extrapolation of that

representative sample to the whole amount in arriving at even a

restitution figure.

       And that's what happened here, that Mr. Frischman

analyzed, I believe, 50 representative bottles, determined

through the elaborate notes that he made, which we submitted in

the report, and the detail of the bottles that he submitted,

which ones were fraudulent, which was well over 90 percent.

And so, when he applied the math, if you will, to what

percentage of the Hobson claim was fraudulent, thus entitling

Mr. Hobson to restitution, the bottom-line figure came out to

3,118,856.

       Here, too, your Honor, there was an amount that the

defendant promised to deliver, but did not deliver and kept

Mr. Hobson's money, and that sort of has been a part -- that's

the 552,531 figure, and that is figured in, I believe, the math

that we did in arriving at the $318,000 figure.

       THE COURT:  Just two comments I have:

       The law of loss, so to speak, jurisprudence, says that

in order to figure out the actual and/or intended loss, first

of all, one needs to do no more than a reasonable

approximation, but nevertheless, in at least some of the

examples that you have been dealing with, for example,

E7OKKURS

Mr. Doyle, Ms. Twellman, in addition to her affidavit, I

believe, attaches a bottle-by-bottle addendum to that affidavit

explaining how she arrived at her figure, and the same is done

in the Hobson case.  There's also a, I don't know, four-page

description of what those bottles contain.

MR. OKULA:  Indeed, your Honor.  That was implicit in

my presentation that your Honor is familiar with, the

bottle-by-bottle analysis for both the Doyle claim as part of

the Twellman analysis and the Hobson claim as part of the

Frischman analysis.

So, your Honor, unless you have any further questions,

I know you'll let us have a chance to be heard again with

respect to the proper sentence, but we will rest on our papers

here.

THE COURT:  Sure.

MR. OKULA:  Thank you.

THE COURT:  Mr. Mooney?

MR. MOONEY:  Thank you, your Honor.

Your Honor, the difficulty with the Doyle claim, and

the reason that we had requested a Fatico hearing with regards

to Mr. Doyle's claim, is that we get sort of a claim that I

bought so many apples, then they turned into X number of

oranges; therefore, I'm entitled to be recompensed for all of

the original apples, and we don't even know how they got there.

Today, for the first time -- for the first time a few

E7OKKURS

1    minutes ago, we're given the name of this paper expert who

2    apparently looked at the labels on the Doyle wine and now tells

3    us that these almost 2,000 bottles are counterfeit.  We have

4    had no opportunity to follow up or check up on this person and

5    see what his credentials are.  We have seen nothing in the way

6    of any kind of report.  We have been given minimal information

7    with regards to how this individual went about to supposedly

8    doing the things that he was doing.

9              This is $15 million.  This isn't a 15,000, or 1,500,

10   or $15 claim, this is a $15 million claim that is being put

11   forth, and we know -- we don't know -- what we don't know is

12   from these 2,000 bottles that Ms. Twellman says that they took

13   and isolated when Mr. Kurniawan was arrested, we don't know how

14   that matches up with what was bought.  We have been given a

15   schedule that shows the payment of the $15.1 million.  We have

16   that, so we know he paid $15.1 million to buy wine.  We don't

17   know how much wine and how many bottles that he bought.  We do

18   know, when we look at it, that it goes back to quite an early

19   period of time.

20             It's somewhat incredulous to believe that in March of

21   2012, bottles purchased in 2005, 2006, 2007, 2008, all of those

22   bottles are available, could be collected, and put in the

23   warehouse, especially when wines matching the descriptions of

24   all of those show on the wine menus of Mr. Doyle's restaurants

25   in Australia, and that the comments that have been made in the

1    social media with regard to those restaurants talk about

2    drinking them.  There's discussions of drinking 1945 DRCs and

3    how wonderful the 1945 DRCs were when they drank them.

4           To believe that they somehow have all this wine, and

5    can collect it, and put it together is -- like I say, it just

6    doesn't work.  It defies reality.

