E87MKURS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                           12 Cr. 376 (RMB)

5    RUDY KURNIAWAN,

6                   Defendant.

7    ------------------------------x

8                                      New York, N.Y.
                                       August 7, 2014
9                                      9:40 a.m.

10

     Before:
11
                        HON. RICHARD M. BERMAN,
12
                                       District Judge
13

14                          APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     STANLEY J. OKULA
17        Assistant United States Attorney

18   JEROME MOONEY
     VINCENT S. VERDIRAMO
19        Attorneys for Defendant

20

21

22

23

24

25

E87MKURS

```
 1                (Case called)
 2                THE COURT:  We have a few things to go over.  You may
 3      remember from our last in-court session we put the matter over
 4      to today for first a hearing and then for the sentencing
 5      itself.
 6                In the interim, the lawyers have been working
 7      diligently, one with the other, and it appears that there is no
 8      need for a hearing because there is either agreement or
 9      agreement to disagree on certain items that I'll need to
10      resolve.
11                Let's start with this, a brief hearing from the
12      lawyers for both sides.  I received a letter dated August 5,
13      2014 from Mr. Mooney and one of the topics of the hearing that
14      had been scheduled was Mission Fine Wines.  I have a question
15      for you when you address this issue.  It seems as if the
16      government and the defense agreed on a number of $2 million.
17                MR. OKULA:  Yes, your Honor.
18                MR. MOONEY:  Yes, your Honor.
19                THE COURT:  And I thought the number was $2,326,450,
20      from the report in question.  So maybe you could address that
21      when you speak.
22                Then the David Doyle was another sort of big-ticket
23      item.  If I understand correctly, the defense agrees that David
24      physically is owed 15.11 million in restitution but that for
25      the loss amount the number is somewhere around 8 million plus.
```

E87MKURS

 1    That's the way I understand it.

 2           I'm happy to hear from both the government and

 3    Mr. Mooney as to why we don't need the hearing and what's been

 4    agreed to and what's still open.

 5           In any order you like.

 6           MR. OKULA:  I'm happy to have Mr. Mooney go first,

 7    your Honor, because I think that would establish a certain

 8    baseline in terms of what we have agreed to.

 9           MR. MOONEY:  I think that makes sense, your Honor.

10           First of all, your Honor raised the question of

11    Mission Fine Wines.  The report did show $2.3 million in

12    current value.  And we had still some questions with regards to

13    some of the bottles that were included and whether those were

14    properly allocated or should be properly allocated to

15    Mr. Kurniawan.

16           We also had serious questions, and it's similar to

17    what we phrased with Mr. Doyle, with regards to the process of

18    using current values for wines when, in fact, for the purposes

19    of loss calculation it ought to be what was actually paid back

20    at the time, and so that undercuts that.

21           What happened, there was negotiations that we entered

22    into with regards to Mission and our figure was like 1.5

23    million and their figure was someplace between 2 and a half and

24    three million.  Ultimately we arrived at a figure of 2 million.

25    And it was my understanding that Mission also agreed to the $2

E87MKURS

1   million and that's why it's a settlement of the parties for the

2   purposes of both restitution and loss.

3               THE COURT:  Mr. Okula.

4               MR. OKULA:  It is a settlement for the purpose of

5   restitution and loss in the $2 million figure, your Honor.

6               THE COURT:  I'm happy to adopt that figure then under

7   those circumstances.

8               How about David Doyle?

9               MR. MOONEY:  With respect to David Doyle, we have a

10  similar kind of situation, your Honor.  And what happens with

11  David Doyle, the first document that we received from Mr. Doyle

12  with respect to the situation was an inventory, Exhibit B,

13  prepared by Susan Twellman that is the 1500 bottles of wine

14  that Ms. Twellman says were purchased from Mr. Kurniawan, that

15  upon his arrest they put together and stuck away in the

16  warehouse, and then they created this list.

17              And, once again, what we have on this list is the

18  current value of those wines.  If the wine was what it was

19  supposed to be, they are telling us that the current value of

20  those would be $17.7 million for those 1500 bottles.  That's

21  today's value.  As we pointed out in the letter, for the

22  purposes of restitution, your Honor could use current value.

23              We have had some negotiations with Mr. Doyle's

24  lawyers.  We have also had discussions with the government with

25  regards to it.  Because they have come up with a current

E87MKURS

valuation that exceeds the 15.11 million that the government

was claiming, we are in agreement that for the purposes of

restitution the 15.11 million dollar figure is appropriate and

can be used.  We still think that some of these things in here

are a little high, but we are agreeing to that number primarily

because they have a justification that they have put forward

that makes sense.

     THE COURT:  Is it also your position that for purposes

of loss calculation the number is $8,862,000?

     MR. MOONEY:  We think that the appropriate number for

loss should be half of what the current value is.

     THE COURT:  What's that number?

     MR. MOONEY:  And that number is $8,840,000, your

Honor.

     THE COURT:  $8,840,000.

     MR. MOONEY:  Correct.

     We don't have all the data.  One of the things, if you

recall, one of the things that we were pushing for and that we

were unhappy about was that we needed to see what did he pay

for the wine.  We didn't have that information.  That

information was then supplied.  On Monday we received it from

Mr. Doyle's lawyers.  It's incomplete.  It doesn't have

everything.  But that's okay.  One would not expect necessarily

to have everything for purchases from 2005 to 2008.  But it

gave us a substantial amount of information and it allowed us

E87MKURS

1     to then go through.

2             And to the extent that we could, we went through the

3     list and marked down the differences between what was paid for

4     the wine and what the current values of the wines were.  And

5     you get things.  For example, a magnum of the 1921 Chateau

6     Chival Blanc is being shown on the inventory, $20,810.

7     Mr. Doyle purchased it from Mr. Kurniawan for $10,000.  The

8     1947 Chateau Chival Blanc magnum is listed on the inventory at

9     $22,982.  It was purchased for $12,500.  Some of them are

10    dramatically high.  Some of them, in all fairness, have stayed

11    about the same and maybe even dropped a little.  The 1961

12    Chateau Haut Brion is shown at $7,049, whereas 6,000 was paid

13    for the same bottles and 800,000 was paid for some others.  I

14    can go through more of them.

15            THE COURT:  I just wanted to establish that you feel

16    you can go forward without a hearing, which is, I think, what

17    you all indicated to me, based on the record, and you will

18    argue what the record shows.

19            MR. MOONEY:  That's correct, your Honor.  That's

20    correct.  We think that in the record, as we have it now, with

21    the materials that we presently have, there is sufficient

22    information for your Honor to make appropriate findings.

23            THE COURT:  You agree with that, Mr. Okula?

24            MR. OKULA:  I do.

25            THE COURT:  Just one other thing.  We are discussing

E87MKURS

```
 1    these figures.  The last time we pointed out that the amount of
 2    loss is a driver of the sentence that Mr. Kurniawan will
 3    receive in the sense that in a fraud case the guideline range,
 4    which albeit is no longer mandatory, but is something that we
 5    still pay attention to, it's one of the factors that we look
 6    at.  So the guideline range of incarceration is a function of
 7    the total amount of loss, which is why you all and the Court
 8    have been spending all this time trying to figure out what the
 9    amount of loss is, A, and, B, it makes a pretty big difference
10    if the loss is somewhere between 7 and $20 million as opposed
11    to being between 20 and $50 million.  Isn't that right?
12              MR. OKULA:  Yes, your Honor.
13              THE COURT:  We are really arguing about where in those
14    two categories the loss is.  And just before we go further, do
15    I understand the defense to be saying that the loss, adding up
16    Fascitelli, Doyle, Devine, Koch, Mission Fine Wines, Spectrum,
17    Andrew Hobson, Reid Buerger, and Acker Merral is 19 million
18    plus?  Is that where you are?
19              MR. MOONEY:  That's correct, your Honor.  We are at
20    19.2 million.
21              THE COURT:  You are 800,000 shy of this threshold?
22              MR. MOONEY:  That's correct, your Honor.
23              THE COURT:  And you, Mr. Okula, are well over the 20
24    million.  You're somewhere, in fact, in the 30 million, 35
25    million dollar range, right?
```

E87MKURS

1          MR. OKULA:  I think that's correct, your Honor, yes.

2          MR. MOONEY:  I think your Honor mentioned Acker

3   Merral.  Acker Merral is not a victim in this.

4          THE COURT:  I thought the defense chart showed Acker

5   Merral for $450,000.

6          MR. MOONEY:  No.  I think that's somebody else.

7   Excuse me.  That's the Acker Merral & Condit auction.  That is

8   the 450,000, Truly Hardy's testimony.

9          THE COURT:  Did either of you want to say anything

10  preliminary?  This is going to take some time because there are

11  lots of details.  We have also done a rather close examination,

12  particularly in the area of loss, because there is so much at

13  stake here.  And where we could, we did a bottle-by-bottle

14  analysis.  It is going to take me a little while to go through

15  all that.

16          What I thought I would do is start the sentencing,

17  there will come a time that I'll ask you again, unless you want

18  to say anything further now, to comment:  Defense,

19  Mr. Kurniawan, Mr. Okula.  And then there will be another

20  opportunity if you any of the three of you wanted to add

21  anything further.

22          MR. OKULA:  I think that would be helpful, your Honor.

23          Might I suggest the following, that your Honor closed

24  essentially the argument with respect to Mr. Fascitelli and

25  Andrew Hobson at the close of the last hearing.  Stated another

E87MKURS

| | |
|---|---|
| 1 | way, the only thing that we were going to dispute or argue |
| 2 | today was really Doyle and Mission Fine Wines. |
| 3 | THE COURT:  Right. |
| 4 | MR. OKULA:  I think if your Honor is prepared to |
| 5 | announce where you come out on that, based on the current |
| 6 | record, it could influence heavily the length of the |
| 7 | proceedings because if you find, for instance, that the full |
| 8 | amount of the Fascitelli loss is appropriate above 5 million, |
| 9 | that's going to put the guidelines loss even for |
| 10 | Mr. Kurniawan's position above 20 million, which is going to |
| 11 | make academic any further argument on that point. |
| 12 | THE COURT:  I get that.  I am going to do it the long |
| 13 | way so we have a record in one place.  Admittedly it will take |
| 14 | a little bit longer.  I am prepared to give you my impression |
| 15 | of what the loss is for each of them.  And I think, even if |
| 16 | it's somewhat repetitious, I am going to do it again. |
| 17 | We are here then today for sentencing of Mr. Kurniawan |
| 18 | following his convictions on December 18, 2013 of one count of |
| 19 | mail fraud and one count of wire fraud.  These related to his |
| 20 | manufacture and sale of counterfeit high-end wines and also to |
| 21 | his obtaining a $3 million revolving loan from Fine Art |
| 22 | Capital, which is a subsidiary of Emigrant Bank.  He did that, |
| 23 | the latter, by providing false information to the bank, |
| 24 | including that he was a permanent resident of the United |
| 25 | States, which he is not, and also by pledging assets to secure |

that revolving credit loan, and those assets included paintings

by prominent artists, including Andy Warhol and Damien Hirst,

among others, which he also pledged to other creditors.

I thought it would be useful, again, to have in one

place, not necessarily required for sentencing, but a brief

summary of the principal phases of this case, and they are, as

I understand them, the following:

First, for the arrest and remand, Mr. Kurniawan was

arrested at 9638 East Naomi Avenue in Arcadia, California,

where he was living with his mother, on March 8, 2012.  Central

District of California Magistrate Judge Hillman at the time of

his arrest imposed home incarceration with electronic

monitoring.  There was an appeal by the government of that

initial bail package.  That appeal was heard by Southern

District of New York District Court Judge Denise Cote on March

19, 2012, and at that time, incidentally, the defendant and his

then attorneys, as well as two Southern District of New York

Assistant U.S. Attorneys, appeared from the Central District of

California by video conference.  That was with Judge Cote, who

was here in New York.  And Judge Cote denied bail which had

been set and ordered a remand of Mr. Kurniawan.

No subsequent bail application has been made to me

since that time.  And on May 23, 2012, I advised

Mr. Kurniawan's former counsel, Michael Proctor, of the

following.  I said to him:  I don't actually know what your

E87MKURS

position is, Mr. Proctor with respect to bail, if you are

seeking a new determination or if you are comfortable with

Judge Cote's ruling.  That's in the transcript of May 23, 2012

where Mr. Proctor responds:  We are not seeking a new bail

determination today, your Honor.  We are still continuing to

explore bail resources, and I would not be surprised if there

was an application to your Honor at some point in the process.

Mr. Kurniawan is a citizen of Indonesia and he has been

detained ever since his arrest, which is now over two years

ago, and there is a likely immigration hold on him based upon

his being a foreign national and also based upon an earlier

denial of his application for political asylum in the United

States, and an order of his removal from the United States.  So

that's I'm calling phase 1 or that's one aspect of the case,

historically.

          2 relates to the same date and it relates to this

search of Mr. Kurniawan's home pursuant to a search warrant on

March 8, 2012 from which search was obtained evidence that was

introduced in the trial of this case in December of last year,

and that evidence included, without limitation, numerous wine

bottle labels, seals, wax, corks, cork remover, cork inserter,

laser printer, wine bottles, some of which were full, some of

which were empty, some of which were partially full, computers,

et cetera.  That search was the subject of a defense motion to

suppress any evidence seized from Mr. Kurniawan's home on the

E87MKURS

1  grounds principally that the FBI agents involved in the search

2  allegedly conducted an unlawful, what's called protective sweep

3  of Mr. Kurniawan's home.  That motion was opposed by the

4  government through a written submission, and at the time

5  neither the defense nor the government requested a hearing on

6  the motion to suppress.  Rather, the parties stipulated that an

7  evidentiary hearing was not required.  And that motion was the

8  subject of a separate written opinion and order by me dated

9  January 17, 2013.  And attached, incidentally, to that order as

10 Exhibit A is a color photo view from the threshold front door

11 of Mr. Kurniawan's home.

12         And in that order I determined, among other things,

13 that the search of Mr. Kurniawan's home was lawful and that

14 there was probable cause for the issuance of a search warrant

15 by United States Magistrate Judge Michael R. Wilner of the

16 Central District of California, a search warrant which he

17 authorized on March 18, 2012, based on several things, one of

18 which was the criminal complaint against Mr. Kurniawan, dated

19 March 5, 2012.  That complaint included sworn statements of FBI

20 agents tying the home to alleged criminal conduct.  It was also

21 based, the search warrant was, on what we call plain view items

22 observed by law enforcement at the time of Mr. Kurniawan's

23 arrest and which were described to Magistrate Judge Wilner.