7           They don't tie Exhibit B to Exhibit A in any way.  So,

8    we don't know what portion of Exhibit A is reflected in

9    Exhibit B, because when they pull together their Exhibit B, and

10   when they give us this list of wine that they've sent off to

11   this warehouse, they don't tell us what Mr. Doyle paid for the

12   wine.

13          Instead, what they tell us is what Mr. Doyle believes

14   that that wine would be worth today, which is about

15   $19 million.  Which, by the way, is kind of interesting when

16   Ms. Twellman is saying in her affidavit that somehow

17   Mr. Kurniawan has done significant damage to the fine wine

18   market, yet these 2,000 bottles, if they were authentic, would

19   be worth something closer to 20 million today instead of

20   15 million that they're claiming was even paid for them.  So,

21   obviously there's been an appreciation, and we don't even know

22   how much more because we don't know -- we just don't know what

23   percentage and what portion those 2,000 bottles make up of the

24   total amount of bottles that were purchased.

25          And we, quite frankly, your Honor, have very low

E7OKKURS

1    confidence in -- this isn't a wine expert, this is some kind of

2    an ink expert who came in and looked at things, and there's no

3    report.  We don't know how many bottles he looked at, we don't

4    know what methodology was employed, we just don't have any of

5    that information, yet this is the most substantial claim that's

6    out there being made.  It's completely insufficient for the

7    purposes of us even being able to adequately respond and to

8    deal with.  And that's why we supplied copies of the wine menus

9    from the restaurants, to show what was there, and that's why we

10   asked for a Fatico hearing with regards to this, because we

11   ought to have an opportunity to look into it.

12           One of the things that keeps getting forgotten in all

13   of this:  The government talks about the millions of dollars

14   that Mr. Kurniawan received from the sale of wines, and he did.

15   He got a lot of money from selling wines.  But we have also

16   produced, and we gave your Honor the records that showed that

17   Mr. Kurniawan bought, and paid for, $40 million worth of wine.

18   That's what he bought, and he collected all that.

19           Then, he sold wine.  And the government has seized the

20   warehouse that Mr. Kurniawan had, and the government's expert

21   has told us that there is about $3-1/2 million worth of wine in

22   that warehouse.  Therefore, we know that over $36 million in

23   wine purchased by Mr. Kurniawan was sold.  It's a substantial

24   part of what went out in all of these sales.

25           Yet, now we have all of these people -- we have

E7OKKURS

1    Mr. Doyle, and we have Mr. Fascitelli, and others that are

2    coming in -- that say, well, every bottle that I bought was a

3    counterfeit, virtually every bottle that I bought was a

4    counterfeit.  This is easy, this is what I paid; therefore,

5    that's what I want back, and it doesn't match up with reality.

6          The other reality that it doesn't match up with is the

7    ability of this man to even have been able to create that.  He

8    had phenomenal taste.  He was able to recreate and put together

9    something which matched the taste of these fine wines.  But

10   your Honor saw the pictures at trial.  Your Honor saw the sink

11   in the house.  Your Honor saw the little device that could be

12   used to put the corks in and to recork it.  And granted, he had

13   all the labels that he might need, because it's as easy to

14   print 500 labels as five -- he had all the labels, he had all

15   those parts -- but putting together each of those bottles would

16   be a very time-consuming thing.

17         And we saw for ourself when the FBI came in and raided

18   the house, you know, three bottles soaking in the sink, a

19   couple of bottles sitting up on the counter.  This is not a

20   production line that turns out thousands and thousands of

21   bottles, as the government would want us to believe, because

22   we've got $40 million worth of stuff that he bought and is

23   reselling, and that's a big part of what goes out there.

24         And that's why when we look at some of the reports,

25   like Mr. Doyle says, OK, 69 percent of what was sold in these

E7OKKURS

1   auctions was probably counterfeit.  Those are more realistic

2   sorts of figures.