24 And it was also based upon the experience of law enforcement

25 officers involved in the case.

E87MKURS

1        I found that there was probable cause to issue the

2   search warrant because, quote, under the totality of

3   circumstances, there was fair probability that contraband or

4   evidence of a crime would be found in the particular location,

5   in this instance Mr. Kurniawan's home.

6        I relied in part for purposes of the probable cause

7   analysis upon the plain view description provided by Agent

8   Farache in his affidavit, dated March 8, 2012, in which he

9   stated, in part, and among other things, from just inside the

10  threshold of the subject Kurniawan's residence front door he

11  observed certain items in plain view.  That affidavit was

12  presented to Magistrate Judge Wilner in support of the request

13  for a search warrant.

14       In the probable cause analysis that's set forth in the

15  opinion that I mentioned, dated January 17, 2013, I did not

16  rely on the color photo taken by law enforcement officers at or

17  about the time of Mr. Kurniawan's arrest, which depicted crates

18  and bottles of wine stacked approximately 10 to 15 feet high in

19  plain view of the threshold of Mr. Kurniawan's door because I

20  understood at the time, and have no reason not to have that

21  understanding now, that that photo itself was not presented to

22  Magistrate Judge Wilner.  And although the Court did not

23  resolve the separate issue, conclusively, of a good-faith

24  search, it found that it was not necessary to reach the good

25  faith issue definitively because of the probable cause finding

E87MKURS

made in that record.  But I also determined that law

enforcement agents who conducted the search of Mr. Kurniawan's

home would have been entitled in good faith to rely on Judge

Wilner's search warrant.

        As you all know, under the good-faith exception, even

absent probable cause, evidence will not be suppressed from the

officer's reliance on the magistrate's probable cause

determination and on the technical sufficiency of the warrant.

Here the magistrate issues were objectively reasonable and the

magistrate was not misled by statements made with reckless

disregard for the truth.

        I also determined in that order and opinion that the

FBI was entitled to rely in good faith upon the search warrant

issued by the magistrate and the photo.  So the photo I thought

and said was relevant to the good-faith issue and that's why it

is attached to that opinion and order as Exhibit A.  That's the

second phase, so-called, or the second highlight of this case.

        The third is the trial which began on December 9, 2013

and ended on December 18, 2013 with the jury verdict of guilty

on both counts.  There were approximately 16 witnesses,

including, among others, Barbara Chu of Emigrant Bank, Truly

Hardy of Acker Merral & Condit, FBI Agent James Wynne, French

Burgundy vintners Laurent Ponsot so who said, "My idea was to

wash the integrity of the terrior of Burgundy.  It was starting

a crusade against the fakers."  That's Mr. Ponsot talking.

E87MKURS

During the trial Ponsot stated, among other things, when you
are a winemaker, and when you see your bottles faked, the first
idea you have is a bit of glory.  You say, Wow, somebody is
counterfeiting my wines.  It means my wines are at a good
level.  But very quickly I said to myself -- this is Ponsot
talking -- yes.  But someone one day will open a bottle and
will be disappointed because it's not the wine I made.  And
that is not good for the reputation of the winery.  It's
dirtying the spirit of the appellations of Burgundy."
Christophe Roumier also testified at the trial.  He said:  "I
wasn't sure.  I just wrote down in French.  But I said the wine
was not authentic.  This was my last word on it anyway because
wine had, if I may say, a taste that is not the touch of
tannins that we obtain in Burgundy."  And Aubert Gaudin de
Villaine also came, as you recall, came and spoke and said the
following:  Why are fake bottles and counterfeiting a problem
for the domaine?  It puts a cloud of doubt, you know, on the
authenticity of the wines.  And then a cloud of doubt is the
beginning of less reputation.  It's not good for the reputation
of Burgundy in general and it can be very destructive.  It puts
a cloud of doubt on the authenticity of the wines, he said
again.  When somebody sees a bottle of Romanee-Conti or La
Tache or any other wines, it puts a cloud of doubt.  It's not
good for your reputation.

     We also heard from William Koch, from David Parker,

E87MKURS

from Antonio Beltran Castanos, from Douglas Barzelay, who is a

wine collector and who organized a dinner in 2007 to taste the

so-called Cellar I and Cellar II auction wines.  And he,

Mr. Barzelay, said:  But the wines were -- there were so many

of them that they were so self-evidently fraudulent.  And

Michael Egan, an expert, reviewed 267 bottles and found them to

be all counterfeit.  And Brian Kalliel said:  I can tell you

that he, referring to Mr. Kurniawan, always collected and

brought back the bottles.

Those are the three phases I wanted to summarize.

Turning to sentencing, the rules of sentencing, as you

know, have changed rather dramatically over the past six or

seven years as a result of Supreme Court decisions in the Gall

case, Gall v. United States, in the Kimbrough case, and in U.S.

v. Booker, and also decisions from our own Second Circuit Court

of Appeals in U.S. v. Crosby and U.S. v. Regalado, among other

things.  The upshot of these changes is that the United States

Sentencing Guidelines are no longer mandatory, as they once

were.  Now they are a factor to be considered, but by no means

the only factor.

And now, as a result of these decisions, we, the

sentencing courts, are directed to look at a statute that's

referred to as 18, United States Code, Section 3553(a), which I

have done at least preliminarily over the course of the last

several months or so, while this sentencing has been pursued,

E87MKURS

written about by the lawyers, the subject of numerous

conferences, letters.  I have had some opportunity

preliminarily to consider these factors which go to the heart

of sentencing, and they are as follows:

        One is the nature and the circumstances of the offense

or, in this case, offenses.  There are two crimes.  Another is

the history and characteristics of the defendant.  And then we

seek to accomplish these objectives in sentencing: 1.  Reflect

the seriousness of the offense; another, to promote respect for

the law; another, to provide a just punishment; another, to

afford adequate deterrence to criminal conduct.  So I think

this sentence hypothetically implicates several of these

factors and some of them I have yet to enumerate.  I will pause

for a moment because I think the issue of deterrence is quite

important in this proceeding.

        We also, as an objective, seek to protect the public

from further crimes of the defendant, to provide him as

appropriate with needed educational or vocational training,

medical care, or other correctional treatment in the most

effective manner.  And in doing all that we look at the kind of

sentences available, the kinds of sentences and the sentencing

range established in the sentencing guidelines over which we

have spent numerous days pursuing the sentencing guidelines

criteria and factors and range, even though, as I said at the

outset, the sentencing guidelines are no longer mandatory.

E87MKURS

1  They are just one of several of these factors that we consider.

2          We look at any policy statements issued by the

3  sentencing commission, we seek to avoid unwarranted sentence

4  disparities among similarly-situated defendants, and to provide

5  for restitution.

6          Our practice as sentencing courts is to start with a

7  guidelines analysis, where we have been for the last at least

8  several weeks, perhaps months.  And I will spend a fair amount

9  of time yet in this discussion today on the guidelines

10  analysis.  I hope you will bear with me.  It's a somewhat

11  technical but, I suppose, worse than that, it's lengthy.

12          So the parties in this case, that is to say, the

13  defense and the government, and also the probation department

14  have made separate submissions about the guidelines analysis.

15  And they each, the three of them, I won't say dispute one

16  another, but they have come up with different sentencing

17  guideline ranges.  So the defense in this case says that the

18  range of incarceration is between 70 and 87 months under the

19  guidelines and that's based on what we call an offense level of

20  27 and a criminal history category of I.  That's the defense

21  position.

22          The government, on the other hand, says that the range

23  is higher and that it's 135 to 168 months of incarceration

24  based on what they believe is appropriate offense level, which

25  is 33, and a criminal history category of I.

E87MKURS

1          The probation department, which is an arm of the

2    Justice Department, they did a calculation and they believe

3    that the guideline range is yet higher still.  They believe

4    that the range is 168 to 210 months of incarceration based on

5    an offense level of 35 and a criminal history category of I.

6          Most respectfully I am not going to consider much

7    further the probation department's range.  I think that I have

8    discussed this with the lawyers.  I think that it's incorrect.

9    I think that in their analysis what the probation department

10   did was to tack on Mr. Kurniawan's second guilty verdict, so to

11   speak, for the Fine Art Capital situation.

12         I added that to the other fraud count and I think that

13   appropriately that was not to happen, that in a case like this

14   the conviction of the counterfeit wine is so much higher, that

15   is to say, the guideline range, than the second count, that the

16   second count is, I won't say disregarded, but is not

17   cumulative.  You can all address that if you feel differently

18   when we come to it.

19         The principal difference among these three or a

20   principal difference is, and we have talked about this on July

21   24, is the amount of loss, loss in these circumstances is a

22   term of art and loss is defined as the actual loss and that

23   means the reasonably foreseeable pecuniary harm that resulted

24   from the offense, plus the intended loss, which means the

25   pecuniary harm that was intended to result from the offense and

E87MKURS

1   even, that is to say, the intended loss, even includes the

2   pecuniary harm that would have been impossible or unlikely to

3   occur.  An example given is a government sting operation where

4   there really can't be an actual loss, but nevertheless the

5   pecuniary loss intended, even in a sting operation where there

6   will be no actual loss, is included in the definition of loss.

7          And under the guidelines, loss includes the value of

8   all property taken, even though all or part of it may have been

9   returned.  That's found in <u>United States v. Brach</u>, 942 F.2d 141

10  a Second Circuit case from 1991.

11         So the big dispute, as I say, is the amount of loss.

12  The defense, Mr. Mooney said a minute ago I think that the loss

13  was 19.2 million, give or take, but not 20 million.  And the

14  government says that it's over 20 million, probably closer to

15  30, 35 million.  It doesn't matter.  The range is 20 to 50

16  million.  So anywhere in that range would put you in a

17  different category.

18         In its submission, dated May 1, 2014, the defense

19  requests of the Court a sentence for Mr. Kurniawan of time

20  served.  So that means the time that he has already served, the

21  defense is asking that that be his sentence today.  And in that

22  submission the defense explains how Mr. Kurniawan became

23  involved in the wine business.  It recounts that at age 22, at

24  a birthday celebration for Mr. Kurniawan's father,

25  Mr. Kurniawan ordered a bottle of Opus One.  He enjoyed the

taste and learned that he had an unusual ability to discern

subtle differences between one wine and another.  This is from

the defense submission.  He began to hone this skill by

purchasing wines from a local dealer in the Los Angeles area

and then tasting them mostly at home.  He would open three or

four bottles, take and compare the wines, then return to them a

day or two later and see if and how the taste had changed as

the wine oxidized.  Rudy began buying wines of increasing

quality and corresponding price.  This is from the defendant

submission.  Rudy started to attend wine tastings at the Red

Carpet, a wine store in the Los Angeles area.  The manager of

the establishment noticed Rudy and invited him to some other

tasting events.  Rudy, still in his early twenties, was the

youngest person present at these events.  Soon the youngster

became a prodigy as others began to note the sophistication of

his palate.

        The defense also notes that Mr. Kurniawan will not be

eligible for release into a halfway house upon his release from

custody as a result of his immigration status.  What that means

is that where there is, and there probably is in this case, an

immigration hold on the defendant, if he were to be released

from incarceration or whenever he is released from

incarceration, he would not be at liberty, but he would be

moved to an immigration facility and his incarceration would

continue, particularly where, as here, there has been an order

E87MKURS

1    of deportation.

2              The defense goes on to request from the Court a

3    downward departure.  This is the jargon of the sentencing

4    guidelines, the older regime where the guidelines were

5    mandatory, where one could still obtain relief from a

6    guideline, even though it was mandatory, by one of several

7    possible downward departures which the Court could make.

8              And here the defense, although we are not in the

9    guideline regime, has made that application and points out that

10   the guideline in the defense view, the guidelines substantially

11   overstates the seriousness of the offenses of conviction, and

12   in support the defense argues that the relative amount expended

13   by each individual compared to his, each individual's personal

14   wealth, and the relevance objective impact upon him as a result

15   of having purchased fake line causes the valuation based merely

16   on sums spent to be overstated.  In other words, the impact on

17   these buyers, many of whom were wealthy, is not as great as the

18   impact might be on someone who didn't have that wealth, and

19   that's one basis the defense is arguing for a lower sentence.

20             The defense is also seeking a lower sentence than the

21   guideline range because of what it calls acceptance of

22   responsibility by Mr. Kurniawan.  And the defense in this

23   context says that only by standing trial and allowing the

24   evidence to be presented could Mr. Kurniawan create a record

25   that will allow the Court of Appeals, the Second Circuit Court

E87MKURS

of Appeals, to clearly focus on the relative importance of this
search, which I mentioned a few minutes ago, as part of the
proof presented against him.

Defense goes on to say that although Rudy did make the
government prove its case, he neither testified nor presented
affirmative evidence that he did not engage in the creation of
some counterfeit or altered bottles of wine.

As part of the defense package there is also a letter
from Mr. Kurniawan to the Court dated April 25, 2014.
Mr. Kurniawan states, among other things, the following:  He
says I make no excuses for what I did.  What I did was wrong,
not only legally, but also morally and socially.  He goes on to
say:  Judge Berman, it is important for me to tell you that I
understand what I did was wrong and that I am genuinely sorry
for everything that I have done.  I never meant for things to
turn out as they did.  I never meant to hurt or embarrass
anyone.  I am not evil or violent.  And I am truly sorry for
the shame and pain that I have brought on my family and the
embarrassment I have brought on the people I wanted to be my
friends.  I am willing to make restitution to the people I took
advantage of.

I found the letter to be helpful.  I found one
important point was missing from the letter in that the letter
does not take explicit responsibility for the complex
multimillion dollar mail and wire frauds found by the jury.  So

E87MKURS

1    it doesn't, in fact, say what it is that Mr. Kurniawan did that

2    he is sorry for.