3        The Doyle figures -- the Doyle claim is insufficient.

4   We haven't been given enough information to be able to

5   adequately respond to it, and the Court hasn't been given

6   enough information even to make proper estimates with regards

7   to it.  It's too big a claim, it's too important a claim, to be

8   accepted, and we ask the Court to reject that.

9        As to Mr. Fascitelli, again, it's the same sort of

10  difficulties.  5.5 million is what he says he paid for the

11  wine, yet somehow it's all bad.

12       And I am confused by the argument, because it was our

13  understanding that 5.5 million represents what Mr. Fascitelli

14  bought altogether.  Well, he bought at some of these auctions.

15  In fact, when Mr. Egan testified, he put these slides up on

16  during trial, he tells us that the two big buyers were

17  Fascitelli and Koch.  Those were the two big buyers that bought

18  at those auctions.  And why would we be given all the reports

19  on Mr. Egan if the reports weren't covering Mr. Fascitelli's

20  purchases.  That's what they were coming through for.  Granted,

21  they don't say, they say it's a client, some unnamed client.

22       So the 69 percent is what we see when we look at those

23  reports, and it's -- quite frankly, it's a fair figure to

24  apply.  We think it's an appropriate figure to apply, and we

25  think that it gives a fair number to Mr. Fascitelli.

E7OKKURS

1          And we are willing -- we think, your Honor, that for

2     the purposes of loss calculation, wines that were never

3     delivered ought not to be counted for loss calculation.  This

4     case was not about Mr. Kurniawan promising and not delivering

5     wines.  This was a case about Mr. Kurniawan promising and

6     delivering the wrong wines.  So, some of the wines that he did

7     were wrong.  But we do agree that those numbers can come back

8     in for restitution purposes, because Mr. Kurniawan agrees that

9     he owes that money to people, they never got anything.  We just

10    think that should be kept out.

11         So, that's why, when you look at our calculations, we

12    believe --

13         THE COURT:  Do you have a number for Mr. Doyle and/or

14    a number for Mr. Fascitelli?

15         MR. MOONEY:  We have no number for Mr. Doyle, your

16    Honor, because we have absolutely inadequate information to

17    work with.  We just don't know.  If you applied Mr. Egan's

18    figures, the 69 percent figure, the 69 percent of what

19    Mr. Doyle bought was also probably bad -- what would that give

20    us -- that would put us up around 8 or 9 million.  But it's

21    just inadequate information to deal with.  We're poking a stick

22    in the dark on Mr. Doyle.

23         As for Mr. Fascitelli, we do, your Honor, we claim

24    that the loss figure should be 3.3 million, but the restitution

25    should be 3,795,000.  And like I say, for the 3,795,000, we've

E7OKKURS

1    put that 684,000 back in.  So we think that's a proper figure

2    for Mr. Fascitelli.

3         Mr. Hobson, we're having some of the same sort of

4    difficulties with.  We were not able to adequately determine

5    from what we were given a proper way to really sort of put that

6    together and figure it out.

7         As a result, what we did do is we had -- we did have a

8    good expert report there, and the expert looked at, and

9    identified a bunch of bottles, and said here's the bottles that

10   we think are bad.  Now, some of them, the bottles, he said,

11   well, I can't make an opinion on these, I don't know, I'm not

12   saying one way or the other.  I don't think you can hold those

13   as bad bottles, but with regards to the ones that he listed as

14   being improper, we actually went through and found them in the

15   purchase receipts from Mr. Hobson, and we gave your Honor a

16   chart, and if you'll look at the chart, they come up to a total

17   taking up -- the ones that he had no opinion on, it's $845,366.

18   To that, we added back -- we think the loss figure would be

19   845,000.  We think the restitution figure, you add back in the

20   552,000 that he didn't receive, and it comes to 1,397,000.

21        The same rules that are required for the purposes of a

22   conviction or trial really don't apply in these proceedings,

23   but still, still, the real --

24        THE COURT:  The burden of proof here is preponderance

25   of the evidence.