3            By submission dated May 12, 2014, the government seeks

4    a sentence, as I said before, within the range that it

5    calculated, of anywhere from 135 to 168 months.  And the

6    government asked the Court to take into consideration that the

7    defendant does not receive any additional points or incremental

8    penalty as a result of the grouping analysis and the crime

9    committed against Fine Art Capital, Count Two.  That's a little

10   bit technical, but the point that the government is making

11   there is that when I try to make before and when I said that

12   the probation department's calculation I thought was

13   overstated, because the probation department added Count Two on

14   top of Count One.  And under the guidelines the government does

15   not believe, and I agree with the government in this respect,

16   that there should be an additional penalty.

17           So the government's position is, in shorthand, that

18   defendant is essentially benefitting from the fact that there

19   is no incremental penalty for the fraud against Fine Art

20   Capital.  I think the government is correct in its analysis.

21   I'm sure the defense also agrees with that.

22           And the government argues further that Mr. Kurniawan's

23   scheme was long lived and caused substantial economic harm.

24   Kurniawan sold millions of dollars of wine that was not

25   genuine.  And the government notes that a sentence within the

E87MKURS

1    applicable guideline range, which they feel, again, is 135 to

2    168 months, would help send a message to or deter other wine

3    counterfeiters.  The message would be that, quote, cheating

4    others out of their money is a serious crime that will result

5    in substantial jail time.  As I said before, I agreed to this

6    extent, and that is that I do feel that deterrence is a key

7    aspect of today's sentencing.  I think I might stop here for a

8    little bit of a pause and turn to Mr. Mooney and Mr. Kurniawan,

9    if he wishes to be heard, doesn't have to be and to the

10   government or any aspect of presentation that you wish to make

11   on behalf of your clients.

12          MR. MOONEY:  Thank you, your Honor.

13          First of all, I do believe that Mr. Kurniawan does

14   have something that he wants to say to the Court.

15          THE DEFENDANT:  Your Honor, I'm really sorry.  I meant

16   everything I said in the letter.  I thought about a lot of

17   things in the last two and a half years.  Now I just want to be

18   able to take care of my mom, who is not in good health.  That's

19   all that matters.  Thank you, your Honor.

20          THE COURT:  Thank you.

21          MR. MOONEY:  The Court has been helpful this morning

22   in laying out the foundation and the background of where we

23   find ourselves at this point.  This case is unique because

24   there is nothing similar out there.  There have been other

25   cases and other things involving people who have counterfeited

E87MKURS

wines, who have sold counterfeit wines.  Other than the single
case in Europe that we made reference to in our pleadings,
there have been no other cases.  There are some new cases now
also in Europe.  This is the only one in a United States
federal court.

It's also a unique case and it's really sort of our
key point, because of what ends up being central to this.  And
it's the concept of bottles of wine that receive such a huge
inflated value over what almost any of us can even comprehend
that the numbers start to become frightening when we start to
look at them and we add them all up.

That's why one of our key points with regards to all
of this, and I think I really do want to start there and then
maybe talk about some of the other technical things.  One of
our key points is the guided departure that's provided by 20(c)
in 1B1.1.

One of the things that the commission understood --

THE COURT:  The sentencing commission.

MR. MOONEY:  -- sentencing commission understood, when
they created and put together the guidelines, was that there
were going to be some artificial benchmarks that were going to
be created to try to come up with a numerical evaluation of
things.  One of those was in what we see here with regards to
economic crimes.  Sort of made sense to say, well, let's look
at things in terms of what the values of those things were

E87MKURS

because very often value will reflect what the harm is that was done.  It's easy to see the sort of measure that it would create.

Your Honor is sitting here in this court, in the Southern District of New York, has obviously seen a lot of the cases that have come out some of the financial crimes involving a lot of activities that went on in the mid 2005 to 2010, to some degree ahead, prior to that.

Those cases ended up with a substantial amount of harm being done in many cases that could be measured to a great extent by the amount of money that was involved.  Because in those cases people's retirement disappeared, charities, which depended upon monies which had been placed in the trust of other people, suddenly found that the money was gone.  They could no longer do the things that they had planned to do before.  As I said, people were not able to retire.  They had to stay at work and continue to try to earn money because the money that they had collected and put together and had spent their life organizing to be able to allow them to live was gone.  Companies had to close.  People lost their jobs.  Havoc was reigned throughout the country on the basis of what happened because the money that was lost in those cases was money that was dearly needed and very important to the people who had put that money up and who had put that money at risk and who had lost that money.  The harm in those cases was, to a

E87MKURS

great extent, adequately measured by the economic value of what wend forward.  This case is different.  This case is entirely different.

       To begin with, it deals with something which was not purchased by people as a necessity.  For the most part it wasn't even a real investment.  Judge Oetken calls it sort of a hobby and it seems to fall within that category, although there is value and a person who buys one of these models and decides to put it back some place may well be counting on the thing having some value.  And, of course, as we see from the listing that we get from Mr. Doyle that seems to have gone up in value, I don't know that that means that it's a place where people ought to go put any sort of investment.

       And there is absolutely no evidence, no evidence whatsoever that anybody, any individual, any person ever bought these bottles with the idea of them being an investment.

       And what they paid for them, what they paid for them is absolutely incomprehensible.  We provided information that the average price in the United States paid by people for a bottle of wine is $7.  That surprised me.  I expected it to be a much higher number.  I traditionally spend more than that when I buy wine.

       And when I saw the figures -- and it comes from the industry.  There is a huge difference between $7 and then -- it's absolutely astonishing.  One of the wines that Mr. Doyle

E87MKURS

1  has, a 1947 Chateau Chival Blanc, the second Jeroboam,

2  $231,748.  I don't even want to think about what that

3  translates into in price per drink, price per sip.  One

4  shouldn't have a thimble full of liquid that is worth more than

5  somebody's paycheck.  There shouldn't be a bottle of wine

6  that's three times what people normally make in a year.  And so

7  it just completely misrepresents the actual value and the

8  actual harm of what's done.  That's the problem with looking at

9  this at a strict number basis and that's why it suddenly shoots

10  it up into the stratosphere.  That's why we have suggested to

11  your Honor that the guided departure for overrepresentation of

12  value is appropriate.  Nobody died.  Nobody lost their savings.

13  Nobody lost their job.  Nobody was rendered devoid of things

14  that they needed for their life.

15       Again, I think Judge Oetken says it well.  He says the

16  fraud in this case did not result in death, serious physical

17  injury, or even minor physical injury.  The fraud did not risk

18  any such jury.  The fraud did not result in a restriction of

19  liberty or an insult.  In this case he was talking about

20  Mr. Koch's human dignity by way of discrimination.  The fraud

21  did not cause an economic loss that interrupted Koch's life by

22  interference with his housing, employment, or saving for

23  retirement, and the fraud did not involve any potential

24  vulnerable victims.  And all of the victims are in the same

25  spot as Mr. Kurniawan.  They are all the same.

E87MKURS

```
1           THE COURT:  Is the principle that if you are rich and
2   you get your fraud in, the person who commits the fraud pays a
3   lesser penalty?
4           MR. MOONEY:  No, your Honor.  What I'm saying is that
5   if you defraud somebody who is very rich, even though the
6   number may be bigger, you have to compare that number, using
7   just that number.
8           THE COURT:  What do you compare it to, that person's
9   net worth?
10          MR. MOONEY:  Perhaps.  Or perhaps you look at the
11  impact that it had on it.  It would be different, I submit, if
12  as a result of being defrauded, a rich person ends up having to
13  make adjustments to their lifestyle that is impacted in some
14  way.  It's the impact that it has upon the person that you have
15  to look at.
16          We gave the example in our papers of the theft of the
17  very expensive car, $200,000 Rolls-Royce.  If you steal that
18  car from somebody who has a garage full of cars, it's a
19  $200,000 loss, it's an inconvenience, it's an irritation, it's
20  a crime.  But you go steal the $10,000 Ford from the business
21  who relies upon that vehicle for transportation, maybe the
22  crimes are equal --
23          THE COURT:  You are saying that the theft of the Ford,
24  that thief goes to jail for a longer period than the thief who
25  steals the Rolls-Royce?
```

E87MKURS

1          MR. MOONEY:  Perhaps.  But at least you don't say it's

2     20 times worse for the theft of the Rolls-Royce than it is for

3     the theft of the Ford.  In terms of the impact on the victim,

4     they are at most the same.  They are at worst the same.  It

5     certainly isn't a bigger impact on the person who owned the

6     Rolls-Royce, because the value is greater.  Doesn't that impact

7     that person to a greater extent.

8          In terms of the amount that's available, if I went out

9     and I bought a $150 bottle of wine, and I don't often buy $150

10    bottles of wine, and it turn out to be a bad bottle,

11    counterfeit bottle, or spoiled or something wrong with it, I am

12    going to be unhappy.  I am going to be dissatisfied.  But I

13    haven't changed my lifestyle.  I haven't been affected on any

14    sort of an important level by that.  And my $150 bottle of wine

15    isn't much different than the 5 or $10,000 bottle of wine to

16    the buyers in these cases.  I think that's why Judge Oetken in

17    the Greenberg case said, you have to look at it in terms of

18    what the impact was on the people that were involved.

19         THE COURT:  Judge Oetken, wasn't he in the throes of

20    evaluating the jury's pretty substantial award of punitive

21    damages and he found that to be excessive?  While he did award

22    punitive damages, the jury gave some $365,000 in compensatory

23    damages and then, if I remember correctly, some $12 million in

24    punitive damages.

25         MR. MOONEY:  That's correct, your Honor.

E87MKURS

1          THE COURT:  Judge Oetken, what he was doing there, in

2     the civil case, not in the criminal case, was reducing the

3     amount of punitive damages.

4          MR. MOONEY:  That's exactly what he was doing.

5          THE COURT:  But punitive damages is quite a unique

6     concept.  And so some of the things that he said didn't hurt

7     anybody, didn't cause him to change his lifestyle, didn't

8     embarrass him, might be applicable to punitive damages.  But

9     you are saying we should apply them in this case to a

10    sentencing.  That's the argument you are making, right?

11         MR. MOONEY:  I am, your Honor.  I think there is

12    relevance, because punitive damages are there for the purposes

13    of punishing egregious behavior.  It is interesting that Judge

14    Oetken agreed with the jury's finding with regards to the

15    egregious behavior.  He did not say, no, no, no, the behavior

16    was not as egregious in terms of the fraud that was committed.

17    He went through and clicked it off one by one and said, yes,

18    this was egregious, this was very fraudulent.  He did it on

19    purpose.  There were no mitigating circumstances from the

20    position of what Mr. Greenberg did in Judge Oetken's

21    evaluation.  But instead he said, because it is a punishment,

22    you have to look at the harm that was done.  And he said that

23    the harm is overstated by the $12 million and reduced it to

24    700,000.  So he reduces it by 15 or so times what it would have

25    been otherwise.

E87MKURS

1          We are saying that that type of analysis is

2     appropriate here.  We are all fighting around $20 million.  We

3     are all around that figure in terms of what we are talking

4     about here.  If you take that $20 million figure and you reduce

5     it by 20, you get down something closer to a million dollars,

6     and something in that range makes more sense.  We have even in

7     our memorandum suggested that a 100 to 1 would make more sense

8     of production.

9          THE COURT:  Ratio of 100 to 1 would make more sense.

10         MR. MOONEY:  Would make much more sense in terms of

11    taking it down into a place that more meaningfully represents

12    it.  That's really -- and I think I've probably beat that horse

13    to death.  That's one of our most important issues with regards

14    to this and I think this case has to be looked at in terms of

15    this focus.

16         It's also important with regards to that to look at --

17    and your Honor says deterrence is important and your Honor

18    talked about the testimony from the winemakers.  And their

19    desire, obviously, is to see something happen with regards to

20    this.

21         As your Honor knows, in this area, in white collar

22    cases, very, very long sentences are not necessary for

23    deterrence.  In fact, the deterrent effect of a sentence

24    between three years in prison and five years in prison or seven

25    years in prison in a white collar case doesn't seem to change

E87MKURS

1    much.  The major thing that happens in white collar cases is

2    the loss of reputation.

3         Mr. Kurniawan has been branded -- unlike many other

4    people that may come into this court, this isn't just something

5    that people can look up and find out about by looking at the

6    court records.  His name will always be linked with everything

7    that we see in terms of all of these articles and everything

8    that happened here.  He will have no ability to ever escape

9    from what has occurred.

10        THE COURT:  That's what we call individual deterrence.

11   But there is also a concept of general deterrence which might

12   deter other people from engaging in that kind of behavior.

13        MR. MOONEY:  This is true.  But it does have an impact

14   that way.  Because what occurs is the information that gets out

15   and the very knowledge that somebody looks at and says, this

16   guy was able to counterfeit all of these wines and create all

17   of this stuff.  But look at what happened.  He ended up being

18   caught.  He ended up being convicted.  He ended up spending now

19   29 months locked up and not in an easy place.  He has been here

20   in a situation where if he had been convicted and given a

21   three-year or four-year or five-year sentence two years ago, he

22   would have been off in a much more pleasant place, still not a

23   place that any of us, I think, want to sign up to spend time

24   in, but certainly better than where he's been.  That's

25   something to take into consideration.

E87MKURS

 1          What my point is, in the white collar field it is not

 2   the length of sentence as much as the fall from grace and the

 3   inevitability of some sentence and some period of incarceration

 4   which has the effect.

 5          And we cited in our papers another one of the judges

 6   in this district who specifically pointed out that that was the

 7   case, that in white collar cases lower sentences seem to be

 8   fine, but there was certainly no evidence presented that

 9   indicated that longer sentences in economic crimes and white

10   collar cases would create a higher deterrent effect.

11          It's pretty easy because the kind of people that

12   engage in these kinds of crimes are people who have been

13   accepted into society.  They have been recognized.  They have

14   built themselves up to the point that they now have accumulated

15   some status.  They don't plan to get caught.  That's not what

16   they are thinking about.  And for these people to fall from

17   grace and the loss of everything else that they have

18   accumulated is usually much greater in terms of the impact that

19   it has on them than is the dangerous venue spending time in

20   prison.

21          I was talking about the United States v. Adelson case

22   where the Court made reference to the fact that time in prison,

23   incarceration itself, is a smaller deterrent effect.  The

24   reasons that we put people in prison, the number one reason we

25   put people in prison is to try to protect society.  There is no

E87MKURS

1   evidence that that's necessary with regards to Mr. Kurniawan.