E7OKKURS

1          MR. MOONEY:  Correct.  We're down from conviction.

2          And the evidence that's relied upon has to have some

3     reliability, and there's got to be a chain.  It has to go, I

4     mean, A, B, C, D, E.  You can't go A, B, C, E.  And,

5     unfortunately, what we got when we're looking to some of these

6     claims that are being presented is a big gap.  And when there's

7     a gap, we are not in a position where we can even confront it

8     and come forward, because there's just a gap there, the

9     information is insufficient.  We deal in things that follow

10    logically from one point to another, and that requires that the

11    pieces be tied together.

12         And in the case of Mr. Doyle, they're absolutely not

13    tied together.  In the case of Mr. Fascitelli, there is some

14    information that isn't there, but we can come to a conclusion

15    based upon the reports that are done.  And in the case of

16    Mr. Hobson, there's information there that would support the

17    numbers that we have put forth.

18         So, we ask your Honor to use those numbers, your

19    Honor.

20         THE COURT:  OK.  Thanks.

21         Did you want a one-minute rebuttal?

22         MR. OKULA:  Since we have the burden, just two

23    minutes, very briefly, your Honor, to respond to a couple of

24    the arguments that they perhaps are not worthy of response, but

25    I just wanted to beat the drum, nonetheless.

E7OKKURS

1          With respect to the Twellman affidavit and the

2     underlying analysis done by the ink expert, I think I heard

3     Mr. Mooney say something to the effect of, well, that person

4     was just an ink expert.  Well, so what?  If that person

5     determines that laser jet printing was not used on those types

6     of wine bottles in Burgundy during those years, it's case over.

7     So you don't need a wine expert to come in to tell you that

8     those bottles are fake.  Some person with particularized

9     knowledge and the ability to give you information like that

10    those -- that printing wasn't done is plainly sufficient.

11         The final thing, your Honor, is Mr. Mooney made the

12    argument essentially that they were hampered, they had a

13    complete inability to look into some of these claims.  Now,

14    don't get me wrong, I'm not running away from our burden here,

15    I recognize we have the burden here, and I submit, most

16    respectfully, that we satisfied it overwhelmingly.

17         But the mere fact that we have the burden doesn't

18    hamper Mr. Mooney from using all the tools that he has

19    available to him to go out, to check these bottles himself.

20    After all, if there's one person in this courtroom who has the

21    ability to look at those bottles and determine whether they're

22    his fakes, you're not looking at that person, your Honor, he's

23    seated right there.  So, if Mr. Mooney wanted to go up to look

24    at the Hobson bottles, all he had to do was ask your Honor for

25    the issuance of a 17(c) subpoena to get some of those bottles

E7OKKURS

1    to look at them himself.

2            So, once again, your Honor, I'm not running away from

3    our burden.  We demonstrated what we needed to demonstrate, but

4    to make the argument that they were completely hamstrung from

5    conducting any analysis themselves of any of these claims is

6    factually inaccurate.

7            Thank you.

8            THE COURT:  So, I had one -- Mr. Mooney, did you want

9    one more --

10            MR. MOONEY:  Yes.  I just want to say, your Honor,

11    Ms. Twellman's affidavit is dated last week.  This isn't

12    something that they produced and gave us a month or so ago when

13    there was time -- that's why we asked for a Fatico hearing, so

14    we could do things like this and take a look at it.  It was

15    July 16th, and we are now the 24th.

16            THE COURT:  So, I have one other question for the

17    government:  On the victims, are you still of the view that

18    there are ten or more victims in a legal sense, or are you less

19    than that?

20            MR. OKULA:  No.  We are of the view that there are

21    more than ten, your Honor, because the people who were

22    victimized through, for instance, the purchases at the

23    auctions, who upon determining that these were fakes, that the

24    auction house took them back.  Or when Kurniawan, the

25    defendant, consigned to the Chicago Hart Davis Hart, the

E7OKKURS

1    distributor there, some of his wines for sale, essentially

2    asked them to act as his spokesperson to consign them for sale

3    to the public, they rejected them as fakes.