2        We have violent people out there that your Honor sees

3   all the time that we need to keep locked up because these

4   people are dangerous.  We put people in prison sometimes

5   because there is things we can do for them.  They need drug

6   treatment.  They need education.  There is things that can be

7   done to help them out.  That's not present in this case.  All

8   we are talking about here is the deterrent effect that it has

9   for other people who look back at the sentence and the degree

10  of punishment.  And I submit to your Honor that in terms of

11  both of those, the objectives are met by the publicity that he

12  has been exposed to, the amount of forfeiture and fines or

13  forfeiture that's been placed against him.  There is a $20

14  million forfeiture order that we have agreed to which

15  liquidates all of his property.

16       THE COURT:  That occurred on July 24, where you all

17  signed an order of forfeiture in the amount of $20 million.

18       MR. MOONEY:  That's correct.  We all agreed to that.

19  And that is a component of punishment because that's separate

20  and apart from the restitution that he is going to have to make

21  to people, which is another 20 plus million dollars that we

22  have agreed to.  There is substantial punishment that's already

23  been in place.  He has lost everything; most importantly,

24  business reputation.

25       There is no need for further incarceration in this

E87MKURS

case.  The best thing for your Honor to do is get him out, let

him go on with his life, let him learn from these events, and

he has.  He is sorry for what he did.  He realizes how wrong it

was.

         The interesting thing is, with the ability that he had

to create wines that tasted like the great wines, not just

phony bottles, but wines that tasted like the great wines, all

he had to have done was say, this is a wine that tastes like a

1945 DRC, not that it is a 1945 DRC, but it tastes like a 1945

DRC, and he would have been fine.

         It's like the fairly well-known artist in Europe who

created all of these paintings that could have passed for

masters and, in fact, did pass for masters.  We don't know

where all of them are at this point.  He has learned his

lesson.  He knows now.  He is still creating them.  Now he puts

his own name on it.

         THE COURT:  There is a question I have not been able

to find an answer in all of these submissions, and there have

been dozens, from you, from the defense, from the government.

We had the trial.  I think nobody would dispute that if

Mr. Kurniawan had turned his attention to productive or maybe

he would have been a wine consultant or an expert or he would

have been someone that you might consult before you buy a

$100,000 bottle of wine or any one of the number of things he

had so many talents.

E87MKURS

1          Why did he do what he did?

2          MR. MOONEY:  He did what he did because it cost him to

3     be accepted and recognized.  He was insecure, very insecure

4     because even though his family had wealth, it didn't have the

5     kind of wealth that these other people had.  They were a whole

6     different scale.  He wasn't as old as they were.  They were all

7     older.

8          And when he found some of these early bottles, through

9     those he became accepted by these other people.  He wanted to

10    be there.  He wanted to be a part of it.  So he started to

11    create things.

12         Then he gets hooked up with Acker Merral.  And we

13    haven't gone off into a lot of the things that happened there.

14    But they start then feeding it.  They start giving him money

15    and saying, okay, we need wines.  Go find these wines.  We need

16    wines for the auctions.  And he can't perform.  It's kind of

17    like the athlete who has been hired based upon abilities that

18    he does have, which are good abilities, but his abilities

19    aren't going to be good enough to keep him in the game.  So he

20    starts to take drugs so that he can make up the difference.

21         And in Mr. Kurniawan's case he starts to create the

22    wines because he can't find them.  He is buying them.  He

23    bought $40 million worth of wine, 40 million.  36 million of

24    that we know was sold as part of what he put back into his

25    sales.  But he couldn't keep coming up with these great wines.

E87MKURS

1     They just weren't there.  But he could create them and he did.

2          The more he did, the more they gave him money, the

3     more that he had to do more, and it just kept building up and

4     building up.  And it made him popular and gave him connections.

5          If you look at the e-mails, suddenly he's on a friend

6     and first-name basis with people like David Doyle, with people

7     like Michael Fascitelli.  These are the kind of people that

8     somebody like Rudy could never imagine he is going to be on a

9     friend and first-name basis with as their supplier of this

10    thing that they can't get, because nobody can get it.  It isn't

11    there.  It's only there because he is creating it.  He can

12    become the supplier so he can become the friend.  And he gets

13    caught in that emotion of it.

14         The government wants to just make him a greedy person,

15    but the evidence doesn't really support it, because the family

16    had money.  He spent $40 million buying wine.  Most of that

17    came from money from the family.  A lot of it came from the

18    money of the other sales of things.  He could have lived very

19    comfortably and very nice without ever having to have gotten

20    involved in any of this.  But he wanted to be over here and

21    recognized with these other people, and he got caught got up in

22    that whole thing.  He knows better than that.  Besides, he ran

23    forever.  That's never going to happen again.

24         What has it done to the overall industry.  Your Honor

25    had mentioned the Chateaus.  One of the things that's happened

E87MKURS

```
1    is things are starting to change, things need to change.
2    Because we know, to say that Rudy Kurniawan is responsible for
3    the counterfeits in the market would be absolutely unfair, too.
4    We know that the market is flooded with counterfeits.  There is
5    lots of counterfeits, not just the counterfeits that he made.
6    There were counterfeits before he even started ever doing it.
7         Mr. Greenberg's counterfeits didn't come primarily
8    from Rudy.  He bought those at Royal.  Some of those may have
9    come from Hardy Roedenstock.  We know that there is lots of
10   counterfeits.  Mr. Ponsot said that 80 percent of what was
11   there in the fine Burgundies were counterfeits.  Things have
12   changed.
13        The first thing that's changed is the Chateaus
14   themselves, as a result of that, has started to look at this
15   and said, we need to take some actions in order to provide some
16   better protections.  That's one of the things that has happened
17   on a positive note.
18        A second positive thing that has happened is some of
19   the experts, some of the people who have been looking at
20   bottles have studied this.  They have used this case as a basis
21   for collecting information, and now being able to do very good
22   evaluations and very meaningful evaluations of bottles that are
23   out there.  So there is an opportunity to get a better handle
24   of this.  That's what positively changed.
25        What hasn't positively changed.  What hasn't
```

E87MKURS

positively changed.  Most of the auction houses putting some

emphasis on having provenance in terms of the stuff that they

sell.

        THE COURT:  They are or they are not?

        MR. MOONEY:  They are not.  Instead, they just went to

Hong Kong.  And the Hong Kong market is flooded with

counterfeits.

        So is there a deterrence from this case?  You would

think there would be a deterrence.  But they don't seem to

care.  They just moved out of the United States.  That's their

deterrence.  Their deterrence is we will go someplace else

because we don't want to be subject of having problems back

here.

        Mr. Koch went around and sued everybody.  You would

have thought that that would have fixed things.  In some cases

it had some ameliorative effect.  Royal Wine Merchants has now

agreed that they are not going to sell high-end wines, so

Mr. Koch has had some impact on the market.

        When it comes to the level of deterrence, I don't see

a long sentence for Mr. Kurniawan being something that would

deter somebody else from going out and counterfeiting wines.

The people that are counterfeiting wines are probably doing it

other places at this point.  Instead, what has happened, which

is similar to deterrence, is that an industry has looked at the

practices involved and said, we have to make some changes in

E87MKURS

1    term of how we do things, and that's starting to happen.  And

2    we have developed better experts and better tools for experts

3    to be able to do things.  There are positives that have come

4    out of this case.  It won't end it.  It hasn't ended it.  But

5    it's unfair to say that this man is responsible.  It's just not

6    fair to do that.

7              I think the only guideline issue that we have got in

8    terms -- I sort of moved backwards.  The only guideline issue

9    we have really got is whether it's over 20 or under 20, and we

10   think it's just under 20.  The government says it's someplace

11   over 20.

12             We think part of the reason that you've got to do that

13   is that you can't assume that every bottle that Mr. Kurniawan

14   sold was a counterfeit because we know $36 million worth of

15   wine that he sold was wine that he bought.  That's part of

16   that.  We know that that's in there.  The government records

17   show us that 36 million of what was sold was wine that he

18   bought.  And so we are assuming that the majority of that is

19   going to be either good or, if it was counterfeit, it wasn't

20   counterfeit that he knew about, counterfeit that he

21   participated anywhere, counterfeit that he had a hand in.

22             We also know that the values should be what people

23   paid, not the present value.  Therefore, when you look at the

24   information that was provided by Mr. Doyle, you can't take the

25   15 million or the 17 million because that's a current value,

E87MKURS

1    and the values doesn't match up to what he paid.  If you look,

2    what he paid was half or less than that, based upon the records

3    that have been provided to us to take a look at, so that

4    doesn't work.  The same thing applies to others.

5           Mr. Fascitelli.  Mr. Fascitelli said, well, I paid

6    $5.5 million to buy wine.  We also had the same thing with Mr.

7    Doyle.  Part of it was loans.  People would make loans.  Doyle

8    loaned him a million and a half dollars.  Fascitelli loaned him

9    a huge amount of money.  Part of it was anticipation that there

10   would be wines in the future that they would receive.

11          Mr. Egan, when he did the evaluation of the Fascitelli

12   wines, the stuff that he evaluated in the one report comes up

13   as 69 percent.  That's why we said, okay, that's a figure you

14   can use.  In his testimony he talked about $1.2 million in

15   terms of wines that he had looked at, a good portion of which

16   were Mr. Fascitelli's.  One of those figures would certainly

17   make more sense with regards to Mr. Fascitelli.  Part of the

18   problem is that those numbers have not been well established

19   for the purposes of loss.

20          The government has talked about people who turned

21   their wines back into Acker.  Those people were people that

22   should be included.  But that is improper, too.  Because there

23   was 100 percent return policy.  All that means is that after

24   there was controversy over the wines, people didn't want the

25   product.  I may have purchased a General Motors car that has a

E87MKURS

1    faulty ignition switch on it.  Then again, it may not have a

2    faulty ignition switch.

3          But when the recall notice comes out, I take it in to

4    have it fixed or repaired, whether it's bad or not.  And the

5    fact that I took it back in to be fixed doesn't mean it was

6    faulty.

7          So the fact that people returned their wine without

8    some other evaluation of that wine does not mean that there was

9    a thing wrong with any of those bottles.  They well could be

10   part of that $36 million worth of wine that we know was

11   purchased and sold.  All they were doing was using the

12   availability of the return policy to get it back and why not.

13   They spent money on it.  There was some question about it.

14   They don't have to go see if there is anything wrong with it.

15   They just return it.

16         It's interesting that we have no idea whatever

17   happened to any of those bottles.  Acker didn't report, well,

18   we have all these bottles that we took back from people and we

19   had them all tested, they are all bad.  I suspect they were all

20   resold.  We don't know where they are.  That's what I suspect

21   happened to them.  And Acker is not stepping up.  Acker has

22   never come forward at all and said, we have got bad bottles.

23   So none of that could be counted for the purposes of loss,

24   because it hasn't been established.  It's not enough of a basis

25   there.  On that basis we think that the numbers should be under

E87MKURS

1    the 20 million, based what has been established and what we

2    have agreed to in terms of what's appropriate.

3              THE COURT:  Not 19.2 million?

4              MR. MOONEY:  19.2.  It doesn't make any difference.

5    It could be 19.9 or 2 million and 1.  We are saying it should

6    be under the 20 million, not over the 20 million.

7              THE COURT:  It's a lot closer to 20 than it is to say

8    10.

9              MR. MOONEY:  It is closer to 20 than it is to 10.

10   Unfortunately, we use a cliff system for all of these things.

11   You hit the cliff, you drop over the two extra points.  And the

12   two extra points make a difference.  The government has the

13   obligation to establish it.  And there is doubt here and the

14   benefit of the doubt ought to be given to Mr. Kurniawan to say,

15   okay, it's close to $20 million, but it hasn't been established

16   to go over the $20 million.  Therefore, we will keep it down

17   there.

18             Unless your Honor has any questions, that's all I've

19   got.

20             THE COURT:  Why don't we hear from Mr. Okula and then

21   we will take a little break and we will resume with the

22   sentencing.  Is that all right?

23             MR. OKULA:  Yes, thank you, your Honor.

24             Your Honor, the presentation that you heard from

25   Mr. Mooney is quite shocking on a number of levels because he

E87MKURS

is essentially arguing not only with respect to guidelines

calculation but for 3553 factors that there should be two

standards that your Honor applies.  Your Honor should apply two

standards, a different standard for one who carries out an

audacious years-long fraud scheme like Mr. Kurniawan did, as

the jury found.  He should be treated differently and less

harshly than people who commit other types of crimes, like

violent crimes.

That's shocking, your Honor.  It's shocking on a

number of levels.  One, it's not contemplated or even discussed

in the guidelines.  There is no distinction between someone who

victimizes somebody by selling phony Tiffany watches, phony

$5,000 bottles of wine, or the most inexpensive piece of

property.

Your Honor, fraud is fraud, and the defendant carried

out an audacious, multiyear fraud scheme and there is no

distinction in a guidelines or logic for treating it

differently.  Indeed, the guidelines do make an accommodation

for the situation that Mr. Mooney is talking about, but in the

opposite way that he is arguing.  In particular, your Honor,

what Mr. Mooney was saying, these are not people who were

vulnerable victims.  These are not people that when they lost

their property they were put on public assistance or the like.

There is a specific guidelines adjustment for

vulnerable victims.  So the guidelines takes that into account,

E87MKURS

your Honor, and increases the guidelines when people like that
are victimized.  It draws no distinction between a person who
is making $20,000 a year, $50,000 a year, or a person who is a
multimillionaire.

Let me be perfectly clear, your Honor.  We didn't
bring this case because we are carrying water for the people
who were the principal purchasers of these expensive bottles of
wine.  We did it for one simple reason, is that the defendant
carried out a fraud scheme, and we don't draw distinctions
between whether the victims are wealthy or whether the victims
are not wealthy.  Fraud is fraud.  And the defendant happened
to run into the perfect storm of having as an investigator the
FBI's foremost art and counterfeit expert in terms of Jim
Wynne, the special agent who was originally on this case.

But for the work of Mr. Wynne and Mr. Hernandez at the
outset of this case, the defendant could still be selling the
counterfeit bottles.  Indeed, and I'll get to this in a few
moments when we talk about the intended loss, your Honor saw
that tens of thousands of labels that were recovered from his
residence.

But for him having been found out through the work of
Agent Wynne and others and the materials that were recovered in
the search, he likely would still be doing what he's doing
today.