4         Those are as much victims as the people who actually

5    suffered out of pocket.  And we submitted, your Honor, that

6    longer list of people who were victims of the defendant for

7    intended loss purpose.  Now, they have been made whole because

8    they got reimbursement from the auction houses, but there are

9    plainly more than ten, yes, your Honor.

10        THE COURT:  OK.  So we are going to take a break now,

11   and then we will resume in about five or ten minutes.  Thanks

12   very much.

13        MR. OKULA:  Thank you, your Honor.

14        (Recess)

15        THE COURT:  My inclination here, before this oral

16   argument and even now, is that the record is sufficient to

17   reach conclusions as to loss, restitution, et cetera, but my

18   practice has been, particularly in a criminal case, to go the

19   extra mile on behalf of the defense in a situation where the

20   defense has asked for further process and further hearing.  So,

21   I am going to do that in this case as well.

22        We have already set a separate proceeding for Mission

23   Fine Wines.  We will do the same for Doyle.

24        What exactly, Mr. Mooney -- or do you want to go off

25   the record and confer with counsel for the government and let

E7OKKURS

| | |
|---|---|
| 1 | me know who's needed, what's needed, you want to see the expert |
| 2 | for Doyle?  Why don't you spend a minute with Mr. Okula. |
| 3 | (Pause) |
| 4 | MR. MOONEY:  Your Honor, the government's going to |
| 5 | provide us with a copy of the expert report, which apparently |
| 6 | they have, and then I think we can decide from there whether |
| 7 | the expert needs to be present, or just Ms. Twellman, or both |
| 8 | of them. |
| 9 | THE COURT:  And when -- you think it's feasible to do |
| 10 | this on the time we have set aside, on Tuesday? |
| 11 | MR. MOONEY:  I have a little bit of a difficulty with |
| 12 | that, your Honor.  I have -- |
| 13 | THE COURT:  Well, you talk to Mr. Okula, and obviously |
| 14 | if we are going to do it, we are going to do it at a time that |
| 15 | you can all be there. |
| 16 | MR. MOONEY:  I have a hearing in a place called Heber, |
| 17 | Utah, on Wednesday morning, and I am not sure how I do a 2:30 |
| 18 | afternoon hearing in New York on Tuesday and get to Heber, |
| 19 | Utah, by 8 o'clock Wednesday morning. |
| 20 | THE COURT:  All right.  When can you let me know what |
| 21 | you both decided in terms of a date? |
| 22 | MR. MOONEY:  I think first thing tomorrow morning. |
| 23 | MR. OKULA:  Yes. |
| 24 | MR. MOONEY:  First thing tomorrow morning, your Honor. |
| 25 | THE COURT:  OK.  So I think that's the fairest thing |

E7OKKURS

1    to do.  As I say, Mr. Okula, my tendency was to agree that

2    there is sufficient information in the record, but we will go

3    the extra step in favor of letting the defense get a crack at

4    the expert.

5            MR. OKULA:  And we are happy to do that, your Honor.

6    In fact, I was going to offer it up at the beginning of our

7    presentation.  I didn't know that it would be necessary or

8    required by the Court, but I had spoken to counsel for

9    Mr. Doyle, who has been the intermediary and working with us

10   diligently in connection with the Twellman and the Deck

11   information, and Ms. Twellman, I understood, would be available

12   next week, but we will agree with Mr. Mooney in the event -- or

13   settle some dates that we can present to the Court.

14           THE COURT:  OK.

15           Mr. Mooney, you should also consider whether you want

16   to combine the Mission Wine with this, at the same time,

17   whenever that's going to be.  It might be the most efficient

18   for you, who does the traveling.

19           MR. MOONEY:  Delta would probably prefer us to have

20   two of them.  I personally would prefer them to be a single

21   hearing.

22           THE COURT:  So I'll hear from you tomorrow morning

23   with suggested dates.  And there's one other matter that I

24   wanted to mention to particularly Mr. Okula.