Your Honor, our point is this.  There is no

E87MKURS

distinction in either the terms of the guidelines or the

application notes for giving any adjustment or any downward

adjustment based on the loss figures simply because the

principal victims here are people who were part of the 1

percent.

       Indeed, your Honor, I think although they are not

technically restitution victims in this case, an important 3553

factor for your Honor to consider, and one that your Honor

alluded to earlier, are the victims like Laurent Ponsot, who

testified so eloquently about the harm to his product, his

baby, what he spent years cultivating and creating.

       Once again, they are not strictly restitution victims

in this case.  But to hear from Laurent Ponsot how there is

going to be eternal doubts about whether the bottles that are

purchased in the market are good or not good, based on the work

of this man, for proliferating the creation of those phony

bottles, victims like that, indirect victims to be sure, but

victims like Ponsot and the other owners of the domaines that

were principally victimized the through the defendant's scheme

should be given significant consideration.  And, if anything,

your Honor, it should be a basis for a higher-end guideline

than some sort of reduction.

       Your Honor, we urge you in the most emphatic way to

reject the argument that people should be treated in a

different way under the guidelines simply because what number

E87MKURS

is reported on their tax return.

          This is no principal difference, your Honor, for treating a white collar defendant different from an inner city defendant for incapacitation and for general deterrence purposes.

          Now, I concede readily, your Honor, that the argument for general deterrence is the important one here rather than incapacitation.  But you should not buy into the argument that simply because this is a white collar case that the guidelines are relatively irrelevant and you should not figure or consider the loss amount.  Your Honor, the defendant knew and understood what the potential scope of his fraud was.  In fact, it was his aim not simply to fit in to purchase or to create these bogus bottles because he wanted to be with the crowd, the elite Burgundy tasters at these dinners.  He did it for money.  He could have fit in with that group by bringing his bottles, his bogus bottles, to the dinners without defrauding all of those people, but he did it for the money.

          Your Honor, there are some unbelievably devastating and revealing e-mails that speak directly to what the defendant's attempt, what he attempted to do here is.  And the one attached to our sentencing memo, which was an April 21 e-mail from the defendant to Michael Fascitelli.  Your Honor, this e-mail itself is enough to put your Honor over the $20 million mark and, in fact, closer to 50 million.

1            In that e-mail the defendant, through his conniving,

2    through his misrepresenting, through his luring, really, his

3    lulling of Fascitelli, trying to sell him $30 million of bogus

4    wines, listen to what he says.  He said:  This is just my

5    suggestion, which I think is safest and best for you.  We can

6    go over the original list.  He is referring to an original list

7    of elite wines that defendant had sent to Fascitelli.  And this

8    list, when we meet up in New York and I explain to you in

9    detail why this and that, et cetera, Burgundies, I barely

10   tweaked, as it's where the most money can be made quickly for

11   you.

12           So what he is suggesting, and this directly refutes

13   Mr. Mooney's point whether there is any proof whether anybody

14   did this for investment, Mr. Kurniawan is indicating right here

15   that he understood that Fascitelli was holding some of these

16   for possible resale and, in fact, he is suggesting that you can

17   hold them and they will bring money on resale.

18           But he says, I have strong buyers in that category of

19   old stuff in DRC, referring to the names de Villane, Roumier,

20   and Conti.  What he's saying is, Mr. Kurniawan is suggesting

21   that Fascitelli buy this 30 million dollar bottle of wine, and

22   then he sold him out in the future saying, I have all these

23   buyers that can circle back and you will make money when you

24   can resell it to them, and he says it in the next paragraph as

25   well.  He is trying to lure him in by suggesting he is giving

E87MKURS

him a big discount on this $30 million price.  The defendant

says, I changed the discount at 35 percent parenthetically.

You've got your wish.  And came up to 30 million and change.

And then he discusses more about how he, Rudy Kurniawan, can

bring purchasers of the Fascitelli wine and how the amounts

will increase in the future.

        Why is this important, your Honor?  Because it

directly refutes a number of things that Mr. Mooney just said

to you.  One, he tried to do a -- No.  He tried to take by

fraud $30 million from Mr. Fascitelli.  Two, none of the

victims were really doing this for investment.  Untrue.  Here

he is specifically contemplating that Fascitelli is doing it

for investment, and he is holding out the potential that he,

Rudy, will bring buyers to Fascitelli.  So it directly

undercuts it.

        And Mr. Mooney said, well, you know, he had family

money.  He really did this to fit in.  Did he need the

Lamborghini just to fit in, Judge.  Did he need all the

watches, high-end watches that he bought just to fit in.  Did

he need the two homes to fit in.  Did he need to buy interests

in these elite Los Angeles restaurants like Comme Ca and Mozza.

No.  He did it because he wanted to line his own pockets.  He

did it to line his own pockets.  It's the most rudimentary

elemental aspect of a fraud scheme.  The defendant wanted to

take money by fraud and that's what this case is about, Judge.

E87MKURS

1          You should not draw any distinction between the

2    kingpin of counterfeiters, like Rudy Kurniawan, and say that

3    sentencing to jail is unimportant in white collar cases.  In

4    fact, it's dramatically important for general deterrence

5    purposes.

6          Your Honor, I spent the last couple of years

7    essentially prosecuting the analogue of Rudy Kurniawan in the

8    tax fraud area, and that defendant was sentenced a couple of

9    weeks ago.  He was, by many measures, the most prolific,

10   prodigious purveyor of fraudulent tax shelters responsible for

11   an amount that passed virtually anyone else, $3 billion of

12   fraud.  And there was a 15-year sentence imposed in that case.

13   It was a dramatic reduction of what the guidelines called for.

14         But, your Honor, the sentencing judge in that case

15   recognized that the message had to go out that white collar

16   cases are not victimless cases and in that case the victims

17   were the Federal Government, the treasury, and the state

18   treasuries.  Here, the victims of the defendant are the people

19   who bought his fraudulent line and the owners of the domaines,

20   who had their reputation of their wines sullied and forever

21   called into question in the future as a result of his activity.

22         To be sure, your Honor, the numbers are less for

23   specific guidelines, but they call out for, I emphatically urge

24   you, for a guidelines sentence in this case.  There are no

25   mitigating factors that suggest that a reduction of the

1     applicable guidelines is appropriate here.  It was in

2     unparallel duration.  He did it for years and years and years.

3     When people called him on it, he lied to them, lied to them

4     over and over again.

5            You remember the testimony of Ponsot.  How when he

6     tried to confront the defendant, to get to the bottom, where

7     did you get these wines, where did you get these wines, the

8     defendant told him lie after lie, put him off, wouldn't tell

9     him the truth.  He had a time then to come clean.  He had a

10    time to mend his reputation and to give up the ghost and say,

11    okay, these are all fraud.  But he wanted the money.  He wanted

12    to keep going.  He wanted to continue to sell his fraudulent

13    wines.  Your Honor, there are no mitigating factors here.

14           Your Honor, turning quickly to the guidelines issue,

15    as I just alluded to, the Fascitelli e-mail in itself puts your

16    Honor over the $20 million amount.  I don't know how much more

17    your Honor wants to hear, if that's important.

18           But with respect to a couple of other victims,

19    Mr. Mooney referred to Acker Merral and how those returns

20    shouldn't count for intended loss.  He disregarded totally

21    Mr. Frischman's evidence with respect to the $2 million or so

22    of fraudulent wines the defendant consigned to Hart Davis Hart

23    in Chicago that he tried to sell.  Those in and of itself put

24    them over the $2 million amount.

25           Your Honor, as we cited to the cases in the

E87MKURS

1    counterfeiting area, where somebody who possesses additional

2    counterfeit and is caught at that time, the defendant was

3    caught with what could be sold as millions or tens of millions

4    of dollars of additional bottles to prove the fraudulent labels

5    that he had in his residence.  That, standing alone, is enough

6    to put you over the $20 million amount.

7         Your Honor, unless you have specific questions, I

8    would like to conclude.  Your Honor, the defendant approached

9    his victims.  He promised to his victims that he was selling

10   them.  Ron Cruz.

11        At the end of the day, Judge, what this case really

12   came down to was a defendant carrying out a brand con and he

13   should be punished for that.  Thank you, your Honor.

14        THE COURT:  When you ask for a guidelines sentence,

15   you mean a sentence specifically of what?

16        MR. OKULA:  Well, we have a respectful difference of

17   opinion, your Honor, with respect to the application of the

18   more than 10 victims adjustment.  I know your Honor's

19   preliminary view on that.  I think the cases make clear that

20   even someone who is victimized, someone like Don Stott, someone

21   like Hart Davis Hart determined that they have been defrauded.

22   Even if they don't know the identity of the person who

23   defrauded them, and that's one of the points of points that it

24   made, that they relied on some of the testimony on

25   Mr. Frischman and others saying that they didn't know at that

E87MKURS

1    point in time whether the defendant was the creator of the

2    fraudulent wines or whether he had innocently come into the

3    fraudulent wine.

4          But what is not in dispute, I suggest, your Honor, is

5    that people who receive these bottles knew they had been

6    defrauded because they received counterfeit bottles.  And they

7    returned them after they made the determination that they were

8    the victims of the fraud.  I think, your Honor, under the

9    guidelines, under the strict reading of that guideline, it does

10   allow your Honor to count those people as victims.

11         Your Honor, in this 3553(a) land that we are now, the

12   two-level adjustment, the difference between level 31 and 33 is

13   not that important.  I would suggest, your Honor, that

14   certainly the recommendation of probation, which comes in at

15   the guidelines level, even if you don't count more than 10

16   victims, of 108 to 120 some odd months is the appropriate

17   number in this case.

18         THE COURT:  Thanks very much.

19         We are going to take a 10-minute break and there is

20   some painstaking work I still have to do to reconcile these

21   numbers.  Let's take a break.

22         (Recess)

23         THE COURT:  We need to spend now a little time on

24   this.  It is a little painstaking.  We need to do this.  I have

25   done, with the help of Christine Murray, a detailed analysis of

E87MKURS

1    the record.

2         Incidentally, the record here is voluminous.  In my

3    notes, as of July 24, there were submissions dated May 1,

4    written submissions, May 24, July 18 from the defense; and from

5    the government, May 12, May 23, July 16, July 18, July 22, July

6    24, and now August 4.  So everything I think that possibly

7    could be said on these issues has been said.  And those

8    submissions have all been excellent, by the way, and very

9    helpful.

10        We have been over all of them and where we could we

11   did sort of a bottle-by-bottle analysis.  And we do come up

12   with the conclusion that the amount of loss exceeds 20 million.

13   I'll give you the individual sums and you can total them up and

14   you'll see I think it's probably closer to 30 or 30 plus

15   million.

16        So the rule here is that the Court need only make a

17   reasonable estimate of the loss.  We have done that.  The

18   estimate of the loss shall be based on available information,

19   taking into account as appropriate and practicable under the

20   circumstances.  So that is sentencing guidelines 2B1.1,

21   application note 3C.  We also looked at United States v.

22   Canova, 412 F.3d 331, a Second Circuit case from 2005, and also

23   United States v. Townsley.  The Westlaw cite is 2012 WL

24   3137989.  That's from the Northern District of California 2012.

25        And so here are the loss calculations based as much as

E87MKURS

possible on a bottle-by-bottle review.

          With regard to Michael Fascitelli, we compute the loss
to be $3,651,800.  To get to this sum we reviewed expert
reports prepared by Michael Egan.  One report, dated August
2008 determined that some 60 percent of the wines were
counterfeit.  Another report, also in 2008, determined that 75
percent of the wines were counterfeit.  We listed the wines
determined by Mr. Egan to be counterfeit and then
cross-referenced those wines with e-mails that Mr. Kurniawan
sent to Michael Fascitelli and those e-mails are dated April
21, 2008 and to David Doyle dated June 12, 2007 in which
Mr. Kurniawan offered to sell Fascitelli and Doyle wines for
certain specific discounted prices.

          So the Court used the value of the wines set forth in
Mr. Kurniawan's own e-mails to ascribe a value to each of the
counterfeit bottles.  I think this is a conservative estimate,
so to speak, or conservative calculation, rather, not estimate,
which gives the defense the benefit of the doubt.

          With regard to David Doyle, we ascribe a loss amount
of $13,611,990.  This is based on an affidavit dated July 16,
2004 of Susan Twellman, who is the estate manager for David
Doyle, and the government's supplemental submission dated July
18, 2014 of 15.111990 reflects the wire and property transfers
made to Kurniawan from Susan Twellman on behalf of David Doyle
and that is not disputed.  That number is not disputed by the

E87MKURS

 1    defense and it's reflected in Susan Twellman's affidavit dated

 2    July 16, 2014.

 3        The $15,111,990 amount is further reduced by 1.5

 4    million as that amount, as the defense accurately points out,

 5    was a cash advance and was not directly connected to any

 6    purchase of wine.

 7        The Twellman affidavit incidentally contains a 16-page

 8    bottle-by-bottle description of 1590 bottles of wine and their

 9    current value, if the wine were genuine, that were purchased by

10    Doyle from Mr. Kurniawan, and a separate four-page

11    bottle-by-bottle description of 217 bottles of wine and their

12    current value if the wine were not counterfeit that were

13    purchased by Doyle from Kurniawan through Acker Merral &

14    Condit.  A print expert named Barrett Deck, hired by Mr. Doyle,

15    determined that less than approximately 1 percent of the wines

16    were authentic, and thus the loss figure should be

17    approximately $15 million.

18        The report submitted by Maureen Downey dated August 2,

19    2014 confirms the analysis of the print expert hired by

20    Mr. Doyle in that the sample of 232 bottles of wine of

21    Mr. Doyle's evaluated by Ms. Down were all determined to be

22    counterfeit.

23        By letter dated August 5, 2014, the defense accepts

24    the conclusions reached in the report of Maureen Downey with

25    respect to the David Doyle wines she analyzed, concluding that

E87MKURS

each of the approximately 175 bottles of Doyle wines examined

in Los Angeles and 24 bottles examined in New York were all

counterfeit.

         Ms. Twellman's affidavit of July 16, 2014 is

instructive in another respect.  She says that beyond the loss

of Mr. Doyle's 19 million dollar investment, Rudy Kurniawan's

actions represent utter personal betrayal.  Mr. Doyle and I --

this is Ms. Twellman talking -- considered Rudy Kurniawan to be

a good friend.  We spent a great deal of time together and grew

to trust him and value his friendship.  However, it is now

apparent that to Mr. Kurniawan his friendship with us was

nothing more than a sham, a means to extract millions of

dollars from Mr. Doyle using duplicity and deceit.