25           I've asked you a couple of times about this issue of

E7OKKURS

1    victims and the number of victims, because, like the loss

2    amount, the number of victims, whether it's ten or more or

3    whether it's fewer, also impacts the offense level, makes a big

4    difference, and consequently, that drives the sentencing

5    guideline range.  I have obviously some question in my mind.

6          I would ask you, Mr. Okula, when you are considering

7    victim, are you also taking into account the application note

8    that applies to, I think it's 2B1.1?  You don't have to answer

9    now.  Take a look at that and see if that doesn't impact your

10   evaluation of the number of victims or the information that's

11   necessary to present in support of the number of victims.

12         MR. OKULA:  I will indeed, your Honor.  Thank you.

13         THE COURT:  OK.

14         So, we are adjourned.  We have a date.  We will leave

15   it on the calendar for the moment, the Tuesday afternoon date,

16   just for purposes of good order, but it's anticipated that I

17   will hear jointly from you first thing tomorrow morning, OK?

18         Great.  Thanks very much.

19         MR. MOONEY:  Thank you, your Honor.

20         THE COURT:  You bet.

21         (Pause)

22         THE COURT:  Christine mentioned that you all have

23   proposed three dates.  Of those, I would say the one that is

24   most sensible is August 4, it's a Monday.

25         I'm thinking, also, for you, Mr. Mooney, you might

E7OKKURS

1    want to come on the Sunday, the day before, to be here,

2    obviously, or the Saturday might be easiest for you travel

3    wise.

4             So I think that's the date that makes most sense.

5    That works for everybody and all the people, the witnesses.

6             My plan -- I take it yours, also, both of you -- would

7    be that when we conclude this proceeding in the morning, we

8    would then move to sentencing, so that we would wrap it up on

9    the same day, right?

10            MR. OKULA:  Very well.  Yes, your Honor.

11            And I think we alluded earlier, and certainly to our

12   filing -- in our filing this morning, to the notion that as we

13   are providing additional information, we are continuing to have

14   conversations with the defense about, in light of the

15   additional information, whether a hearing is still necessary.

16   Should we ultimately reach a decision in some regard, either

17   with regard to the Doyle claim or the Mission Fine Wine claim,

18   that the witnesses are not necessary, that the defense does not

19   wish a hearing on that, I assume we can alert the Court, and

20   then we can proceed to the sentencing at the earlier time that

21   day?

22            THE COURT:  On the same day?

23            MR. OKULA:  Yes, same day.

24            THE COURT:  Absolutely.

25            MR. OKULA:  The start time.

E7OKKURS

```
 1              THE COURT:  We will absolutely reserve -- well, yes, I

 2     think we will stick with that.  I was going to say it can even

 3     be earlier than that, perhaps, but we're splitting hairs in

 4     terms of how much time is available.

 5              So, yes, 8/4 is devoted to you.  And we would do the

 6     hearing at, let's say, 9:30, we'll shoot for 9:30 on the 4th.

 7     And if, as Mr. Okula is pointing out, something else happens,

 8     and you don't need to have a hearing, we will do the sentencing

 9     at 9:30.  How's that?

10              MR. MOONEY:  We always try to be as accommodating and

11     helpful as we can, your Honor.

12              THE COURT:  And me, too.

13              All right.  Great.

14              MR. OKULA:  Just for point of clarification, your

15     Honor, do we understand correctly that your Honor has heard

16     enough with respect to Fascitelli and Hobson, and that that

17     issue, for your matter, you obviously have to announce where

18     you're at that, but there is nothing additional your Honor

19     wants on those?

20              THE COURT:  I'm comfortable that I have enough

21     information.  I think, as Mr. Mooney pointed out, that the

22     amount in question for Doyle is so significant, that it kind is

23     the most important that we do.

24              MR. OKULA:  Understood, your Honor.  Thank you.

25              THE COURT:  All right.  Thanks so much.
```

E7OKKURS

1          MR. MOONEY:  Thank you, your Honor.

2          THE COURT:  You bet.

3          MR. VERDIRAMO:  Thank you, your Honor.

4                          *  *  *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25