         The result has been -- this is still Ms. Twellman

speaking -- the result has been personally devastating to both

Mr. Doyle and me.  In addition, Mr. Kurniawan's scheme has

severely damaged the rare fine wine market and has made the

ability to invest in and trade old rare wines extremely

difficult, without nearly perfect provenance and documentation,

something often impossible to obtain.  Authentic wines are now

viewed with suspicion and have become severely impaired in the

marketplace, making future recovery of investments in these

rare wines questionable.

         Moving along to Brian Devine, I have attributed a loss

to him of $5,320,602.50.  Mr. Devine purchased wines from

E87MKURS

someone named Leny Tan, which could not be consigned due to
authenticity issues.  Mr. Devine was advised by Zachy's that
they would not offer for sale at any time any wine that he
purchased from Leny Tan.  It appears to the Court that
Mr. Devine did, in fact, purchase wines from Kurniawan as
Kurniawan was posing as Leny Tan.  I'm referring to an e-mail
dated September 20, 2003 from Brian Devine to Leny Tan.

        The Court has also reviewed an affidavit from Brian
Devine, dated June 29, 2014, in which Mr. Devine states, among
other things, quote, I never knowingly purchased wine from Rudy
Kurniawan.  All of my purchases were done through Internet
communications with a person named Leny Tan, a/k/a Lenywati
Tan, a/k/a Nakasone Tan, which I have since been informed and
believe were aliases for Rudy Kurniawan.

        I originally purchased wine at a WineCommune auction
from Lenywati Tan on February 26, 2003 and was thereafter
introduced by Leny Tan to Rudy Kurniawan through e-mail.

        During the period 2003 through 2005, I made numerous
purchases of purportedly rare and expensive wine from Leny Tan,
who purported to be acting as a broker for various sellers.  I
paid Leny Tan a total of $5,320,602.50 corresponding to those
purchases.  And so I'm finding by a preponderance of the
evidence that Brian Devine's loss was $5,320,602.50.

        Incidentally, all of these findings are by a
preponderance of the evidence, which is the standard at

E87MKURS

1    sentencing time on these issues.

2              So with regard to Andrew Hobson, the Court attributed

3    a loss of $3,118,856, which is the amount of wines purchased

4    from Kurniawan by Hobson, and expert analysis conducted by Alan

5    Frischman, who determined that the wines were fake.  There is a

6    submission dated July 16, 2014 from the government which

7    contains a five-page summary of purchases of wines made and a

8    four-page description of the counterfeit wines purchased.

9              William Koch, $2,106,486 for loss purposes.  You

10   remember that Mr. Koch has, in effect, dropped out of the case

11   in the sense that he reached a civil settlement with

12   Mr. Kurniawan in California in a case that he brought against

13   Mr. Kurniawan there.  But still for loss purposes and intended

14   loss purposes I have attributed 2,106,486 to Mr. Koch.

15             Reid Buerger, I have attributed for loss analysis

16   $192,254.  To Spectrum Wine Auction I have attributed $686,500.

17   And with respect to individuals who purchased from Acker Merral

18   & Condit and who received full refunds for their purchases,

19   this would include:  Donald Stott, Edward Milstein, Thomas

20   Roberts, Pia Cattaneo, Gene Mulvihill, Tom Tuft, Robert Cane,

21   Gary Hurvitz, Tom Evans, Jeffrey Levy, Benjamin Lewin, David

22   Solomon.  Although I could have used a loss figure and could

23   have used the amount of their refund -- because as is

24   previously noted, the guidelines permit the fair market value

25   of the property unlawfully taken to be used -- I nevertheless

E87MKURS

discounted their respective loss amounts to 70 percent,

approximating the amount of wines that were counterfeited.

That I did based on the testimony largely of Douglas Barzelay

by referencing the tasting that he organized with Don Stott

from the Cellar I and Cellar II wine sales.  We tasted, I

think, it ultimately came to 11 or 12 bottles -- this is from

Mr. Barzelay speaking -- and six or seven of them were clearly

fraudulent.  So roughly 70 percent.

          And as determined by the government expert, Michael

Egan, somewhere between 60 and 75 percent of the wine purchased

was counterfeit.  I'm also relying on United States v. Brach,

942 F.2d, 141 Second Circuit case from 1991.

          Continuing, with respect to Acker Merral & Condit and

the April 20, 2008 Cellar III auction, the Court attributed the

loss of $450,000, which we discussed earlier, the value of

domaine Ponsot wines removed from auction had that as a low

estimate.

          With regard to Hart Davis Hart Wine Company, I

attributed a loss of $2,613,860, which represent the attempted

consignment by Kurniawan to Hart Davis Hart Wine Company in

Chicago that was rejected because all or nearly all of the wine

was fake.  And I relied on the affidavit of Alan Frischman in

this regard.

          With respect to Mission Fine Wines, which we had put

over from July 24 for a hearing today, the need for which has

E87MKURS

been obviated, because the parties agree that the loss to be

attributed to Mission Fine Wines is $2 million.  By letter

dated August 5, 2014, the defense states that it accepts the

conclusions reached by Downey with respect to the counterfeit

wines examined at Mission Fine Wines and that the government

and the defendant are in agreement that the appropriate

restitution and guidelines figure for Mission Fine Wines is $2

million.  Counsel also advised the Court that Mission Fine

Wines is in agreement, I think, with this figure.

         With regard to Christies, I'm not attributing any loss

based upon a lack of documentary evidence at this time, and so

no loss attributed.

         Two other issues that we need to resolve, two other

legal arguments.  As Mr. Okula has pointed out, it makes a

difference in the guideline range as to the number of victims

involved, victims being a term of art as described in the

sentencing guidelines.

         We have determined, I have, for guidelines analysis

purposes that there were less than 10 victims, as defined in

the Mandatory Victim Restitution Act, which says that a victim

is a person directly and proximately harmed as a result of the

commission of an offense.  I'm citing United States v. Ekanem,

383 F.3d 40, a Second Circuit case from 2004.  If you go, as

Mr. Okula pointed out, to the application note 1 of sentencing

guidelines 2B1.1, it defines victim as any person who sustained

E87MKURS

any part of the actual loss permitted under section (b)(1).
And the conclusion is that as some of the alleged victims
received full refunds from Acker Merral & Condit, I am not
including those individuals as victims, pursuant to 2B1.1(b)(2)
for purposes of enhancement.

          Just so you know for the record, I have determined
that there are seven victims, and they are Michael Fascitelli,
Mission Fine Wines, Reid Buerger, Brian Devine, Andrew Hobson,
David Doyle, and William Koch.  We do have, the government and
myself in this regard, a respectful disagreement.

          One more issue, legal issue before we turn to the
other factors of 18 U.S.C. 3553(a).  The question about
acceptance of responsibility requested by the defense.  That is
to say, Mr. Kurniawan's acceptance of responsibility.  Even if
we were in the guidelines regime, I don't believe that he would
qualify here for acceptance of responsibility credit.  Let me
explain that.

          United States Sentencing Guidelines 3E1.1, which is
called acceptance of responsibility, says, among other things,
that if the defendant clearly demonstrates acceptance of
responsibility for his offense, decrease the offense level by
two levels.  It goes on to say in B that if the defendant
qualifies for a decrease under subsection A, the one I just
read, the offense level determined prior to the operation of
subsection A is level 16 or greater.  And upon motion of the

E87MKURS

          government stating that the defendant has assisted authorities

          in the investigation of a prosecution of his own misconduct by

          timely notifying authorities of his intention to enter a plea

          of guilty, thereby permitting the government to avoid

          preparation for trial and permitting the government and the

          Court to allocate their resources efficiently, decrease the

          offense level one additional level.

                   So what does this mean?  This means that if there is

          acceptance of responsibility as defined, you decrease the

          offense level by two and in some circumstances by one

          additional level.  I don't believe that the arguments for

          acceptance of responsibility are persuasive here, and I would

          deny that application.  It's clear to the Court that the

          defendant has not, in fact, either at the trial or even here

          during the sentencing phase, accepted responsibility for his

          illegal actions, except through a generalized statement, and I

          sincerely believe the statement that he is sorry for the

          position that he has placed himself in.  He never specifies the

          details of what he did that he believes is wrong, legally

          wrong, with respect to the wine fraud.  And with respect to the

          Fine Art Capital fraud also found by the jury, he makes no

          effort to justify that in any specificity either.

                   In his sentencing letter to the Court Mr. Kurniawan

          does not say what exactly he did that was illegal.  What is he

          so sorry about.  Which frauds.  Mr. Mooney at trial said this.

E87MKURS

<br>

1         What do we know.  The first thing that we know is that

2    in these wine markets counterfeits are rampant.  And to a

3    degree he, referring to Mr. Kurniawan, did commit wine heresy,

4    but not the kind of wine heresy that constitutes a fraud

5    because he wasn't doing it to defraud people.  Did he go out

6    there attempting to defraud people?  No, he didn't.  He went

7    out there wanting to be part of the club, wanting to show off.

8    Did that make him do some things that maybe he shouldn't have

9    done?  Perhaps.  Probably.  He may have gone out there, he may

10   have messed with some of them.  He may have recorked and

11   reconditioned.  They, the government, haven't proven their case

12   beyond a reasonable doubt.

13         Now, it is perfectly proper for counsel to make

14   whatever arguments he has or at his disposal, so I'm not in any

15   way suggesting that Mr. Mooney has done anything incorrect or

16   wrong.  But I think he does point out or it's clear to me that

17   there is no evidence either in Mr. Kurniawan's statement or his

18   letter to the Court or anywhere in the transcript that he takes

19   specific responsibility for the crimes that the jury found that

20   he has committed.

21         We also find in the transcript the following in the

22   sentencing submissions.  These are quotations.  Rudy learned

23   that everybody expected there to be counterfeits.  In fact,

24   part of the contest was to see who could figure out what was

25   real and what was fraudulent.  The remedies if you got a bad

E87MKURS

bottle were to drink it and point out how it was wrong, or just

put it up for auction so that it would pass to the next guy

down the line.  Trying to keep up with the very wealthy members

of the elite wine collector group was expensive, and Rudy

started to see himself as part of their world.  With the

additional money coming in from the advances, he was able to

play the part.  But in doing so he was spending large sums.

The required restaurants, clothing and jewelry were very

expensive.  The submission goes on to say:  Individuals who can

afford to pay thousands of dollars for a bottle of wine are

members of a sophisticated class and have resources and

extraordinary remedies at their fingertips.  They have regular

lawyers, sometimes phalanxes of them at their call.  It is thus

clear that the consequences of wronging them are not likely to

go unpunished.  They can and will take care of themselves.

        To the high-end wine market, primarily represented by

a small group of collectors and the auction houses that cater

to them, seems to recognize, even accept that fraudulent wine

is part of its culture.  This is in the defense submission.  It

is of note that in spite of years of controversy, open general

acknowledgement of the phenomena and many thousands of blog

entries discussing what is real and what is not, the market has

shown no inclination to correct itself.  And then, finally,

from the defense, it seems clear no matter how counterintuitive

it may be, that no sentence that this Court imposes will have

E87MKURS

any impact on this trade, the market, or its participants.
Only the buyers and sellers themselves can meaningfully affect
this practice and protect themselves, and they can do it
easily.

        I am not so sure that those statements, me personally,
I don't accept those statements as true.  I do think that the
Court can certainly, in part, impact fraudulent behavior, deter
it to some extent in the course of today's sentencing.  These
arguments are unconvincing to me.

        I note again that Mr. Kurniawan did not even address
how he allegedly accepted responsibility for the fraud
committed against Fine Art Capital except to note that Fine Art
Capital was fully repaid, principal and interest, on its loan,
and all costs incurred from the sale of the security pledged
for the loan.  I don't think that this is legally sufficient.

        In the Court's view, the defendant has not clearly
accepted responsibility for his actions, although surely he
regrets the position he is now in.  Although the defendant may
not have testified at trial -- incidentally, I find no fault in
the fact that defendant went to trial.  He has every right to
do that, as every defendant does, because every defendant is
presumed to be innocent unless and until the jury determines
otherwise or there is a guilty plea.  I'm not in the least bit
faulting his exercise of his right to have a trial.

        Although he did not testify at the trial and he had no

E87MKURS

1    obligation to do that either, an affirmative defense was

2    presented.  Expert, Mr. C. Robert Collins testified, among

3    other things, on behalf of the defense, that authentic wine can

4    end up with many different labels.  And when asked by defense

5    counsel, and has that made it more difficult to identify the

6    authenticity of many Burgundies, Mr. Collins replied,

7    absolutely.

8         I think that disposes of the legal issues.  Forfeiture

9    has been done by consent.  Number of victims I just indicated.

10   Loss amount I just indicated.  Restitution will we will come to

11   later, but I don't think there is any difference or much

12   difference at all between the defense and the government with

13   respect to restitution.

14         Let's move to the 18 U.S.C. 3553(a) factors and see if

15   we can make some sense of this story here.  If you analyze

16   those factors, this is what stands out, at least to me.

17         As to the nature and circumstances of the offense, I

18   think this was a very serious economic fraud or con -- that

19   word has been used, I think it applies -- a very serious crime

20   and a manipulation of the U.S. and international marketplace

21   for the buying and selling of fine wine.  It's not so much with

22   respect to or is in addition with respect to any individuals

23   who may have been harmed, but great harm, I think, by these

24   behaviors pose a threat to the U.S. and international

25   marketplace, not only for buying and selling fine wine, but for

E87MKURS

1     other products as well.

2            Mr. Kurniawan burst on the Los Angeles scene in or

3     about 2001 in his early twenties, presumably from a wealthy

4     Indonesian family, and bedazzled the high-end U.S. wine market,

5     no doubt, including many who perhaps should have known much

6     better, with his expert palate, expensive clothes and cars and

7     watches, his spectacular and seemingly generous tastings and

8     buying dinners for which he invariably picked up the tab.  His

9     financial assets at one point were estimated to be in and

10    around $41 million, including world class art and a voracious

11    appetite for buying and selling fine wine.

12           But at the heart of this crime, the con I would say,

13    Mr. Kurniawan cleverly over time included wine manufactured in

14    his Los Angeles kitchen and repackaged in empty famous vintage

15    bottles which he had sent to his home in and among the likely

16    genuine bottles of wine that he also sold, until rumors of

17    counterfeiting overtook him and these rumors became criminal

18    reality.

19           As to the history and characteristics of the

20    defendant, we don't know much, but we have learned, it appears

21    he comes from a wealthy Indonesian family of Chinese descent.

22    Wealth is stated in the presentence investigation report to be

23    in the field of real estate.  He is educated and has lived in

24    the United States since he has been 16 years of age, as far as

25    I can tell.  He has two brothers who were interviewed in

E87MKURS

1    connection with the presentence investigation report, I think

2    at my suggestion that there be family members interviewed.  And

3    they seem to think that this is just business and don't seem

4    really to get the seriousness of Rudy's criminal convictions.

5    His mother lives in Los Angeles, supported by the two brothers.

6            That's as much really as we know, as I know about

7    Mr. Kurniawan's background.

8            The need for the sentence imposed to reflect the

9    seriousness of the offense, to promote respect for the law, to

10   provide just punishment, the Court finds, as noted, that

11   Mr. Kurniawan's frauds are very serious because the amounts of

12   money, the amount of loss is somewhere between 20 and $50

13   million.

14           But perhaps even more important, because of the

15   negative light they cast upon the marketplace and the good

16   names of some of our leading institutions, not just in France,

17   but here as well, some of our global trading partners,

18   particularly in Burgundy, France, who, among others, helped

19   burst the wine fraud Kurniawan bubble and crucially came to New

20   York City to testify in the Kurniawan trial.

21           With respect to deterrence, here we speak both of

22   specific and general deterrence and both are enormously

23   important in this sentencing, perhaps general deterrence being

24   more important.  First, as to Mr. Kurniawan, that would be

25   specific deterrence.  We know what I've said about him

E87MKURS

historically.  But we don't know really what motivated this

bold, grandiose, unscrupulous, but destined to fail con.  We

need a sentence that removes him from the marketplace to deter

his further criminality.

          Second, and, as I say, perhaps even more important

than others, we need to make clear to other would-be

counterfeiters or people who would defraud that they will

receive significant punishment in the form of jail time if they

attempt to manipulate our commerce and our trade relationships

by committing fraud.

          And then as to the factor of protecting the public

from further crimes, many of the people who were directly

impacted by Mr. Kurniawan's frauds are wealthy, and no doubt

about that, and can take care of themselves pretty much as has

been shown.  We all recognize that.

          But the public at large needs to know that our food

and our drink are safe and are what's on the label and not some

homemade and potentially unsafe witch's brew.  And the public

needs to know that our economic dealings are on the up and up

and that our criminal justice system will do its part to help

stamp out fraud.

          There is another factor, providing the defendant with

needed educational or vocational training or medical care or

other correctional treatment, that does not seem to be a

significant factor in this case.

E87MKURS

1          We look at the kind of sentences available, the kinds

2     of sentence and sentencing range established in the sentencing

3     guidelines, which, fundamentally, by my calculations, are 108

4     to 135 months of incarceration.  We are looking at any policy

5     statements issued by the sentencing commission, seek to avoid

6     unwarranted sentencing disparity among similarity-situated

7     defendants, and to provide for restitution.

8          As I've just mentioned, the applicable sentencing

9     guideline range in this case is 108 to 135 months of

10    incarceration.  I computed the offense level to be 31 and the

11    criminal history category to be I.  I'm somewhat lower than the

12    government, higher than the defendant, lower still than the

13    probation department.

14         When you consider all of these 18 U.S.C. 3553(a)

15    factors, here is what conclusions I drew.  Mr. Kurniawan is 37

16    years old.  He resides in the U.S., without permission, after

17    having been denied asylum in March 2001.  He was ordered to

18    self deport.  He appealed that decision.  The appeal was

19    dismissed on or about March 25, 2003.  And he was, again,

20    ordered to deport within 30 days.  He has a college education,

21    appears to have been in the United States since the able of 16.

22    He is a citizen of Indonesia and is in the U.S. illegally

23    following the denial of his asylum petition.  He is single, has

24    no children.  He appears to be from a wealthy Indonesian family

25    of Chinese descent.  He was raised in Indonesia by his parents

E87MKURS

and at the age of 16 entered the U.S., from my understanding,

legally, with a student visa.  He lived for a time with two of

his brothers in California.  They now, as I understand it,

live, one in Jakarta and the other in Hong Kong.

When the defendant was in his early twenties his

mother entered the United States and the defendant thereafter

resided with her in California where she, having been granted

asylum, still lives.  Defendant appears to have been an

important caregiver for his mother, who is now approximately 66

years of age, and they speak by phone regularly.  It appears

that defendant's employment was exclusively related to the

purchase and sale of wine.  As I indicated before, both

defendant's mother and two brothers were interviewed by the

probation department.

Victims.  I have noted before that I believe that

there are seven, less than ten, that is.  That impacts the

offense level.  I've taken that into account in arriving at an

offense level of 31.  I have looked at United States Sentencing

Guidelines 2B1.1 and application note 1 and also United States

v. Abiodun, 356 F.3d 162, a Second Circuit case from 2008.

Restitution.  Restitution is owed to those individuals

with identifiable actual losses.  This is somewhat different

and the restitution amount can and in this case is different

than the loss amount.  Because loss amounts include actual and

intended loss, there are individuals or entities who have loss

E87MKURS

1   amounts that are higher than their restitution amounts.

2   Restitution awarded by the Court is also reduced by any

3   reimbursement already received by the victims.  The restitution

4   is payable to the clerk of court for disbursement to the

5   following victims.

6           Before I get to those names, I want to use a moment to

7   give you some more citations with respect to restitution.  One

8   is United States v. Maurer, 226 F.3d 150, Second Circuit case

9   from 2000.  Another is United States v. Schwamborn, 542, Fed

10  Appx 87, a Second Circuit case from 2013.  It's a summary

11  order.

12          The persons to whom restitution is owed are the

13  following:  Formerly we had included Mr. Koch on the list.  But

14  as you know, by letter dated July 24, 2014, counsel for

15  Mr. Koch said that he is withdrawing his claim for restitution

16  in this case.

17          Michael Fascitelli, $3,651,800, determined from expert

18  reports of Mr. Fascitelli's wines and valuation provided by

19  Mr. Kurniawan.  By letter dated July 18, 2014, the defense has

20  said the following:  Mr. Fascitelli's claim for restitution

21  should be reduced to 69 percent of the figure that he paid, 5.5

22  million, so that number came to 3,795,000.  My figure is

23  somewhat lower than that figure.  This figure includes allowing

24  the 69 percent even relating to wines for which he paid but

25  never received.  At the hearing argument on July 24, 2014,

E87MKURS

defense counsel said it was our understanding that 5.5 million

represents what Mr. Fascitelli bought all together.  So the 69

percent is what we see when we look at these reports and, quite

frankly, it's a fair figure to apply.  We think it's an

appropriate figure to apply, and we think it gives a fair

number to Mr. Fascitelli.  The defense number, as I say, is a

little bit higher than the number I have come up with, and that

number is $3,651,800.

        The number for Reid Buerger for restitution is

$192,254.  That reflects the amount purchased from Acker Merral

& Condit at the October 2006 auction that Mr. Buerger attempted

to sell at another auction who questioned the authenticity of

the wines.  I think defense counsel agrees with this figure.

        The number that I have come up with for David Doyle,

restitution is $15,111,000.  I've used a figure that defense

counsel has used, also.  That is $15,111,000.

        Brian Devine, restitution, $5,320,602.50.  According

to his affidavit, dated June 29, 2014, during the period 2003

to 2005, Mr. Devine made numerous purchases purportedly of rare

and expensive wine from Leny Tan.  These are the Leny Tan wines

that I described before.

        Andrew Hobson, $3,118,856 restitution.

        Jeffrey Levy listed by probation as a victim entitled

to restitution.  I don't think that is accurate and so I have

not set a restitution amount for Mr. Levy.

E87MKURS

1          Mission Fine Wines, there is agreement, as we have

2     heard before, among the parties and also with the consent of

3     Mission Fine Wines, that $2 million is the appropriate

4     restitution amount.

5          I think if you add these figures up, it will come to

6     or pretty close to $29,395,502.50.  I'm sorry.  That minimum

7     should be $28,405,502.50.  I took off the $990,000 to make my

8     figures compatible with the defense figures.  So the number is

9     somewhat lower.

10          Forfeiture.  Forfeiture is mandatory, even when

11     restitution is also imposed.  So there is forfeiture and

12     restitution, not one or the other.  These two aspects of a

13     defendant's sentence serve distinct purposes.  Restitution

14     functions to compensate the victim whereas forfeiture acts to

15     punish the wrongdoer.  The two remedies need not be at cross

16     purposes.  Although it is not bound to do so, the government

17     has the discretion to use forfeited assets to restore a victim

18     whom the defendant has failed to compensate.  The cite is

19     United States v. Blackman, 746 F.3d 137, a Fourth Circuit case

20     from 2014.

21          As you have heard at the July 24, 2014 proceeding in

22     this matter, the parties agreed to a forfeiture of $20 million,

23     and I signed an order to that effect.  I have also reviewed the

24     presentence investigation report in this case which was

25     approved on July 7, 2014, together with an addendum of that

E87MKURS

1   date, and there was a second addendum approved on that date,

2   and a sentencing recommendation also of July 7, 2014.

3          Some but not all of the written submissions that I

4   have received are dated July 18, 2014; May 24, 2014; May 1,

5   2014 from Mr. Mooney and Mr. Verdiramo; from the government

6   dated July 18, 2014; July 16, 2014; May 23, 2014; and May 12,

7   2014.  That was as of the July proceeding.  There have been

8   numerous additional submissions since then.  There are also

9   submissions dated April 25, 2014.  May 23, 2014 is the letter

10  from Mr. Koch.  There is also a letter submitted to probation

11  from Williams and Connelly dated June 18, 2014 on behalf of

12  Reid Buerger.

13         So I would ask you, Mr. Mooney, if you and

14  Mr. Kurniawan have had the opportunity to read and discuss the

15  presentence investigation report as well as the addendum and

16  sentencing recommendation and additional sentencing materials?

17         MR. MOONEY:  Yes, your Honor, we have.

18         THE COURT:  Mr. Kurniawan, you discussed those

19  materials with your attorney?

20         THE DEFENDANT:  Yes, your Honor.

21         THE COURT:  Do either of you have any remaining

22  objections to the contents of the presentence report?

23         MR. MOONEY:  No, your Honor.  I think the Court has

24  corrected those problems.

25         THE COURT:  Mr. Kurniawan, any?  No.

E87MKURS

1           How about the government?

2           MR. OKULA:  No, your Honor.

3           THE COURT:  I will return the presentence report to

4    probation, which is our usual practice.

5           And at this time, if you wish, Mr. Mooney,

6    Mr. Kurniawan, and Mr. Okula can have another opportunity to

7    address the Court, if you would like to.  You can also

8    incorporate what you've said before, if you would prefer.

9           Mr. Mooney, anything further?

10          MR. MOONEY:  Yes, your Honor.

11          I understand your Honor's concern with respect to the

12   potential impact of this case on international markets.  I

13   think it overstates to a certain extent the nature of that

14   because this only deals with the very highest-priced portions

15   of it and, in fact, doesn't deal with anything that is in

16   direct market from any of the vineyards.  It deals --

17          THE COURT:  I am not sure I understand that.

18          MR. MOONEY:  In other words, no product at these

19   prices is being sold out of the vineyards.  This is stuff

20   that's been bottled.  It's been sold.  It's old.

21          THE COURT:  Secondary market.

22          MR. MOONEY:  Or tertiary or who knows how many times

23   down there.  Because what makes them valuable is, it's material

24   that's still around after a really, really long time.  It's

25   like when I go into an old bookstore.  I've got an early

E87MKURS

edition of the writings of juveniles.  My purchase or

nonpurchase of that doesn't have any impact on the writer

because he's been dead for a really long time.  In fact, in the

cases of many of these wines, one of the difficulties was that

the winemakers have even been dead for a period of time.  I

think that's something to take into consideration when looking

at it in terms of the markets.  It did not directly impact the

relationships of the markets.

THE COURT:  We had three very much alive winemakers

here in court testifying, and they are very much alive.

MR. MOONEY:  They are very much alive and they came

here and they testified.  And they testified that this is a

problem.  And as we said before, one of the positives that came

out of this case is the focus that it put on this and the fact

that some practices are changing.  Mr. Ponsot himself is the

one that said, well, I first heard that people were

counterfeiting some of my wines.  And he first heard about it

in the Hong Kong market, not something that was done to

Mr. Kurniawan, but in the Hong Kong market, and said, I was

flattered at first.  And then later I decided, no, this is

potentially a problem because people might taste it and it

wasn't what it was supposed to be.

What happens is, the winemakers, the Chateaus, are

taking additional efforts now to make sure that wines are going

to be registered, that the bottles are going to be marked on

E87MKURS

the high end.  We will have a better system to be able to look

at.  If you go back and look at the letter from Devine, when he

was sent the Mission wines to look at, several of which he

actually authenticated, he said in there, one of the problems

with early wines is that different printing was used, different

labels were used.  Nobody cared very much about those things.

Now they care.  Now they are taking efforts.  There have been

changes that are made that are actually positive changes.

That's not to say that punishment isn't appropriate

and some deterrence isn't appropriate.  I just think it's

important to note that perhaps some good in some ways is coming

out of this, although from everything else that I'm hearing, it

doesn't seem to have changed anything that's going on in Hong

Kong, although interestingly, as we pointed out, the Susan

Twellman affidavit, which has the inventory, and she says in

her affidavit on the one hand, well, the market has been

affected.  But then on the other side you look at the current

values of these wines.

What Mr. Doyle is holding, according to what

Mr. Doyle's people are telling us now, would have been worth

twice the amount that he paid for it.  So the market doesn't

seem to have been deflated by virtue of this, because the

prices are up.  The bottom certainly hasn't dropped out.  There

have not been any economic injuries that have occurred as a

result of those things.  That's, I think, our position.  There

1    is something that we think is important with regards to those

2    aspects.

3           The Court has come up with a guideline, lower

4    guideline level of 108 months.  That's nine years.  That's a

5    long time.  That's a very, very long time under these

6    circumstances.  It's particularly long due to the fact that

7    because of his immigration status, he would have to serve out a

8    full 85 percent of that time.  He wouldn't have any other

9    options.  And then he would be held -- when all of that was

10   done, he served 85 percent of the guidelines sentence and then

11   at the end of that period of time he would go over to the heads

12   of the immigration, and who knows they would hold him before

13   they finally would dispose of what they are doing.  That in and

14   of itself is something the Court could take into consideration.

15   He would be entitled to up to 10 percent of that for halfway

16   house release.  Almost one year of a sentence would be time

17   that a person who was in the country legally or citizen would

18   potentially not have to face.  He is not going to get any of

19   those benefits.

20          Also because of his immigration status he is going to

21   have some difficulties in placement.  He would still qualify

22   for a low-level facility, but he wouldn't be able to

23   participate in any off-facility jobs, employment, or work like

24   that.  His immigration status will make him have to stay in the

25   facility.  That will make the service of time more difficult,

E87MKURS

more complicated, and certainly not as commodious as somebody

who does not have that impediment.  Those are factors.  His

status, I think, are factors that I think the Court should take

into consideration under 3553(a) in terms of imposing a

sentence which is below the guideline parameter.

Further, as we have said before, even though the Court

has determined that this is a serious financial fraud, and we

don't argue with that, it's still important to note that the

relative harm that was done to the various victims -- again, I

know I spent an awful lot of time talking about this.  But the

relative harm that I think would justify this Court in saying,

I am going to come down a little bit, because people were not

individually devastated.  And there really wasn't the capacity,

even, for people to be individually devastated.  Did it have an

impact on all sorts of thins that are going on?  Yes, it did.

Some of those are potentially good, some of those perhaps not

so good.

As I said before, there is no bodies.  Nobody died.

Nobody was seriously injured.  Nobody suffered any kind of

physical injury whatsoever from this.  Is it important for us

to know what's in the bottles that we are getting?  It is.

There has never been any indication that Mr. Kurniawan put

anything in these bottles other than wines which he had blended

to taste like the great wines.

It's very interesting that Mr. Doyle drank a 1945 DRC,

E87MKURS

one of the number one wines that everybody has pointed to that

said, those were Rudy Kurniawan counterfeits, those were

counterfeits, he drank one of those bottles with a number of

other people, and they talked about it as being extraordinary.

There was even a newspaper article that was written on how

great this wine was that he drank.  He was very careful about

what he put in the bottles, very careful about what he put in

the bottles.  We are not having a situation where things were

put into the bottles that could be harmful to people.  There is

no indication that anything happened that had any threat of

harm whatsoever.  We do agree that that's important, but it's

important here that he was careful about what he put in.

            And I think it's important that what he put in the

bottles, he tried to put things in that would match the taste.

He didn't just have the bottle with the label that he had put

on it and people opened it up and it's just horrible.  For the

most part when people drank it, they thought it was the right

thing.

            We have another situation, another 1945 DRC.  This is

the one that was opened, everybody signed it, they drank it at

the party here in New York.  Mr. Devine came over himself and

drank it.  Everybody thought it was great.  We don't know.  Was

that one that was real or was it one that Mr. Kurniawan made.

For the most part, one of the reasons this went on for a fair

amount of period of time was the stuff that he made tasted

right.  People still got the experience.  They did get the

experience.  It was different than just saying, okay, I'm going

to phony up the label and then I am going to put stuff in it

that's going to be awful when people drink it.  That didn't

happen.  I think that's a factor that can be considered.

Look at the bottles.  Look at the evidence from trial

about what he was buying to put in.  He was spending 2 or $300

a bottle for the wines that he was getting, that he was mixing

together to put into the bottles.  He wasn't putting in the $7

wine that is the average wine that we hear about from people.

It's a very expensive wine.  It wasn't what people were buying.

No, it wasn't.  We never maintained that it was.  It was not.

It was absolutely not what they were buying.  They paying for

something else.  What they got was a replica.  It wasn't a bad

replica, but it was a replica that certainly wasn't worth it.

They should not have been selling it for $10,000, or $5,000, or

$4,000.  He should have been selling it for $300 to $400.  He

didn't do that.  He committed a crime.  He committed fraud.

Nine years is just way too long for that.  Just way too long

for that, your Honor.  A substantially shorter sentence would

still send all the messages that the Court wants and would be

an appropriate disposition in this case.

THE COURT:  Mr. Kurniawan, did you want to add

anything?

THE DEFENDANT:  No.  I'm just really sorry.

E87MKURS

1          THE COURT:  Mr. Okula.

2          MR. OKULA:  Your Honor, we have gone on at some

3     length.  I just want to make two quick points and I'll be very

4     brief, your Honor.

5          To the extent that Mr. Mooney is arguing that the

6     defendant's fraud, inasmuch as it has caused a change in

7     practices by the wine industry that he should be given some

8     credit for that, the Court should reject that.  The fact that

9     the bank may put up safety screens after they have been robbed

10    by a bank robber doesn't mean that the bank robber deserves

11    credit because they have caused a bank to be more careful.  So,

12    too, here in the fraud, your Honor.  Maybe we should have taken

13    a lot of steps earlier to try to put in anticounterfeit

14    devices.  But the fact that the defendant's fraud caused him to

15    do that doesn't mean that he deserves credit.

16         The second point, very briefly, your Honor, is one to

17    pick up on something that you observed earlier.  That is, that

18    no one really knows what's in those bottles.  The defendant

19    doesn't certainly have the safety precautions in place in his

20    kitchen to make sure that something isn't going to go awry with

21    what he's putting in the bottles.  As Mr. Mooney just conceded,

22    what he was selling, what he was doing in lying to people was

23    giving them something that was grossly inferior.

24         Your Honor referred earlier to the jargon of the

25    sentencing guidelines.  Using the jargon of the wine industry,

E87MKURS

1    your Honor, what the defendant was doing was engaging in the

2    prolific prevail of plonk.  It's a reference to inferior,

3    grossly inferior wine and that's what he was doing.  He was

4    lying to people, taking their money and giving them plonk.  For

5    that he deserves, based on his serious offense, a serious

6    sentence.

7              THE COURT:  I am going to adopt the findings of fact

8    in the presentence report unless defense counsel has any

9    further objections.

10             MR. MOONEY:  No.

11             THE COURT:  Mr. Kurniawan, any further objections?

12   No.  How about the government?

13             MR. OKULA:  No, your Honor.

14             THE COURT:  I am going to state the sentence I intend

15   to impose and then I am going to impose it.

16             The guideline range, as I've calculated it, is 108 to

17   135 months.  The offense level is 31.  The criminal history

18   category is I.  I intend to impose a sentence of 120 months of

19   incarceration.  I intend, also, to impose a term of supervised

20   release following incarceration of three years, subject to what

21   are called the mandatory conditions which are that defendant

22   not commit another federal, state, or local crime; two, that he

23   not illegally possess a controlled substance; three, that he

24   not possess a firearm, dangerous weapon or destructive device;

25   and, four, that he refrain from any unlawful use of a

E87MKURS

1     controlled substance.  That he be required to submit to one

2     drug test within 15 days of placement on supervised release and

3     at least two unscheduled drug tests thereafter as may be

4     directed by the probation officer.

5          In addition, he will be required to comply with what

6     are called standard conditions 1 through 13, plus these:  He

7     shall be supervised in his district of residence.  That assumes

8     that there is no deportation.  To the extent that assumes that

9     in the event he were released for some reason in the United

10    States, he would be subject to supervision in his district of

11    residence.  And in that case he would be required to report to

12    probation within 48 hours of release from custody.  He is

13    required, also, to cooperate with the Department of Homeland

14    Security, Bureau of Citizenship and Immigration Services in

15    connection with any proceedings they may bring to determine his

16    status in the United States.  And he will be required to abide

17    by their rules, regulations, and laws.  In addition, he is

18    required to file all past tax returns, if that has not

19    occurred, and pay all past due taxes, if there are any.

20         With respect to fine, I'm not imposing a fine.  The

21    financial penalties here are very steep and no fine is needed

22    in addition.

23         I am imposing restitution, as I said before, in the

24    amount of $28,405,502.50, payable to the clerk of court for the

25    benefit of the individuals that I identified who are entitled

E87MKURS

1    to restitution.

2         How this is to be paid during the term of

3    incarceration if the defendant is engaged in a BOP non-UNICOR

4    work program, the defendant shall pay $25 per quarter toward

5    these criminal financial penalties.  However, if he

6    participates in a Bureau of Prisons' UNICOR program as a grade

7    1 through 4, to be required to pay 50 percent of his monthly

8    UNICOR earnings toward the criminal financial penalties

9    consistent with BOP regulations at 28 CFR 545.11.  If any

10   portion of the financial penalties remains unpaid at the time

11   of Mr. Kurniawan's release from incarceration, the remainder

12   shall be paid during the term of supervision in equal monthly

13   installments.

14        We have also considered forfeiture, and I have signed

15   an order of $20 million forfeiture agreed to by the parties.

16        Going back for a moment to the payment schedule, I

17   have considered the factors set forth at 18 United States Code

18   Section 3663(a)(1)(B)(i) and 18, United States Code, Section

19   3664 in imposing restitution.  Among other things, I have

20   considered the amount of the loss sustained by victims as a

21   result of the offense, the financial resources of the

22   defendant, the financial needs and earning ability of the

23   defendant, and any dependents he may have and such other

24   factors as I've deemed appropriate.  In addition, I intend to

25   impose a $200 special assessment which is mandatory under 18

E87MKURS

1    United States Code, Section 3013.

2            Briefly, the reasons for the sentence.  First of all,

3    the offense level is 31.  The criminal history category is I.

4    The guideline range is 108 to 135.  I do believe that this

5    sentence is appropriate in light of the factors which we have

6    been analyzing most of this morning at 18, United States Code,

7    Section 3553(a).  And I think that this sentence meets those

8    criteria and objectives, considering the nature and

9    circumstances of the offenses to be very serious, the history

10   and characteristics of Mr. Kurniawan.  I think this sentence

11   reflects the seriousness of the offense, promotes respect for

12   the law, provides a just punishment, affords adequate

13   deterrence, both individual and general deterrence to criminal

14   conduct, protects the public from further crimes.

15           And so before I actually impose that sentence, I will

16   give defense counsel, Mr. Kurniawan, and the government one

17   more opportunity to comment.

18           MR. OKULA:  We have nothing further, your Honor.

19           MR. MOONEY:  Your Honor, I will just say again I think

20   for Mr. Kurniawan and for what he did and what he's involved

21   in, I think that this is harsh.  I would ask the Court to

22   reconsider at least going to the lower level of the guideline,

23   which would be 108 months.  That's a substantial sentence.

24   It's a guidelines sentence.  It doesn't even move outside.

25   It's a difference of only one year.  But it's a significant

E87MKURS

1    difference in terms of the potential impact upon Mr. Kurniawan.

2    Again, in recognition of the fact that because of his status,

3    there is so many benefits that he just won't have.

4           THE COURT:  Mr. Kurniawan, anything further?

5           THE DEFENDANT:  No.

6           THE COURT:  I would ask you to please stand and I

7    intend to impose the sentence.

8           So the guideline range, which is not mandatory, as we

9    have said many times today, is 108 to 135 months.  Having

10   considered the factors at 18 United States Code Section

11   3553(a), it is my judgment that the defendant, Rudy Kurniawan,

12   be committed to the custody of the Bureau of Prisons to be

13   imprisoned for a term of 120 months, followed by three years of

14   supervision subject to the mandatory and special conditions

15   that I mentioned before and incorporate here by reference.  No

16   fine.

17          Restitution in the total amount of $28,405,502.50 to

18   the individuals identified previously and incorporated here by

19   reference.  Payments to be made through the clerk of court.

20   Forfeiture in the amount of $20 million has already been agreed

21   to.  I also impose a $200 special assessment which is due

22   immediately and is mandatory.

23          And, again, I believe that this sentence comports with

24   the criteria and factors at 18 U.S.C. Section 3553(a), as I've

25   discussed and we have been discussing for a good part of today.

E87MKURS

1    And so I think this is the appropriate sentence.

2            Does either counsel, starting with the government,

3    know of any legal reason why this sentence should not be

4    imposed as so stated?

5            MR. OKULA:  We do not, your Honor.

6            MR. MOONEY:  No, your Honor.

7            THE COURT:  I hereby order the sentence to be imposed

8    as so stated.

9            Mr. Kurniawan, you have the right to appeal this

10   sentence.  If you are unable to pay the cost of an appeal, you

11   have the right to apply for leave to appeal in forma pauperis.

12   If you request, the clerk of court will prepare and file a

13   notice of appeal on your behalf immediately.

14           Do you understand your appeal rights?

15           THE DEFENDANT:  Yes, your Honor.

16           THE COURT:  Any open counts or aspects of the case the

17   government was seeking to resolve?

18           MR. OKULA:  No, your Honor.

19           THE COURT:  Starting with the government, did you wish

20   to add anything to today's sentencing proceeding?

21           MR. OKULA:  We do not, your Honor.

22           THE COURT:  How about the defense.

23           MR. MOONEY:  Your Honor, we would ask the Court to

24   recommend a designation to a facility in southern California,

25   specifically the Taft facility, which is near Bakersfield and

E87MKURS

1    is the closest facility to where Mr. Kurniawan's mother lives.

2               THE COURT:  Is it T-a-f-t?

3               MR. MOONEY:  Yes, your Honor.

4               THE COURT:  I will make that recommendation.  It's in

5    or near Bakersfield?

6               MR. MOONEY:  It's just outside of Bakersfield.  It's

7    in Taft, California, which is close by there.

8               THE COURT:  Mr. Okula, is there not an underlying

9    indictment here that we need to resolve?

10               MR. OKULA:  I don't believe so, your Honor.

11               THE COURT:  To the extent that there were, you would

12    ask me to dismiss it.

13               MR. OKULA:  Most respectfully, yes, your Honor.

14               THE COURT:  I think then I will make that

15    recommendation, counsel.

16               And I think that concludes our long work this morning.

17    And I wish you, Mr. Kurniawan, the very best of luck going

18    forward.  Thanks very much.

19                                o0o

20

21

22

23

24

25